Robert V. Prongay (SBN 270796)
  *rprongay@glancylaw.com*
Casey E. Sadler (SBN 274241)
  *csadler@glancylaw.com*
Charles Linehan (SBN 307439)
  *clinehan@glancylaw.com*
Garth Spencer (SBN 335424)
  *gspencer@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Lead Plaintiff Hartmut Haenisch*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE STABLE ROAD ACQUISITION CORP. SECURITIES LITIGATION | Master File No. 2:21-CV-5744-JFW(SHKx) |
| | <u>CLASS ACTION</u> |
| | **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| | DEMAND FOR JURY TRIAL |

# <u>TABLE OF CONTENTS</u>

I.     NATURE OF THE ACTION AND OVERVIEW ........................................1

II.    JURISDICTION AND VENUE ............................................................4

III.   PARTIES ..................................................................................5

IV.    BACKGROUND REGARDING SRAC AND MOMENTUS.....................7

    A.   Special Purpose Acquisition Companies And Their Inherent Conflicts Of Interest ..........................................................7

    B.   Background Of SRAC: A SPAC Focused On The Cannabis Industry...............................................................................10

    C.   SRAC's Management Faced Pressure To Complete A Qualifying Business Combination By The May 13, 2021 Deadline.....................13

    D.   Background Of Momentus: A Space Industry Startup With No Revenue .............................................................................17

    E.   Momentus's Need For Cash Gave Its Management An Incentive To Conceal Problems That Might Prevent A Merger With SRAC ....18

V.     UNDISCLOSED ADVERSE FACTS KNOWN TO DEFENDANTS DURING THE CLASS PERIOD ....................................................19

    A.   The U.S. Government Determined That Momentus's Russian CEO Was A National Security Risk...................................................19

    B.   Momentus's Only Test Of Its Technology In Space Was A Failure ...............................................................................25

    C.   Momentus's Wildly Excessive Revenue Projections Ignored Its National Security Risks And Unproven Technology .........................28

    D.   SRAC Failed To Conduct Adequate Due Diligence .........................29

VI.    DEFENDANTS MISLED INVESTORS TO GAIN SUPPORT FOR THE MERGER .........................................................................32

    A.   Defendants Announce The Merger Agreement And Misleadingly Hype Momentus's Prospects .........................................................32

B.   Defendants Aggressively And Misleadingly Promoted The Proposed Merger Following Its Announcement .................................. 34

VII.   THE TRUTH EMERGES, CAUSING SRAC'S STOCK PRICE TO PLUMMET ........................................................................................ 36

A.   January 4, 2021 Disclosures Regarding Launch Delay ...................... 37

B.   January 25, 2021 Disclosures Regarding Kokorich's Resignation .... 38

C.   March 8, 2021 Disclosures Regarding Governmental Investigations ..................................................................................... 39

D.   May 4, 2021 Disclosures Regarding Loss Of Customers ................... 41

E.   May 24, 2021 Disclosures Regarding Further Launch Delays ........... 42

F.   June 29, 2021 Disclosures Regarding Failed Technology Test And National Security Issues ................................................................. 43

G.   July 13, 2021 Publication Of The SEC Order And SEC Complaint ........................................................................................... 48

VIII.   DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS ...................................................................................... 50

A.   Misleading Pre-Class Period Public Statements ................................ 50

B.   October 7, 2020 Merger Agreement Announcement ......................... 52

C.   October 13, 2020 Updated Investor Presentation .............................. 59

D.   November 2, 2020 Registration Statement ........................................ 59

E.   November 17, 2020 Analyst Day Presentation ................................... 67

F.   December 14, 2020 Amended Registration Statement And Updated Investor Presentation ............................................................ 67

G.   January 4-5, 2021 Press Release And Interviews ............................... 69

H.   January 25, 2021 Press Release .......................................................... 74

I.   March 8, 2021 Amended Registration Statement ............................... 75

J.   April 7, 2021 Preliminary Proxy Statement And Updated Investor Presentation ........................................................... 77

K.   May 4-5, 2021 Updated Investor Presentation ................................... 80

L.   June 29, 2021 Amended Registration Statement ................................ 82

IX.   ADDITIONAL SCIENTER ALLEGATIONS ............................................ 82

A.   SRAC And The SRAC Individual Defendants Knew Or Recklessly Disregarded The Falsity Of Their Statements ................. 83

B.   Momentus And The Momentus Individual Defendants Knew Or Recklessly Disregarded The Falsity Of Their Statements ................. 86

X.   LOSS CAUSATION .......................................................................... 91

XI.   CLASS ACTION ALLEGATIONS ......................................................... 91

XII.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ............................................................ 93

XIII.   NO SAFE HARBOR ......................................................................... 95

XIV.   CAUSES OF ACTION ....................................................................... 96

XV.   PRAYER FOR RELIEF ...................................................................... 103

XVI.   JURY TRIAL DEMANDED ................................................................. 103

# **EXHIBIT LIST**

Exhibit 1 –  Securities and Exchange Commission Order Instituting Cease-And-Desist Proceedings In the Matter of Momentus, Inc. (July 13, 2021) (the "SEC Order")

Exhibit 2 –  Complaint in the matter of *Securities and Exchange Commission v. Mikhail Kokorich*, Case No. 1:21-cv-1869 (D.D.C. July 13, 2021) (the "SEC Complaint")

Exhibit 3 –  U.S. Department of Commerce, Bureau of Industry and Security, Export License Rejection Notice (Mar. 22, 2018), as filed in *SEC v. Kokorich*

Exhibit 4 –  Letter from Counsel for Mikhail Kokorich to the U.S. Department of Treasury, Committee on Foreign Investment in the United States (June 24, 2018), as filed in *SEC v. Kokorich*

Exhibit 5 –  Momentus email chain  Re: "Need El Camino Real Failure Review Board" (Nov. 27, 2019), as filed in *SEC v. Kokorich*

Exhibit 6 –  Momentus email chain Re: "Intent to Deny Notification from Commerce" (Nov. 12, 2020), as filed in *SEC v. Kokorich*

Exhibit 7 –  Letter from U.S. Department of Defense, Office of Foreign Investment Review to the Securities and Exchange Commission (Jan. 13, 2021), as filed in *SEC v. Kokorich*

Exhibit 8 –  Redlined version of the Amended Consolidated Class Action Complaint For Violations Of The Federal Securities Laws, dated November 12, 2021

Lead Plaintiff Hartmut Haenisch ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon his personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation, review and analysis of: (a) regulatory filings made by Stable Road Acquisition Corp. ("SRAC") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by SRAC and by Momentus Inc. ("Momentus")[1]; (c) an SEC cease and desist order relating to SRAC and Momentus; (d) documents filed in litigation initiated by the SEC relating to SRAC and Momentus; and (e) review of other publicly available information concerning SRAC and Momentus.

# I.   NATURE OF THE ACTION AND OVERVIEW

1.     This is a federal securities class action brought on behalf of persons and entities that purchased or otherwise acquired SRAC securities between October 7, 2020 and July 13, 2021, inclusive (the "Class Period"), excluding Defendants, seeking to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. During the Class Period SRAC's Class A common stock, public units,

---

[1] After the end of the Class Period alleged in this Amended Complaint, on or about August 12, 2021, pursuant to a business combination: (i) Stable Road Acquisition Corp. acquired Momentus Inc., (ii) Momentus Inc. merged into a subsidiary of SRAC named Project Marvel Second Merger Sub, LLC, and (iii) SRAC changed its name to Momentus Inc. As used in this Amended Complaint, the terms Momentus Inc. or Momentus refer to the corporation that existed by that name (and previously by the name Space Apprentices Enterprise Inc.) prior to the business combination, and the terms Stable Road Acquisition Corp. or SRAC refer to the corporation known by that name prior to the business combination and currently known as Momentus Inc.

1   and public warrants were publicly traded on the Nasdaq Capital Market under the
2   ticker symbols "SRAC," "SRACU," and "SRACW," respectively.

3       2.    SRAC, Momentus, and their directors and officers, materially misled
4   investors regarding Momentus's business and future prospects in an attempt to gain
5   investor support for a proposed merger between SRAC, a special purpose
6   acquisition company (or "SPAC") focused on the cannabis industry, and Momentus,
7   a privately owned space industry startup with no revenue.

8       3.    SRAC had attempted to locate an appropriate cannabis/marijuana
9   related company to acquire as was its stated purpose but they were unable to locate
10   one prior to the May 13, 2021 deadline upon which SRAC would need to repay
11   $172.5 million to shareholders if no successful merger was consummated.  In order
12   to prevent this return of money and to enrich the Defendants, who stood to make
13   tens of millions of dollars from any merger, SRAC rushed to enter into the merger
14   with Momentus (even though Momentus was not in the cannabis industry).  To
15   make sure that shareholders approved this last-minute deal, Defendants misleadingly
16   touted the proposed merger and Momentus's prospects.

17       4.    This was confirmed by the SEC itself when on July 13, 2021, the SEC
18   publicly detailed Defendants' misconduct in: (i) a cease and desist order (the "SEC
19   Order," attached hereto as Exhibit 1) against Defendants Momentus, SRAC, SRC-
20   NI Holdings LLC (the "Sponsor" of SRAC) and Brian Kabot (SRAC's CEO); and
21   (ii) a civil complaint (the "SEC Complaint," attached hereto as Exhibit 2) filed
22   against Defendant Kokorich.[2]  According to the SEC Order and SEC Complaint,
23   Defendants had misleadingly touted the proposed merger and Momentus's prospects
24   while failing to disclose that (i) multiple federal agencies had determined that

25   _____
26   [2] While the SEC is actively litigating its case against Defendant Kokorich, he fled
27   the country following his abrupt resignation in January 2021 amid increasing
     governmental scrutiny of national security concerns relating to him.
28

Momentus's then-CEO Defendant Kokorich, who is a citizen of Russia with ties to the Russian government and who is not a citizen or legal permanent resident of the United States, posed an unacceptable national security risk, (ii) Momentus had never successfully tested its technology in space as claimed, (iii) as a result, Momentus's financial projections of immediate, explosive revenue growth were highly misleading, and (iv) SRAC's superficial due diligence of Momentus failed to provide any reasonable basis for its public statements about the company. Moreover, the SEC Order and Complaint explained that Momentus, SRAC, and Kabot agreed to pay the SEC fines totaling over $8 million, the Sponsor agreed to give up SRAC stock potentially worth millions of dollars, and Defendants agreed to allow certain investors to cancel agreements to purchase SRAC securities.

5.    In a July 13, 2021 press release announcing the SEC Order and the SEC Complaint, SEC Chair Gary Gensler specifically confirmed that Defendants "misled the investing public" and that Stable Road had "fail[ed] to undertake adequate due diligence to protect shareholders." As Gensler explained:

> This case illustrates risks inherent to SPAC transactions, as those who stand to earn significant profits from a SPAC merger may conduct inadequate due diligence and mislead investors . . . Stable Road, a SPAC, and its merger target, Momentus, both misled the investing public. The fact that Momentus lied to Stable Road does not absolve Stable Road of its failure to undertake adequate due diligence to protect shareholders. Today's actions will prevent the wrongdoers from benefitting at the expense of investors and help to better align the incentives of parties to a SPAC transaction with those of investors relying on truthful information to make investment decisions.

6.    Although the SEC's actions prevented Defendants from causing further harm to investors, these actions came too late for the many investors who had purchased SRAC securities during the October 7, 2020 to July 13, 2021 Class Period. These investors paid excessive prices for SRAC securities, which prices were artificially inflated throughout the Class Period by Defendants' materially false and misleading statements.

7.     As a result of Defendants' wrongful acts and omissions, and the resulting precipitous decline in the market value of SRAC's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

8.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. Defendant SRAC maintains its principal executive offices in this District.

11.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

12.     Defendant Kokorich is subject to personal jurisdiction because, among other things, he lived and worked in the United States during the relevant period, purposefully directed his business activities at the United States, and knowingly provided statements for use in materials used to promote securities transactions in the United States and to be used in SEC filings.

## III.   PARTIES

13.   Lead Plaintiff Hartmut Haenisch, as set forth in the previously filed certification (Dkt No. 46-2), incorporated by reference herein, purchased SRAC securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.   Defendant Stable Road Acquisition Corp. ("SRAC") was a special purpose acquisition company during the Class Period. SRAC was incorporated in Delaware. During the Class Period SRAC maintained its principal executive offices at 1345 Abbot Kinney Blvd. Venice, California 90291. During the Class Period, SRAC Class A common stock, warrants and units traded on the Nasdaq Capital Market under the symbols "SRAC," "SRACW" and "SRACU," respectively.

15.   Defendant SRC-NI Holdings, LLC ("Sponsor") served as the sponsor of SRAC during the Class Period. The Sponsor was formed in Delaware as a limited liability company. During the Class Period, the Sponsor's principal place of business was 1345 Abbot Kinney Blvd., Venice, California 90291.

16.   Defendant Brian Kabot served as Chief Executive Officer and Chairman of the board of directors of SRAC during the Class Period. During the Class Period Kabot was a manager of the Sponsor, shared voting and dispositive control over securities owned by the Sponsor, and was reported as beneficially owning securities owned by the Sponsor. During the Class Period Kabot's business address was c/o Stable Road Acquisition Corp., 1345 Abbot Kinney Blvd. Venice, California 90291.

17.   Defendant Juan Manuel Quiroga served as Chief Investment Officer and Secretary of SRAC during the Class Period. During the Class Period Quiroga was a manager of the Sponsor, shared voting and dispositive control over securities owned by the Sponsor, and was reported as beneficially owning securities owned by

the Sponsor. During the Class Period Quiroga's business address was c/o Stable Road Acquisition Corp., 1345 Abbot Kinney Blvd. Venice, California 90291.

18.   Defendant James Norris served as Chief Financial Officer and a director of SRAC during the Class Period. During the Class Period Norris was directly or indirectly a member of the Sponsor. During the Class Period Norris's business address was c/o Stable Road Acquisition Corp., 1345 Abbot Kinney Blvd. Venice, California 90291.

19.   Defendant James Hofmockel served as a director of SRAC during the Class Period. During the Class Period Hofmockel was directly or indirectly a member of the Sponsor. During the Class Period Hofmockel's business address was c/o Stable Road Acquisition Corp., 1345 Abbot Kinney Blvd. Venice, California 90291.

20.   Defendant Momentus, Inc. was a privately owned space industry startup that was an acquisition target of SRAC during the Class Period. Momentus was incorporated in Delaware.  During the Class Period Momentus's principal executive offices were located at 3050 Kenneth St., Santa Clara, California 95054.

21.   Defendant Mikhail Kokorich served as Chief Executive Officer and a director of Momentus during the Class Period, until his resignation effective immediately on or about January 25, 2021. During the Class Period Kokorich was a major shareholder of Momentus until he sold his shares to Momentus on or about June 8, 2021.  During the Class Period Kokorich's business address, through at least the time of his resignation, was c/o Momentus Inc., 3050 Kenneth Street, Santa Clara, CA 95054.

22.   Defendant Dawn Harms served as Chief Revenue Officer of Momentus during the Class Period, until Kokorich's resignation effective immediately on or about January 25, 2021, at which time Harms became interim CEO and a director of Momentus. During the Class Period Harms's business address was c/o Momentus Inc., 3050 Kenneth Street, Santa Clara, CA 95054.

23.     Defendant Fred Kennedy served as President of Momentus during the Class Period. During the Class Period Kennedy's business address was c/o Momentus Inc., 3050 Kenneth Street, Santa Clara, CA 95054.

24.     Defendants Kabot, Quiroga, Norris, and Hofmockel are referred to herein as the "SRAC Individual Defendants."

25.     Defendants Kokorich, Harms, and Kennedy are referred to herein as the "Momentus Individual Defendants."

26.     The SRAC Individual Defendants and the Momentus Individual Defendants are referred to herein as the Individual Defendants.

## IV.   BACKGROUND REGARDING SRAC AND MOMENTUS

### A.   Special Purpose Acquisition Companies And Their Inherent Conflicts Of Interest

27.     Special purpose acquisition companies, or SPACs, are publicly traded companies with no business activities, formed specifically to acquire an existing operating company. SPACs typically raise capital for the acquisition through an initial public offering ("IPO"), and that capital is held in trust for a specific period of time.

28.     If a merger or acquisition is successfully made within the allocated time frame, founders and managers of the SPAC can profit through their ownership of the SPAC's securities (typically about 20% of the SPAC's stock, in addition to warrants to purchase additional shares). However, if an acquisition is not completed within that time frame, then the SPAC is dissolved and the money held in trust is returned to investors, with no compensation paid to the founders and managers of the SPAC, whose SPAC securities expire worthless. Accordingly, the founders and management team of a SPAC are highly incentivized to complete an acquisition within their deadline, even if the benefits of that transaction for the public shareholders of the SPAC are dubious.

29.     The process of an acquisition target company merging with a publicly traded SPAC is in many respects similar to a traditional IPO, in that a previously private company becomes publicly traded. However, SPAC transactions and IPOs have certain key differences. In a traditional IPO banks underwrite the offering and perform substantial due diligence in order to evaluate the company going public, to formulate appropriate disclosures to prospective investors, and to accurately price its securities. However, in a SPAC transaction there are no underwriters, and so the amount of due diligence performed, and the disclosures surrounding this due diligence, are solely determined by the SPAC and its controlling persons, who have strong incentives to agree to, and gain shareholder approval for, an acquisition regardless of its true merits.

30.     Typically, common stockholders of a SPAC are granted voting rights to approve or reject the business combination proposed by the management team. Thus, when the management team identifies a target, a merger proxy statement must be distributed to all SPAC stockholders, which includes the target company's financial statements and the terms of the proposed business combination. Public stockholders in SPACs rely on management of the SPAC and the target company to honestly provide accurate information about any contemplated transactions.

31.     Amidst a recent boom in SPAC IPOs and acquisitions, SEC officials have noted widespread concerns including "risks from fees, conflicts, and sponsor compensation, . . . and the potential for retail participation drawn by baseless hype," and additional concerns regarding whether SPAC sponsors have "sufficient incentives to do appropriate due diligence on the target and its disclosures to public investors, especially since SPACs are designed not to include a conventional underwriter."[3]

---

[3] John Coates, Acting Director, SEC Division of Corporation Finance, Apr. 8, 2021, SPACs, IPOs and Liability Risk under the Securities Laws, *available at*
(footnote continued)

32.     Similarly, SEC Chair Gary Gensler recently testified to Congress, "the surge of SPACs raises a number of policy questions. First and foremost, are SPAC investors being appropriately protected? Are retail investors getting the appropriate and accurate information they need . . . ?"[4]

33.     Numerous other commentators have similarly noted the conflict of interest between SPAC management and shareholders with respect to the completion of a business combination. For example, in a paper forthcoming in the Yale Journal on Regulation, law professors at Stanford and New York University address "misaligned incentives inherent in the SPAC structure," including that "the sponsor has an incentive to enter into a losing deal for SPAC investors if its alternative is to liquidate."[5]   Based on empirical research of post-merger returns to SPAC shareholders, that paper goes on to conclude that "SPAC sponsors have proposed losing propositions to their shareholders, which is one of the concerns raised by the incentives built into the SPAC structure. . . . [S]ponsors do quite well, even where SPAC shareholders have experienced substantial losses."

34.     As noted by SEC Chair Gensler in his July 13, 2021 comments accompanying the announcement of the SEC Order and the SEC Complaint against Defendants, "[t]his case illustrates risks inherent to SPAC transactions, as those who stand to earn significant profits from a SPAC merger may conduct inadequate due diligence and mislead investors." As set forth herein, SRAC and Momentus

---

https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws.

[4] Gary Gensler, May 26, 2021, Testimony Before the Subcommittee on Financial Services and General Government, U.S. House Appropriations Committee, *available at* https://www.sec.gov/news/testimony/gensler-2021-05-26.

[5] Klausner, Michael D. and Ohlrogge, Michael and Ruan, Emily, A Sober Look at SPACs (Oct. 28, 2020) Yale Journal on Regulation, Forthcoming, *Available at*: https://ssrn.com/abstract=3720919.

exemplify SPAC conflicts of interest because the Defendants were incentivized to, and did, aggressively promote a proposed business combination between SRAC and Momentus based on materially false and incomplete information that understated the risks to Momentus's business, overstated Momentus's future prospects, and resulted in a grossly excessive proposed valuation of Momentus, all of which artificially inflated the prices of SRAC securities during the Class Period.

## B.    Background Of SRAC: A SPAC Focused On The Cannabis Industry

35.    During the Class Period, SRAC was a special-purpose acquisition company, which was incorporated on May 28, 2019 for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. SRAC operated from an office in Venice, California.

36.    SRAC filed its IPO prospectus (the "IPO Prospectus"), used to market its shares to investors, with the SEC on November 8, 2019. On or about November 13, 2019, SRAC completed its IPO, selling 17,250,000 units at $10.00 per unit and generating gross proceeds of $172.5 million. Simultaneously with the consummation of the IPO, the Sponsor, which was SRAC's sponsor and an affiliate of certain of SRAC's officers and directors, participated in a private placement of a total 545,000 private placement units for $10.00 per unit, generating additional gross proceeds of $5.45 million. The IPO and concurrent private placement resulted in net proceeds of $172.5 million placed in SRAC's trust account.  Following its IPO, SRAC's public units, Class A common stock and public warrants were publicly traded on the Nasdaq Capital Market under the ticker symbols "SRACU," "SRAC" and "SRACW," respectively.

37.    During the IPO and afterwards, the directors and officers of SRAC, who also controlled the Sponsor, held themselves out to investors as highly experienced businesspeople, with successful track records in acquiring and growing

businesses. In particular, the directors and officers of SRAC held themselves out to investors as highly experienced in the cannabis industry, which they repeatedly stated would be SRAC's focus for completing an acquisition.

38.   From SRAC's IPO and throughout the Class Period, SRAC had only three officers: Defendants Kabot, Norris, and Chief Investment Officer Quiroga. Apart from these three officers, SRAC had no employees.

39.   At the time of its IPO SRAC had five directors: Defendant Kabot (Chairman), Defendant Norris, Defendant Hofmockel, March Lehmann, and Kellen O'Keefe. On December 23, 2019 Ann Kono joined SRAC's board. SRAC's board consisted of these six members throughout the Class Period, apart from the resignation of O'Keefe effective immediately on March 24, 2021.

40.   SRAC was led by Defendant Kabot, who served as SRAC's CEO and Chairman since its inception. In the IPO Prospectus, SRAC repeatedly touted Kabot's investment experience, and in particular his investment experience in the cannabis industry. For example, SRAC stated "Mr. Kabot is well qualified to serve as a director due to his extensive investing and advisory experience in the cannabis industry."

41.   SRAC similarly touted the cannabis industry experience of directors O'Keefe and Lehmann, stating in the IPO Prospectus that "Mr. Lehmann is well qualified to serve as a director due to his extensive investing and advisory experience in the cannabis industry," and describing Lehmann's roles as an officer in two cannabis industry companies.

42.   SRAC also touted the investment experience of Defendants CFO Norris, Chief Investment Officer Quiroga, and director Hofmockel. SRAC stated in the IPO Prospectus that " Mr. Norris is well qualified to serve as a director due to his extensive investment management experience," and similarly stated that "Mr. Hofmockel is well qualified to serve as a director due to his extensive investing and advisory experience." SRAC touted Defendant Quiroga's "over 20 years of

experience in the financial sector." After Kono joined the board, SRAC told investors that "Ms. Kono is well qualified to serve as a director due to her extensive advisory experience."

43. The IPO Prospectus did not disclose, for any of its directors or officers, any experience with satellites, the space industry, engineering, national security regulations, or any related matters. SRAC's directors and officers had no meaningful experience in these subjects.

44. In its IPO Prospectus, SRAC repeatedly emphasized that its business strategy and source of competitive advantage would be a focus on the cannabis industry. For example SRAC stated, "[o]ur strategy is to pursue one or more business combinations with companies servicing and operating adjacent or ancillary to, the cannabis sector but which are not directly involved in the production, distribution and sale of cannabis (i.e. businesses that 'touch the plant')." SRAC likewise stated, "[w]hile we may pursue an initial business combination target in any business or industry, we intend to focus our search on companies in the cannabis industry."

45. SRAC assured investors that it believed its management team "is well positioned to identify and evaluate businesses within the cannabis sector that would benefit from their skills and access to the public markets," and that its management team offers "a deep network of contacts, in the cannabis sector." SRAC further stated that "Mr. Kabot and Mr. Quiroga have, in the aggregate, executed over 20 transactions within or ancillary to the cannabis sector and have been responsible for investing over $150 million within or ancillary to the cannabis sector since July 2017."

46. The IPO Prospectus mentions "cannabis" 281 times, but contains no references to satellites, the space industry, engineering, national security regulations, or any related matters.

47.     SRAC's intense focus on the cannabis industry continued beyond its IPO. For example, in its SEC Form 10-K annual report filed March 26, 2020, SRAC repeated many of its IPO Prospectus statements regarding the cannabis experience of its management and its focus on the cannabis industry. For example, SRAC stated, "[o]ur strategy is to pursue one or more business combinations with companies servicing and operating adjacent or ancillary to, the cannabis sector but which are not directly involved in the production, distribution and sale of cannabis (i.e. businesses that 'touch the plant')." SRAC's SEC Form 10-Q quarterly report field August 11, 2020 likewise repeated that "[a]lthough the Company is not limited to a particular industry or sector for purposes of consummating a Business Combination, the Company is focusing its search on companies in the cannabis industry."

48.     SRAC's other SEC filings subsequent to the IPO and prior to its October 7, 2020 announcement of the Momentus merger agreement similarly contain numerous references to cannabis, but no references to satellites, the space industry, engineering, national security regulations, or any related matters.

### C.     SRAC's Management Faced Pressure To Complete A Qualifying Business Combination By The May 13, 2021 Deadline

49.     Due to the SRAC Individual Defendants' ownership interests in SRAC and the terms and financial structure of SRAC as a SPAC, the SRAC Individual Defendants possessed strong financial incentives to complete a qualifying transaction by the May 13, 2021 deadline.  As that deadline grew nearer, the SRAC Individual Defendants faced increasing pressure to complete a transaction irrespective of the merits of that transaction for SRAC's public shareholders.

50.     SRAC was subject to certain restrictions in its amended and restated certificate of incorporation regarding its pursuit of an acquisition.  First, SRAC only had 18 months to complete a business combination from the closing date of the IPO. If SRAC did not complete a business combination in time (*i.e.*, by May 13, 2021) or

obtain postponement of this deadline, its corporate existence would cease, except for purposes of winding up its affairs and liquidating.  SRAC was required to hold the approximately $172.5 million of net proceeds from its IPO in a trust account, and these funds were to be released only upon the consummation of a qualifying business combination, or in the case of liquidation to return the funds to SRAC's investors.

51.    Second, if SRAC's stockholders approved an amendment to the amended and restated certificate of incorporation that would affect the substance or timing of SRAC's obligation to redeem 100% of the public shares if SRAC did not complete a business combination on time, SRAC was required to provide the holders of its public shares with the opportunity to redeem all or a portion of their public shares upon approval of any such amendment. Attempting to obtain such a postponement of its deadline for a business combination thus presented serious risks that (i) shareholders would not approve the postponement and so SRAC would be forced to liquidate if it failed to complete a transaction on time, or (ii) if a postponement was approved, shareholders may decide to redeem SRAC shares in amounts that would significantly deplete SRAC's $172.5 million trust account and jeopardize its ability to complete a transaction even with an extended deadline.

52.    The directors and officers of SRAC acquired a significant financial interest in SRAC prior to the IPO, through their interests in and control over SRAC's Sponsor.  Each of SRAC's officers and directors was, directly or indirectly, a member of the Sponsor.  The Sponsor's board of managers was comprised of Edward K. Freedman, Defendant Kabot and Defendant Quiroga. SRAC reported each of Freedman, Kabot, and Quiroga as beneficially owning the securities owned by the Sponsor, and reported that these individuals shared voting and dispositive control over such securities.

53.    In June 2019 the directors and officers of SRAC caused SRAC to issue the Sponsor 4,312,500 "founder shares" of SRAC Class B common stock for an

aggregate purchase price of $25,000 in cash, or approximately $0.006 per share. These founder shares, purchased at a nominal price, were planned to represent approximately 20% of the outstanding shares upon completion of SRAC's IPO. The founder shares were identical to SRAC's publicly offered shares except for certain key features, including that the founder shares would have no redemption rights and would not participate in a liquidating distribution, and so would be worthless if SRAC did not complete a business combination by its deadline.

54.     Simultaneously with the consummation of the IPO, the Sponsor purchased 454,128 SRAC units for $10.00 per unit, totaling over $4.5 million, in a private placement.  These units consisted of private placement shares and private placement warrants, which were identical to SRAC's publicly offered units consisting of public shares and public warrants, except for certain key features, including that the private placement shares and private placement warrants would have no redemption rights and would not participate in a liquidating distribution, and so would be worthless if SRAC did not complete a business combination by its deadline.

55.     From immediately after SRAC's IPO through the end of the Class Period, SRAC reported that the Sponsor and/or its affiliate SRAC Pipe Partners LLC owned approximately 21.7% of SRAC's common stock. SRAC reported these shares as beneficially owned by the Sponsor's managers: Defendant Kabot, Defendant Quiroga, and Freedman.

56.     The interests of the Sponsor, its affiliate, and their beneficial owners in SRAC securities had substantial value. For example, SRAC reported that as of December 11, 2020, the Sponsor and its affiliate owned SRAC stock and warrants with an aggregate market value of approximately $80.9 million, which would be rendered worthless if the Business Combination was not approved.

57.     The Sponsor and each of SRAC's officers and directors agreed to waive their rights to liquidating distributions with respect to their founder shares and

private placement shares if SRAC did not complete a business combination by its deadline.  SRAC's warrants were to expire worthless if SRAC failed to complete its initial business combination by the May 13, 2021 deadline. Thus, if SRAC did not meet its deadline, the initial shares and the warrants owned by the Sponsor, its affiliates, and each of SRAC's officers and directors would be rendered worthless.

58.    As the May 13, 2021 deadline drew closer, the financial pressure on the SRAC Individual Defendants to complete a qualifying business combination increased.  Identifying a merger target, completing negotiations, finalizing merger documentation, and obtaining required shareholder approvals, is an extremely time consuming process that requires at least several months to complete.  For example, discussions between SRAC and Momentus began in June 2020, but the Business Combination was not completed until August 2021. While this process was delayed by the SEC's investigation of SRAC and the need to renegotiate the terms of the proposed merger, even transactions that do not face these obstacles take several months to complete.

59.    From SRAC's November 13, 2019 IPO through at least June 2020, SRAC identified and met with various potential target businesses, many of them in the cannabis industry, to discuss a possible business combination, yet none of these discussions resulted in the management of SRAC and a target companying entering into a merger agreement (other than the negotiations with Momentus). For example, SRAC's management team evaluated over 50 potential business combination targets, and entered into non-disclosure agreements with approximately 26 potential business combination targets (other than Momentus), none of which resulted in a deal.

60.    By the time Defendant Kabot of SRAC was first introduced to Defendant Kokorich of Momentus on June 26, 2020, SRAC was running out of suitable target companies and running out of time in which to complete an acquisition by its May 2021 deadline.

61.     As detailed below, the materialization of risks concealed from investors by Defendants, including ongoing national security and SEC investigations into Defendants, derailed Defendants' initial plans to complete the merger of SRAC and Momentus by early 2021. Beginning on or about March 25, 2021 Defendants undertook extensive efforts to obtain shareholder approval to extend their May 13, 2021 deal deadline by three months to August 13, 2021, and planned a May 6 vote on the extension proposal. Defendants failed to secure sufficient votes in favor of the extension by May 6, and so postponed the vote to May 13, which was still the last day for SRAC to complete a deal or liquidate. The proposal narrowly met its 65% approval requirement on May 13 with 66% of outstanding shares voting in favor.   Even with the extended August 13, 2021 deadline Defendants faced extreme time pressure and financial incentives to complete a deal, and SRAC had no viable options to complete a deal apart from Momentus. After the end of the Class Period, on or about August 12, 2021 Momentus and SRAC completed their merger.

**D.     Background Of Momentus: A Space Industry Startup With No Revenue**

62.     Momentus was founded in 2017 in Santa Clara, California, by co-founders Defendant Kokorich and Lev Khasis.  Kokorich served as Momentus's CEO from November 2017 until his abrupt resignation on January 25, 2021. At the time of the October 7, 2020 merger agreement announcement by SRAC and Momentus, and throughout most of the Class Period, among Momentus's largest beneficial owners were Defendant Kokorich and Olga Khasis, the spouse of co-founder Lev Khasis. At the time of the October 7, 2020 merger agreement announcement, key members of the Momentus management team included Defendant Kokorich, Defendant Harms, then serving as Momentus's Chief Revenue Officer, and Defendant Kennedy, Momentus's President.

63.     The joint press release from Momentus and SRAC announcing their merger agreement on October 7, 2020, described Momentus as "a commercial space

company offering in-space transportation and infrastructure services."  SRAC and Momentus claimed that "Momentus is developing capabilities to provide critical infrastructure services: in-space transportation, satellite as a service, and in-orbit services." They further claimed that "Momentus' customers include satellite operators, satellite manufacturers, launch providers, defense primes such as Lockheed Martin and government agencies such as NASA."

64.    At no time have Momentus's operations had any connection to the cannabis industry.

65.    As SRAC and Momentus admitted in later SEC filings, as of October 2020 Momentus had never completed a commercial launch of customer cargo, and as a result had not recognized any revenue in its entire history from 2017 through the October 2020 merger announcement.

**E.    Momentus's Need For Cash Gave Its Management An Incentive To Conceal Problems That Might Prevent A Merger With SRAC**

66.    Since its founding in 2017, Momentus had been regularly incurring substantial losses. Momentus recorded worsening net losses of $6.2 million for 2018, $15.8 million for 2019, and $15.4 million for just the six months ended June 30, 2020.

67.    Due to its lack of any revenue and history of increasingly large losses, Momentus was entirely dependent for its continued existence on raising funds from investors. At the time of the October 2020 merger announcement, Momentus had already raised, and spent, tens of millions of dollars of investor capital.

68.    In May 2020 Momentus received a $970,000 loan under the federal government's Paycheck Protection Program, which required it to certify that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."

69.    As of June 30, 2020 Momentus's total liabilities were greater than its total assets. As of June 30, 2020 Momentus had $10.7 million in cash on hand,

which would not even be enough to continue its operations through the end of the year based on the rate of its losses in the first half of 2020.

70.     Accordingly, the Momentus Individual Defendants had a strong incentive to conceal any problems that might prevent Momentus from completing a merger with SRAC and gaining access to its badly needed cash.

71.     As later revealed in the SEC Complaint, by late 2019 Momentus was in constant fundraising mode. Beginning in early 2020, Defendant Kokorich had discussions with an investment bank in an effort to secure additional funding, and in mid-2020 Momentus formally engaged the bank and sought its assistance to find a suitable SPAC candidate for a merger. In addition to his discussions with SRAC, Kokorich had discussions with two other SPACs, both of which chose not to move forward with a merger with Momentus because Momentus was still at a relatively early stage and immature as a company.

## V.     UNDISCLOSED ADVERSE FACTS KNOWN TO DEFENDANTS DURING THE CLASS PERIOD

### A.     The U.S. Government Determined That Momentus's Russian CEO Was A National Security Risk

72.     Throughout the Class Period, Momentus and the Momentus Individual Defendants knew, but failed to disclose, that the U.S. government had determined that Momentus's CEO, co-founder and major shareholder Defendant Kokorich presented a national security risk, which posed serious problems for Momentus and created a heightened risk that Momentus would not be granted regulatory approvals necessary for its operations.

73.     Kokorich is a citizen of Russia. At no time has he been a citizen or legal permanent resident of the United States. Kokorich has ties with persons and entities closely affiliated with the Russian government.

74.     Kokorich co-founded Momentus with Lev Khasis, who from 2013 through present has been First Deputy Chairman of the Executive Board of

Sberbank, which is the largest bank in Russia and which is owned by the Russian state. Sberbank is subject to U.S. sanctions imposed by the U.S. Treasury Department Office of Foreign Assets Control in 2018 because Sberbank supported Russia's annexation of Crimea from Ukraine. Sberbank has been led from 2007 through present by its CEO and Chairman Herman Gref, who is reported to be close to Russia's autocratic leader Vladimir Putin. In a 2018 report to Congress, the Treasury Department named Gref on a list of "senior foreign political figures and oligarchs in the Russian Federation, as determined by their closeness to the Russian regime and their net worth."

75.     Prior to his founding of Momentus, from 2012 on Defendant Kokorich founded and led a company called Dauria Aerospace, which had offices near Moscow, Russia and in Mountain View, California. Dauria Aerospace obtained contracts from the Russian state via the state-owned company Roscosmos State Corporation for Space Activities. Dauria Aerospace partnered with the Skolkovo Foundation, which purports to be a non-profit backed by the Russian state to support a scientific and technological center for the development and commercialization of advanced technologies. According to a warning published by the FBI's Boston office in 2014, the Skolkovo Foundation "may be a means for the Russian government to access our nation's sensitive or classified research, development facilities and dual-use technologies with military and commercial applications."

76.     The parties to the SEC's ongoing litigation against Defendant Kokorich have filed various documents as exhibits in that litigation, which directly confirm Momentus's and Kokorich's knowledge of the U.S. government's national security concerns relating to Kokorich during the Class Period.

77.     On March 22, 2018, the U.S. Department of Commerce, Bureau of Industry and Security ("BIS") sent an Export License Rejection Notice to Momentus (which was at that time operating under the name Space Apprentices Enterprise). *See* Exhibit 3. The Rejection Notice denied Momentus's application to provide to

Defendant Kokorich "[t]echnology required for the use of electrothermal propulsion devices and thrusters," *i.e.*, the propulsion technology that formed the core of all of Momentus's planned services, and which Momentus advertised as its main competitive advantage. The Rejection Notice stated that the Department of Commerce had concluded that Kokorich "is not an acceptable recipient at this time of U.S.-origin items controlled for national security reasons." *See* Exhibit 3.

78.   On June 24, 2018, an attorney for Defendant Kokorich wrote a letter to the U.S. Department of Treasury, Committee on Foreign Investment in the United States ("CFIUS") regarding Kokorich's ownership of stock in another space industry company, Astro Digital U.S., Inc. ("Astro Digital"). *See* Exhibit 4. The letter was written to follow up on the attorney's recent phone conference with CFIUS personnel in the U.S. Departments of Treasury and Defense regarding the same subject matter. Kokorich's attorney stated in the letter that "[d]uring the teleconference, CFIUS informed us that it is preparing to order the Kokoriches to divest their ownership interest in Astro Digital. According to your colleagues, CFIUS has concluded that the Kokoriches present a threat to the national security of the United States." The letter further stated that Kokorich was "well versed in U.S. export control and sanctions laws and regulations." *See* Exhibit 4. According to the letter, CFIUS' investigation relating to national security concerns surrounding Defendant Kokorich had "now spanned almost two years," and prevented Astro Digital from being able to obtain new investment or funding. Defendant Kokorich's counsel listed Kokorich and his spouse as receiving copies of the letter.

79.   On November 12, 2020, Momentus received a notification from the Office of National Security and Technology Transfer Controls within the BIS, informing Momentus that the U.S. Department of Commerce intended to deny Momentus' application for the deemed export of its "Vigoride" software and technology to Defendant Kokorich. *See* Exhibit 6. The notification stated that the Department of Commerce believed the denial "furthers the United States policy . . to

restrict the export of goods and technology which would make a significant contribution to the military potential of any other country or combination of countries which would prove detrimental to the national security of the United States." The notification further stated that the Department of Commerce made its determination in consultation with the Department of Defense, the Department of State, and the Department of Energy. *See* Exhibit 6.

80.     The U.S. Department of Defense, Office of Foreign Investment Review sent a letter dated January 13, 2021 to the Securities and Exchange Commission regarding the proposed merger between SRAC and Momentus. *See* Exhibit 7. According to admissions later made in SRAC's SEC filings, "On January 21, 2021, Momentus became aware of correspondence from the U.S. Department of Defense . . . stating Momentus posed a risk to national security as a result of the foreign ownership and control of Momentus by Mikhail Kokorich and Lev Khasis and their associated entities, as well as concerns regarding disclosures relating to such matters made by Stable Road in its SEC filings in connection with the Business Combination."

81.     The January 13, 2021 letter stated that the Department of Defense "has concluded that Momentus presently poses a risk to national security and accordingly has requested appropriate governmental agencies conduct national security reviews," and that the Office of Foreign Investment Review would "continue to recommend that DoD places an indefinite hold on all Momentus' relationships with DoD." The letter stated that Kokorich's previous Dauria Aerospace company partnered with the Skolkovo Foundation, which the FBI assessed "may be a means for the Russian government to access our nation's sensitive or classified research." *See* Exhibit 7. The letter also noted national security concerns relating to Momentus' "complex and opaque foreign ownership structure [that] may not accurately reflect the ultimate beneficial owner of Momentus nor the true identity of financiers of Momentus." In particular, the letter noted that reported major Momentus

shareholder Olga Khasis was the wife of Lev Khasis, who was the "First Deputy Chairman of Russia's state-owned bank, Sberbank," and that Sberbank is on the Treasury Department Office of Foreign Assets Control's "Sanctions List."

82.    The Department of Defense's January 13, 2021 letter went on to state that the Department of Defense believed SRAC's November 2, 2020 S-4 filed with the SEC to be misleading regarding these and related national security issues, and that the "DoD is currently reviewing a 2019 federal investigation to determine if Mikhail Kokorich violated export control laws while serving as both an investor and executive in several satellite companies." *See* Exhibit 7. The letter concludes by stating that the Defense Department "concluded that Momentus' current proposal poses a risk to investors," and by requesting that the SEC "delay the IPO of Momentus in order to provide DoD and other government agencies the appropriate time to conduct further due diligence."

83.    This Department of Defense letter appears to have prompted the SEC's investigation of Momentus, SRAC and the proposed merger. As SRAC admitted in later SEC filings, "[o]n January 24, 2021, [Momentus] received a subpoena from the Division of Enforcement of the U.S. Securities and Exchange Commission . . . requesting documents regarding the Registration Statement on Form S-4 and Amendment No. 1 thereto 1 . . . filed by SRAC in connection with the Business Combination." SRAC further admitted in other filings that "[i]n January 2021, the SEC's Division of Enforcement informed SRAC and Momentus that it was investigating certain disclosures made in filings with the SEC, including in connection with the Business Combination."

84.    In addition to the foregoing documents filed in the SEC's ongoing litigation against Defendant Kokorich, the SEC revealed additional details regarding Kokorich's national security risks and related problems in the SEC Complaint and the SEC Order. According to the SEC Order's findings and the SEC Complaint's allegations, in June 2018 U.S. Customs and Immigration Services ("USCIS")

revoked Defendant Kokorich's work visa and denied his application for permanent resident status. In September 2018 Kokorich applied for asylum, claiming to be a prominent critic of the Russian government. On or about August 28, 2019, USCIS informed Kokorich that it had not granted his asylum application, and that it had referred his case to an immigration judge for adjudication in removal proceedings. USCIS based its determination on "inconsistencies" in Kokorich's application and testimony "with regard to [his] political affiliations and activities in Russia." On or about the same date, the FBI, the Department of Homeland Security, and the BIS's Office of Export Enforcement arrived unannounced at Momentus's headquarters, questioned multiple employees, and detained Kokorich and transported him to an immigration detention center after which he was released on bond. Kokorich was in the process of adjudicating the removal proceedings when he left the U.S. in January 2021.

85.    The SEC Order and SEC Complaint also provide additional factual findings and allegations regarding the November 12, 2020 notification from the BIS informing Momentus that the it intended to deny Momentus' application for the deemed export of its "Vigoride" software and technology to Defendant Kokorich. *See* Exhibit 6. Momentus had filed this application in February 2020, and on April 15, 2020 Momentus learned that the application was placed on "hold without action" by the BIS reviewer. On October 7, 2020 a BIS representative emailed Momentus stating that the Departments of Defense and State would recommend denying the application, and two days later the same BIS representative further disclosed that the Department of Energy would also recommend denial. On October 23, 2020 the BIS representative emailed again to disclose that BIS's Operating Committee had determined to deny the license.

86.    Throughout the Class Period Momentus and the Momentus Individual Defendants failed to disclose to investors the foregoing highly material known facts, that multiple U.S. government agencies had repeatedly concluded that Defendant

Kokorich was an unacceptable national security risk, which posed serious problems for Momentus's ability to carry out its planned operations in the space industry, which is very regulated and highly sensitive from a national security standpoint.

## B.     Momentus's Only Test Of Its Technology In Space Was A Failure

87.     Throughout the Class Period, Momentus and the Momentus Individual Defendants knew, but failed to disclose, that Momentus had only conducted one test of its technology in space, that this test was not completed due to an equipment failure, and that even if this test had been successfully completed it would not have demonstrated the commercial viability of Momentus's technology. As such, Momentus was highly unlikely to be able to develop and commercialize its technology on the aggressive timeline touted by Defendants in support of the merger.

88.     The critical piece of technology that Momentus touted as a breakthrough and its key source of competitive advantage was the water plasma propulsion system that was to be the source of power to provide Momentus's advertised services of transporting satellites in space. This water plasma thruster was of primary importance to all of Momentus's plans and had to work in space in order for Momentus to generate any revenue.

89.     Toward the end of the Class Period and afterward, under pressure from the SEC to correct their prior misstatements, Defendants admitted the severe shortcomings of the one and only in space test that Momentus ever attempted of this technology:

> Our first-generation X-band thruster, which operates at 30 Watts, was flown aboard a demonstration mission called El Camino Real in mid-2019. During this mission, Momentus launched its first MET [microwave electrothermal thruster] into space as a hosted payload on a nanosatellite. The mission's objective was to demonstrate the MET's ability to produce water plasma in space by performing 100 one-minute firings . . . Failure of the host satellite in November 2019

prematurely terminated the demonstration after only 23 of the planned 100 firings of the thruster had been performed . . .

90. Momentus later confirmed the failure of this mission in a post-Class Period press release, stating "The MET water plasma-based thruster was launched in July 2019 in a mission known as El Camino Real. The mission did not meet its pre-launch success criteria."

91. Momentus and its personnel including Defendants Kokorich and Harms were immediately aware of the premature end of the test due to the equipment failure. This failure was discussed in a November 26-27, 2019 email chain among six Momentus employees including Defendants Harms and Kokorich, as well as Momentus's Chief Engineer, with the subject line "Need El Camino Real Failure Review Board." *See* Exhibit 5. In that email chain, Momentus's Chief Technology Officer wrote, "[e]ven if we recover the spacecraft, at this point it is my judgement that we need to convene a failure review board." *See* Exhibit 5.

92. Defendants' end of Class Period admissions detailed further shortcomings of this one and only in space test, stating that of the 23 firings completed before the mission's failure, there were "12 hot firings with microwave power turned on and 11 cold firings with the microwave turned off," and that "a pump issue significantly restricted flow of water into the thruster during nine of the 12 hot firings, preventing plasma-generation."

93. Even for the three hot firings that had water present, Defendants admitted that "pressure and temperature data did not provide sufficient information to either confirm or contradict plasma presence." However, Defendants went on to state "Momentus believes that the reflected power data collected during the three hot firings with water present to be sufficient to conclude that plasma was produced."

94. Defendants went on to admit "issue[s]" and "weaknesses" revealed by this test, stating "[t]he aforementioned pump issue and other observed weaknesses

from El Camino Real have informed our propulsion system design, pressure sensor selection and overall vehicle design process."

95.   Furthermore, Defendants admitted that the technology they planned to commercially deploy was not the small, commercially useless test model thruster involved in the 2019 in space test, but a redesigned version that was supposed to generate many times more thrust, that would be needed for any commercial operations. While the 2019 test model was supposed to operate at 30 Watts, Defendants admitted that their planned commercial use thrusters were supposed to operate at powers of 550 Watts, 750 Watts, or more. Defendants further admitted that "the technology underlying Momentus's anticipated service offerings (including its water plasma propulsion technology) is still in the process of being developed and has not been fully tested or validated in space."

96.   In addition to the foregoing admissions by the Defendants, the SEC revealed additional details regarding Momentus's failure to successfully test its technology in space in the SEC Complaint and the SEC Order. According to the SEC Order's findings and the SEC Complaint's allegations, a former Momentus officer stated that the thruster tested in the El Camino Real mission did not have "commercial potential" because it was "too small, too inefficient, too low in [specific impulse], too low in total impulse." A former Momentus officer stated that the mission yielded "no data to suggest that that thruster would deliver an impulse of any commercial significance." A Momentus engineer admitted that the mission did not yield sufficient data to demonstrate the propulsion system's reliability or longevity. The SEC also revealed that while the satellite used in the El Camino Real test is still in space, it is not functional.

97.   The SEC Complaint and the SEC Order also confirm Defendant Kokorich's knowledge of these facts. Kokorich admitted he understood even before the launch that the mission was not designed to show that the thruster could provide a measurable change in velocity from thrust, to measure specific impulse, or to show

the thruster's reliability. In a February 2020 internal Momentus document sent to Defendant Kokorich, a Momentus engineer acknowledged that Momentus did not obtain "any useful mission results" from the launch.

98.     Throughout the Class Period Momentus and the Momentus Individual Defendants failed to disclose to investors the foregoing highly material known facts, that Momentus's only test of its technology in space was not completed due to an equipment failure, and that even if this test had been successfully completed it would not have demonstrated the commercial viability of Momentus's technology.

## C.   Momentus's Wildly Excessive Revenue Projections Ignored Its National Security Risks And Unproven Technology

99.     During the Class Period Defendants repeatedly emphasized to public investors their aggressive revenue projections for Momentus. For example, Defendants' projections issued as part of the October 7, 2020 deal announcement forecast $2 million in 2020 revenue, $19 million in 2021, and $152 million in 2022, growing to over $4 billion by 2027.

100.   Because Momentus would only recognize revenue upon successfully providing its planned services in space, these forecasts were premised on the key assumptions that Momentus's technology would work as hoped in space, and that Momentus would be granted all of the many required regulatory approvals to conduct its operations and place its products on rocket launches. As such, Defendants' near-term revenue forecasts likewise depended on the critical assumption that Momentus would be allowed to participate in one rocket launch in 2020, and three more in 2021.

101.   But, as detailed above in Section V.A, Momentus and the Momentus Individual Defendants knew that the federal government had serious national security concerns relating to Defendant Kokorich which posed a high risk that Momentus would not receive regulatory approvals necessary to conduct its operations. And, as detailed above in Section V.B, Momentus and the Momentus

Individual Defendants knew that it had never successfully demonstrated the commercial viability of its technology in space which posed a high risk that its technology would not perform as hoped on its first ever commercial missions.

102.   Momentus and the Momentus Individual Defendants knew of these serious risks to its planned operations and launch schedule, and likewise knew that their revenue projections ignored those risks and simply assumed that the federal government would grant Momentus all required regulatory approvals and that Momentus's technology would work in space as hoped. Defendants therefore knew that the best-case scenario assumptions they used in preparing Momentus's published financial projections were very likely to fail, and that the aggressive revenue projections based on those assumptions were highly unlikely to be achieved.

103.   Taken together, the foregoing facts seriously undermined the accuracy of Defendants' revenue forecasts, and the failure to disclose these facts rendered the issuance of the forecasts and Defendants' related statements materially misleading. Momentus and the Momentus Individual Defendants knew their projections were based on unreasonable assumptions and therefore lacked any reasonable basis in fact.

### D.   SRAC Failed To Conduct Adequate Due Diligence

104.   Throughout the Class Period, SRAC and the SRAC Individual Defendants knew, but failed to disclose, that they had conducted inadequate due diligence of Momentus that failed to follow up on known red flags regarding Defendant Kokorich's national security issues, and that failed to investigate the results of Momentus's only test of its technology in space.

105.   SRAC and the SRAC Individual Defendants therefore knew that they lacked sufficient information to assess the truth or falsity of their own statements regarding regulatory risks facing Momentus, or the purported success of Momentus's one and only in space test of its technology. These Defendants

similarly knew that they lacked sufficient information to assess the truth or falsity of their own statements reiterating Momentus's aggressive revenue projections, because those projections were based on key assumptions that SRAC had never evaluated.

106.    Toward the end of the Class Period and afterward, under pressure from the SEC to correct their prior misstatements, Defendants admitted facts showing that SRAC failed to reasonably investigate Momentus's claims regarding its technology.

107.    Defendants admitted that "none of the directors or officers of SRAC are engineers or physicists, and therefore their views as to the technical and commercial viability of Momentus' technology relied on the review and conclusions of experts that SRAC engaged as part of its due diligence review, as well as the representations of Momentus' senior management."

108.    Defendants further admitted that their technical advisors' review did not evaluate Momentus's claims to have successfully tested its technology in space, and was rushed to completion in only four weeks:

> On September 1, 2020, SRAC engaged Stellar Solutions, a technology consulting firm, to assist with technical due diligence. Stellar Solutions' review, which resulted in a final report to SRAC in approximately four weeks, was designed to conduct an assessment encompassing technical capabilities, technical maturity, system and operational risks and concerns, as well as industry expert observations on market and competitive considerations for the services and business. Stellar Solutions did not conduct a review of the results of the 2019 demonstration mission called El Camino, based on its determination regarding the further development of the technology since that time and the additional ground testing that had been conducted by Momentus thereafter.

109.    Defendants also admitted that members of the law firm, Kirkland & Ellis LLP, retained by SRAC in connection with the proposed merger and due diligence of Momentus, included investors in the Sponsor and its affiliate SRAC Pipe Partners LLC. Therefore, SRAC's attorneys assisting with due diligence were

not independent and objective, but shared the SRAC Individual Defendants' conflicts of interest based on their financial interests in the Sponsor. According to SRAC's SEC filings later in the Class Period, "[c]ertain partners of Kirkland & Ellis LLP are investors in the Sponsor and SRAC Partners."

110. In addition to the foregoing admissions by the Defendants, the SEC revealed additional details regarding the failure of SRAC and the SRAC Individual Defendants to conduct adequate due diligence of Momentus in the SEC Complaint and the SEC Order.

111. The SEC Order found that SRAC did not specifically ask Stellar Solutions to review Momentus's El Camino Real mission, and Stellar Solution's report to SRAC made no mention of that mission.

112. The SEC Order also found that SRAC and Defendant Kabot conducted inadequate due diligence relating to national security concerns surrounding Defendant Kokorich. SRAC and Defendant Kabot knew that CFIUS had required Kokorich to divest form another space technology company in 2018. During due diligence, SRAC received a copy of CFIUS's final order and repeatedly asked Momentus for correspondence and other documents that would describe the basis of the order. Momentus responded that it did not possess those documents. SRAC failed to obtain a full and complete understanding of the basis for the CFIUS order or its impact on Momentus's business.

113. In sum, SRAC and the SRAC Individual Defendants knew that they had failed to verify key information relating to Momentus's technology and Kokorich's national security risks, and that they were simply repeating to public investors unsupported assertions made to them by Momentus and the Momentus Individual Defendants.

## VI. DEFENDANTS MISLED INVESTORS TO GAIN SUPPORT FOR THE MERGER

### A. Defendants Announce The Merger Agreement And Misleadingly Hype Momentus's Prospects

114. On October 7, 2020, with time running out to complete a business combination before SRAC's May 13, 2021 deadline, SRAC and Momentus announced that they had entered into a merger agreement, pursuant to which the two companies would merge, SRAC stockholders would gain a proportionate interest in Momentus, Momentus would gain access to the $172.5 million in SRAC's trust account (plus additional funds from a concurrent private placement), and Momentus would become a publicly traded company. The Defendants stated that completion of the proposed transaction was subject to approval by Momentus and SRAC shareholders, and was expected to be completed in early 2021.

115. On October 7, 2020, SRAC filed with the SEC a Form 8-K that contained further information about the proposed merger transaction. Among other things, the Form 8-K included as attachments a copy of the joint press release from SRAC and Momentus, a copy of the merger agreement, and an investor presentation about Momentus and the proposed merger. On the same day, Defendants conducted a public conference call to discuss the proposed merger and to provide further information to investors, and Defendant Kabot gave a televised interview on CNBC. Through these various channels, Defendants aggressively touted the proposed merger and Momentus's prospects.

116. Defendants' October 7, 2020 statements were materially false and/or misleading, and failed to disclose material adverse facts about the Momentus's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (a) the federal government had determined Momentus's CEO, Defendant Kokorich, to be a threat to national security, (b) Momentus had never successfully tested its technology in space, (c) as a result, Defendants' projections of

Momentus's future revenue were wildly overstated, and (d) SRAC's due diligence of Momentus was superficial, ignored red flags that demanded further investigation, and did not provide a reasonable basis for SRAC's statements about Momentus.

117.  For example, nowhere in Defendants' October 7, 2020 statements did they mention that the federal government had raised national security concerns regarding Momentus's co-founder, major shareholder and CEO Defendant Kokorich, which had caused the U.S. Department of Commerce Bureau of Industry and Security to deny Momentus an export license, and which had caused the U.S. Treasury Department Committee on Foreign Investment in the United States to order Kokorich to divest his ownership interests in another space industry company he had led.

118.  In the press release announcing the Merger Agreement, SRAC and Momentus stated that, "[i]n 2019, the Company successfully tested its water plasma propulsion technology in space." However, the mission referred to failed before achieving its objectives, and did not even attempt to demonstrate the commercial viability of Momentus's technology.

119.  Defendants ignored the substantial risks to Momentus's business posed by these national security concerns and the unproven status of its technology, and baselessly forecast revenues of $2 million in 2020, $19 million in 2021, increasing to over $1 billion by 2024, and over $4 billion by 2027, despite never having earned any revenue in the company's history to date.

120.  And when Defendant Kabot went on television, in response to a question regarding the current "blank check bonanza," and "whether you think there's just too many" SPACs, he stated:

> what I think is great for the investor is we did four months of due diligence. We spent a lot of money with some of the top service providers out there from Stellar Solutions to Kirkland and Ellis, from Orrick to Evercore to cantor completing our underwriting, right, we did four months of due diligence, which in a traditional ipo you would

never have the opportunity to do, so I think SPACs are very healthy for the market.

Defendant Kabot made these statements despite knowing that SRAC had failed to undertake basic due diligence such as confirming whether Momentus's technology was actually successfully tested in space, or following up on red flags known to SRAC about national security issues relating to Defendant Kokorich.

121.   In sum, from their very first public statements regarding the proposed merger on October 7, 2020, Defendants materially misled investors as part of their efforts to aggressively promote the deal and ensure its prompt closing.

**B.   Defendants Aggressively And Misleadingly Promoted The Proposed Merger Following Its Announcement**

122.   From Defendants' first public announcement of the proposed Merger on October 7, 2020 up to the SEC's July 13, 2021 announcement of the SEC Order and the filing of the SEC Complaint, Defendants aggressively and misleadingly promoted the proposed Merger and Momentus's business prospects in numerous public statements, in an apparent effort to build investor support for the Merger.

123.   Throughout the Class Period Defendants falsely ignored and downplayed the U.S. government's national security concerns relating to Defendant Kokorich. Defendants falsely told investors that Momentus had successfully tested its technology in space. Defendants ignored national security and technological risks to baselessly claim that Momentus could achieve explosive revenue growth, beginning in only a matter of months. And Defendants falsely boasted of SRAC's purportedly "extensive" due diligence of Momentus.

124.   SRAC filed with the SEC a Registration Statement on Form S-4 on November 2, 2020, which, similar to Defendants' October 7, 2020 statements, contained false and misleading statements and omissions regarding Momentus, SRAC's due diligence, and the proposed merger.

125.   While SRAC's November 2, 2020 Registration Statement (and later amendments) recited certain potential risks that could arise in connection with the merger with Momentus, it provided no reasons to suspect that SRAC had failed to reasonably investigate such risks, or any indication that any of these potential risks had already substantially materialized. In short, SRAC's shareholders had no reason to doubt the Defendants' characterization of Momentus as a valuable business with a clear path to rapid and substantial revenue growth and profitability.

126.   SRAC subsequently amended the Registration Statement four times during the Class Period on: December 14, 2020; March 8, 2021; June 29, 2021; and July 12, 2021. While certain of these amendments provided additional information regarding Momentus's national security problems, Momentus's failure to successfully test its technology in space, Momentus's financial projections, or SRAC's due diligence, each amended Registration Statement still omitted material information and failed to disclose sufficient information to fully reveal the truth to investors.

127.   SRAC also filed with the SEC updated versions of the investor presentation relating to Momentus that had been initially filed on October 7, 2020. SRAC filed such updated investor presentations, each of which remained materially misleading for the above stated reasons, on October 13, 2020; November 17, 2020; December 14, 2020; April 7, 2021; and May 5, 2021.

128.   Momentus issued a dozen promotional press releases during the Class Period, which touted Momentus's business and/or promoted the proposed Merger, for example by announcing customer "contracts" to deliver satellites to lunar orbits which Momentus had never attempted and lacked the technology to achieve.

129.   Defendants gave interviews to public media outlets to misleadingly promote the proposed merger throughout the Class Period. For example, on January 4, 2021, simultaneously with Defendants' announcement that Momentus's launch schedule would be delayed in order to obtain regulatory approvals, Defendant

Kennedy gave an interview to IPO Edge in which he misleadingly reaffirmed Momentus's revenue projections and downplayed national security concerns relating to Defendant Kokorich. And on May 4, 2021 Defendants Kabot and Harms, along with Momentus Chief Technology Officer Rob Schwartz, gave another interview to IPO Edge, in which they continued to misleadingly tout Momentus's prospects and technology.

130. Defendants' statements throughout the Class Period regarding Momentus were apparently made as part of a public relations strategy to build investor support for the proposed Merger. As with Defendants' initial October 7, 2020 statements, Defendants' other Class Period statements misleadingly downplayed or ignored national security risks, touted Momentus's technology, made baseless financial projections, and falsely touted SRAC's purportedly extensive due diligence.

## VII. THE TRUTH EMERGES, CAUSING SRAC'S STOCK PRICE TO PLUMMET

131. From January 4, 2021 until July 13, 2021, the truth regarding SRAC and Momentus was revealed to investors in a series of partial corrective disclosures and materializations of previously concealed risks. Over this period, Momentus and SRAC made several piecemeal partial disclosures of regulators' national security concerns relating to Momentus, resulting in the repeated postponement of its planned space missions, the resignation of Defendant Kokorich, and customers and suppliers abandoning Momentus. Over this period, Momentus and SRAC similarly made piecemeal partial disclosures relating to and as a result of the SEC's investigation into their misleading statements to investors, culminating in the SEC's announcement of the Cease and Desist Order and the filing of a civil enforcement action against Defendant Kokorich on July 13, 2021.

132. In response to SRAC's and Momentus's partial corrective disclosures and materializations of concealed risks over the January 4, 2021 to July 13, 2021

period, and ultimately in response to the SEC's revelations, SRAC's publicly traded stock price declined dramatically. While SRAC stock reached a Class Period intra-day high of $29.18 per share on February 10, 2021, on July 15, 2021 it closed at only $10.38 per share.

## A.   January 4, 2021 Disclosures Regarding Launch Delay

133.   On January 4, 2021, after the close of stock market trading, Momentus published a press release titled "Momentus Announces Move of Vigoride from January 2021 Mission; Will be Remanifesting to a Subsequent Launch," and SRAC publicly filed a copy of the press release with the SEC.

134.   The press release stated in relevant part that Momentus "will be remanifesting its January 2021 mission to a subsequent launch opportunity in 2021. This move will allow for the additional time necessary to secure FAA approval of Momentus' payloads, including completion of a standard interagency review. "

135.   From the October 7, 2020 deal announcement onward, Defendants had repeatedly touted a planned December 2020 or January 2021 mission to place customer satellites in space and test Momentus's technology in space. However, as partially revealed by the January 4, 2021 press release, the risks relating to national security and SRAC's deficient due diligence concealed by Defendants' false statements had begun to materialize, with a federal government agency denying an approval without which Momentus could not operate its business, and with the announcement of an ongoing "interagency review."

136.   Following publication of this press release, on January 5, 2021 SRAC's stock closed at $16.25 per share, 6.0% lower as compared to its previous day closing price. SRAC's stock continued to fall in the next trading session, closing January 6, 2021 at a price of $15.40 per share, representing a total loss of 10.9% since publication of the press release.

1

### B.    January 25, 2021 Disclosures Regarding Kokorich's Resignation

137.   On January 25, 2021 before the open of stock market trading, Momentus published a press release titled "Momentus Names Dawn Harms Interim CEO," and SRAC publicly filed a copy of the press release with the SEC.

138.   The press release disclosed that Defendant Kokorich had resigned effective immediately, and would be replaced by Defendant Harms as interim CEO. The press release stated in relevant part, "Momentus, in consultation with . . . Stable Road . . . has determined that accepting Mr. Kokorich's resignation is in the best interest of the Company, in an effort to expedite the resolution of U.S. government national security and foreign ownership concerns surrounding the Company, the existence of which the Company recently has confirmed." The press release quoted Defendant Kabot as stating, "We believe that this leadership transition will position the company for success and help accelerate regulatory reviews by the U.S. government." The press release stated that "Momentus and Stable Road are fully committed to cooperating with the U.S. government in connection with any regulatory reviews."

139.   From the October 7, 2020 deal announcement onward, Defendants had repeatedly touted Defendant Kokorich's central importance to Momentus and its future plans. However, as partially revealed by the January 25, 2021 press release, the federal government had "national security and foreign ownership concerns" relating to Momentus. Also as partially revealed by the January 25 press release, the risks relating to national security and SRAC's deficient due diligence concealed by Defendants' false statements had further materialized, to the point that Momentus's CEO and co-founder was forced to resign, amid ongoing "regulatory reviews by the U.S. government."

140.   Following publication of this press release, on January 25, 2021 SRAC's stock closed at $23.68 per share, 4.7% lower as compared to its previous day closing price. SRAC's stock continued to fall in the next trading session, closing

January 26, 2021 at a price of $22.75 per share. And SRAC's stock continued to fall in the following trading session, closing January 27, 2021 at a price of $20.10 per share, representing a total loss of 19.1% since publication of the press release.

### C.   March 8, 2021 Disclosures Regarding Governmental Investigations

141.   On March 8, 2021 during stock market trading hours SRAC publicly filed with the SEC an amended Registration Statement on Form S-4/A.

142.   The amended Registration Statement contained partial corrective disclosures, and revealed the further materialization of concealed risks, relating to the federal government's national security concerns surrounding Defendant Kokorich. For example, the amended Registration Statement disclosed that:

> On January 21, 2021, Momentus became aware of correspondence from the U.S. Department of Defense . . . stating Momentus posed a risk to national security as a result of the foreign ownership and control of Momentus by Mikhail Kokorich and Lev Khasis and their associated entities, as well as concerns regarding disclosures relating to such matters made by Stable Road in its SEC filings in connection with the Business Combination.

143.   The amended Registration Statement similarly revealed that "after a series of communications with the FAA with respect to a license for the January 2021 mission, the FAA ultimately determined that it was unable to grant to SpaceX an approval of the Momentus payload for the SpaceX Transporter-1 launch in January 2021 due to national security and foreign ownership concerns regarding Momentus raised by the Department of Defense during an interagency review."

144.   The amended Registration Statement further disclosed that Momentus had offered to undertake costly and time consuming "mitigation" efforts, that would adversely impact its business, in order to address the federal government's national security concerns:

> These proposed mitigation measures include, among other things, the engagement of an independent professional to conduct an audit of Momentus' technology, adoption and implementation of a NSIT- or

ISO-compliant data security plan, and appointment of a security officer to oversee compliance with mitigation terms agreed with CFIUS. Momentus and SRAC indicated in the CFIUS notice that the proposed mitigation measures are not intended to be exhaustive or exclusive, and that they are committed to wholly addressing CFIUS's and its member agencies' national security concerns.

145.   The amended Registration Statement revealed that Momentus now did not expect to complete its first launch until June 2021, and that Momentus generally expected a more delayed schedule for launches and commercialization of its technology as compared to its prior forecasts.

146.   The amended Registration Statement revealed that Momentus's backlog of customer contracts fell from $90 million to $86 million. This represented the cancellation of $4 million worth of customer contracts, and was a further materialization of concealed risks relating to national security and SRAC's deficient due diligence, and the resulting significant delay in Momentus's planned launch schedule. Similarly, the amended Registration Statement deleted a statement from the prior version of the Registration Statement, which had said "[w]e were recently selected by Lockheed Martin to support its $89.7 million contract from NASA's 2020 Tipping Point solicitation, to provide Satellite as a Service using our Vigoride vehicle for Lockheed Martin's payload," thus revealing that Lockheed Martin would no longer use Momentus for this mission.

147.   The notes to Momentus's financial statements included in the amended Registration Statement revealed that Momentus "has concluded there is substantial doubt about its ability to continue as a going concern within one year after the date these financial statements are issued," due to its history of losses, need to obtain additional investment, and uncertainty surrounding its products and services. The substantial doubt about Momentus's ability to continue as a going concern represented a further materialization of risks relating to national security and SRAC's deficient due diligence concealed from investors, as delays in Momentus's

launch schedule and ability to generate revenue were directly caused by the federal government's national security review of Kokorich and Momentus.

148.   The amended Registration Statement also revealed that "in January 2021, the SEC's Division of Enforcement informed SRAC and Momentus that it was investigating certain disclosures made in filings with the SEC, including in connection with the Business Combination. SRAC and Momentus are fully cooperating with the SEC's investigation and are unable to predict the outcome of the matter at this time."

149.   Following publication of the amended Registration Statement, on March 8, 2021 SRAC's stock closed at $12.50 per share, 8.0% lower as compared to its previous day closing price.

**D.    May 4, 2021 Disclosures Regarding Loss Of Customers**

150.   On May 4, 2021 during stock market trading hours representatives of SRAC and Momentus participated in a live broadcast interview with IPO Edge. The interview was accompanied by a modified version of Momentus's investor presentation. On May 5, 2021 SRAC publicly filed a transcript of this interview with the SEC on Form 425, along with a copy of the accompanying investor presentation.

151.   The investor presentation was similar to presentations previously published by SRAC and Momentus. However, whereas prior presentations had touted $90 million or $86 million of "backlog" customer contracts, Defendants removed all backlog numbers from this new version of the presentation. The May 4, 2021 presentation contained slides titled "Momentus at a Glance" and "Significant Customer Traction and Expected Demand" that were substantially similar to slides included in prior presentations, with the exception that the prior versions contained specific backlog numbers which were now conspicuously absent from the May 4, 2021 presentation. Also conspicuously absent from the May 4, 2021 presentation was the inclusion of Lockheed Martin among the lists of customers included in prior

presentation versions. These changes to the investor presentation revealed to the market that Momentus continued to lose customers and backlog. This was a further materialization of concealed risks relating to national security and SRAC's deficient due diligence, and the resulting significant delay in Momentus's planned launch schedule.

152.   Following the broadcast of this interview and presentation, on May 4, 2021 SRAC's stock closed at $11.08 per share, 6.7% lower as compared to its previous day closing price.

**E.     May 24, 2021 Disclosures Regarding Further Launch Delays**

153.   On May 24, 2021 during stock market trading hours SRAC publicly filed with the SEC a current report on Form 8-K.

154.   The current report stated in relevant part "On May 23, 2021, Momentus informed Stable Road that it does not expect to fly any missions in 2021 and that this determination was based on information from SpaceX that it was suspending its Momentus-related efforts while Momentus works to secure approvals from the U.S. government . . . Momentus is in the process of updating its financial projections and backlog."

155.   From the October 7, 2020 deal announcement onward, Defendants had repeatedly touted participation in multiple planned launches in 2021, even after they admitted to delays in the launch schedule in response to ongoing national security investigations. Defendants had likewise repeatedly touted SpaceX as a key partner important to Momentus's future plans and success. However, as partially revealed by the May 24, 2021 current report, the risks relating to national security and SRAC's deficient due diligence concealed by Defendants' false statements had further materialized, and Momentus would now not be able to participate in any launches in 2021, and so would not be able to generate any revenue from offering its services in space in 2021.

156. Similarly, from the October 7, 2020 deal announcement onward, Defendants had repeatedly touted the potential revenue from Momentus's customer order backlog, and aggressive revenue projections based on multiple launches occurring in 2021, but now admitted that these figures required "updating."

157. Following publication of this current report, on May 24, 2021 SRAC's stock closed at $10.42 per share, 13.4% lower as compared to its previous day closing price. SRAC's stock continued to fall in the next trading session, closing May 25, 2021 at a price of $10.17 per share, representing a total loss of 15.5% since publication of the current report.

**F.    June 29, 2021 Disclosures Regarding Failed Technology Test And National Security Issues**

158. On June 29, 2021 after the close of stock market trading SRAC publicly filed with the SEC an amended Registration Statement on Form S-4/A.

159. The amended Registration Statement contained partial corrective disclosures relating to Momentus's unproven technology. The amended Registration Statement disclosed that "the technology underlying [Momentus's] anticipated service offerings (including its water plasma propulsion technology) is still in the process of being developed and has not been fully tested or validated in space and may never have the capabilities or functionality in space that Momentus currently expects."

160. More specifically, the amended Registration Statement admitted that Momentus's sole in space test had not met its objectives and had encountered serious operational problems:

> Our first-generation X-band thruster, which operates at 30 Watts, was flown aboard a demonstration mission called El Camino Real in mid-2019. During this mission, Momentus launched its first MET into space as a hosted payload on a nanosatellite. The mission's objective was to demonstrate the MET's ability to produce water plasma in space by performing 100 one-minute firings. The MET was instrumented with temperature, pressure and RF reflected power

sensors to infer the presence of water plasma, which if detected, would indicate that the water propellant was flowing into the thrust chamber and radio frequency energy was being absorbed by the water. Failure of the host satellite in November 2019 prematurely terminated the demonstration after only 23 of the planned 100 firings of the thruster had been performed including 12 hot firings with microwave power turned on and 11 cold firings with the microwave turned off. While a pump issue significantly restricted flow of water into the thruster during nine of the 12 hot firings, preventing plasma-generation, the three hot firings that did have water present were found to have produced plasma.

161.   The amended Registration Statement also contained partial corrective disclosures, and revealed the further materialization of concealed risks, relating to the federal government's national security concerns surrounding Defendant Kokorich. For example, the amended Registration Statement disclosed that:

On June 8, 2021, CFIUS' review of the joint notice relating to historical acquisitions of interests in Momentus by Mr. Kokorich, his wife, and entities that they control concluded when the Company entered into a National Security Agreement with Mr. Kokorich, on behalf of himself and Nortrone Finance S.A. (an entity controlled by Mr. Kokorich), Lev Khasis and Olga Khasis, each in their respective individual capacities and on behalf of Brainyspace LLC (an entity controlled by Olga Khasis), and the U.S. government, represented by the U.S. Departments of Defense and the Treasury (the 'NSA'). In accordance with the NSA, on June 8, 2021, Mr. Kokorich, Nortrone Finance S.A., Lev Khasis and his wife Olga Khasis, and Brainyspace LLC fully divested all the equity interests in Momentus owned or beneficially owned by them by selling such equity interests to Momentus. The NSA also establishes various requirements and restrictions on Momentus in order to protect national security, certain of which may materially and adversely affect the operating results of Momentus due to uncertainty associated with and the cost of compliance with security measures, and limitations on Momentus' control over certain U.S. facilities, contracts, personnel, vendor selection and operations.

162.   The amended Registration Statement revealed that Momentus would have to pay Defendant Kokorich, Lev Khasis, and their affiliates, $50 million in exchange for the repurchase of their interests in Momentus.

163.   The amended Registration Statement revealed that Momentus's National Security Agreement with the U.S. government imposed onerous and expensive requirements on Momentus, including that:

> Under the NSA, we are required to hire and pay for the costs of a full time Security Officer who will be responsible for overseeing compliance with the NSA, an independent third-party monitor to monitor compliance with the NSA by the parties to the NSA, as well as an independent third-party auditor to regularly audit our compliance with the NSA. We are also required to establish: (i) a security plan to safeguard protected technical information, systems and facilities; (ii) a board-level Security Committee to oversee the development and implementation of policies and procedures to safeguard protected technical information, systems and facilities and to exercise appropriate oversight and monitoring of Momentus' operations to ensure that the protective measures contained in the NSA are effectively maintained and implemented; (iii) an audit plan; and (iv) a communications plan. We are also required to provide detailed and frequent reports to the third-party monitor. We will incur substantial costs to implement these and other requirements under the NSA, and we expect that substantial personnel time will need to be devoted to implement and comply with these requirements . . . These costs, requirements and restrictions may materially and adversely affect our operating results.

164.   The amended Registration Statement revealed that, prior to the divestment by Kokorich, Khasis, and their affiliates, "the Federal Aviation Administration . . . recently denied one of our payload review applications due to interagency concerns related to our foreign ownership and corporate structure." Defendants similarly disclosed that "on May 10, 2021 . . . Momentus received a letter from the FAA denying Momentus' application for a payload review for the planned June 2021 launch based on the FAA's finding that its launch would jeopardize U.S. national security."

165.   The amended Registration Statement revealed further delays to Momentus's anticipated launch schedule:

> Our first launch with customers is currently anticipated to occur in June 2022, subject to receipt of licenses and other government approvals and availability of slots on our launch provider's manifests. Prior planned launches were cancelled due to not receiving required licenses and other governmental approvals and other factors, and we can offer no assurances that our first launch will occur in June 2022.

And Defendants similarly admitted that "Momentus now anticipates sending its first two Vigoride vehicles into space in June 2022 . . . approximately 18 months later than had been contemplated at the time of our initial merger announcement."

166.   Defendants further admitted in the amended Registration Statement that the national security concerns and resulting delays had led customers to abandon Momentus:

> If we do not receive [government] approvals in a timely manner, our financial condition, results of operations, backlog and prospects will be materially adversely affected. For example, we have experienced erosion in our backlog of $86 million as of March 4, 2021 to $66 million as of June 11, 2021 as customers chose to cancel their contracts with us and seek alternative providers due to delays in our scheduled missions as we await receipt of necessary governmental approvals.

167.   The amended Registration Statement revealed that SRAC and Momentus had amended their merger agreement, to reflect the fact that Momentus was only half as valuable as Defendants had previously represented to public investors:

> On June 29, 2021, SRAC, Momentus and the other parties to the Merger Agreement entered into an amendment to the Merger Agreement to, among other things, reduce the enterprise valuation of Momentus from $1.131 billion to $566.6 million due to regulatory delays which have resulted in delays in the closing of the Business Combination and Momentus' launch schedule. As a result of these delays, Momentus has updated its financial projections.

168.   The amended Registration Statement disclosed dramatic downward revisions to Momentus's prior revenue projections. For example, Defendants now admitted Momentus had no revenue in 2020, projected no revenue for 2021, and projected only $5 million in revenue for 2022, in addition to dramatic downward revisions in all later years as well. Defendants admitted, "[i]n general, projected revenue and gross profits have shifted forward by 18 months."

169.   The amended Registration Statement admitted that Momentus's revenue projections "are based on assumptions about Momentus' ability to fully develop, test and validate its technology in space, including its water plasma propulsion technology, and assumes that Momentus can obtain the necessary licenses and regulatory approvals from the U.S. government for its missions on a timely basis."

170.   The amended Registration Statement further admitted that, "Momentus has incurred significant losses since inception, it expects to incur losses in the future and it may not be able to achieve or maintain profitability."

171.   Finally, the amended Registration Statement admitted regarding the ongoing SEC investigation:

> On January 24, 2021, the Company received a subpoena from the Division of Enforcement of the U.S. Securities and Exchange Commission . . . requesting documents regarding the Registration Statement . . . filed by SRAC in connection with the Business Combination. Most recently, the Company has entered into settlement discussions with the Division of Enforcement in an effort to resolve a potential enforcement action.

172.   Following publication of the amended Registration Statement, on June 30, 2021 SRAC's stock closed at $13.97 per share, 4.7% higher as compared to its

previous day closing price.[6] However, this increase occurred because on June 29, 2021 Defendants simultaneously released news that was positive for SRAC's public shareholders, in addition to the above described negative news in the form of corrective disclosures and materialization of concealed risks.

173.    The June 30, 2021 increase in stock price was caused by the revised deal terms announced on June 29. SRAC's public investors now stood to obtain a 19.4% interest in Momentus following the proposed merger, whereas previously they would only have obtained a 12.5% interest. This 55.2% increase in the interest to be received by SRAC's public stockholders should have, all else being equal, resulted in a commensurate increase in SRAC's publicly traded stock price. That SRAC's stock price increased by only 4.7% shows the market's severe negative reaction to the June 29 revelations regarding Momentus's technology, national security related risks, and downward revision of Momentus's financial projections.

### G.    July 13, 2021 Publication Of The SEC Order And SEC Complaint

174.    On July 13, 2021, the SEC published the SEC Order, publicly filed the SEC Complaint, and issued a related press release.

175.    As detailed above in Section V, the SEC Order and the SEC Complaint revealed material additional facts, not previously disclosed, regarding Momentus's unproven technology, Defendant Kokorich's national security risks, and SRAC's deficient due diligence, which corrected Defendants' prior false and misleading statements and omissions.

176.    Furthermore, by revealing the grave deficiencies in SRAC's due diligence process, the SEC revealed to the market that there was an elevated risk

---

[6] For the avoidance of doubt, Plaintiff does not claim to have suffered an out of pocket economic loss on June 30, 2021, but rather alleges the facts in this Section VII.F in order to show Defendants' June 29, 2021 admissions and the market's strongly negative reaction to those admissions.

that other material, undisclosed problems existed at Momentus, that SRAC's deficient due diligence had failed to discover.

177.   In addition, the SEC Order and the SEC Complaint were the further materialization of the risks concealed from investors by Defendants. Defendants' own false statements had created the risk that regulatory action would be taken against them, and would adversely affect the future prospects of SRAC and Momentus through, *inter alia*, penalties, additional compliance burdens, and reputational damage.

178.   Among the requirements of the SEC Order, consented to by Defendants Momentus, SRAC, the Sponsor, and Kabot, were that: (i) SRAC shall pay a $1 million penalty, (ii) Kabot shall pay a $40,000 penalty, (iii) Momentus shall a $7 million penalty, (iv) each of Momentus, SRAC, the Sponsor, and Kabot shall cooperate with SEC interviews in any related proceedings, (v) Momentus shall create an independent board committee to ensure compliance with the SEC order and implement disclosure controls, (vi) Momentus shall retain and pay for an independent compliance consultant approved by the SEC, who will conduct comprehensive ethics and compliance reviews, (vii) Momentus shall adopt and implement all recommendations of the independent compliance consultant, (viii) Momentus and SRAC shall allow certain private placement investors to terminate their investment agreements, and (ix) the Sponsor shall forego 250,000 founder shares in SRAC to which it was otherwise entitled.

179.   Following the publication of the SEC Order and the SEC Complaint, on July 14, 2021 SRAC's stock closed at $10.66 per share, 10.3% lower as compared to its previous day closing price. SRAC's stock continued to fall in the next trading session, closing July 15, 2021 at a price of $10.38 per share, representing a total loss of 12.6% since publication of the SEC Order and SEC Complaint.

# VIII. DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS

## A.  Misleading Pre-Class Period Public Statements

180.  In several pre-Class Period public statements, available to public investors during the Class Period, Defendants claimed that Momentus's water plasma propulsion system had been successfully tested in space, and that its commercial viability had been demonstrated by this in space test.

181.  Momentus, through its launch partner Astro Digital US, Inc., publicly filed a report with the Federal Communications Commission dated September 11, 2018, relating to Momentus's planned initial in space test mission. In connection with that submission, Momentus and Astro Digital publicly filed a document titled "Form 442, Technical Question 6 Response," which stated under the heading "Mission Summary":

> The Momentus X1 microwave electrothermal thruster (MET) spacecraft mission is a commercial demonstration of a propulsion system to exhibit its applicability to small spacecraft . . . The mission will demonstrate the reliability, longevity, performance, and utility of the microwave-based plasma propulsion system, which utilizes water as a propellant. A propulsion system suitable for 16U CubeSat vehicles or larger that is cost-effective enables more orbital maneuverability for a large class of space vehicles. Areas where this could be of benefit include orbital debris removal missions, collision avoidance, beyond-LEO missions, and smallsat deorbiting.

182.  The same document, under the heading "Specific objectives of the Research Project," stated:

> The research objectives of this project are: . . . To demonstrate that microwave electrothermal thrusters provide cost-effective high delta V capability to SmallSats via orbital maneuvering. This mission will show that this particular system is mature enough to be used by the small satellite market, and can be quickly and easily integrated with CubeSats as well as larger, more capable spacecraft. This provides an immediate low-cost mechanism for a wide range of space vehicles to integrate with a low risk profile.

183.   In a January 14, 2019 blog post on the Momentus website discussing this initial in space test flight, Momentus claimed:

> The purpose of El Camino Real will be to flight demonstrate our core propulsion technology so customers, investors, and stakeholders can have absolute confidence that when they sign up for a Momentus Space service, it will be on time, safe and reliable. We will be flying our high performance X-Band (10 GHz)microwave electrothermal thruster with enough water propellant that we will be able to run the thruster long enough to fully characterize its performance in space with dozens of stop start cycles and then safely de-orbit the vehicle.

184.   In a September 25, 2019 article titled "Momentus reports success in testing water plasma propulsion," published by the space industry publication Space News, Defendant Kokorich is quoted as stating:

> The on-orbit testing has demonstrated for the first time that microwave electrothermal plasma technology has the potential to achieve high specific impulse using water propellant . . . Water plasma propulsion is now technologically mature enough to be baselined for operational in-space transportation missions.

185.   The article further quoted Defendant Kokorich as stating, "[t]he purpose of the El Camino Real mission was to flight demonstrate our core propulsion technology so customers, investors and stakeholders can have absolute confidence that Momentus will deliver their payloads to a given orbit."

186.   These statements, combined with Defendants' Class Period public statements touting the "successful" in space test of Momentus's technology, materially misled investors regarding the purposes and results of Momentus's one and only in space test. As detailed in Section V.B, *supra*, Momentus's only in space test was a failure, and it was not designed to demonstrate, and was not capable of demonstrating, the commercial viability of Momentus's technology.

### B.     October 7, 2020 Merger Agreement Announcement

187.   The Class Period begins on October 7, 2020 when Defendants announced the proposed merger between SRAC and Momentus in communications including: (i) a joint press release from SRAC and Momentus, (ii) an investor presentation prepared by Momentus and filed with the SEC by SRAC, (iii) a conference call with Defendants Kabot and Kokorich participating, the script for which was filed with the SEC by SRAC, and (iv) a televised interview with Defendant Kabot on CNBC, the transcript of which was filed with the SEC by SRAC. SRAC filed these documents with the SEC as exhibits to current reports signed by Defendant Kabot.

#### 1.     National Security Risks

188.   The joint press release from SRAC and Momentus stated "The Company plans to launch its first Vigoride vehicle in December 2020 with commercial customers and four to five Vigorides in 2021."

189.   The investor presentation presented a timeline under the heading "First Mover with Rapid Progress To Date," forecasting four launches by the end of 2021.

190.   In the television interview, Defendant Kabot stated regarding Momentus's launch schedule:

> Our first commercial launch will be in December 2020 with SpaceX. We have a pretty full vehicle of satellites to deliver. And then we have a phenomenal launch cadence for 2021 going up with SpaceX in February, June, and December 2021. We actually have one and a half vehicles already booked for December 2021. So pretty aggressive launch cadence with SpaceX.

191.   The conference call script quotes Defendant Kokorich as saying "I am the Founder and CEO of Momentus . . . We are a first mover in offering space transportation and infrastructure services, powered by our groundbreaking water plasma propulsion technology." The conference call script further quotes Defendant

Kokorich as saying that Momentus "will be conducting our first flight with customers in December 2020."

192.   The joint press release from SRAC and Momentus quoted Defendant Kokorich as stating, "Momentus is at the forefront of the new space economy and is poised to capitalize on the significant growth opportunity as a first mover." The press release further quoted Defendant Kokorich as stating "[w]e expect to deploy the proceeds of this transaction to support our rapid growth and operations, and to support our capital needs as we ramp up revenues."

193.   The joint press release from SRAC and Momentus quoted Defendant Kabot as stating "As the only public, pure-play commercial space company capable of revolutionizing space infrastructure, Momentus is poised to capitalize on its market-defining position."

194.   The investor presentation stated, "Exceptional Team Led By Visionary Founder," prominently featuring a picture of Defendant Kokorich, who it described as a "Visionary space entrepreneur and innovator," and who it identified as Momentus's CEO and founder. The presentation also stated under the heading "Momentus Opportunity," "Well-seasoned team with experience in aerospace, propulsion and robotics piloted by visionary leader and innovator," in reference to Defendant Kokorich.

195.   The conference call script quotes Defendant Kabot as stating, "[w]ith its visionary founder, highly experienced management team, progress to date and significant commercial traction, Momentus is set to revolutionize and enable the future of the space economy."

196.   The statements in ¶¶188-95 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.A, *supra*, regarding national security risks pertaining to Defendant Kokorich. These undisclosed adverse facts made it highly likely that the

federal government would significantly restrict Momentus's operations so long as Kokorich remained an officer or shareholder, and likewise made it highly unlikely that the federal government would grant Momentus the approvals necessary to achieve its advertised launch schedule.

197.   In addition, the statements of SRAC and Defendant Kabot in ¶¶188-95 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.D, *supra*, regarding SRAC's failure to perform adequate due diligence on Momentus. Because SRAC and Defendant Kabot had not performed adequate due diligence on Kokorich's national security risks, their statements regarding his continued involvement with Momentus and regarding Momentus's planned launch schedule lacked any reasonable basis and so were materially misleading.

## 2.   Momentus's Technology

198.   The investor presentation under the heading "Company Overview," stated, "Groundbreaking water propulsion technology that significantly reduces costs and is reusable," and "Successfully tested water based propulsion technology on a demo flight launched mid-2019 – is still operational today."

199.   In the television interview, Defendant Kabot stated "we had a very successful test launch, the vehicle is still flying around in space, which is great."

200.   The joint press release from SRAC and Momentus stated "Momentus offers its customers significantly more affordable access to space by combining the capabilities of low-cost launch vehicles and Momentus' transport and service vehicles, powered by water plasma propulsion technology . . . In 2019, the Company successfully tested its water plasma propulsion technology in space."

201.   The investor presentation presented a timeline under the heading "First Mover with Rapid Progress To Date," reflecting the "El Camino test flight" in 2019.

202.   The investor presentation presented a slide titled "Cornerstone Water Propulsion Innovation" which stated "High ISP . . . 2 to 5 times any chemical propulsion system" and "High thrust . . . 10 times higher than most electric propulsion."

203.   The joint press release from SRAC and Momentus quoted Defendant Kokorich as stating, "The technologies we've developed or built upon, including our groundbreaking water plasma propulsion, will support growing demand from the booming satellite industry with affordable, versatile and low risk transportation and infrastructure services."

204.   The conference call script quotes Defendant Kokorich as saying, "We are building upon last year's successful in-space test of our water plasma propulsion and will be conducting our first flight with customers in December 2020." The script also quotes Defendant Kokorich as stating, "We are a first mover in offering space transportation and infrastructure services, powered by our groundbreaking water plasma propulsion technology." The script further quotes Defendant Kokorich stating:

> At the heart of our vehicles is our groundbreaking water plasma propulsion technology, which uses simple water as a propellant. Our system was designed to be safe, inexpensive and offer an excellent mix of thrust and efficiency. Our thruster is more efficient than conventional chemical propulsion and has higher thrust than electric propulsion, such as Hall-effect thrusters.

205.   The statements in ¶¶198-204 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.B, *supra*, regarding Momentus's in space test failure. These undisclosed adverse facts directly contradicted Defendants' claims to have successfully tested Momentus's technology in space, and rendered Defendants'

statements about the properties and commercial readiness of this technology materially misleading.

206.   In addition, the statements of SRAC and Defendant Kabot in ¶¶198-204 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.D, *supra*, regarding SRAC's failure to perform adequate due diligence on Momentus. Because SRAC and Defendant Kabot had not performed adequate due diligence on the El Camino Real mission, their statements regarding the results of this mission and the commercial readiness of Momentus's technology lacked any reasonable basis and so were materially misleading.

### 3.   Financial Projections

207.   The investor presentation stated under the heading "Transaction Highlights," "No additional capital needs expected prior to achieving profitability."

208.   The joint press release from SRAC and Momentus stated "As of September 30, 2020, the Company had customer contracts which represent approximately $90 million in potential revenue over the next several years."

209.   The investor presentation contained a slide titled "Significant Customer Traction and Expected Demand," which stated, "Signed Contracts >$90M."

210.   In the television interview, the interviewer asked, "I read that the company has contracts for $90 million in potential revenue – I should not, potential – over the next several of years, what kind of risk is involved in those kind of forecasts?" Defendant Kabot responded "That $90 million is fully contracted and then a portion are options that are written into the agreements."

211.   The joint press release from SRAC and Momentus stated "Combined company will have an estimated enterprise value of approximately $1.2 billion"

//

//

212.   The investor presentation contained the following revenue projections:



213.   The investor presentation repeated these revenue projections under the heading "Clear Path to Profitability and >$1B in EBITDA."

214.   The conference call script quotes Defendant Kokorich as stating that "we believe that our financial projections assume a conservative market capture," and further stating:

> Commercially, we have seen strong market traction. Our customers include defense primes such as Lockheed Martin, government agencies such as NASA, and dozens of small satellite manufacturers and operators. Our backlog encompasses the initial and early deployment of our customers' constellations, and we expect our backlog with existing customers will grow by many multiples as we plan to serve the rollout of our customers' constellations. We have several substantial opportunities currently in negotiation or in discussions, worth more than $1 billion of additional potential revenue.
>
> We expect good margin expansion over the next few years and we are projecting that we will be profitable by 2023 and operating at or near run-rate margins by 2025. On a run rate basis, we expect gross margins of around 70%, and EBITDA margins of 60%.

215.   The statements in ¶¶207-14 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements

not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.C, *supra*, regarding financial projections. The undisclosed adverse facts regarding Kokorich's national security risks and Momentus's failed in space test made the assumptions underlying the financial projections and related metrics unreasonable, and made it highly unlikely that these projections and related metrics would be achieved.

216.   In addition, the statements of SRAC and Defendant Kabot in ¶¶207-14 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.D, *supra*, regarding SRAC's failure to perform adequate due diligence on Momentus. Because SRAC and Defendant Kabot had not performed adequate due diligence on Kokorich's national security risks or the El Camino Real mission, their statements regarding financial projections and related metrics for Momentus, which depended on key assumptions regarding Momentus's launch schedule and technology, lacked any reasonable basis and so were materially misleading.

### 4.   Due Diligence

217.   In the television interview, the interviewer asked, "Speaking of SPACs right, I came into this segment saying blank check bonanza, SPAC-a-palooza . . . I'm wondering what you make of it and whether you think there's just too many." Defendant Kabot responded:

> I think it's very healthy, right . . . And what I think is great for the investor is we did four months of due diligence. We spent a lot of money with some of the top service providers out there from Stellar Solutions to Kirkland and Ellis, from Orrick to Evercore to cantor completing our underwriting, right, we did four months of due diligence, which in a traditional ipo you would never have the opportunity to do, so I think SPACs are very healthy for the market.

218.   The statements of SRAC and Defendant Kabot in ¶217 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.D, *supra*, regarding SRAC's failure to perform adequate due diligence on Momentus. Because SRAC and Defendant Kabot had not performed adequate due diligence on Momentus, their statements touting their due diligence process were materially misleading.

### C.   October 13, 2020 Updated Investor Presentation

219.   On October 13, 2020, SRAC filed with the SEC a current report on Form 8-K, signed by Defendant Kabot, which contained as an exhibit an updated version of the investor presentation filed by SRAC on October 7, 2020.

220.   The false and misleading statements and omissions contained in this updated investor presentation were identical or substantially similar to the false and misleading statements and omissions contained in the previously published investor presentation as detailed in Section VIII.B, *supra*, and were false and misleading for the same reasons detailed Sections VIII.B and V.

### D.   November 2, 2020 Registration Statement

221.   On November 2, 2020, SRAC filed a registration statement on Form S-4 with the SEC seeking shareholder approval of the merger. The registration statement was signed by Defendant Kabot, Defendant Norris, and by each member of SRAC's board of directors including Defendant Hofmockel. The registration statement incorporated information about Momentus that was supplied to SRAC by Momentus and the Momentus Individual Defendants.

#### 1.   National Security Risks

222.   The registration statement stated that, "[u]pon the consummation of the Business Combination, the Company's co-founder, Mr. Kokorich, will serve as Chief Executive Officer and a director of the Combined Company." The registration

statement further stated, "[w]e believe Mikhail Kokorich will play a vital role in helping us achieve our goals and advance the interests of our stockholders," and that "[w]e believe that Mr. Kokorich is qualified to serve as a member of the board of directors of the Combined Company because of his extensive professional experience in the space technology industry and deep knowledge of the operations of Momentus as our Chief Executive Officer."

223.   The registration statement stated that "[w]e plan to launch the first iteration of our pioneer transport vehicle, Vigoride, in December 2020, followed by five vehicles in 2021. All of our flights, beginning in December 2020, will have paying customers onboard." The registration statement similarly stated that "Vigoride's first commercial mission is planned to launch in December 2020, followed by launches in April 2021, June 2021, and December 2021."

224.   The registration statement stated that, "restrictions on the ability of foreign persons to invest in us could limit our ability to engage in strategic transactions that could benefit our stockholders."

225.   The registration statement stated that "it is possible that Mr. Kokorich's controlling interests in the Company, or perceptions surrounding Mr. Khasis and his affiliation with Sberbank, could make it more difficult to obtain CFIUS approval in connection with future potential investments by the Company in U.S. businesses." The registration statement further stated that:

> With respect to any investment by Momentus that is within CFIUS's jurisdiction . . . CFIUS could block the consummation of an acquisition or investment within its jurisdiction or could order divestiture after the transaction is completed. Recently, a number of stockholders of a U.S. company, including Mr. Kokorich, divested their interests in such company pursuant to an order by CFIUS.

226.   Regarding Momentus's application to the BIS for an export license to provide its technology to Defendant Kokorich, the registration statement stated that:

---

AMENDED COMPLAINT

> We have been pursuing a BIS license since early 2018 to authorize the deemed export of the Company's controlled technology to Mr. Kokorich, but we have not yet been able to obtain such a license, and there is no assurance we will ever be able to obtain such a license in the future. If we continue to operate without such a license, Mr. Kokorich will continue to be unable to access this controlled technology for as long as he remains a non-US person. While we believe that if the current restrictions on Mr. Kokorich's access to controlled technology remain in place, we will be able to continue to operate our business without any material adverse impact on us, it is possible that these restrictions could in the future lead to complications or other issues that may have a material adverse impact on our operations.

227.   Regarding Defendant Kokorich's immigration status, the registration statement stated that:

> Momentus' co-founder and Chief Executive Officer, Mikhail Kokorich, who will be the Chief Executive Officer of the Combined Company, is a citizen of the Russian Federation who is seeking asylum in the United States and is authorized to work in the United States while his asylum application is pending. While Momentus believes Mr. Kokorich's application will be granted, if for any reason it is not, he may not be able to remain in the United States, which could make it difficult for him to perform his duties as Chief Executive Officer and as a director of the Company and the Combined Company, which would adversely impact us.

228.   The statements in ¶¶222-27 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.A, *supra*, regarding national security risks pertaining to Defendant Kokorich. These undisclosed adverse facts made it highly likely that the federal government would significantly restrict Momentus's operations so long as Kokorich remained an officer or shareholder, and likewise made it highly unlikely that the federal government would grant Momentus the approvals necessary to achieve its advertised launch schedule.

229.   In addition, the statements in ¶¶224-27 were materially false and/or misleading when made because the risk warnings presented as mere hypothetical risks adverse events that had already materialized; and the risk warnings failed to disclose specific facts concerning regulatory actions involving Defendant Kokorich, as detailed in Section V.A, *supra*, that were necessary for investors to understand the magnitude and/or probability of the risks at issue.

230.   In addition, the statements of SRAC and the SRAC Individual Defendants in ¶¶222-27 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.D, *supra*, regarding SRAC's failure to perform adequate due diligence on Momentus. Because SRAC and the SRAC Individual Defendants had not performed adequate due diligence on Kokorich's national security risks, their statements regarding his continued involvement with Momentus, Momentus's planned launch schedule, and Momentus's regulatory risks lacked any reasonable basis and so were materially misleading.

## 2.   Momentus's Technology

231.   The registration statement stated that, "Momentus has developed a portfolio of technologies, including its cornerstone water plasma propulsion technology, which it successfully tested in space in 2019."

232.   The registration statement stated that "[o]ur revolutionary water plasma propulsion technology provides a unique competitive advantage for our vehicles and services," and that "[w]e view this technology as ground-breaking, as it can achieve considerable propulsive thrust level while maintaining high ISP, which enables a shorter duration of missions, an enhanced reach, and excellent payload mass ratio."

233.   The registration statement reproduced a slide from the SRAC/Momentus investor presentations previously published on October 7, 2020 and October 13, 2020, which slide was titled "Cornerstone Water Propulsion

Innovation," and which stated "High ISP . . . 2 to 5 times any chemical propulsion system" and "High thrust . . . 10 times higher than most electric propulsion."

234.   The registration statement, under the heading "Competitive Advantage Overview," stated:

> A key space-specific barrier to entry is flight heritage. Ultimately the only way to assess the reliability of a product, such as satellites or launch services, is by seeing a history of successful results, which in turn influences insurance rates and customers' perceptions. Therefore, we believe that our status as a first mover will offer a substantial competitive advantage as we continue to build flight heritage ahead of competitors.

235.   The statements in ¶¶231-34 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.B, *supra*, regarding Momentus's in space test failure. These undisclosed adverse facts directly contradicted Defendants' claims to have successfully tested Momentus's technology in space, and rendered Defendants' statements about the properties and commercial readiness of this technology materially misleading.

236.   In addition, the statements of SRAC and the SRAC Individual Defendants in ¶¶231-34 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.D, *supra*, regarding SRAC's failure to perform adequate due diligence on Momentus. Because SRAC and the SRAC Individual Defendants had not performed adequate due diligence on the El Camino Real mission, their statements regarding the results of this mission and the commercial readiness of Momentus's technology lacked any reasonable basis and so were materially misleading.

### 3.   Financial Projections

237.   The registration statement stated that, "The Combined Company will have an anticipated initial enterprise value of $1.2 billion, implying a 1.0x multiple of 2025 projected EBITDA as Momentus' operations are expected to achieve scale."

238.   The registration statement stated that, "we have received significant interest from a wide range of different customers across different satellite applications. Our current signed backlog (as of November 1, 2020) is worth approximately $90 million in potential revenue and continues to increase, while our pipeline consists of approximately $1.1 billion in potential contracts in negotiation or early conversations."

239.   The registration statement contained the following revenue projections:

| Management Forecasted Financials[1] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ($ in millions) | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E |
| Satellite Transportation Services[1] | $ 2 | $ 19 | $ 122 | $ 435 | $ 852 | $ 1,089 | $ 1,453 | $ 1,717 |
| Satellite as a Service[1] | — | — | 30 | 153 | 319 | 721 | 1,192 | 1,650 |
| In-Orbit Services[1] | — | — | — | 10 | 29 | 150 | 343 | 669 |
| Revenue[1] | $ 2 | $ 19 | $ 152 | $ 598 | $ 1,200 | $ 1,960 | $ 2,987 | $ 4,035 |
| (%) Growth | | NM | 809% | 718% | 293% | 101% | 63% | 52% | 35% |

240.   The registration statement claimed that "in the view of Momentus' management," these projections "reflect[] to the best of management's knowledge and reasonable belief at the time of preparation, the expected course of action and the expected future financial performance of Momentus as of the date of preparation."

241.   The statements in ¶¶237-40 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.C, *supra*, regarding financial projections. The undisclosed adverse facts regarding Kokorich's national security risks and Momentus's failed in space test made the assumptions underlying the financial

projections and related metrics unreasonable, and made it highly unlikely that these projections and related metrics would be achieved.

242.    In addition, the statements of SRAC and the SRAC Individual Defendants in ¶¶237-40 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.D, *supra*, regarding SRAC's failure to perform adequate due diligence on Momentus. Because SRAC and the SRAC Individual Defendants had not performed adequate due diligence on Kokorich's national security risks or the El Camino Real mission, their statements regarding financial projections and related metrics for Momentus, which depended on key assumptions regarding Momentus's launch schedule and technology, lacked any reasonable basis and so were materially misleading.

### 4.    Due Diligence

243.    Regarding SRAC's due diligence, the registration statement stated that:

During the period between the execution of the Confidentiality Agreement and the execution of the Merger Agreement on October 7, 2020, SRAC and its advisors conducted extensive due diligence with respect to Momentus' financial model, customer base and customer contracts, total addressable market, industry in which Momentus operates, companies comparable to Momentus and aero-defense companies with similar characteristics, technology solutions, intellectual property and relationship with SpaceX. Momentus provided representatives of SRAC and its advisors with, among other materials in connection with SRAC's diligence review, confidential presentations reflecting an overview of Momentus' business, as well as financial forecasts and written responses to detailed business and financial due diligence questions.

244.    The registration statement further stated that, "[r]epresentatives of each of SRAC and Momentus, as well as each of their advisors, met telephonically

several times throughout July, August and September 2020 to discuss disclosure requests and responses in connection with SRAC's diligence review."

245.   The registration statement further stated that, "[o]n September 1, 2020, SRAC engaged Stellar Solutions to assist with technical due diligence, including with respect to Momentus' R&D strategy, vehicle development to date, testing progress and competitive market positioning," and that "[f]rom September 25, 2020 until signing on October 7, 2020, SRAC had multiple teleconferences and email exchanges with representatives of K&E, Stellar Solutions, RSM and certain of its other advisors regarding the results of their due diligence review of Momentus and any outstanding areas of their due diligence review."

246.   The registration statement stated that in deciding to approve the merger agreement, SRAC's board of directors "considered the scope of the due diligence investigation conducted by SRAC's management and outside advisors and evaluated the results thereof," including "extensive meetings and calls with the Momentus management team," "review of materials related to Momentus made available by Momentus, including . . . export control and security matters," "review of financial due diligence materials prepared by professional advisors," " technical diligence by a third party systems engineering service provider with significant experience in system and subsystem design and propulsion technology," and "discussions with industry experts."

247.   The statements of SRAC and the SRAC Individual Defendants in ¶¶243-46 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.D, *supra*, regarding SRAC's failure to perform adequate due diligence on Momentus. Because SRAC and the SRAC Individual Defendants had not performed adequate due diligence on Momentus, their statements touting their due diligence process were materially misleading.

### E.   November 17, 2020 Analyst Day Presentation

248.   On November 17, 2020, SRAC filed with the SEC a current report on Form 8-K, signed by Defendant Kabot, which contained as an exhibit an "analyst day" presentation which was substantially similar to the investor presentations previously filed by SRAC on October 7, 2020 and October 13, 2020.

249.   The false and misleading statements and omissions contained in this analyst day presentation were identical or substantially similar to the false and misleading statements and omissions contained in the previously published investor presentations (with the exception that the November 17, 2020 analyst day presentation omitted the "Transaction Highlights" slide) as detailed in Section VIII.B, *supra*, and were false and misleading for the same reasons detailed Sections VIII.B and V.

### F.   December 14, 2020 Amended Registration Statement And Updated Investor Presentation

250.   On December 14, 2020, SRAC filed with the SEC a current report on Form 8-K, signed by Defendant Kabot, which contained an updated investor presentation which was substantially similar to the investor presentations previously filed by SRAC on October 7, 2020 and October 13, 2020, and to the analyst day presentation previously filed by SRAC on November 17, 2020.

251.   The false and misleading statements and omissions contained in this updated investor presentation were identical or substantially similar to the false and misleading statements and omissions contained in the previously published investor presentations as detailed in Section VIII.B, *supra*, and were false and misleading for the same reasons detailed Sections VIII.B and V.

252.   On December 14, 2020, SRAC also filed an amended registration statement on Form S-4/A with the SEC seeking shareholder approval of the merger. The amended registration statement was signed by Defendant Kabot and Defendant Norris, and by Defendant Kabot as attorney-in-fact for each member of SRAC's

board of directors including Defendant Hofmockel. The amended registration statement incorporated information about Momentus that was supplied to SRAC by Momentus and the Momentus Individual Defendants. The amended registration statement was substantially similar to the version previously filed by SRAC on November 2, 2020.

253. The false and misleading statements and omissions contained in this amended registration statement were identical or substantially similar to the false and misleading statements and omissions contained in the previously published registration statement (with the exception that Momentus's planned inaugural commercial mission was postponed from December 2020 to January 2021) as detailed in Section VIII.D, *supra*, and were false and misleading for the same reasons detailed Sections VIII.D and V.

254. In addition, the December 14, 2020 amended registration statement added new misleading statements regarding Momentus's application to the BIS for an export license to provide its technology to Defendant Kokorich, stating "notwithstanding the restrictions on Mr. Kokorich's access to export-controlled materials, Momentus has been able to secure contracts with customers ranging from private space companies to established U.S. space industry entities such as NASA and Lockheed Martin."

255. In discussing Momentus's BIS application, the amended registration statement further stated, "Mr. Kokorich is pursuing several paths to U.S. Person status, and we believe that he meets all of the legal requirements to be granted such status in the United States. Momentus is also continuing to pursue appropriate export licensure for Mr. Kokorich."

256. The statements in ¶¶254-55 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.A, *supra*, regarding national security risks pertaining to

Defendant Kokorich. These undisclosed adverse facts made it highly likely that the federal government would significantly restrict Momentus's operations so long as Kokorich remained an officer or shareholder, and made it highly unlikely that the federal government would grant Kokorich U.S. Person status.

257. In addition, the statements of SRAC and the SRAC Individual Defendants in ¶¶254-55 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.D, *supra*, regarding SRAC's failure to perform adequate due diligence on Momentus. Because SRAC and the SRAC Individual Defendants had not performed adequate due diligence on Kokorich's national security risks, their statements regarding his continued involvement with Momentus, whether he would be granted U.S. Person status, and Momentus's regulatory risks lacked any reasonable basis and so were materially misleading.

### G.     January 4-5, 2021 Press Release And Interviews

258. On January 4, 2021 Momentus issued a press release, which SRAC filed with the SEC as an exhibit to a current report on Form 8-K, signed by Defendant Kabot. Also on January 4, 2021, IPO Edge published an interview with Defendant Kennedy, which SRAC filed with the SEC. On January 5, 2021 Forbes published an interview with Defendant Kokorich, which SRAC filed with the SEC.

#### 1.     National Security Risks

259. In the press release, Momentus stated regarding regulatory approvals and its launch schedule that:

> [Momentus] will be remanifesting its January 2021 mission to a subsequent launch opportunity in 2021. This move will allow for the additional time necessary to secure FAA approval of Momentus' payloads, including completion of a standard interagency review. Momentus currently holds all other necessary licenses for its Vigoride

vehicle. The Company has booked several additional launches with SpaceX between June and December of 2021.

260.   The press release quoted Defendant Kennedy as stating, "We will continue to work with the FAA, as we have done successfully with other regulatory agencies, to obtain approval in a timely manner."

261.   The IPO Edge interviewer asked Kennedy, "What caused the delays?", to which Defendant Kennedy replied in relevant part:

> The most recent shift (from January 2021 to a subsequent launch in 2021) came about as result of a delay in the Federal Aviation Administration's (FAA's) approval of Momentus' spacecraft. The FAA did not express any specific concerns of its own, but rather indicated that more time was needed to complete its interagency review of Momentus' payload.

262.   The IPO Edge interviewer asked, "What is the nature of this interagency review, and is this the first time you are undergoing such a review?", to which Defendant Kennedy replied:

> We are quite familiar with interagency review processes, and we have cleared similar reviews for our other licenses. For example, we recently cleared an interagency review as part of our effort to obtain a license from the National Oceanic and Atmospheric Administration (NOAA) to allow the operation of our spacecraft's camera. While we discuss interagency reviews in our S-4, these reviews are a standard part of various license application processes, allowing multiple government agencies – the Department of Commerce, Department of Defense, Department of State, NASA, and others – to examine the applications from their individual perspectives.

263.   The IPO Edge interviewer asked, "You state in your S-4 that interagency review may include a review of foreign ownership. Is that a concern for Momentus?", to which Defendant Kennedy replied:

> NOAA and its partner agencies have already reviewed Momentus' foreign ownership – this review was completed to the satisfaction of these agencies, as evidenced by NOAA's issuance of a license.

Momentus is approximately 74% U.S.-owned today, and this U.S.-majority ownership is expected to increase to approximately 84% upon the company's merger with Stable Road.  This merger is on target to close in the first quarter of 2021 (subject to approval of Stable Road's and Momentus' stockholders and other closing conditions, including a registration statement being declared effective by the SEC). We also mention in our S-4 that Mikhail Kokorich, the CEO of Momentus and one of the company's larger shareholders, is an asylum seeker from the Russian Federation, currently pursuing several paths to U.S. Person status. We believe that Mr. Kokorich meets all legal requirements to be granted such status in the United States, and that he will be offered U.S. citizenship, further increasing U.S. ownership of Momentus.

264.   The IPO Edge interviewer asked, "In addition to the FAA approval, are there any other approvals/licenses Momentus still needs in order to launch Vigoride?", to which Defendant Kennedy replied, "No, Momentus currently holds all necessary licenses for its Vigoride vehicle."

265.   The Forbes interviewer asked Kokorich, "Who is your biggest inspiration?", to which Defendant Kokorich replied:

My source of inspiration is the story of Igor Sikorsky, a great Russian-American inventor, aviator and entrepreneur. I found a lot of commonalities in his life and my own. He became famous and successful in the Russian Empire, where he built the largest plane in the world, and finally ran from the Bolshevik regime of Soviet Russia to the United States. He created a large aerospace company and became the inventor of a new class of flying machines: helicopters, the possibility of which was predicted by the great Leonardo Da Vinci.

266.   The statements in ¶¶259-65 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.A, *supra*, regarding national security risks pertaining to Defendant Kokorich. These undisclosed adverse facts made it highly likely that the federal government would significantly restrict Momentus's operations so long as

Kokorich remained an officer or shareholder, and likewise made it highly unlikely that the federal government would grant Momentus the approvals necessary to achieve its advertised launch schedule.

267.   In addition, the statements of SRAC and Defendant Kabot in ¶¶259-65 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.D, *supra*, regarding SRAC's failure to perform adequate due diligence on Momentus. Because SRAC and Defendant Kabot had not performed adequate due diligence on Kokorich's national security risks, their statements regarding his continued involvement with Momentus, Momentus's planned launch schedule, and Momentus's regulatory risks lacked any reasonable basis and so were materially misleading.

### 2.    Financial Projections

268.   In the press release, Momentus stated that "The Company reaffirms its expectation of 2021 revenue as detailed in its December 2020 investor presentation."

269.   The Press release quoted Defendant Kennedy as stating, "We anticipate that by launching our first Vigoride vehicle on a subsequent mission, we will still achieve our revenue expectations for 2021 while delivering our customers' payloads to orbit."

270.   The IPO Edge interviewer asked Defendant Kennedy, "How will the new launch date impact your 2021 revenue?", to which Defendant Kennedy replied, "The number of launches did not change. Rather than launching in January, we will launch this particular vehicle at our first opportunity, later this year.  Hence, we do not expect changes to our total revenue for 2021."

271.   The Forbes interviewer asked Kokorich, "Why did you choose the SPAC route to going public? What are the benefits of this versus the traditional IPO route?", to which Defendant Kokorich replied:

> During the SPAC merger process, a company can communicate its plans and projections to the market, which is challenging to do during the IPO process. This is especially valuable for fast-growing companies, who place a lot of value in future growth. Additionally, a company can negotiate and test its valuation during the PIPE process before the deal becomes public and the company goes to market. PIPE is common for SPAC deals, and it also signals to the market that the valuation was negotiated with professional and reputable investors.

272.   The statements in ¶¶268-71 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.C, *supra*, regarding financial projections. The undisclosed adverse facts regarding Kokorich's national security risks and Momentus's failed in space test made the assumptions underlying the financial projections and related metrics unreasonable, and made it highly unlikely that these projections and related metrics would be achieved.

273.   In addition, the statements of SRAC and Defendant Kabot in ¶¶268-71 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.D, *supra*, regarding SRAC's failure to perform adequate due diligence on Momentus. Because SRAC and Defendant Kabot had not performed adequate due diligence on Kokorich's national security risks or the El Camino Real mission, their statements regarding financial projections and related metrics for Momentus, which depended on key assumptions regarding Momentus's launch schedule and technology, lacked any reasonable basis and so were materially misleading.

**H.    January 25, 2021 Press Release**

274.   On January 25, 2021 Momentus issued a press release, which SRAC filed with the SEC as an exhibit to a current report on Form 8-K, signed by Defendant Kabot. The press release announced that Momentus's "Board of Directors has appointed Dawn Harms, the Company's Chief Revenue Officer, as a director and interim CEO effective immediately, following the resignation of director and founding CEO Mikhail Kokorich."

275.   The press release stated, "Momentus, in consultation with [SRAC], has determined that accepting Mr. Kokorich's resignation is in the best interest of the Company, in an effort to expedite the resolution of U.S. government national security and foreign ownership concerns surrounding the Company, the existence of which the Company recently has confirmed."

276.   The press release quoted Defendant Kabot as stating, "We believe that this leadership transition will position the company for success and help accelerate regulatory reviews by the U.S. government . . . We have full confidence in Dawn and the team to lead the Company to reach both near-term targets and achieve even greater success over the longer-term."

277.   The statements in ¶¶274-76 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.A, *supra*, regarding national security risks pertaining to Defendant Kokorich. These undisclosed adverse facts made it highly likely that the federal government would significantly restrict Momentus's operations so long as Kokorich remained a shareholder, and likewise made it highly unlikely that the federal government would grant Momentus the approvals necessary to achieve its advertised launch schedule.

278.   In addition, the statements of SRAC and Defendant Kabot in ¶¶274-76 were materially false and/or misleading when made and/or omitted to state material

facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.D, *supra*, regarding SRAC's failure to perform adequate due diligence on Momentus. Because SRAC and Defendant Kabot had not performed adequate due diligence on Kokorich's national security risks, their statements regarding the effect of his resignation, Momentus's planned launch schedule, and Momentus's regulatory risks lacked any reasonable basis and so were materially misleading.

## I.      March 8, 2021 Amended Registration Statement

279.   On March 8, 2021, SRAC filed an amended registration statement on Form S-4/A with the SEC seeking shareholder approval of the merger. The amended registration statement was signed by Defendant Kabot and Defendant Norris, and by Defendant Kabot as attorney-in-fact for each member of SRAC's board of directors including Defendant Hofmockel. The amended registration statement incorporated information about Momentus that was supplied to SRAC by Momentus and the Momentus Individual Defendants.

280.   The false and misleading statements and omissions contained in this amended registration statement regarding Momentus's technology, financial projections, and SRAC's due diligence were identical or substantially similar to the false and misleading statements and omissions regarding these subjects as contained in the previously published versions of the registration statement as detailed in Section VIII.D, *supra*, and were false and misleading for the same reasons detailed Sections VIII.D and V.

281.   In addition, the amended registration statement disclosed regarding Defendant Kokorich's resignation:

> On January 21, 2021, Momentus became aware of correspondence from the U.S. Department of Defense ("DoD") stating Momentus posed a risk to national security as a result of the foreign ownership and control of Momentus by Mikhail Kokorich and Lev Khasis and their associated entities, as well as concerns regarding disclosures

relating to such matters made by Stable Road in its SEC filings in connection with the Business Combination. In an effort to expedite the resolution of these U.S. Government concerns, on January 23, 2021, Mr. Kokorich resigned as Momentus' Chief Executive Officer and as a director of Momentus.

282.   The amended registration statement described Kokorich's relinquishment of voting rights in his Momentus stock as part of efforts to overcome the U.S. government's national security concerns:

> As contemplated by the CFIUS notice, on March 1, 2021, each of (i) Mr. Kokorich (and Nortrone Finance S.A. ("Nortrone"), which is wholly owned and controlled by Mr. Kokorich and his wife (collectively, the "Kokorich Parties")), and (ii) Brainyspace LLC ("Brainyspace") (the beneficial owner of which is Olga Khasis, a U.S. citizen and wife of Lev Khasis, a co-founder and former director of Momentus who is a legal permanent U.S. resident and also a Russian citizen), relinquished their ability to direct the voting of any shares in Momentus through the implementation of trust structures and certain voting arrangements.

283.   The amended registration statement disclosed that Kokorich planned to remain a shareholder of Momentus for several years, stating "The Kokorich Parties and Brainyspace have agreed with Momentus that they will fully divest their shares by March 1, 2024, or as required by CFIUS."

284.   The amended registration statement discussed Momentus's planned launch schedule, stating "Vigoride's first two commercial missions are planned to launch in June 2021, followed by a mission in August 2021 and three additional missions in December 2021."

285.   The statements in ¶¶281-84 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.A, *supra*, regarding national security risks pertaining to Defendant Kokorich. These undisclosed adverse facts made it highly likely that the

federal government would significantly restrict Momentus's operations so long as Kokorich remained a shareholder, and likewise made it highly unlikely that the federal government would grant Momentus the approvals necessary to achieve its advertised launch schedule.

286. In addition, the statements of SRAC and the SRAC Individual Defendants in ¶¶281-84 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.D, *supra*, regarding SRAC's failure to perform adequate due diligence on Momentus. Because SRAC and the SRAC Individual Defendants had not performed adequate due diligence on Kokorich's national security risks, their statements regarding the effect of his resignation, Momentus's planned launch schedule, and Momentus's regulatory risks lacked any reasonable basis and so were materially misleading.

### J.   April 7, 2021 Preliminary Proxy Statement And Updated Investor Presentation

287. On April 7, 2021, SRAC filed with the SEC a current report on Form 8-K, signed by Defendant Kabot, which contained as an exhibit an updated version of the investor presentations previously published by SRAC and Momentus. Also on April 7, 2021, SRAC filed with the SEC a preliminary proxy statement on Form 14A, signed by Defendant Kabot, to postpone its May 13, 2021 deal deadline.

288. The false and misleading statements and omissions relating to Momentus's technology that were contained in the updated investor presentation were identical or substantially similar to the false and misleading statements and omissions on that subject contained in the previously published investor presentations as detailed in Section VIII.B, *supra*, and were false and misleading for the same reasons detailed Sections VIII.B and V.

### 1.      National Security Risks

289.    The preliminary proxy statement stated regarding Momentus's efforts to resolve regulatory concerns, "Momentus has undertaken several important actions in an effort to further accelerate the resolution of these concerns," including "The entry into trust structures and certain voting arrangements providing for the complete relinquishment of the ability to direct the voting of shares of Momentus by Mr. Kokorich and Mr. Khasis and/or their associated entities," and "Arrangements providing for the complete divestment of shares of Momentus by Mr. Kokorich and Mr. Khasis and/or their associated entities by March 1, 2024 or as required by CFIUS."

290.    The preliminary proxy statement stated, "Momentus' first launch of customer payloads is currently anticipated to occur in June 2021 on a SpaceX Falcon-9 rocket," and further stated that "Momentus still plans to build and launch six Momentus vehicles in 2021 in three launches."

291.    The investor presentation likewise contained a timeline forecasting Momentus's launch of six Momentus vehicles in 2021 in three launches.

292.    The statements in ¶¶289-91 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.A, *supra*, regarding national security risks pertaining to Defendant Kokorich. These undisclosed adverse facts made it highly likely that the federal government would significantly restrict Momentus's operations so long as Kokorich remained a shareholder, and likewise made it highly unlikely that the federal government would grant Momentus the approvals necessary to achieve its advertised launch schedule.

293.    In addition, the statements of SRAC and Defendant Kabot in ¶¶289-91 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to

disclose, among other things, the adverse facts detailed in Section V.D, *supra*, regarding SRAC's failure to perform adequate due diligence on Momentus. Because SRAC and Defendant Kabot had not performed adequate due diligence on Kokorich's national security risks, their statements regarding the effect of his resignation, Momentus's planned launch schedule, and Momentus's regulatory risks lacked any reasonable basis and so were materially misleading.

### 2.    Financial Projections

294.    The investor presentation contained the following revenue projections:



295.    The investor presentation repeated these revenue projections under the heading "Clear Path to Profitability and >$1B in EBITDA."

296.    The investor presentation contained a slide titled "Significant Customer Traction and Expected Demand," which stated "Current Backlog of Potential Revenue ~86M."

297.    The statements in ¶¶294-96 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.C, *supra*, regarding financial projections. The undisclosed adverse facts regarding Kokorich's national security risks and Momentus's failed in space test made the assumptions underlying the financial

projections and related metrics unreasonable, and made it highly unlikely that these projections and related metrics would be achieved.

298. In addition, the statements of SRAC and Defendant Kabot in ¶¶294-96 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.D, *supra*, regarding SRAC's failure to perform adequate due diligence on Momentus. Because SRAC and Defendant Kabot had not performed adequate due diligence on Kokorich's national security risks or the El Camino Real mission, their statements regarding financial projections and related metrics for Momentus, which depended on key assumptions regarding Momentus's launch schedule and technology, lacked any reasonable basis and so were materially misleading.

### K.   May 4-5, 2021 Updated Investor Presentation

299. On May 4, 2021 representatives of SRAC and Momentus (including Defendants Kabot and Harms, in addition to Momentus's Chief Technology Officer Rob Schwarz) participated in a live broadcast interview with IPO Edge. The interview was accompanied by a modified version of Momentus's investor presentation. On May 5, 2021 SRAC publicly filed a transcript of this interview with the SEC on Form 425, along with a copy of the accompanying investor presentation.

300. The false and misleading statements and omissions relating to Momentus's technology that were contained in the investor presentation were identical or substantially similar to the false and misleading statements and omissions on that subject contained in previously published investor presentations, as detailed in Section VIII.B, *supra*, and were false and misleading for the same reasons detailed Sections VIII.B and V.

//

//

301.   The investor presentation contained the following revenue projections:



302.   The statements in ¶301 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.C, *supra*, regarding financial projections. The undisclosed adverse facts regarding Kokorich's national security risks and Momentus's failed in space test made the assumptions underlying the financial projections and related metrics unreasonable, and made it highly unlikely that these projections and related metrics would be achieved.

303.   In addition, the statements of SRAC in ¶301 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts detailed in Section V.D, *supra*, regarding SRAC's failure to perform adequate due diligence on Momentus. Because SRAC had not performed adequate due diligence on Kokorich's national security risks or the El Camino Real mission, its statements regarding financial projections and related metrics for Momentus, which depended on key assumptions regarding Momentus's launch schedule and technology, lacked any reasonable basis and so were materially misleading.

### L. June 29, 2021 Amended Registration Statement

304. On June 29, 2021, SRAC filed an amended registration statement on Form S-4/A with the SEC seeking shareholder approval of the merger. The amended registration statement was signed by Defendant Kabot and Defendant Norris, and by Defendant Kabot as attorney-in-fact for each member of SRAC's board of directors including Defendant Hofmockel. The amended registration statement incorporated information about Momentus that was supplied to SRAC by Momentus and the Momentus Individual Defendants.

305. The false and misleading statements and omissions contained in this amended registration statement regarding SRAC's due diligence were identical or substantially similar to the false and misleading statements and omissions regarding these subjects as contained in the previously published versions of the registration statement as detailed in Section VIII.D, *supra*, and were false and misleading for the same reasons detailed Sections VIII.D and V.

## IX. ADDITIONAL SCIENTER ALLEGATIONS

306. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the names of SRAC and Momentus were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

307. As alleged herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding SRAC and Momentus, their control over, and/or receipt and/or modification of SRAC's and Momentus's allegedly materially misleading misstatements and/or their associations with SRAC and Momentus which made them privy to confidential proprietary information

concerning SRAC and Momentus, participated in the fraudulent scheme alleged herein.

### A.   SRAC And The SRAC Individual Defendants Knew Or Recklessly Disregarded The Falsity Of Their Statements

308.   The positions of the SRAC Individual Defendants give rise to a strong inference of their scienter with respect to issues relating to the proposed merger and SRAC's due diligence. Defendant Kabot was SRAC's CEO. Defendant Norris was SRAC's CFO. Defendant Quiroga was SRAC's Chief Investment Officer. Defendant Hofmockel was a director of SRAC.

309.   The SRAC Individual Defendants repeatedly held themselves out as knowledgeable regarding the operational details of SRAC and Momentus and the subject matter of the various misrepresentations and omissions alleged herein, which gives rise to a strong inference of their scienter.

310.   Defendants Kabot, Quiroga, and Hofmockel repeatedly and directly participated in SRAC's due diligence of Momentus, and so knew first-hand the limitations of SRAC's due diligence, and the falsity of Defendants' related statements to investors. For example, among the many instances of their involvement in the due diligence process, as admitted in SRAC's SEC filings:

(a)   "On August 13, 2020, Mr. Kabot and Mr. Quiroga visited Momentus' headquarters for an in-person management presentation and facility tour. During the day, they met with key members of management, discussed their backgrounds and roles at the company, performed additional due diligence and toured the facility."

(b)   "On August 14, 2020, Mr. Kabot, Mr. Quiroga, representatives of Evercore and members of the Momentus management, including Rob Schwarz (Chief Technology Officer), Mr. Mitchell and Alexander Fishkin (Chief Business Affairs and Legal Officer), had a due diligence teleconference to discuss Momentus' intellectual property and other related topics. Also on August 14, 2020, Mr. Kabot,

Mr. Quiroga, representatives of Evercore and members of Momentus management, including Philip Hoover-Smoot (Associate General Counsel and Chief Ethics & Compliance Officer), had another due diligence teleconference to discuss Momentus' commercial contracts and related topics. On August 26, 2020, Mr. Kabot, Mr. Quiroga and representatives of Evercore had a teleconference to discuss the due diligence calls SRAC had with Momentus."

(c)   "On August 26, 2020, Mr. Kabot, Mr. Quiroga and Mr. Kokorich had a meeting to discuss certain details of the proposed business combination, including hiring Jikun Kim as the chief financial officer of Momentus, the process for drafting and negotiating definitive documentation, the PIPE Investment, the management equity incentive plan for the Combined Company including the proposed CEO Option Grant, diligence and the composition of the board of directors following the closing."

(d)   "On September 2, 2020, the SRAC board of directors had a call to discuss the potential business combination. During this call, Mr. Kabot and Mr. Quiroga provided the other directors an update on progress with respect to diligence, definitive documentation and the potential PIPE investment."

(e)   "On September 10, 2020, Mr. Quiroga and representatives of Evercore had a teleconference with representatives of Stellar Solutions to discuss SRAC's engagement of Stellar Solutions to assist in technical diligence of Momentus."

(f)   "On September 18, 2020, Messrs. Quiroga, Hofmockel and representatives of K&E, RSM US LLP ('RSM') and Stellar Solutions had a teleconference to provide updates on the due diligence process and their diligence findings to date."

(g)   "On September 21, 2020, the SRAC board of directors had a call to discuss progress in the initial business combination. Mr. Kabot and Mr. Quiroga provided a detailed update to the board regarding progress on the PIPE investment,

the negotiation of the merger agreement and other transaction documents and SRAC's due diligence findings to date."

(h)    "On September 25, 2020, Messrs. Kabot, Quiroga, Hofmockel and Ms. Harms had a call to discuss certain areas of business due diligence, including customer contracts, backlog and deal pipeline."

311.   During and leading up to the Class Period SRAC was an extremely small organization.   SRAC had three officers (Defendants Kabot, Norris and Quiroga) and no full-time employees. This allowed the SRAC Individual Defendants to have in-depth knowledge of all aspects of SRAC's operations.

312.   Prior to the Business Combination, SRAC had no business operations of its own, and its sole purpose was to enter into a merger.   Therefore, the business combination with Momentus was SRAC's core, and indeed only, operation, which gives rise to a strong inference of the SRAC Individual Defendants' scienter with respect to issues relating to Momentus.

313.   The SRAC Individual Defendants possessed strong personal financial motives to complete the merger between SRAC and Momentus, and therefore to cover up problems with SRAC's due diligence and problems at Momentus, and to misleadingly tout the merger and inflate Momentus's apparent future prospects. For example, as of December 11, 2020, the Sponsor and its affiliate owned SRAC stock and warrants with an aggregate market value of approximately $80.9 million, which would be rendered worthless if the merger was not approved. These securities were reported as beneficially owned by Defendants Quiroga and Kabot, and each of the SRAC Individual Defendants were directly or indirectly a member of the Sponsor. As the directors and/or officers of SRAC the SRAC Individual Defendants had ample opportunity to control SRAC's public statements regarding the proposed merger.

314.   That the SRAC Individual Defendants do not appear to have sold SRAC securities during the Class Period does not negate a strong inference of their

scienter. It is a customary condition of SPAC mergers, necessary to market the SPAC to prospective investors, that the SPAC's directors, officers, and substantial shareholders must enter into lock-up agreements whereby they agree not to sell SPAC securities until a given amount of time has passed from the completion of a merger with a target company. SRAC's Sponsor and SRAC's executive officers and directors, including the SRAC Individual Defendants, entered into such a lock-up agreement with SRAC in which they agreed not to sell SRAC securities until six months after the closing of SRAC's merger with a target company. SRAC's merger with Momentus was not completed until on or about August 12, 2021, well after the truth had been revealed about SRAC and Momentus and the artificial inflation had been removed from SRAC's security prices. Therefore, due to the federal government's intervention to reveal the truth to investors and due to the SRAC Individual Defendants' lock-up agreement, the SRAC Individual Defendants did not have the opportunity to sell SRAC securities at an artificial profit. That the federal government intervened to foil the SRAC Individual Defendants' fraudulent scheme before it came to fruition does not negate a strong inference of their scienter.

315.   The scienter of the SRAC Individual Defendants is imputable to SRAC because they were directors and/or officers of SRAC acting within the scope of their authority.

316.   The misrepresentations and omissions of SRAC as alleged herein are of such a nature that they would have been approved by corporate officials sufficiently knowledgeable about SRAC to know that those statements and omissions were misleading.

**B.    Momentus And The Momentus Individual Defendants Knew Or Recklessly Disregarded The Falsity Of Their Statements**

317.   The positions of the Momentus Individual Defendants give rise to a strong inference of their scienter with respect to issues relating to the proposed merger, Momentus's technology, Momentus's national security risks, and

Momentus's financial projections. Defendant Kokorich was Momentus's CEO. Defendant Harms was Momentus's Chief Revenue Officer, and later interim CEO. Defendant Kennedy was Momentus's President.

318.   The Momentus Individual Defendants repeatedly held themselves out as knowledgeable regarding the operational details of Momentus and the subject matter of the various misrepresentations and omissions alleged herein, which gives rise to a strong inference of their scienter.

319.   As alleged herein, some or all of the Momentus Individual Defendants were directly involved in issues relating to Momentus's 2019 in space test, national security risks, and financial projections, and so knew first-hand the falsity of Defendants' related statements to investors.

320.   Defendant Kokorich was directly and substantially involved in preparing and disseminating to investors false information about Momentus as alleged herein. Defendant Kokorich knew that information he provided to SRAC and its representatives would be repeated to investors in connection with the proposed merger. As revealed by the SEC Order and the SEC Complaint:

(a)   Prior to the execution of the merger agreement, Momentus and Defendant Kokorich told SRAC and Defendant Kabot that the El Camino Real mission was a success, but did not inform them of any internal concerns or shortcomings with the in-space test. Defendant Kokorich and Momentus never shared with SRAC and Defendant Kabot material internal analyses about the El Camino Real mission's failure.

(b)   Defendant Kokorich told Defendant Kabot prior to signing the merger agreement that he had a strong case for political asylum, and that he also had a second path to U.S. citizenship if for any reason the asylum application was not granted. Defendant Kokorich did not tell Defendant Kabot that the USCIS had previously issued a referral notice saying that it had not granted his asylum

application, and that it had referred his case to an immigration judge for adjudication in removal proceedings.

(c) Defendant Kokorich assured Defendant Kabot that the CFIUS divestiture order regarding his other space technology company was closed, and that it was a different situation from his Momentus ownership. Defendant Kokorich asserted that the issues CFIUS raised in the prior matter had to do with other investors, not specifically him.

(d) Defendant Kokorich participated in the preparation of the November and December 2020 S-4 registration statements, and specifically the subsections of the S-4 statements that described or contained information about Momentus. In his role as CEO, Defendant Kokorich generally reviewed and approved Momentus's portion of the registration statements. Defendant Kokorich also helped to draft what he described as the technology and business or market strategy sections of the S-4 statements. Each registration statement contained a subsection titled, "Information about Momentus," that Momentus drafted. Defendant Kokorich reviewed and approved these subsections before they were provided to SRAC for inclusion in the registration statement. Momentus also drafted the "Risk Factors" subsection and provided it to Stable Road for inclusion in the registration statement. Defendant Kokorich reviewed and did not correct the "Risk Factors" subsection.

321. During and leading up to the Class Period Momentus was a small organization. As of November 2, 2020 Momentus had only 82 employees, which allowed the Momentus Individual Defendants to have in-depth knowledge of all aspects of Momentus's operations.

322. At all relevant times the business of Momentus has centered on its water plasma propulsion technology. Therefore, matters relating to Momentus's water plasma technology such as whether it had been successfully tested in space,

were core operations for Momentus, and give rise to a strong inference of the scienter of the Momentus Individual Defendants with respect to these issues.

323. At all relevant times, Momentus required regulatory approvals to conduct its planned operations, and operated exclusively in the heavily regulated space industry, which industry is highly sensitive with respect to national security. At all relevant times up until his abrupt resignation in January 2021, Defendant Kokorich was the key person behind Momentus, as its co-founder, CEO and leader. Therefore, matters relating to Defendant Kokorich's national security issues and Momentus's regulatory approvals were core operations for Momentus, and give rise to a strong inference of the scienter of the Momentus Individual Defendants with respect to these issues.

324. The Momentus Individual Defendants possessed strong personal financial motives to complete the merger between SRAC and Momentus, and therefore to cover up problems with SRAC's due diligence and problems at Momentus, and misleadingly tout the merger and inflate Momentus's apparent future prospects. For example, leading up to the proposed merger Momentus had no revenue, was losing money at a rapid rate, and needed substantial investment capital to survive and continue to pay compensation to the Momentus Individual Defendants. In addition, Defendant Kokorich and Defendant Harms had substantial ownership interests in Momentus that would become much more valuable and liquid upon completion of a merger with SRAC. As of November 2, 2020 SRAC disclosed that, as a result of their ownership of Momentus securities, Defendant Kokorich was expected to beneficially own 19.3 million shares (approximately 14% of the total outstanding) and Defendant Harms was expected to beneficially own over 100,000 shares of the combined company after the closing of the merger. As the directors and/or officers of Momentus the Momentus Individual Defendants had ample opportunity to control Momentus's public statements regarding the proposed merger.

325.   That the Momentus Individual Defendants do not appear to have sold SRAC securities during the Class Period does not negate a strong inference of their scienter, because the Momentus Individual Defendants did not own SRAC securities during the Class Period. Rather, the Momentus Individual Defendants' motives as alleged herein pertained to inducing SRAC and its investors to complete a merger with Momentus. SRAC's merger with Momentus was not completed until on or about August 12, 2021, well after the truth had been revealed about SRAC and Momentus and the artificial inflation had been removed from SRAC's security prices. Therefore, due to the federal government's intervention to reveal the truth to investors and due to the Momentus Individual Defendants' lack of prior ownership of SRAC securities, the Momentus Individual Defendants did not have the opportunity to sell SRAC securities at an artificial profit. That the federal government intervened to foil the Momentus Individual Defendants' fraudulent scheme before it came to fruition does not negate a strong inference of their scienter.

326.   As alleged above, Defendant Kokorich was personally involved in the fraud alleged herein. Kokorich co-founded Momentus in 2017 and served as its CEO and director. Kokorich abruptly resigned from Momentus and fled to Switzerland in January 2021 amid increasing governmental scrutiny of national security concerns relating to him, and amid the resulting delays in Momentus's heavily touted launch schedule, which scrutiny and delays represented the materialization of risks that Defendants had concealed from investors. As such, Kokorich's departure closely following the materialization of these risks is strongly indicative of his and Momentus's scienter.

327.   The scienter of the Momentus Individual Defendants is imputable to Momentus because they were directors and/or officers of Momentus acting within the scope of their authority.

328.   The misrepresentations and omissions of Momentus as alleged herein are of such a nature that they would have been approved by corporate officials

sufficiently knowledgeable about Momentus to know that those statements and omissions were misleading.

## X.   LOSS CAUSATION

329.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

330.   Throughout the Class Period, as detailed herein, Defendants made materially false and/or misleading statements and/or omissions.   This course of wrongful conduct caused the price of SRAC securities to be artificially inflated.   But for Defendants' misrepresentations and/or omissions, Plaintiff and the other members of the Class would not have purchased SRAC securities or would not have purchased such securities at artificially inflated prices. Later, when Defendants' prior misrepresentations and/or omissions were disclosed to the market, the price of SRAC securities fell significantly as the prior artificial price inflation was dissipated.   As a result of their purchases and/or acquisition of SRAC securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.* damages, under the Exchange Act.   The timing and magnitude of the decline in the prices of SRAC's securities negates any inference that the economic losses and damages suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic factors, or company-specific facts unrelated to Defendants' wrongful conduct.

331.   As detailed in Section VII, *supra*, the truth regarding SRAC and Momentus was revealed to the market and/or the previously concealed risks materialized through a series of partial disclosures, which removed the artificial inflation in SRAC securities prices and caused economic loss to Plaintiff and the Class.

## XI.   CLASS ACTION ALLEGATIONS

332.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and

entities that purchased or otherwise acquired SRAC securities between October 7, 2020 and July 13, 2021, inclusive, and who were damaged thereby (the "Class"), seeking to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Excluded from the Class are Defendants, the officers and directors of SRAC and Momentus, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

333.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SRAC's shares actively traded on the Nasdaq Capital Market. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of SRAC shares were traded publicly during the Class Period. Record owners and other members of the Class may be identified from records maintained by SRAC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

334.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

335.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

336.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of SRAC and Momentus;

(c)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(d)     whether the prices of SRAC's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(e)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

337.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

338.   The market for SRAC's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, SRAC's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired SRAC's securities relying upon the integrity of the market price of SRAC's securities and market information relating to SRAC, and have been damaged thereby.

339.   At all relevant times, the market for SRAC's securities was an efficient market for the following reasons, among others:

(a)   SRAC shares met the requirements for listing, and were listed and actively traded on the Nasdaq Capital Market, a highly efficient and automated market;

(b)   As a regulated issuer, SRAC filed periodic public reports with the SEC and/or the Nasdaq Capital Market;

(c)   SRAC's securities were liquid and traded with substantial volume during the Class Period; and

(d)   SRAC regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

340.   As a result of the foregoing, the market for SRAC's securities promptly digested current information regarding SRAC from all publicly available sources and reflected such information in SRAC's share price. Unexpected material news about SRAC was rapidly reflected in and incorporated into SRAC's stock price during the Class Period.

341.   Plaintiff and members of the Class purchased and/or sold SRAC's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts. The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of SRAC's securities

342.   Under these circumstances, all purchasers of SRAC's securities during the Class Period suffered similar injury through their purchase of SRAC's securities

at artificially inflated prices, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

343.   Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above. The Class's claims are, in large part, grounded on Defendants' material omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding SRAC's and Momentus's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here

## XIII. NO SAFE HARBOR

344.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that

the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of SRAC and/or Momentus who knew that the statement was false when made.

## XIV.  CAUSES OF ACTION

**COUNT I**

**Violation Of Section 10(b) Of The Exchange Act And
Rule 10b-5 Promulgated Thereunder
Against Defendants Momentus, SRAC, Kokorich,
Kennedy, Kabot, Norris, And Hofmockel**

345.  Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

346.  During the Class Period Defendants Momentus, SRAC, Kokorich, Kennedy, Kabot, Norris, and Hofmockel (the "Count I Defendants") made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading.

347.  During the Class Period, the Count I Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase SRAC's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Count I Defendants, and each the Count I Defendant, took the actions set forth herein.

348.   The Count I Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of SRAC's securities in an effort to maintain artificially high market prices for SRAC's securities in violation of Section 10(b) of the Exchange Act and

Rule 10b-5.  All the Count I Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

349.  The Count I Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about SRAC's and Momentus's financial well-being and prospects, as specified herein.

350.  The Count I Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of SRAC's and Momentus's value and performance, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about SRAC, Momentus, and their business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of SRAC's securities during the Class Period.

351.  For each of Defendants Kokorich, Kennedy, Kabot, Norris, and Hofmockel, primary liability and controlling person liability arise from the following facts: (i) these Defendants were high-level executives and/or directors at SRAC or Momentus during the Class Period and members of SRAC's or Momentus's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of SRAC or Momentus, was privy to and participated in the creation, development and reporting of SRAC's and/or Momentus's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and

familiarity with the other Defendants and was advised of, and had access to, other members of SRAC's and/or Momentus's management team, internal reports and other data and information about SRAC's and/or Momentus's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of SRAC's and/or Momentus's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

352. The Count I Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing SRAC's and Momentus's financial well-being and prospects from the investing public and supporting the artificially inflated price of SRAC's securities. As demonstrated by the Count I Defendants' overstatements and/or misstatements of the SRAC's and Momentus's business, operations, financial well-being, and prospects throughout the Class Period, these Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

353. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of SRAC's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of SRAC's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Count I Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Count I Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other

members of the Class acquired SRAC's securities during the Class Period at artificially high prices and were damaged thereby.

354.   At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that SRAC and Momentus were experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their SRAC securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

355.   By virtue of the foregoing, the Count I Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

356.   As a direct and proximate result of the Count I Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of SRAC's securities during the Class Period.

## **COUNT II**

### **Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5(a) And (c) Promulgated Thereunder Against Defendants Momentus, Kokorich, Harms, And Kennedy**

357.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

358.   This Count is asserted against Defendants Momentus, Kokorich, Harms, and Kennedy (the "Count II Defendants"), and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) promulgated thereunder by the SEC.

359.   The Count II Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) in that they:

(a) employed devices, schemes and artifices to defraud; and/or

(b) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of SRAC securities during the Class Period.

360. The Count II Defendants' wrongdoing under this count includes, *inter alia*, failing to disclose to SRAC the information outlined in Sections V.A-C, *supra*, regarding national security risks, untested technology, and unsupported financial projections. The failure to disclose this information constituted a deceptive act independent of the dissemination of the false statements to the public, but without which the scheme to defraud could not have been effectuated. Without the Count II Defendants' failure to disclose this information the false representations would never have been made public.

361. The Count II Defendants' wrongdoing also includes the preparation of financial data (including revenue data) and other information to be included in SRAC's offering materials and investor presentations. The Count II Defendants' preparation of these materials also constituted a deceptive act independent of the dissemination of the false statements to the public, but without which the scheme to defraud could not have been effectuated. Without the false and misleading financial data, slides, narrative information and other materials provided by the Count II Defendants to SRAC and the SRAC Individual Defendants, SRAC and the SRAC Individual Defendants would not have been able to deceive SRAC's public investors.

362. The Count II Defendants acted with scienter in that they knew (or deliberately disregarded or were deliberately reckless in disregarding) that the public documents and statements issued or disseminated in the name of SRAC, as described above, were materially false and/or misleading; knew (or deliberately disregarded or were deliberately reckless in disregarding) that assumptions that Momentus would not be affected by national security risks, and that its technology

would work as planned, were used to formulate Momentus's financial projections; knew (or deliberately disregarded or were deliberately reckless in disregarding) that such financial projections were key to Momentus's pursuit of financing via the proposed merger, knowing that SRAC would issue public statements or documents incorporating this information and disseminate it to the investing public; and knowingly (or recklessly) and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

363.   The Count II Defendants, including Momentus and senior officers and/or directors of Momentus, had actual knowledge of the truth regarding Momentus's prospects for revenue growth, including factors which limited its growth potential including national security risks and untested technology.   The Count II Defendants intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they employed the devices, schemes and artifices to defraud; and/or engaged in the acts, practices and a course of business described above.

364.   As a result of the foregoing, the market price of SRAC securities was artificially inflated during the Class Period.

365.   In ignorance of the falsity of the Count II Defendants' statements, and the schemes, acts and practices described above, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of SRAC securities during the Class Period in purchasing SRAC securities at prices that were artificially inflated as a result of the Count II Defendants' schemes, acts, and practices.

366.   Had Plaintiff and the other members of the Class been aware that the market price of SRAC securities had been artificially and falsely inflated by Defendants, they would not have purchased SRAC's securities at the artificially inflated prices that they did, or at all.

367.   As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

368.   By reason of the foregoing, the Count II Defendants have violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder and are liable to Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of SRAC securities during the Class Period.

## COUNT III

### Violation Of Section 20(a) Of The Exchange Act
### Against The Individual Defendants And The Sponsor

369.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

370.   The Individual Defendants and the Sponsor acted as controlling persons of SRAC and/or Momentus within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of SRAC and/or Momentus's operations and intimate knowledge of the false information provided by Momentus to SRAC and/or filed by SRAC with the SEC and disseminated to the investing public, the Individual Defendants and the Sponsor had the power to influence and control and did influence and control, directly or indirectly, the decision-making of SRAC and/or Momentus, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants and the Sponsor were provided with or had unlimited access to copies of SRAC's and/or Momentus's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

371.   In particular, the Individual Defendants and the Sponsor had direct and/or supervisory involvement in the day-to-day operations of SRAC and/or Momentus and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

372.   As set forth above, Defendants Momentus, SRAC, Kokorich, Harms, Kennedy, Kabot, Norris, and Hofmockel each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants and the Sponsor are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of SRAC's securities during the Class Period.

## XV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)   Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)   Such other and further relief as the Court may deem just and proper.

## XVI.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 12, 2021

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Garth A. Spencer*
Robert V. Prongay (SBN 270796)
  *rprongay@glancylaw.com*
Casey E. Sadler (SBN 274241)
  *csadler@glancylaw.com*
Charles Linehan (SBN 307439)
  *clinehan@glancylaw.com*
Garth Spencer (SBN 335424)
  *gspencer@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Lead Plaintiff Hartmut Haenisch*

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007
Email: fcruz@frankcruzlaw.com

*Additional Counsel*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old. On November 12, 2021, I served true and correct copies of the foregoing document by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 12, 2021, at Los Angeles, California.

*s/ Garth A. Spencer*
Garth A. Spencer