# EXHIBIT G



| Company: | Stable Road Acquisition Corp. |
|---|---|
| Document: | 8-K · 10/7/2020 |
| Section: | Entire Document |
| File Number: | 001-39128 |
| Pages | 10 |

09/13/2021 02:10:16 PM

Intelligize, Inc. info@intelligize.com 1-888-925-8627

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 8-K

### CURRENT REPORT
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
**Date of Report (Date of earliest event reported): October 7, 2020**

## STABLE ROAD ACQUISITION CORP.
**(Exact name of registrant as specified in its charter)**

| Delaware | 001-39128 | 84-1905538 |
|---|---|---|
| **(State or other jurisdiction of incorporation)** | **(Commission File Number)** | **(IRS Employer Identification No.)** |

**1345 Abbot Kinney Blvd.**
**Venice, California**                                    **90291**

| **(Address of principal executive offices)** | **(Zip Code)** |

**(833) 478-2253**
**(Registrant's telephone number, including area code)**

**Not applicable**
**(Former name or former address, if changed since last report.)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☒ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Units, each consisting of one share of Class A Common Stock and one-half of one Redeemable Warrant | SRACU | The Nasdaq Stock Market LLC |
| Class A Common Stock, par value $0.0001 per share | SRAC | The Nasdaq Stock Market LLC |
| Warrants, each whole warrant exercisable for one share of Class A Common Stock at an exercise price of $11.50 per share | SRACW | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 1.01 Entry Into A Material Definitive Agreement.**

On October 7, 2020, Stable Road Acquisition Corp., a Delaware corporation ("Parent"), entered into an Agreement and Plan of Merger (the "Merger Agreement"), by and among Parent, Project Marvel First Merger Sub, Inc., a Delaware corporation ("First Merger Sub"), Project Marvel Second Merger Sub, LLC, a Delaware limited liability company ("Second Merger Sub"), and Momentus Inc., a Delaware corporation (the "Company"), pursuant to which: (a) First Merger Sub will merge with and into the Company (the "First Merger"), with the Company being the surviving corporation of the First Merger (such company, in its capacity as the surviving corporation of the First Merger, the "Surviving Corporation") and (b) immediately following the First Merger and as part of the same overall transaction as the First Merger, the Surviving Corporation will merge with and into Second Merger Sub (the "Second Merger" and, together with the First Merger, the "Mergers"), with Second Merger Sub being the surviving company of the Second Merger. The transactions set forth in the Merger Agreement, including the Mergers, will constitute a "Business Combination" as contemplated by Parent's Amended & Restated Certificate of Incorporation.

The Merger Agreement and the transactions contemplated thereby were unanimously approved by the Board of Directors of Parent (the "Board") on October 7, 2020.

***The Merger Agreement***

*Merger Consideration*

Pursuant to the Merger Agreement, the aggregate merger consideration payable to the equityholders of the Company will be paid in equity consideration equal to $1,131,000,000, minus the Company's indebtedness for borrowed money as of the closing of the Mergers (the "Closing"), plus the amount of the Company's cash and cash equivalents (excluding restricted cash as determined in accordance with GAAP, any cash being held on behalf of the Company's customers and any security deposits for leases) as of the Closing, plus the aggregate exercise price of all outstanding options and warrants (the "Merger Consideration"). The Merger Consideration payable to the stockholders of the Company will be paid in shares of newly issued Class A common stock of Parent, par value $0.00001 ("Parent Class A Common Stock"), with a deemed value of $10 per share. In addition, Parent will pay off, or cause to be paid off, on behalf of the Company and in connection with the Closing, the Company's outstanding indebtedness for borrowed money.

In connection with the Mergers, each share of the Company's capital stock (subject to limited exceptions) will be cancelled and automatically deemed for all purposes to represent the right to receive a portion of the Merger Consideration in accordance with the Company's organizational documents. In addition, the Merger Consideration that is paid with respect to any shares of the Company's capital stock that is subject to any vesting restrictions or other conditions shall continue to be subject to such vesting restrictions and conditions after the Closing.

Each option of the Company ("Company Option") that is outstanding and unexercised immediately prior to the Closing (whether vested or unvested) will be automatically assumed by Parent and converted into an option to acquire an adjusted number of shares of Parent Class A Common Stock at an adjusted exercise price per share and will continue to be governed by substantially the same terms and conditions (including vesting and exercisability terms) as were applicable to the corresponding former Company Option.

Each warrant to purchase shares of capital stock of the Company ("Company Warrants") that is outstanding and unexercised immediately prior to the Closing will be automatically converted into a warrant to acquire an adjusted number of shares of Parent Class A Common Stock at an adjusted exercise price per share and will continue to be governed by substantially the same terms and conditions (including applicable vesting conditions) as were applicable to the corresponding former Company Warrant.

1

*Representations, Warranties and Covenants*

The parties to the Merger Agreement have made representations, warranties and covenants that are customary for transactions of this nature. The representations and warranties contained in the Merger Agreement will not survive the Closing, other than in the event of actual fraud.

The Merger Agreement contains additional covenants of the parties, including, among others, covenants providing for (a) the parties to carry on their respective businesses in the ordinary course consistent with past practice through the consummation of the Mergers, (b) Parent and the Company (x) being prohibited from soliciting or negotiating with third parties regarding alternative transactions and agreeing to certain related restrictions and (y) to cease discussions regarding alternative transactions, (c) Parent and the Company to cooperate to prepare (and for Parent to file with the Securities and Exchange Commission (the "SEC")) a registration statement on Form S-4 (the "Registration Statement") for the purpose of registering under the Securities Act the shares of Parent Class A Common Stock to be issued to the Company's stockholders in connection with the Mergers, as well as the Company Options that will be assumed in the Mergers (which Registration Statement will contain a proxy statement/consent solicitation statement/prospectus for the purpose of, among other things, (i) soliciting proxies from Parent's stockholders to vote in favor of adoption and approval of the Merger Agreement, the transactions contemplated thereby and certain other matters at a special meeting called therefor and (ii) soliciting written consents from the Company's stockholders in favor of the adoption and approval of the Merger Agreement and the transactions contemplated thereby), (d) the protection of, and access to, confidential information of the parties and (e) the parties to cooperate in obtaining necessary approvals from governmental agencies. In connection with the execution of the Merger Agreement, certain existing stockholders of the Company have agreed to enter into customary lock-up agreements prior to the Closing pursuant to which such stockholders will be restricted from disposing of Parent Class A Common Stock (or securities exercisable for or convertible into such stock) for a period of six months following the Closing (or, if earlier, the date that the Parent Class A Common Stock trades at or above $12.00 per share for any 20 trading days in a 30 trading day period after the Closing).

*Conditions to Consummation of the Mergers*

The consummation of the transactions contemplated by the Merger Agreement is subject to customary closing conditions for special purpose acquisition companies, including the following conditions to each party's obligations, among others: (a) approval by Parent's stockholders and the Company's stockholders, (b) Parent having at least $5,000,001 of net tangible assets as of the effective time of the consummation of the Mergers, (c) the expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended and (d) the approval of the listing of the shares of Parent Class A Common Stock to be issued in connection with the closing of the transactions contemplated by the Merger Agreement on The Nasdaq Stock Market ("Nasdaq") and the effectiveness of the Registration Statement.

The Company's obligations to consummate the transactions contemplated by the Merger Agreement are subject to the following conditions: (i) the accuracy of certain representations and warranties of Parent in all material respects (or in some cases except for such failure to be accurate not having a material adverse effect on Parent), and the performance by Parent, First Merger Sub and Second Merger Sub with their respective agreements and covenants in the Merger Agreement in all material respects (and the delivery by Parent of a certificate certifying as to such matters), (ii) the resignation of certain individuals from their positions and offices with Parent, (iii) the delivery of all other documents required to be delivered by Parent pursuant to the Merger Agreement, and there having been no amendment to the Sponsor Agreement except as may be approved by the Company, (iv) Parent making appropriate arrangements to have Parent's trust account, less certain specified amounts, available for payment of the transaction costs of Parent and the Company and (v) Parent having at least $250,000,000 in available cash (including proceeds in connection with the Private Placement (and any alternative financing arranged by Parent and the Company in the event the Private Placement becomes unavailable) and the funds in Parent's trust account) immediately prior to the effective time of the consummation of the Mergers (after taking into account payments required to satisfy Parent's stockholder redemptions) (the "Minimum Cash Condition").

2

The obligations of Parent, First Merger Sub and Second Merger Sub to consummate the transactions contemplated by the Merger Agreement are subject to the following conditions, among others: (1) the accuracy of certain representations and warranties of the Company in all material respects (or in some cases except for such failure to be accurate not having a material adverse effect on the Company), and the performance by the Company of its agreements and covenants in the Merger Agreement in all material respects, and no material adverse effect having occurred since the date of the Merger Agreement (and the delivery by the Company of a certificate certifying as to such matters), (2) the resignation of certain individuals from their positions and offices with the Company and (3) the delivery of all other documents required to be delivered by the Company pursuant to the Merger Agreement.

*Termination*

The Merger Agreement may be terminated under certain customary and limited circumstances prior to the consummation of the Mergers, including (a) by mutual written consent of the parties, (b) by either Parent or the Company, if the consummation of the Mergers has not occurred on or prior to the date that is six (6) months following the date of the Merger Agreement (the "Outside Date"), (c) by either Parent or the Company if a governmental entity has issued a final and non-appealable order or taken any other action, in any case having the effect of permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by the Merger Agreement, including the Mergers, (d) by either Parent or the Company upon a breach of any representations, warranties, covenants or other agreements set forth in the Merger Agreement by the other party if such breach gives rise to a failure of a closing condition and cannot or has not been cured within the earlier of 30 days' notice by the non-breaching party and the Outside Date, (e) by either Parent or the Company if Parent's stockholder approval is not obtained, (f) by Parent at any time prior to obtaining the requisite Company stockholder approval if the board of directors of the Company shall have made a Company change in recommendation regarding the Mergers, (g) by the Company at any time prior to Parent obtaining the approval of the stockholders of Parent if the board of directors of Parent shall have made a Parent change in recommendation regarding the Mergers, (h) by Parent if any Written Consent Party (as defined below) fails to deliver a written consent constituting the requisite Company stockholder approval within three (3) business days of the Registration Statement becoming effective, or (i) by the Company, if (i) the Minimum Cash Condition becomes incapable of being satisfied at the Closing and (ii) a period of ten (10) business days has elapsed since the Minimum Cash Condition became incapable of being satisfied and, at the end of such period, the Minimum Cash Condition remains incapable of being satisfied at the Closing (after giving effect to any alternative financing arranged by Parent and the Company with respect to the Mergers).

The foregoing description of the Merger Agreement and the transactions contemplated thereby, including the Mergers, does not purport to be complete and is qualified in its entirety by the terms and conditions of the Merger Agreement, a copy of which is attached hereto as Exhibit 2.1 and is incorporated herein by reference. The Merger Agreement contains representations, warranties and covenants that the respective parties made to each other as of the date of such agreement or other specific dates. The assertions embodied in those representations, warranties and covenants were made for purposes of the contract among the respective parties to the Merger Agreement and are subject to important qualifications and limitations agreed to by the contracting parties in connection with negotiating the Merger Agreement. The Merger Agreement has been attached to provide investors with information regarding its terms. It is not intended to provide any other factual information about Parent or any other party to the Merger Agreement. In particular, the representations, warranties, covenants and agreements contained in the Merger Agreement, which were made only for purposes of the Merger Agreement and as of specific dates, were solely for the benefit of the respective parties to the Merger Agreement, may be subject to limitations agreed upon by the contracting parties (including being qualified by confidential disclosures made for the purposes of allocating contractual risk between the respective parties to the Merger Agreement instead of establishing these matters as facts) and may be subject to standards of materiality applicable to the contracting parties that differ from those applicable to Parent's investors and security holders. Except as expressly stated therein, Parent's and the Company's investors and security holders are not third-party beneficiaries under the Merger Agreement and should not rely on the representations, warranties, covenants and agreements, or any descriptions thereof, as characterizations of the actual state of facts or condition of any party to the Merger Agreement. Moreover, information concerning the subject matter of the representations and warranties may change after the date of the Merger Agreement, which subsequent information may or may not be fully reflected in Parent's public disclosures.

<u>Private Placement Subscription Agreements</u>

On October 7, 2020, Parent entered into Subscription Agreements with certain investors (the "<u>Subscription Agreements</u>") pursuant to which the investors have agreed to purchase an aggregate of 17,500,000 shares of Parent Class A Common Stock in a private placement for $10.00 per share (the "<u>Private Placement</u>"), including 1,000,000 shares which were agreed to be purchased by SRAC PIPE Partners LLC, a Delaware limited liability company ("<u>SRAC Partners</u>"). The proceeds from the Private Placement will be partially used to fund the Repurchase and for general working capital purposes following the closing.

Each Subscription Agreement will terminate upon the earlier to occur of (a) the termination of the Merger Agreement in accordance with its terms, (b) the mutual written agreement of the parties to such Subscription Agreement, (c) 30 days after the Outside Date (as defined in the Merger Agreement), if the Closing has not occurred by such date, or (d) by written notice of the investor to Parent in the event the Merger Agreement is amended, supplemented or otherwise modified after the date such Subscription Agreement was entered into in a manner that materially adversely affects the investor. As of the date hereof, the shares of Parent Class A Common Stock to be issued in connection with the Subscription Agreements have not been registered under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"). Parent will, within 30 days after the consummation of the transactions contemplated by the Merger Agreement, file with the SEC a registration statement registering the resale of such shares of Parent Class A Common Stock and will use its commercially reasonable efforts to have such registration statement declared effective as soon as practicable after the filing thereof (but no later than the earlier of (i) the 60th calendar day following the filing date (or the 90th calendar day if the SEC notifies Parent (orally or in writing) that it will "review" the registration statement) and (ii) the 5th business day after the date Parent is notified (orally or in writing) by the SEC that the registration statement will not be "reviewed" or will not be subject to further review). A copy of the Subscription Agreement, in substantially the same form as entered into with such investors, is attached hereto as <u>Exhibit 10.1</u>, and is incorporated herein by reference, and the foregoing description of the Private Placement is qualified in its entirety by reference thereto.

<u>Support Agreement</u>

Concurrently with the execution of the Merger Agreement, Mikhail Kokorich, Prime Movers Lab Fund I, LP ("<u>PML</u>"), and certain affiliated equityholders of PML (each, a "<u>Written Consent Party</u>"), which collectively hold (a) a majority of the outstanding voting power of the Company stock issued and outstanding as of the date hereof (voting as a single class and on an as-converted basis), (b) a majority of the shares of the Company common stock issued and outstanding as of the date hereof (voting as a single class) and (c) a majority of the shares of the Company preferred stock issued and outstanding as of the date hereof (voting as a single class and on an as-converted basis), entered into Support Agreements with Parent (each, a "<u>Support Agreement</u>"), pursuant to which, among other things, each Written Consent Party agreed to support the transactions contemplated by the Merger Agreement, including agreeing to execute a written consent constituting the requisite Company stockholder approval within three (3) business days of the Registration Statement becoming effective. The Support Agreements will terminate upon the earlier to occur of: (i) the effective time of the Mergers, (ii) the date of the termination of the Merger Agreement in accordance with its terms, and (iii) the effective date of a mutual written agreement of Parent and such Written Consent Party terminating such Support Agreement. The form of Support Agreement is attached as <u>Exhibit 10.2</u> hereto and is incorporated herein by reference, and the foregoing description of the Support Agreements is qualified in its entirety by reference thereto.

Sponsor Agreement

Concurrently with the execution of the Merger Agreement, SRC-NI Holdings, LLC, Parent's sponsor ("Sponsor"), SRAC Partners, the Company and Parent entered into a letter agreement (the "Sponsor Agreement"), pursuant to which, among other things, Sponsor agreed to (a) waive certain anti-dilution rights set forth in Section 4.3(b)(ii) of Parent's Amended and Restated Certificate of Incorporation, (b) surrender to Parent, immediately prior to the consummation of the Mergers and for no consideration, up to 1,437,500 shares of Parent's Class B common stock, par value $0.0001 per share, in the event that the amount in the Parent's trust account (for the avoidance of doubt, prior to giving effect to the any redemptions by Parent's stockholders and the payment of any transaction costs by Parent), *minus* the aggregate amount of cash proceeds that will be required to satisfy any redemptions by Parent's stockholders, is less than $100,000,000, (c) subject to potential forfeiture 1,437,000 shares of Parent Class A Common Stock (the "Sponsor Earnout Shares") in accordance with the terms of the Merger Agreement, such that one-third of such Sponsor Earnout Shares will be respectively forfeited in the event that the Parent Class A Common Stock does not achieve trading prices of at least $12.50, $15.000 and $17.50 (as such trading prices may be adjusted for any dividend, subdivision, stock split or similar event, and as determined by reference to the volume-weighted average price achieved for at least 20 out of 30 consecutive trading days) prior to the fifth (5th) anniversary of the closing (and provided that, in connection with any change of control of Parent prior to such five-year anniversary, such Sponsor Earnout Shares shall become no longer subject to forfeiture based upon the value received by holders of Parent Class A Common Stock being at least such trading prices in connection with such change of control), (d) support the transactions contemplated by the Merger Agreement, including agreeing to vote in favor of the adoption of the Merger Agreement at the Special Meeting (as defined below) and (e) not to transfer any shares of Parent Class A Common Stock for a period of six months following the Closing (or, if earlier, the date that the Parent Class A Common Stock trades at or above $12.00 per share for any 20 trading days in a 30 trading day period after Closing). The Sponsor Agreement is attached as Exhibit 10.3 hereto and is incorporated herein by reference, and the foregoing description of the Sponsor Agreement is qualified in its entirety by reference thereto.

Amended and Restated Registration Rights Agreement

At the consummation of the Mergers, Parent, Sponsor, certain existing holder(s) of Parent capital stock (including SRAC Partners) and certain Company stockholders, in each case who will receive Parent Class A Common Stock pursuant to the Merger Agreement and the transactions contemplated thereby will enter into an Amended and Restated Registration Rights Agreement (the "Registration Rights Agreement") in respect of the shares of Parent Class A Common Stock issued to Sponsor and such Company stockholders in connection with the transactions set forth above. Pursuant to such agreement, such holders and their permitted transferees will be entitled to certain customary registration rights, including, among other things, demand, shelf and piggy-back rights, subject to cut-back provisions. Pursuant to the Registration Rights Agreement, Sponsor and SRAC Partners will agree not to sell, transfer, pledge or otherwise dispose of shares of Parent Class A Common Stock or other securities exercisable therefor for certain time periods specified therein.

Repurchase Agreement

Concurrently with the execution of the Merger Agreement, PML, the Company and Parent entered into a repurchase agreement (the "Repurchase Agreement") pursuant to which, amongst other things, Parent has agreed to repurchase a certain number of shares of Parent Class A Common Stock from PML, at a purchase price of $10.00 per share, immediately following the Closing (the "Repurchase"). The Repurchase is contingent on the amount of available cash Parent has at the Closing from (a) the Private Placement (and any alternative financing arranged by Parent and the Company in the event the Private Placement becomes unavailable) and (b) the funds in Parent's trust account (after taking into account payments required to satisfy Parent's stockholder redemptions), after further deducting the amount of Parent's transaction expenses and the Company's transaction expenses ("Net Proceeds") being in excess of $265 million. If Net Proceeds exceed $265,000,000 but are less than $280,000,000, the number of shares of Parent Class A Common Stock subject to the Repurchase will be equal to the amount by which Net Proceeds exceed $250 million, *divided by* $10.00. In the event Net Proceeds are in excess of $280,000,000, the number of shares of Parent Class A Common Stock subject to the Repurchase will be equal to $30,000,000, *divided by* $10.00. At the closing of the Repurchase, Parent will be entitled to deduct from such cash payment an amount equal to 3.3% of such cash payment (representing PML's obligation to pay the Company a portion of its transaction expenses). The Repurchase Agreement is attached as Exhibit 10.4 hereto and is incorporated herein by reference, and the foregoing description of the Repurchase Agreement is qualified in its entirety by reference thereto.

**Item 3.02 Unregistered Sales of Equity Securities.**

The disclosure set forth above under the heading "Private Placement Subscription Agreements" in Item 1.01 of this Current Report on Form 8-K (this "Current Report") is incorporated by reference into this Item 3.02. The shares of Parent Class A Common Stock to be issued in the Private Placement in connection with the closing will not be registered under the Securities Act, in reliance on the exemption from registration provided by Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder.

5

**Item 7.01 Regulation FD Disclosure.**

On October 7, 2020, Parent and the Company issued a joint press release announcing the execution of the Merger Agreement. The press release is attached hereto as <u>Exhibit 99.1</u> and incorporated by reference herein. Notwithstanding the foregoing, information contained on the websites of Parent, the Company or any of their affiliates referenced in <u>Exhibit 99.1</u> or linked therein or otherwise connected thereto does not constitute part of nor is it incorporated by reference into this Current Report.

Attached as <u>Exhibit 99.2</u> and incorporated by reference herein is the investor presentation dated October 2020 that will be used by Parent with respect to the transactions contemplated by the Merger Agreement.

A conference call by management of Parent and the Company (the "<u>Conference Call</u>") can be accessed via the following link: https://protect-us.mimecast.com/s/NWw7CERxwAsX5yYxuN4FtY4?domain=cts.businesswire.com. A copy of the script for the Conference Call is attached hereto as <u>Exhibit 99.3</u> and incorporated herein by reference.

The information in this Item 7.01, including <u>Exhibit 99.1</u>, <u>Exhibit 99.2</u> and <u>Exhibit 99.3</u>, is furnished and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>"), or otherwise subject to liabilities under that section, and shall not be deemed to be incorporated by reference into the filings of Parent under the Securities Act or the Exchange Act, regardless of any general incorporation language in such filings. This Current Report will not be deemed an admission as to the materiality of any of the information in this Item 7.01, including <u>Exhibit 99.1</u>, <u>Exhibit 99.2</u> and <u>Exhibit 99.3</u>.

***Forward-Looking Statements***

This Current Report may contain a number of "forward-looking statements" as defined in the Private Securities Litigation Reform Act of 1995. Forward-looking statements include statements about the expected timing of the completion of this transaction, information concerning Parent or the Company's possible or assumed future results of operations, business strategies, the expected development , capabilities and timing of the operation or offering of the Company's transport vehicles and services, the expected timing of the Company's first mission in December 2020, potential revenue from customer contracts, debt levels, competitive position, industry environment, potential growth opportunities and the effects of regulation, including whether this transaction will generate returns for stockholders. These forward-looking statements are based on Parent's or the Company's management's current expectations, estimates, projections and beliefs, as well as a number of assumptions concerning future events. When used in this Current Report, the words "estimates," "projected," "expects," "anticipates," "forecasts," "plans," "intends," "believes," "seeks," "may," "will," "should," "future," "propose" and variations of these words or similar expressions (or the negative versions of such words or expressions) are intended to identify forward-looking statements.

These forward-looking statements are not guarantees of future performance, conditions or results, and involve a number of known and unknown risks, uncertainties, assumptions and other important factors, many of which are outside Parent's or the Company's management's control, that could cause actual results to differ materially from the results discussed in the forward-looking statements. These risks, uncertainties, assumptions and other important factors include, but are not limited to: changes in domestic and foreign business, market, financial, political and legal conditions; the inability of the parties to successfully or timely consummate the proposed business combination, including the risk that any required regulatory approvals are not obtained, are delayed or are subject to unanticipated conditions that could adversely affect the combined company or the expected benefits of the proposed business combination or that the approval of the stockholders of Parent or the Company is not obtained; failure to realize the anticipated benefits of the proposed business combination; risks relating to the uncertainty of the projected financial information with respect to the Company; risks related to the ability of customers to cancel contracts for convenience; risks related to the rollout of the Company's business and the timing of expected business milestones; the effects of competition on the Company's future business; level of product service or product or launch failures that could lead customers to use competitors' services; developments and changes in laws and regulations, including increased regulation of the space transportation industry; the impact of significant investigative, regulatory or legal proceedings; the amount of redemption requests made by Parent's public stockholders; the ability of Parent or the combined company to issue equity or equity-linked securities in connection with the proposed business combination or in the future; and other risks and uncertainties indicated from time to time in the definitive proxy statement/consent solicitation statement/prospectus relating to the proposed business combination, including those under "Risk Factors" therein, and other documents filed or to be filed with the SEC by Parent. You are cautioned not to place undue reliance upon any forward-looking statements, which speak only as of the date made.

Forward-looking statements included in this Current Report speak only as of the date of this Current Report. Except as required by law, neither Parent nor the Company undertakes any obligation to update or revise its forward-looking statements to reflect events or circumstances after the date of this release. Additional risks and uncertainties are identified and discussed in the Parent's reports filed with the SEC and available at the SEC's website at www.sec.gov.

*Disclaimer*

This Current Report is for informational purposes only and is neither an offer to purchase, nor a solicitation of an offer to sell, subscribe for or buy any securities or the solicitation of any vote in any jurisdiction pursuant to the proposed transactions or otherwise, nor shall there be any sale, issuance or transfer or securities in any jurisdiction in contravention of applicable law. No offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act of 1933, as amended.

INVESTMENT IN ANY SECURITIES DESCRIBED HEREIN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY OTHER REGULATORY AUTHORITY NOR HAS ANY AUTHORITY PASSED UPON OR ENDORSED THE MERITS OF THE PROPOSED TRANSACTIONS OR THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

*Additional Information About the Transactions*

In connection with the proposed transaction contemplated by the Merger Agreement (the "Proposed Transaction"), Parent intends to file with the SEC a Registration Statement that will include a proxy statement of Parent, a consent solicitation statement of the Company and prospectus of Parent, and each party will file other documents with the SEC regarding the Proposed Transaction. A definitive proxy statement/consent solicitation statement/prospectus and other relevant documents will be sent to the stockholders of Parent and the Company, seeking any required stockholder approval, and is not intended to provide the basis for any investment decision or any other decision in respect of such matters. **PARENT'S STOCKHOLDERS AND OTHER INTERESTED PERSONS ARE ADVISED TO READ, WHEN AVAILABLE, THE REGISTRATION STATEMENT AND THE PROXY STATEMENT/CONSENT SOLICITATION STATEMENT/PROSPECTUS WHICH FORMS A PART OF THE REGISTRATION STATEMENT, AS WELL AS ANY AMENDMENTS THERETO, AND THE EFFECTIVE REGISTRATION STATEMENT AND DEFINITIVE PROXY STATEMENT/CONSENT SOLICITATION/PROSPECTUS IN CONNECTION WITH PARENT'S SOLICITATION OF PROXIES FOR PARENT'S SPECIAL MEETING OF STOCKHOLDERS TO APPROVE THE TRANSACTIONS CONTEMPLATED BY THE MERGER AGREEMENT (THE "SPECIAL MEETING"), BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED TRANSACTION.** When available, the definitive proxy statement/consent solicitation statement/prospectus will be mailed to Parent's stockholders as of a record date to be established for voting on the Proposed Transaction and the other matters to be voted upon at the Special Meeting. Parent's stockholders will also be able to obtain copies of the proxy statement/consent solicitation statement/prospectus, and all other relevant documents filed or that will be filed with the SEC in connection with the Proposed Transaction, without charge, once available, at the SEC's website at www.sec.gov or by directing a request to: Stable Road Capital LLC, Attn: James Norris, CPA, Chief Financial Officer, 1345 Abbot Kinney Blvd., Venice, CA 90291; Tel: 310-956-4919; james@stableroadcapital.com.

7

*Participants in the Solicitation*

Parent, the Company and certain of their respective directors, executive officers and other members of management and employees may be deemed participants in the solicitation of proxies of Parent's stockholders in connection with the Proposed Transaction. **PARENT'S STOCKHOLDERS AND OTHER INTERESTED PERSONS MAY OBTAIN, WITHOUT CHARGE, MORE DETAILED INFORMATION REGARDING THE DIRECTORS AND OFFICERS OF PARENT IN ITS ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2019, WHICH WAS FILED WITH THE SEC ON MARCH 26, 2020. INFORMATION REGARDING THE PERSONS WHO MAY, UNDER SEC RULES, BE DEEMED PARTICIPANTS IN THE SOLICITATION OF PROXIES TO PARENT'S STOCKHOLDERS IN CONNECTION WITH THE PROPOSED TRANSACTION AND OTHER MATTERS TO BE VOTED AT THE SPECIAL MEETING WILL BE SET FORTH IN THE REGISTRATION STATEMENT FOR THE PROPOSED TRANSACTION WHEN AVAILABLE.** Additional information regarding the interests of participants in the solicitation of proxies in connection with the Proposed Transaction will be included in the Registration Statement that Parent intends to file with the SEC.

**Item 9.01 Financial Statements and Exhibits.**

**(d)** *Exhibits*

The exhibits listed in the following Exhibit Index are filed as part of this Current Report.

| Exhibit No. | Description |
|---|---|
| 2.1* | Merger Agreement, dated as of October 7, 2020, by and among Stable Road Acquisition Corp., Project Marvel First Merger Sub, Inc., Project Marvel Second Merger Sub, LLC, and Momentus Inc. |
| 10.1 | Form of Subscription Agreement. |
| 10.2 | Form of Support Agreement. |
| 10.3 | Sponsor Agreement, dated as of October 7, 2020, by and among Stable Road Acquisition Corp., SRC-NI Holdings, LLC and SRAC PIPE Partners LLC. |
| 10.4 | Repurchase Agreement, dated as October 7, 2020, by and among Stable Road Acquisition Corp., Momentus Inc. and Prime Movers Lab Fund I, LP. |
| 99.1 | Joint Press Release, dated as of October 7, 2020. |
| 99.2 | Investor Presentation. |
| 99.3 | Script for October 7, 2020 Conference Call |

\*    The schedules to this Exhibit have been omitted in accordance with Regulation S-K Item 601(b)(2). Parent agrees to furnish supplementally a copy of any omitted schedule to the SEC upon its request.

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

|  |  |
|---|---|
|  | **STABLE ROAD ACQUISITION CORP.** |
|  | By:   /s/ Brian Kabot |
|  | Name: Brian Kabot |
| October 7, 2020 | Title: Chief Executive Officer |

9

**Exhibit 2.1**

**AGREEMENT AND PLAN OF MERGER**
**BY AND AMONG**
**STABLE ROAD ACQUISITION CORP.,**
**PROJECT MARVEL FIRST MERGER SUB, INC.,**
**PROJECT MARVEL SECOND MERGER SUB, LLC**
**and**
**MOMENTUS INC.**
**DATED AS OF OCTOBER 7, 2020**

Case 2:21-cv-05744-JFW-SHK   Document 123-7   Filed 02/14/22   Page 13 of 212
Page ID #:3747

**AGREEMENT AND PLAN OF MERGER**
**BY AND AMONG**
**STABLE ROAD ACQUISITION CORP.,**
**PROJECT MARVEL FIRST MERGER SUB, INC.,**
**PROJECT MARVEL SECOND MERGER SUB, LLC**
**and**
**MOMENTUS INC.**
**DATED AS OF OCTOBER 7, 2020**

**TABLE OF CONTENTS**

ARTICLE I. THE CLOSING TRANSACTIONS                                                                      3
Section 1.1          Closing                                                                             3
Section 1.2          Closing Statements                                                                 3
Section 1.3          Closing Documents                                                                  4
Section 1.4          Closing Transactions                                                               5
ARTICLE II. THE MERGERS                                                                                  6
Section 2.1          Effective Times                                                                     6
Section 2.2          The Mergers                                                                         6
Section 2.3          Effect of the Mergers                                                               6
Section 2.4          Governing Documents                                                                 7
Section 2.5          Directors and Officers of the Surviving Corporation and the Surviving Entity        7
Section 2.6          Effect of the First Merger                                                          7
Section 2.7          Effect of the Second Merger                                                        10
Section 2.8          Disbursement of Aggregate Stock Consideration                                      10
Section 2.9          Withholding Taxes                                                                  12
Section 2.10         Appraisal Rights                                                                   12
Section 2.11         Taking of Necessary Action; Further Actions                                        13
Section 2.12         Tax Treatment of the Mergers                                                       13
ARTICLE III. SPONSOR EARNOUT SHARES                                                                     13
Section 3.1          Potential Forfeiture                                                               13
Section 3.2          Vesting                                                                            14
Section 3.3          Adjustment                                                                         14
ARTICLE IV. REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY                                        14
Section 4.1          Organization and Qualification                                                     14
Section 4.2          Company Subsidiaries                                                               14
Section 4.3          Capitalization                                                                     15
Section 4.4          Due Authorization                                                                  16
Section 4.5          No Conflict; Governmental Consents and Filings                                     17
Section 4.6          Legal Compliance; Permits.                                                         17
Section 4.7          Financial Statements                                                               18

| Section 4.8 | No Undisclosed Liabilities | 18 |
|---|---|---|
| Section 4.9 | Absence of Certain Changes or Events | 19 |
| Section 4.10 | Litigation | 19 |
| Section 4.11 | Benefit Plans | 19 |
| Section 4.12 | Labor Relations. | 21 |
| Section 4.13 | Real Property; Tangible Property. | 23 |
| Section 4.14 | Taxes | 24 |
| Section 4.15 | Environmental Matters | 25 |
| Section 4.16 | Brokers; Third Party Expenses | 26 |
| Section 4.17 | Intellectual Property | 26 |
| Section 4.18 | Privacy. | 28 |
| Section 4.19 | Agreements, Contracts and Commitments | 29 |
| Section 4.20 | Insurance | 32 |
| Section 4.21 | Affiliate Matters | 32 |
| Section 4.22 | Certain Provided Information | 32 |
| Section 4.23 | Indebtedness | 33 |
| Section 4.24 | Material Customers and Material Suppliers | 33 |
| Section 4.25 | Government Contracts | 33 |
| Section 4.26 | Absence of Certain Business Practices | 34 |
| Section 4.27 | CFIUS | 34 |
| Section 4.28 | Product Liability | 34 |
| Section 4.29 | Required Vote | 35 |
| Section 4.30 | Disclaimer of Other Warranties | 35 |
| ARTICLE V. REPRESENTATIONS AND WARRANTIES OF PARENT, FIRST MERGER SUB AND SECOND MERGER SUB | | 36 |
| Section 5.1 | Organization and Qualification | 36 |
| Section 5.2 | Parent Subsidiaries | 36 |
| Section 5.3 | Capitalization | 37 |
| Section 5.4 | Authority Relative to this Agreement | 38 |
| Section 5.5 | No Conflict; Required Filings and Consents | 38 |
| Section 5.6 | Compliance; Permits | 39 |
| Section 5.7 | Parent SEC Reports; Financial Statements; No Undisclosed Liabilities | 39 |

ii

| Section 5.8 | Absence of Certain Changes or Events | 40 |
|---|---|---|
| Section 5.9 | Litigation | 40 |
| Section 5.10 | Business Activities | 40 |
| Section 5.11 | Parent Material Contracts | 41 |
| Section 5.12 | Parent Listing | 41 |
| Section 5.13 | PIPE Investment Amount | 41 |
| Section 5.14 | Trust Account | 42 |
| Section 5.15 | Taxes | 42 |
| Section 5.16 | Information Supplied | 43 |
| Section 5.17 | Board Approval; Stockholder Vote | 43 |
| Section 5.18 | Brokers | 44 |
| Section 5.19 | Indebtedness | 44 |
| Section 5.20 | Sponsor Agreement | 44 |
| Section 5.21 | Investment Company Act; JOBS Act | 44 |
| Section 5.22 | Parent Stockholders | 44 |
| Section 5.23 | Disclaimer of Other Warranties | 45 |
| ARTICLE VI. CONDUCT PRIOR TO THE CLOSING DATE | | 45 |
| Section 6.1 | Conduct of Business by the Company | 45 |
| Section 6.2 | Conduct of Business by Parent, First Merger Sub and Second Merger Sub | 48 |
| ARTICLE VII. ADDITIONAL AGREEMENTS | | 50 |
| Section 7.1 | Company No Solicitation | 50 |
| Section 7.2 | Parent No Solicitation. | 51 |
| Section 7.3 | Registration Statement; Proxy Statement / Consent Solicitation | 52 |
| Section 7.4 | Consent Solicitation Statement; Company Change in Recommendation. | 54 |
| Section 7.5 | Parent Special Meeting; Parent Change in Recommendation. | 55 |
| Section 7.6 | Regulatory Approvals | 56 |
| Section 7.7 | Other Filings; Press Release | 57 |
| Section 7.8 | Confidentiality; Communications Plan; Access to Information | 58 |
| Section 7.9 | Reasonable Best Efforts | 59 |
| Section 7.10 | No Parent Securities Transactions | 59 |
| Section 7.11 | No Claim Against Trust Account | 59 |

| | | |
|---|---|---|
| Section 7.12 | Disclosure of Certain Matters | 60 |
| Section 7.13 | Securities Listing | 60 |
| Section 7.14 | Trust Account | 60 |
| Section 7.15 | Directors' and Officers' Liability Insurance | 61 |
| Section 7.16 | Section 16 Matters | 61 |
| Section 7.17 | Board of Directors | 62 |
| Section 7.18 | Affiliate Matters | 62 |
| Section 7.19 | Debt Payoff | 62 |
| Section 7.20 | Release | 62 |
| Section 7.21 | PIPE Investment | 63 |
| Section 7.22 | Employee Matters | 64 |
| Section 7.23 | Sponsor Agreement | 65 |
| Section 7.24 | Parent A&R Bylaws | 65 |
| Section 7.25 | Certain Transaction Agreements | 65 |
| Section 7.26 | Company Stock Plans | 65 |
| Section 7.27 | Repurchase | 64 |
| Section 7.28 | Intellectual Property Matters | 66 |
| Section 7.29 | PCAOB Audited Financials | 66 |
| ARTICLE VIII. CONDITIONS TO THE TRANSACTION | | 66 |
| Section 8.1 | Conditions to Obligations of Each Party's Obligations | 66 |
| Section 8.2 | Additional Conditions to Obligations of the Company | 67 |
| Section 8.3 | Additional Conditions to the Obligations of Parent, First Merger Sub and Second Merger Sub | 67 |
| ARTICLE IX. TERMINATION | | 68 |
| Section 9.1 | Termination | 68 |
| Section 9.2 | Notice of Termination; Effect of Termination | 69 |
| ARTICLE X. NO SURVIVAL | | 70 |
| Section 10.1 | No Survival | 70 |
| ARTICLE XI. GENERAL PROVISIONS | | 70 |
| Section 11.1 | Notices | 70 |
| Section 11.2 | Interpretation | 71 |
| Section 11.3 | Counterparts; Electronic Delivery | 71 |
| Section 11.4 | Entire Agreement; Third Party Beneficiaries | 72 |

iv

| Section 11.5 | Severability | 72 |
|---|---|---|
| Section 11.6 | Other Remedies; Specific Performance | 72 |
| Section 11.7 | Governing Law | 72 |
| Section 11.8 | Consent to Jurisdiction; Waiver of Jury Trial | 73 |
| Section 11.9 | Rules of Construction | 74 |
| Section 11.10 | Expenses | 74 |
| Section 11.11 | Assignment | 74 |
| Section 11.12 | Amendment | 74 |
| Section 11.13 | Extension; Waiver | 74 |
| Section 11.14 | No Recourse | 74 |
| Section 11.15 | Legal Representation | 75 |
| Section 11.16 | Disclosure Letters and Exhibits | 75 |

EXHIBITS

| Exhibit A | Form of Support Agreement |
|---|---|
| Exhibit B | Form of Sponsor Agreement |
| Exhibit C | Form of Parent A&R Charter |
| Exhibit D | Form of Parent A&R Bylaws |
| Exhibit E | Form of A&R Registration Rights Agreement |
| Exhibit F | Form of Lockup Agreement |
| Exhibit G | Form of Underwriting Agreement Amendment |
| Exhibit H | Form of Stockholder Written Consent |
| Exhibit I | Form of FIRPTA Certificate |

SCHEDULES

| Schedule A | Defined Terms |
|---|---|

### AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER is made and entered into as of October 7, 2020, by and among Stable Road Acquisition Corp., a Delaware corporation ("Parent"), Project Marvel First Merger Sub, Inc., a Delaware corporation and a direct, wholly-owned Subsidiary of Parent ("First Merger Sub"), Project Marvel Second Merger Sub, LLC, a Delaware limited liability company and a direct, wholly-owned Subsidiary of Parent ("Second Merger Sub"), and Momentus Inc., a Delaware corporation (the "Company"). Each of the Company, Parent, First Merger Sub and Second Merger Sub shall individually be referred to herein as a "Party" and, collectively, the "Parties". The term "Agreement" as used herein refers to this Agreement and Plan of Merger, as the same may be amended from time to time in accordance with the terms hereof, and all schedules, exhibits and annexes hereto (including the Company Disclosure Letter and the Parent Disclosure Letter). Defined terms used in this Agreement are listed alphabetically in Schedule A, together with the section and, if applicable, subsection in which the definition of each such term is located.

### RECITALS

WHEREAS, Parent is a blank check company incorporated in Delaware for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses.

WHEREAS, upon the terms and subject to the conditions of this Agreement and in accordance with the General Corporation Law of the State of Delaware (the "DGCL") and the General Limited Liability Company Act of the State of Delaware ("DLLCA") and other applicable Law, the Parties intend to enter into a business combination transaction by which: (a) First Merger Sub will merge with and into the Company (the "First Merger"), with the Company being the surviving corporation of the First Merger (the Company, in its capacity as the surviving corporation of the First Merger, is sometimes referred to as the "Surviving Corporation"); and (b) immediately following the First Merger and as part of the same overall transaction as the First Merger, the Surviving Corporation will merge with and into Second Merger Sub (the "Second Merger" and, together with the First Merger, the "Mergers"), with Second Merger Sub being the surviving company of the Second Merger (Second Merger Sub, in its capacity as the surviving company of the Second Merger, is sometimes referred to as the "Surviving Entity").

WHEREAS, for U.S. federal income tax purposes, each of the Parties intends that the Mergers, taken together, will constitute an integrated transaction that qualifies as a "reorganization" within the meaning of Section 368(a) of the Code, and that this Agreement be, and hereby is, adopted as a "plan of reorganization" for the purposes of Section 368 of the Code and Treasury Regulations Section 1.368-2(g).

WHEREAS, the board of directors of the Company has unanimously: (a) determined that it is in the best interests of the Company and Company Stockholders, and declared it advisable, to enter into this Agreement providing for the Mergers in accordance with the DGCL and DLLCA, as applicable; (b) approved this Agreement and the Transactions, including the Mergers in accordance with the DGCL and DLLCA, as applicable, on the terms and subject to the conditions of this Agreement; and (c) adopted a resolution recommending the plan of merger set forth in this Agreement be adopted by the Company Stockholders in accordance with the Company's Charter Documents.

WHEREAS, concurrently with the execution and delivery of this Agreement, the Company Stockholders collectively holding (a) at least a majority of the outstanding voting power of the Company Stock issued and outstanding as of the date hereof (voting as a single class and on an as-converted basis), (b) at least a majority of the shares of the Company Common Stock issued and outstanding as of the date hereof (voting as a single class) and (c) at least a majority of the shares of the Company Preferred Stock issued and outstanding as of the date hereof (voting as a single class and on an as-converted basis) (each such Company Stockholder, a "Written Consent Party"), have entered into voting and support agreements with Parent in substantially the form attached hereto as Exhibit A (each, a "Support Agreement").

WHEREAS, concurrently with the execution and delivery of this Agreement, Parent, the Company and the Selling Company Holder (as defined below) have entered into the Repurchase Agreement (as defined below), pursuant to which, among other things, Parent has agreed to repurchase, effective as of immediately following the Second Effective Time (as defined below), a number of shares of Parent Class A Common Stock as set forth therein and subject to the terms and conditions thereof.

WHEREAS, the board of directors of Parent has unanimously: (a) determined that it is in the best interests of Parent and the stockholders of Parent, and declared it advisable, to enter into this Agreement providing for the Mergers in accordance with the DGCL and DLLCA, as applicable; (b) approved this Agreement and the Transactions, including the Mergers in accordance with the DGCL and DLLCA, as applicable, on the terms and subject to the conditions of this Agreement; and (c) adopted a resolution recommending the plan of merger set forth in this Agreement be adopted by the stockholders of Parent (the "Parent Recommendation").

WHEREAS, concurrently with the execution and delivery of this Agreement, Sponsor, Parent and SRAC PIPE Partners LLC, a Delaware limited liability company, have entered into a letter agreement (the "Sponsor Agreement"), in substantially the form attached hereto as Exhibit B, pursuant to which, (a) immediately prior to the Closing, Sponsor may surrender to Parent the Sponsor Contingent Closing Shares, if any, and (b) in connection with the Closing, Sponsor shall subject the Sponsor Earnout Shares to potential forfeiture in the event that certain milestones are not achieved by Parent following the Closing, in each case, upon the terms and subject to the conditions set forth therein.

WHEREAS, on or about the date hereof, Parent has obtained commitments from certain investors (the "PIPE Investors") for a private placement of Parent Class A Common Stock (the "PIPE Investment"), such private placement to be consummated immediately prior to the consummation of the Transactions.

WHEREAS, in connection with the Closing, Parent shall, subject to obtaining the Requisite Parent Stockholder Approval, adopt the Second Amended and Restated Certificate of Incorporation of Parent (the "Parent A&R Charter") in substantially the form attached hereto as Exhibit C.

WHEREAS, in connection with the Closing, Parent shall, subject to obtaining the Requisite Parent Stockholder Approval, adopt the Amended and Restated Bylaws of Parent (the "Parent A&R Bylaws") in substantially the form attached hereto as Exhibit D.

WHEREAS, in connection with the consummation of the First Merger, Parent, Sponsor and certain Company Stockholders who will receive Parent Class A Common Stock pursuant to Section 2.6(a) will enter into an amended and restated Registration Rights Agreement (the "A&R Registration Rights Agreement") in substantially the form attached hereto as Exhibit E.

WHEREAS, in connection with the consummation of the Mergers, Parent and certain Company Stockholders who will receive Parent Class A Common Stock pursuant to Section 2.6(a) will each enter into a lockup agreement (each, a "Lockup Agreement"), in substantially the form attached hereto as Exhibit F.

WHEREAS, concurrently with the execution and delivery of this Agreement and as a condition to Parent's willingness to enter into this Agreement, Parent and the chief executive officer of the Company have entered into a Restrictive Covenant Agreement (the "Restrictive Covenant Agreement").

NOW, THEREFORE, in consideration of the covenants, promises and representations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

ARTICLE I.

THE CLOSING TRANSACTIONS

Section 1.1 <u>Closing</u>. Unless this Agreement shall have been terminated pursuant to <u>Section 9.1</u>, the consummation of the Transactions (the "<u>Closing</u>"), other than the filing of the Certificates of Merger (as defined below), shall take place at the offices of Orrick, Herrington & Sutcliffe LLP, 631 Wilshire Blvd., Suite 2-C, Santa Monica, CA 90401 at a time and date to be specified in writing by the Parties, which shall be no later than the third Business Day after the satisfaction or waiver of the conditions set forth in <u>ARTICLE VIII</u> (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at the Closing), or at such other time, date and location as the Parties agree in writing (the date on which the Closing occurs, the "<u>Closing Date</u>"). The Parties agree that the Closing signatures may be transmitted by email.pdf files.

Section 1.2 <u>Closing Statements</u>.

(a) No later than two (2) Business Days prior to the Closing Date, Parent shall deliver to the Company written notice (the "<u>Parent Closing Statement</u>") setting forth Parent's good faith estimate of: (i) the amount of Parent Cash as of the Closing (for the avoidance of doubt, prior to giving effect to the Parent Stockholder Redemptions and the payment of any Parent Transaction Costs) and all relevant supporting documentation used by Parent in calculating such amounts reasonably requested by the Company; (ii) the aggregate amount of cash proceeds that will be required to satisfy the Parent Stockholder Redemptions; (iii) the amount of Parent Transaction Costs as of the Closing and all relevant supporting documentation used by Parent in calculating such amounts reasonably requested by the Company; and (iv) the number of shares of Parent Class A Common Stock to be outstanding as of the Closing after giving effect to the Parent Stockholder Redemptions, the issuance of shares of Parent Class A Common Stock pursuant to the Subscription Agreements and the surrender of the Sponsor Contingent Closing Shares, if any (for the avoidance of doubt, excluding the Sponsor Earnout Shares).

(b) No later than two (2) Business Days prior to the Closing Date, the Company shall deliver to Parent written notice (the "<u>Company Closing Statement</u>") setting forth the Company's good faith estimate of: (i) the Closing Indebtedness Amount as of the Closing (including the Payoff Amounts) and all relevant supporting documentation used by the Company in calculating such amounts reasonably requested by Parent; (ii) the amount of Company Transactions Costs as of the Closing, together with instructions that list the applicable bank accounts designated to facilitate payment by Parent of the Company Transaction Costs and all relevant supporting documentation used by the Company in calculating such amounts reasonably requested by Parent; (iii) the amount of Company Cash as of the Closing and all relevant supporting documentation used by the Company in calculating such amounts reasonably requested by Parent; (iv) a calculation of the Aggregate Stock Consideration based upon the foregoing; and (v) a capitalization table schedule, setting forth the number of Company Stock Adjusted Fully Diluted Shares and, for each holder of Company Interests, (A) the name, address and email address (in each case, if available) of such holder, (B) the number and class, series or type of Company Interests held by such holder and (C) the portion of the Aggregate Stock Consideration payable to each such holder of Company Interests (with detail as to the amount payable with respect to each class, series and type of Company Interest held by such holder).

(c) Parent will consider in good faith the Company's comments to the Parent Closing Statement, and if any adjustments are made to the Parent Closing Statement by Parent prior to the Closing, such adjusted Parent Closing Statement shall thereafter become the Parent Closing Statement for all purposes of this Agreement. The Parent Closing Statement and the calculations and determinations contained therein shall be prepared in accordance with Parent's Charter Documents, the DGCL and the applicable definitions contained in this Agreement. The Company will consider in good faith Parent's comments to the Company Closing Statement, and the Company Closing Statement shall be subject to Parent prior written approval (not to be unreasonably withheld, conditioned or delayed). If any adjustments are made to the Company Closing Statement by the Company prior to the Closing, such adjusted Company Closing Statement shall thereafter become the Company Closing Statement for all purposes of this Agreement. The Company Closing Statement and the calculations and determinations contained therein shall be prepared in accordance with the Company's Charter Documents, all documents, plans and agreements governing the Company Interests, the DGCL and the applicable definitions contained in this Agreement. Notwithstanding anything to the contrary in this Agreement or any knowledge possessed or acquired by or on behalf of Parent, First Merger Sub, Second Merger Sub or any of their respective Affiliates, each of Parent, First Merger Sub and Second Merger Sub and, following the Closing, the Surviving Entity, and each of their respective Affiliates shall be entitled to rely (without any duty of inquiry) upon the Company Closing Statement and the allocation of the Aggregate Stock Consideration described therein, and the Letter of Transmittal that shall be required to be delivered by the applicable holders of Company Interests as a condition to receipt of any portion of the Aggregate Stock Consideration shall include a waiver of, among other things and subject to certain customary exceptions, any and all claims (x) that the Company Closing Statement did not accurately reflect the terms of the Company's Charter Documents and all documents, plans and agreements governing the Company Interests, and (y) in connection with the issuance of any Company Interests (including any rights to indemnities from the Company, the Surviving Entity or any of their respective Affiliates pursuant to any Contract entered into by such holder in connection with such issuance).

Section 1.3 <u>Closing Documents</u>.

(a) At the Closing, Parent, First Merger Sub or Second Merger Sub, as applicable, shall deliver to the Company:

(i) a certified copy of the Parent A&R Charter;

(ii) a copy of the A&R Registration Rights Agreement, duly executed by Parent, Sponsor and SRAC PIPE Partners LLC;

(iii) a copy of the Second Certificate of Merger, duly executed by the Second Merger Sub;

(iv) certified copies of resolutions and actions taken by Parent's, First Merger Sub's and Second Merger Sub's board of directors and stockholders (or managers and members, as applicable) in connection with the approval of this Agreement and the Transactions, certifying that such resolutions have not been modified, amended or revoked and remain in full force and effect as of the Closing;

(v) a copy of each Lockup Agreement, duly executed by Parent;

(vi) a copy of the Underwriting Agreement Amendment, by and between Parent and Cantor Fitzgerald & Co., in substantially the form attached hereto as <u>Exhibit G</u>; and

(vii) all other documents, instruments or certificates required to be delivered by Parent at or prior to the Closing pursuant to <u>Section 8.2</u>.

4

(b) At the Closing, the Company shall deliver, or cause to be delivered, as applicable, to Parent:

(i) a copy of the First Certificate of Merger, duly executed by the Company;

(ii) a copy of the A&R Registration Rights Agreement, duly executed by the Company Stockholders set forth on Section 1.3(b)(ii) of the Company Disclosure Letter;

(iii) a copy of each Lockup Agreement, duly executed by the Company Stockholders set forth on Section 1.3(b)(iii) of the Company Disclosure Letter;

(iv) certified copies of (A) resolutions and actions taken by the Company's board of directors in connection with the approval of this Agreement and the Transactions and (B) the Stockholder Written Consent, in each case certifying that the resolutions have not been modified, amended or revoked and remain in full force and effect as of the Closing;

(v) a certificate duly executed under penalties of perjury, substantially in the form set forth on Exhibit I and conforming to the requirements of Section 1.897-2(h)(1)(i) and 1.1445-2(c)(3)(i) of the Treasury Regulations, together with a draft notice, substantially in the form set forth on Exhibit I, prepared in accordance with Section 1.897-2(h)(2) of the Treasury Regulations; and

(vi) all other documents, instruments or certificates required to be delivered by the Company at or prior to the Closing pursuant to Section 8.3.

Section 1.4 Closing Transactions. At the Closing and on the Closing Date, the Parties shall cause the consummation of the following transactions in the following order, upon the terms and subject to the conditions of this Agreement:

(a) Parent shall direct the Trustee to make any payments required to be made by Parent in connection with the Parent Stockholder Redemptions.

(b) Parent shall pay, or cause to be paid, all Parent Transaction Costs to the applicable payees, to the extent not paid prior to the Closing.

(c) The certificate of merger with respect to the First Merger shall be prepared and executed in accordance with the relevant provisions of the DGCL (the "First Certificate of Merger") and filed with the Secretary of State of the State of Delaware.

(d) The certificate of merger with respect to the Second Merger shall be prepared and executed in accordance with the relevant provisions of the DLLCA (the "Second Certificate of Merger" and, together with the First Certificate of Merger, the "Certificates of Merger") and filed with the Secretary of State of the State of Delaware.

(e) Parent shall deposit (or cause to be deposited) with the Exchange Agent the portion of the Aggregate Stock Consideration payable pursuant to Section 2.6(a), Section 2.6(d) and Section 2.6(f).

(f) Parent shall (on behalf of the Company) pay, or cause to be paid, the Payoff Amounts to the applicable payee(s) set forth in the Payoff Letters.

5

(g) Parent shall (on behalf of the Company) pay, or, cause to be paid, all amounts included in the Company Transaction Costs, to the extent not paid by the Company prior to the Closing, to the applicable payees as set forth on the Company Closing Statement, by wire of immediately available funds;  provided, that Parent shall (on behalf of the Company) pay, or cause to be paid, the Company Transaction Costs that represent compensation to employees to the Company for payment to the applicable service provider at the time required by the applicable employment arrangement through the Company's payroll system.

ARTICLE II.
THE MERGERS

Section 2.1 Effective Times. Subject to the terms and subject to the conditions of this Agreement, on the Closing Date the Company and First Merger Sub shall cause the First Merger to be consummated by filing the First Certificate of Merger with the Secretary of State of the State of Delaware, in accordance with the applicable provisions of the DGCL (the time of such filing, or such later time as may be agreed in writing by the Company and Parent and specified in the First Certificate of Merger, being the "Effective Time"). As soon as practicable following the Effective Time and in any case on the same day as the Effective Time, the Surviving Corporation and Second Merger Sub shall cause the Second Merger to be consummated by filing the Second Certificate of Merger with the Secretary of State of the State of Delaware, in accordance with the applicable provisions of the DLLCA (the time of such filing, or such later time as may be agreed in writing by the Company and Parent and specified in the Second Certificate of Merger, being the "Second Effective Time").

Section 2.2 The Mergers.

(a) At the Effective Time, upon the terms and subject to the conditions of this Agreement and in accordance with the applicable provisions of the DGCL, First Merger Sub and the Company shall consummate the First Merger, pursuant to which First Merger Sub shall be merged with and into the Company, following which the separate corporate existence of First Merger Sub shall cease and the Company shall continue as the Surviving Corporation after the First Merger and as a direct, wholly-owned Subsidiary of Parent (provided, that references to the Company for periods after the Effective Time until the Second Effective Time shall include the Surviving Corporation).

(b) At the Second Effective Time, upon the terms and subject to the conditions of this Agreement and in accordance with the applicable provisions of the DLLCA, the Surviving Corporation shall be merged with and into Second Merger Sub, following which the separate corporate existence of the Surviving Corporation shall cease and Second Merger Sub shall continue as the Surviving Entity after the Second Merger and as a direct, wholly-owned Subsidiary of Parent (provided, that references to the Company or the Surviving Corporation for periods after the Second Effective Time shall include the Surviving Entity).

Section 2.3 Effect of the Mergers.

(a) At the Effective Time, the effect of the First Merger shall be as provided in this Agreement, the First Certificate of Merger and the applicable provisions of the DGCL. Without limiting the generality of the foregoing, and subject thereto, at the Effective Time, all the property, rights, privileges, agreements, powers and franchises, debts, liabilities, duties and obligations of First Merger Sub and the Company shall become the property, rights, privileges, agreements, powers and franchises, debts, liabilities, duties and obligations of the Surviving Corporation, which shall include the assumption by the Surviving Corporation of any and all agreements, covenants, duties and obligations of First Merger Sub and the Company set forth in this Agreement to be performed after the Effective Time.

6

(b) At the Second Effective Time, the effect of the Second Merger shall be as provided in this Agreement, the Second Certificate of Merger and the applicable provisions of the DLLCA. Without limiting the generality of the foregoing, and subject thereto, at the Second Effective Time, all the property, rights, privileges, agreements, powers and franchises, debts, liabilities, duties and obligations of Second Merger Sub and the Surviving Corporation shall become the property, rights, privileges, agreements, powers and franchises, debts, liabilities, duties and obligations of the Surviving Entity, which shall include the assumption by the Surviving Entity of any and all agreements, covenants, duties and obligations of the Second Merger Sub and the Surviving Corporation set forth in this Agreement to be performed after the Second Effective Time.

Section 2.4 <u>Governing Documents</u>. Subject to <u>Section 7.15</u>, at the Effective Time, the certificate of incorporation and bylaws of the Surviving Corporation shall be amended to read the same as the certificate of incorporation and bylaws of First Merger Sub as in effect immediately prior to the Effective Time, except that the name of the Surviving Corporation shall be "Momentus Space Inc.". Subject to <u>Section 7.15</u>, at the Second Effective Time, the certificate of formation and operating agreement of Second Merger Sub shall be the certificate of formation and operating agreement of the Surviving Entity until thereafter amended in accordance with its terms and as provided by applicable Law, except that the name of the Surviving Entity shall be "Momentus Space LLC".

Section 2.5 <u>Directors and Officers of the Surviving Corporation and the Surviving Entity</u>.

(a) The Company shall take all necessary action prior to the Effective Time such that (i) each director of the Company in office immediately prior to the Effective Time shall cease to be a director immediately following the Effective Time (including by causing each such director to tender an irrevocable resignation as a director, effective as of the Effective Time) and (ii) each person set forth on <u>Section 2.5(a)</u> of the Company Disclosure Letter shall be appointed to the Board of Directors of the Surviving Corporation, effective as of immediately following the Effective Time, and, as of such time, shall be the only directors of the Surviving Corporation (including by causing the board of directors of the Company to adopt resolutions prior to the Effective Time that expand or decrease the size of the board of directors of the Company, as necessary, and appoint such persons to the vacancies resulting from the incumbent directors' respective resignations or, if applicable, the newly created directorships upon any expansion of the size of the board of directors of the Company). Each person appointed as a director of the Surviving Corporation pursuant to the preceding sentence shall remain in office as a director of the Surviving Corporation until his or her successor is elected and qualified or until his or her earlier death, resignation or removal.

(b) Persons constituting the executive officers of the Company prior to the Effective Time shall continue to be the executive officers of the Surviving Corporation until the earlier of their death, resignation or removal or until their respective successors are duly appointed.

(c) Immediately following the Second Effective Time the (i) directors of the Surviving Corporation shall be the managers of the Surviving Entity and (ii) executive officers of the Surviving Corporation shall be the executive officers of the Surviving Entity, in each case, as set forth in the operating agreement of the Surviving Entity.

Section 2.6 <u>Effect of the First Merger</u>. Upon the terms and subject to the conditions of this Agreement, at the Effective Time, by virtue of the First Merger and without any further action on the part of Parent, First Merger Sub, the Company, the holders of Company Interests or the holders of any of the securities of Parent, the following shall occur:

7

(a) Each share of Company Stock (other than Excluded Shares and shares of unvested Company Restricted Stock) issued and outstanding immediately prior to the Effective Time will be cancelled and automatically deemed for all purposes to represent the right to receive, and the holder of such share of Company Stock shall be entitled to receive, the Per Share Company Stock Consideration pursuant to this Section 2.6(a), issuable in Parent Class A Common Stock, in each case, without interest, upon surrender of stock certificates representing all of such Company Stockholder's Company Stock (each, a "Certificate") and delivery of the other documents required pursuant to Section 2.8. As of the Effective Time, each Company Stockholder shall cease to have any other rights in and to the Company, the Surviving Corporation or the Surviving Entity, and each Certificate relating to the ownership of shares of Company Stock (other than Excluded Shares) shall thereafter represent only the right to receive the Per Share Company Stock Consideration.

(b) Each Company Warrant that is outstanding and unexercised immediately prior to the Effective Time will automatically be converted into a warrant to acquire a number of shares of Parent Class A Common Stock at an adjusted exercise price per share, in each case, as determined under this Section 2.6(b) (each such resulting warrant, an "Assumed Warrant"). Each Assumed Warrant shall be subject to the same terms and conditions as were applicable to such corresponding Company Warrant immediately prior to the Effective Time (including applicable vesting conditions), except to the extent such terms or conditions are rendered inoperative by the Transactions or such other immaterial administrative or ministerial changes as the Parties may determine are appropriate to effectuate the administration of the Assumed Warrants. Accordingly, effective as of the Effective Time: (a) each such Assumed Warrant shall be exercisable solely for shares of Parent Class A Common Stock; (b) the number of shares of Parent Class A Common Stock subject to each Assumed Warrant shall be determined by multiplying the number of shares of Company Stock subject to the Company Warrant by the Per Share Company Stock Consideration and rounding the resulting number down to the nearest whole number of shares of Parent Class A Common Stock; and (c) the per share exercise price for the Parent Class A Common Stock issuable upon exercise of such Company Warrant shall be determined by dividing the per share exercise price for the shares of Company Stock subject to the Company Warrant, as in effect immediately prior to the Effective Time, by the Per Share Company Stock Consideration, and rounding the resulting exercise price up to the nearest whole cent. Prior to the Effective Time, the Company shall, if applicable, deliver any notices and obtain any consents required in order to effect the treatment of the Company Warrants described in this Section 2.6(b) pursuant to the terms of the Company Warrants and any plan or similar document governing the Company Warrants.

(c) Each Company Option that is outstanding and unexercised immediately prior to the Effective Time (whether vested or unvested) shall automatically be assumed by Parent and converted into an option to acquire a number of shares of Parent Class A Common Stock at an adjusted exercise price per share, in each case, as determined under this Section 2.6(c) (each such resulting option, a "Rollover Option"). Each Rollover Option shall be subject to the same terms and conditions as were applicable to such corresponding Company Option immediately prior to the Effective Time (including applicable vesting conditions), except to the extent such terms or conditions are rendered inoperative by the Transactions or such other immaterial administrative or ministerial changes as the Parties may determine are appropriate to effectuate the administration of the Rollover Options. Accordingly, effective as of the Effective Time: (i) each such Rollover Option shall be exercisable solely for shares of Parent Class A Common Stock; (ii) the number of shares of Parent Class A Common Stock subject to each Rollover Option shall be determined by multiplying the number of shares of Company Stock subject to the corresponding Company Option by the Per Share Company Stock Consideration and rounding the resulting number down to the nearest whole number of shares of Parent Class A Common Stock; and (iii) the per share exercise price for the Parent Class A Common Stock issuable upon exercise of such Rollover Option shall be determined by dividing the per share exercise price for the shares of Company Stock subject to the Company Option, as in effect immediately prior to the Effective Time, by the Per Share Company Stock Consideration, and rounding the resulting exercise price up to the nearest whole cent. Notwithstanding the foregoing, the conversions described in this Section 2.6(c) shall occur in a manner consistent with the requirements of Section 409A of the Code and, in the case of any Company Option to which Section 422 of the Code applies, the exercise price and the number of shares of Parent Class A Common Stock purchasable pursuant to such option shall be determined in a manner consistent with the requirements of Section 424(a) of the Code. Prior to the Effective Time, the Company shall perform such actions as are required under the Company Stock Plans and the awards governing the Company Options in order to effect the treatment of the Company Options described in this Section 2.6(c).

(d) Each Company Non-Plan Option that is outstanding and unexercised immediately prior to the Effective Time shall be automatically cancelled for no consideration.

(e) Each award of Company Restricted Stock that is outstanding and unvested immediately prior to the Effective Time shall automatically be assumed by Parent and converted into an award of restricted stock with respect to a number of shares of Parent Class A Common Stock (the "Rollover Restricted Stock") determined by multiplying the number of shares of Company Restricted Stock subject to such award by the Per Share Company Stock Consideration and rounding the resulting number down to the nearest whole number of shares of Parent Class A Common Stock. Each share of Rollover Restricted Stock shall be subject to the same terms and conditions as were applicable to such corresponding share of Company Restricted Stock immediately prior to the Effective Time (including applicable vesting conditions), except to the extent such terms or conditions are rendered inoperative by the Transactions or such other immaterial administrative or ministerial changes as the Parties may determine are appropriate to effectuate the administration of the Rollover Restricted Stock. The Parties intend that the Rollover Restricted Stock payable pursuant to this Section 2.6(e) to the holders of Company Common Stock (but only with respect to their Company Common Stock which was fully vested upon receipt or for which they have filed timely and valid elections under Section 83(b) of the Code) will be treated as received in exchange for the applicable holder's Company Common Stock, and agree to report for income Tax purposes such payments as consideration for such holder's Company Common Stock and not as compensation for services. Pursuant to Revenue Ruling 2007-49, the holders of Company Common Stock that receive Rollover Restricted Stock in the First Merger pursuant to this Section 2.6(e) that are subject to vesting arrangements will make a timely and valid election under Section 83(b) of the Code with respect to such Rollover Restricted Stock, in which case, the Parties agree that no compensation will occur when such Rollover Restricted Stock is issued or vests.

(f) Immediately prior to the Effective Time, each outstanding Company SAFE shall be automatically converted into the right to receive the aggregate Per Share Company Stock Consideration payable in accordance with the terms of such applicable Company SAFE in connection with the Transactions (for the avoidance of doubt, with respect to each Company SAFE, such aggregate Per Share Company Stock Consideration shall be equal to (i) the number of shares of Company Stock equal to the (A) Purchase Amount (as defined in each such Company SAFE), *divided by* (B) Liquidity Price (as defined in each such Company SAFE) applicable to such Company SAFE, *multiplied by* (ii) the Per Share Company Stock Consideration). Each Company SAFE so converted shall immediately thereafter terminate in accordance with its terms.

(g) Notwithstanding anything to the contrary contained herein, no certificates or scrip representing fractional shares of Parent Class A Common Stock shall be issued upon the conversion of Company Interests, as applicable pursuant to this Section 2.6, and such fractional share interests shall not entitle the owner thereof to vote or to any other rights of a holder of Parent Class A Common Stock. In lieu of the issuance of any such fractional share, Parent shall pay to each former holder of Company Interests (other than Excluded Shares) who otherwise would be entitled to receive such fractional share an amount in cash, without interest, rounded down to the nearest cent, equal to the product of (a) the amount of the fractional share interest in a share of Parent Class A Common Stock to which such holder otherwise would have been entitled but for this Section 2.6(g), multiplied by (b) $10.00.

9

(h) Each issued and outstanding share of common stock of First Merger Sub shall be converted into and become one (1) validly issued, fully paid and nonassessable share of common stock, par value $0.01 per share, of the Surviving Corporation, which shall constitute the only outstanding shares of capital stock of the Surviving Corporation. From and after the Effective Time, all certificates representing the common stock of First Merger Sub shall be deemed for all purposes to represent the number of shares of common stock of the Surviving Corporation into which they were converted in accordance with the immediately preceding sentence.

(i) Each share of Company Stock held in the Company's treasury or owned by Parent, First Merger Sub, Second Merger Sub or the Company immediately prior to the Effective Time (together with the Dissenting Shares, the "Excluded Shares"), shall be cancelled and no consideration shall be paid or payable with respect thereto.

(j) The numbers of shares of Parent Class A Common Stock that the holders of Company Interests are entitled to receive as a result of the First Merger and as otherwise contemplated by this Agreement shall be adjusted to reflect appropriately the effect of any stock split, split-up, reverse stock split, stock dividend or distribution (including any dividend or distribution of securities convertible into Parent Class A Common Stock), extraordinary cash dividend, reorganization, recapitalization, reclassification, combination, exchange of shares or other like change with respect to Parent Class A Common Stock occurring on or after the date hereof and prior to the Closing.

Section 2.7 Effect of the Second Merger. Upon the terms and subject to the conditions of this Agreement, at the Second Effective Time, by virtue of the Second Merger and without any action on the part of any Party or any holder of Company Interests or the holders of any shares of capital stock of Parent, the Surviving Corporation or Second Merger Sub: (a) each share of common stock of the Surviving Corporation issued and outstanding immediately prior to the Second Effective Time shall be cancelled and shall cease to exist without any conversion thereof or payment therefor; and (b) the membership interest of Second Merger Sub outstanding immediately prior to the Second Effective Time shall be converted into and become the membership interest of the Surviving Entity, which shall constitute one hundred percent (100%) of the outstanding equity of the Surviving Entity. From and after the Second Effective Time, the membership interests of the Second Merger Sub shall be deemed for all purposes to represent the number of membership interests into which they were converted in accordance with the immediately preceding sentence.

Section 2.8 Disbursement of Aggregate Stock Consideration.

(a) Subject to this Section 2.8, promptly following the Effective Time, Parent shall deliver, or cause to be delivered to each holder of Company Interests (other than holders of Excluded Shares, Company Options, Company Warrants and Company Restricted Stock) the portion of the Aggregate Stock Consideration payable to such holder in respect of the Company Interests held by such holder in accordance with the terms of Section 2.6 (as reflected in the Company Closing Statement).

(b) Prior to the Effective Time, Parent shall appoint a commercial bank or trust company (the "Exchange Agent") for the purpose of exchanging Certificates, if applicable, and otherwise distributing to each holder of Company Interests (other than holders of Excluded Shares, Company Options, Company Warrants and Company Restricted Stock) the portion of the Aggregate Stock Consideration payable to each such holder of Company Interests.

(c) At the Effective Time, Parent shall make available to the Exchange Agent the portion of the Aggregate Stock Consideration required pursuant to the Company Closing Statement to fund the payments set forth in Section 2.6(a) and Section 2.6(f). Such equity deposited with the Exchange Agent shall be referred to in this Agreement as the "Exchange Fund". At the Effective Time, Parent shall deliver irrevocable instructions to the Exchange Agent to deliver such foregoing portion of the Aggregate Stock Consideration out of the Exchange Fund in the manner it is contemplated to be issued or paid pursuant to this ARTICLE II.

(d) Promptly after the Effective Time (and in any event within five (5) Business Days thereafter), the Exchange Agent shall mail to each holder of Company Interests (other than holders of Excluded Shares and holders of Company Options, Company Warrants and Company Restricted Stock): (i) a letter of transmittal (the "Letter of Transmittal") in such form and having such other provisions as Parent and the Company may reasonably agree; and (ii) instructions for surrendering Certificates representing Company Stock (or affidavits of loss in lieu of the Certificates as provided in Section 2.8(g)), if applicable, to the Exchange Agent (the "Surrender Documentation"); provided, however, that the Exchange Agent shall not be required to deliver a Letter of Transmittal or Surrender Documentation to any holder of Company Interests that has delivered its Letter of Transmittal and Surrender Documentation, if applicable, with respect to such holder's Company Interests to the Exchange Agent at least two Business Days prior to the Closing Date. Upon receipt by the Exchange Agent of the completed Letter of Transmittal and the Surrender Documentation, the Exchange Agent will deliver to the holder of such Company Interests the portion of the Aggregate Stock Consideration payable to such holder in respect of the Company Interests held by such holder in accordance with the terms of Section 2.6, less any required Tax withholdings as provided in Section 2.9; provided, however, that if the holder of such Company Interests delivers to the Exchange Agent the Letter of Transmittal and, if applicable, Surrender Documentation, at least two Business Days prior to the Closing Date, the Exchange Agent shall deliver to the holder of such Company Interests the portion of the Aggregate Stock Consideration payable to such holder on the Closing Date or as promptly as practicable thereafter. All Certificates surrendered by the Company Stockholders shall forthwith be cancelled. Until a Letter of Transmittal and, if applicable, Surrender Documentation, has been received by the Exchange Agent, each Company Interest shall represent after the Effective Time for all purposes only the right to receive the portion of the Aggregate Stock Consideration payable in respect of such Company Interest pursuant to Section 2.6. No interest will be paid or accrued on any amount payable upon due submission of any Letter of Transmittal or, if applicable, Surrender Documentation.

(e) In the event of a transfer of ownership of shares of Company Stock that is not registered in the transfer records of the Company, the Per Share Company Stock Consideration to be delivered upon due surrender of the Certificate may be issued to such transferee if the Certificate formerly representing such shares of Company Stock is presented to the Exchange Agent, accompanied by all documents required to evidence and effect such transfer and to evidence that any applicable stock transfer Taxes have been paid or are not applicable. From and after the Effective Time, there shall be no transfers on the transfer books of the Company of any shares of Company Stock that were outstanding immediately prior to the Effective Time. If, after the Effective Time, any Certificate is presented to the Surviving Corporation, the Surviving Entity, Parent or the Exchange Agent for transfer, it shall be cancelled and deemed exchanged for (without interest and after giving effect to any required Tax withholdings as provided in Section 2.9) the aggregate Per Share Company Stock Consideration represented by such Certificate, as applicable.

(f) Any portion of the Exchange Fund (including the proceeds of any investments of the Exchange Fund) that remains unclaimed by the holders of Company Interests for 180 days after the Effective Time shall be delivered to the Surviving Entity. Any holder of Company Interests who has not theretofore complied with this ARTICLE II shall thereafter look only to the Surviving Entity for payment of their respective portion of the Aggregate Stock Consideration (after giving effect to any required Tax withholdings as provided in Section 2.9). Notwithstanding the foregoing, none of the Surviving Corporation, the Surviving Entity, Parent, the Exchange Agent or any other Person shall be liable to any former holder of Company Interests for any amount properly delivered to a public official pursuant to applicable abandoned property, escheat or similar Laws.

(g) In the event any Certificate shall have been lost, stolen or destroyed: (i) upon the making of an affidavit of that fact by the Person claiming such Certificate to be lost, stolen or destroyed; and (ii) if required by Parent, the posting by such Person of a bond in customary amount and upon such terms as may be required by Parent as indemnity against any claim that may be made against it, the Surviving Corporation or the Surviving Entity with respect to such Certificate, the Exchange Agent will issue the portion of the Aggregate Stock Consideration attributable to such Certificate (after giving effect to any required Tax withholdings as provided in Section 2.9).

Section 2.9 <u>Withholding Taxes</u>. Notwithstanding anything herein to the contrary, each of Parent, First Merger Sub, Second Merger Sub, the Company, the Surviving Corporation, the Surviving Entity and their respective Affiliates shall be entitled to deduct and withhold from any consideration or other amounts otherwise deliverable or payable under this Agreement such amounts that any such Persons are required to deduct and withhold under the Code or any other applicable Tax Law. To the extent that Parent, First Merger Sub, Second Merger Sub, the Company, the Surviving Corporation, the Surviving Entity or their respective Affiliates withholds such amounts with respect to any Person and pays such withheld amounts to the applicable Governmental Entity, such withheld amounts shall be treated as having been paid to or on behalf of such Person for all purposes. In the case of any such payment payable to employees of the Company or its Affiliates in connection with the Mergers treated as compensation for applicable Tax purposes, the parties shall cooperate to pay such amounts through the Company's payroll to facilitate applicable withholding.

Section 2.10 <u>Appraisal Rights</u>.

(a) Notwithstanding any provision of this Agreement to the contrary and to the extent available under the DGCL or, to the extent applicable, the CCC, shares of Company Stock that are outstanding immediately prior to the Effective Time and that are held by Company Stockholders who shall have neither voted in favor of the First Merger nor consented thereto in writing in respect of such Company Stock and who shall have demanded properly in writing appraisal for such Company Stock in accordance with Section 262 of the DGCL, or, to the extent applicable, Chapter 13 of the CCC, and otherwise complied with all of the provisions of the DGCL or CCC, as applicable, relevant to the exercise and perfection of appraisal rights (collectively, the "<u>Dissenting Shares</u>"), shall not be converted into, and such Company Stockholders shall have no right to receive, the Per Share Company Stock Consideration that would otherwise be attributable to such Dissenting Shares in accordance with Section 2.6 (as reflected in the Company Closing Statement) unless and until such Company Stockholder fails to perfect or withdraws or otherwise loses his, her or its right to appraisal and payment under the DGCL, and if and to the extent applicable, the CCC. Any Company Stockholder who fails to perfect or who effectively withdraws or otherwise loses his, her or its rights to appraisal of such Dissenting Shares under Section 262 of the DGCL, and if and to the extent applicable, Chapter 13 of the CCC (or other applicable Law), shall thereupon be deemed to have been converted into, and to have become exchangeable for, as of the Effective Time, the right to receive the Per Share Company Stock Consideration attributable to such Dissenting Shares in accordance with the terms of the Company's Charter Documents (as reflected in the Company Closing Statement), without any interest thereon, upon surrender, in the manner provided in Section 2.8, of the Certificate or Certificates that formerly evidenced such Dissenting Shares.

12

(b) Prior to the Closing, the Company shall give Parent (i) prompt written notice of any demands for appraisal received by the Company and any withdrawals of such demands, and (ii) the opportunity to participate in all negotiations and proceedings (including the defense and any settlement thereof) with respect to demands for appraisal under the DGCL and, if and to the extent applicable, the CCC. The Company will enforce any contractual waivers that Company Stockholders have granted regarding appraisal rights that apply to the Transactions. The Company shall not, except with the prior written consent of Parent (which consent shall not be unreasonably withheld, conditioned or delayed), make any payment with respect to any demands for appraisal or offer to settle or settle any such demands.

Section 2.11 <u>Taking of Necessary Action; Further Actions</u>. If, at any time after the Effective Time or the Second Effective Time, any further action is necessary or desirable to carry out the purposes of this Agreement and to vest the Surviving Corporation following the First Merger and the Surviving Entity following the Second Merger with full right, title and possession to all assets, property, rights, privileges, powers and franchises of the Company, First Merger Sub and Second Merger Sub, the officers and directors or members, as applicable, (or their designees) of the Company, First Merger Sub and Second Merger Sub are fully authorized in the name of their respective corporations or otherwise to take, and will take, all such lawful and necessary action, so long as such action is not inconsistent with this Agreement.

Section 2.12 <u>Tax Treatment of the Mergers</u>. The Parties intend that, for United States federal income tax purposes, the Mergers will constitute an integrated plan described in Rev. Rul. 2001-46, 2001-2 C.B. 321 that qualifies as a "reorganization" within the meaning of Section 368(a) of the Code and the Treasury Regulations to which each of Parent and the Company are to be parties under Section 368(b) of the Code and the Treasury Regulations (the "<u>Intended Tax Treatment</u>") and this Agreement is intended to be, and is adopted as, a plan of reorganization for purposes of Sections 354, 361 and the 368 of the Code and within the meaning of Treasury Regulations Section 1.368-2(g). None of the Parties knows of any fact or circumstance (without conducting independent inquiry or diligence of the other relevant party), or has taken or will take any action, whether before or after the Mergers, if such fact, circumstance or action would be reasonably expected to cause the Mergers, taken together, to fail to qualify for the Intended Tax Treatment. The Mergers, taken together, shall be reported by the Parties for all Tax purposes in accordance with the Intended Tax Treatment, including the filing of the statement required by Treasury Regulations Section 1.368-3, unless otherwise required by a Governmental Entity as a result of a "determination" within the meaning of Section 1313(a) of the Code. The Parties shall reasonably cooperate with each other and their respective counsel to document and support the Intended Tax Treatment, including providing factual support letters of the sort customarily provided as the basis for a legal opinion that the Mergers qualify for the Intended Tax Treatment. For the avoidance of doubt, the qualification of the Mergers for the Intended Tax Treatment will not be a condition to Closing.

ARTICLE III.

SPONSOR EARNOUT SHARES

Section 3.1 <u>Potential Forfeiture</u>. In accordance with the Sponsor Agreement, Sponsor has agreed that, effective upon the Closing, the Sponsor will subject 1,437,500 shares of Parent Class A Common Stock owned by Sponsor (the "<u>Sponsor Earnout Shares</u>") to potential forfeiture if the Triggering Events do not occur during the Earnout Period, with such Sponsor Earnout Shares vesting (and therefore no longer subject to forfeiture) pursuant to the terms of this <u>ARTICLE III</u>. Until the occurrence of the applicable Triggering Event, certificates representing the Sponsor Earnout Shares shall bear a legend referencing that they are subject to forfeiture pursuant to the provisions of this Agreement, and any transfer agent for Parent Class A Common Stock will be given appropriate stop transfer orders that will be applicable until the Sponsor Earnout Shares are vested; <u>provided</u>, <u>however</u>, that upon the vesting of any Sponsor Earnout Shares in accordance with the terms herein, Parent shall immediately cause the removal of such legend and direct such transfer agent that such stop transfer orders are no longer applicable. For the avoidance of doubt, each Triggering Event shall only occur once, if at all.

Section 3.2 <u>Vesting</u>. Until the earlier of all of the Sponsor Earnout Shares having become fully vested or the expiry of the Earnout Period:

(a) one-third (1/3rd) of the Sponsor Earnout Shares (479,166 shares) shall immediately become fully vested and no longer subject to forfeiture upon the occurrence of Triggering Event I;

(b) one-third (1/3rd) of the Sponsor Earnout Shares (479,167 shares) shall immediately become fully vested and no longer subject to forfeiture upon the occurrence of Triggering Event II; and

(c) one-third (1/3rd) of the Sponsor Earnout Shares (479,167 shares) shall immediately become fully vested and no longer subject to forfeiture upon the occurrence of Triggering Event III.

Section 3.3 <u>Adjustment</u>. If, and as often as, the outstanding shares of Parent Class A Common Stock are changed into a different number of shares or a different class, by reason of any dividend, subdivision, reclassification, recapitalization, split, combination or exchange, or any similar event after the date hereof, then the number of Sponsor Earnout Shares to be surrendered or forfeited pursuant to this <u>ARTICLE III</u> will in each case be equitably adjusted to reflect such change.

ARTICLE IV.

<u>REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY</u>

Except as set forth in the letter dated as of the date of this Agreement delivered by the Company to Parent, First Merger Sub and Second Merger Sub prior to or in connection with the execution and delivery of this Agreement (the "<u>Company Disclosure Letter</u>"), the Company hereby represents and warrants to Parent, First Merger Sub and Second Merger Sub as of the date hereof and as of the Closing Date as follows:

Section 4.1 <u>Organization and Qualification</u>. The Company is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its assets, rights and properties and to carry on its business as it is now being conducted, except as would not be material to the Company. The Company is duly licensed, qualified to do business and in good standing in each jurisdiction in which the ownership of its property or assets or the character of its activities requires it to be so licensed, qualified or in good standing, except where the failure to be so licensed or qualified or in good standing would not, individually or in the aggregate, reasonably be expected to be material to the Company. Complete and correct copies of the certificate of incorporation and by-laws (or other comparable instruments relating to governance with different names) (collectively referred to herein as "<u>Charter Documents</u>") of the Company as amended and currently in effect, have been made available to Parent or its representatives. The Company is not in violation in any material respect of its Charter Documents, the Investors' Rights Agreement, the First Refusal and Co-Sale Agreement or the Voting Agreement.

Section 4.2 <u>Company Subsidiaries</u>. The Company has no and has never had any direct or indirect Subsidiaries or participations in joint ventures or other entities, and does not own and has never owned, directly or indirectly, any equity interests or other interests or investments (whether equity or debt) in any Person.

14

Section 4.3 Capitalization.

(a) As of the date hereof, the authorized capital stock of the Company consists of: (i) 328,400,000 shares of Company Class A Common Stock, of which 17,782,030 shares are issued and outstanding as of the date of this Agreement; (ii) 80,000,000 shares of Company Class B Common Stock, of which 70,000,000 shares are issued and outstanding as of the date of this Agreement; (iii) 20,000,000 shares of Company FF Preferred Stock, of which 20,000,000 shares are issued and outstanding as of the date of this Agreement; (iv) 44,745,720 shares of Company Series Seed Preferred Stock, of which 42,298,151 shares are issued and outstanding as of the date of this Agreement; (v) 3,563,412 shares of Company Series Seed-1 Preferred Stock, of which 3,563,412 shares are issued and outstanding as of the date of this Agreement; (vi) 4,751,218 shares of Company Series Seed-2 Preferred Stock, of which 4,751,218 shares are issued and outstanding as of the date of this Agreement; (vii) 65,000,000 shares of Company Series A Preferred Stock, of which 61,962,132 shares are issued and outstanding as of the date of this Agreement; and (viii) 32,301,028 shares of Company Series A-1 Preferred Stock, of which 32,301,028 shares are issued and outstanding as of the date of this Agreement. All of the issued and outstanding shares of Company Stock have been duly authorized and validly issued and are fully paid and nonassessable and have not been issued in violation of any preemptive or similar rights. Each share of Company Stock has been issued in compliance in all material respects with: (A) applicable Law and (B) the Company's Charter Documents. Section 4.3(a) of the Company Disclosure Letter sets forth a detailed capitalization table of the Company as of the date hereof including, for each holder of Company Stock the name of the holder of Company Stock and the number and class or series of Company Stock held by such holder.

(b) Section 4.3(b) of the Company Disclosure Letter sets forth, as of the date hereof, (i) with respect to each outstanding and unexercised Company Option and Company Non-Plan Option, the name of the holder of such Company Option and Company Non-Plan Option, the vesting schedule applicable to such Company Option and Company Non-Plan Option, the number of vested and unvested shares of Company Common Stock covered by such Company Option and Company Non-Plan Option as of the date of this Agreement and the extent to which such Company Option and Company Non-Plan Option will vest upon the Transactions, the date of grant, the vesting commencement date, the cash exercise price per share of such Company Option and Company Non-Plan Option, the vesting schedule of such Company Option and Company Non-Plan Option, whether such Company Option and Company Non-Plan Option is intended to qualify as an "incentive stock option" under Section 422 of the Code, whether early exercise is permitted with respect to such Company Option and Company Non-Plan Option and the applicable expiration date thereof; (ii) with respect to each outstanding award of Company Restricted Stock, the name of the holder of such Company Restricted Stock, the number of shares of Company Common Stock subject to such award of Company Restricted Stock, the extent to which such Company Restricted Stock will vest upon consummation of the Transactions, the date of grant, the vesting commencement date, and the vesting schedule of such Company Restricted Stock; and (iii) with respect to each Company Warrant, the name of the holder of such Company Warrant, the number of shares of Company Common Stock or other Company Stock covered by such Company Warrant, the date of issuance, the cash exercise price per share of such Company Warrant, and the applicable expiration date thereof. As of the date hereof, other than the Company Options, Company Non-Plan Options, Company Restricted Stock and Company Warrants set forth on Section 4.3(b) of the Company Disclosure Letter, there are no stock appreciation, phantom stock, stock-based performance unit, stock option, profit participation, restricted stock, restricted stock unit, equity commitments or other equity or equity-based compensation award or similar rights or agreements with respect to the Company. Except as set forth on Section 4.3(b) of the Company Disclosure Letter, the Company has not granted any outstanding options, warrants, rights (including preemptive rights), subscriptions, calls, puts or other securities convertible into or exchangeable or exercisable for shares of the Company Stock, or any other commitments or agreements providing for the issuance of additional shares, the sale of treasury shares, or for the repurchase or redemption of shares of Company Stock, and there are no agreements of any kind which may obligate the Company to issue, purchase, register for sale, redeem or otherwise acquire any of its capital stock. Except as set forth on Section 4.3(b) of the Company Disclosure Letter, there are no outstanding bonds, debentures, notes or other indebtedness of the Company having the right to vote (or convertible into, or exchangeable for, securities having the right to vote) on any matter for which the Company Stockholders may vote. Except for this Agreement, there are no registration rights, and there is no voting trust, proxy, rights plan, anti-takeover plan, stockholders agreement or other agreements or understandings with respect to the shares of Company Stock. Each Company Option and each Company Non-Plan Option (A) was issued in all material respects in accordance with the terms of the applicable incentive equity plan of the Company and all other applicable Law and properly accounted for in all material respects in accordance with GAAP and (B) was granted with a per share exercise price not less than the fair market value of a share of Company Common Stock on the applicable grant date (determined in accordance with Section 409A of the Code) and is otherwise exempt from the application of Section 409A of the Code. A valid Code Section 83(b) election was filed with respect to each award of Company Restricted Stock that was granted upon the early exercise of any Company Option and Company Non-Plan Option.

15

(c) Except as provided for in this Agreement or accounted for pursuant to the terms hereof, as a result of the consummation of the Transactions, no shares of capital stock, warrants, options or other securities of the Company are issuable and no rights in connection with any shares, warrants, options or other securities of the Company accelerate or otherwise become triggered (whether as to vesting, exercisability, convertibility or otherwise).

Section 4.4 Due Authorization.

(a) The Company has all requisite corporate power and authority to: (i) execute, deliver and perform this Agreement and the other Transaction Agreements to which it is a party and (ii) carry out the Company's obligations hereunder and thereunder and to consummate the Transactions (including the Mergers), in each case, subject to the consents, approvals, authorizations and other requirements described in Section 4.5. The execution, delivery and performance by the Company of this Agreement and the other Transaction Agreements to which it is a party and the consummation by the Company of the Transactions (including the Mergers) have been duly and validly authorized by all requisite action, including approval by the board of directors of the Company and, following receipt of the Requisite Company Stockholder Approval, the Company Stockholders as required by the DGCL and the CCC, and no other corporate proceeding on the part of the Company is necessary to authorize this Agreement and the other Transaction Agreements or the Company's performance hereunder or thereunder. This Agreement has been and, upon execution by the Company, such other Transaction Agreements to which it is a party will be duly and validly executed and delivered by the Company and (assuming any such agreement constitutes a legal, valid and binding obligation of the counterparties thereto) constitute the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with their terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting or relating to creditors' rights generally and subject, as to enforceability, to general principles of equity (collectively, the "Remedies Exception").

(b) At a meeting duly called and held, the board of directors of the Company has unanimously: (a) determined that it is fair and in the best interests of the Company and Company Stockholders, and declared it advisable, to enter into this Agreement and the other Transaction Agreements providing for the Mergers in accordance with the DGCL and DLLCA, as applicable; (b) approved this Agreement and the Transactions, including the Mergers in accordance with the DGCL and DLLCA, as applicable, on the terms and subject to the conditions of this Agreement; and (c) adopted a resolution recommending the Transactions be approved, and the plan of merger set forth in this Agreement be adopted, by the Company Stockholders in accordance with the Company's Charter Documents (the "Company Recommendation").

16

Section 4.5 <u>No Conflict; Governmental Consents and Filings</u>.

(a) Subject to the receipt of the consents, approvals, authorizations and other requirements set forth in <u>Section 4.5(b)</u>, the execution, delivery and performance of this Agreement (including the consummation by the Company of the Transactions) and the other Transaction Agreements to which the Company is a party by the Company do not and will not: (i) violate any provision of, or result in the breach of, any applicable Law to which the Company is subject or by which any property or asset of the Company is bound; (ii) conflict with or violate the Charter Documents of the Company; (iii) violate any provision of or result in a breach, default or acceleration of, or require a notice or consent under, any Company Material Contract, or to the Knowledge of the Company, any Data Security Requirement, or terminate, cancel or modify the terms, conditions or provisions or result in the termination, cancellation or modification of the terms, conditions or provisions of any Company Material Contract, or result in the creation of any Lien under any Company Material Contract or upon any of the properties or assets of the Company, or constitute an event which, after notice or lapse of time or both, would result in any such violation, breach, default, acceleration, termination, cancellation, modification or creation of a Lien under a Company Material Contract or upon any of the material properties or assets of the Company; or (iv) result in a violation or revocation of any Material Permits, except to the extent that the occurrence of any of the foregoing items set forth in clauses (iii) or (iv) would not, individually or in the aggregate, have a Company Material Adverse Effect.

(b) No action by, consent, notice, permit, approval or authorization of, or designation, declaration or filing with, any Governmental Entity or notice, approval, consent, waiver or authorization from any Governmental Entity is required on the part of the Company with respect to the Company's execution, delivery or performance of this Agreement, any of the other Transaction Agreements to which it is a party or the consummation by the Company of the Transactions (including the Mergers), except for: (i) applicable requirements of the HSR Act or any similar foreign Law; (ii) any consents, notices, approvals, authorizations, designations, declarations, waivers or filings, the absence of which would not, individually or in the aggregate, reasonably be expected to be material to the Company, or prevent the consummation of the Transactions; (iii) compliance with any applicable requirements of the securities laws; (iv) the filing of the First Certificate of Merger in accordance with the DGCL; (v) the filing of the Second Certificate of Merger in accordance with the DLLCA; and (vi) where the failure to obtain such consent, approval, authorization or permit, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to be material to the Company.

Section 4.6 <u>Legal Compliance; Permits.</u>

(a) The Company has during the past three (3) years complied with, and is not currently in violation of, any applicable Law with respect to the conduct of its business, or the ownership or operation of its business, except for failures to comply or violations which would not, individually or in the aggregate, reasonably be expected to be material to the Company. During the past three (3) years, the Company has not received any written, or to the Knowledge of the Company, oral notice of non-compliance with any applicable Law.

(b) The Company is in possession of all Permits necessary to own, lease and operate the properties and assets it purports to own, operate or lease and to carry on its business as it is now being conducted (the "<u>Material Permits</u>"), except where the failure to have such Material Permits would not, individually or in the aggregate, reasonably be expected to be material to (i) such ownership, lease, operation or conduct or (ii) the Company. Except as would not, individually or in the aggregate, reasonably be expected to be material to the Company: (a) each Material Permit is in full force and effect in accordance with its terms; (b) no outstanding written notice of revocation, cancellation or termination of any Material Permit has been received by the Company; (c) there are, and during the past three (3) years there have been, no Legal Proceedings pending or, to the Knowledge of the Company, threatened, that seek the revocation, cancellation, limitation, restriction or termination of any Material Permit; and (d) the Company is in compliance with all Material Permits applicable to the Company.

Section 4.7 <u>Financial Statements</u>.

(a) Set forth on <u>Section 4.7</u> of the Company Disclosure Letter are complete copies of: (i) the audited balance sheets as of December 31, 2019 and 2018 and statements of operations, statements of changes in stockholders' deficit and statements of cash flows of the Company for the years ended December 31, 2019 and 2018 together with the auditor's reports thereon (the "<u>Audited Financial Statements</u>"); and (ii) an unaudited balance sheet as of August 31, 2020 and statements of operations, statements of changes in stockholders' deficit and statements of cash flows of the Company as of and for the eight (8) month period ended August 31, 2020 (the "<u>Interim Financial Statements</u>" and, together with the Audited Financial Statements, the "<u>Financial Statements</u>").

(b) The Financial Statements present fairly, in all material respects, the financial position, cash flows and results of operations of the Company as of the dates and for the periods indicated in such Financial Statements in conformity with GAAP consistently applied in all material respects (except in the case of the Interim Financial Statements for the absence of footnotes, or the inclusion of limited footnotes, and other presentation items and for normal year-end adjustments, none of which if included would reasonably be expected to be, individually or in the aggregate, material to the Company) and were derived from, and accurately reflect in all material respects, the books and records of the Company.

(c) The Company has established and maintained a system of internal controls. Such internal controls are sufficient to provide reasonable assurance regarding the reliability of the Company's financial reporting and the preparation of the Company's financial statements for external purposes in accordance with GAAP. Other than as would not reasonably be expected to be, individually or in the aggregate, material to the Company, such internal controls are sufficient to provide reasonable assurance (i) that the Company's financial reporting and the preparation of the Company's financial statements adequately account for assets, (ii) that transactions, receipts and expenditures of the Company are being executed and made only in accordance with appropriate authorizations of management and in all material respects in accordance with applicable Law, (iii) regarding prevention or timely detection of unauthorized acquisition, use or disposition of the assets of the Company and (iv) that accounts, notes and other receivables and inventory are recorded accurately.

(d) All accounts receivable of the Company reflected in the Interim Financial Statements (i) are bona fide and valid receivables arising from sales actually made or services actually performed and arising in the ordinary course of business of the Company, (ii) are properly reflected on the books and records of the Company, and (iii) to the Knowledge of the Company as of the date of the Interim Financial Statements, are not subject to any setoffs, counterclaims, credits or other offsets which are not reflected on the Interim Financial Statements, other than routine credits granted for errors in ordering, shipping, pricing, discounts, rebates, returns in the ordinary course of business of the Company.

(e) There are no outstanding loans or other extensions of credit made by the Company to any executive officer (as defined in Rule 3b-7 under the Exchange Act) or director of the Company.

Section 4.8 <u>No Undisclosed Liabilities</u>. There is no liability, debt or obligation (absolute, accrued, contingent or otherwise) of the Company of the nature required to be disclosed or reserved for in a balance sheet prepared in accordance with GAAP, except for liabilities, debts and obligations: (a) provided for in, or otherwise reflected or reserved for on the Financial Statements or disclosed in the notes thereto; (b) that have arisen since the date of the most recent balance sheet included in the Financial Statements in the ordinary course of the operation of business and consistent with the past practice of the Company (none of which is a liability for breach of contract, tort, misappropriation, or infringement or a claim or lawsuit); (c) incurred in connection with the transactions contemplated by this Agreement; (d) that will be discharged or paid off prior to or at the Closing; or (e) that would not reasonably be expected to be, individually or in the aggregate, material to the Company.

Section 4.9 Absence of Certain Changes or Events. Except as set forth on Section 4.9 of the Company Disclosure Letter or as expressly contemplated by this Agreement, since December 31, 2019 through the date of this Agreement, (a) the Company has conducted its business in the ordinary course consistent with past practice, and (b) there has not been any change, effect, event, occurrence, circumstance, state of facts or development that, individually or in the aggregate, has had or would reasonably be likely to have a Company Material Adverse Effect. Since the date of the Interim Financial Statements, the Company has not taken or omitted to take any action that, if taken or omitted to be taken after the date hereof would require the prior written consent of Parent pursuant to Section 6.1.

Section 4.10 Litigation. Except as would not, individually or in the aggregate, reasonably be expected to be material to the Company, as of the date hereof, there are, and for the past three (3) years there have been: (a) no pending or, to the Knowledge of the Company, threatened, Legal Proceedings against the Company or any of its properties, rights or assets, or, to the Knowledge of the Company, any of the directors or officers of the Company with regard to their actions as such; (b) no pending or, to the Knowledge of the Company, threatened audits, examinations or investigations by any Governmental Entity against the Company, other than with respect to audits, examinations or investigations conducted by a Governmental Entity in the ordinary course of business pursuant to a Contract; (c) no pending or threatened Legal Proceedings by the Company against any third party; (d) no settlements or similar agreements that impose any material ongoing obligations, liabilities or restrictions on the Company; and (e) no Orders imposed or, to the Knowledge of the Company, threatened to be imposed upon the Company or its properties or assets, or any of the directors or officers of the Company with regard to their actions as such.

Section 4.11 Benefit Plans.

(a) Section 4.11(a) of the Company Disclosure Letter sets forth a true and complete list of each material Benefit Plan as of the date hereof. For purposes of this Agreement, "Benefit Plans" means each "employee benefit plan" as defined in Section 3(3) of ERISA, whether or not subject to ERISA, and any other employment, individual consulting, retention, termination, severance, separation, transition, incentive, equity or equity-based, deferred compensation, change in control, bonus, retirement, pension, savings, health, welfare, paid time off, retiree or post-termination health or welfare, fringe benefit, or any other compensation or benefit plan, agreement, arrangement, policy or program, including such plans, agreements, arrangements, policies, and programs providing compensation or benefits to any current or former director, officer, employee or other service provider of the Company, in each case, (i) which is maintained, sponsored, contributed to or required to be contributed to by the Company, or (ii) under or with respect to which the Company has or could reasonably be expected to have any current or contingent obligation or liability (including on account of an ERISA Affiliate). Benefit Plans solely sponsored and maintained by the Company shall be separately identified on Section 4.11(a) of the Company Disclosure Letter as "Company Benefit Plans." Benefit Plans solely sponsored and maintained by a professional employer organization shall be separately identified Section 4.11(a) of the Company Disclosure Letter as "PEO Benefit Plans." No Company Benefit Plan and, to the Knowledge of the Company, no PEO Benefit Plan is subject to the applicable Law of a jurisdiction other than the United States (whether or not United States Law also applies) or primarily benefits employees, directors, consultants or individual service providers of the Company who reside or work primarily outside of the United States.

19

(b) With respect to each material Company Benefit Plan, the Company has made available to Parent or its representatives copies of: (i) all current plan documents and all amendments thereto, or if unwritten, a written summary of the material terms thereof; (ii) all trust agreements, funding arrangements or insurance Contracts; (iii) the most recent summary plan description and all summaries of material modifications thereto; (iv) the most recent financial statements, actuarial valuation report and annual report on Form 5500 and all attachments thereto (if applicable); (v) the most recent determination, advisory or opinion letter, if any, issued by the Internal Revenue Service; and (vi) any non-routine correspondence with any Governmental Entity dated during the past three (3) years. With respect to each PEO Benefit Plan, the Company has provided to Parent: (i) the current summary plan description and all summaries of material modifications thereto and (ii) the most recent IRS determination, advisory or opinion letter (to the extent applicable). In addition, the Company has provided to Parent or its representatives a schedule summarizing all outstanding retention, change in control bonuses, change in control severance or other similar payment obligations of the Company that is true and accurate in all material respects as of no earlier than thirty (30) days prior to the date hereof (the "Retention Award Summary") and the Company has made available to Parent or its representatives a copy of each Company Benefit Plan that is an agreement listed in the Retention Award Summary.

(c) (i) Each Company Benefit Plan and, to the Knowledge of the Company, each PEO Benefit Plan, has been administered, established, maintained and funded in all material respects in accordance with its terms and all applicable Laws, including ERISA and the Code; (ii) all contributions (including all employer contributions and employee salary reduction contributions), distributions, reimbursements or payments required to be made by the Company or any current or former employee of the Company under or with respect to any Benefit Plan have been made by the due date thereof (including any valid extension), and all contributions, distributions, reimbursements and payments for any period ending on or before the Closing Date that are not yet due have been made or properly accrued; and (iii) except as would not reasonably be expected to result in a material liability to the Company, no non-exempt "prohibited transaction" (within the meaning of Section 406 of ERISA and Section 4975 of the Code) or breach of fiduciary duty (as determined under ERISA) has occurred or, to the Knowledge of the Company, is reasonably expected to occur, with respect to any Benefit Plan. Each Company Benefit Plan and, to the Knowledge of the Company, each PEO Benefit Plan, which is intended to be qualified within the meaning of Section 401(a) of the Code: (A) has received a current favorable determination, advisory or opinion letter from the Internal Revenue Service as to its qualification; or (B) has been established under a standardized master and prototype or volume submitter plan for which a current favorable Internal Revenue Service advisory letter or opinion letter has been obtained by the plan sponsor and may be relied upon by the adopting employer, and nothing has occurred and no circumstances exist that could reasonably be expected to adversely affect or result in the loss of the qualification of such plan. The Company has not incurred (whether or not assessed), and is not reasonably expected to incur or to be subject to, any Tax or other penalty with respect to the reporting requirements under Sections 6055 and 6056 of the Code, as applicable, or under Section 4980B, 4980D or 4980H of the Code

(d) Except as set forth in Section 4.11(a) of the Company Disclosure Letter, no Benefit Plan is, the Company has not sponsored, maintained, contributed or been obligated to contribute to, and the Company does not have (and is not reasonably be expected to incur) any current or contingent liability or obligation (including on account of an ERISA Affiliate) under or in respect of: (i) a "defined benefit plan" (as defined in Section 3(35) of ERISA) or a plan that is or was subject to Title IV of ERISA, Section 412 or 430 of the Code or Section 302 of ERISA; (ii) any "multiemployer plan" (within the meaning of Section (3)(37) of ERISA); (iii) a "multiple employer plan" (as defined in Section 413(c) of the Code or Section 210 of ERISA); or (iv) a "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA. The Company does not have, and is not reasonably expected to have, any current or contingent liability or obligation under Title IV of ERISA or by reason of at any time being considered a single employer under Section 414 of the Code with any other Person.

20

(e) Except as would not, individually or in the aggregate, reasonably be expected to be material to the Company, with (i) respect to the Company Benefit Plans or their administrators or fiduciaries: (x) no Legal Proceedings (other than routine claims for benefits in the ordinary course) are pending or, to the Knowledge of the Company, threatened; and (y) to the Knowledge of the Company, no facts or circumstances exist that could reasonably be expected to give rise to any such Legal Proceedings, and (ii) with respect to any PEO Benefit Plan, no such Legal Proceedings have been disclosed to the Company or have been, to the Knowledge of the Company, threatened.

(f) None of the Company Benefit Plans or, to the Knowledge of the Company, PEO Benefit Plans, provides for, and the Company has no liability or obligation in respect of, post-employment or retiree health, life insurance or other welfare benefits or coverage for any Person, except as may be required under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, Section 4980B of the Code or similar state or other applicable Law and at the sole expense of such participant or the participant's beneficiary.

(g) Except as set forth in  Section 4.11(g) of the Company Disclosure Letter, neither the execution and delivery of this Agreement nor the consummation of the Transactions will, either alone or in connection with any other event(s): (i) result in any payment or benefit becoming due to any current or former employee, officer, contractor, director or other individual service provider of the Company or under any Benefit Plan or otherwise; (ii) increase the amount of compensation or benefits otherwise payable to any current or former employee, officer, contractor, director or other individual service provider of the Company or under any Benefit Plan or otherwise; (iii) result in the acceleration of the time of payment, funding or vesting, or forfeiture, of any compensation or benefits to any current or former employee, officer, contractor, director or other service provider of the Company or under any Benefit Plan or otherwise; or (iv) directly or indirectly cause the Company to transfer or set aside any assets to fund any benefits under or result in any limitation on the right to merge, amend or terminate any Benefit Plan.

(h) The Company does not maintain any obligations to gross-up or reimburse any individual for any tax or related interest or penalties incurred by such individual, including under Sections 409A or 4999 of the Code or otherwise.

(i) Each Company Benefit Plan that is a "nonqualified deferred compensation plan" subject to Section 409A of the Code has been established, documented, operated and maintained in compliance with Section 409A of the Code in all material respects, and all applicable regulations and notices issued thereunder.

(j) No payment, amount or benefit that could be, or has been, received (whether in cash or property or the vesting of cash or property or the cancellation of indebtedness) by any current or former employee, officer, stockholder, director or other individual service provider of the Company or any of its Affiliates as a result of the execution and delivery of this Agreement or the consummation of the Transactions could reasonably be expected to be characterized as an "excess parachute payment" (as defined in Section 280G(b)(1) of the Code).

Section 4.12 Labor Relations.

(a) The Company is not a party to or bound by any collective bargaining agreement or other Contract with a labor union, works council, or other labor organization respecting persons employed by the Company and no such agreements or arrangements are currently being negotiated by the Company. No employee of the Company is represented by a labor union, works council, or other labor organization with respect to their employment by the Company. There are no representation proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of the Company, threatened to be brought or filed, with the National Labor Relations Board or other labor relations tribunal, nor has any such representation proceeding, petition, or demand been brought, filed, made, or, to the Knowledge of the Company, threatened within the last three (3) years. There is not, and in the past three (3) years has not been, any organizing activity involving the Company or, to the Knowledge of the Company, threatened by any labor organization or group of employees.

21

(b) There have been no strikes, work stoppages, slowdowns, lockouts, arbitrations, or material grievances or other material labor disputes (including unfair labor practice charges, grievances, or complaints) pending, or, to the Knowledge of the Company, threatened against or involving the Company involving any employee, except for those which would not, individually or in the aggregate, reasonably be expected to be material to the Company.

(c) To the Knowledge of the Company, as of the date hereof, none of the Company's officers or key employees has given notice of any intent to terminate his or her employment with the Company. The Company is, and for the past three (3) years, has been in compliance in all material respects and, to the Knowledge of the Company, each of their employees and consultants are, and for the past three (3) years have been, in compliance in all material respects, with the terms of any employment and consulting agreements between the Company and such individuals.

(d) Except as otherwise listed on Section 4.12(d) of the Company Disclosure Letter, as of the date hereof there are no Legal Proceedings against the Company pending or, to Knowledge of the Company, threatened before any Governmental Entity based on, arising out of, in connection with or otherwise relating to the employment, termination of employment or failure to employ by the Company, of any individual except for those complaints, charges or claims which would not, individually or in the aggregate, reasonably be expected to be material to the Company.

(e) The Company is, and for the past three (3) years, has been, in compliance with all Laws relating to the employment of labor, including all such Laws relating to wages (including minimum wage and overtime), hours or work, child labor, discrimination, civil rights, withholdings and deductions, classification and payment of employees, independent contractors, and consultants, employment equity, the federal Worker Adjustment and Retraining Notification Act ("WARN") and any similar state or local "mass layoff" or "plant closing" Law, collective bargaining, occupational health and safety, workers' compensation, and immigration, except for instances of noncompliance which would not, individually or in the aggregate, reasonably be expected to be material to the Company. There has been no "mass layoff" or "plant closing" (as defined by WARN) with respect to the Company within the six months prior to the date of this Agreement and no such events are reasonably expected to occur prior to Closing.

(f) Except as would not, individually or in the aggregate, reasonably be expected be material to the Company, the Company is not delinquent in payments to any employees or independent contractors or former employees or independent contractors for any services or amounts required to be reimbursed or otherwise paid.

(g) During the past three (3) years, to the Knowledge of the Company, there have been no employment discrimination or employment harassment allegations raised, brought, threatened, or settled relating to any appointed officer or director of the Company involving or relating to his or her services provided to the Company. The policies and practices of the Company comply, and for the past three (3) years have materially complied, with all federal, state, and local Laws concerning employment discrimination and employment harassment, except as would not, individually or in the aggregate, reasonably be expected to be material to the Company.

22

(h) To the Knowledge of the Company, no employee of the Company is in any material respect in violation of any term of any employment agreement, nondisclosure agreement, non-competition agreement, restrictive covenant or other obligation: (i) to the Company or (ii) to a former employer of any such employee relating (A) to the right of any such employee to be employed by the Company or (B) to the knowledge, use or disclosure of Trade Secrets.

(i) The execution and delivery of this Agreement and the other Transaction Agreements and the performance of this Agreement and the Transactions do not require the Company to seek or obtain any consent, engage in consultation with, or issue any notice to any unions or labor organizations.

Section 4.13 Real Property; Tangible Property.

(a) The Company does not own and has never owned any real property.

(b) Section 4.13(b) of the Company Disclosure Letter lists, as of the date hereof, all material leasehold or subleasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property held by the Company (the "Leased Real Property"). The Company has a valid, binding and enforceable leasehold estate in, and enjoys, in all material respects, peaceful and undisturbed possession of, all Leased Real Property. Each of the leases, lease guarantees and agreements related to any Leased Real Property, including all amendments, terminations and modifications thereof (collectively, the "Company Real Property Leases"), is in full force and effect. The Company has made available to Parent true, correct and complete copies of all material Company Real Property Leases. The Company is not in breach of or default under any Company Real Property Lease, and, to the Knowledge of the Company, no event has occurred and no circumstance exists which, if not remedied, and whether with or without notice or the passage of time or both, would result in such a breach or default, except for such breaches or defaults as would not individually or in the aggregate, reasonably be expected to be material to the Company. The Company has not received written notice from, or given any written notice to, any lessor of such Leased Real Property of, nor is there any default, event or circumstance that, with notice or lapse of time, or both, would constitute a default by the party that is the lessee or lessor of such Leased Real Property. No party to any Company Real Property Lease has exercised any termination rights with respect thereto, the Company's possession and quiet enjoyment of the Leased Real Property under such Company Real Property Lease has not been disturbed in any material respect, and to the Knowledge of the Company, there are no material disputes with respect to such Company Real Property Lease. The other party to such Company Real Property Lease is not an affiliate of, and otherwise does not have any economic interest in, the Company and the Company has not subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof.

(c) The Company owns and has good and marketable title to, or a valid leasehold interest in or right to use, all of the material tangible assets or personal property used in or necessary for the operation of the Company's business as currently conducted as of the date hereof, free and clear of all Liens other than: (i) Permitted Liens; and (ii) the rights of lessors under any leases. The material tangible assets or personal property (together with the contractual rights) of the Company: (A) constitute all of the assets, rights and properties that are necessary for the operation of the business of the Company as currently conducted as of the date hereof, and taken together, are adequate and sufficient for the operation of the businesses of the Company as currently conducted as of the date hereof; and (B) have been maintained in all material respects in accordance with generally applicable accepted industry practice, are in good working order and condition, except for ordinary wear and tear and as would not, individually or in the aggregate, reasonably be expected to be material to the business of the Company.

23

Section 4.14 <u>Taxes</u>.

(a) All material Tax Returns filed or required to be filed by the Company have been timely filed (taking into account applicable extensions), and all such Tax Returns are true, correct and complete in all material respects.

(b) The Company has timely paid in full all material Taxes which are due and payable (whether or not shown as due on any Tax Return).

(c) The Company has complied in all material respects with all applicable Laws relating to the withholding of Taxes and all Taxes required by applicable Law to be withheld by the Company have been withheld and paid over to the appropriate Governmental Entity in all material respects.

(d) The Company has properly (i) collected and remitted sales, use, value added and similar Taxes with respect to sales made to its customers or services provided to its customers and (ii) for all sales or services that are exempt from sales, use, value added and similar Taxes and that were made without charging or remitting such Taxes, received and retained any appropriate Tax exemption certificates and other documentation qualifying such sale or service as exempt.

(e) No deficiency for Taxes has been asserted or assessed in writing by any Governmental Entity against the Company, which deficiency has not been paid in full or finally resolved with no payment due. No audit or other Legal Proceeding by any Governmental Entity is currently pending or threatened in writing against the Company with respect to Taxes. There are no requests for rulings or determinations in respect of any Tax pending between the Company, on the one hand, and any Governmental Entity, on the other hand.

(f) There are no liens for material amounts of Taxes (other than Liens for Taxes not yet due and payable) upon any of the assets of the Company.

(g) There are no Tax indemnification agreements, Tax sharing agreements, or similar arrangements under which the Company could be liable after the Closing Date for the Tax liability of any Person (other than customary commercial Contracts not primarily related to Taxes such as a loan or a lease).

(h) The Company has not constituted either a "distributing corporation" or a "controlled corporation" in a distribution of stock qualifying for tax-free treatment under Section 355 of the Code in the past two (2) years.

24

(i) The Company has not entered into a "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4(b).

(j) The Company: (i) does not have any liability for the Taxes of another Person pursuant to Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign Tax law) or as a transferee or a successor or by Contract (other than customary commercial Contracts not primarily related to Taxes such as a loan or a lease); and (ii) has never been a member of an affiliated, consolidated, combined or unitary group filing for U.S. federal, state or local income Tax purposes.

(k) The Company has not consented to extend the time in which any Tax may be assessed or collected by any Governmental Entity, which extension is still in effect, and the Company has not requested, granted, or become the beneficiary of any extension or waiver of any statute of limitations period with respect to Taxes, which period (after giving effect to such extension or waiver) has not yet expired.

(l) The Company has never had a permanent establishment and has never been subject to income Tax, in a jurisdiction outside the country of its organization.

(m) The Company will not be required to include any item of income in, or exclude any material item or deduction from, taxable income for any taxable period beginning after the Closing Date or, in the case of any taxable period beginning on or before and ending after the Closing Date, the portion of such period beginning after the Closing Date, as a result of: (i) an installment sale or open transaction disposition that occurred prior to the Closing; (ii) any change in or use of an improper method of accounting prior to the Closing, including by reason of the application of Section 481 of the Code (or any analogous provision of state, local or foreign Tax law); (iii) a prepaid amount received or deferred revenue accrued prior to the Closing; (iv) any intercompany transaction described in Treasury Regulations under Section 1502 (or any corresponding or similar provision of state or local Tax law) with respect to a transaction consummated prior to the Closing; or (v) any closing agreement pursuant to Section 7121 of the Code or any similar provision of state, local or foreign Tax law executed prior to the Closing.

(n) The Company has no unpaid liability under Section 965(a) of the Code.

(o) No claim has been made in writing to the Company by any Governmental Entity in a jurisdiction in which the Company does not file Tax Returns that it is or may be subject to Tax by, or required to file Tax Returns in, that jurisdiction.

(p) The Company is not and has never been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code.

(q) The Company has (i) to the extent applicable, properly complied with all requirements of applicable Tax Law in order to defer the amount of the employer's share of any "applicable employment taxes" under Section 2302 of the CARES Act, (ii) not deferred any payroll tax obligations pursuant to any Payroll Tax Executive Order, (iii) to the extent applicable, properly complied with all requirements of applicable Tax Law and duly accounted for any available Tax credits under Sections 7001 through 7005 of the Families First Act and Section 2301 of the CARES Act, and (iv) not sought (nor has any Affiliate that would be aggregated with the Company and treated as one employer for purposes of Section 2301 of the CARES Act sought) a covered loan under paragraph (36) of Section 7(a) of the Small Business Act (15 U.S.C. 636(a)), as added by Section 1102 of the CARES Act.

(r) To the Knowledge of the Company, a valid election under Section 83(b) of the Code has been timely made with respect to each share of Company Restricted Stock that was subject to vesting based on the passage of time and/or the achievement of performance goals when such Company Restricted Stock was issued, or that was otherwise subject to a "substantial risk of forfeiture" within the meaning of Section 83 of the Code.

Section 4.15 <u>Environmental Matters</u>. The Company is, and for the past three (3) years has been, in compliance in all material respects with all Environmental Laws. The Company has obtained, holds, is, and for the past three (3) years has been, in material compliance with all permits, licenses and other authorizations required under applicable Environmental Laws to permit the Company to operate its properties and assets in a manner in which they are now operated and maintained and to conduct the business of the Company as currently conducted. There are no written claims or notices of violation pending or, to the Knowledge of the Company, threatened against the Company alleging material violations of or liability under any Environmental Law. Neither the Company nor any other Person whose liability the Company has expressly assumed or otherwise become subject to, has treated, stored, disposed of, arranged for the disposal of, transported, handled, manufactured, distributed, exposed any Person to or released any Hazardous Material at, on or under any property or facility, or currently or formerly owned or operated any property or facility contaminated by any Hazardous Materials, in each case in a manner that would give rise to a material liability (contingent or otherwise) of the Company, including for investigation costs, cleanup costs, response costs, corrective action costs, personal injury, property damage, natural resources damages or attorney fees, under any Environmental Laws. The Company has not agreed to indemnify any Person or assumed by Contract the liability of any third party arising under Environmental Law. The Company has made available to Parent copies of all material written environmental reports, audits, assessments, liability analyses, memoranda and studies in the possession of, or conducted by, the Company with respect to compliance or liabilities under Environmental Law.

Section 4.16 Brokers; Third Party Expenses. No broker, finder, investment banker or other Person is entitled to, nor will be entitled to, either directly or indirectly, any brokerage fee, finders' fee or other similar commission, for which Parent or the Company would be liable in connection with the transactions contemplated by this Agreement or the Transactions based upon arrangements made by the Company or any of its Affiliates.

Section 4.17 Intellectual Property.

(a) Section 4.17(a) of the Company Disclosure Letter sets forth a true, correct and complete list of all of the following Intellectual Property included in the Owned Intellectual Property as of the date hereof: (A) issued Patents and pending applications for Patents, (B) registered Trademarks, pending applications for registration of Trademarks and material unregistered Trademarks, (C) registered Copyrights and pending applications for Copyright registration, (D) internet domain names and social media accounts (collectively, the "Scheduled Intellectual Property"), including, for each item listed, the applicable jurisdiction, title, application and registration or serial number and date, and record owner and, if different, the legal owner and beneficial owner. All necessary registration, maintenance, renewal, and other relevant filing fees due through the date hereof for the Scheduled Intellectual Property have been timely paid and all necessary documents and certificates in connection therewith have been timely filed with the relevant Patent, Trademark, Copyright, domain name, or other authorities in the United States or foreign jurisdictions, as the case may be, for the purposes of maintaining the Scheduled Intellectual Property in full force and effect.

(b) The Owned Intellectual Property, along with the Licensed Intellectual Property (when used within the scope of the applicable IP License), constitutes all of the Intellectual Property used in or necessary for the conduct and operation of the business of the Company (together with the Owned Intellectual Property, the "Business IP"), provided, however, with respect to third party Patents, the foregoing representations are made to the Knowledge of the Company. The Company is (and immediately following the Closing, the Surviving Entity will be) the sole and exclusive owner of all right, title and interest in and to all Owned Intellectual Property, free and clear of all Liens other than Permitted Liens, and the Company has (and immediately following the Closing, the Surviving Entity will have) sufficient, valid and continuing rights, pursuant to a valid written IP License (complete and correct copies of which have been made available to Parent prior to the date of this Agreement), including to use, sell and license (as the case may be) all other Intellectual Property used in or necessary for the conduct and operation of the business of the Company in the manner conducted prior to Closing. The Owned Intellectual Property is valid and, to the Knowledge of the Company, subsisting and enforceable.

(c) The conduct and operation of the business of the Company as presently conducted (including the creation, licensing, marketing, importation, offering for sale, sale, or use of the products and services of the business of the Company), and the Owned Intellectual Property have not infringed, misappropriated (or constituted or resulted from a misappropriation of) or otherwise violated, and are not infringing, misappropriating (or constituting or resulting from the misappropriation of) or otherwise violating any Intellectual Property of any Person, provided, however, with respect to third party Patents, the foregoing representations are made to the Knowledge of the Company.

26

(d) The Company has not received from any Person in the past three (3) years any written (or to the Knowledge of the Company, oral) notice, charge, complaint, claim or other assertion ("Claims or Assertions") (i) of any infringement, misappropriation or other violation of any Intellectual Property of any Person or (ii) contesting the use, ownership, validity or enforceability of any Intellectual Property, and no Legal Proceedings relating to any of the foregoing are pending against the Company. To the Knowledge of the Company, no other Person has infringed, misappropriated or otherwise violated, or is infringing, misappropriating or otherwise violating, any Owned Intellectual Property. In the past three (3) years, the Company has not made any Claims or Assertions against any Person (A) alleging any of the foregoing referenced in clauses (i) or (ii), and no Legal Proceedings relating to any of the foregoing are pending against a third Person.

(e) To the Knowledge of the Company, no past or present director, officer or employee of the Company and no R&D Sponsor owns (or has any valid claim, or any right (whether or not currently exercisable) to any ownership interest, in or to) any material Owned Intellectual Property. Each of the present and former employees, consultants and independent contractors of the Company who are or have been engaged in inventing, conceiving, authoring, creating or developing for or on behalf of the Company any material Intellectual Property in the course of such Person's employment or engagement with the Company has executed and delivered to the Company a written agreement, pursuant to which such Person has: (i) agreed to hold all Trade Secrets of the Company in confidence both during and after such Person's employment or retention, as applicable; and (ii) presently assigned to the Company all of such Person's rights, title and interest in and to all Intellectual Property invented, conceived, authored, created or developed for the Company in the course of such Person's employment or retention thereby. To the Knowledge of the Company, there is no uncured material breach by any such Person with respect to any such agreement. No funding or facilities of any R&D Sponsor were used in the development of any Intellectual Property under any such agreement or otherwise for or on behalf of the Company.

(f) The Company has taken commercially reasonable steps to protect the secrecy, confidentiality and value of all material Trade Secrets and other confidential and proprietary information included in the Owned Intellectual Property and all material Trade Secrets of any Person to whom the Company has a contractual confidentiality obligation with respect to such material Trade Secrets. No Trade Secret that is material to the business of the Company has been authorized to be disclosed, or, to the Knowledge of the Company, has actually been disclosed, to any third Person, other than pursuant to a valid, written non-disclosure agreement restricting the disclosure and use of such Trade Secret. No source code constituting Owned Intellectual Property has been (and no event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time, or both), will, or would reasonably be expected to, result in a requirement that any such source code be) delivered, licensed, or made available or otherwise disclosed by the Company to, or accessed by, any escrow agent or other Person, other than employees or contractors of the Company subject to written agreements restricting the disclosure and use of such source code, and no Person other than the Company is in possession of, or has been granted any license or other right to, any such source code.

(g) No Open Source Software is or has been included, incorporated or embedded in, linked to, combined, made available or distributed with any Software owned by the Company (including distributed to any of its customers), in each case, in a manner that requires or obligates the Company to: (i) disclose, contribute, distribute, license or otherwise make available to any Person (including the open source community) any Software (including any source code) constituting Owned Intellectual Property; (ii) license any Software constituting Owned Intellectual Property for making modifications or derivative works of, or reverse-engineering, any such Software; (iii) disclose, contribute, distribute, license or otherwise make available to any third Person any portion of any source code constituting Owned Intellectual Property, (iv) create any obligation for the Company to grant, or purport to grant, to any Person any rights or immunities under any Owned Intellectual Property (including any patent non-asserts or patent licenses), or (v) otherwise impose any limitation, restriction, or condition on the right or ability of the Company to use any Owned Intellectual Property. The Company is in material compliance with the terms and conditions of all licenses for Open Source Software used in the business of the Company.

(h) The Company owns or has a valid right to access and use pursuant to a written agreement all Company IT Systems used by the Company. To the Knowledge of the Company, the Company IT Systems: (i) are adequate for, and operate and perform in all material respects as required in connection with, the operation and conduct of the business of the Company as currently conducted; and (ii) do not contain any viruses, worms, Trojan horses, bugs, faults or other devices, errors, contaminants, malicious code or effects that (A) materially disrupt or adversely affect the functionality of the Company IT Systems, except as disclosed in their documentation or (B) enable or assist any Person to access without authorization any Company IT Systems. The Company has taken reasonable precautions designed to protect the confidentiality, integrity, and security of (a) the Company IT Systems that the Company owns or controls and (b) all information stored or contained in or transmitted by the Company IT Systems, in each case of clause (a) and (b) from any theft, corruption, loss or unauthorized use, access, interruption or modification by any Person. To the Knowledge of the Company, during the past three (3) years, there has been no unauthorized access to or breach or violation of any Company IT Systems. In the last three (3) years, there have been no failures, breakdowns, continued substandard performance, data loss, material outages, material unscheduled downtime or other adverse events affecting any Company IT Systems, in each case that have caused or could reasonably be expected to result in the substantial disruption of or substantial interruption in or to the use of such Company IT Systems or the conduct and operation of the business of the Company.

(i) Neither the execution and delivery of this Agreement nor the consummation of the Transactions will, including as a consequence of any Contract to which Company is party, cause any of the following: (i) the loss or impairment of, or any Lien on, any Owned Intellectual Property or material Licensed Intellectual Property; (ii) the release, disclosure or delivery of any source code constituting Owned Intellectual Property to any Person; (iii) the grant, assignment or transfer to any other Person of any license or other right or interest under, to or in any Owned Intellectual Property; or (iv) the payment of any additional consideration to, or the reduction of any payments from, any Person with respect to any Owned Intellectual Property or material Licensed Intellectual Property. Immediately following the Closing, the Business IP and Company IT Systems will be owned by, licensed to, or available for use by, the Surviving Entity on terms and conditions identical to those under which the Company owned, licensed, or used, the Business IP and Company IT Systems immediately prior to the Closing, without the payment of any additional amounts or consideration beyond those that would have been due had the Closing not occurred.

Section 4.18 Privacy.

(a) The Company and any Person acting for or on the Company's behalf materially complies, and has at all times during the past three (3) years (in the case of any such Person, during the time such Person was acting for or on behalf of the Company) materially complied, as applicable to the Company, with: (i) all applicable Privacy Laws; (ii) all of the Company's policies and notices regarding Personal Information (whether posted to an external-facing website of the Company or otherwise made available or communicated to third parties by the Company) ("Company Privacy Notices"); and (iii) all of the Company's obligations regarding Personal Information, privacy, or security under any Contract the Company has entered into or by which it is bound (clauses (i) through (iii), collectively, "Data Security Requirements"). The Company has not received in the three (3) years prior to the date of this Agreement any written notice of any Claims or Assertions (including written notice from third parties acting on its or their behalf) of or been charged with, the violation of, any Privacy Laws (and no such Claim or Assertion or related Legal Proceeding is currently pending or, to the Knowledge of the Company, threatened). To the Knowledge of the Company, the Company Privacy Notices have not contained any material omissions or been inaccurate, misleading or deceptive.

(b) The Company uses, and has during the past three (3) years used reasonable efforts to: (i) implement and maintain in all material respects reasonable safeguards to protect Personal Information and other confidential data in its possession or under its control against loss, theft, misuse or unauthorized access, use, modification or disclosure, including by implementing, and monitoring compliance with, policies and procedures regarding the receipt, collection, compilation, use, storage, processing, sharing, safeguarding, security (both technical and physical), disposal, destruction, disclosure, or transfer (including cross-border) of such Personal Information and other Trade Secrets; and (ii) ensure that all third-party service providers, outsourcers, processors or other third parties who process, store or otherwise handle Personal Information for or on behalf of the Company have agreed to (A) comply with applicable Privacy Laws in all material respects and (B) take reasonable steps to protect and secure Personal Information from loss, theft, misuse or unauthorized access, use, modification or disclosure. To the Knowledge of the Company, any third party who has provided Personal Information to the Company during the past three (3) years has done so in compliance with applicable Privacy Laws, including providing any notice and obtaining any consent required under such Privacy Laws.

(c) To the Knowledge of the Company, during the past three (3) years, (i) there have been no breaches, security incidents, misuse of or unauthorized access to or unauthorized use, transfer, destruction, disclosure or modification of any Personal Information or Trade Secrets in the possession or control of the Company or collected, used or processed by or on behalf of the Company and (ii) the Company has not provided or been legally or contractually required to provide any notices to any Person in connection with a disclosure of Personal Information or event referenced in the foregoing clause (i). The Company has implemented reasonable disaster recovery and business continuity plans, and taken actions consistent with such plans, to the extent required, to safeguard the data and Personal Information in its possession or control. The Company has conducted commercially reasonable data security testing or audits at reasonable and appropriate intervals and has resolved or remediated any material data security issues or vulnerabilities identified thereby. To the Knowledge of the Company, neither the Company nor any third party acting at the direction or authorization of the Company has paid: (x) any perpetrator of any data breach incident or cyber-attack; or (y) any third party with actual or alleged information about a data breach incident or cyber-attack, pursuant to a request for payment from or on behalf of such perpetrator or other third party. The Company is not subject to any contractual requirements or other legal obligations that, following the Closing, would prohibit Parent from receiving, accessing, storing, or using Personal Information in the manner in which the Company received, accessed, stored, and used such Personal Information prior to the Closing. The execution, delivery, and performance of this Agreement complies with all applicable Privacy Laws, and with the privacy policies and applicable contractual obligations of the Company.

Section 4.19 Agreements, Contracts and Commitments.

(a) Section 4.19 of the Company Disclosure Letter sets forth a true, correct and complete list of each Company Material Contract (as defined below) that is in effect as of the date hereof. For purposes of this Agreement, "Company Material Contract" shall mean each Company Real Property Lease and each of the following Contracts to which the Company is a party (together with, solely to the extent made available to Parent, all material amendments, waivers or other changes thereto):

(i) Each Contract (other than purchase orders with suppliers or customers entered into in the ordinary course of business) that has involved, or that the Company reasonably anticipates will involve, aggregate annual payments or consideration furnished by or to the Company of more than $150,000 in the calendar year ended December 31, 2019 or any subsequent calendar year;

29

(ii) Each Contract under which the Company has: (A) created, incurred, assumed or guaranteed (or may create, incur, assume or guarantee) Indebtedness having a principal or stated amount in excess of $200,000; (B) granted a Lien on its assets, whether tangible or intangible, to secure any Indebtedness having a principal or stated amount in excess of $200,000; or (C) extended credit to any Person (other than customer payment terms in the ordinary course of business);

(iii) Each Contract for the acquisition of any property or Person or any business division thereof or the disposition of any material assets of the Company (in each case, other than in the ordinary course of business and whether structured as an acquisition of stock, assets, merger or otherwise), with outstanding obligations to make payments, contingent or otherwise (including with respect to "earnout" payments, notes or indemnification obligations), other than Contracts for the sale of obsolete equipment or Contracts in which the applicable acquisition or disposition has been consummated and there are no material continuing obligations in respect thereof;

(iv) Each collective bargaining agreement or other Contract with any labor union, works council, or other labor organization respecting employees of the Company;

(v) Each Contract with outstanding obligations for the sale or purchase of personal property, fixed assets or real estate having a value individually, with respect to all sales or purchases thereunder, in excess of $200,000 or, together with all related Contracts, in excess of $500,000, in each case, other than sales or purchases in the ordinary course of business of obsolete equipment;

(vi) Each Contract with a third party establishing any joint venture, partnership, strategic alliance or other collaboration that is material to the business of the Company;

(vii) Each Contract (other than those made in the ordinary course of business) providing for the grant of an option or a first-refusal, first-offer or similar preferential right to purchase, lease or acquire any material asset of the Company;

(viii) Each Contract that (1) is an IP License, excluding non-exclusive licenses to: (A) Owned Intellectual Property granted to customers in the ordinary course of business; (B) Open Source Software; and (C) click-wrap, shrink-wrap and off-the-shelf Software commercially available on standard, non-discriminatory terms with license, maintenance, support and other fees of no more than $25,000 per year, or (2) is a consent-to-use, covenant-not-to-sue, coexistence, concurrent use, settlement agreement or similar agreement, in each case (y) with respect to Owned Intellectual Property or (z) that affects the Company's ability to use, enforce, or disclose any Intellectual Property;

(ix) Each Contract providing for the authorship, invention, creation, conception or other development of any Intellectual Property: (A) by the Company for any third party, other than development for customers in the ordinary course of business for which the Company retains sole and exclusive ownership thereof; (B) by any third party for the Company, other than Contracts entered into with employees, consultants and independent contractors that are the subject of the second sentence of Section 4.17(e); or (C) jointly by the Company and any third party;

(x) Each Contract with any supplier (A) that is a sole source supplier to the Company or (B) from which the Company sources substantially all of their supply of any material product or service, in each case having a value with respect to all purchases thereunder in excess of $200,000 per year;

(xi) Each Contract, other than teaming agreements entered into in connection with the pursuit of a specific Contract with a Governmental Entity or subcontract thereto or customary non-disclosure agreements, which restricts in any material respect or contains any material limitations on the ability of the Company to compete in any line of business or in any geographic territory;

30

(xii) Each Contract with an executive officer of the Company, or any Contract with any other employee or independent contractor of the Company, in each case, with an annual base salary in excess of $150,000 or which provides for change in control, retention, severance or similar payments;

(xiii) Each Contract between the Company, on the one hand, and any Company Stockholder, on the other hand, having a value of greater than $120,000 per year, excluding any employee benefit plan or other plans, programs, policies, commitments or arrangements that would constitute an employee benefit plan;

(xiv) Each Contract involving any resolution or settlement of any pending or threatened actions or other disputes (A) entered into within eighteen (18) months prior to the date of this Agreement, other than settlement agreements having a value that does not exceed $50,000, (B) with any Governmental Entity or (C) imposing continuing obligations on the Company, including injunctive or other non-monetary relief;

(xv) Each Contract with a Governmental Entity;

(xvi) Any stockholder agreement, partnership agreement, investors' rights agreement, voting agreement, right of first refusal and co-sale agreement, registration rights agreement or other Contract, in each case with a holder of equity securities of the Company;

(xvii) Each Contract that grants to any Person (A) a "most favored nation" or "most favored pricing" provision or (B) any exclusive rights, rights of first refusal, rights of first negotiation or similar rights;

(xviii) Each Contract expressly prohibiting or restricting in any respect the ability of the Company to engage in any business, to operate in any geographical area or to compete with any Person;

(xix) Each Contract requiring capital expenditures after the date of this Agreement in an amount in excess of $500,000;

(xx) Each Contract with (A) a Material Customer and (B) a Material Supplier;

(xxi) Each Contract listed in clause (xxi) of Section 4.19 of the Company Disclosure Letter; and

(xxii) Any written offer or proposal which, if accepted, would constitute any of the foregoing.

31

(b) All Company Material Contracts are: (i) in full force and effect, subject to the Remedies Exception; and (ii) represent the valid, legal and binding obligations of the Company and, to the Knowledge of the Company, represent the valid, legal and binding obligations of the other parties thereto. True, correct and complete copies of all Company Material Contracts have been made available to Parent. None the Company nor, to the Knowledge of the Company, any other party thereto, is in breach of or default under, and no event has occurred which with notice or lapse of time or both would become a breach of or default under, any of the Company Material Contracts, and no party to any Company Material Contract has given any written claim or notice of any such breach, default or event, which individually or in the aggregate, would be reasonably likely to be material to the Company. No party to any of the Company Material Contracts that is a customer of or supplier to the Company has, within the past twelve (12) months, cancelled or terminated its business with, or, to the Knowledge of the Company, threatened to cancel or terminate its business with, the Company.

Section 4.20 Insurance. Section 4.20 of the Company Disclosure Letter contains a list, as of the date hereof, of all material policies of property, fire and casualty, product liability, workers' compensation, directors and officers and other forms of insurance held by, or for the benefit of, the Company as of the date hereof (collectively, the "Insurance Policies"), which policies are in full force and effect. True and complete copies of the Insurance Policies (or, to the extent such policies are not available, policy binders) have been made available to Parent or its representatives. The Company has not received any written notice from any insurer under any of the Insurance Policies, canceling, terminating or materially adversely amending any such policy or denying renewal of coverage thereunder and all premiums on such insurance policies due and payable as of the date hereof have been paid. There is no pending material claim by the Company against any insurance carrier for which coverage has been denied, rejected or disputed by the applicable insurance carrier (other than a customary reservation of rights notice).

Section 4.21 Affiliate Matters. Except: (a) the Benefit Plans, (b) Contracts relating to labor and employment matters set forth on Section 4.12 of the Company Disclosure Letter and (c) Contracts relating to any such Person's ownership of Company Stock or other securities of the Company or such Person's employment or consulting arrangements with the Company, the Company is not party to any Contract with any: (i) present or former officer, director of the Company or beneficial owner (within the meaning of Section 13(d) of the Exchange Act) of 1% or more of the capital stock or equity interests of the Company or a member of his or her immediate family; or (ii) Affiliate of the Company. To the Knowledge of the Company, no present or former officer, director, Company Stockholder or holder of derivative securities of the Company (each, an "Insider") or any member of an Insider's immediate family is, directly or indirectly, interested in any Contract with the Company (other than such Contracts as relate to any such Person's ownership of Company Stock or other securities of the Company or such Person's employment or consulting arrangements with the Company) or owns any property or assets used in the business of the Company.

Section 4.22 Certain Provided Information. The information relating to the Company supplied or to be supplied by the Company for inclusion in the Merger Materials will not, as of the date on which the Merger Materials (or any amendment or supplement thereto) are first distributed to holders of Parent Class A Common Stock and Parent Class B Common Stock or at the time of the Parent Special Meeting or at the Closing, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading. Notwithstanding the foregoing, the Company makes no representation, warranty or covenant with respect to: (a) statements made or incorporated by reference therein based on information supplied by Parent, First Merger Sub or Second Merger Sub for inclusion or incorporation by reference in the Merger Materials or any Parent SEC Reports; or (b) any projections or forecasts included in the Merger Materials.

32

Section 4.23 <u>Indebtedness</u>. <u>Section 4.23</u> of the Company Disclosure Letter sets forth the principal amount of all of the outstanding Indebtedness of the Company as of the date hereof. Following the consummation of the Transactions (including and assuming the payment of the Payoff Amounts to the applicable payee(s) set forth in the Payoff Letters as contemplated by <u>Section 1.4(f)</u>), at the Closing, the Company will not have any outstanding Indebtedness for borrowed money.

Section 4.24 <u>Material Customers and Material Suppliers</u>.

(a) <u>Section 4.24(a)</u> of the Company Disclosure Letter sets forth a list of the Company's top ten (10) customers of goods and services purchased from the Company as measured by the dollar amount of purchases therefrom, for the twelve (12) months ended August 31, 2020 (the "<u>Material Customers</u>"), showing the total purchases by each such Material Customer from the Company during such period. During the past twelve (12) months from the date hereof, no Material Customer has (i) terminated or materially reduced its business or relationship with the Company or otherwise materially and adversely modified its relationship or terms with the Company or (ii) notified the Company in writing or, to the Knowledge of the Company, orally of its intention to take any such action (and, to the Knowledge of the Company, no such Material Customer is contemplating such an action).

(b) <u>Section 4.24(b)</u> of the Company Disclosure Letter sets forth a list of the Company's top ten (10) suppliers and vendors of goods and services to the Company as measured by the dollar amount of purchases therefrom, for the twelve (12) months ended August 31, 2020 (the "<u>Material Suppliers</u>"), showing the total purchases by the Company from each such Material Supplier, during such period. During the past twelve (12) months from the date hereof, no Material Supplier has (i) terminated or materially reduced its business or relationship with the Company or otherwise materially and adversely modified its relationship or terms with the Company or (ii) notified the Company in writing, to the Knowledge of the Company, orally of its intention to take any such action (and, to the Knowledge of the Company, no such Material Supplier is contemplating such an action).

Section 4.25 <u>Government Contracts</u>. To the Knowledge of the Company, during the past three (3) years, the Company has not (a) materially breached or materially violated any Law, certification, representation, clause, provision or requirement pertaining to any Government Contract; (b) been suspended or debarred from bidding on government contracts by a Governmental Entity; (c) been audited or investigated by any Governmental Entity with respect to any Government Contract (other than routine audits, examinations or investigations conducted by a Governmental Entity in the ordinary course of business pursuant to such Government Contract); (d) conducted or initiated any internal investigation or made any disclosure with respect to any alleged or potential irregularity, misstatement or omission arising under or relating to a Government Contract; (e) received from any Governmental Entity or any other Person any written notice of material breach, cure, show cause or default with respect to any Government Contract; (f) had any Government Contract terminated by any Governmental Entity or any other Person for default or failure to perform; (g) received any small business set-aside contract, any other set-aside contract or other order or contract requiring small business or other preferred bidder status or (h) entered any Government Contracts payable on a cost-reimbursement basis. The Company has established and maintains adequate internal controls for compliance in all material respects with its Government Contracts. All material pricing discounts have been properly reported to and credited to the customer and all invoices and claims for payment, reimbursement or adjustment submitted by the Company were current, accurate and complete in all material respects as of their respective submission dates. There are no material outstanding claims or disputes in connection with the Company's Government Contracts. To the Knowledge of the Company, there are no outstanding or unsettled allegations of fraud, false claims or overpayments nor any investigations or audits by any Governmental Entity with regard to any of the Company's Government Contracts.

Section 4.26 <u>Absence of Certain Business Practices</u>.

(a) Since May 16, 2017 the Company: (i) the Company, its directors, officers, employees and, to the Knowledge of the Company, agents and third party representatives, in each case acting on behalf of the Company, have been in compliance with the U.S. Foreign Corrupt Practices Act of 1977, the UK Bribery Act, and other applicable Laws relating to bribery or corruption in all material respects, and all other applicable Specified Business Conduct Laws in all respects; and (ii) the Company has not (A) received written or, to the Knowledge of the Company, oral notice from any Governmental Entity or other Person of, or made a voluntary, mandatory or directed disclosure to any Governmental Entity relating to, any actual or alleged violation of any Specified Business Conduct Law, or (B) been a party to or the subject of any pending or, to the Knowledge of the Company, threatened Legal Proceeding or investigation by or before any Governmental Entity, or written or, to the Knowledge of the Company, oral allegation from any Person, related to any actual or alleged violation of any Specified Business Conduct Law. The Company maintains and enforces policies and procedures reasonably designed to promote compliance with Specified Business Conduct Laws.

(b) Neither the Company nor any of its directors, officers, employees nor, to the Knowledge of the Company, any agents or third party representatives, in each case acting on behalf of the Company, is currently or has been, since May 16, 2017, (i) organized, resident (at the time of employment with, or engagement by, the Company) or located in a country or region that is or, as of the date of determination, was, the subject or target of a comprehensive embargo under Sanctions Laws (as of the date hereof, Cuba, Iran, North Korea, Sudan, Syria, the Government of Venezuela, and the Crimea region of Ukraine) or (ii) the subject or target of any sanctions or export-related restrictions administered by OFAC, Commerce, State, the United Nations Security Council, Her Majesty's Treasury of the United Kingdom, or the European Union.

(c) Neither the Company nor, to the Knowledge of the Company, any officer, or employee of any of the Company, has made an untrue statement of a material fact or fraudulent statement to any Governmental Entity, failed to disclose a material fact that must be disclosed to any Governmental Entity, or committed an act, made a statement or failed to make a statement that, at the time such statement, disclosure or failure to disclose occurred, would constitute a violation of any Law that would reasonably be expected to be material to the Company.

Section 4.27 <u>CFIUS</u>.

(a) The Company will not, in connection with the Transactions, grant access to any material nonpublic technical information (as defined in 31 C.F.R. § 800.232) to any Foreign Person that is not currently a shareholder of the Company.

(b) No Foreign Person that is currently a shareholder of the Company will obtain any new or different rights in connection with the Transactions that could result in a covered control transaction (as defined in 31 C.F.R. § 800.210) or a covered investment (as defined in 31 C.F.R. § 800.211).

Section 4.28 <u>Product Liability</u>. During the past three (3) years, (a) each product and service offering manufactured or sold by the Company has been manufactured or sold in material conformity with all contractual commitments, to the extent applicable; (b) the Company has not, as of the date hereof, incurred any material obligations for replacement or repair of any of their products or service offerings or other damages in connection therewith; (c) there are no existing or, to the Knowledge of the Company, threatened, product warranty, product liability or product recall or similar claims involving any of the products of the Company as of the date hereof; and (d) there have been no product recalls of any of the products of the Company as of the date hereof.

Section 4.29 <u>Required Vote</u>. The consent of each Written Consent Party is the only vote of the holders of Company Stock, including any class of Company Preferred Stock, that is required to approve this Agreement and the Transactions (including, for the avoidance of doubt, pursuant to the CCC).

Section 4.30  <u>Disclaimer of Other Warranties</u>. THE COMPANY HEREBY ACKNOWLEDGES THAT, EXCEPT AS EXPRESSLY PROVIDED IN <u>ARTICLE V</u> OR THE TRANSACTION AGREEMENTS, NONE OF PARENT, FIRST MERGER SUB, SECOND MERGER SUB OR ANY OF THEIR RESPECTIVE AFFILIATES OR REPRESENTATIVES HAS MADE, IS MAKING, OR SHALL BE DEEMED TO MAKE ANY REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, TO THE COMPANY, ANY OF ITS AFFILIATES OR REPRESENTATIVES OR ANY OTHER PERSON, WITH RESPECT TO PARENT, FIRST MERGER SUB, SECOND MERGER SUB OR ANY OF THEIR RESPECTIVE BUSINESSES, ASSETS OR PROPERTIES OF THE FOREGOING, OR OTHERWISE, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, FUTURE RESULTS, PROPOSED BUSINESSES OR FUTURE PLANS. WITHOUT LIMITING THE FOREGOING AND NOTWITHSTANDING ANYTHING TO THE CONTRARY: (A) NONE OF PARENT, FIRST MERGER SUB, SECOND MERGER SUB OR ANY OF THEIR RESPECTIVE AFFILIATES OR REPRESENTATIVES SHALL BE DEEMED TO MAKE TO THE COMPANY, COMPANY STOCKHOLDERS, OR THEIR RESPECTIVE AFFILIATES OR REPRESENTATIVES ANY REPRESENTATION OR WARRANTY OTHER THAN AS EXPRESSLY MADE BY PARENT, FIRST MERGER SUB AND SECOND MERGER SUB TO THE COMPANY IN <u>ARTICLE V</u>; AND (B) NONE OF PARENT, FIRST MERGER SUB, SECOND MERGER SUB NOR ANY OF THEIR RESPECTIVE AFFILIATES OR REPRESENTATIVES, HAS MADE, IS MAKING, OR SHALL BE DEEMED TO MAKE TO THE COMPANY, COMPANY STOCKHOLDERS, OR THEIR RESPECTIVE AFFILIATES OR REPRESENTATIVES OR ANY OTHER PERSON ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO: (I) THE INFORMATION DISTRIBUTED OR MADE AVAILABLE TO THEM BY OR ON BEHALF OF PARENT, FIRST MERGER SUB OR SECOND MERGER SUB IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTIONS; (II) ANY MANAGEMENT PRESENTATION, CONFIDENTIAL INFORMATION MEMORANDUM OR SIMILAR DOCUMENT; OR (III) ANY FINANCIAL PROJECTION, FORECAST, ESTIMATE, BUDGET OR SIMILAR ITEM RELATING TO PARENT, FIRST MERGER SUB, SECOND MERGER SUB OR ANY OF THEIR BUSINESS, ASSETS, LIABILITIES, PROPERTIES, FINANCIAL CONDITION, RESULTS OF OPERATIONS AND PROJECTED OPERATIONS OF THE FOREGOING. THE COMPANY HEREBY ACKNOWLEDGES THAT IT HAS NOT RELIED ON ANY PROMISE, REPRESENTATION OR WARRANTY THAT IS NOT EXPRESSLY SET FORTH IN <u>ARTICLE V</u> OF THIS AGREEMENT OR THE TRANSACTION AGREEMENTS. THE COMPANY ACKNOWLEDGES THAT IT HAS CONDUCTED, TO ITS SATISFACTION, AN INDEPENDENT INVESTIGATION AND VERIFICATION OF PARENT, FIRST MERGER SUB, SECOND MERGER SUB AND THE BUSINESS, ASSETS, LIABILITIES, PROPERTIES, FINANCIAL CONDITION, RESULTS OF OPERATIONS AND PROJECTED OPERATIONS OF THE FOREGOING AND, IN MAKING ITS DETERMINATION THE COMPANY HAS RELIED ON THE RESULTS OF ITS OWN INDEPENDENT INVESTIGATION AND VERIFICATION, IN ADDITION TO THE REPRESENTATIONS AND WARRANTIES OF THE COMPANY EXPRESSLY AND SPECIFICALLY SET FORTH IN  <u>ARTICLE V</u> OF THIS AGREEMENT AND THE TRANSACTION AGREEMENTS. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS <u>SECTION 4.30</u>, CLAIMS AGAINST PARENT, FIRST MERGER SUB, SECOND MERGER SUB OR ANY OTHER PERSON SHALL NOT BE LIMITED IN ANY RESPECT IN THE EVENT OF ACTUAL FRAUD IN THE MAKING OF THE REPRESENTATIONS AND WARRANTIES IN <u>ARTICLE V</u> OR THE TRANSACTION AGREEMENTS BY SUCH PERSON.

ARTICLE V.
REPRESENTATIONS AND WARRANTIES OF PARENT, FIRST MERGER SUB AND SECOND MERGER SUB

Except: (a) as set forth in the letter dated as of the date of this Agreement and delivered by Parent, First Merger Sub and Second Merger Sub to the Company on or prior to the date of this Agreement (the "Parent Disclosure Letter"); and (b) as disclosed in the Parent SEC Reports filed with the SEC prior to the date of this Agreement (to the extent the qualifying nature of such disclosure is readily apparent from the content of such Parent SEC Reports) excluding disclosures referred to in "Forward-Looking Statements", "Risk Factors", "Qualitative Disclosures About Market Risk" and any other disclosures therein to the extent they are of a predictive or cautionary nature or related to forward-looking statements, Parent, First Merger Sub and Second Merger Sub represent and warrant to the Company as of the date hereof and as of the Closing Date as follows:

Section 5.1 Organization and Qualification.

(a) Each of Parent, First Merger Sub and Second Merger Sub is a company duly incorporated or organized, validly existing and in good standing under the laws of the State of Delaware, and as of immediately prior to the Closing, will be a company duly organized, validly existing and in good standing under the laws of the State of Delaware.

(b) Each of Parent, First Merger Sub and Second Merger Sub has the requisite corporate or limited liability power and authority to own, lease and operate its assets, rights and properties and to carry on its business as it is now being conducted, except as would not be material to Parent, First Merger Sub and Second Merger Sub, taken as a whole.

(c) None of Parent, First Merger Sub or Second Merger Sub are in violation of any of the provisions of their respective Charter Documents.

(d) Each of Parent, First Merger Sub and Second Merger Sub is duly qualified or licensed to do business as a foreign corporation or limited liability company and is in good standing, in each jurisdiction where the character of the properties owned, leased or operated by it or the nature of its activities makes such qualification or licensing necessary, except where failure to be so licensed or qualified has not and would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of Parent, First Merger Sub and Second Merger Sub to enter into this Agreement or consummate the Transactions.

Section 5.2 Parent Subsidiaries. Parent has no direct or indirect Subsidiaries or participations in joint ventures or other entities, and does not own, directly or indirectly, any equity interests or other interests or investments (whether equity or debt) in any Person, whether incorporated or unincorporated, other than First Merger Sub and Second Merger Sub. Neither First Merger Sub nor Second Merger Sub has any assets or properties of any kind, does not now conduct and has never conducted any business, and has and will have at the Closing no obligations or liabilities of any nature whatsoever, except for such obligations incident to this Agreement. Each of First Merger Sub and Second Merger Sub is an entity that has been formed solely for the purpose of engaging in the Transactions, and except as contemplated by this Agreement will have no, assets, liabilities or obligations of any kind or nature whatsoever other than those incident to its respective formation. Second Merger Sub has at all times during its existence been treated as a disregarded entity for federal and applicable state and local income Tax purposes, and no election has been made or will be made to treat Second Merger Sub as a corporation for federal and applicable state or local income Tax purposes.

36

Section 5.3 <u>Capitalization</u>.

(a) As of the date of this Agreement: (i) 1,000,000 preferred shares of Parent, par value $0.0001 per share ("<u>Parent Preferred Stock</u>") are authorized and no shares are issued and outstanding; (ii) 100,000,000 Class A common shares of Parent, par value $0.0001 per share ("<u>Parent Class A Common Stock</u>"), are authorized and 17,795,000 are issued and outstanding; (iii) 10,000,000 Class B common shares of Parent, par value $0.0001 per share ("<u>Parent Class B Common Stock</u>" and, together with the Parent Preferred Stock and the Parent Class A Common Stock, the "<u>Parent Shares</u>"), are authorized and 4,312,500 are issued and outstanding; (iv) 272,500 warrants to purchase one share of Parent Class A Common Stock issued pursuant to a private placement (the "<u>Private Placement Warrants</u>") are outstanding; and (v) 8,625,000 warrants to purchase one share of Parent Class A Common Stock that are publicly traded (the "<u>Public Warrants</u>", collectively with the Private Placement Warrants, the "<u>Parent Warrants</u>") are outstanding. All outstanding Parent Class A Common Stock, Parent Class B Common Stock, Private Placement Warrants and Public Warrants have been duly authorized, validly issued, fully paid and are non-assessable and are not subject to preemptive rights.

(b) The authorized capital stock of First Merger Sub consists of 1,000 shares of common stock, par value $0.01 per share (the "<u>First Merger Sub Common Stock</u>"). As of the date hereof, 1,000 shares of First Merger Sub Common Stock are issued and outstanding. All outstanding shares of First Merger Sub Common Stock have been duly authorized, validly issued, fully paid and are non-assessable and are not subject to preemptive rights, and are held by Parent.

(c) As of the date hereof, all outstanding membership interests of Second Merger Sub have been duly authorized, validly issued and are not subject to preemptive rights and are held by Parent.

(d) Except for the Parent Warrants and the Subscription Agreements, as of the date of this Agreement, there are no outstanding options, warrants, rights, convertible or exchangeable securities, "phantom" stock rights, stock appreciation rights, stock-based performance units, commitments or Contracts of any kind to which Parent, First Merger Sub or Second Merger Sub is a party or by which any of them is bound obligating Parent, First Merger Sub or Second Merger Sub to issue, deliver or sell, or cause to be issued, delivered or sold, additional Parent Shares, First Merger Sub Common Stock, Second Merger Sub membership interests or any other shares of capital stock or membership interests other interest or participation in, or any security convertible or exercisable for or exchangeable into Parent Shares, First Merger Sub Common Stock, Second Merger Sub membership interests or any other shares of capital stock or membership interests or other interest or participation in Parent, First Merger Sub or Second Merger Sub.

(e) Each Parent Share, share of First Merger Sub Common Stock, Second Merger Sub membership interest and Parent Warrant: (i) has been issued in compliance in all material respects with: (A) applicable Law and (B) the Charter Documents of Parent, First Merger Sub or Second Merger Sub, as applicable; and (ii) was not issued in violation of any purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right under any applicable Law, the Charter Documents of Parent, First Merger Sub or Second Merger Sub, as applicable or any Contract to which any of Parent, First Merger Sub or Second Merger Sub is a party or otherwise bound by including the Trust Agreement.

(f) All outstanding shares of capital stock or other equity securities or ownership interests or any securities convertible into or exchangeable for shares of capital stock or other equity securities or ownership interests of the Subsidiaries of Parent are owned by Parent, or a direct or indirect wholly owned Subsidiary of Parent, free and clear of all Liens (other than Permitted Liens and Liens arising pursuant to applicable securities Laws).

37

(g) Subject to obtaining the Requisite Parent Stockholder Approval, the shares of Parent Class A Common Stock to be issued by Parent in connection with the Transactions, upon issuance in accordance with the terms of this Agreement, will be duly authorized, validly issued, fully paid and nonassessable, and will not be subject to any preemptive rights of any other stockholder of Parent and will be capable of effectively vesting in the Company Stockholders title to all such securities, free and clear of all Liens (other than Liens arising pursuant to applicable securities Laws).

(h) Each holder of any Parent Shares initially issued to the Sponsor in connection with Parent's initial public offering has agreed: (i) to vote all of such Parent Shares in favor of approving the Transactions; and (ii) to refrain from electing to redeem any of such Parent Shares pursuant to Parent's Charter Documents.

(i) Except as set forth in Parent's Charter Documents and in connection with the Transactions, there are no registration rights, and there is no voting trust, proxy, rights plan, anti-takeover plan or other similar agreements or understandings to which Parent is a party or by which Parent is bound with respect to any ownership interests of Parent.

Section 5.4 <u>Authority Relative to this Agreement</u>. Each of Parent, First Merger Sub and Second Merger Sub has the requisite power and authority to: (a) execute, deliver and perform this Agreement and the other Transaction Agreements to which it is a party; and (b) carry out its obligations hereunder and thereunder and, to consummate the Transactions (including the Mergers). The execution, delivery and performance by Parent, First Merger Sub and Second Merger Sub of this Agreement and the other Transaction Agreements to which each of them is a party, and the consummation by Parent, First Merger Sub and Second Merger Sub of the Transactions (including the Mergers), have been duly and validly authorized by all necessary corporate or limited liability company action on the part of each of Parent, First Merger Sub and Second Merger Sub, and no other proceedings on the part of Parent, First Merger Sub or Second Merger Sub are necessary to authorize this Agreement or the other Transaction Agreements to which each of them is a party or to consummate the transactions contemplated thereby, other than obtaining the Requisite Parent Stockholder Approval. This Agreement has been and the other Transaction Agreements to which each of them is a party will be duly and validly executed and delivered by Parent, First Merger Sub and Second Merger Sub and, assuming the due authorization, execution and delivery thereof by the other Parties (assuming any such agreement constitutes a legal, valid and binding obligation of the counterparties thereto), constitute the legal and binding obligations of Parent, First Merger Sub and Second Merger Sub (as applicable), enforceable against Parent, First Merger Sub and Second Merger Sub (as applicable) in accordance with their terms, except insofar as enforceability may be limited by the Remedies Exception.

Section 5.5 <u>No Conflict; Required Filings and Consents</u>.

(a) Subject to the receipt of the consents, approvals, authorizations and other requirements set forth in <u>Section 5.5(b)</u>, neither the execution, delivery nor performance by Parent, First Merger Sub and Second Merger Sub of this Agreement or the other Transaction Agreements to which each of them is a party, nor (assuming the Requisite Parent Stockholder Approval is obtained) the consummation of the Transactions shall: (i) conflict with or violate their respective Charter Documents; (ii) violate any applicable Law to which Parent, First Merger Sub and Second Merger Sub are subject or by which any of their properties or assets are bound; or (iii) result in any breach of or constitute a default (or an event that with notice or lapse of time or both would become a default) under, or materially impair their respective rights or alter the rights or obligations of any third party under, or give to others any rights of consent, termination, amendment, acceleration or cancellation of, or result in the creation of a Lien (other than any Permitted Lien) on any of the properties or assets of Parent or any of its Subsidiaries pursuant to, any Parent Material Contracts, except, with respect to clause (iii), as would not, individually or in the aggregate, have a Parent Material Adverse Effect.

38

(b) The execution and delivery by each of Parent, First Merger Sub and Second Merger Sub of this Agreement and the other Transaction Agreements to which it is a party, does not, and the performance of its obligations hereunder and thereunder will not, require any action by, consent, approval, authorization or permit of, or filing with or notification to, any Governmental Entity, except: (i) for the filing of the Certificates of Merger in accordance with the DGCL and DLLCA, as applicable; (ii) for applicable requirements, if any, of the Securities Act, the Exchange Act, blue sky laws, and the rules and regulations thereunder, and appropriate documents with the relevant authorities of other jurisdictions in which Parent is qualified to do business; (iii) for the filing of any notifications required under the HSR Act or any similar foreign Law and the expiration of the required waiting period thereunder; and (iv) where the failure to obtain such consents, approvals, authorizations or permits, or to make such filings or notifications, would not, individually or in the aggregate, reasonably be expected to have a Parent Material Adverse Effect, or prevent the consummation of the Mergers.

Section 5.6 Compliance; Permits. Since its incorporation or organization, as applicable, each of Parent, First Merger Sub and Second Merger Sub has complied in all material respects with and has not been in violation of any applicable Law with respect to the conduct of its business, or the ownership or operation of its business. Since the date of its incorporation or organization, as applicable, to the Knowledge of Parent, no investigation or review by any Governmental Entity with respect to Parent or any of its Subsidiaries has been pending or threatened. No written or, to the Knowledge of Parent, oral notice of non-compliance with any applicable Law has been received by any of Parent, First Merger Sub or Second Merger Sub. Each of Parent, First Merger Sub and Second Merger Sub is in possession of all Permits necessary to own, lease and operate the properties it purports to own, operate or lease and to carry on its business as it is now being conducted, except where the failure to have such Permits would not, individually or in the aggregate, reasonably be expected to be material to Parent, First Merger Sub and Second Merger Sub, taken as a whole.

Section 5.7 Parent SEC Reports; Financial Statements; No Undisclosed Liabilities.

(a) Parent has timely filed all forms, reports, schedules, statements and other documents, including any exhibits thereto, required to be filed or furnished by Parent with the SEC under the Exchange Act or the Securities Act since Parent's incorporation (collectively, as they have been amended since the time of their filing and including all exhibits thereto, the "Parent SEC Reports"). The Parent SEC Reports were prepared in all material respects in accordance with the requirements of the Securities Act, the Exchange Act and the Sarbanes-Oxley Act, as the case may be, and the rules and regulations thereunder. The Parent SEC Reports did not at the time they were filed with the SEC contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading. Parent maintains disclosure controls and procedures required by Rule 13a-15(e) or 15d-15(e) under the Exchange Act. Each director and executive officer of Parent has filed with the SEC on a timely basis all statements required with respect to Parent by Section 16(a) of the Exchange Act and the rules and regulations thereunder. As used in this Section 5.7, the term "file" shall be broadly construed to include any manner in which a document or information is furnished, supplied or otherwise made available to the SEC or Nasdaq.

(b) The financial statements and notes contained or incorporated by reference in the Parent SEC Reports fairly present in all material respects the financial condition and the results of operations, changes in stockholders' equity and cash flows of Parent as at the respective dates of, and for the periods referred to, in such financial statements, all in accordance with: (i) GAAP; and (ii) Regulation S-X or Regulation S-K, as applicable, subject, in the case of interim financial statements, to normal recurring year-end adjustments (the effect of which will not, individually or in the aggregate, be material) and the omission of notes, or the inclusion of limited notes, and other presentation items for normal year-end adjustments to the extent permitted by Regulation S-X or Regulation S-K, as applicable. Parent has no off-balance sheet arrangements that are not disclosed in the Parent SEC Reports. No financial statements other than those of Parent are required by GAAP to be included in the consolidated financial statements of Parent.

(c) There is no liability, debt or obligation (absolute, accrued, contingent or otherwise) of any of the Parent or its Subsidiaries of the nature required to be disclosed or reserved for in a balance sheet prepared in accordance with GAAP, except for liabilities, debts and obligations: (a) provided for in, or otherwise reflected or reserved for the financial statements and notes contained or incorporated by reference in the Parent SEC Reports; (b) that have arisen since the date of the most recent balance sheet included in the financial statements and notes contained or incorporated by reference in the Parent SEC Reports in the ordinary course of the operation of business of Parent; (c) incurred in connection with the transactions contemplated by this Agreement; (d) that will be discharged or paid off prior to or at the Closing; or (e) that would not be material to the business of Parent and its Subsidiaries, taken as a whole.

Section 5.8 Absence of Certain Changes or Events. Except as set forth in Parent SEC Reports filed prior to the date of this Agreement, and except as contemplated by this Agreement, since December 31, 2019, there has not been: (a) any Parent Material Adverse Effect or (b) any action taken or agreed upon by Parent or any of its Subsidiaries that would be prohibited by Section 6.2 if such action were taken on or after the date hereof without the consent of the Company.

Section 5.9 Litigation. There are no Legal Proceedings pending or, to the Knowledge of Parent, threatened in writing against or otherwise relating to Parent or any of its Subsidiaries, before any Governmental Entity: (a) challenging or seeking to enjoining, alter or materially delay the Transactions; or (b) that would, individually or in the aggregate, reasonably be expected to be material to Parent.

Section 5.10 Business Activities. Since their respective dates of formation or incorporation, as applicable, none of Parent, First Merger Sub or Second Merger Sub has conducted any business activities other than activities: (a) in connection with or ancillary to its organization, including activities customary for the formation and operation of special purpose acquisition companies; (b) directed toward or incidental to the accomplishment of a business combination; or (c) required by Law. Except as set forth in Parent's Charter Documents, there is no Contract or Order binding upon Parent, First Merger Sub or Second Merger Sub or to which any of them is a party which has or could reasonably be expected to have the effect of prohibiting or materially impairing any business practice of it, any acquisition of property by it or the conduct of business by it as currently conducted or as currently contemplated to be conducted as of the Closing, other than such effects, individually or in the aggregate, which would not reasonably be expected to be material to Parent. Parent does not own or have a right to acquire, directly or indirectly, any interest or investment (whether equity or debt) in any corporation, partnership, joint venture, business, trust or other entity. Except for this Agreement and the Transactions, neither Parent nor any of its Subsidiaries has any interests, rights, obligations or liabilities with respect to, or is party to, bound by or has its assets or property subject to, in each case whether directly or indirectly, any Contract or transaction which is, or could reasonably be interpreted as constituting, a Business Combination. Except for this Agreement and the Transaction Agreements, neither Parent, First Merger Sub nor Second Merger Sub are not party to any Contract with any other Person that would require payments by Parent, First Merger Sub or Second Merger Sub in excess of $25,000 monthly or $250,000 in the aggregate.

40

Section 5.11 <u>Parent Material Contracts</u>. <u>Section 5.11</u> of the Parent Disclosure Letter sets forth a true, correct and complete list of each "material contract" (as such term is defined in Regulation S-K of the SEC) to which Parent, First Merger Sub or Second Merger Sub is party, including Contracts by and among Parent, First Merger Sub or Second Merger Sub, on the one hand, and any director, officer, stockholder or Affiliate of such Parties (the "<u>Parent Material Contracts</u>"), other than any such Parent Material Contract that is listed as an exhibit to any Parent SEC Report.

Section 5.12 <u>Parent Listing</u>. The issued and outstanding Parent Units (other than the Private Placement Units) are registered pursuant to Section 12(b) of the Exchange Act and listed for trading on the Nasdaq Stock Markets ("<u>Nasdaq</u>") under the symbol "SRACU". The issued and outstanding shares of Parent Class A Common Stock (other than those underlying the Private Placement Units) are registered pursuant to Section 12(b) of the Exchange Act and are listed for trading on Nasdaq under the symbol "SRAC". The issued and outstanding Parent Warrants (other than those underlying the Private Placement Units) are registered pursuant to Section 12(b) of the Exchange Act and are listed for trading on Nasdaq under the symbol "SRACW". Parent has not been notified by Nasdaq that it does not comply with any Nasdaq listing rule, which noncompliance is not subject to any compliance extension or ability to remedy, in each case as permitted by the Nasdaq continued listing rules. There is no action or proceeding pending or, to the Knowledge of Parent, threatened in writing against Parent by Nasdaq or the SEC with respect to any intention by such entity to deregister the Parent Units, the shares of Parent Class A Common Stock or Parent Warrants or terminate the listing of the Parent Units, the shares of Parent Class A Common Stock or Parent Warrants on Nasdaq, other than Legal Proceedings where a compliance extension or ability to remedy is available under applicable Law. None of Parent or any of its Affiliates has taken any action in an attempt to intentionally terminate the registration of the Parent Units, the Parent Class A Common Stock or Parent Warrants under the Exchange Act.

Section 5.13 <u>PIPE Investment Amount</u>. Parent has delivered to the Company true, accurate and complete copies of each of the subscription agreements (the "<u>Subscription Agreements</u>") entered into by Parent with the PIPE Investors, pursuant to which the PIPE Investors have committed to provide equity financing to Parent in the aggregate amount of $175,000,000 (the "<u>PIPE Investment Amount</u>"). The PIPE Investment Amount, together with the amount in the Trust Account at the Closing, are in the aggregate sufficient to enable Parent to: (a) pay all cash amounts required to be paid by Parent or its Subsidiaries at the Closing under or in connection with this Agreement; and (b) pay any and all fees and expenses of or payable by Parent at the Closing with respect to the Transactions. To Parent's Knowledge, with respect to each PIPE Investor, the Subscription Agreements are in full force and effect and have not been withdrawn or terminated, or otherwise amended or modified, in any respect, and no withdrawal, termination, amendment or modification is contemplated by Parent, except in each case for such assignments of subscription obligations contemplated by or permitted by the Subscription Agreements. Each Subscription Agreement is a legal, valid and binding obligation of Parent and, to Parent's Knowledge, each PIPE Investor, subject to the Remedies Exception. Except as set forth on <u>Section 5.13</u> of the Parent Disclosure Letter, there are no other agreements, side letters, or arrangements between Parent and any PIPE Investor relating to any Subscription Agreement, that could affect the obligation of the PIPE Investors to contribute to Parent the applicable portion of the PIPE Investment Amount set forth in the Subscription Agreements, and, as of the date hereof, Parent does not know of any facts or circumstances that would reasonably be expected to result in any of the conditions set forth in any Subscription Agreement not being satisfied, or the PIPE Investment Amount not being available to Parent, on the Closing Date. No event has occurred that, with or without notice, lapse of time or both, would constitute a default or breach on the part of Parent under any material term or condition of any Subscription Agreement and, as of the date hereof, Parent has no reason to believe that it will be unable to satisfy in all material respects on a timely basis any term or condition of closing to be satisfied by it contained in any Subscription Agreement. The Subscription Agreements contain all of the conditions precedent (other than the conditions contained in the other Transaction Agreements) to the obligations of the PIPE Investors to contribute to Parent the applicable portion of the PIPE Investment Amount set forth in the Subscription Agreements on the terms therein.

41

Section 5.14 <u>Trust Account</u>.

(a) As of the date hereof, Parent has $173,095,867.91 in a trust account (the "<u>Trust Account</u>"), maintained and invested pursuant to that certain Investment Management Trust Agreement (the "<u>Trust Agreement</u>") effective as of November 7, 2019, by and between Parent and Continental Stock Transfer & Trust Company, a New York corporation (the "<u>Trustee</u>") for the benefit of its public stockholders, with such funds invested in United States government securities or money market funds meeting certain conditions under Rule 2a-7 promulgated under the Investment Company Act.

(b) The Trust Agreement has not been amended or modified and, to the Knowledge of Parent with respect to the Trustee, is valid and in full force and effect and is enforceable in accordance with its terms, except insofar as enforceability may be limited by the Remedies Exception. Parent has performed all material obligations required to be performed by it as of the date hereof under, and complied in all material respects with the terms of the Trust Agreement and is not in breach thereof or default thereunder and there does not exist under the Trust Agreement any event which, with the giving of notice or the lapse of time, would constitute such a breach or default by Parent or, to the Knowledge of Parent, the Trustee. There are no separate Contracts, side letters or other understandings (whether written or unwritten, express or implied) that would cause the description of the Trust Agreement in the Parent SEC Reports to be inaccurate in any material respect or that would entitle any Person (other than (x) stockholders of Parent who elect to redeem their shares of Parent Class A Common Stock pursuant to Parent's Charter Documents, including pursuant to the Parent Stockholder Redemptions, (y) the underwriters of Parent's initial public offering with respect to any deferred underwriting compensation and (z) Parent with respect to income earned on the proceeds in the Trust Account in order to pay taxes in accordance with Parent's Charter Documents) to any portion of the proceeds in the Trust Account. Prior to the Closing, none of the funds held in the Trust Account may be released except: (A) to pay income and franchise taxes from any interest income earned in the Trust Account and Tax obligations; (B) in accordance with the Trust Agreement; and (C) to redeem Parent Class A Common Stock in accordance with the provisions of Parent's Charter Documents. There are no Legal Proceedings pending or, to the Knowledge of Parent, threatened in writing with respect to the Trust Account. As of the Effective Time, the obligations of Parent to dissolve or liquidate pursuant to Parent's Charter Documents shall terminate and, as of the Effective Time, Parent shall have no obligation whatsoever pursuant to Parent's Charter Documents to dissolve and liquidate the assets of Parent by reason of the consummation of the transactions contemplated hereby. To Knowledge of Parent, as of the date hereof, following the Effective Time, none of Parent's stockholders shall be entitled to receive any amount from the Trust Account except to the extent such Parent stockholder is exercising a Parent Stockholder Redemption. As of the date hereof, assuming the accuracy of the representations and warranties of the Company contained herein and the compliance by the Company with its obligations hereunder, Parent does have any reason to believe that any of the conditions to the use of funds in the Trust Account will not be satisfied or funds available in the Trust Account will not be available to Parent on the Closing Date.

Section 5.15 <u>Taxes</u>.

(a) All material Tax Returns filed or required to be filed by Parent and its Subsidiaries have been timely filed (taking into account any applicable extensions), and all such Tax Returns are true, correct and complete in all material respects.

(b) Each of Parent and its Subsidiaries has timely paid all material Taxes in full which are due and payable by it (whether or not shown as due on any Tax Return).

(c) Parent has complied in all material respects with all applicable Laws relating to the withholding of Taxes and all Taxes required by applicable Law to be withheld by the Company have been withheld and paid over to the appropriate Governmental Entity in all material respects.

(d) No deficiency for Taxes has been asserted or assessed in writing by any Governmental Entity against Parent or any of its Subsidiaries, which deficiency has not been paid in full or finally resolved with no payment due. No audit or other Legal Proceeding by any Governmental Entity is currently pending or threatened in writing against Parent or any of its Subsidiaries with respect to Taxes. There are no requests for rulings or determinations in respect of any Tax pending between the Parent or its Subsidiaries, on the one hand, and any Governmental Entity, on the other hand.

(e) There are no liens for material amounts of Taxes (other than Liens for Taxes not yet due and payable) upon any of the assets of Parent or its Subsidiaries.

(f) There are no Tax indemnification agreements, Tax sharing agreements or similar agreements under which Parent or its Subsidiaries could be liable after the Closing Date for the Tax liability of any Person other than Parent and its Subsidiaries (other than customary commercial Contracts not primarily related to Taxes such as a loan or a lease).

(g) None of Parent nor any of its Subsidiaries has entered into a "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4(b).

(h) Parent (i) has no liability for the Taxes of another Person (other than its Subsidiaries) pursuant to Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign Tax law) or as a transferee or a successor or by Contract (other than customary commercial Contracts not primarily related to Taxes such as a loan or a lease); and (ii) has never been a member of an affiliated, consolidated, combined or unitary group filing for U.S. federal, state or local income Tax purposes, other than a group the common parent of which was and is Parent.

(i) None of Parent nor any of its Subsidiaries has consented to extend the time in which any Tax may be assessed or collected by any Governmental Entity, which extension is still in effect, and neither Parent nor any of its Subsidiaries has requested, granted, or become the beneficiary of any extension or waiver of any statute of limitations period with respect to Taxes, which period (after giving effect to such extension or waiver) has not yet expired.

Section 5.16 Information Supplied. None of the information supplied or to be supplied by Parent for inclusion or incorporation by reference in the Merger Materials will, at the date mailed to stockholders of Parent or at the time of the Parent Special Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading. Notwithstanding the foregoing, Parent makes no representation, warranty or covenant with respect to: (a) statements made or incorporated by reference therein based on information supplied by the Company for inclusion or incorporation by reference in the Merger Materials; or (b) any projections or forecasts included in the Merger Materials.

Section 5.17 Board Approval; Stockholder Vote. The board of directors of Parent and First Merger Sub (including any required committee or subgroup of the board of directors of Parent or First Merger Sub, as applicable) and the sole member of Second Merger Sub have, as of the date of this Agreement, unanimously: (a) approved and declared the advisability of this Agreement, the other Transaction Agreements and the consummation of the Transactions; and (b) determined that the consummation of the Transactions is in the best interest of, as applicable, the stockholders of Parent or First Merger Sub (as applicable) and the sole member of Second Merger Sub. Other than obtaining the Requisite Parent Stockholder Approval, no other corporate proceedings on the part of Parent are necessary to approve the consummation of the Transactions.

43

Section 5.18 <u>Brokers</u>. Except as set forth on <u>Section 5.18</u> of the Parent Disclosure Letter, other than fees or commissions for which Parent will be solely responsible, none of Parent, First Merger Sub, Second Merger Sub, nor any of their respective Affiliates, including Sponsor, has any liability or obligation to pay, or is entitled to receive, any fees or commissions to any broker, finder or agent with respect to the Transactions.

Section 5.19 <u>Indebtedness</u>. <u>Section 5.19</u> of the Parent Disclosure Letter sets forth the principal amount of all of the outstanding Indebtedness, as of the date hereof, of Parent and its Subsidiaries.

Section 5.20 <u>Sponsor Agreement</u>. Parent has delivered to the Company a true, correct and complete copy of the Sponsor Agreement. The Sponsor Agreement is in full force and effect and has not been withdrawn or terminated, or otherwise amended or modified, in any respect, and no withdrawal, termination, amendment or modification is contemplated by Parent. The Sponsor Agreement is a legal, valid and binding obligation of Parent and, to the knowledge of Parent, each other party thereto (in each case, subject to the Remedies Exception) and neither the execution or delivery by any party thereto, nor the performance of any party's obligations under, the Sponsor Agreement violates any provision of, or results in the breach of or default under, or require any filing, registration or qualification under, any applicable Law. No event has occurred that, with or without notice, lapse of time or both, would constitute a default or breach on the part of Parent under any material term or condition of the Sponsor Agreement.

Section 5.21 <u>Investment Company Act; JOBS Act</u>. Parent is not an "investment company" or a Person directly or indirectly "controlled" by or acting on behalf of an "investment company", in each case within the meaning of the Investment Company Act. Parent constitutes an "emerging growth company" within the meaning of the Jumpstart Our Business Startups Act of 2012 ("<u>JOBS Act</u>").

Section 5.22 <u>Parent Stockholders</u>. Neither Parent nor the Sponsor is a Foreign Person. No Foreign Person that is an investor in Parent or the Sponsor will obtain (i) access to any material nonpublic technical information (as defined in 31 C.F.R. § 800.232) in the possession of the Company, (ii) membership or observer rights on, or the right to nominate an individual to a position on, the board of directors of the Company, or (iii) any involvement, other than through voting of shares, in substantive decision-making of the Company regarding (a) the use, development, acquisition, safekeeping, or release of sensitive personal data (as defined in 31 C.F.R. § 800.241) of U.S. citizens maintained or collected by the Company, (b) the use, development, acquisition, or release of critical technologies, as defined in 31 C.F.R. § 800.215, or (c) the management, operation, manufacture, or supply of covered investment critical infrastructure, as defined in 31 C.F.R. § 800.212.

44

Section 5.23 <u>Disclaimer of Other Warranties</u>. PARENT, FIRST MERGER SUB AND SECOND MERGER SUB HEREBY ACKNOWLEDGE THAT, EXCEPT AS EXPRESSLY PROVIDED IN <u>ARTICLE IV</u> OR IN THE TRANSACTION AGREEMENTS, NONE OF THE COMPANY, ANY OF ITS SUBSIDIARIES OR ANY OF THEIR RESPECTIVE AFFILIATES OR REPRESENTATIVES HAS MADE, IS MAKING, OR SHALL BE DEEMED TO MAKE ANY REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, TO PARENT, FIRST MERGER SUB, SECOND MERGER SUB, ANY OF THEIR RESPECTIVE AFFILIATES OR REPRESENTATIVES OR ANY OTHER PERSON, WITH RESPECT TO THE COMPANY STOCKHOLDERS (OR ANY HOLDER OF DERIVATIVE SECURITIES OF THE COMPANY), THE COMPANY OR ANY OF THE DIRECTORS, OFFICERS, EMPLOYEES, BUSINESSES, ASSETS OR PROPERTIES OF THE FOREGOING, OR OTHERWISE, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, FUTURE RESULTS, PROPOSED BUSINESSES OR FUTURE PLANS. WITHOUT LIMITING THE FOREGOING AND NOTWITHSTANDING ANYTHING TO THE CONTRARY: (A) NONE OF THE COMPANY, ANY OF ITS SUBSIDIARIES OR ANY OF THEIR RESPECTIVE AFFILIATES OR REPRESENTATIVES SHALL BE DEEMED TO MAKE TO PARENT, FIRST MERGER SUB, SECOND MERGER SUB, OR THEIR RESPECTIVE AFFILIATES OR REPRESENTATIVES ANY REPRESENTATION OR WARRANTY OTHER THAN AS EXPRESSLY MADE BY THE COMPANY TO PARENT, FIRST MERGER SUB AND SECOND MERGER SUB IN <u>ARTICLE IV</u> OR IN THE TRANSACTION AGREEMENTS; AND (B) NONE OF THE COMPANY NOR ANY OF ITS SUBSIDIARIES, NOR THEIR RESPECTIVE AFFILIATES OR REPRESENTATIVES, HAS MADE, IS MAKING, OR SHALL BE DEEMED TO MAKE TO PARENT, FIRST MERGER SUB, SECOND MERGER SUB, OR THEIR RESPECTIVE AFFILIATES OR REPRESENTATIVES OR ANY OTHER PERSON ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO: (1) THE INFORMATION DISTRIBUTED OR MADE AVAILABLE TO PARENT OR ITS REPRESENTATIVES BY OR ON BEHALF OF THE COMPANY IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTIONS; (2) ANY MANAGEMENT PRESENTATION, CONFIDENTIAL INFORMATION MEMORANDUM OR SIMILAR DOCUMENT; OR (3) ANY FINANCIAL PROJECTION, FORECAST, ESTIMATE, BUDGET OR SIMILAR ITEM RELATING TO THE COMPANY, ANY OF ITS SUBSIDIARIES AND/OR THE BUSINESS, ASSETS, LIABILITIES, PROPERTIES, FINANCIAL CONDITION, RESULTS OF OPERATIONS AND PROJECTED OPERATIONS OF THE FOREGOING. EACH OF PARENT, FIRST MERGER SUB AND SECOND MERGER SUB HEREBY ACKNOWLEDGES THAT IT HAS NOT RELIED ON ANY PROMISE, REPRESENTATION OR WARRANTY THAT IS NOT EXPRESSLY SET FORTH IN <u>ARTICLE IV</u> OF THIS AGREEMENT OR THE TRANSACTION AGREEMENTS. EACH OF PARENT, FIRST MERGER SUB AND SECOND MERGER SUB ACKNOWLEDGES THAT IT HAS CONDUCTED, TO ITS SATISFACTION, AN INDEPENDENT INVESTIGATION AND VERIFICATION OF THE COMPANY, ITS SUBSIDIARIES AND THE BUSINESS, ASSETS, LIABILITIES, PROPERTIES, FINANCIAL CONDITION, RESULTS OF OPERATIONS AND PROJECTED OPERATIONS OF THE FOREGOING AND, IN MAKING ITS DETERMINATION TO PROCEED WITH THE TRANSACTIONS, EACH OF PARENT, FIRST MERGER SUB AND SECOND MERGER SUB HAS RELIED ON THE RESULTS OF ITS OWN INDEPENDENT INVESTIGATION AND VERIFICATION, IN ADDITION TO THE REPRESENTATIONS AND WARRANTIES OF THE COMPANY EXPRESSLY AND SPECIFICALLY SET FORTH IN <u>ARTICLE IV</u> OF THIS AGREEMENT AND THE TRANSACTION AGREEMENTS. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS <u>SECTION 5.23</u>, CLAIMS AGAINST THE COMPANY OR ANY OTHER PERSON SHALL NOT BE LIMITED IN ANY RESPECT IN THE EVENT OF ACTUAL FRAUD IN THE MAKING OF THE REPRESENTATIONS AND WARRANTIES IN <u>ARTICLE IV</u> OR THE TRANSACTION DOCUMENTS BY SUCH PERSON.

ARTICLE VI.
<u>CONDUCT PRIOR TO THE CLOSING DATE</u>

Section 6.1 <u>Conduct of Business by the Company</u>. During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement pursuant to its terms or the Closing, the Company shall (A) carry on its business in the ordinary course consistent with past practice (including, for the avoidance of doubt, recent past practice in light of COVID-19; provided that, any commercially reasonable action taken, or omitted to be taken, that relates to, or arises out of, COVID-19 shall be deemed to be in the ordinary course of business), and (B) use commercially reasonable efforts to maintain its goodwill and relationships with customers, suppliers, employees and other material business relations, except: (a) to the extent that Parent shall otherwise consent in writing (such consent not to be unreasonably withheld, conditioned or delayed); (b) as expressly contemplated by this Agreement or <u>Section 6.1</u> of the Company Disclosure Letter; or (c) as required by applicable Law. Notwithstanding anything to the contrary contained herein, nothing herein shall prevent the Company from taking or failing to take any commercially reasonable action, including the establishment of any commercially reasonable policy, procedure or protocol, in response to COVID-19 or any COVID-19 Measures so long as, in each instance, prior to taking any such action that would otherwise violate this <u>Section 6.1</u>, the Company, to the extent reasonably practicable under the circumstances, provides Parent with advance notice of such anticipated action and consults with Parent in good faith with respect to such action and (x) no such actions or failure to take such actions shall be deemed to violate or breach this <u>Section 6.1</u> in any way, and (y) all such actions or failure to take such actions shall be deemed to constitute an action taken in the ordinary course of business. Without limiting the generality of the foregoing, except as required or expressly permitted by the terms of this Agreement or as set forth on <u>Section 6.1</u> of the Company Disclosure Letter, or as required by applicable Law, without the prior written consent of Parent (such consent not to be unreasonably withheld, conditioned or delayed), during the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement pursuant to its terms or the Closing, the Company shall not do any of the following:

45

(a) except as otherwise required by any existing Benefit Plan, this Agreement or applicable Law: (i) increase or grant any increase in the compensation, bonus, fringe or other benefits of, or pay, grant or promise any bonus to, any current or former employee, officer, director, independent contractor or other individual service provider of the Company whose annual base salary (or annual base wages or annual fees) would exceed $300,000 after any increase; (ii) grant, pay or increase any severance, change in control, deferred compensation, retention, equity or equity-based or other similar payment or benefit to any current or former employee, officer, director, independent contractor or other individual service provider of the Company (other than retention bonuses to current employees of the Company in the ordinary course of business); (iii) enter into, commence participation in, adopt, establish, modify, amend or terminate any Benefit Plan or any compensation or benefit plan, policy, program, agreement, trust or arrangement that would have constituted a Benefit Plan if it had been in effect on the date of this Agreement (other than annual renewal of group health and welfare plans in the ordinary course of business consistent with past practice that does not result in a material increase in cost to the Company); (iv) take any action to accelerate the vesting or payment of, or otherwise fund or secure the payment of, any compensation or benefits under any Benefit Plan or otherwise; or (v) make employment offers, hire or terminate (other than for cause) any employee or any other individual who is providing or will provide services to the Company, other than any employment offers, hires or terminations of employees with an annual base salary of less than $200,000 in the ordinary course of business consistent with past practice (provided, however, that nothing set forth in this Section 6.1(a) shall prohibit the Company from making commitments (but not making grants) to offer any equity or equity-based compensation awards in the ordinary course of business in an amount not in excess of five percent (5%), individually, or twenty-five percent (25%), in the aggregate, from each of the Employee Incentive Plan or Employee Stock Purchase Plan);

(b) transfer, sell, assign, license, sublicense, encumber, impair, abandon, permit to lapse or expire, dedicate to the public, cancel, subject to any Lien, fail to diligently maintain, or otherwise dispose of any right, title or interest of the Company in any Owned Intellectual Property or Licensed Intellectual Property, in each case other than non-exclusive licenses to any Owned Intellectual Property granted by the Company to customers in the ordinary course of business;

(c) (i) make, declare, set aside, establish a record date for or pay any dividend or distribution (whether in cash, stock or property) to the Company Stockholders in their capacities as stockholders; (ii) effect any recapitalization, reclassification, split or other change in its capitalization; (iii) except in connection with the exercise of any Company Option or Company Warrant outstanding as of the date of this Agreement in accordance with its terms or as permitted by Section 6.1(a) with respect to commitments (but not grants) to offer equity or equity based compensation awards in the ordinary course of the business from the Employee Incentive Plan or Employee Stock Purchase Plan, authorize for issuance, issue, sell, transfer, pledge, encumber, dispose of or deliver any additional shares of its capital stock or securities convertible into or exchangeable for shares of its capital stock, or issue, sell, transfer, pledge, encumber or grant any right, option, restricted stock unit, stock appreciation right or other commitment for the issuance of shares of its capital stock, or adjust, split, combine, subdivide, recapitalize, reclassify or otherwise effect any change in respect of any shares of its capital stock or other equity interests or securities of the Company; or (iv) repurchase, redeem or otherwise acquire, or offer to repurchase, redeem or otherwise acquire, any shares of its capital stock or other equity interests, except for: (A) the acquisition by the Company of any shares of capital stock, membership interests or other equity interests of the Company issued and outstanding as of the date hereof in connection with the forfeiture or cancellation of such equity interests; and (B) purchases or redemptions pursuant to exercises of Company Options issued and outstanding as of the date hereof or the withholding of shares to satisfy net settlement or Tax obligations with respect to equity awards in accordance with the terms of such equity awards;

(d) amend its Charter Documents, or form or establish any Subsidiary;

(e) (i) merge, consolidate or combine with any Person; or (ii) acquire or agree to acquire by merging or consolidating with, purchasing any equity interest in or a substantial portion of the assets of, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof;

(f) sell, lease, license, sublicense, abandon, divest, transfer, cancel, abandon or permit to lapse or expire, dedicate to the public, or otherwise dispose of, any assets or properties, other than (i) non-exclusive licenses to any Owned Intellectual Property granted by the Company to customers in the ordinary course of business or (ii) any sale, lease or disposition of tangible assets or properties in the ordinary course of business consistent with past practice except as set forth on Section 6.1(f) of the Company Disclosure Letter;

(g) disclose any Trade Secrets (other than in the ordinary course of business subject to appropriate written obligations with respect to confidentiality, non-use and non-disclosure) or any source code to any Person;

(h) (i) issue or sell any debt securities or rights to acquire any debt securities of any of the Company or guarantee any debt securities of another Person; (ii) make, incur, create or assume any Indebtedness, loans, advances or capital contributions to, or investments in, or guarantee any Indebtedness of, any Person, except for loans, advances or capital contributions pursuant to and in accordance with the terms of agreements or legal obligations existing as of the date of this Agreement, in each case set forth on Section 6.1(h) of the Company Disclosure Letter; (iii) create any material Liens on any material property or assets of the Company in connection with any Indebtedness thereof (other than Permitted Liens); (iv) fail to comply with the terms of the Existing Credit Agreement, or take any action, or omit to take any action, that would constitute or result in a default or event of default under the Existing Credit Agreement; (v) cancel or forgive any Indebtedness owed to the Company; or (vi) make, incur or commit to make or incur any capital expenditures, other than in the ordinary course of business consistent with past practice;

(i) commence, release, assign, compromise, settle or agree to settle any Legal Proceeding (i) material to the Company or its properties or assets, (ii) which would subject the Company to any non-monetary obligation or (iii) involving monetary obligations of the Company in excess of $100,000;

46

(j) (i) except in the ordinary course of business consistent with past practices: (A) modify, amend or terminate in a manner that is adverse to the Company, any Company Material Contract; (B) enter into any Contract that would have been a Company Material Contract had it been entered into prior to the date of this Agreement; (C) waive, delay the exercise of, release or assign any material rights or claims under any Company Material Contract; or (D) incur or enter into a Contract requiring the Company to pay in excess of $150,000 in any 12-month period; or (ii) modify or amend any material term under the Existing Credit Agreement or, other than pursuant to the terms of this Agreement, terminate or allow the termination of the Existing Credit Agreement or any of the commitments thereunder;

(k) except as required by GAAP or applicable Law, make any material change in accounting methods, principles or practices;

(l) (i) make, change or rescind any income or other material Tax election; (ii) settle or compromise any Tax claim; (iii) change (or request to change) any method of accounting for Tax purposes; (iv) file any amended Tax Return; (v) waive or extend any statute of limitations in respect of a period within which an assessment or reassessment of Taxes may be issued; (vi) knowingly surrender any claim for a refund of Taxes; (vii) fail to pay any income or other material Tax that becomes due and payable (including estimated payments); (viii) enter into any "closing agreement" as described in Section 7121 of the Code (or any similar Law) with any Governmental Entity, (ix) incur any Taxes outside of the ordinary course of business or (x) file any income or other material Tax Return inconsistent with past practice;

(m) authorize, recommend, propose or announce an intention to adopt a plan of complete or partial liquidation, restructuring, recapitalization, dissolution, reorganization or winding-up of the Company;

(n) subject to clause (c) above, enter into or amend any agreement with, or pay, distribute or advance any assets or property to, any of its officers, directors, employees, partners, stockholders, Insiders or other Affiliates, other than payments or distributions relating to obligations in respect of arms-length commercial transactions pursuant to the agreements set forth on Section 6.1(n) of the Company Disclosure Letter as existing on the date of this Agreement;

(o) enter into (i) a new line of business or (ii) any agreement that materially restricts the ability of the Company to engage or compete in, or enter into, any line of business;

(p) implement any layoffs, furloughs or hours reduction with respect to any employee or individual service providers of the Company, or plant closings, or similar events that individually or in the aggregate would give rise to any obligations or liabilities on the part of the Company under WARN or any similar state or local "mass layoff" or "plant closing" Law;

(q) voluntarily fail to maintain, cancel or materially change coverage under any insurance policy in form and amount equivalent in all material respects to the insurance coverage currently maintained with respect to the Company and its assets and properties;

(r) except as required by Law, (i) recognize any labor union, works council, or other labor organization as the bargaining representative of any employee or (ii) enter into, modify, or terminate any collective bargaining agreement or other Contract with a labor union, works council, or other labor organization;

(s) apply for or receive any relief under (i) the CARES Act or any other applicable Law or governmental program designed to provide relief related to COVID-19 or (ii) any Payroll Tax Executive Order;

47

(t) other than in the ordinary course of business consistent with past practice, intentionally delay or postpone payment of any accounts payable or commissions or any other liability, or enter into any agreement or negotiation with any party to extend the payment date of any accounts payable or commissions or any other liability, or accelerate sales or the collection of (or discount) of any accounts or notes receivable or otherwise change their cash management practices; or

(u) agree in writing or otherwise agree, commit or resolve to take any of the actions described in Sections 6.1(a) through (t) above.

(v) Nothing contained in this Agreement shall give Parent, directly or indirectly, any right to control or direct the operations of the Company prior to the Closing. Prior to the Closing, each of the Company and Parent shall exercise, consistent with the other terms and conditions of this Agreement, complete control and supervision over their respective businesses.

Section 6.2 <u>Conduct of Business by Parent, First Merger Sub and Second Merger Sub</u>. During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement pursuant to its terms or the Closing, Parent shall, and shall cause its Subsidiaries to, carry on its business in the ordinary course consistent with past practice, except to the extent that the Company shall otherwise consent in writing (such consent not to be unreasonably withheld, conditioned or delayed) or as contemplated by this Agreement (including as contemplated by the PIPE Investment). Without limiting the generality of the foregoing, except as required or permitted by the terms of this Agreement or as required by applicable Law, without the prior written consent of the Company (such consent not to be unreasonably withheld, conditioned or delayed), during the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement pursuant to its terms or the Closing, Parent shall not, and shall cause its Subsidiaries not to, do any of the following:

(a) declare, set aside or pay dividends on or make any other distributions (whether in cash, stock, equity securities or property) in respect of any capital stock (or warrant) or split, combine or reclassify any capital stock (or warrant), effect a recapitalization or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for any capital stock or warrant, or effect any like change in capitalization;

(b) other than in connection with the Parent Stockholder Redemption, the Repurchase or as otherwise required by Parent's Charter Documents, purchase, redeem or otherwise acquire, directly or indirectly, any equity securities of Parent or any of its Subsidiaries;

(c) other than as set forth in the Subscription Agreements, grant, issue, deliver, sell, authorize, pledge or otherwise encumber, or agree to any of the foregoing with respect to, any shares of capital stock or other equity securities or any securities convertible into or exchangeable for shares of capital stock or other equity securities, or subscriptions, rights, warrants or options to acquire any shares of capital stock or other equity securities or any securities convertible into or exchangeable for shares of capital stock or other equity securities, or enter into other agreements or commitments of any character obligating it to issue any such shares of capital stock or equity securities or convertible or exchangeable securities;

(d) amend its Charter Documents or form or establish any Subsidiary (other than First Merger Sub and Second Merger Sub pursuant to this Agreement);

(e) (i) merge, consolidate or combine with any Person; or (ii) acquire or agree to acquire by merging or consolidating with, or by purchasing any equity interest in or a portion of the assets of, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets, or enter into any joint ventures, strategic partnerships or alliances;

48

(f) incur any Indebtedness or guarantee any such Indebtedness of another Person or Persons, issue or sell any debt securities or options, warrants, calls or other rights to acquire any debt securities of Parent, as applicable, enter into any "keep well" or other agreement to maintain any financial statement condition or enter into any arrangement having the economic effect of any of the foregoing, in each case, except in the ordinary course of business consistent with past practice; provided, however, that Parent shall be permitted to incur Indebtedness (which shall constitute Parent Transaction Costs) from its Affiliates and stockholders in order to meet its reasonable capital requirements, with any such loans to be made only as reasonably required by the operation of Parent in due course on arm's length terms and conditions and repayable at Closing and in any event in an aggregate amount not to exceed $200,000;

(g) release, assign, compromise, settle or agree to settle any Legal Proceeding material to Parent;

(h) except as required by GAAP or applicable Law, make any change in accounting methods, principles or practices;

(i) (i) make, change or rescind any income or other material Tax election (other than in the ordinary course for a newly formed entity) (ii) settle or compromise any Tax claim; (iii) change (or request to change) any method of accounting for Tax purposes (other than in the ordinary course for a newly formed entity); (iv) file any amended Tax Return; (v) waive or extend any statute of limitations in respect of a period within which an assessment or reassessment of Taxes may be issued (other than any extension pursuant to an extension to file any Tax Return); (vi) knowingly surrender any claim for a refund of Taxes; or (vii) enter into any "closing agreement" as described in Section 7121 of the Code (or any similar Law) with any Governmental Entity;

(j) create any material Liens on any material property or assets of Parent, First Merger Sub or Second Merger Sub;

(k) liquidate, dissolve, reorganize or otherwise wind up the business or operations of Parent, First Merger Sub or Second Merger Sub;

(l) commence, settle or compromise any Legal Proceeding that would reasonably be expected to be material to Parent, First Merger Sub or Second Merger Sub;

(m) enter into any new line of business;

(n) amend the Trust Agreement or any other agreement related to the Trust Account;

(o) pay, distribute or advance any assets or property to, any of its officers, directors, employees, partners or stockholders, other than payments or distributions relating to obligations in respect of arms-length commercial transactions pursuant to the agreements or commitments (or proposed agreements or commitments to be entered into prior to the Closing) set forth on Section 6.2(o) of the Parent Disclosure Letter; or

(p) agree in writing or otherwise agree, commit or resolve to take any of the actions described in Sections 6.2(a) through (o) above.

49

ARTICLE VII.
ADDITIONAL AGREEMENTS

Section 7.1 Company No Solicitation.

(a) The Company will not, and will cause each of its directors, officers and employees not to, and shall instruct and use its reasonable best efforts to cause its other Representatives not to, directly or indirectly:

(i) solicit, initiate, knowingly encourage or knowingly facilitate or cooperate with any inquiries regarding, or the submission or announcement by any Person (other than Parent or its Subsidiaries) of, any proposal or offer that constitutes, or would reasonably be expected to lead to, any Company Acquisition Proposal;

(ii) furnish any information regarding the Company in connection with, for the purpose of soliciting, initiating, encouraging or facilitating, or in response to, a Company Acquisition Proposal;

(iii) engage in or otherwise participate in any discussions or negotiations with any Person (other than Parent or its Representatives) with respect to any Company Acquisition Proposal or any inquiry, proposal or offer that would reasonably be expected to lead to any Company Acquisition Proposal; or

(iv) approve, adopt, endorse, recommend or enter into, or propose to approve, adopt, endorse, recommend or enter into, any letter of intent or similar document, agreement, commitment, or agreement in principle with respect to any Company Acquisition Proposal.

(b) If the Company receives a Company Acquisition Proposal or any inquiry or request for information with respect to a Company Acquisition Proposal or that is reasonably likely to lead to a Company Acquisition Proposal, then the Company shall promptly (and in no event later than forty eight (48) hours after its receipt of such Company Acquisition Proposal or request) notify Parent in writing of such Company Acquisition Proposal or request (which notification shall, unless expressly prohibited by a confidentiality agreement in effect as of the date hereof, include the identity of the Person making or submitting such request or Company Acquisition Proposal and a copy of any such written request or proposal (or, if not in writing, the material terms and conditions thereof)).

(c) Promptly following the execution and delivery of this Agreement, the Company shall, and shall cause each of its Affiliates and its and their respective directors, officers and employees, and shall instruct and use reasonable best efforts to cause its other Representatives to (and the Written Consent Parties have acknowledged to the Company that it shall), immediately cease and cause to be terminated any existing solicitation of, or discussions or negotiations with, any Person (other than Parent and its Representatives) relating to any Company Acquisition Proposal made on or prior to the date hereof. The Company shall not, and shall cause its Affiliates not to, release any third party from, or waive, amend or modify any provision of, or grant permission under, or fail to enforce, any standstill provision in any agreement to which the Company or any of its Affiliates is a party.

(d) Any violation of the restrictions contained in this Section 7.1 by any of the Company's Representatives shall be deemed to be a breach of this Section 7.1 by the Company.

50

Section 7.2 <u>Parent No Solicitation.</u>

(a) Parent will not, and will cause each of its Subsidiaries and its and their respective directors, officers and employees not to, and shall instruct and use its reasonable best efforts to cause its other Representatives not to, directly or indirectly:

(i) make, solicit, initiate, knowingly encourage or knowingly facilitate or cooperate with any inquiries regarding, or the submission or announcement by any Person of, any proposal or offer that constitutes, or would reasonably be expected to lead to, any Parent Acquisition Proposal;

(ii) furnish any information regarding Parent or any Subsidiary of Parent in connection with, for the purpose of making, soliciting, initiating, encouraging or facilitating, or in response to, a Parent Acquisition Proposal;

(iii) engage in or otherwise participate in any discussions or negotiations with any Person with respect to any Parent Acquisition Proposal or any inquiry, proposal or offer that would reasonably be expected to lead to any Parent Acquisition Proposal; or

(iv) approve, adopt, endorse, recommend or enter into, or propose to approve, adopt, endorse, recommend or enter into, any letter of intent or similar document, agreement, commitment, or agreement in principle with respect to any Parent Acquisition Proposal.

(b) If Parent receives a Parent Acquisition Proposal or any inquiry or request for information with respect to a Parent Acquisition Proposal or that is reasonably likely to lead to a Parent Acquisition Proposal, then Parent shall promptly (and in no event later than forty eight (48) hours after its receipt of such Parent Acquisition Proposal or request) notify the Company in writing of such Parent Acquisition Proposal or request (which notification shall, unless expressly prohibited by a confidentiality agreement in effect as of the date hereof, include the identity of the Person making or submitting such request or Parent Acquisition Proposal and a copy of any such written request or proposal (or, if not in writing, the material terms and conditions thereof)).

(c) Promptly following the execution and delivery of this Agreement, Parent shall, and shall instruct and cause each of its Affiliates and its and their respective directors, officers and employees, and shall use reasonable best efforts to cause its other Representatives to, immediately cease and cause to be terminated any existing solicitation of, or discussions or negotiations with, any Person (other than the Company and its Representatives) relating to any Parent Acquisition Proposal made on or prior to the date hereof. Parent shall not, and shall cause its Affiliates not to, release any third party from, or waive, amend or modify any provision of, or grant permission under, or fail to enforce, any standstill provision in any agreement to which Parent or any of its Affiliates is a party.

(d) Any violation of the restrictions contained in this <u>Section 7.2</u> by any of Parent's Representatives shall be deemed to be a breach of this <u>Section 7.2</u> by Parent.

51

Section 7.3 <u>Registration Statement; Proxy Statement / Consent Solicitation</u>.

(a) Parent and the Company shall cooperate to prepare and file as promptly as reasonably practicable following the date hereof a registration statement on Form S-4 or other applicable form (the "<u>Registration Statement</u>") to be filed by Parent with the SEC pursuant to which shares of Parent Common Stock issuable in the First Merger and the Rollover Options and Rollover Restricted Stock will be registered with the SEC, including the registration for resale of the shares of Parent Class A Common Stock issuable in the First Merger to certain stockholders of the Company to be designated by the Company, which shall include a proxy statement / consent solicitation containing (i) a consent solicitation statement in preliminary form (the "<u>Consent Solicitation Statement</u>") in connection with the solicitation by the Company of written consents from the Company Stockholders to approve, by the requisite consent of the Company Stockholders under the DGCL and the Company's Charter Documents, this Agreement, the First Merger and the other Transactions (the "<u>Requisite Company Stockholder Approval</u>") and (ii) a proxy statement in preliminary form of the type contemplated by Regulation 14A promulgated under the Exchange Act (the "<u>Parent Proxy Statement</u>") in order to (A) provide Parent's stockholders with the opportunity to elect to have their Parent Class A Common Stock converted to cash in accordance with the provisions of Parent's Charter Documents (such elections made by Parent's stockholders, the "<u>Parent Stockholder Redemptions</u>"); and (B) facilitate the solicitation by Parent of proxies from the holders of the shares of Parent Common Stock to approve at the Parent Special Meeting, by the requisite vote of Parent's stockholders under the DGCL, Parent's Charter Documents, the Nasdaq rules and regulations and applicable Law (the "<u>Requisite Parent Stockholder Approval</u>"): (1) the adoption of this Agreement and approval of the Transactions; (2) the issuance of the number of shares of Parent Class A Common Stock to be issued in connection with the First Merger; (3) an increase in the number of authorized shares of Parent Class A Common Stock as may be required by the immediately preceding clause (2); (4) the amendment and restatement of Parent's Charter Documents to be effective from and after the Closing, including as set forth in substantially the form of the Parent A&R Charter attached hereto as <u>Exhibit C</u> and the Parent A&R Bylaws attached hereto as <u>Exhibit D</u>; (5) the adoption and approval of (i) a new equity incentive plan in a form and substance reasonably acceptable to Parent and the Company (the "<u>Employee Incentive Plan</u>"), and which Employee Incentive Plan will provide for awards for a number of shares of Parent Class A Common Stock up to seven and a half percent (7.5%) of the aggregate number of shares of Parent Class A Common Stock issued and outstanding immediately after the Closing (after giving effect to the Parent Stockholder Redemptions, if any) (the "<u>Employee Incentive Plan Share Reserve</u>"), and the Employee Incentive Plan Share Reserve shall automatically increase on the first day of each fiscal year beginning with the 2021 fiscal year until the Employee Incentive Plan terminates by a number of shares equal to the lesser of (A) three percent (3%) of the shares of Parent Class A Common Stock issued and outstanding on the last day of the immediately preceding fiscal year and (B) such smaller number of shares as determined by the Parent board of directors, (ii) a new employee stock purchase plan in a form and substance reasonably acceptable to Parent and the Company (the "<u>Employee Stock Purchase Plan</u>"), and which Employee Stock Purchase Plan will provide for awards for a number of shares of Parent Class A Common Stock up to two percent (2%) of the aggregate number of shares of Parent Class A Common Stock issued and outstanding immediately after the Closing (after giving effect to the Parent Stockholder Redemptions, if any) (the "<u>Employee Stock Purchase Plan Share Reserve</u>") and the Employee Stock Purchase Plan Share Reserve shall automatically increase on the first day of each fiscal year beginning with the 2021 fiscal year and ending on (and including) the first day of the 2031 fiscal year by a number of shares equal to the lesser of (A) half a percent (0.5%) of the shares of Parent Class A Common Stock issued and outstanding on the last day of the immediately preceding fiscal year, (B) the number of shares of Parent Class A Common Stock initially reserved for issuance under the Employee Stock Purchase Plan, and (C) such smaller number of shares as determined by the Parent board of directors, and (iii) a new Chief Executive Officer equity incentive plan, the general terms and conditions of which are set forth on <u>Section 7.3(a)</u> of the Company Disclosure Letter (the "<u>CEO Incentive Plan</u>"), and which CEO Incentive Plan will provide for awards for a number of shares of Parent Class A Common Stock up to twelve and a half percent (12.5%) of the aggregate number of shares of Parent Class A Common Stock issued and outstanding immediately after the Closing (after giving effect to the Parent Stockholder Redemptions, if any); (6) the election of the members of the board of directors of Parent in accordance with <u>Section 7.17</u>; (7) approval of the Repurchase and (8) any other proposals the Parties mutually deem necessary or desirable to consummate the Transactions (collectively, the "<u>Parent Stockholder Matters</u>").

(b) The Company and Parent shall each use its reasonable best efforts to (i) cause the Registration Statement, when filed with the SEC, to comply in all material respects with all legal requirements applicable thereto, (ii) promptly provide responses to the SEC with respect to all comments received on Merger Materials from the SEC, (iii) cause the Registration Statement to be declared effective under the Securities Act as promptly as practicable after such filing and (iv) keep the Registration Statement effective as long as is necessary to consummate the Transactions contemplated hereby. Each of the Company and Parent shall cause the definitive Merger Materials to be mailed to their respective stockholders as of the applicable record date as promptly as practicable (and in any event within four (4) Business Days) following the date upon which the Registration Statement becomes effective. Each party shall furnish all information concerning it and its Affiliates to the other party and provide such other assistance as may be reasonably requested by the other party to be included in the Merger Materials and shall otherwise reasonably assist and cooperate with the other party in the preparation of the Merger Materials and the resolution of any comments received from the SEC. In furtherance of the foregoing, the Company (i) agrees to promptly provide Parent with all information concerning the business, management, operations and financial condition of the Company, in each case, reasonably requested by Parent for inclusion in the Merger Materials and (ii) shall cause the directors, officers and employees of the Company to be reasonably available to, and to provide any documents reasonably requested by, Parent and its counsel in connection with the drafting of the Merger Materials and responding in a timely manner to comments on the Merger Materials from the SEC. For purposes of this Agreement, the term "Merger Materials" shall mean the Registration Statement, including the prospectus forming a part thereof, the Consent Solicitation Statement, the Parent Proxy Statement, and any amendments thereto.

(c) If any information relating to the Company or Parent, or any of their respective Affiliates, directors or officers, should be discovered by the Company or Parent which is required to be set forth in an amendment or supplement to the Merger Materials so that such document would not include any misstatement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, the party which discovers such information shall promptly notify the other party and an appropriate amendment or supplement describing such information shall be promptly filed with the SEC and, to the extent required by and in compliance with applicable Law, disseminated to the stockholders of the Company and Parent. Parent shall promptly notify the Company of the receipt of any comments from the SEC or the staff of the SEC and of any request by the SEC or the staff of the SEC for amendments or supplements to the Merger Materials or for additional information concerning the Merger Materials or the Mergers and shall, as promptly as practicable after receipt thereof, supply the Company with copies of all written correspondence between it or any of its Representatives, on the one hand, and the SEC or the staff of the SEC, on the other hand, or, if not in writing, a description of such communication, with respect to the Merger Materials or the Mergers. Parent will advise the Company, promptly after Parent receives notice thereof, of the time of effectiveness of the Registration Statement or any supplement or amendment has been filed, of the issuance of a stop order relating thereto or of the suspension of the qualification of the Parent Class A Common Stock issuable in the First Merger, and Parent and the Company will each use its reasonable best efforts to have any such stop order or suspension lifted, reversed or otherwise terminated. No filing of, or amendment or supplement to the Merger Materials, or response to any comments from the SEC or the staff of the SEC relating to the Merger Materials, will be made by Parent without the prior written consent of the Company (such consent not to be unreasonably withheld, conditioned or delayed) and without providing the Company a reasonable opportunity to review and comment thereon unless pursuant to a telephone call initiated by the SEC. Parent shall be permitted to make all necessary filings with respect to the Transactions under the Securities Act, the Exchange Act and applicable blue sky Laws and the rules and regulations thereunder; provided that, prior to Parent making any such filings, the Company shall be given an opportunity to review and provide comments, which comments Parent will consider in good faith.

53

Section 7.4 <u>Consent Solicitation Statement; Company Change in Recommendation.</u>

(a) As promptly as practicable following the date upon which the Registration Statement becomes effective, the Company shall solicit the Requisite Company Stockholder Approval via written consent in accordance with Section 228 of the DGCL and the Company's Charter Documents. In connection therewith, prior to the date upon which the Registration Statement becomes effective, the board of directors of the Company shall set a record date for determining the Company Stockholders entitled to provide such written consent. The Company shall use reasonable best efforts to cause the Written Consent Parties to duly execute and deliver stockholder written consents in substantially the form attached hereto as <u>Exhibit H</u> (the "<u>Stockholder Written Consent</u>") in respect of the Company Stock beneficially owned by each such Written Consent Party (which represent (i) at least a majority of the outstanding voting power of the Company Stock issued and outstanding (voting as a single class and on an as-converted basis), (ii) at least a majority of the shares of the Company Common Stock issued and outstanding as of the date hereof (voting as a single class) and (iii) at least a majority of the shares of the Company Preferred Stock issued and outstanding (voting as a single class and on an as-converted basis)) in accordance with the Company's Charter Documents and Section 228 of the DGCL within three (3) Business Days of the Registration Statement becoming effective. As promptly as practicable following the execution and delivery of the Stockholder Written Consents by the Written Consent Parties to the Company, the Company shall deliver to Parent a copy of such Stockholder Written Consent in accordance with <u>Section 11.1</u>. Promptly following the receipt of the Requisite Company Stockholder Approval via the Stockholder Written Consent, the Company will prepare (subject to the reasonable approval of Parent) and deliver to the Company Stockholders who have not executed and delivered the Stockholder Written Consent the notice required by Section 228(e) of the DGCL and include a description of the appraisal rights of the Company's stockholders available under Section 262 of the DGCL, along with such other information as is required thereunder and pursuant to applicable Law. If any Written Consent Party fails to deliver its Stockholder Written Consent to the Company within three Business Days of the Registration Statement becoming effective (a "<u>Written Consent Failure</u>"), Parent shall have the right to terminate this Agreement as set forth in <u>Section 9.1(i)</u>.

(b) The Consent Solicitation Statement shall include the Company Recommendation. Neither the board of directors of the Company nor any committee thereof shall: (i) withdraw, modify, amend or qualify (or propose to withdraw, modify, amend or qualify publicly or to any Company Stockholder) the Company Recommendation, or fail to include the Company Recommendation in the Consent Solicitation Statement; (ii) approve, recommend or declare advisable (or publicly propose to do so) any Company Acquisition Proposal; (iii) fail to publicly announce, within ten (10) Business Days after a tender offer or exchange offer relating to the equity securities of the Company (other than the Transactions) shall have been commenced by any third party other than Parent and its Affiliates, a statement disclosing that the board of directors of the Company recommends rejection of such tender or exchange offer (for the avoidance of doubt, the taking of no position or a neutral position by the board of directors of the Company in respect of the acceptance of any such tender offer or exchange offer as of the end of such period shall constitute a failure to publicly announce that the board of directors of the Company recommends rejection of such tender or exchange offer); or (iv) if requested by Parent, fail to issue, within ten (10) Business Days after a Company Acquisition Proposal (other than any tender offer or exchange offer) is publicly announced, a press release reaffirming the Company Recommendation (it being understood that the Company will have no obligation to make such reaffirmation on more than two separate occasions) (any action described in clauses "(i)" through "(iv)" being referred to as a "<u>Company Change in Recommendation</u>"); or (v) cause or permit the Company to enter into any contract, letter of intent, memorandum of understanding, agreement in principle or other understanding contemplating or relating to a Company Acquisition Transaction.

(c) Notwithstanding any Company Change in Recommendation, unless this Agreement has been earlier validly terminated in accordance with <u>Section 9.1</u>, the Company shall solicit the Requisite Company Stockholder Approval in accordance with <u>Section 7.4(a)</u>, including using reasonable best efforts to cause all Company Stockholders to duly execute and deliver the Stockholder Written Consent, and nothing contained in this Agreement shall be deemed to relieve the Company of such obligation.

54

(d) Nothing contained in this Agreement shall prohibit the Company, the board of directors of the Company or their Representatives from directing any Person (or the Representative of that Person) who makes a Company Acquisition Proposal to the provisions of this Section 7.4; provided, however, that no such communication or statement that would constitute a Company Change in Recommendation shall be permitted.

Section 7.5 Parent Special Meeting; Parent Change in Recommendation.

(a) Parent shall, as promptly as practicable following the date upon which the Registration Statement becomes effective, cause a special meeting of its stockholders (the "Parent Special Meeting") to be duly called and held as soon as reasonably practicable for the purpose of obtaining the Requisite Parent Stockholder Approval and Parent shall use its reasonable best efforts to obtain the Requisite Parent Stockholder Approval at the Parent Special Meeting. In connection therewith, promptly following the date upon which the Registration Statement becomes effective, the board of directors of Parent shall set a record date for determining the stockholders of Parent entitled to vote at the Parent Special Meeting. Parent shall comply with Law and all legal requirements applicable to such meeting, including the DGCL, Parent's Charter Documents and the Exchange Act, including Regulation 14A and Schedule 14A promulgated thereunder, as applicable. Notwithstanding anything to the contrary contained in this Agreement, Parent shall be entitled to postpone or adjourn the Parent Special Meeting only: (i) to ensure that any supplement or amendment to the Parent Proxy Statement that the board of directors of Parent has reasonably determined in good faith after consultation with Parent's outside legal counsel is required by applicable Law is disclosed to Parent's stockholders and for such supplement or amendment to be promptly disseminated to Parent's stockholders prior to the Parent Special Meeting; (ii) if, as of the time for which the Parent Special Meeting is originally scheduled (as set forth in the Parent Proxy Statement), there are insufficient shares of Parent Common Stock represented (either in person or by proxy) to constitute a quorum necessary to conduct the business to be conducted at the Parent Special Meeting; or (iii) in order to solicit additional proxies from stockholders for purposes of obtaining the Requisite Parent Stockholder Approval; provided, that (A) in the event of a postponement or adjournment pursuant to clauses (i), (ii) or (iii) above, the Parent Special Meeting shall be reconvened as promptly as practicable and in any event no later than five (5) Business Days after the date that such matters are resolved and (B) in no event shall the Parent Special Meeting be held later than three (3) Business Days prior to the Outside Date.

(b) The Parent Proxy Statement shall include the Parent Recommendation. Neither the board of directors of Parent nor any committee thereof shall: (i) withdraw, modify, amend or qualify (or publicly propose to withdraw, modify, amend or qualify) the Parent Recommendation, or fail to include the Parent Recommendation in the Parent Proxy Statement; (ii) approve, recommend or declare advisable (or publicly propose to do so) any Parent Acquisition Proposal; (iii) fail to publicly announce, within ten (10) Business Days after a tender offer or exchange offer relating to the equity securities of Parent (other than the Transactions) shall have been commenced by any third party (and in no event later than one (1) Business Day prior to the date of the Parent Special Meeting, as it may be postponed or adjourned pursuant to Section 7.5(a)), a statement disclosing that the board of directors of Parent recommends rejection of such tender or exchange offer (for the avoidance of doubt, the taking of no position or a neutral position by the board of directors of Parent in respect of the acceptance of any such tender offer or exchange offer as of the end of such period shall constitute a failure to publicly announce that the board of directors of Parent recommends rejection of such tender or exchange offer); (iv) if requested by the Company, fail to issue, within ten (10) Business Days after a Parent Acquisition Proposal (other than any tender offer or exchange offer) is publicly announced (and in no event later than one (1) Business Day prior to the date of the Parent Special Meeting, as it may be postponed or adjourned pursuant to Section 7.5(a)), a press release reaffirming the Parent Recommendation (any action described in clauses "(i)" through "(iv)" being referred to as a "Parent Change in Recommendation"); or (v) cause or permit Parent to enter into any contract, letter of intent, memorandum of understanding, agreement in principle or other understanding contemplating or relating to a Parent Acquisition Transaction.

(c) Notwithstanding any Parent Change in Recommendation, unless this Agreement has been earlier validly terminated in accordance with Section 9.1, the Parent Stockholder Matters shall be submitted to Parent's stockholders at the Parent Special Meeting for the purpose of obtaining the Requisite Parent Stockholder Approval and nothing contained in this Agreement shall be deemed to relieve Parent of such obligation.

(d) Nothing contained in this Agreement shall prohibit Parent, the board of directors of Parent or their Representatives from (i) taking and disclosing to Parent's stockholders a position contemplated by Rule 14e-2(a) or Rule 14d-9 promulgated under the Exchange Act or issuing a "stop, look and listen" statement to Parent's stockholders pursuant to Rule 14d-9(f) promulgated under the Exchange Act pending disclosure of its position thereunder or (ii) directing any Person (or the Representative of that Person) who makes a Parent Acquisition Proposal to the provisions of this Section 7.5; provided, however, that in the case of clause "(ii)," no such communication or statement that would constitute a Parent Change in Recommendation shall be permitted, made or taken.

Section 7.6 Regulatory Approvals. Within ten (10) Business Days after the date hereof, Parent and the Company shall each prepare and file the notification required of it under the HSR Act in connection with the Transactions and shall promptly and in good faith respond to all information requested of it by the U.S. Federal Trade Commission, U.S. Department of Justice, or any other Governmental Entity in connection with such notification and otherwise cooperate in good faith with each other and such Governmental Entities. Each Party will promptly furnish to the other such information and assistance as the other may reasonably request in connection with its preparation of any filing or submission that is necessary under the HSR Act and will use reasonable best efforts to cause the expiration or termination of the applicable waiting periods as soon as practicable, including by requesting early termination of the HSR waiting period. Neither Parent nor the Company shall, and each shall use reasonable best efforts to cause their respective Affiliates not to, directly or indirectly take any action, including, directly or indirectly, acquiring or investing in any Person or acquiring, leasing or licensing any assets, or agreement to do any of the foregoing, if doing so would reasonably be expected to impose any material delay in the obtaining of, or significantly increase the risk of not obtaining, any required approval under the HSR Act. Each Party will promptly provide the other with copies of all substantive written communications (and memoranda setting forth the substance of all substantive oral communications) between each of them, any of their Subsidiaries and their respective agents, representatives and advisors, on the one hand, and any Governmental Entity, on the other hand, with respect to this Agreement or the Transactions. Without limiting the foregoing, Parent and the Company shall: (i) promptly inform the other of any communication to or from the U.S. Federal Trade Commission, the U.S. Department of Justice or any other Governmental Entity regarding the Transactions; (ii) permit each other to review in advance any proposed substantive written communication to any such Governmental Entity and incorporate reasonable comments thereto; (iii) give the other prompt written notice of the commencement of any Legal Proceeding with respect to such transactions; (iv) not agree to participate in any substantive meeting or discussion with any such Governmental Entity in respect of any filing, investigation or inquiry concerning this Agreement or the Transactions unless, to the extent reasonably practicable, it consults with the other Party in advance and, to the extent permitted by such Governmental Entity, gives the other Party the opportunity to attend; (v) keep the other reasonably informed as to the status of any such Legal Proceeding; and (vi) promptly furnish each other with copies of all correspondence, filings (except for filings made under the HSR Act) and written communications between such Party and their Subsidiaries and their respective agents, representatives and advisors, on one hand, and any such Governmental Entity, on the other hand, in each case, with respect to this Agreement and the Transactions; provided that materials required to be supplied pursuant to this section may be redacted (1) to remove references concerning the valuation of the Company, (2) as necessary to comply with contractual arrangements, (3) as necessary to comply with applicable law, and (4) as necessary to address reasonable privilege or confidentiality concerns; provided further, that a Party may reasonably designate any competitively sensitive material provided to another party under this Section 7.6 as "Outside Counsel Only". Parent on the one hand, and the Company, on the other hand, shall each pay 50% of any filing fees required by Governmental Entities, including with respect to any registrations, declarations and filings required in connection with the execution and delivery of this Agreement, the performance of the obligations hereunder and the consummation of the Transactions, including filing fees in connection with filings under the HSR Act.

56

Section 7.7 <u>Other Filings; Press Release</u>.

(a) As promptly as practicable after execution of this Agreement, Parent will prepare and file a Current Report on Form 8-K pursuant to the Exchange Act to report the execution of this Agreement, the form and substance of which shall be approved in advance in writing by the Company (such approval not to be unreasonably withheld, conditioned or delayed).

(b) Promptly after the execution of this Agreement, Parent and the Company shall also issue a joint press release announcing the execution of this Agreement.

(c) At least three (3) days prior to the Closing, the Company shall prepare a draft Current Report on Form 8-K announcing the Closing, together with, or incorporating by reference, the financial statements prepared by the Company and its accountant, and such other information that may be required to be disclosed with respect to the Transactions in any report or form to be filed with the SEC ("<u>Closing Form 8-K</u>"), the form and substance of which shall be approved in advance in writing by Parent (such approval not to be unreasonably withheld, conditioned or delayed)

. Prior to the Closing, Parent and the Company shall prepare a mutually agreeable joint press release announcing the consummation of the Transactions hereunder ("<u>Closing Press Release</u>"). Substantially concurrently with the Closing, Parent shall issue the Closing Press Release. Concurrently with the Closing, or as soon as practicable thereafter (but in any event within four (4) Business Days thereafter), Parent shall file the Closing Form 8-K with the SEC. In connection with the preparation of the Closing Form 8-K and the Closing Press Release, or any other report or form to be filed with the SEC, each party shall, upon request by the other party, furnish all information concerning it and its Affiliates to the other party and provide such other assistance as may be reasonably requested by the other party to be included in the Closing Form 8-K or the Closing Press Release and shall otherwise reasonably assist and cooperate with the other party in the preparation of the Closing Form 8-K and the Closing Press Release and the resolution of any comments received from the SEC with respect thereto.

(d) From the date hereof through the Effective Time, Parent will keep current and timely file all reports required to be filed or furnished with the SEC and otherwise comply in all material respects with its reporting obligations under applicable Laws.

(e) Parent shall, at all times during the period from the date hereof through the Effective Time: (i) take all actions necessary to continue to qualify as an "emerging growth company" within the meaning of the JOBS Act; and (ii) not take any action that would cause Parent to not qualify as an "emerging growth company" within the meaning of the JOBS Act; provided that no action or omission taken by Parent pursuant to this <u>Section 7.7(e)</u> shall be deemed to constitute a violation of <u>Section 6.2</u>.

Section 7.8 <u>Confidentiality; Communications Plan; Access to Information</u>.

(a) Parent and the Company acknowledge that they are parties to the Confidentiality Agreement, the terms of which are incorporated herein by reference. Following Closing, the Confidentiality Agreement shall be superseded in its entirety by the provisions of this Agreement; <u>provided</u>, <u>however</u>, that if for any reason this Agreement is terminated prior to the Closing, the Confidentiality Agreement shall nonetheless continue in full force and effect in accordance with its terms.

(b) Parent and the Company shall reasonably cooperate to create and implement a communications plan regarding the Transactions (the "<u>Communications Plan</u>") promptly following the date hereof. Notwithstanding the foregoing, none of the Parties will make any public announcement or issue any public communication regarding this Agreement, any other Transaction Agreement or the Transactions or any matter related to the foregoing, without the prior written consent of the Company, in the case of a public announcement by Parent, or Parent, in the case of a public announcement by the Company Stockholders or the Company (such consents, in either case, not to be unreasonably withheld, conditioned or delayed), except: (i) if such announcement or other communication is required by applicable Law, in which case the disclosing Party shall, to the extent permitted by applicable Law, first allow such other Parties to review such announcement or communication and have the opportunity to comment thereon and the disclosing Party shall consider such comments in good faith; (ii) in the case of the Company, the Company Stockholders, Parent and their respective Affiliates, if such announcement or other communication is made in connection with reporting, fundraising or other investment related activities and is made to such Person's direct and indirect investors or potential investors or financing sources subject to an obligation of confidentiality; (iii) to the extent provided for in the Communications Plan, internal announcements to employees of the Company; (iv) to the extent such announcements or other communications contain only information previously disclosed in a public statement, press release or other communication previously approved in accordance with <u>Section 7.7</u> or this <u>Section 7.8(b)</u>; (v) announcements and communications to Governmental Entities in connection with registrations, declarations and filings relating to the Transactions required to be made under this Agreement and (vi) communications to customers, suppliers and lenders of the Company for purposes of seeking any consents and approvals required in connection with the Transactions solely to the extent such communications are consistent with a public statement, press release or other communication previously approved in accordance with <u>Section 7.7</u> or this <u>Section 7.8(b)</u>.

(c) Subject to confidentiality obligations (whether contractual, imposed by applicable Law or otherwise) that are applicable to information furnished to the Company by third parties that may be in the Company's possession from time to time, and except for any information that is subject to attorney-client privilege (provided that, to the extent reasonably possible, the Parties shall cooperate in good faith to permit disclosure of such information in a manner that preserves such privilege or compliance with such confidentiality obligation), and to the extent permitted by applicable Law, the Company will afford Parent and its financial advisors, accountants, counsel and other representatives reasonable access during normal business hours, upon reasonable notice, to the properties, books, records and personnel of the Company during the period prior to the Closing to obtain all information concerning the business, including the status of business development efforts, properties, results of operations and personnel of the Company, as Parent may reasonably request in connection with the consummation of the Transactions; <u>provided</u>, <u>however</u>, that any such access shall be conducted in a manner not to interfere with the businesses or operations of the Company and in compliance with COVID-19 Measures. Subject to confidentiality obligations (whether contractual, imposed by applicable Law or otherwise) that are applicable to information furnished to Parent by third parties that may be in Parent's possession from time to time, and except for any information that is subject to attorney-client privilege (provided that, to the extent reasonably possible, the Parties shall cooperate in good faith to permit disclosure of such information in a manner that preserves such privilege or compliance with such confidentiality obligation), and to the extent permitted by applicable Law, Parent will afford the Company and its financial advisors, underwriters, accountants, counsel and other representatives reasonable access during normal business hours, upon reasonable notice, to the properties, books, records and personnel of Parent during the period prior to the Closing to obtain all information concerning the business, including properties, results of operations and personnel of Parent, as the Company may reasonably request in connection with the consummation of the Transactions; <u>provided</u>, <u>however</u>, that any such access shall be conducted in a manner not to interfere with the businesses or operations of Parent and in compliance with COVID-19 Measures.

Section 7.9 <u>Reasonable Best Efforts</u>. Upon the terms and subject to the conditions set forth in this Agreement, each of the Parties agrees to use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Mergers and the other Transactions, including using reasonable best efforts to accomplish the following: (i) the taking of all commercially reasonable acts necessary to cause the conditions precedent set forth in <u>ARTICLE VIII</u> to be satisfied; (ii) the obtaining of all necessary actions, waivers, consents, approvals, orders and authorizations from Governmental Entities and the making of all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Entities, if any); (iii) the obtaining of all consents, approvals or waivers from third parties required as a result of the Transactions, including any other consents, approvals or waivers from third parties referred to on <u>Section 4.5(b)</u> of the Company Disclosure Letter; (iv) the termination of each agreement set forth on <u>Section 7.9(iv)</u> of the Company Disclosure Letter; (v) the defending of any suits, claims, actions, investigations or proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the Transactions, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Entity vacated or reversed; and (vi) the execution or delivery of any additional instruments reasonably necessary to consummate, and to fully carry out the purposes of, the Transactions. This obligation shall include, on the part of Parent, sending a termination letter to the Trustee substantially in the applicable form attached to the Trust Agreement (the "<u>Trust Termination Letter</u>").

Section 7.10 <u>No Parent Securities Transactions</u>. Neither the Company nor any of its controlled Affiliates, directly or indirectly, shall engage in any transactions involving the securities of Parent prior to the time of the making of a public announcement regarding all of the material terms of the business and operations of the Company and the Transactions. The Company shall use its reasonable best efforts to require each of its officers, directors and employees to comply with the foregoing requirement.

Section 7.11 <u>No Claim Against Trust Account</u>. For and in consideration of Parent entering into this Agreement, the receipt and sufficiency of which is hereby acknowledged, the Company hereby irrevocably waives, on behalf of itself and its Affiliates, notwithstanding anything to the contrary in this Agreement, any right, title, interest or claim of any kind it has or may have in the future in or to the Trust Account (and any monies therein) or distributions therefrom, regardless of whether such claim arises as a result of, in connection with or relating in any way to, this Agreement or any proposed or actual business relationship between Parent or its Representatives, on the one hand, and the Company or its Representatives, on the other hand, or any other matter, and regardless of whether such claim arises based on contract, tort, equity or any other theory of legal liability; provided, that (a) nothing herein shall serve to limit or prohibit the Company's right to pursue a claim against Parent for (i) legal relief against monies or other assets held outside the Trust Account or (ii) specific performance or other equitable relief in connection with the consummation of the Transactions (including a claim for Parent to specifically perform its obligations under this Agreement and cause the disbursement of the balance of the cash remaining in the Trust Account (after giving effect to the Parent Stockholder Redemptions) to the Company in accordance with the terms of this Agreement and the Trust Agreement) so long as such claim would not affect Parent's ability to fulfill its obligation to effectuate the Parent Stockholder Redemptions and (b) nothing herein shall serve to limit or prohibit any claims that the Company may have in the future against Parent's assets or funds that are not held in the Trust Account (including any funds that have been released from the Trust Account (except any such funds released in order to effectuate the Parent Stockholder Redemptions) and any assets that have been purchased or acquired with any such funds) (collectively, including subject to the foregoing limitations set forth in sub-clauses (a) and (b) the "<u>Released Claims</u>"). The Company, on behalf of itself and its Affiliates, hereby irrevocably waives any Released Claims that the Company or any of its Affiliates may have against the Trust Account (including any distributions therefrom) now or in the future as a result of, or arising out of, any negotiations, contracts or agreements with Parent or its Representatives and will not seek recourse against the Trust Account (including any distributions therefrom) for any reason whatsoever (including for an alleged breach of any agreement with Parent or its Affiliates). The Company agrees and acknowledges that such irrevocable waiver is material to this Agreement and specifically relied upon by Parent and its Affiliates to induce Parent to enter into this Agreement, and the Company further intends and understands such waiver to be valid, binding and enforceable against the Company and each of its Affiliates under applicable Law.

Section 7.12 <u>Disclosure of Certain Matters</u>. Each of Parent, First Merger Sub, Second Merger Sub and the Company will promptly provide the other Parties with prompt written notice of any event, development or condition of which they have Knowledge that: (a) is reasonably likely to cause any of the conditions set forth in <u>ARTICLE VIII</u> not to be satisfied; or (b) would require any amendment or supplement to the Merger Materials; <u>provided</u>, <u>however</u>, that no such notification or the failure to provide such notification shall, in and of itself, effect any of the representations, warranties, covenants, rights or remedies, or the conditions to the obligations of, the Parties or result, in and of itself, in the failure of a condition set forth in <u>ARTICLE VIII</u>; <u>provided</u>, <u>further</u>, that for the avoidance of doubt, any such information actually contained in such foregoing notification may effect the representations, warranties, covenants, rights or remedies, or the conditions to the obligations of, the Parties or result in the failure of a condition set forth in <u>ARTICLE VIII</u>).

Section 7.13 <u>Securities Listing</u>. Parent will use its reasonable best efforts to cause the shares of Parent Class A Common Stock issued in connection with the Transactions to be approved for listing on Nasdaq at Closing. During the period from the date hereof until the Closing, Parent shall use its reasonable best efforts to keep the Parent Class A Common Stock and Public Warrants listed for trading on Nasdaq. After the Closing, Parent shall use commercially reasonable efforts to continue the listing for trading of the Parent Class A Common Stock and Public Warrants on Nasdaq.

Section 7.14 <u>Trust Account</u>. Upon satisfaction or waiver of the conditions set forth in <u>ARTICLE VIII</u> (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at the Closing) and provision of notice thereof to the Trustee (which notice Parent shall provide to the Trustee in accordance with the terms of the Trust Agreement): (a) in accordance with and pursuant to the Trust Agreement and Parent's Charter Documents, at the Closing, Parent: (i) shall cause the documents, opinions and notices required to be delivered to the Trustee pursuant to the Trust Agreement to be so delivered, including providing the Trustee with the Trust Termination Letter; and (ii) shall use its reasonable best efforts to cause the Trustee to, and the Trustee shall thereupon be obligated to, distribute the Trust Account as directed in the Trust Termination Letter, including all amounts payable: (A) to stockholders who have properly elected to have their Parent Class A Common Stock converted to cash in accordance with the provisions of Parent's Charter Documents; (B) for income tax or other tax obligations of Parent prior to Closing; (C) to the underwriters of the initial public offering of Parent with respect to any deferred underwriting compensation, (D) for any Parent Transaction Costs, (E) as repayment of loans and reimbursement of expenses to directors, officers and stockholders of Parent; and (F) as payment to stockholders as cash in lieu of the issuance of any fractional shares pursuant to <u>Section 2.6(g)</u>; and (b) thereafter, the Trust Account shall terminate, except as otherwise provided therein.

60

Section 7.15 <u>Directors' and Officers' Liability Insurance</u>.

(a) Parent agrees that all rights to exculpation, indemnification and advancement of expenses now existing in favor of the current or former directors or officers of the Company (each, a "<u>D&O Indemnified Party</u>"), as provided in its Charter Documents or in any indemnification agreement with the Company binding as of the date hereof, shall survive the Closing and shall continue in full force and effect. For a period of six (6) years from the Closing Date, Parent shall cause the Surviving Entity to maintain in effect the exculpation, indemnification and advancement of expenses provisions of the Company's Charter Documents as in effect immediately prior to the Closing Date or in any of their respective indemnification agreements with any D&O Indemnified Party as in effect immediately prior to the Closing Date, and Parent shall not, and shall cause the Surviving Entity not to, amend, repeal or otherwise modify any such provisions in any manner that would adversely affect the rights thereunder of any D&O Indemnified Party; <u>provided</u>, <u>however</u>, that all rights to indemnification or advancement of expenses in respect of any Legal Proceedings pending or asserted or any claim made within such period shall continue until the disposition of such Legal Proceeding or resolution of such claim.

(b) Prior to the Closing, the Company shall purchase a "tail" or "runoff" directors' and officers' liability insurance policy (the "<u>D&O Tail</u>") in respect of acts or omissions occurring prior to the Effective Time covering each such Person that is a director or officer of the Company currently covered by a directors' and officers' liability insurance policy of the Company on terms with respect to coverage, deductibles and amounts no less favorable than those of such policy in effect on the date of this Agreement for the six-year period following the Closing at a price not to exceed three-hundred percent (300%) of the last annual premium paid by the Company for such purpose. Parent shall, and shall cause the Surviving Entity to, maintain the D&O Tail in full force and effect for its full term and cause all obligations thereunder to be honored by the Company, as applicable, and no other party shall have any further obligation to purchase or pay for such insurance pursuant to this <u>Section 7.15(b)</u>; <u>provided</u>, <u>however</u>, that in no event shall the premium of the D&O Tail exceed three-hundred percent (300%) of the last annual premium paid by the Company for such purpose; and <u>provided</u>, <u>further</u>, that if the cost of such insurance coverage exceeds such amount, the Surviving Entity shall obtain a policy with the greatest coverage available for a cost not exceeding such amount.

(c) The rights of each D&O Indemnified Party hereunder shall be in addition to, and not in limitation of, any other rights such person may have under the Charter Documents of the Company, any other indemnification arrangement, any Law or otherwise. The obligations of Parent and the Company under this <u>Section 7.15</u> shall not be terminated or modified in such a manner as to adversely affect any D&O Indemnified Party without the consent of such D&O Indemnified Party. The provisions of this <u>Section 7.15</u> shall survive the Closing and expressly are intended to benefit, and are enforceable by, each of the D&O Indemnified Parties, each of whom is an intended third-party beneficiary of this <u>Section 7.15</u>.

(d) If Parent or, after the Closing, the Company or its successors or assigns: (i) consolidates with or merges into any other Person and shall not be the continuing or surviving entity of such consolidation or merger; or (ii) transfers or conveys all or substantially all of its properties and assets to any Person, then, in each such case, proper provision shall be made so that the successors and assigns of Parent or the Company, as applicable, assume the obligations set forth in this <u>Section 7.15</u>.

Section 7.16 <u>Section 16 Matters</u>. Prior to the Effective Time, Parent shall take all commercially reasonable steps as may be required (to the extent permitted under applicable Law) to cause any acquisition or disposition of the Parent Class A Common Stock that occurs or is deemed to occur by reason of or pursuant to the Transactions by each individual who is or will be subject to the reporting requirements of Section 16(a) of the Exchange Act with respect to Parent to be exempt under Rule 16b-3 promulgated under the Exchange Act, including by taking steps in accordance with the No-Action Letter, dated January 12, 1999, issued by the SEC regarding such matters.

61

Section 7.17 <u>Board of Directors</u>. Except as otherwise agreed in writing by the Company and Parent prior to the Closing, and conditioned upon the occurrence of the Closing, subject to any limitation imposed under applicable Laws and Nasdaq listing requirements, Parent shall take all actions necessary or appropriate to cause the individuals set forth on <u>Section 7.17</u> of the Parent Disclosure Letter to be elected as members of the Parent board of directors, effective as of the Closing. On the Closing Date, Parent shall enter into customary indemnification agreements reasonably satisfactory to the Company with the individuals set forth on <u>Section 7.17</u> of the Parent Disclosure Letter, which indemnification agreements shall continue to be effective following the Closing.

Section 7.18 <u>Affiliate Matters</u>. Prior to the Closing, the Company shall terminate, or cause to be terminated, all Contracts set forth on <u>Section 7.18</u> of the Company Disclosure Letter, in each case without any outstanding liabilities or obligations (financial or otherwise) to the Surviving Entity following the Closing.

Section 7.19 <u>Debt Payoff</u>. No later than three (3) Business Days prior to the Closing Date, the Company shall deliver to Parent a copy of the executed payoff letter (the "<u>Payoff Letter</u>") with respect to the Existing Credit Agreement, in a customary form, which Payoff Letter shall (a) specify the aggregate outstanding principal amount (including any accrued interest and/or fees to be paid in kind), all accrued and unpaid interest, all outstanding fees and all other amounts owing (including breakage costs, prepayment or redemption penalties or premiums) that constitute the payoff amount under the Existing Credit Agreement (the "<u>Payoff Amount</u>") and (b) acknowledge that upon receipt of the Payoff Amount, the Existing Credit Agreement and all related instruments evidencing Indebtedness under the Existing Credit Agreement (including any guarantees, Liens and collateral documents) shall be terminated or satisfied and discharged.

Section 7.20 <u>Release</u>.

(a) Effective upon and following the Closing, Parent, on its own behalf and on behalf of its respective Affiliates and Representatives, generally, irrevocably, unconditionally and completely releases and forever discharges each holder of Company Interests, each of their respective Affiliates and each of their and their respective Affiliates' respective Released Related Parties, and each of their respective successors and assigns and each of their respective Released Related Parties (collectively, the "<u>Company Released Parties</u>") from all disputes, claims, losses, controversies, demands, rights, liabilities, actions and causes of action of every kind and nature, whether known or unknown, arising from any matter concerning the Company occurring prior to the Closing Date (other than as contemplated by this Agreement), including for controlling equityholder liability or breach of any fiduciary duty relating to any pre-Closing actions or failures to act by the Company Released Parties; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 7.20</u> shall release any Company Released Parties from: (i) their obligations under this Agreement or the other Transaction Agreements; (ii) as applicable, any disputes, claims, losses, controversies, demands, rights, liabilities, breaches of fiduciary duty, actions and causes of action arising out of such Company Released Party's employment by the Company; or (iii) any claim based on Actual Fraud.

(b) Effective upon and following the Closing, each holder of Company Interests, on its own behalf and on behalf of each of its Affiliates and Representatives, generally, irrevocably, unconditionally and completely releases and forever discharges Parent, First Merger Sub, Second Merger Sub and the Company, each of their respective Affiliates and each of their and their respective Affiliates' respective Released Related Parties, and each of their respective successors and assigns and each of their respective Released Related Parties (collectively, the "<u>Parent Released Parties</u>") from all disputes, claims, losses, controversies, demands, rights, liabilities, actions and causes of action of every kind and nature, whether known or unknown, arising from any matter concerning the Company occurring prior to the Closing Date (other than as contemplated by this Agreement, including with respect to <u>Section 7.15</u>); <u>provided</u>, <u>however</u>, that nothing in this <u>Section 7.20</u> shall release the Parent Released Parties from their obligations: (i) under this Agreement or the other Transaction Agreements; (ii) with respect to any salary, bonuses, vacation pay or employee benefits accrued pursuant to a Benefit Plan in effect as of the date of this Agreement or any expense reimbursement pursuant to a policy of the Company in effect as of the date of this Agreement and consistent with past practice; or (iii) any claim based on Actual Fraud.

Section 7.21 <u>PIPE Investment</u>.

(a) Unless otherwise approved in writing by the Company, neither Parent nor its Affiliates shall permit any amendment or modification to be made to, any waiver (in whole or in part) or provide consent to (including consent to termination), of any provision or remedy under, or any replacements of, any of the Subscription Agreements in a manner materially adverse to the Company. Parent shall take, or cause to be taken, all commercially reasonable actions and do, or cause to be done, all commercially reasonable things necessary, proper or advisable to consummate the transactions contemplated by the Subscription Agreements on the terms and conditions described therein, including maintaining in effect the Subscription Agreements and using its commercially reasonable efforts to: (i) satisfy in all material respects on a timely basis all conditions and covenants applicable to Parent in the Subscription Agreements and otherwise comply with its obligations thereunder, (ii) in the event that all conditions to the investor's obligation to fund in the Subscription Agreements (other than conditions that Parent or any of its Affiliates exclusively control the satisfaction of and other than those conditions that by their nature are to be satisfied at the Closing) have been satisfied, consummate transactions contemplated by the Subscription Agreements at or prior to Closing; (iii) deliver any required notices to counterparties to the Subscription Agreements sufficiently in advance of the Closing to cause them, in the event that all conditions to the investor's obligation to fund in the Subscription Agreements are satisfied (other than those conditions that by their nature are to be satisfied at the Closing), to fund their obligations at or prior to or concurrently with the Closing; and (iv) without limiting the Company's rights to enforce such Subscription Agreements pursuant to <u>Section 11.6</u>, enforce its rights under the Subscription Agreements in the event that all conditions to the investor's obligation to fund in the Subscription Agreements (other than conditions that Parent or any of its Affiliates control the satisfaction of and other than those conditions that by their nature are to be satisfied at the Closing) have been satisfied, to cause the applicable PIPE Investors to pay to (or as directed by) Parent the applicable portion of the PIPE Investment Amount, as applicable, set forth in the Subscription Agreements in accordance with their terms.

(b) Without limiting the generality of the foregoing, Parent shall give the Company prompt written notice: (i) of any material amendment to any Subscription Agreement (other than as a result of any assignments or transfers contemplated therein or otherwise permitted thereby); (ii) of any material breach or default (or any event or circumstance that, with or without notice, lapse of time or both, would be reasonably likely to give rise to any material breach or default) by any party to any Subscription Agreement known to Parent; (iii) of the receipt of any written notice or other written communication from any party to any Subscription Agreement with respect to any actual, potential, threatened or claimed expiration, lapse, withdrawal, material breach, material default, termination or repudiation by any party to any Subscription Agreement or any material provisions of any Subscription Agreement; and (iv) if Parent does not expect to receive all or any portion of the PIPE Investment Amount on the terms, in the manner or from the PIPE Investors as contemplated by the Subscription Agreements. Parent shall deliver all notices it is required to deliver under the Subscription Agreements on a timely basis in order to cause, in the event that all conditions to the investor's obligation to fund in the Subscription Agreements are satisfied (other than those conditions that by their nature are to be satisfied at the Closing), the PIPE Investors to consummate the PIPE Investment concurrently with the Closing and shall take all actions required under any Subscription Agreements with respect to the timely issuance and delivery of any physical certificates evidencing the shares of Parent Class A Common Stock as and when required under any such Subscription Agreements.

63

(c) In the event any portion of the PIPE Investment becomes unavailable on the terms and conditions contemplated in the Subscription Agreements, Parent and the Company shall (and shall direct their respective financial advisors to) cooperate in good faith and use their respective commercially reasonable efforts to arrange and obtain as promptly as reasonably practicable following the occurrence of such event alternative financing on terms and conditions no less favorable, in the aggregate, than those contained in the Subscription Agreements ("Alternative Financing") from alternative sources (the "Alternative Financing Source") equal to such portion of the PIPE Investment that becomes unavailable. If and to the extent a definitive subscription agreement is entered into with respect to Alternative Financing, and subject to the terms and conditions of this Agreement, Section 7.21(a) and Section 7.21(b) shall apply to such Alternative Financing *mutatis mutandis*.

Section 7.22 Employee Matters.

(a) Parent shall or shall cause the Surviving Entity to provide, during the period between the Effective Time and the one (1) year anniversary of the Effective Time (or, if shorter, the period of employment of the relevant employee) (the "Continuation Period"), the employees of the Company who remain employed immediately after the Effective Time (the "Continuing Employees") with (i) a base salary or base wage rate no less favorable to each Continuing Employee than the base salary or base wage rate applicable thereto immediately prior to the Effective Time; (ii) an incentive cash compensation opportunity (excluding nonqualified deferred compensation, change in control bonus, transaction bonus, retention, long-term cash compensation and equity or equity-based compensation) no less favorable to each Continuing Employee than the incentive compensation opportunity (excluding nonqualified deferred compensation, change in control bonus, transaction bonus, retention, long-term cash compensation and equity or equity-based compensation) applicable thereto immediately prior to the Effective Time; and (iii) employee benefits (excluding nonqualified deferred compensation, defined benefit pension, retiree or post-termination health or welfare, and equity or equity-based benefits) substantially comparable in the aggregate to the employee benefits (excluding nonqualified deferred compensation, defined benefit pension, retiree or post-termination health or welfare, severance, and equity or equity-based benefits) provided to the Continuing Employees under the Benefit Plans in effect immediately prior to the Effective Time.

(b) Parent shall or shall cause the Surviving Entity to (i) provide the Continuing Employees with credit for purposes of eligibility to participate and vesting, and solely for the purposes of determining the level of paid time off benefits, as applicable, under any employee benefit plan, program or arrangement (other than nonqualified deferred compensation, defined benefit pension, retiree or post-termination health or welfare, and equity or equity-based plans, programs or arrangements) established or maintained by the Surviving Entity or any of its Subsidiaries in which the Continuing Employees are eligible to participate during the Continuation Period (the "New Plans") for service accrued or deemed accrued prior to the Effective Time with the Company, including, but not limited to, New Plans that are vacation plans or arrangements, 401(k) plans and any welfare plans, to the same extent and for the same purposes as recognized under the comparable Benefit Plan in effect immediately prior to the Closing Date; provided, however, that such service shall not be credited to the extent it would result in a duplication of any benefit, coverage or compensation or the funding of any such benefit or compensation; and (ii) use commercially reasonable efforts to, with respect to the applicable plan year in which the Effective Time occurs, (A) cause to be waived any eligibility waiting periods, any evidence of insurability requirements and the application of any pre-existing condition limitations under each New Plan that is a group health plan for the Continuing Employees or their eligible, covered dependents to the extent that such periods, requirements or limitations did not apply or were satisfied by the Continuing Employees or their eligible, covered dependents under the comparable Benefit Plan in effect immediately prior to the Effective Time, and (B) cause any eligible expenses incurred by any Continuing Employee and his or her eligible, covered dependents, during the portion of the plan year prior to the Closing, under those Benefit Plans that are group health plans in which such Continuing Employee currently participates to be taken into account under the comparable New Plans that are group health plans in which such Continuing Employee participates subsequent to the Closing Date for purposes of satisfying any deductible, coinsurance, and maximum out-of-pocket requirements applicable to such Continuing Employee and his or her eligible, covered dependents for the applicable plan year.

(c) The provisions of this Section 7.22 and Section 7.26 are solely for the benefit of the Parties, and nothing contained in this Agreement, express or implied, shall confer upon any Continuing Employee or legal representative or beneficiary or dependent thereof, or any other Person, any rights or remedies of any nature or kind whatsoever under or by reason of this Agreement, whether as a third-party beneficiary or otherwise, including any right to employment or service or continued employment or service for any specified period, any particular term or condition of employment or service, or level of compensation or benefits. Nothing contained in this Agreement, express or implied, shall constitute an establishment, termination, amendment or modification of any Benefit Plan, New Plan or any other compensation or benefit plan, policy, program, agreement or arrangement of the Company, Parent or any of their respective Affiliates or shall require the Company, Parent, the Surviving Entity and each of their respective Affiliates to continue any Benefit Plan, New Plan or other compensation or benefit plan, policy, program, agreement or arrangement, or prevent the establishment, amendment, modification or termination or benefit or compensation plan, program, policy, agreement, or arrangement at any time assumed, established, sponsored or maintained by any of them.

Section 7.23 Sponsor Agreement. Unless otherwise approved in writing by the Company, Parent shall not make any amendment or modification to, or any waiver (in whole or in part) of, any provision or remedy under, or consent to the termination or replacement of, the Sponsor Agreement.

Section 7.24 Parent A&R Bylaws. On or effective as of the Closing Date, Parent shall cause the Parent A&R Bylaws, in substantially the form attached hereto as Exhibit D, to be adopted.

Section 7.25 Certain Transaction Agreements. At the Closing, (a) Parent shall use reasonable best efforts to cause each Parent Stockholder that mutually agreed to be party to the A&R Registration Rights Agreement to deliver to the Company a copy of such agreement duly executed by such Parent Stockholder, and (b) the Company shall use reasonable best efforts to cause each Company Stockholder that mutually agreed to be a party thereto to deliver to Parent copies of the A&R Registration Rights Agreement and Lockup Agreement duly executed by such Company Stockholder.

Section 7.26 Company Stock Plans. At or prior to the Effective Time, the Company and the Company board of directors (including any committee thereof which governs or administers the Company Stock Plans or the Company Equity Awards), as applicable, shall adopt any resolutions, obtain any consents, provide any notices and take any actions which are necessary and sufficient to cause (i) the Company Stock Plans to terminate and (ii) all Company Equity Awards that are outstanding as of the Effective Time to be assumed by Parent (subject to the approval of the Parent Stockholder Matters as contemplated in Section 7.3(a)), as provided for in Section 2.6.

Section 7.27 Repurchase. As of immediately following the Second Effective Time, Parent shall use a portion of the PIPE Investment Amount equal to the Aggregate Repurchase Price (as defined in the Repurchase Agreement) to repurchase shares of Parent Class A Common Stock issued to the Selling Company Holder in the Mergers at a purchase price of $10.00 per share, in accordance with the terms and subject to the conditions of the Repurchase Agreement (the "Repurchase").

Section 7.28 Intellectual Property Matters. At or prior to the Effective Time, the Company shall use reasonable best efforts to deliver, or cause to be delivered to Parent all instruments of assignment and transfer as may be reasonably requested by Parent to vest in the Surviving Entity all of the Company's right, title, and interest in and to the Owned Intellectual Property free and clear of all Liens (other than Permitted Liens), including duly executed assignments to the Surviving Entity of all Owned Intellectual Property in a form suitable for recording in the U.S. Patent and Trademark Office or equivalent offices in foreign jurisdictions.

Section 7.29 PCAOB Audited Financials. The Company shall deliver true and complete copies of the audited balance sheets as of December 31, 2019 and 2018 and statements of operations, statements of changes in stockholders' deficit and statements of cash flows of the Company for the years ended December 31, 2019 and 2018 together with the auditor's reports thereon, each audited in accordance with the auditing standards of the Public Company Accounting Oversight Board (collectively, the "PCAOB Audited Financials") not later than 30 days from the date hereof.

ARTICLE VIII.
CONDITIONS TO THE TRANSACTION

Section 8.1 Conditions to Obligations of Each Party's Obligations. The respective obligations of each Party to this Agreement to effect the Mergers and the other Transactions shall be subject to the satisfaction at or prior to the Closing of the following conditions:

(a) The Stockholder Written Consent, constituting the Requisite Company Stockholder Approval, shall have been delivered to Parent, and shall remain in full force and effect.

(b) At the Parent Special Meeting (including any adjournments thereof permitted by Section 7.5(a)), the Requisite Parent Stockholder Approval shall have been obtained.

(c) Parent shall have at least $5,000,001 of net tangible assets following the exercise by the holders of Parent Class A Common Stock issued in Parent's initial public offering of securities and outstanding immediately before the Closing of their right to convert their Parent Class A Common Stock held by them into a pro rata share of the Trust Account in accordance with Parent's Charter Documents.

(d) All applicable waiting periods (and any extensions thereof) under the HSR Act will have expired or otherwise been terminated.

(e) No provision of any applicable Law prohibiting, enjoining or making illegal the consummation of the Transactions shall be in effect and no temporary, preliminary or permanent Order enjoining or making illegal the consummation of the Transactions will be in effect or will be threatened in writing by a Governmental Entity.

(f) The shares of Parent Class A Common Stock to be issued in connection with the Closing shall have been approved for listing on the Nasdaq, subject only to the requirement to have a sufficient number of round lot holders and official notice of issuance.

(g) The Registration Statement shall have become effective and no stop order suspending the effectiveness of the Registration Statement shall be in effect and no proceedings for that purpose shall be pending before or threatened by the SEC.

Section 8.2 <u>Additional Conditions to Obligations of the Company</u>. The obligations of the Company to consummate and effect the Mergers and the other Transactions shall be subject to the satisfaction at or prior to the Closing of each of the following conditions, any of which may be waived, in writing, exclusively by the Company:

(a) The Fundamental Representations of Parent shall be true and correct in all material respects (without giving effect to any limitation as to "materiality" or "Parent Material Adverse Effect" or any similar limitation contain herein) on and as of the date hereof and the Closing Date as though made on and as of the date hereof and the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date); and all other representations and warranties of Parent set forth in <u>ARTICLE V</u> hereof shall be true and correct (without giving effect to any limitation as to "materiality" or "Parent Material Adverse Effect" or any similar limitation contained herein) on and as of date hereof and the Closing Date as though made on and as of date hereof and the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date), except where the failure of such representations and warranties of Parent to be so true and correct, individually or in the aggregate, has not had and is not reasonably likely to have a Parent Material Adverse Effect.

(b) Parent, First Merger Sub and Second Merger Sub shall have performed or complied with all agreements and covenants required by this Agreement to be performed or complied with by them on or prior to the Closing Date, in each case in all material respects.

(c) Parent shall have delivered to the Company a certificate, signed by an executive officer of Parent and dated as of the Closing Date, certifying as to the matters set forth in <u>Section 8.2(a)</u> and <u>Section 8.2(b)</u>.

(d) The persons listed on <u>Section 8.2(d)</u> of the Company Disclosure Letter shall have resigned from all of their positions and offices with Parent.

(e) Parent shall have delivered or shall stand ready to deliver all of the certificates, instruments, Contracts and other documents specified to be delivered by it hereunder, including copies of the documents to be delivered by Parent pursuant to <u>Section 1.3(a)</u>, duly executed by Parent, First Merger Sub and Second Merger Sub, as applicable, and there shall been no amendment, modification or termination of the Sponsor Agreement except as permitted pursuant to <u>Section 7.23</u>.

(f) Parent shall have made appropriate arrangements to have the Trust Account, less amounts paid and to be paid pursuant to <u>Section 7.14</u>, available to Parent for payment of the Company Transaction Costs and the Parent Transaction Costs at the Closing.

(g) The amount of Parent Cash at the Closing, *minus* the aggregate amount of cash proceeds that will be required to satisfy the Parent Stockholder Redemptions, shall equal or exceed the Parent Minimum Cash.

Section 8.3 <u>Additional Conditions to the Obligations of Parent, First Merger Sub and Second Merger Sub</u>. The obligations of Parent, First Merger Sub and Second Merger Sub to consummate and effect the Mergers and the other Transactions shall be subject to the satisfaction at or prior to the Closing of each of the following conditions, any of which may be waived, in writing, exclusively by Parent:

(a) The Fundamental Representations of the Company shall be true and correct in all material respects (without giving effect to any limitation as to "materiality" or "Company Material Adverse Effect" or any similar limitation contain herein) on and as of the date hereof and the Closing Date as though made on and as of the date hereof and the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date); and all other representations and warranties of the Company set forth in <u>ARTICLE IV</u> hereof shall be true and correct (without giving effect to any limitation as to "materiality" or "Company Material Adverse Effect" or any similar limitation contained herein) on and as of the date hereof and the Closing Date as though made on and as of the date hereof and the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date), except where the failure of such representations and warranties of the Company to be so true and correct, individually or in the aggregate, has not had and is not reasonably likely to have a Company Material Adverse Effect.

(b) The Company shall have performed or complied with all agreements and covenants required by this Agreement to be performed or complied with by it at or prior to the Closing Date, in each case in all material respects.

(c) Since the date of this Agreement, there shall not have occurred a Company Material Adverse Effect.

(d) The Company shall have delivered to Parent a certificate, signed by an executive officer of the Company and dated as of the Closing Date, certifying as to the matters set forth in Section 8.3(a), Section 8.3(b) and Section 8.3(c).

(e) The persons listed on Section 8.3(e) of the Parent Disclosure Letter shall have resigned from all of their positions and offices with the Company.

(f) The Company shall have delivered, or caused to be delivered, or shall stand ready to deliver all of the certificates, instruments, Contracts and other documents specified to be delivered by it hereunder, including copies of the documents to be delivered pursuant to Section 1.3(b), duly executed.

ARTICLE IX.

TERMINATION

Section 9.1 Termination. This Agreement may be terminated at any time prior to the Closing:

(a) by mutual written agreement of Parent and the Company at any time;

(b) by either Parent or the Company if the Transactions shall not have been consummated by April 7, 2021 (the "Outside Date"); provided, however, that the right to terminate this Agreement under this Section 9.1(b) shall not be available to any Party whose action or failure to act has been a principal cause of or resulted in the failure of the Transactions to occur on or before such date and such action or failure to act constitutes a breach of this Agreement;

(c) by either Parent or the Company if a Governmental Entity shall have issued an Order having the effect of permanently restraining, enjoining or otherwise prohibiting the Transactions, including the Mergers, which Order or other action is final and nonappealable;

(d) by the Company, upon a breach of any representation, warranty, covenant or agreement set forth in this Agreement on the part of Parent, First Merger Sub or Second Merger Sub, or if any representation or warranty of Parent, First Merger Sub or Second Merger Sub shall have become untrue, in either case such that the conditions set forth in ARTICLE VIII would not be satisfied as of the time of such breach or as of the time such representation or warranty shall have become untrue; provided, that if such breach by Parent, First Merger Sub or Second Merger Sub is curable by Parent, First Merger Sub or Second Merger Sub prior to the Closing, then the Company must first provide written notice of such breach and may not terminate this Agreement under this Section 9.1(d) until the earlier of: (i) thirty (30) days after delivery of written notice from the Company to Parent of such breach; and (ii) the Outside Date; provided, further, that each of Parent, First Merger Sub and Second Merger Sub continues to exercise commercially reasonable efforts to cure such breach (it being understood that the Company may not terminate this Agreement pursuant to this Section 9.1(d) if: (A) the Company shall have materially breached this Agreement and such breach has not been cured; or (B) such breach by Parent, First Merger Sub or Second Merger Sub is cured during such 30-day period);

68

(e) by Parent, upon a breach of any representation, warranty, covenant or agreement set forth in this Agreement on the part of the Company or if any representation or warranty of the Company shall have become untrue, in either case such that the conditions set forth in ARTICLE VIII would not be satisfied as of the time of such breach or as of the time such representation or warranty shall have become untrue; provided, that if such breach by the Company is curable by the Company prior to the Closing, then Parent must first provide written notice of such breach and may not terminate this Agreement under this Section 9.1(e) until the earlier of: (i) thirty (30) days after delivery of written notice from Parent to the Company of such breach; and (ii) the Outside Date; provided, further, that the Company continues to exercise commercially reasonable efforts to cure such breach (it being understood that Parent may not terminate this Agreement pursuant to this Section 9.1(e) if: (A) Parent shall have materially breached this Agreement and such breach has not been cured; or (B) such breach by the Company is cured during such 30-day period);

(f) by either Parent or the Company, if, at the Parent Special Meeting (including any adjournments thereof), the Requisite Parent Stockholder Approval shall not have been obtained;

(g) by Parent at any time prior to obtaining the Requisite Company Stockholder Approval if the board of directors of the Company shall have made a Company Change in Recommendation;

(h) by the Company at any time prior to obtaining the Requisite Parent Stockholder Approval if the board of directors of Parent shall have made a Parent Change in Recommendation;

(i) by Parent, in the event of a Written Consent Failure; or

(j) by the Company, if (i) the condition set forth in Section 8.2(g) becomes incapable of being satisfied at the Closing and (ii) a period of ten (10) Business Days has elapsed since such condition becomes incapable of being satisfied and, at the end of such period, such condition remains incapable of being satisfied at the Closing (after giving effect to any Alternative Financing).

Section 9.2 Notice of Termination; Effect of Termination.

(a) Any termination of this Agreement under Section 9.1 above will be effective immediately upon the delivery of written notice of the terminating Party to the other Parties.

(b) In the event of the termination of this Agreement as provided in Section 9.1, this Agreement shall be of no further force or effect and the Transactions shall be abandoned, and there shall be no liability hereunder on the part of any Party, except for and subject to the following: (i) Section 7.8(a) (*Confidentiality*), Section 7.11 (*No Claim Against Trust Account*), this Section 9.2, ARTICLE XI (*General Provisions*) and the Confidentiality Agreement shall survive the termination of this Agreement; and (ii) nothing herein shall relieve any Party from liability for any intentional breach of this Agreement or Actual Fraud.

ARTICLE X.

NO SURVIVAL

Section 10.1 <u>No Survival</u>. None of the representations, warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the Closing and all rights, claims and causes of action (whether in contract or in tort or otherwise, or whether at law or in equity) with respect thereto shall terminate at the Closing. Notwithstanding the foregoing, neither this <u>Section 10.1</u> nor anything else in this Agreement to the contrary shall limit: (a) the survival of any covenant or agreement of the Parties which by its terms is required to be performed or complied with in whole or in part after the Closing, which covenants and agreements shall survive the Closing in accordance with their respective terms; or (b) any claim against any Person with respect to Actual Fraud.

ARTICLE XI.

GENERAL PROVISIONS

Section 11.1 <u>Notices</u>. All notices and other communications hereunder shall be in writing and shall be deemed given: (a) on the date established by the sender as having been delivered personally; (b) one Business Day after being sent by a nationally recognized overnight courier guaranteeing overnight delivery; (c) upon transmission, if sent by email (provided no "bounceback" or notice of non-delivery is received); or (d) on the fifth Business Day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications, to be valid, must be addressed as follows:

if to Parent, First Merger Sub or Second Merger Sub, to:

> Stable Road Acquisition Corp.
> 1345 Abbott Kinney Boulevard
> Venice, CA 90291
> Attention:     Brian Kabot
>                Juan Quiroga
> E-mail:        brian@stableroadcapital.com
>                juan@nalainvestments.com

with a copy (which shall not constitute notice) to:

> Kirkland & Ellis LLP
> 300 North LaSalle
> Chicago, IL 60654
> Attention:     Douglas C. Gessner, P.C.
>                Bradley C. Reed, P.C.
>                Kevin M. Frank
> E-mail:        douglas.gessner@kirkland.com
>                bradley.reed@kirkland.com
>                kevin.frank@kirkland.com

if to the Company, prior to the Closing, to:

> Momentus Inc.
> 3050 Kenneth St.
> Santa Clara, CA 95054
> Attention: Alexander Fishkin
> E-mail: alex@momentus.space

70

with a copy (which shall not constitute notice) to:

> Orrick, Herrington & Sutcliffe LLP
> 631 Wilshire Blvd, Suite 2-C
> Santa Monica, CA 90401
> Attention:    Daniel S. Kim
>                   Hari Raman
>                   Albert W. Vanderlaan
> E-mail:        dan.kim@orrick.com
>                   hraman@orrick.com
>                   avanderlaan@orrick.com

or to such other address or to the attention of such Person or Persons as the recipient Party has specified by prior written notice to the sending Party (or in the case of counsel, to such other readily ascertainable business address as such counsel may hereafter maintain). If more than one method for sending notice as set forth above is used, the earliest notice date established as set forth above shall control.

Section 11.2 <u>Interpretation</u>. The words "hereof," "herein," "hereinafter," "hereunder," and "hereto" and words of similar import refer to this Agreement as a whole and not to any particular section or subsection of this Agreement and reference to a particular section of this Agreement will include all subsections thereof, unless, in each case, the context otherwise requires. The definitions of the terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context shall require, any pronoun shall include the corresponding masculine, feminine and neuter forms. When a reference is made in this Agreement to an Exhibit, such reference shall be to an Exhibit to this Agreement unless otherwise indicated. When a reference is made in this Agreement to Sections or subsections, such reference shall be to a Section or subsection of this Agreement. Unless otherwise indicated the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation." The words "made available" mean, unless the context otherwise requires, that a copy of the subject documents or other materials has been provided to the party to which such information or material is to be provided or furnished no later than 9:00 a.m. ET at least two Business Days prior to the date of this Agreement via upload to the "Project Marvel - Legal Review" or "Project Marvel - Stable Road" virtual "data room" hosted by Intralinks, Inc. set up by the Company in connection with this Agreement. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. When reference is made herein to "the business of" an entity, such reference shall be deemed to include the business of all direct and indirect Subsidiaries of such entity. Reference to the Subsidiaries of an entity shall be deemed to include all direct and indirect Subsidiaries of such entity. The word "or" shall be disjunctive but not exclusive. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and if the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day. References to a particular statute or regulation including all rules and regulations thereunder and any predecessor or successor statute, rule, or regulation, in each case as amended or otherwise modified from time to time. All references to currency amounts in this Agreement shall mean United States dollars.

Section 11.3 <u>Counterparts; Electronic Delivery</u>. This Agreement, the Transaction Agreements and each other document executed in connection with the Transactions, and the consummation thereof, may be executed in one or more counterparts, all of which shall be considered one and the same document and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Parties, it being understood that all Parties need not sign the same counterpart. The Parties agree that the delivery of this Agreement, the Transaction Agreements and each other document executed in connection with the Transactions, may be effected by means of an exchange and release of electronically transmitted signatures (including by electronic mail in.pdf format). Delivery by electronic transmission to counsel for the other Parties of a counterpart executed by a Party shall be deemed to meet the requirements of the previous sentence.

Section 11.4 <u>Entire Agreement; Third Party Beneficiaries</u>. This Agreement and the other Transaction Agreements: (a) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof; and (b) other than the rights, at and after the Effective Time, of Persons pursuant to the provisions of <u>Section 7.15</u> (*Directors' and Officers' Liability Insurance*) and <u>Section 11.14</u> (*No Recourse*) (which will be for the benefit of the Persons set forth therein), are not intended to confer upon any other Person other than the Parties any rights or remedies.

Section 11.5 <u>Severability</u>. In the event that any term, provision, covenant or restriction of this Agreement, or the application thereof, is held to be illegal, invalid or unenforceable under any present or future Law: (a) such provision will be fully severable; (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom; and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms of such illegal, invalid or unenforceable provision as may be possible.

Section 11.6 <u>Other Remedies; Specific Performance</u>. Except as otherwise provided herein, prior to the Closing, any and all remedies herein expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy. The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that each Party shall be entitled to enforce specifically the terms and provisions of this Agreement in any court of the United States or any state having jurisdiction and immediate injunctive relief to prevent breaches of this Agreement, without the necessity of proving the inadequacy of money damages as a remedy and without bond or other security being required, this being in addition to any other remedy to which they are entitled at law or in equity. Each of the Parties hereby acknowledges and agrees that it may be difficult to prove damages with reasonable certainty, that it may be difficult to procure suitable substitute performance, and that injunctive relief and/or specific performance will not cause an undue hardship to the Parties. Each of the Parties hereby further acknowledges that the existence of any other remedy contemplated by this Agreement does not diminish the availability of specific performance of the obligations hereunder or any other injunctive relief. Each Party hereby further agrees that in the event of any action by any other party for specific performance or injunctive relief, it will not assert that a remedy at law or other remedy would be adequate or that specific performance or injunctive relief in respect of such breach or violation should not be available on the grounds that money damages are adequate or any other grounds. Parent acknowledges and agrees that the Company shall be entitled to bring an action for specific enforcement to cause Parent to seek to enforce the provisions of the Subscription Agreements to the fullest extent permissible pursuant to such Subscription Agreements as if it were a party thereto.

Section 11.7 <u>Governing Law</u>. This Agreement and the consummation the Transactions, and any action, suit, dispute, controversy or claim arising out of this Agreement and the consummation of the Transactions, or the validity, interpretation, breach or termination of this Agreement and the consummation of the Transactions, shall be governed by and construed in accordance with the internal law of the State of Delaware regardless of the law that might otherwise govern under applicable principles of conflicts of law thereof.

Section 11.8 <u>Consent to Jurisdiction; Waiver of Jury Trial</u>.

(a) Each of the Parties irrevocably consents to the exclusive jurisdiction and venue of the Court of Chancery of the State of Delaware; <u>provided</u>, that if the Court of Chancery of Delaware declines jurisdiction or if subject matter jurisdiction over the matter that is the subject of the Legal Proceeding is vested exclusively in the U.S. federal courts, such Legal Proceeding shall be heard in, and each of the Parties irrevocably consents to the exclusive jurisdiction and venue of, the U.S. District Court for the District of Delaware; <u>provided, further</u>, that if the U.S. District Court for the District of Delaware declines jurisdiction or if subject matter jurisdiction over the matter that is the subject of the Legal Proceeding is vested exclusively in the Delaware state courts, such Legal Proceeding shall be heard in, and each of the Parties irrevocably consents to the exclusive jurisdiction and venue of, the Delaware state courts located in Wilmington, Delaware (together with the U.S. District Court for the District of Delaware and the Court of Chancery of the State of Delaware, the "<u>Chosen Courts</u>") in connection with any matter based upon or arising out of this Agreement, the other Transaction Agreements and the consummation of the Transactions. Each Party and any Person asserting rights as a third-party beneficiary may do so only if he, she or it hereby waives, and shall not assert as a defense in any legal dispute, that: (i) such Person is not personally subject to the jurisdiction of the Chosen Courts for any reason; (ii) such Legal Proceeding may not be brought or is not maintainable in the Chosen Courts; (iii) such Person's property is exempt or immune from execution; (iv) such Legal Proceeding is brought in an inconvenient forum; or (v) the venue of such Legal Proceeding is improper. Each Party and any Person asserting rights as a third-party beneficiary hereby agrees not to commence or prosecute any such action, claim, cause of action or suit other than before the Chosen Courts, nor to make any motion or take any other action seeking or intending to cause the transfer or removal of any such action, claim, cause of action or suit to any court other than the Chosen Courts, whether on the grounds of inconvenient forum or otherwise. Each Party hereby consents to service of process in any such proceeding in any manner permitted by laws of the State of Delaware, and further consents to service of process by nationally recognized overnight courier service guaranteeing overnight delivery, or by registered or certified mail, return receipt requested, at its address specified pursuant to <u>Section 11.1</u>, and waives and covenants not to assert or plead any objection which they might otherwise have to such manner of service of process. Notwithstanding the foregoing in this <u>Section 11.8</u>, any Party may commence any action, claim, cause of action or suit in a court other than the Chosen Courts solely for the purpose of enforcing an order or judgment issued by the Chosen Courts.

(b) TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH OF THE PARTIES AND ANY PERSON ASSERTING RIGHTS AS A THIRD-PARTY BENEFICIARY WAIVES ANY RIGHT TO TRIAL BY JURY ON ANY CLAIMS OR COUNTERCLAIMS ASSERTED IN ANY LEGAL DISPUTE RELATING TO THIS AGREEMENT, EACH OTHER TRANSACTION AGREEMENTS AND THE CONSUMMATION OF THE TRANSACTIONS, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING. IF THE SUBJECT MATTER OF ANY SUCH LEGAL DISPUTE IS ONE IN WHICH THE WAIVER OF JURY TRIAL IS PROHIBITED, NO PARTY NOR ANY PERSON ASSERTING RIGHTS AS A THIRD-PARTY BENEFICIARY SHALL ASSERT IN SUCH LEGAL DISPUTE A NONCOMPULSORY COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION AGREEMENTS AND THE CONSUMMATION OF THE TRANSACTIONS. FURTHERMORE, NO PARTY NOR ANY PERSON ASSERTING RIGHTS AS A THIRD-PARTY BENEFICIARY SHALL SEEK TO CONSOLIDATE ANY SUCH LEGAL DISPUTE WITH A SEPARATE ACTION OR OTHER LEGAL PROCEEDING IN WHICH A JURY TRIAL CANNOT BE WAIVED.

73

Section 11.9 <u>Rules of Construction</u>. Each of the Parties agrees that it has been represented by independent counsel of its choice during the negotiation and execution of this Agreement and each Party hereto and its counsel cooperated in the drafting and preparation of this Agreement and the documents referred to herein and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the Party drafting such agreement or document.

Section 11.10 <u>Expenses</u>. Except as otherwise expressly provided in this Agreement, whether or not the Transactions are consummated, each Party will pay its own costs and expenses incurred in anticipation of, relating to and in connection with the negotiation and execution of this Agreement and the Transaction Agreements and the consummation of the Transactions; <u>provided</u>, that if the Closing shall occur, Parent shall (a) pay or cause to be paid, in accordance with <u>Section 1.4(g)</u>, the Company Transaction Costs to the extent not paid by the Company prior to the Closing and (b) pay or cause to be paid, in accordance with <u>Section 1.4(b)</u>, any Parent Transaction Costs. For the avoidance of doubt, any payments to be made (or to cause to be made) by Parent pursuant to this <u>Section 11.10</u> shall be paid only upon consummation of the Mergers and release of proceeds from the Trust Account.

Section 11.11 <u>Assignment</u>. No Party may assign, directly or indirectly, including by operation of law, either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Parties. Subject to the first sentence of this <u>Section 11.11</u>, this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns.

Section 11.12 <u>Amendment</u>. This Agreement may be amended by the Parties at any time by execution of an instrument in writing signed on behalf of each of the Parties.

Section 11.13 <u>Extension; Waiver</u>. At any time prior to the Closing, Parent (on behalf of itself, First Merger Sub and Second Merger Sub), on the one hand, and the Company (on behalf of itself and the holders of Company Interests) may, to the extent not prohibited by applicable Law: (a) extend the time for the performance of any of the obligations or other acts of the other Party; (b) waive any inaccuracies in the representations and warranties made to the other Party contained herein or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements or conditions for the benefit of such Party contained herein. Any agreement on the part of a Party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party. Delay in exercising any right under this Agreement shall not constitute a waiver of such right. In the event any provision of any of the other Transaction Agreement in any way conflicts with the provisions of this Agreement (except where a provision therein expressly provides that it is intended to take precedence over this Agreement), this Agreement shall control.

Section 11.14 <u>No Recourse</u>. Notwithstanding anything that may be expressed or implied in this Agreement, this Agreement may only be enforced against, and any Legal Proceeding for breach of this Agreement may only be made against, the entities that are expressly identified herein as Parties to this Agreement, and no Released Related Party of a Party shall have any liability for any liabilities or obligations of the Parties for any Legal Proceeding (whether in tort, contract or otherwise) for breach of this Agreement or in respect of any oral representations made or alleged to be made in connection herewith. No Party shall have any right of recovery in respect hereof against any Released Related Party of a Party and no personal liability shall attach to any Released Related Party of a Party through such Party, whether by or through attempted piercing of the corporate veil, by the enforcement of any judgment, fine or penalty or by virtue of any Law or otherwise. The provisions of this <u>Section 11.14</u> are intended to be for the benefit of, and enforceable by the Released Related Parties of the Parties and each such Person shall be a third-party beneficiary of this <u>Section 11.14</u>. This <u>Section 11.14</u> shall be binding on all successors and assigns of Parties.

Section 11.15 <u>Legal Representation</u>. Parent hereby agrees on behalf of its directors, members, partners, officers, employees and Affiliates (including after the Closing, the Company), and each of their respective successors and assigns (all such parties, the "<u>Waiving Parties</u>"), that Orrick, Herrington & Sutcliffe LLP (or any successor) may represent the holders of Company Interests or any of their respective directors, members, partners, officers, employees or Affiliates (other than the Company) (collectively, the "<u>Waiving Party Group</u>"), in each case, in connection with any Legal Proceeding or obligation arising out of or relating to this Agreement, any Transaction Agreement or the Transactions, notwithstanding its representation (or any continued representation) of the Company or other Waiving Parties, and each of Parent and the Company on behalf of itself and the Waiving Parties hereby consents thereto and irrevocably waives (and will not assert) any conflict of interest, breach of duty or any other objection arising therefrom or relating thereto. Parent and the Company acknowledge that the foregoing provision applies whether or not Orrick, Herrington & Sutcliffe LLP provides legal services to the Company after the Closing Date. Each of Parent and the Company, for itself and the Waiving Parties, hereby further irrevocably acknowledges and agrees that all communications, written or oral, between the Company or any member of the Waiving Party Group and its counsel, including Orrick, Herrington & Sutcliffe LLP, made prior to the Closing in connection with the negotiation, preparation, execution, delivery and performance under, or any dispute or Legal Proceeding arising out of or relating to, this Agreement, any Transaction Agreements or the Transactions, or any matter relating to any of the foregoing, are privileged communications that do not pass to the Company notwithstanding the Mergers, and instead survive, remain with and are controlled by the Waiving Party Group (the "<u>Privileged Communications</u>"), without any waiver thereof. Parent and the Company, together with any of their respective Affiliates, Subsidiaries, successors or assigns, agree that no Person may use or rely on any of the Privileged Communications, whether located in the records or email server of the Company or otherwise (including in the knowledge of the officers and employees of the Company), in any Legal Proceeding against or involving any of the Parties after the Closing, and Parent and the Company agree not to assert that any privilege has been waived as to the Privileged Communications, whether located in the records or email server of the Company or otherwise (including in the knowledge of the officers and employees of the Company).

Section 11.16 <u>Disclosure Letters and Exhibits</u>. The Company Disclosure Letter and Parent Disclosure Letter shall each be arranged in separate parts corresponding to the numbered and lettered sections and subsections in this Agreement, and the information disclosed in any numbered or lettered part shall be deemed to relate to and to qualify only the particular provision set forth in the corresponding numbered or lettered Section or subsection of this Agreement, except to the extent that: (a) such information is cross-referenced in another part of the Company Disclosure Letter or Parent Disclosure Letter, as applicable; or (b) it is reasonably apparent on the face of the disclosure (without any independent knowledge on the part of the reader regarding the matter disclosed) that such information qualifies another provision in this Agreement. The specification of any dollar amount in the representations and warranties contained in this Agreement or the inclusion of any specific item in the Company Disclosure Letter and Parent Disclosure Letter is not intended to imply that such amounts (or higher or lower amounts) are or are not material, and no Party shall use the fact of the setting of such amounts or the fact of the inclusion of any such item in the Company Disclosure Letter or Parent Disclosure Letter in any dispute or controversy between the Parties as to whether any obligation, item, or matter not described herein or included in Company Disclosure Letter or the Parent Disclosure Letter is or is not material for purposes of this Agreement. The inclusion of any item in the Company Disclosure Letter or Parent Disclosure Letter shall not be deemed to constitute an acknowledgment by the Company or Parent, as applicable, that the matter is required to be disclosed by the terms of this Agreement, nor shall such disclosure in and of itself be deemed (a) an admission of any breach or violation of any Contract or Law, (b) an admission of any liability or obligation to any third party, or (c) to establish a standard of materiality.

[*Signature Pages Follow*]

75

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed as of the date first written above.

**STABLE ROAD ACQUISITION CORP.**

By: /s/ Brian Kabot

Name: Brian Kabot

Title:  Chief Executive Officer

[SIGNATURE PAGE TO AGREEMENT AND PLAN OF MERGER]

76

**PROJECT MARVEL FIRST MERGER SUB, INC.**

By: /s/ Brian Kabot
—————————————————————
Name: Brian Kabot
Title:  President & Chief Executive Officer

[SIGNATURE PAGE TO AGREEMENT AND PLAN OF MERGER]

77

**PROJECT MARVEL SECOND MERGER SUB, LLC**

By: /s/ Brian Kabot

Name:Brian Kabot

Title:  President & Chief Executive Officer

[SIGNATURE PAGE TO AGREEMENT AND PLAN OF MERGER]

78

MOMENTUS INC.

By: /s/ Mikhail Kokorich

Name: Mikhail Kokorich
Title:  Chief Executive Officer

[SIGNATURE PAGE TO AGREEMENT AND PLAN OF MERGER]

79

**SCHEDULE A**
**DEFINED TERMS**

Section 1.1. <u>Defined Terms</u>. Terms defined in this Agreement are organized alphabetically as follows, together with the Section and, where applicable, paragraph, number in which definition of each such term is located:

| | |
|---|---|
| "<u>A&R Registration Rights Agreement</u>" | Recitals |
| "<u>Actual Fraud</u>" | Schedule A, Section 1.2 |
| "<u>Affiliate</u>" | Schedule A, Section 1.2 |
| "<u>Aggregate Stock Consideration</u>" | Schedule A, Section 1.2 |
| "<u>Agreement</u>" | Preamble |
| "<u>Alternative Financing</u>" | Section 7.21(c) |
| "<u>Alternative Financing Source</u>" | Section 7.21(c) |
| "<u>Antitrust Laws</u>" | Schedule A, Section 1.2 |
| "<u>Assumed Warrant</u>" | Section 2.6(b) |
| "<u>Audited Financial Statements</u>" | Section 4.7(a) |
| "<u>Base Value</u>" | Schedule A, Section 1.2 |
| "<u>Benefit Plans</u>" | Section 4.11(a) |
| "<u>Business Combination</u>" | Schedule A, Section 1.2 |
| "<u>Business Day</u>" | Schedule A, Section 1.2 |
| "<u>Business IP</u>" | Section 4.17(b) |
| "<u>CARES Act</u>" | Schedule A, Section 1.2 |
| "<u>Cash and Cash Equivalents</u>" | Schedule A, Section 1.2 |
| "<u>CEO Incentive Plan</u>" | Section 7.3(a) |
| "<u>Certificate</u>" | Section 2.6(a) |
| "<u>Certificates of Merger</u>" | Section 1.4(d) |
| "<u>Change of Control</u>" | Schedule A, Section 1.2 |
| "<u>Charter Documents</u>" | Section 4.1 |
| "<u>Chosen Courts</u>" | Section 11.8(a) |
| "<u>Claims or Assertions</u>" | Section 4.17(d) |
| "<u>Closing</u>" | Section 1.1 |
| "<u>Closing Date</u>" | Section 1.1 |
| "<u>Closing Form 8-K</u>" | Section 7.7(c) |
| "<u>Closing Indebtedness Amount</u>" | Schedule A, Section 1.2 |
| "<u>Closing Press Release</u>" | Section 7.7(c) |

80

"Code"                                          Schedule A, Section 1.2
"Commerce"                                       Schedule A, Section 1.2 (Definition of "Specified Business Conduct
                                                Laws")
"Common Share Price"                             Schedule A, Section 1.2
"Communications Plan"                            Section 7.8(b)
"Company"                                        Preamble
"Company Acquisition Proposal"                   Schedule A, Section 1.2
"Company Acquisition Transaction"                Schedule A, Section 1.2
"Company Benefit Plans"                          Section 4.11(a)
"Company Cash"                                   Schedule A, Section 1.2
"Company Change in Recommendation"               Section 7.4(b)
"Company Closing Statement"                       Section 1.2(b)
"Company Class A Common Stock"                    Schedule A, Section 1.2
"Company Class B Common Stock"                    Schedule A, Section 1.2
"Company Common Stock"                            Schedule A, Section 1.2
"Company Disclosure Letter"                       ARTICLE IV, Preamble
"Company Equity Awards"                           Schedule A, Section 1.2
"Company Interests"                               Schedule A, Section 1.2
"Company FF Preferred Stock"                       Schedule A, Section 1.2
"Company IT Systems"                               Schedule A, Section 1.2
"Company Material Adverse Effect"                  Schedule A, Section 1.2
"Company Material Contract"                        Section 4.19(a)
"Company Non-Plan Option"                          Schedule A, Section 1.2
"Company Option"                                   Schedule A, Section 1.2
"Company Preferred Stock"                          Schedule A, Section 1.2
"Company Privacy Notices"                          Section 4.18(a)
"Company Real Property Leases"                      Section 4.13(b)
"Company Recommendation"                           Section 4.4(b)
"Company Released Parties"                          Section 7.20(a)
"Company Restricted Stock"                          Schedule A, Section 1.2
"Company SAFE"                                       Schedule A, Section 1.2
"Company Series A Preferred Stock"                   Schedule A, Section 1.2
"Company Series A-1 Preferred Stock"                 Schedule A, Section 1.2
"Company Series Seed Preferred Stock"                Schedule A, Section 1.2
"Company Series Seed-1 Preferred Stock"              Schedule A, Section 1.2

81

| | |
|---|---|
| "Company Series Seed-2 Preferred Stock" | Schedule A, Section 1.2 |
| "Company Stock" | Schedule A, Section 1.2 |
| "Company Stock Adjusted Fully Diluted Shares" | Schedule A, Section 1.2 |
| "Company Stockholder" | Schedule A, Section 1.2 |
| "Company Stock Plans" | Schedule A, Section 1.2 |
| "Company Transaction Costs" | Schedule A, Section 1.2 |
| "Company Warrants" | Schedule A, Section 1.2 |
| "Confidentiality Agreement" | Schedule A, Section 1.2 |
| "Consent Solicitation Statement" | Section 7.3(a) |
| "Continuation Period" | Section 7.22(a) |
| "Continuing Employees" | Section 7.22(a) |
| "Contract" | Schedule A, Section 1.2 |
| "Copyrights" | Schedule A, Section 1.2 (Definition of "Intellectual Property") |
| "Data Security Requirements" | Section 4.18(a) |
| "D&O Indemnified Party" | Section 7.15(a) |
| "D&O Tail" | Section 7.15(b) |
| "DGCL" | Recitals |
| "Dissenting Shares" | Section 2.10(a) |
| "DLLCA" | Recitals |
| "Earnout Period" | Schedule A, Section 1.2 |
| "Effective Time" | Section 2.1 |
| "Employee Incentive Plan" | Section 7.3(a) |
| "Employee Incentive Plan Share Reserve" | Section 7.3(a) |
| "Employee Stock Purchase Plan" | Section 7.3(a) |
| "Employee Stock Purchase Plan Share Reserve" | Section 7.3(a) |
| "Environmental Law" | Schedule A, Section 1.2 |
| "ERISA" | Schedule A, Section 1.2 |
| "ERISA Affiliate" | Schedule A, Section 1.2 |
| "Exchange Act" | Schedule A, Section 1.2 |
| "Exchange Agent" | Section 2.8(b) |
| "Exchange Fund" | Section 2.8(c) |
| "Excluded Shares" | Section 2.6(i) |
| "Existing Credit Agreement" | Schedule A, Section 1.2 |

82

| | |
|---|---|
| "Families First Act" | Schedule A, Section 1.2 |
| "Financial Derivative/Hedging Arrangement" | Schedule A, Section 1.2 |
| "Financial Statements" | Section 4.7(a) |
| "First Certificate of Merger" | Section 1.4(c) |
| "First Merger" | Recitals |
| "First Merger Sub" | Preamble |
| "First Merger Sub Common Stock" | Section 5.3(b) |
| "Fundamental Representations" | Schedule A, Section 1.2 |
| "GAAP" | Schedule A, Section 1.2 |
| "Government Contract" | Schedule A, Section 1.2 |
| "Governmental Entity" | Schedule A, Section 1.2 |
| "Hazardous Material" | Schedule A, Section 1.2 |
| "HSR Act" | Schedule A, Section 1.2 |
| "Indebtedness" | Schedule A, Section 1.2 |
| "Insider" | Section 4.21 |
| "Insurance Policies" | Section 4.20 |
| "Intellectual Property" | Schedule A, Section 1.2 |
| "Intended Tax Treatment" | Section 2.12 |
| "Interim Financial Statements" | Section 4.7(a) |
| "IP License" | Schedule A, Section 1.2 |
| "Knowledge" | Schedule A, Section 1.2 |
| "Law" | Schedule A, Section 1.2 |
| "Leased Real Property" | Section 4.13(b) |
| "Legal Proceeding" | Schedule A, Section 1.2 |
| "Letter of Transmittal" | Section 2.8(d) |
| "Licensed Intellectual Property" | Schedule A, Section 1.2 |
| "Lien" | Schedule A, Section 1.2 |
| "Lockup Agreement" | Recitals |
| "Material Customers" | Section 4.24(a) |
| "Material Permits" | Section 4.6(b) |
| "Material Suppliers" | Section 4.24(b) |
| "Merger Materials" | Section 7.3(b) |
| "Mergers" | Recitals |
| "Nasdaq" | Section 5.12 |

83

| | |
|---|---|
| "New Plan" | Section 7.22(b) |
| "OFAC" | Schedule A, Section 1.2 |
| "Open Source Software" | Schedule A, Section 1.2 |
| "Order" | Schedule A, Section 1.2 |
| "Outside Date" | Section 9.1(b) |
| "Owned Intellectual Property" | Schedule A, Section 1.2 |
| "Parent" | Preamble |
| "Parent A&R Charter" | Recitals |
| "Parent A&R Charter" | Recitals |
| "Parent Acquisition Proposal" | Schedule A, Section 1.2 |
| "Parent Acquisition Transaction" | Schedule A, Section 1.2 |
| "Parent Cash" | Schedule A, Section 1.2 |
| "Parent Change in Recommendation" | Section 7.5(b) |
| "Parent Class A Common Stock" | Section 5.3(a) |
| "Parent Class B Common Stock" | Section 5.3(a) |
| "Parent Closing Statement" | Section 1.2(a) |
| "Parent Disclosure Letter" | ARTICLE V |
| "Parent Material Adverse Effect" | Schedule A, Section 1.2 |
| "Parent Material Contracts" | Section 5.11 |
| "Parent Minimum Cash" | Schedule A, Section 1.2 |
| "Parent Preferred Stock" | Section 5.3(a) |
| "Parent Proxy Statement" | Section 7.3(a) |
| "Parent Recommendation" | Recitals |
| "Parent Released Parties" | Section 7.20(b) |
| "Parent SEC Reports" | Section 5.7(a) |
| "Parent Shares" | Section 5.3(a) |
| "Parent Special Meeting" | Section 7.5 |
| "Parent Stockholder Matters" | Section 7.3(a) |
| "Parent Stockholder Redemptions" | Section 7.3(a) |
| "Parent Transaction Costs" | Schedule A, Section 1.2 |
| "Parent Units" | Schedule A, Section 1.2 |
| "Parent Warrants" | Section 5.3(a) |
| "Parties" | Preamble |
| "Patents" | Schedule A, Section 1.2 (Definition of "Intellectual Property") |

84

| | |
|---|---|
| "Payoff Amount" | Section 7.19 |
| "Payoff Letter" | Section 7.19 |
| "Payroll Tax Executive Order" | Schedule A, Section 1.2 |
| "PEO Benefit Plans" | Section 4.11(a) |
| "Permit" | Schedule A, Section 1.2 |
| "Permitted Lien" | Schedule A, Section 1.2 |
| "Person" | Schedule A, Section 1.2 |
| "Personal Information" | Schedule A, Section 1.2 |
| "Per Share Company Stock Consideration" | Schedule A, Section 1.2 |
| "PIPE Investment" | Recitals |
| "PIPE Investment Amount" | Section 5.13 |
| "PIPE Investors" | Recitals |
| "Privacy Laws" | Schedule A, Section 1.2 |
| "Private Placement Units" | Schedule A, Section 1.2 |
| "Private Placement Warrants" | Section 5.3(a) |
| "Privileged Communications" | Section 11.15 |
| "Public Warrants" | Section 5.3(a) |
| "Registration Statement" | Section 7.3(a) |
| "Released Claims" | Section 7.11 |
| "Released Related Parties" | Schedule A, Section 1.2 |
| "Remaining Trust Amount" | Schedule A, Section 1.2 (Definition of "Sponsor Contingent Closing Shares") |
| "Remedies Exception" | Section 4.4(a) |
| "Representatives" | Schedule A, Section 1.2 |
| "Repurchase" | Section 7.27 |
| "Repurchase Agreement" | Schedule A, Section 1.2 |
| "Requisite Company Stockholder Approval" | Section 7.3(a) |
| "Requisite Parent Stockholder Approval" | Section 7.3(a) |
| "Restricted Cash" | Schedule A, Section 1.2 |
| "Restrictive Covenant Agreement" | Recitals |
| "Retention Award Summary" | Section 4.11(b) |
| "Rollover Option" | Section 2.6(c) |
| "Rollover Restricted Stock" | Section 2.6(e) |
| "R&D Sponsor" | Schedule A, Section 1.2 |
| "Scheduled Intellectual Property" | Section 4.17(a) |

85

| | |
|---|---|
| "SEC" | Schedule A, Section 1.2 |
| "Second Certificate of Merger" | Section 1.4(d) |
| "Second Effective Time" | Section 2.1 |
| "Second Merger" | Recitals |
| "Second Merger Sub" | Preamble |
| "Securities Act" | Schedule A, Section 1.2 |
| "Selling Company Holder" | Schedule A, Section 1.2 |
| "Software" | Schedule A, Section 1.2 |
| "Specified Business Conduct Laws" | Schedule A, Section 1.2 |
| "Sponsor" | Schedule A, Section 1.2 |
| "Sponsor Agreement" | Recitals |
| "Sponsor Contingent Closing Shares" | Schedule A, Section 1.2 |
| "Sponsor Earnout Shares" | Section 3.1 |
| "State" | Schedule A, Section 1.2 (Definition of "Specified Business Conduct Laws") |
| "Stockholder Written Consent" | Section 7.4 |
| "Subscription Agreements" | Section 5.13 |
| "Subsidiary" | Schedule A, Section 1.2 |
| "Support Agreement" | Recitals |
| "Surrender Documentation" | Section 2.8(d) |
| "Surviving Corporation" | Recitals |
| "Surviving Entity" | Recitals |
| "Tax Return" | Schedule A, Section 1.2 |
| "Tax/Taxes" | Schedule A, Section 1.2 |
| "Trademarks" | Schedule A, Section 1.2 (Definition of "Intellectual Property") |
| "Trade Secrets" | Schedule A, Section 1.2 (Definition of "Intellectual Property") |
| "Transaction Agreements" | Schedule A, Section 1.2 |
| "Transactions" | Schedule A, Section 1.2 |
| "Treasury Regulations" | Schedule A, Section 1.2 |
| "Triggering Event I" | Schedule A, Section 1.2 |
| "Triggering Event II" | Schedule A, Section 1.2 |
| "Triggering Event III" | Schedule A, Section 1.2 |
| "Triggering Events" | Schedule A, Section 1.2 |
| "Trust Account" | Section 5.14(a) |

86

| | |
|---|---|
| "Trust Agreement" | Section 5.14(a) |
| "Trust Termination Letter" | Section 7.9 |
| "Trustee" | Section 5.14(a) |
| "Voting Stock" | Schedule A, Section 1.2 (Definition of "Change of Control") |
| "Waiving Parties" | Section 11.15 |
| "Waiving Party Group" | Section 11.15 |
| "WARN" | Section 4.12(e) |
| "Written Consent Failure" | Section 7.4 |
| "Written Consent Party" | Recitals |

Section 1.2. Additional Terms. For purposes of this Agreement, the following capitalized terms have the following meanings:

"Actual Fraud" shall mean with respect to a Party to this Agreement, an actual and intentional fraud with respect to the making of the representations and warranties pursuant to ARTICLE IV or ARTICLE V (as applicable), provided, that such actual and intentional fraud of such Person shall only be deemed to exist if any of the individuals included on Section 1.2 of the Company Disclosure Letter (in the case of the Company) or Section 1.2 of the Parent Disclosure Letter (in the case of Parent) had actual knowledge (as opposed to imputed or constructive knowledge) that the representations and warranties made by such Person pursuant to, in the case of the Company, ARTICLE IV as qualified by the Company Disclosure Letter, or, in the case of Parent, ARTICLE V as qualified by the Parent Disclosure Letter, were actually breached when made.

"Affiliate" shall mean, as applied to any Person, any other Person directly or indirectly controlling, controlled by or under direct or indirect common control with, such Person. For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. Notwithstanding the foregoing, in no event shall any investment fund or portfolio company controlling or under common control with any Written Consent Party or the Sponsor be considered an Affiliate of the Company or Parent.

"Aggregate Exercise Price" shall mean the sum of the aggregate cash exercise prices of all Company Warrants, Company Options and Company Non-Plan Options outstanding, unexercised and in the money as of immediately prior to the Effective Time.

"Aggregate Stock Consideration" shall mean a number of shares of Parent Class A Common Stock (deemed to have a value of $10.00 per share), equal to the quotient obtained by *dividing* (a) (i) the Base Value, *minus* (ii) the Closing Indebtedness Amount, *plus* (iii) the amount of the Company Cash as of the Closing, *plus* (iv) the Aggregate Exercise Price *by* (b) $10.00.

"Antitrust Laws" shall mean the HSR Act and any federal, state or foreign Law, regulation or decree designed to prohibit, restrict or regulate actions for the purpose or effect of monopolization or restraint of trade or the significant impediment of effective competition, including merger control procedures.

"Base Value" shall mean an amount equal to $1,131,000,000.

87

"Business Combination" has the meaning ascribed to such term is defined in Article II of Parent's Amended and Restated Certificate of Incorporation dated November 7, 2019.

"Business Day" shall mean any day other than a Saturday, a Sunday or other day on which commercial banks in New York, New York are authorized or required by Law to close.

"CARES Act" shall mean the Coronavirus Aid, Relief, and Economic Security Act (as may be amended or modified), together with all rules and regulations and guidance issued by any Governmental Entity with respect thereto.

"Cash and Cash Equivalents" shall mean the cash and cash equivalents, including checks, money orders, marketable securities, short-term instruments, negotiable instruments, funds in time and demand deposits or similar accounts on hand, in lock boxes, in financial institutions or elsewhere, together with all accrued but unpaid interest thereon, and all bank, brokerage or other similar accounts; provided that (a) Cash and Cash Equivalents shall be determined in accordance with GAAP; and (b) the amount of Cash and Cash Equivalents as of any given time shall be decreased by any Restricted Cash and any checks, drafts and wires issued as of such time that have not yet cleared.

"CCC" shall mean the California Corporations Code, as amended.

"Change of Control" means (a) the sale, conveyance or disposition in one or a series of transactions of all or substantially all of the assets of Parent and its significant Subsidiaries (taken together as a whole) to a third party, or any transaction that is subject to Rule 13e-3 of the Exchange Act, as amended, (b) the acquisition by any Person or "group" (as defined in the Exchange Act) directly or indirectly, of beneficial ownership of securities representing at least 50% or more of the voting power of the securities issued by Parent having the power to vote (measured by voting power rather than number of shares) in the election of directors of Parent ("Voting Stock"), or (c) the consolidation, merger or other business combination of Parent with or into any other Person or Persons, however effected, resulting in any Person or "group" (as defined in the Exchange Act) acquiring at least 50% of the combined voting power of the then outstanding securities of Parent or the surviving Person outstanding immediately after such combination; provided, however, that for the avoidance of doubt a Change of Control will not be deemed to have occurred in the case of clause (c) above in the case of (i) a consolidation, merger or other business combination in which holders of the Voting Stock immediately prior to such transaction continue after such transaction to hold, directly or indirectly, the same relative percentage of the securities issued by such surviving entity or entities having the power to vote the power to vote, or (ii) a migratory merger effected solely for the purpose of changing the jurisdiction of incorporation of Parent.

"Closing Indebtedness Amount" shall mean the aggregate outstanding principal amounts (including any accrued interest and/or fees to be paid in kind), all accrued and unpaid interest, all outstanding fees and all other amounts owing that constitute the payoff amounts (including any prepayment fees or penalties, if applicable) with respect to the Company's Indebtedness solely with respect to borrowed money as of the Closing.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

88

"Common Share Price" shall mean the maximum volume-weighted average price of one share of Parent Class A Common Stock as reported on Nasdaq (or the exchange on which the shares of Parent Class A Common Stock are then listed) and displayed under the heading "Bloomberg VWAP" on the Bloomberg page for the "<equity> AQR" page corresponding to the "ticker" for the Parent Class A Common Stock (or its equivalent successor if Bloomberg ceases to publish such price, or such page is not available) achieved for a period of at least twenty (20) days out of thirty (30) consecutive trading days ending on the trading day immediately prior to the date of determination (as adjusted as appropriate to reflect any stock splits, reverse stock splits, stock dividends (including any dividend or distribution of securities convertible into Parent Class A Common Stock), extraordinary cash dividend, reorganization, recapitalization, reclassification, combination, exchange of shares or other like change or transaction with respect to Parent Class A Common Stock) and determined without regard to after-hours trading or any other trading outside of the regular trading session trading hours.

"Company Acquisition Proposal" shall mean any inquiry, indication of interest, proposal or offer (other than an offer, indication of interest or proposal made or submitted by or on behalf of Parent or any of its Affiliates) contemplating or otherwise relating to any Company Acquisition Transaction.

"Company Acquisition Transaction" shall mean any transaction or series of related transactions (other than the Transactions) involving, directly or indirectly:

(a) any merger, consolidation, amalgamation, share exchange, business combination, joint venture, reorganization or other similar transaction involving the Company;

(b) any transaction (i) in which any Person or "group" (as defined in the Exchange Act and the rules thereunder) of Persons acquires beneficial or record ownership of securities (or instruments convertible into or exercisable or exchangeable for, such securities) representing 25% or more of the outstanding voting power of the Company; or (ii) in which the Company issues securities (or instruments convertible into or exercisable or exchangeable for, such securities) representing 25% or more of the outstanding voting power of the Company (after giving effect to such transaction);

(c) any sale, exchange, transfer, acquisition or disposition of 25% or more of the assets of the Company or of any business or businesses that constitute or account for 25% or more of the revenues or income of the Company;

(d) any tender offer or exchange offer that if consummated would result in any Person or "group" (as defined in the Exchange Act and the rules thereunder) of Persons acquiring beneficial or record ownership of securities (or instruments convertible into or exercisable or exchangeable for such securities) representing 25% or more of the outstanding voting power of the Company; or

(e) any combination of the foregoing types of transaction if the sum of the percentage of the voting power of the Company or of the revenues, income or assets of the Company involved is 25% or more.

"Company Cash" shall mean, as of the date or time of determination, an amount equal to all Cash and Cash Equivalents of the Company.

"Company Class A Common Stock" shall mean the shares of Class A Common Stock, par value $0.000001 per share, of the Company.

"Company Class B Common Stock" shall mean the shares of Class B Common Stock, par value $0.000001 per share, of the Company.

89

"Company Common Stock" shall mean shares of the Company Class A Common Stock and the Company Class B Common Stock.

"Company Equity Awards" means each Company Option, each Company Non-Plan Option, each award of Company Restricted Stock and each other compensatory award to any current or former director, officer, employee or other service provider of the Company of rights of any kind to receive any Company Stock under the Company Stock Plans or otherwise.

"Company FF Preferred Stock" shall mean the shares of FF Preferred Stock, par value $0.000001 per share, of the Company.

"Company Interests" shall mean the Company Stock (including Company Restricted Stock), Company Options, Company Non-Plan Options, Company Warrants and Company SAFEs.

"Company IT Systems" shall mean any and all information technology and computer systems, Software, firmware, hardware, networks and infrastructure, servers, interfaces, platforms, related systems, databases, and data communication equipment and lines, websites, facilities, and equipment owned or licensed by, or otherwise used by or for, or relied on by, the Company to process, store, transmit, maintain, backup or operate data, information and functions, whether or not in electronic format.

"Company Material Adverse Effect" shall mean any change, event, development, circumstance, or occurrence, that, individually or when aggregated with other changes, events, developments, circumstances or occurrences: (a) has had a materially adverse effect on the business, assets, liabilities, properties, condition (financial or otherwise) or results of operations of the Company; or (b) is reasonably likely to prevent or materially delay the ability of the Company to consummate the Transactions; provided, however, that no change, event, occurrence or effect arising out of or related to any of the following, alone or in combination, shall be taken into account in determining whether a Company Material Adverse Effect has occurred pursuant to the foregoing clause (a): (i) acts of war, sabotage, civil unrest or terrorism, or any escalation or worsening of any such acts of war, sabotage, civil unrest or terrorism, or changes in global, national, regional, state or local political or social conditions; (ii) earthquakes, hurricanes, tornados, pandemics (including COVID-19) or other natural or man-made disasters; (iii) the taking of any action required by this Agreement or changes attributable to the public announcement or pendency of the Transactions (including the impact thereof on relationships with customers, suppliers, employees or Governmental Entities); (iv) changes or proposed changes in applicable Law, regulations or interpretations thereof or decisions by courts or any Governmental Entity after the date of this Agreement; (v) changes or proposed changes in GAAP (or any interpretation thereof) after the date of this Agreement; (vi) any downturn in general economic conditions, including changes in the credit, debt, securities, financial, capital or reinsurance markets (including changes in interest or exchange rates, prices of any security or market index or commodity or any disruption of such markets), in each case, in the United States or anywhere else in the world; (vii) events or conditions generally affecting the industries and markets in which the Company operates including changes in interest rates; (viii) any failure to meet any projections, forecasts, estimates, milestones, budgets or financial or operating predictions of revenue, earnings, cash flow or cash position, provided that this clause (viii) shall not prevent a determination that any change, event, development, circumstance or occurrence underlying such failure has resulted in a Company Material Adverse Effect; (ix) any launch failure, crash, fatality, launch or flight delay, launch or flight cancellation; and (x) any actions required to be taken, or required not to be taken, pursuant to the terms of this Agreement; provided, however, that if a change or effect related to clauses (i), (ii) and (iv) through (vii) disproportionately adversely affects the Company, compared to other Persons operating in the same industry and geographies as the Company, then such disproportionate impact may be taken into account in determining whether a Company Material Adverse Effect has occurred.

"Company Non-Plan Option" shall mean a compensatory option to purchase any Company Stock granted outside of the terms and conditions of the Company Stock Plans.

"Company Option" shall mean an option to purchase any Company Stock pursuant to the Company Stock Plans.

"Company Preferred Stock" shall mean the shares of Company Series Seed Preferred Stock, Company Series Seed-1 Preferred Stock, Company Series Seed-2 Preferred Stock, Company Series A Preferred Stock and Company Series A-1 Preferred Stock.

"Company Restricted Stock" shall mean the restricted shares of Company Common Stock granted pursuant to the Company Stock Plans or otherwise, which includes any shares of Company Common Stock issued pursuant to early-exercised Company Options and any shares of Company Common Stock for which restrictions were subsequently imposed following their issuance that in each case, are subject to vesting based on the passage of time and/or the achievement of performance goals.

"Company SAFE" shall mean, in each case, an instrument containing a future right to shares of Company Stock.

"Company Series A Preferred Stock" shall mean the Series A Preferred Stock, par value $0.000001 per share, of the Company.

"Company Series A-1 Preferred Stock" shall mean the Series A-1 Preferred Stock, par value $0.000001 per share, of the Company.

"Company Series Seed Preferred Stock" shall mean the Series Seed Preferred Stock, par value $0.000001 per share, of the Company.

"Company Series Seed-1 Preferred Stock" shall mean the Series Seed-1 Preferred Stock, par value $0.000001 per share, of the Company.

"Company Series Seed-2 Preferred Stock" shall mean the Series Seed-2 Preferred Stock, par value $0.000001 per share, of the Company.

"Company Stock" shall mean the Company Common Stock, the Company Preferred Stock and the Company FF Preferred Stock and any vested Company Restricted Stock.

"Company Stock Adjusted Fully Diluted Shares" shall mean the sum of (without duplication) (a) the aggregate number of shares of Company Stock outstanding as of immediately prior to the Effective Time (including all shares of Company Restricted Stock, whether vested or unvested), (b) the aggregate number of shares of Company Stock issuable upon exercise of all (i) Company Options, (ii) Company Non-Plan Options and (iii) Company Warrants, in each case, whether vested or unvested and outstanding as of immediately prior to the Effective Time and (c) the aggregate number of shares of Company Stock into which the Company SAFEs are deemed to convert for purposes of receiving the Per Share Company Stock Consideration in accordance with the terms of the Company SAFEs in connection with the Transactions.

"Company Stockholder" shall mean a holder of a share of Company Stock issued and outstanding immediately prior to the Effective Time.

91

"Company Stock Plans" shall mean (i) the 2018 Stock Plan of the Company that was adopted in May 2018 and terminated in November 2018 and (ii) the 2018 Stock Plan that was adopted in November 2018.

"Company Transaction Costs" shall mean all fees, costs and expenses of the Company, in each case, incurred prior to and on the Closing Date in connection with the negotiation, preparation and execution of this Agreement, the other Transaction Agreements and the consummation of the Transactions, that remain unpaid immediately prior to the Closing, including: (a) all transaction, deal, brokerage, financial or legal advisory or any similar fees, commissions or expenses payable in connection with or anticipation of the consummation of the Transactions to financial advisors, investment banks, data room administrators, attorneys, accountants and other similar advisors and service providers; (b) 50% of the costs, fees and expenses related to the D&O Tail; (c) all severance, change of control payments, stay bonuses, retention bonuses, and any other transaction-related bonuses and all other compensation that may be payable at the Closing or thereafter become payable, in each case of this clause (c), solely to the extent resulting from the consummation of the Transactions (and not any other action (including any termination of employment following the Closing)), and the employer portion of employment, payroll or similar Taxes payable as a result of the foregoing amounts and (d) 50% of any filing fees required by Governmental Entities pursuant to Section 7.6. For the avoidance of doubt, compensation granted pursuant to the CEO Incentive Plan shall not constitute Company Transaction Costs.

"Company Warrants" shall mean warrants of the Company that are convertible or exercisable into Company Stock pursuant to warrants by and between the Company and the holders of Company Warrants.

"Confidentiality Agreement" shall mean that certain Non-Disclosure Agreement, dated July 1, 2020, by and between Parent and the Company, as amended, supplemented or modified from time to time.

"Contract" shall mean any contract, subcontract, agreement, indenture, note, bond, loan or credit agreement, instrument, installment obligation, lease, mortgage, deed of trust, license, sublicense, commitment, undertaking, power of attorney, guaranty or other legally binding commitment, arrangement, understanding or obligation, whether written or oral, in each case, as amended and supplemented from time to time and including all schedules, annexes and exhibits thereto.

"COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions thereof.

"COVID-19 Measures" means any quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester or any other Law, Order, Legal Proceeding, directive, guidelines or recommendations by any Governmental Entity in connection with or in response to COVID-19, including, but not limited to, the CARES Act.

"Earnout Period" shall mean the time period beginning on the date immediately following the Closing Date and ending on and including the date of the five-year anniversary of the Closing Date.

"Environmental Law" shall mean any and all applicable Law relating to pollution, Hazardous Materials, or the protection of the environment, natural resources, or human health and safety.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" shall mean any Person or trade or business (whether or not incorporated) that, together with the Company, is (or at any relevant time has been or would be) treated as a single employer under Section 414(b), (c), (m) or (o) of the Code.

92

"Exchange Act" shall mean the United States Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Existing Credit Agreement" shall mean that certain Equipment Loan and Security Agreement, dated March 9, 2020, by and between the Company and SQN Venture Income Fund II, LP.

"Families First Act" means the Families First Coronavirus Response Act, as signed into law by the President of the United States on March 18, 2020.

"Financial Derivative/Hedging Arrangement" shall mean any transaction (including an agreement with respect thereto) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any combination of these transactions.

"First Refusal and Co-Sale Agreement" shall mean the Amended and Restated First Refusal and Co-Sale Agreement, dated June 21, 2019, by and among the Company and the Company Stockholders party thereto.

"Foreign Person" has the meaning set forth in 31 C.F.R. § 800.224.

"Fundamental Representations" shall mean: (a) in the case of the Company, the representations and warranties contained in  Section 4.1 (*Organization and Qualification*); Section 4.2 (*Company Subsidiaries*); Section 4.3 (*Capitalization*); Section 4.4 (*Due Authorization*); and Section 4.16 (*Brokers; Third Party Expenses*); and (b) in the case of Parent, the representations and warranties contained in Section 5.1 (*Organization and Qualification*); Section 5.2 (*Parent Subsidiaries*); Section 5.3 (*Capitalization*); Section 5.4 (*Authority Relative to this Agreement*); Section 5.10 (*Business Activities*); and the first two sentences of Section 5.14 (*Trust Account*).

"GAAP" shall mean United States generally accepted accounting principles, consistently applied.

"Government Contract" means any Contract for the sale of supplies or services currently in performance or that has not been closed that is between the Company and a Governmental Entity or entered into by the Company as a subcontractor at any tier in connection with a Contract between another Person and a Governmental Entity.

"Governmental Entity" shall mean any federal, state, provincial, municipal, local or foreign government, governmental authority, any political subdivision thereof, regulatory or administrative agency, governmental commission, department, board, bureau, body, authority, rate setting agency, division, office, agency or instrumentality, court or tribunal.

"Hazardous Material" shall mean any substance, material or waste that is listed, classified, defined, characterized or otherwise regulated by a Governmental Entity as a "pollutant," "contaminant," "toxic substance," "hazardous substance," "hazardous material" or words of similar meaning or effect, including any radioactive materials, petroleum products or byproducts, and per- and polyfluoroalkyl substances.

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and any rules or regulations promulgated thereunder.

93

"Indebtedness" shall mean, with respect to any Person, without duplication, any obligations (whether or not contingent) consisting of (a) the outstanding principal amount of and accrued and unpaid interest on, and other payment obligations for, borrowed money, or payment obligations issued or incurred in substitution or exchange for payment obligations for borrowed money; (b) any payment obligations evidenced by any bond, debenture, debt security, promissory note, mortgage or other similar instruments; (c) any obligations, contingent or otherwise, to pay the deferred purchase price for assets, property or services, including "earnout" payments; (d) any obligations, contingent or otherwise, under acceptance, letters of credit or similar facilities, in each case, to the extent drawn; (e) payment obligations of a third party secured by (or for which the holder of such payment obligations has an existing right, contingent or otherwise, to be secured by) any Lien, other than a Permitted Lien, on assets or properties of such Person, whether or not the obligations secured thereby have been assumed; (f) obligations under leases required to be capitalized under GAAP; (g) obligations under any Financial Derivative/Hedging Arrangement; (h) any obligations, that individually exceed $100,000 or collectively exceed $250,000, and are associated with unpaid bonuses or severance or unfunded deferred compensation (computed as though all such obligations were payable as of the Closing); (i) guarantees, make-whole agreements, hold harmless agreements or other similar arrangements with respect to any amounts of a type described in clauses (a) through (h) above; and (j) with respect to each of the foregoing, any unpaid interest, breakage costs, prepayment or redemption penalties or premiums, or other unpaid fees or obligations; provided, however, that Indebtedness shall not include (i) accounts payable to trade creditors and accrued expenses arising in the ordinary course of business consistent with past practice or (ii) Company Transaction Costs or Parent Transaction Costs.

"Intellectual Property" shall mean all rights in the following: (a) all patents and patent applications, including provisional patent applications and similar filings and any and all substitutions, divisionals, continuations, continuations-in-part, divisions, reissues, renewals, extensions, reexaminations, patents of addition, supplementary protection certificates, utility models, inventors' certificates, or the like and any foreign equivalents of the foregoing (including industrial designs and certificates of invention and any applications for either of the foregoing) (collectively, "Patents"); (b) all trademarks, business marks, service marks, brand names, trade dress rights, logos, corporate names, and trade names, and other source or business identifiers and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, along with all applications, registrations, intent-to-use registrations or similar reservations of marks, renewals and extensions thereof (collectively, "Trademarks"); (c) all registered and unregistered copyrights, applications for registration of copyright, works of authorship, literary works, Software (including all source code, object code, firmware, development tools, files, records and data, and all documentation related to any of the foregoing) and all rights therein, pictorial and graphic works, reversions and moral rights (collectively, "Copyrights"); (d) all internet domain names and social media accounts; (e) trade secret rights, know-how, technology, source code, discoveries and improvements, inventions, works, innovations, ideas, research and development, formulas, algorithms, compositions, processes and techniques, Personal Information, data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, graphics, illustrations, artwork, documentation, manuals, and other confidential or proprietary information (collectively "Trade Secrets"); and (f) all other intellectual property, intellectual property rights, proprietary information and proprietary rights of any type in any jurisdiction.

"Investors' Rights Agreement" shall mean the Amended and Restated Investors' Rights Agreement, dated June 21, 2019, by and among the Company and the Company Stockholders party thereto.

"IP License" shall mean (a) any grant (or covenant not to assert) by the Company to another Person of or regarding any right relating to or under the Owned Intellectual Property, and (b) any grant (or covenant not to assert) by another Person to the Company or regarding any right relating to or under any third Person's Intellectual Property.

"Knowledge" shall mean the actual knowledge or awareness as to a specified fact or event (after reasonable inquiry of their respective direct reports) of: (a) with respect to the Company, the individuals listed on Section 1.2 of the Company Disclosure Letter; and (b) with respect to Parent, First Merger Sub or Second Merger Sub, the individuals listed on Section 1.2 of the Parent Disclosure Letter.

"Law" shall mean any federal, state, local, municipal, foreign or other law, statute, constitution, treaty, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, ruling, injunction, judgment, order, writ or other legal requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Entity.

"Legal Proceeding" shall mean any action, suit, hearing, claim, charge, audit, lawsuit, litigation, investigation (formal or informal), review, inquiry, arbitration or proceeding (in each case, whether civil, criminal or administrative or at law or in equity) by or before a Governmental Entity.

"Licensed Intellectual Property" shall mean all Intellectual Property licensed to the Company pursuant to a valid, written IP License.

"Lien" shall mean any mortgage, pledge, security interest, easement, option, right of first refusal, encumbrance, lien, license restriction or charge of any kind (including, any conditional sale or other title retention agreement or lease in the nature thereof, any agreement to give any security interest and any restriction relating to use, quiet enjoyment, voting, transfer, receipt of income or exercise of any other attribute of ownership).

"OFAC" shall mean the U.S. Treasury Department Office of Foreign Assets Control.

"Open Source Software" shall mean (i) any Software that contains, or is derived in whole or in part from, any Software that is generally available in source code form and that is distributed under a license which, by its terms, (a) does not prohibit licensees of such Software from licensing or otherwise distributing such Software in source code form, (b) does not prohibit licensees of such Software from making modifications thereof, and (c) does not require a royalty or other payment for the licensing or other distribution, or the modification, of such Software (other than a reasonable charge to compensate the provider for the cost of providing a copy thereof),and (ii) any Software distributed under such licenses as the GNU General Public License, the GNU Lesser General Public License, the BSD License, the MIT License, the Mozilla Public License, the Apache License, the Common Public License or any other licenses approved by the Open Source Initiative (including all licenses listed at https://opensource.org/osd and http://opensource.org/licenses/alphabetical) or any other "open source", "copyleft," "free," or similar license.

"Order" shall mean any award, injunction, judgment, regulatory or supervisory mandate, order, writ, decree or ruling entered, issued, made, or rendered by any Governmental Entity that possesses competent jurisdiction.

"Owned Intellectual Property" shall mean all Intellectual Property that is owned or purported to be owned by the Company.

"Parent Acquisition Proposal" shall mean any inquiry, proposal or offer contemplating or otherwise relating to any Parent Acquisition Transaction.

95

"Parent Acquisition Transaction" shall mean any "initial business combination" as defined under the final prospectus of Parent, dated as of November 7, 2019, and filed with the U.S. Securities and Exchange Commission (File No. 333-233980) on November 8, 2019 (other than with the Company and its Affiliates).

"Parent Cash" shall mean, as of the date or time of determination: (a) all amounts in the Trust Account (for the avoidance of doubt, prior to giving effect to the Parent Stockholder Redemptions, if any); *plus* (b) the PIPE Investment Amount and the amount of any Alternative Financing (as such amounts are finally delivered to Parent at or prior to the Closing by the PIPE Investors and, if applicable, Alternative Financing Sources).

"Parent Material Adverse Effect" shall mean any change, event, or occurrence, that, individually or when aggregated with other changes, events, or occurrences that would reasonably be expected to prevent or materially delay the ability of Parent, First Merger Sub or Second Merger Sub to consummate the Transactions; provided, however, that no change or effect related to any of the following, alone or in combination, shall be taken into account in determining whether a Parent Material Adverse Effect has occurred: (i) changes or proposed changes in applicable Law, regulations or interpretations thereof or decisions by courts or any Governmental Entity after the date of this Agreement; (ii) changes or proposed changes in GAAP (or any interpretation thereof) after the date of this Agreement; (iii) any downturn in general economic conditions, including changes in the credit, debt, securities, financial, capital or reinsurance markets (including changes in interest or exchange rates, prices of any security or market index or commodity or any disruption of such markets), in each case, in the United States or anywhere else in the world; or (iv) earthquakes, hurricanes, tornados, pandemics (including COVID-19) or other natural or man-made disasters.

"Parent Minimum Cash" shall mean an amount equal to $250,000,000.

"Parent Transaction Costs" shall mean the out-of-pocket fees, costs and expenses of Parent incurred prior to and on the Closing Date in connection with the negotiation, preparation and execution of this Agreement, the other Transaction Agreements and the consummation of the Transactions that remain unpaid immediately prior to the Closing, including (a) the sum of all outstanding deferred, unpaid or contingent underwriting, transaction, deal, brokerage, financial or legal advisory or any similar fees, commissions or expenses owed by Parent, the Sponsor or their respective Affiliates (to the extent Parent or any of its Subsidiaries is responsible for or obligated to reimburse or repay any such amounts) to financial advisors, investment banks, data room administrators, attorneys, accountants and other similar advisors and service providers; (b) any Indebtedness of Parent or its Subsidiaries owed to its Affiliates or stockholders that will be repaid at Closing; (c) 50% of the costs, fees and expenses related to the D&O Tail; and (d) 50% of any filing fees required by Governmental Entities pursuant to Section 7.6.

"Parent Units" shall mean equity securities of Parent each consisting of one share of Parent Class A Common Stock and one-half of one Public Warrant.

"Payroll Tax Executive Order" means any U.S. presidential memorandum, executive order or similar publication or document permitting or requiring the deferral of any payroll Taxes (including those imposed by Section 3101(a) and 3201 of the Code).

"Permit" shall mean any franchise, grant, easement, variance, exception, waiver, accreditation, license, certificate of compliance, authorization, consent, order, permit, approval, or other action of, or any filing, registration or qualification with, any Governmental Entity or any third party.

"Permitted Lien" shall mean: (a) Liens for current period Taxes not yet delinquent or for Taxes that are being contested in good faith by appropriate proceedings and in each case that are sufficiently reserved for on the Financial Statements in accordance with GAAP; (b) statutory and contractual Liens of landlords with respect to leased real property; (c) Liens of carriers, warehousemen, mechanics, materialmen and repairmen incurred in the ordinary course and: (i) not yet delinquent; or (ii) that are being contested in good faith through appropriate proceedings; (d) in the case of leased real property, zoning, building, or other restrictions, variances, covenants, rights of way, encumbrances, easements and other irregularities in title, none of which, individually or in the aggregate, interfere in any material respect with the present use of or occupancy of the affected parcel by the Company; (e) Liens securing the Indebtedness of Company; (f) in the case of Intellectual Property, non-exclusive license agreements granted by the Company to customers in the ordinary course of business; and (g) Liens incurred in connection with capital lease obligations of the Company.

"Person" shall mean any individual, corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization, entity or Governmental Entity.

"Personal Information" shall mean, in addition to any definition for any similar term (e.g., "personally identifiable information" or "PII") provided by applicable Law, or by the Company in any of its privacy policies, notices, Contracts or other public-facing statements, all information that identifies, could be used to identify, could reasonably be linked, directly or indirectly, with, or is otherwise associated or reasonably capable of being associated with, a natural Person or device, including (a) information that identifies, could be used to identify or is otherwise identifiable with an individual or a device, and any individual's name, physical address, telephone number, email address, financial information, financial account number or government-issued identifier, (b) any data regarding an individual's activities online or on a mobile device or other application, whether or not such information is associated with an identifiable individual, and (c) Internet Protocol addresses, device identifiers or other persistent identifiers. Personal Information may relate to any individual, including a current, prospective, or former customer, end user or employee of any Person, and includes information in any form or media, whether paper, electronic, or otherwise.

"Per Share Company Stock Consideration" shall mean a number of shares of Parent Class A Common Stock equal to (a) the Aggregate Stock Consideration, *divided by* (b) the number of Company Stock Adjusted Fully Diluted Shares.

"Privacy Laws" shall mean any and all applicable Laws, legal requirements and self-regulatory guidelines (including of any applicable foreign jurisdiction) relating to privacy, data security, or Personal Information, and similar consumer protection laws, including with respect to the receipt, collection, compilation, use, storage, processing, sharing, safeguarding, security (both technical and physical), disposal, destruction, disclosure or transfer (including cross-border) of Personal Information, including the Federal Trade Commission Act, Payment Card Industry Data Security Standard (PCI-DSS), Controlling the Assault of Non-Solicited Pornography and Marketing (CAN-SPAM) Act, Telephone Consumer Protection Act (TCPA), California Consumer Privacy Act (CCPA), General Data Protection Regulation (GDPR), Regulation 2016/679/EU on the protection of natural persons with regard to the processing of personal data and on the free movement of such data and any and all applicable Laws governing breach notification in connection with Personal Information.

97

"Private Placement Units" shall mean shall mean the units purchased by Sponsor pursuant to that certain Placement Unit Purchase Agreement, by and between Parent and Sponsor, dated as of November 13, 2019, each unit consisting of one share of Parent Class A Common Stock and one-half of one warrant to purchase one share of Parent Class A Common Stock.

"R&D Sponsor" shall mean any Governmental Entity or any university, college or other educational institution or research center.

"Released Related Parties" shall mean, with respect to a Person, such Person's former, current and future direct or indirect equityholders, controlling Persons, shareholders, optionholders, members, general or limited partners, Representatives, and each of their respective successors and assigns.

"Repurchase Agreement" means that certain Repurchase Agreement, entered into by and among Parent and the Selling Company Holder, dated as of the date hereof.

"Representatives" shall mean, with respect to a Person, all of the officers, directors, employees, consultants, legal representatives, agents, advisors, auditors, investment bankers, Affiliates and other representatives of such Person.

"Restricted Cash" shall mean restricted cash as determined in accordance with GAAP, *plus* any cash that is being held on behalf of customers, *plus* any security deposits for leases.

"SEC" shall mean the United States Securities and Exchange Commission.

"Securities Act" shall mean the United States Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Selling Company Holder" means Prime Movers Lab Fund I LP.

"Software" shall mean any and all software or computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source or object code, and all documentation related to any of the foregoing.

"Specified Business Conduct Laws" shall mean: (a) the U.S. Foreign Corrupt Practices Act of 1977, the UK Bribery Act, and other applicable Laws relating to bribery or corruption; (b) all Laws imposing economic or trade sanctions on any Person, including all Laws administered by OFAC, all sanctions laws or embargos imposed or administered by the U.S. Department of State, the United Nations Security Council, Her Majesty's Treasury or the European Union; (c) all Laws relating to the import, export, re-export, or transfer of information, data, goods, and technology, including the Export Administration Regulations administered by the U.S. Department of Commerce ("Commerce"), the International Traffic in Arms Regulations administered by the U.S. Department of State ("State"), the customs and import Laws administered by U.S. Customs and Border Protection, and the EU Dual Use Regulation; (d) the Money Laundering Control Act, the Currency and Foreign Transactions Reporting Act, The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, and other applicable Laws relating to money laundering; and (e) the anti-boycott Laws administered by Commerce and the Internal Revenue Service.

"Sponsor" shall mean SRC-NI Holdings, LLC, a Delaware limited liability company.

"Sponsor Contingent Closing Shares" shall mean (i) 1,437,500 shares of Parent Class B Common Stock (as equitably adjusted to reflect any change in the number of outstanding shares of Parent Class A Common Stock or Parent Class B Common Stock, as applicable, by reason of any dividend, subdivision, reclassification, recapitalization, split, combination or exchange, or any similar event occurring after the date hereof) if (a) the amount in the Trust Account (for the avoidance of doubt, prior to giving effect to the Parent Stockholder Redemptions and the payment of any Parent Transaction Costs, and without taking into account the PIPE Investment Amount), *minus* (b) the aggregate amount of cash proceeds that will be required to satisfy the Parent Stockholder Redemptions (the result of clauses (a) minus (b), the "Remaining Trust Amount"), is less than $100,000,000 and (ii) 0 shares of Parent Class B Common Stock if the Remaining Trust Amount is equal to or greater than $100,000,000.

"Subsidiary" shall mean, with respect to any Person, any partnership, limited liability company, corporation or other business entity of which: (a) if a corporation, a majority of the total voting power of shares of capital stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; or (b) if a partnership, limited liability company or other business entity, a majority of the partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof.

"Tax" or "Taxes" shall mean: (a) any and all federal, state, local and foreign taxes, including gross receipts, income, profits, license, sales, use, estimated, occupation, value added, ad valorem, transfer, franchise, withholding, payroll, recapture, net worth, employment, escheat and unclaimed property obligations, excise and property taxes, assessments, stamp, environmental, registration, governmental charges, duties, levies and other similar charges, in each case, only to the extent such items are in the nature of a tax and are imposed by a Governmental Entity, (whether disputed or not and however denominated) together with all interest, penalties and additions imposed by a Governmental Entity with respect to any such amounts; and (b) any liability in respect of any items described in clause (a) payable by reason of Contract transferee liability, operation of law or Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof of any analogous or similar provision under law) or otherwise.

"Tax Return" shall mean any return, declaration, report, claim for refund, or information return or statement relating to Taxes that is filed or required to be filed with a Governmental Entity, including any schedule or attachment thereto and any amendment thereof.

"Transaction Agreements" shall mean this Agreement, the A&R Registration Rights Agreement, the Subscription Agreements, the Confidentiality Agreement, the Parent A&R Charter, the Parent A&R Bylaws, the Sponsor Agreement, the Lockup Agreements, the Merger Certificates, the Repurchase Agreement, the Restrictive Covenant Agreement and all the agreements documents, instruments and certificates entered into in connection herewith or therewith and any and all exhibits and schedules thereto.

"Transactions" shall mean the transactions contemplated pursuant to this Agreement, including the Mergers.

"Treasury Regulations" shall mean the regulations promulgated by the U.S. Department of the Treasury pursuant to and in respect of provisions of the Code.

99

"<u>Triggering Event I</u>" shall mean the first date on which the Common Share Price is equal to or greater than $12.50 after the Closing Date, but within the Earnout Period; <u>provided</u>, that (i) in the event of a Change of Control pursuant to which Parent's stockholders receive, or have the right to receive, cash, securities or other property attributing a value of at least $12.50 to each share of Parent Class A Common Stock (as agreed in good faith by Sponsor and the board of directors of Parent), then Triggering Event I shall be deemed to have occurred and (ii) in the event that, and as often as, the number of outstanding shares of Parent Class A Common Stock is changed by reason of any dividend, subdivision, reclassification, recapitalization, split, combination, exchange or any similar event, then the applicable Common Share Price threshold (i.e., $12.50) will, for all purposes of this Agreement (and the Sponsor Agreement), in each case be equitably adjusted to reflect such change.

"<u>Triggering Event II</u>" shall mean the first date on which the Common Share Price is equal to or greater than $15.00 after the Closing Date, but within the Earnout Period; <u>provided</u>, that (i) in the event of a Change of Control pursuant to which Parent's stockholders receive, or have the right to receive, cash, securities or other property attributing a value of at least $15.00 to each share of Parent Class A Common Stock (as agreed in good faith by Sponsor and the board of directors of Parent), then Triggering Event II shall be deemed to have occurred and (ii) in the event that, and as often as, the number of outstanding shares of Parent Class A Common Stock is changed by reason of any dividend, subdivision, reclassification, recapitalization, split, combination, exchange or any similar event, then the applicable Common Share Price threshold (i.e., $15.00) will, for all purposes of this Agreement (and the Sponsor Agreement), in each case be equitably adjusted to reflect such change.

"<u>Triggering Event III</u>" shall mean the first date on which the Common Share Price is equal to or greater than $17.50 after the Closing Date, but within the Earnout Period; <u>provided</u>, that (i) in the event of a Change of Control pursuant to which Parent's stockholders receive, or have the right to receive, cash, securities or other property attributing a value of at least $17.50 to each share of Parent Class A Common Stock (as agreed in good faith by Sponsor and the board of directors of Parent), then Triggering Event III shall be deemed to have occurred and (ii) in the event that, and as often as, the number of outstanding shares of Parent Class A Common Stock is changed by reason of any dividend, subdivision, reclassification, recapitalization, split, combination, exchange or any similar event, then the applicable Common Share Price threshold (i.e., $17.50) will, for all purposes of this Agreement (and the Sponsor Agreement), in each case be equitably adjusted to reflect such change.

"<u>Triggering Events</u>" shall mean Triggering Event I, Triggering Event II and Triggering Event III, collectively.

"<u>Voting Agreement</u>" shall mean the Amended and Restated Voting Agreement, dated June 21, 2019, by and among the Company and the Company Stockholders party thereto.

100

**Exhibit 10.1**

SUBSCRIPTION AGREEMENT

Stable Road Acquisition Corp.
1345 Abbot Kinney Blvd
Venice, California 90291
Ladies and Gentlemen:

This Subscription Agreement (this "<u>Subscription Agreement</u>") is being entered into as of the date set forth on the signature page hereto, by and between Stable Road Acquisition Corp., a Delaware corporation ("<u>SRAC</u>"), and the undersigned subscriber (the "<u>Investor</u>"), in connection with the Agreement and Plan of Merger, dated as of the date hereof (as may be amended, supplemented or otherwise modified from time to time, the "<u>Transaction Agreement</u>"), by and among SRAC, Momentus Inc., a Delaware corporation (the "<u>Company</u>"), Project Marvel First Merger Sub, Inc., a Delaware corporation and a direct, wholly-owned subsidiary of SRAC ("<u>First Merger Sub</u>") and Project Marvel Second Merger Sub, LLC, a Delaware limited liability company and a direct, wholly-owned subsidiary of SRAC ("<u>Second Merger Sub</u>"), pursuant to which, among other things, First Merger Sub will merge with and into the Company, with the Company as the surviving corporation of such merger (the "<u>Surviving Corporation</u>"), and immediately thereafter and as part of the same overall transaction, the Surviving Corporation will merge with and into Second Merger Sub, with Second Merger Sub surviving such merger as a wholly-owned subsidiary of SRAC, on the terms and subject to the conditions therein (the transactions contemplated by the Transaction Agreement, including the merger, the "<u>Transaction</u>"). In connection with the Transaction, SRAC is seeking commitments from interested investors to purchase, substantially concurrently with the closing of the Transaction, shares of SRAC's Class A Common Stock, par value $0.0001 per share (the "<u>Shares</u>"), in a private placement for a purchase price of $10.00 per share. The aggregate purchase price to be paid by the Investor for the subscribed Shares (as set forth on the signature page hereto) is referred to herein as the "<u>Subscription Amount</u>."

In connection therewith, and in consideration of the foregoing and the mutual representations, warranties and covenants, and subject to the conditions, set forth herein, and intending to be legally bound hereby, each of the Investor and SRAC acknowledges and agrees as follows:

1. <u>Subscription</u>. The Investor hereby irrevocably subscribes for and agrees to purchase from SRAC the number of Shares set forth on the signature page of this Subscription Agreement on the terms and subject to the conditions provided for herein. The Investor acknowledges and agrees that SRAC reserves the right to accept or reject the Investor's subscription for the Shares for any reason or for no reason, in whole or in part, at any time prior to its acceptance, and the same shall be deemed to be accepted by SRAC only when this Subscription Agreement is signed by a duly authorized person by or on behalf of SRAC.

2. <u>Closing</u>. The closing of the sale of the Shares contemplated hereby (the "<u>Closing</u>") shall occur on the date of and substantially concurrently with and conditioned upon the closing of the Transaction (such date, the "<u>Closing Date</u>"). At least five (5) business days prior to the anticipated Closing Date, SRAC shall deliver a written notice (the "<u>Closing Notice</u>") to the Investor, specifying (a) the anticipated Closing Date and (b) wire instructions for the account(s) into which the Investor shall fund the Subscription Amount. No later than two (2) business days prior to the Closing Date, the Investor shall deliver (i) the Subscription Amount by wire transfer of United States dollars in immediately available funds to the account(s) specified by SRAC in the Closing Notice and (ii) any other information that is reasonably requested in the Closing Notice in order for SRAC to issue the Investor's Shares, including, without limitation, the legal name of the person in whose name such Shares are to be issued and a duly executed Internal Revenue Service Form W-9 or W-8, as applicable. On the Closing Date, SRAC shall deliver to the Investor the number of Shares set forth on the signature page to this Subscription Agreement in book entry form, free and clear of any liens or other restrictions whatsoever (other than those set forth in this Subscription Agreement, arising under any written agreement to which the Investor is a party or arising under state or federal securities laws), in the name of the Investor (or its nominee in accordance with its delivery instructions) by causing such Shares to be registered on SRAC's share register; *provided, however*, that SRAC's obligation to issue the Shares to the Investor is contingent upon SRAC having received the Subscription Amount in full accordance with this <u>Section 2</u>. In the event the closing of the Transaction does not occur within five (5) business days of the Closing Date specified in the Closing Notice, unless otherwise instructed by the Investor, SRAC shall promptly (but not later than one (1) business day thereafter) return the Subscription Amount to the Investor by wire transfer of U.S. dollars in immediately available funds to the account specified by the Investor, and any book entries shall be deemed cancelled. For purposes of this Subscription Agreement, "business day" shall mean a day, other than a Saturday or Sunday, on which commercial banks in New York, New York and Los Angeles, California are open for the general transaction of business.

*Confidential*

3. Closing Conditions.

a. The obligations of the parties hereto to consummate the purchase and sale of the Shares pursuant to this Subscription Agreement is subject to the following conditions:

(i) no applicable governmental authority shall have enacted, issued, promulgated, enforced or entered any judgment, order, law, rule or regulation which is then in effect and has the effect of making the consummation of the transactions contemplated hereby illegal or otherwise restraining or prohibiting consummation of the transactions contemplated hereby; and

(ii) all conditions precedent to the closing of the Transaction under the Transaction Agreement shall have been satisfied or waived (as determined by the parties to the Transaction Agreement and other than those conditions under the Transaction Agreement which, by their nature, are to be fulfilled at the closing of the Transaction, including to the extent that any such condition is dependent upon the consummation of the purchase and sale of the Shares pursuant to this Subscription Agreement, but subject to the satisfaction or waiver of such conditions at the closing of the Transaction) and the closing of the Transaction shall occur, in accordance with the terms of the Transaction Agreement, on the Closing Date, substantially concurrently with the Closing.

b. The obligation of SRAC to consummate the issuance and sale of the Shares pursuant to this Subscription Agreement shall be subject to the conditions that (i) all representations and warranties of the Investor contained in this Subscription Agreement be true and correct in all material respects when made, and be true and correct in all material respects on and as of the Closing Date (unless they specifically speak as of an earlier date in which case they shall be true and correct in all material respects as of such date), and the Investor hereby acknowledges that the consummation of the Closing shall constitute a reaffirmation by the Investor of each of the representations and warranties of the Investor contained in this Subscription Agreement as of the Closing Date; and (ii) all obligations, covenants and agreements of the Investor required to be performed by it at or prior to the Closing Date shall have been performed in all material respects.

c. The obligation of the Investor to consummate the purchase of the Shares pursuant to this Subscription Agreement shall be subject to the condition that (i) all representations and warranties of SRAC contained in this Subscription Agreement shall be true and correct in all material respects when made (other than representations and warranties that are qualified as to materiality or Material Adverse Effect (as defined herein), which representations and warranties shall be true in all respects) and be true and correct in all material respects at and as of the Closing Date (unless they specifically speak as of an earlier date in which case they shall be true and correct in all material respects as of such date) (other than representations and warranties that are qualified as to materiality or Material Adverse Effect, which representations and warranties shall be true in all respects) and SRAC hereby acknowledges that the consummation of the Closing shall constitute a reaffirmation by SRAC of each of the representations and warranties of SRAC contained in this Subscription Agreement as of the Closing Date; (ii) all obligations, covenants and agreements of SRAC required to be performed by it at or prior to the Closing Date shall have been performed in all material respects; (iii) the transactions contemplated by this Subscription Agreement and the other subscription agreements related to the private placement of the Shares for the issuance of at least an aggregate of 10,000,000 Shares generating proceeds to SRAC of at least $100,000,000 shall close substantially concurrently with the closing of the Transaction; and (iv) no amendment or modification of the Transaction Agreement shall have occurred that materially and adversely affects the Investor's economic benefits under this Subscription Agreement.

4. Further Assurances. At the Closing, the parties hereto shall execute and deliver such additional documents and take such additional actions as the parties reasonably may deem to be practical and necessary in order to consummate the subscription as contemplated by this Subscription Agreement.

*Confidential*

5. <u>SRAC Representations and Warranties</u>. SRAC represents and warrants to the Investor that:

a. SRAC is duly incorporated, validly existing and in good standing under the laws of the State of Delaware. SRAC has all power (corporate or otherwise) and authority to own, lease and operate its properties and conduct its business as presently conducted and to enter into, deliver and perform its obligations under this Subscription Agreement.

b. As of the Closing Date, the Shares will be duly authorized and, when issued and delivered to the Investor in exchange for the Subscription Amount in accordance with the terms of this Subscription Agreement, the Shares will be validly issued, fully paid and non-assessable and will not have been issued in violation of any preemptive or similar rights created under SRAC's certificate of incorporation (as amended as of the Closing Date) or under the General Corporation Law of the State of Delaware.

c. This Subscription Agreement and the Transaction Agreement (collectively, the "<u>Transaction Documents</u>") have been duly authorized, executed and delivered by SRAC and, assuming that the Transaction Documents constitute the valid and binding agreement of the other parties thereto, the Transaction Documents are enforceable against SRAC in accordance with their respective terms, except as may be limited or otherwise affected by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other laws relating to or affecting the rights of creditors generally, or (ii) principles of equity, whether considered at law or equity.

d. The execution and delivery of, and the performance of the transactions contemplated by this Subscription Agreement and the other Transaction Documents, including the issuance and sale of the Shares and the compliance by SRAC with all of the provisions of this Subscription Agreement and the consummation of the transactions contemplated herein, will not (i) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance upon any of the property or assets of SRAC or any of its subsidiaries pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, lease, license or other agreement or instrument to which SRAC or any of its subsidiaries is a party or by which SRAC or any of its subsidiaries is bound or to which any of the property or assets of SRAC is subject that would reasonably be expected to have a material adverse effect on the business, financial condition or results of operations of SRAC and its subsidiaries, taken as a whole (a "<u>Material Adverse Effect</u>") or materially affect the validity of the Shares or the legal authority of SRAC to comply in all material respects with the terms of this Subscription Agreement; (ii) result in any violation of the provisions of the organizational documents of SRAC; or (iii) result in any violation of any statute or any judgment, order, rule or regulation of any court or governmental agency or body, domestic or foreign, having jurisdiction over SRAC or any of its properties that would reasonably be expected to have a Material Adverse Effect or materially affect the validity of the Shares or the legal authority of SRAC to comply in all material respects with this Subscription Agreement.

e. As of their respective dates, all reports (the "<u>SEC Reports</u>") required to be filed by SRAC with the U.S. Securities and Exchange Commission (the "<u>SEC</u>") complied in all material respects with the applicable requirements of the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), and/or the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>"), and the rules and regulations of the SEC promulgated thereunder, and none of the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

f. Except for such matters as have not had and would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect, as of the date hereof, there is no (i) action, suit, claim or other proceeding, in each case by or before any governmental authority pending, or, to the knowledge of SRAC, threatened against SRAC or (ii) judgment, decree, injunction, ruling or order of any governmental entity or arbitrator outstanding against SRAC.

3

*Confidential*

g. As of the date of this Subscription Agreement, the authorized capital stock of SRAC consists of (i) 1,000,000 preferred shares of SRAC, par value $0.0001 per share ("Preferred Stock"), of which no shares of Preferred Stock are issued and outstanding; (ii) 100,000,000 Shares, of which 17,795,000 Shares are issued and outstanding; (iii) 10,000,000 shares of Class B Common Stock of SRAC, par value $0.0001 per share ("Class B Common Stock" and, together with the Preferred Stock and the Shares, the "Total SRAC Shares"), of which 4,312,500 shares of Class B Common Stock are issued and outstanding; (iv) 272,500 warrants to purchase one Share (the "Private Placement Warrants"), all of which are outstanding; and (v) 8,625,000 warrants to purchase one Share (the "Public Warrants," collectively with the Private Placement Warrants, the "Warrants"), all of which are outstanding. All outstanding Shares, Class B Common Stock, Private Placement Warrants and Public Warrants have been duly authorized, validly issued, fully paid and are not subject to preemptive rights. Except as set forth above and pursuant to the other subscription agreements, the Transaction Agreement and the other agreements and arrangements referred to therein, as of the date hereof, there are no outstanding options, warrants or other rights to subscribe for, purchase or acquire from SRAC any Shares, Class B Common Stock or other equity interests in SRAC, or securities convertible into or exchangeable or exercisable for such equity interests. As of the date hereof, SRAC has no subsidiaries, other than First Merger Sub and Second Merger Sub and does not own, directly or indirectly, interests or investments (whether equity or debt) in any person, whether incorporated or unincorporated. There are no shareholder agreements, voting trusts or other agreements or understandings to which SRAC is a party or by which it is bound relating to the voting of any securities of SRAC, other than (1) as set forth in the SEC Reports and (2) as contemplated by the Transaction Agreement.

h. As of the date hereof, the issued and outstanding Shares are registered pursuant to Section 12(b) of the Exchange Act, and are listed for trading on The Nasdaq Stock Market ("Nasdaq") under the symbol "SRAC." There is no suit, action, proceeding or investigation pending or, to the knowledge of SRAC, threatened against SRAC by Nasdaq or the SEC with respect to any intention by such entity to deregister such shares or prohibit or terminate the listing of the Shares on Nasdaq. SRAC has taken no action that is designed to terminate the registration of such shares under the Exchange Act.

6. Investor Representations and Warranties. The Investor represents and warrants to SRAC that:

a. The Investor (i) is a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) or an institutional "accredited investor" (within the meaning of Rule 501(a) under the Securities Act), in each case, satisfying the applicable requirements set forth on Schedule A, (ii) is acquiring the Shares only for the Investor's own account and not for the account of others, or if the Investor is subscribing for the Shares as a fiduciary or agent for one or more investor accounts, the Investor has full investment discretion with respect to each such account, and the full power and authority to make the acknowledgements, representations and agreements herein on behalf of each owner of each such account, and (iii) is not acquiring the Shares with a view to, or for offer or sale in connection with, any distribution thereof in violation of the Securities Act (and shall provide the requested information set forth on Schedule A). The Investor is not an entity formed for the specific purpose of acquiring the Shares.

b. The Investor acknowledges and agrees that the Shares are being offered in a transaction not involving any public offering within the meaning of the Securities Act and that the Shares have not been registered under the Securities Act. The Investor acknowledges and agrees that the Shares may not be offered, resold, transferred, pledged (other than in connection with ordinary course prime brokerage relationships) or otherwise disposed of by the Investor absent an effective registration statement under the Securities Act except (i) to SRAC or a subsidiary thereof, (ii) to non-U.S. persons pursuant to offers and sales that occur outside the United States within the meaning of Regulation S under the Securities Act or (iii) pursuant to another applicable exemption from the registration requirements of the Securities Act (including, without limitation, a private resale pursuant to so-called Rule 4(1 ½)), and, in each of clauses (i) and (iii) in accordance with any applicable securities laws of the states and other jurisdictions of the United States, and that any certificates representing the Shares shall contain a restrictive legend to such effect. The Investor acknowledges and agrees that the Shares will be subject to transfer restrictions and, as a result of these transfer restrictions, the Investor may not be able to readily offer, resell, transfer, pledge or otherwise dispose of the Shares and may be required to bear the financial risk of an investment in the Shares for an indefinite period of time. The Investor acknowledges and agrees that the Shares will not be eligible for offer, resale, transfer, pledge or disposition pursuant to Rule 144 promulgated under the Securities Act until at least one year from the Closing Date. The Investor acknowledges and agrees that the Investor has been advised to consult with its legal counsel and tax and accounting advisors prior to making any offer, resale, transfer, pledge or disposition of any of the Shares.

c. The Investor acknowledges and agrees that the Investor is purchasing the Shares from SRAC. The Investor further acknowledges that there have been no representations, warranties, covenants and agreements made to the Investor by or on behalf of SRAC, the Company, any of their respective affiliates or any control persons, direct or indirect equityholders, officers, managers, directors, employees, consultants, partners, agents or representatives of any of the foregoing or any other person or entity, expressly or by implication, other than those representations, warranties, covenants and agreements of SRAC expressly set forth in Section 5 of this Subscription Agreement.

4

*Confidential*

d. The Investor acknowledges and agrees that the Investor has received such information as the Investor deems necessary in order to make an investment decision with respect to the Shares, including, with respect to SRAC, the Transaction and the business of the Company and its subsidiaries. Without limiting the generality of the foregoing, the Investor acknowledges that he, she or it has reviewed SRAC's filings with the SEC. The Investor acknowledges and agrees that the Investor and the Investor's professional advisor(s), if any, have had the full opportunity to ask such questions, receive such answers and obtain such information as the Investor and such Investor's professional advisor(s), if any, have deemed necessary to make an investment decision with respect to the Shares.

e. The Investor became aware of this offering of the Shares solely by means of direct contact between the Investor and SRAC, the Company or a representative of SRAC or the Company, and the Shares were offered to the Investor solely by direct contact between the Investor and SRAC, the Company or a representative of SRAC or the Company. The Investor did not become aware of this offering of the Shares, nor were the Shares offered to the Investor, by any other means. The Investor acknowledges that the Shares (i) were not offered by any form of general solicitation or general advertising and (ii) are not being offered in a manner involving a public offering under, or in a distribution in violation of, the Securities Act, or any state securities laws. The Investor acknowledges that it is not relying upon, and has not relied upon, any statement, representation or warranty made by any person, firm or corporation (including, without limitation, SRAC, the Company, the Placement Agents (defined below), any of their respective affiliates or any control persons, direct or indirect equityholders, officers, managers, directors, employees, consultants, partners, agents or representatives of any of the foregoing), other than the representations and warranties of SRAC contained in Section 5 of this Subscription Agreement, in making its investment or decision to invest in SRAC.

f. The Investor acknowledges that it is aware that there are substantial risks incident to the purchase and ownership of the Shares, including those set forth in SRAC's filings with the SEC. The Investor has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Shares, and the Investor has sought such accounting, legal and tax advice as the Investor has considered necessary to make an informed investment decision.

g. Alone, or together with any professional advisor(s), the Investor has adequately analyzed and fully considered the risks of an investment in the Shares and determined that the Shares are a suitable investment for the Investor and that the Investor is able at this time and in the foreseeable future to bear the economic risk of a total loss of the Investor's investment in SRAC. The Investor acknowledges specifically that a possibility of total loss exists. The Investor is able to sustain a complete loss on its investment in the Shares, has no need for liquidity with respect to its investment in the Shares and has no reason to anticipate any change in circumstances, financial or otherwise, which may cause or require any sale or distribution of all or any part of the Shares.

h. In making its decision to purchase the Shares, the Investor has relied solely upon independent investigation made by the Investor. Without limiting the generality of the foregoing, the Investor has not relied on any statements or other information provided by or on behalf of either Placement Agent or any of their respective affiliates or any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing concerning SRAC, the Company, the Transaction, the Transaction Agreement, this Subscription Agreement or the transactions contemplated hereby or thereby, the Shares or the offer and sale of the Shares.

i. The Investor acknowledges and agrees that no federal or state agency has passed upon or endorsed the merits of the offering of the Shares or made any findings or determination as to the fairness of this investment.

j. The Investor, if not an individual, has been duly formed or incorporated and is validly existing and is in good standing under the laws of its jurisdiction of formation or incorporation, with power and authority to enter into, deliver and perform its obligations under this Subscription Agreement.

*Confidential*

k. The execution, delivery and performance by the Investor of this Subscription Agreement are within the powers of the Investor, have been duly authorized and will not constitute or result in a breach or default under or conflict with any order, ruling or regulation of any court or other tribunal or of any governmental commission or agency, or any agreement or other undertaking, to which the Investor is a party or by which the Investor is bound, and, if the Investor is not an individual, will not violate any provisions of the Investor's organizational documents, including, without limitation, its incorporation or formation papers, bylaws, indenture of trust or partnership or operating agreement, as may be applicable. The signature on this Subscription Agreement is genuine, and the signatory, if the Investor is an individual, has legal competence and capacity to execute the same or, if the Investor is not an individual, the signatory has been duly authorized to execute the same, and this Subscription Agreement constitutes a legal, valid and binding obligation of the Investor, enforceable against the Investor in accordance with its terms except as may be limited or otherwise affected by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other laws relating to or affecting the rights of creditors generally, and (ii) principles of equity, whether considered at law or equity.

l. The Investor is not (i) a person or entity named on the List of Specially Designated Nationals and Blocked Persons administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") or in any Executive Order issued by the President of the United States and administered by OFAC ("OFAC List"), or a person or entity prohibited by any OFAC sanctions program, (ii) owned, directly or indirectly, or controlled by, or acting on behalf of, one or more persons that are named on the OFAC List; (iii) organized, incorporated, established, located, resident or born in, or a citizen, national or the government, including any political subdivision, agency or instrumentality thereof, of, Cuba, Iran, North Korea, Syria, the Crimea region of Ukraine or any other country or territory embargoed or subject to substantial trade restrictions by the United States, (iv) a Designated National as defined in the Cuban Assets Control Regulations, 31 C.F.R. Part 515, or (v) a non-U.S. shell bank or providing banking services indirectly to a non-U.S. shell bank. The Investor agrees to provide law enforcement agencies, if requested thereby, such records as required by applicable law, provided that the Investor is permitted to do so under applicable law. If the Investor is a financial institution subject to the Bank Secrecy Act (31 U.S.C. Section 5311 et seq.), as amended by the USA PATRIOT Act of 2001 and its implementing regulations (collectively, the "BSA/PATRIOT Act"), the Investor maintains policies and procedures reasonably designed to comply with applicable obligations under the BSA/PATRIOT Act. If the Investor is an entity, the Investor also represents and warrants that it maintains policies and procedures reasonably designed to ensure compliance with OFAC-administered sanctions programs, including for the screening of its investors against the OFAC sanctions programs, including the OFAC List. Investor further represents and warrants that, to the extent required by applicable law, the Investor maintains policies and procedures reasonably designed to ensure that the funds held by the Investor and used to purchase the Shares were legally derived.

m. The Investor's acquisition and holding of the Shares will not constitute or result in a non-exempt prohibited transaction under Section 406 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), or any other federal, state, local, non-U.S. or other laws or regulations that are similar to such provisions of ERISA or the Code (collectively, "Similar Laws").

n. If Investor is, or is acting (directly or indirectly) on behalf of, an employee benefit plan that is subject to Title I of ERISA, a plan, individual retirement account or other arrangement that is subject to Section 4975 of the Code or an employee benefit plan that is a governmental plan (as defined in Section 3(32) of ERISA), a church plan (as defined in Section 3(33) of ERISA), a non-U.S. plan (as described in Section 4(b)(4) of ERISA) or other plan that is not subject to the foregoing but may be subject to provisions under any Similar Law, or an entity whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement (each, a "Plan") subject to the fiduciary or prohibited transaction provisions of ERISA or Section 4975 of the Code, then the Investor represents and warrants that (i) it has notified SRAC in writing of its status as a Plan and will provide such additional information as may be requested by the Company in connection therewith, (ii) none of SRAC, the Company nor any of their respective employees, representatives or affiliates (the "Transaction Parties") has acted as the Plan's fiduciary with respect to its decision to acquire and hold the Shares, and (iii) none of the Transaction Parties has provided any advice or recommendation, including, without limitation, in a fiduciary capacity, with respect to its decision to acquire and hold the Shares.

6

*Confidential*

o. No foreign person (as defined in 31 C.F.R. Part 800.224) in which the national or subnational governments of a single foreign state have a substantial interest (as defined in 31 C.F.R. Part 800.244) will acquire a substantial interest in SRAC as a result of the purchase and sale of Shares hereunder such that a declaration to the Committee on Foreign Investment in the United States would be mandatory under 31 C.F.R. Part 800.401, and no foreign person will have control (as defined in 31 C.F.R. Part 800.208) over SRAC from and after the Closing as a result of the purchase and sale of Shares hereunder.

p. No disclosure or offering document has been prepared by Evercore Group, L.L.C., Cantor Fitzgerald & Co. or any of their respective affiliates (collectively, the "Placement Agents") in connection with the offer and sale of the Shares.

q. Neither Placement Agent, nor any of its respective affiliates nor any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing have made any independent investigation with respect to SRAC, the Company or its subsidiaries or any of their respective businesses, or the Shares or the accuracy, completeness or adequacy of any information supplied to the Investor by SRAC.

r. In connection with the issue and purchase of the Shares, neither Placement Agent has acted as the Investor's financial advisor or fiduciary.

s. The Investor has or has commitments to have and, when required to deliver payment to SRAC pursuant to Section 2 above, will have, sufficient funds to pay the Subscription Amount and consummate the purchase and sale of the Shares pursuant to this Subscription Agreement.

t. As of the date hereof and as of the Closing Date, the Investor represents that no disqualifying event described in Rule 506(d)(1)(i-viii) of the Securities Act (a "Disqualification Event") is applicable to the Investor or any of its Rule 506(d) Related Parties (as defined below), except, if applicable, for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable. The Investor hereby agrees that it shall notify SRAC promptly in writing in the event a Disqualification Event becomes applicable to the Investor or any of its Rule 506(d) Related Parties at or prior to the Closing, except, if applicable, for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable. For purposes of this paragraph (t), "Rule 506(d) Related Party" shall mean a person or entity that is a beneficial owner of the Investor's securities for purposes of Rule 506(d) of the Securities Act.

u. The Investor agrees that, from the date of this Subscription Agreement, none of the Investor nor any person or entity acting on behalf of the Investor or pursuant to any understanding with the Investor will engage in any Short Sales with respect to securities of SRAC prior to the Closing. For the purposes hereof, "Short Sales" shall include, without limitation, all "short sales" as defined in Rule 200 promulgated under Regulation SHO under the Exchange Act, and all types of direct and indirect stock pledges (other than pledges in the ordinary course of business as part of prime brokerage arrangements), forward sale contracts, options, puts, calls, swaps and similar arrangements (including on a total return basis), and sales and other transactions through non-U.S. broker dealers or foreign regulated brokers. Notwithstanding the foregoing, nothing herein shall prohibit other entities under common management with the Investor that have no knowledge of this Subscription Agreement or of Investor's participation in this transaction (including the Investor's controlled affiliates and/or affiliates) from entering into any Short Sales.

7

*Confidential*

7. <u>Registration Rights</u>.

a. In the event that the Shares are not registered in connection with the consummation of the Transaction, SRAC agrees that, within thirty (30) calendar days after the Closing Date, SRAC will file with the SEC (at its sole cost and expense) a registration statement registering the resale of the Shares (the "<u>Registration Statement</u>"), and it shall use its commercially reasonable efforts to have the Registration Statement declared effective as soon as practicable after the filing thereof, but no later than the earlier of (i) the 60th calendar day following the filing date (or the 90th calendar day if the SEC notifies SRAC (orally or in writing) that it will "review" the Registration Statement) and (ii) the 5th business day after the date SRAC is notified (orally or in writing) by the SEC that the Registration Statement will not be "reviewed" or will not be subject to further review (such earlier date, the "<u>Effectiveness Date</u>"); *provided*, *however*, that if such date falls on a Saturday, Sunday or other day that the SEC is closed for business, such date shall be extended to the next business day on which the SEC is open for business. SRAC agrees to cause such Registration Statement, or another shelf registration statement that includes the Shares to be sold pursuant to this Subscription Agreement, to remain effective until the earliest of (a) the second anniversary of the Effectiveness Date, (b) the date on which the Investor ceases to hold any Shares issued pursuant to this Subscription Agreement, and (c) the first date on which the Investor is able to sell all of its Shares issued pursuant to this Subscription Agreement (or shares received in exchange therefor) under Rule 144 of the Securities Act without limitation as to the amount of such securities that may be sold. The Investor agrees to disclose its ownership to SRAC upon request to assist it in making the determination described above. SRAC may amend the Registration Statement so as to convert the Registration Statement to a Registration Statement on Form S-3 at such time after SRAC becomes eligible to use such Form S-3. The Investor acknowledges and agrees that SRAC may suspend the use of any such registration statement if it determines that in order for such registration statement not to contain a material misstatement or omission, an amendment thereto would be needed to include information that would at that time not otherwise be required in a current, quarterly, or annual report under the Exchange Act; *provided*, that, (i) SRAC shall not so suspend the use of the Registration Statement for a period of more than sixty (60) consecutive days, (ii) SRAC may suspend the use of the Registration Statement hereunder only once in any twelve (12)-month period and (iii) SRAC shall use commercially reasonable efforts to make such Registration Statement available for the sale by the Investors of the Shares as soon as practicable thereafter.

b. If the SEC prevents SRAC from including any or all of the Shares proposed to be registered for resale under the Registration Statement due to limitations on the use of Rule 415 of the Securities Act for the resale of the Shares by the applicable shareholders or otherwise, (i) such Registration Statement shall register for resale such number of Shares which is equal to the maximum number of Shares as is permitted by the SEC and (ii) the number of Shares to be registered for each selling shareholder named in the Registration Statement shall be reduced pro rata among all such selling shareholders. In no event shall the Investor be identified as a statutory underwriter in the Registration Statement unless requested by the SEC; *provided*, that if the SEC requests that the Investor be identified as a statutory underwriter in the Registration Statement, the Investor will have an opportunity to withdraw from the Registration Statement.

c. SRAC's obligations to include the Shares issued pursuant to this Subscription Agreement for resale in the Registration Statement are contingent upon the Investor furnishing in writing to SRAC such information regarding the Investor, the securities of SRAC held by the Investor and the intended method of disposition of such Shares, which shall be limited to non-underwritten public offerings, as shall be reasonably requested by SRAC to effect the registration of such Shares, and shall execute such documents in connection with such registration as SRAC may reasonably request that are customary of a selling stockholder in similar situations.

d. SRAC shall, notwithstanding any termination of this Subscription Agreement, indemnify, defend and hold harmless Investor (to the extent a seller under the Registration Statement), the officers, directors and agents of Investor, and each person who controls Investor (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) to the fullest extent permitted by applicable law, from and against any and all out-of-pocket losses, claims, damages, liabilities, costs (including, without limitation, reasonable attorneys' fees) and expenses (collectively, "<u>Losses</u>"), as incurred, that arise out of or are based upon (i) any untrue or alleged untrue statement of a material fact contained in the Registration Statement, any prospectus included in the Registration Statement or any form of prospectus or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein (in the case of any prospectus or form of prospectus or supplement thereto, in light of the circumstances under which they were made) not misleading, or (ii) any violation or alleged violation by SRAC of the Securities Act, Exchange Act or any state securities law or any rule or regulation thereunder, in connection with the performance of its obligations under this <u>Section 7</u>, except to the extent, but only to the extent, that such untrue statements, alleged untrue statements, omissions or alleged omissions are based upon information regarding Investor furnished in writing to SRAC by Investor expressly for use therein or Investor has omitted a material fact from such information or otherwise violated the Securities Act, Exchange Act or any state securities law or any rule or regulation thereunder; *provided, however*, that the indemnification contained in this <u>Section 7</u> shall not apply to amounts paid in settlement of any Losses if such settlement is effected without the consent of SRAC (which consent shall not be unreasonably withheld, conditioned or delayed), nor shall SRAC be liable for any Losses to the extent they arise out of or are based upon a violation which occurs (A) in reliance upon and in conformity with written information furnished by Investor, (B) in connection with any failure of such person to deliver or cause to be delivered a prospectus made available by SRAC in a timely manner or (C) in connection with any offers or sales effected by or on behalf of Investor in violation of <u>Section 7(d)</u> hereof. SRAC shall notify Investor promptly of the institution, threat or assertion of any proceeding arising from or in connection with the transactions contemplated by this <u>Section 7</u> of which SRAC is aware. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of an indemnified party and shall survive the transfer of the Shares by Investor.

8

*Confidential*

e. Investor shall indemnify and hold harmless SRAC, its directors, officers, agents and employees, and each person who controls SRAC (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), to the fullest extent permitted by applicable law, from and against all Losses, as incurred, (i) arising out of or based upon any untrue or alleged untrue statement of a material fact contained in any Registration Statement, any prospectus included in the Registration Statement, or any form of prospectus, or in any amendment or supplement thereto or in any preliminary prospectus, or (ii) arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any prospectus, or any form of prospectus or supplement thereto, in light of the circumstances under which they were made) not misleading, with respect to (i) and/or (ii), to the extent, but only to the extent, that such untrue or alleged untrue statements or omissions or alleged omissions are based upon information regarding Investor furnished in writing to SRAC by Investor expressly for use therein (and for the avoidance of doubt, not to the extent based upon information regarding any other investor that is party to any of the other subscription agreements related to the private placement of the Shares); *provided, however*, that the indemnification contained in this Section 7(e) shall not apply to amounts paid in settlement of any Losses if such settlement is effected without the consent of Investor (which consent shall not be unreasonably withheld, conditioned or delayed). In no event shall the liability of Investor be greater in amount than the dollar amount of the net proceeds received by Investor upon the sale of the Shares giving rise to such indemnification obligation. Investor shall notify SRAC promptly of the institution, threat or assertion of any proceeding arising from or in connection with the transactions contemplated by this Section 7(e) of which Investor is aware. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of an indemnified party and shall survive the transfer of the Shares by Investor.

f. With a view to making available to the Investor the benefits of Rule 144 of the Securities Act that may at any time following the Closing Date permit the Investor to sell its Shares to the public without registration. SRAC agrees, until the second anniversary of the Effectiveness Date, to:

(i) make and keep public information available, as those terms are understood and defined in Rule 144 of the Securities Act;

(ii) file with the SEC in a timely manner all reports and other documents required of SRAC under the Securities Act and the Exchange Act for so long as SRAC remains subject to such requirements and the filing of such reports and other documents is required for the applicable provisions of Rule 144 of the Securities Act; and

(iii) furnish to the Investor so long as it owns its Shares, within two (2) business days following its receipt of a written request therefor from the Investor, (x) a written statement by SRAC, if true, that it has complied with the reporting requirements of Rule 144 of the Securities Act, the Securities Act and the Exchange Act, (y) a copy of the most recent annual or quarterly report of SRAC filed with the SEC and such other reports and documents so filed with the SEC by SRAC and (z) such other information as may be reasonably requested in writing to permit the Investor to sell such securities pursuant to Rule 144 without registration (to the extent readily available and consistent with SRAC's internal policies and procedures).

8. Termination. This Subscription Agreement shall terminate and be void and of no further force and effect, and all rights and obligations of the parties hereunder shall terminate without any further liability on the part of any party in respect thereof, upon the earlier to occur of (a) such date and time as the Transaction Agreement is terminated in accordance with its terms without being consummated, (b) upon the mutual written agreement of each of the parties hereto and the Company to terminate this Subscription Agreement, (c) 30 days after the Outside Date (as defined in the Transaction Agreement), if the Closing has not occurred by such date, or (d) by written notice of the Investor to SRAC in the event the Transaction Agreement is amended, supplemented or otherwise modified after the date hereof in a manner that materially adversely affects the Investor (the termination events described in clauses (a)-(d) above, collectively, the "Termination Events"); *provided* that nothing herein will relieve any party from liability for any willful breach hereof prior to the time of termination, and each party will be entitled to any remedies at law or in equity to recover losses, liabilities or damages arising from any such willful breach. SRAC shall notify the Investor in writing of the termination of the Transaction Agreement promptly after the termination of such agreement. Upon the occurrence of any Termination Event, this Subscription Agreement shall be void and of no further effect and any monies paid by the Investor to SRAC in connection herewith shall promptly (and in any event within one business day) following the Termination Event be returned to the Investor.

9

*Confidential*

9. <u>Trust Account Waiver</u>. The Investor acknowledges that SRAC is a blank check company with the powers and privileges to effect a merger, asset acquisition, reorganization or similar business combination involving SRAC and one or more businesses or assets. The Investor further acknowledges that, as described in SRAC's prospectus relating to its initial public offering dated November 7, 2019 (the "<u>Prospectus</u>") available at www.sec.gov, substantially all of SRAC's assets consist of the cash proceeds of SRAC's initial public offering and private placement of its securities, and substantially all of those proceeds have been deposited in a trust account (the "<u>Trust Account</u>") for the benefit of SRAC, its public shareholders and the underwriters of SRAC's initial public offering. Except with respect to interest earned on the funds held in the Trust Account that may be released to SRAC to pay its tax obligations, if any, the cash in the Trust Account may be disbursed only for the purposes set forth in the Prospectus. For and in consideration of SRAC entering into this Subscription Agreement, the receipt and sufficiency of which are hereby acknowledged, the Investor hereby irrevocably waives any and all right, title and interest, or any claim of any kind it has or may have in the future, in or to any monies held in the Trust Account, and agrees not to seek recourse against the Trust Account, regardless of whether such claim arises as a result of, in connection with or relating in any way to, this Subscription Agreement or any other matter, and regardless of whether such claim arises based on contract, tort, equity or any other theory of liability (the "<u>Released Claims</u>"); *provided*, that the Released Claims shall not include any claims that the Investor may have solely in the Investor's capacity as a record or beneficial holder of any Shares other than the Shares purchased by it pursuant to this Subscription Agreement.

10. <u>Miscellaneous</u>.

a. Neither this Subscription Agreement nor any rights that may accrue to the parties hereunder (other than the Shares acquired hereunder, if any) may be transferred or assigned without the prior written consent of each of the other parties hereto; provided that this Subscription Agreement and any of the Investor's rights and obligations hereunder may be assigned to any fund or account managed by the same investment manager as the Investor or by an affiliate of such investment manager without the prior consent of SRAC; *provided further* that (x) prior to such assignment any such assignee shall agree in writing to be bound by the terms hereof and (y) no such assignment shall relieve the Investor of its obligations hereunder if any such assignee fails to fully perform such obligations.

b. SRAC may request from the Investor such additional information as SRAC may reasonably deem necessary to register the resale of the Shares and evaluate the eligibility of the Investor to acquire the Shares, and the Investor shall provide such information as may reasonably be requested to the extent readily available and to the extent consistent with its internal policies and procedures; provided that SRAC expressly agrees to keep any such information provided by the Investor confidential. The Investor acknowledges that SRAC may file a copy of this Subscription Agreement with the SEC as an exhibit to a periodic report or a registration statement of SRAC.

c. The Investor acknowledges that SRAC, the Company, the Placement Agents and others will rely on the acknowledgments, understandings, agreements, representations and warranties contained in this Subscription Agreement. Prior to the Closing, each party hereto agrees to promptly notify the other party hereto if any of the acknowledgments, understandings, agreements, representations and warranties set forth herein with respect to it are no longer accurate. Each party hereto further acknowledges and agrees that each purchase by the Investor, and each sale by SRAC, of Shares will constitute a reaffirmation of their respective acknowledgments, understandings, agreements, representations and warranties herein (as modified by any such notice) as of the time of such purchase and sale.

d. SRAC, the Company and the Placement Agents are each entitled to rely upon this Subscription Agreement and each is irrevocably authorized to produce this Subscription Agreement or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby to the extent required by law or regulatory bodies; *provided, however*, that the foregoing clause of this <u>Section 10(d)</u> shall not give the Company or the Placement Agents any rights other than those expressly set forth herein and, without limiting the generality of the foregoing and for the avoidance of doubt, in no event shall the Company be entitled to rely on any of the representations and warranties of SRAC set forth in this Subscription Agreement.

10

*Confidential*

e. All of the agreements, representations and warranties made by each party hereto in this Subscription Agreement shall survive the Closing.

f. This Subscription Agreement may not be modified, waived or terminated (other than pursuant to the terms of Section 8 above) except by an instrument in writing, signed by each of the parties hereto, *provided, however*, that no modification or waiver by SRAC of the provisions of this Subscription Agreement shall be effective without the prior written consent of the Company (other than modifications or waivers that are solely ministerial in nature or otherwise immaterial and do not affect any economic or any other material term of this Subscription Agreement). No failure or delay of either party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have hereunder.

g. This Subscription Agreement (including the schedule hereto) constitutes the entire agreement, and supersedes all other prior agreements, understandings, representations and warranties, both written and oral, among the parties, with respect to the subject matter hereof. Except as set forth in Section 8, Section 10(c), Section 10(d), Section 10(f), this Section 10(g), the last sentence of Section 10(k) and Section 11 with respect to the persons specifically referenced therein, this Subscription Agreement shall not confer any rights or remedies upon any person other than the parties hereto, and their respective successor and assigns, and the parties hereto acknowledge that such persons so referenced are third party beneficiaries of this Subscription Agreement for the purposes of, and to the extent of, the rights granted to them, if any, pursuant to the applicable provisions.

h. Except as otherwise provided herein, this Subscription Agreement shall be binding upon, and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns, and the agreements, representations, warranties, covenants and acknowledgments contained herein shall be deemed to be made by, and be binding upon, such heirs, executors, administrators, successors, legal representatives and permitted assigns.

i. If any provision of this Subscription Agreement shall be adjudicated by a court of competent jurisdiction to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions of this Subscription Agreement shall not in any way be affected or impaired thereby and shall continue in full force and effect.

j. This Subscription Agreement may be executed in one or more counterparts (including by facsimile or electronic mail or in .pdf) and by different parties in separate counterparts, with the same effect as if all parties hereto had signed the same document. All counterparts so executed and delivered shall be construed together and shall constitute one and the same agreement.

k. The parties hereto acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Subscription Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to seek an injunction or injunctions to prevent breaches or threatened breaches of this Subscription Agreement, without posting a bond or undertaking and without proof of damages, to enforce specifically the terms and provisions of this Subscription Agreement, this being in addition to any other remedy to which such party is entitled at law, in equity, in contract, in tort or otherwise. The right to specific enforcement shall include the right of each party hereto to cause the other party hereto to cause the transactions contemplated hereby to be consummated on the terms and subject to the conditions and limitations set forth in this Subscription Agreement.

l. This Subscription Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof) as to all matters (including any action, suit, litigation, arbitration, mediation, claim, charge, complaint, inquiry, proceeding, hearing, audit, investigation or reviews by or before any governmental entity related hereto), including matters of validity, construction, effect, performance and remedies

11

*Confidential*

m. Each party hereto and any person asserting rights as a third party beneficiary may do so only if he, she or it irrevocably agrees that any action, suit or proceeding between or among the parties hereto, whether arising in contract, tort or otherwise, arising in connection with any disagreement, dispute, controversy or claim arising out of or relating to this Subscription Agreement or any related document or any of the transactions contemplated hereby or thereby ("Legal Dispute") shall be brought only to the exclusive jurisdiction of the courts of the State of Delaware or the federal courts located in the State of Delaware, and each party hereto hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding that is brought in any such court has been brought in an inconvenient forum. During the period a Legal Dispute that is filed in accordance with this Section 10(m) is pending before a court, all actions, suits or proceedings with respect to such Legal Dispute or any other Legal Dispute, including any counterclaim, cross-claim or interpleader, shall be subject to the exclusive jurisdiction of such court. Each party hereto and any person asserting rights as a third party beneficiary may do so only if he, she or it hereby waives, and shall not assert as a defense in any Legal Dispute, that (i) such party is not personally subject to the jurisdiction of the above named courts for any reason, (ii) such action, suit or proceeding may not be brought or is not maintainable in such court, (iii) such party's property is exempt or immune from execution, (iv) such action, suit or proceeding is brought in an inconvenient forum, or (v) the venue of such action, suit or proceeding is improper. A final judgment in any action, suit or proceeding described in this Section 10(m) following the expiration of any period permitted for appeal and subject to any stay during appeal shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Laws. EACH OF THE PARTIES HERETO AND ANY PERSON ASSERTING RIGHTS AS A THIRD PARTY BENEFICIARY MAY DO SO ONLY IF HE, SHE OR IT IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY ON ANY CLAIMS OR COUNTERCLAIMS ASSERTED IN ANY LEGAL DISPUTE RELATING TO THIS SUBSCRIPTION AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND FOR ANY COUNTERCLAIM RELATING THERETO. IF THE SUBJECT MATTER OF ANY SUCH LEGAL DISPUTE IS ONE IN WHICH THE WAIVER OF JURY TRIAL IS PROHIBITED, NO PARTY HERETO NOR ANY PERSON ASSERTING RIGHTS AS A THIRD PARTY BENEFICIARY SHALL ASSERT IN SUCH LEGAL DISPUTE A NONCOMPULSORY COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS SUBSCRIPTION AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. FURTHERMORE, NO PARTY HERETO NOR ANY PERSON ASSERTING RIGHTS AS A THIRD PARTY BENEFICIARY SHALL SEEK TO CONSOLIDATE ANY SUCH LEGAL DISPUTE WITH A SEPARATE ACTION OR OTHER LEGAL PROCEEDING IN WHICH A JURY TRIAL CANNOT BE WAIVED.

n. The Investor hereby consents to the publication and disclosure in any Form 8-K filed by SRAC with the SEC in connection with the execution and delivery of the Transaction Agreement or the transactions contemplated thereby and the Registration Statement (as defined in the Transaction Agreement) (and, to the extent otherwise required by the federal securities laws, exchange rules, the SEC or any other securities authorities or any rules and regulations promulgated thereby, any other documents or communications provided by SRAC or the Company to any governmental entity or to any securityholders of SRAC or the Company) of the Investor's identity and beneficial ownership of the subscribed Shares and the nature of the Investor's commitments, arrangements and understandings under and relating to this Subscription Agreement and, if deemed appropriate by SRAC or the Company, a copy of this Subscription Agreement, all solely to the extent required by applicable law or any regulation or stock exchange listing requirement. The Investor will promptly provide any information reasonably requested by SRAC or the Company for any regulatory application or filing made or approval sought in connection with the Transaction (including filings with the SEC).

12

*Confidential*

o. SRAC shall, by 9:30 a.m., New York City time, on the first (1st) business day immediately following the date of this Subscription Agreement, issue one or more press releases or file with the SEC a Current Report on Form 8-K (collectively, the "Disclosure Document") disclosing, to the extent not previously publicly disclosed, all material terms of the transactions contemplated hereby (and of the other subscription agreements related to the private placement of the Shares entered into prior to the release or filing of such Disclosure Document), the Transaction and any other material, non-public information that SRAC or the Company has provided to the Investor at any time prior to the filing of the Disclosure Document. As of immediately following the filing of the Disclosure Document with the SEC, to the knowledge of SRAC, the Investor shall not be in possession of any material, non-public information received from SRAC, the Company, any of their respective subsidiaries or any of their respective officers, directors, employees, affiliates or agents that is not disclosed in the Disclosure Document or in prior filings with the SEC. In addition, effective upon the filing of the Disclosure Document, SRAC acknowledges and agrees that any and all confidentiality or similar obligations under any agreement, whether written or oral, between SRAC, on the one hand, and the Investor or any of its affiliates, on the other hand, shall terminate and be of no further force or effect.

p. If any change in the number, type or classes of authorized shares of SRAC (including the Shares) shall occur between the date hereof and immediately prior to the Closing by reason of reclassification, recapitalization, stock split (including reverse stock split) or combination, exchange or readjustment of shares, or any stock dividend, the number of Shares issued to the Investor shall be appropriately adjusted to reflect such change.

11. <u>Non-Reliance</u>. The Investor acknowledges that it is not relying upon, and has not relied upon, any statement, representation or warranty made by any person, firm or corporation (including, without limitation, the Company, the Placement Agents, any of their respective affiliates or any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing), other than the statements, representations and warranties of SRAC expressly contained in <u>Section 5</u> of this Subscription Agreement, in making its investment or decision to invest in SRAC.

[*SIGNATURE PAGES FOLLOW*]

13

*Confidential*

       **IN WITNESS WHEREOF**, the Investor has executed or caused this Subscription Agreement to be executed by its duly authorized representative as of the date set forth below.

Name of Investor:                                     State/Country of Formation or Domicile:

By: _____

Name: _____

Title: _____

Name in which Shares are to be registered (if different):        Date: _____, 2020

Investor's EIN:

Business Address-Street:                           Mailing Address-Street (if different):

City, State, Zip:                                     City, State, Zip:

Attn: _____     Attn: _____

Telephone No.:                                   Telephone No.:

Facsimile No.:                                     Facsimile No.:

Number of Shares subscribed for:

Aggregate Subscription Amount: $                  Price Per Share: $10.00

       You must pay the Subscription Amount by wire transfer of United States dollars in immediately available funds to the account specified by SRAC in the Closing Notice. To the extent the offering is oversubscribed, the number of Shares received may be less than the number of Shares subscribed for.

*Signature Page to Subscription Agreement*

*Confidential*

IN WITNESS WHEREOF, SRAC has accepted this Subscription Agreement as of the date set forth below.

STABLE ROAD ACQUISITION CORP.

By: _____

Name:

Title:

Date: , 2020

*Signature Page to Subscription Agreement*

**SCHEDULE A**
**ELIGIBILITY REPRESENTATIONS OF THE INVESTOR**

A.    QUALIFIED INSTITUTIONAL BUYER STATUS

(Please check the applicable subparagraphs):

☐ We are a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act (a "QIB")).

B.    INSTITUTIONAL ACCREDITED INVESTOR STATUS

(Please check the applicable subparagraphs):

1.    ☐ We are an "accredited investor" (within the meaning of Rule 501(a) under the Securities Act or an entity in which all of the equity holders are accredited investors within the meaning of Rule 501(a) under the Securities Act), and have marked and initialed the appropriate box below indicating the provision under which we qualify as an "accredited investor."

2. ☐ We are not a natural person.

Rule 501(a), in relevant part, states that an "accredited investor" shall mean any person who comes within any of the below listed categories, or who SRAC reasonably believes comes within any of the below listed categories, at the time of the sale of the securities to that person. The Investor has indicated, by marking and initialing the appropriate box below, the provision(s) below which apply to the Investor and under which the Investor accordingly qualifies as an "accredited investor."

☐ Any bank, registered broker or dealer, insurance company, registered investment company, business development company, or small business investment company;

☐ Any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000;

☐ Any employee benefit plan, within the meaning of the Employee Retirement Income Security Act of 1974, if a bank, insurance company, or registered investment adviser makes the investment decisions, or if the plan has total assets in excess of $5,000,000;

☐ Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

☐ Any trust with assets in excess of $5,000,000, not formed to acquire the securities offered, whose purchase is directed by a sophisticated person; or

☐ Any entity in which all of the equity owners are accredited investors meeting one or more of the above tests.

*This page should be completed by the Investor*
*and constitutes a part of the Subscription Agreement.*

**Exhibit 10.2**
Final Form

SUPPORT AGREEMENT

THIS SUPPORT AGREEMENT (this "Agreement") is entered into as of October 7, 2020, by and between Stable Road Acquisition Corp., a Delaware corporation ("Parent"), and [●] (the "Company Stockholder"). Capitalized terms used and not defined herein shall have the meanings set forth in the Merger Agreement.

RECITALS

WHEREAS, it is contemplated that, pursuant to the Agreement and Plan of Merger, dated as of the date hereof (as amended, modified, supplemented or waived from time to time in accordance with its terms, the "Merger Agreement"), by and among Parent, Project Marvel First Merger Sub, Inc., a Delaware corporation and a direct, wholly-owned Subsidiary of Parent ("First Merger Sub"), Project Marvel Second Merger Sub, LLC, a Delaware limited liability company and a direct wholly-owned Subsidiary of Parent ("Second Merger Sub"), and Momentus Inc., a Delaware corporation (the "Company"), First Merger Sub shall merge with and into the Company (the "First Merger"), with the Company being the surviving corporation of the First Merger (the "Surviving Corporation"), and immediately following the First Merger, as part of the same overall transaction as the First Merger, the Surviving Corporation will merge with and into Second Merger Sub (the "Second Merger" and, together with the First Merger, the "Mergers") with Second Merger Sub being the surviving company of the Second Merger (the "Surviving Entity"), and as a result of which the Surviving Entity will become a wholly-owned Subsidiary of Parent;

WHEREAS, as of the date hereof, the Company Stockholder is the record and "beneficial owner" (within the meaning of Rule 13d-3 under the Securities Exchange Act of 1934, as amended (together with the rules and regulations promulgated thereunder, the "Exchange Act")) of the number of shares of Company Common Stock, Company Preferred Stock, Company FF Preferred Stock, vested Company Restricted Stock and/or other Company Interests set forth on Schedule 1 attached hereto (and, together with any additional Company Interests in which the Company Stockholder acquires record and beneficial ownership after the date hereof, including by purchase, as a result of a stock dividend, stock split, recapitalization, combination, reclassification, exchange or change of such shares, or upon exercise or conversion of any securities, the "Equity Securities");

WHEREAS, the Company Stockholder will receive substantial benefits from the consummation of the transactions contemplated by the Merger Agreement;

WHEREAS, the representations, warranties, covenants and other agreements set forth herein were a material inducement to Parent to enter into the Merger Agreement and to perform its obligations thereunder; and

WHEREAS, Parent is relying on the representations, warranties, covenants and other agreements of this Agreement and Parent would not enter into the Merger Agreement or be willing to consummate the Mergers without the representations, warranties, covenants and other agreements of this Agreement.

AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained herein, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

1. <u>Voting; Waiver of Appraisal Rights; Waiver of Transfer Restrictions</u>. Subject to the earlier termination of this Agreement in accordance with <u>Section 2</u>, the Company Stockholder, solely in their capacity as a holder of the Equity Securities, agrees as follows: (a) the Company Stockholder hereby irrevocably and unconditionally waives and agrees not to exercise or assert, or make any demand in respect of, any rights of appraisal, any dissenters' rights and any similar rights relating to the Mergers or any other transaction contemplated by the Merger Agreement that the Company Stockholder may have (under Section 262 of DGCL, Chapter 13 of the CCC or otherwise) by virtue of, or with respect to, any outstanding Company Stock owned of record or beneficially by the Company Stockholder; (b) the Company Stockholder will, with respect to all of the Company Stockholder's Equity Securities, vote at any meeting of the stockholders of the Company, and in any action by written consent of the stockholders of the Company, to approve and adopt the Merger Agreement and the transactions contemplated thereby, including the Mergers, and will not withdraw or rescind such vote or otherwise take action to make such vote ineffective, and in furtherance thereof, within three (3) Business Days of the Registration Statement becoming effective, the Company Stockholder will execute and deliver the Stockholder Written Consent in accordance with the terms and conditions set forth in the Merger Agreement, and will not thereafter withdraw or rescind such consent or otherwise take action to make such consent ineffective; and (c) promptly following the Effective Time and in accordance with the terms and conditions set forth in the Merger Agreement, the Company Stockholder will execute and deliver a Letter of Transmittal, in a customary form, for all of the Company Stockholder's Equity Securities. In addition, in accordance with Section 10 of that certain Amended and Restated First Refusal and Co-Sale Agreement, dated as of June 21, 2019, as amended, including on September 30, 2019, by and among the Company and certain of the holders of Company Stock (the "<u>ROFR/Co-Sale Agreement</u>"), the Company Stockholder hereby agrees to waive the provisions of Section 2 of the ROFR/Co-Sale Agreement with respect to the Merger Agreement and the Transactions, including the Mergers.

2. <u>Termination</u>.

(a) Subject to <u>Section 2(b)</u>, this Agreement shall terminate upon the earliest of: (i) the Effective Time; (ii) the termination of the Merger Agreement in accordance with its terms; and (iii) the time this Agreement is terminated upon the mutual written agreement of Parent and the Company Stockholder (the earliest such date under clause (i), (ii) and (iii) being referred to herein as the "<u>Termination Date</u>").

(b) Upon termination of this Agreement, no party hereto shall have any further obligations or liabilities under this Agreement; <u>provided</u>, that the provisions set forth in <u>Section 5</u>, <u>Section 6(a)</u>, <u>Section 6(c)</u> (in each of the foregoing cases, solely in the case of termination under clause (i) of <u>Section 2(a)</u>), <u>Section 6(b)</u>, <u>Section 6(d)</u> and <u>Section 7</u> shall survive the termination of this Agreement; <u>provided</u>, <u>further</u>, that termination of this Agreement shall not relieve any party hereto from any liability for any intentional breach of this Agreement prior to such termination.

(c) The representations and warranties contained in this Agreement and in any certificate or other writing delivered pursuant hereto shall not survive the Closing or the termination of this Agreement.

3. <u>Representations and Warranties of the Company Stockholder</u>.

(a) The Company Stockholder hereby represents and warrants to Parent that the Equity Securities set forth on <u>Schedule 1</u> attached hereto constitute all of the shares of Company Common Stock, Company Preferred Stock, Company FF Preferred Stock, vested Company Restricted Stock and other Company Interests owned of record or beneficially by the Company Stockholder as of the date hereof. The Company Stockholder has good and valid title to such Equity Securities set forth on <u>Schedule I</u> attached hereto and as of the Effective Time will have good and valid title to such Equity Securities held by the Company Stockholder set forth on <u>Schedule I</u> attached hereto free and clear of all Liens (other than transfer restrictions under applicable securities Laws).

2

(b) [(A) The Company Stockholder has all requisite capacity to execute and deliver this Agreement and the Transaction Agreements to which it is a party and to perform its obligations hereunder and thereunder and to consummate the Transactions,] // [(A) The Company Stockholder is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation or organization and has the requisite corporate, limited liability company or other entity power and authority, as applicable, to execute and deliver this Agreement and to perform its obligations hereunder,] [(B) the execution, delivery and performance by the Company Stockholder of this Agreement and its obligations hereunder have been duly and validly authorized by the Company Stockholder and no other act or proceeding on the part of the Company Stockholder is necessary to authorize the execution, delivery or performance of this Agreement,] ([C]) this Agreement has been duly executed and delivered by the Company Stockholder and, assuming the due authorization, execution and delivery by each other party hereto, constitutes a valid and binding obligation of the Company Stockholder, enforceable in accordance with its terms, subject to the Remedies Exception, and ([D]) neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will [(i) conflict with or result in any material breach of any provision of the Charter Documents of the Company Stockholder,] ([ii]) require any material filing with, or the obtaining of any material consent or material approval of, any Governmental Entity by the Company Stockholder (other than the filings, notices and reports pursuant to, in compliance with or required to be made under the Exchange Act and other than those set forth as conditions to closing in the Merger Agreement), or [(iii)] violate in any material respect any material Law applicable to the Company Stockholder, except, in the case of the foregoing clauses [(ii) and (iii)], for violations which would not, individually or in the aggregate, reasonably be expected to prevent or delay the consummation of the transactions contemplated by this Agreement.

4. Merger Agreement Obligations.

(a) Other than as expressly permitted by the Merger Agreement or the other Transaction Agreements, until the Termination Date, the Company Stockholder will not, directly or indirectly, (i) sell, transfer, assign, tender in any tender or exchange offer, pledge, encumber, hypothecate or similarly dispose of (by merger, by testamentary disposition, by operation of law or otherwise), either voluntarily or involuntarily, or enter into any Contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, Lien, hypothecation or similar disposition of (by merger, by testamentary disposition, by operation of law or otherwise), any of its Equity Securities, (ii) deposit any Equity Securities into a voting trust or enter into a voting agreement or arrangement or grant any proxy or power of attorney with respect thereto that is inconsistent with this Agreement (other than any Contracts set forth on Section 7.18 of the Company Disclosure Letter entered into prior to the date hereof and to be terminated contingent upon and automatically effective as of the Closing in accordance with Section 6(c)), or (iii) agree (whether or not in writing) to take any of the actions referred to in the foregoing clause (i) or (ii) of this Section 4; provided, however, that nothing herein shall prohibit the Company Stockholder from transferring Equity Securities to an Affiliate of such Company Stockholder or, if the Company Stockholder is an individual, to any member of the Company Stockholder's immediate family or to a trust solely for the benefit of the Company Stockholder or any member of the Company Stockholder's immediate family; provided, that (x) any such transfers shall be permitted only if, as a precondition to such transfer, the transferee agrees in a writing, reasonably satisfactory in form and substance to Parent, to assume all of the obligations of the Company Stockholder under, and to be bound by all of the terms of, this Agreement and (7) any such permitted transfer shall not relieve the Company Stockholder of its obligations under this Agreement.

(b) Until the Termination Date, the Company Stockholder hereby agrees to be bound by the terms and conditions set forth in the first sentence of Section 7.8(c) (Confidentiality; Communications Plan; Access to Information), Section 7.1 (Company No Solicitation), Section 7.11 (No Claim Against Trust Account) and, to the extent applicable to any of the foregoing, the remaining provisions of Article XI (General Provisions) of the Merger Agreement (and any relevant definitions used in such Sections) fully and to the same extent as if the Company Stockholder was a party and signatory to such provisions of the Merger Agreement.

(c) Notwithstanding anything in this Agreement to the contrary: (i) the Company Stockholder shall not be responsible for the actions of the Company or the Company board of directors (or any committee thereof), or any officers, directors (in their capacity as such), employees and professional advisors of any of the foregoing (the "Company Related Parties"), with respect to any of the matters contemplated by Section 4(b); (ii) the Company Stockholder makes no representations or warranties with respect to the actions of any of the Company Related Parties; and (iii) any breach by the Company of its obligations under Section 7.1 of the Merger Agreement shall not, in and of itself, be considered a breach of Section 4(b) (it being understood for the avoidance of doubt that the Company Stockholder shall remain responsible for any breach by it or its Representatives (other than any such Representative that is a Company Related Party) of Section 4(b)).

5. General Waiver and Release.

(a) Effective as of, and contingent upon, the consummation of the Closing, the Company Stockholder, on behalf of itself and any of its heirs, executors, beneficiaries, administrators, successors, assigns, controlled Affiliates and any other Person or entity claiming by, through or under any of the foregoing (each, a "Releasor"), hereby forever, unconditionally and irrevocably acquits, remises, discharges and releases, effective as of the Closing, the Company and its Affiliates (including, after the Closing, Parent, First Merger Sub, Second Merger Sub, the Surviving Entity and each of their respective Affiliates), each of their respective officers, directors, equityholders, employees, partners, trustees and Representatives, and each successor and assign of any of the foregoing (collectively, the "Releasees") from any and all claims, demands, charges, complaints, causes of action, damages, costs, expenses, obligations, losses, rights, suits, accountings, orders, judgments, obligations, agreements and liabilities of every kind and character whatsoever, whether accrued or fixed, absolute or contingent, matured or unmatured, suspected or unsuspected or determined or determinable, and whether at law or in equity, that any Releasee may have to such Releasor (or that any Releasor may have against any Releasee), in any capacity, whether directly or derivatively through another Person, arising contemporaneously with or prior to the Closing; provided that liabilities and obligations acquitted, remised, discharged and released pursuant to this Section 5(a) (collectively, the "Released Claims") shall not include (A) any rights of the Releasors under this Agreement, the Merger Agreement and the other Transaction Agreements, (B) if such Releasor is an employee of the Company, rights to earned but unpaid wages or other compensation or benefits and rights under any written employment agreements with or benefit plans of the Company in existence as of the date hereof, (C) any rights to indemnification, exculpation and/or advancement of expenses (whether pursuant to the Charter Documents of the Company, any insurance policy or any other agreement entered into with the Company) for serving as an officer, director, manager, agent or employee of the Company, in each case existing prior to Closing, or (D) any rights as a third-party beneficiary to indemnification, exculpation and/or advancement of expenses set forth in the Indemnification Agreement by and between the Company and Dakin Sloss, dated November 1, 2018, in each case existing prior to Closing. Further, the Company Stockholder, on behalf of itself and the Releasors, hereby irrevocably covenants to refrain from, directly or indirectly, asserting any Released Claim, or threatening, commencing, instituting or causing to be commenced, any proceeding of any kind against any Releasee based upon any Released Claim. Without limiting the foregoing, the Company Stockholder, on behalf of itself and each Releasor, understands and agrees that the claims released in this Section 5(a), if and when released, include not only claims presently known but also include all unknown or unanticipated claims, obligations, liabilities, charges, demands, and causes of action of every kind and character that would otherwise come within the scope of the Released Claims.

4

(b) Effective as of, and contingent upon, the consummation of the Closing, the Company Stockholder, on behalf of itself and each Releasor, knowingly and voluntarily waives and releases any and all rights and benefits he, she or it may not have, or in the future may have, under Section 1542 of the California Civil Code ("Section 1542") or any analogous state law or federal law, which reads as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

The Company Stockholder, on behalf of itself and each Releasor, understands that Section 1542, or a comparable statute, rule, regulation or order of another jurisdiction, gives such the Company Stockholder the right not to release existing claims of which the Company Stockholder is not aware, unless the Company Stockholder voluntarily chooses to waive this right. Having been so apprised, the Company Stockholder, on behalf of itself and each Releasor, nevertheless hereby voluntarily elects to and does waive the rights described in Section 1542, or such other comparable statute, rule, regulation or order, and elects to assume all risks for claims that exist, existed or may hereafter exist in its favor, known or unknown, suspected or unsuspected, arising out of or related to claims or other matters purported to be released pursuant to this Section 5, in each case, effective at the Closing. The Company Stockholder, on behalf of itself and each Releasor, acknowledges and agrees that the foregoing waiver is an essential and material term of the release provided pursuant to this Section 5 and that, without such waiver, Parent would not have agreed to the terms of this Agreement.

6. Covenants.

(a) Further Assurances. From time to time and without additional consideration, the Company Stockholder shall execute and deliver, or cause to be executed and delivered, such additional transfers, assignments, endorsements, proxies, consents and other instruments, and shall take such further actions as Parent may reasonably request for the purpose of carrying out and furthering the intent of this Agreement. The Company Stockholder further agrees not to commence or participate in, and to take all actions necessary to opt out of any class in any class action with respect to, any action or claim, derivative or otherwise, against Parent, Parent's Affiliates, the Sponsor, the Company, the Surviving Entity or any of their respective successors and assigns relating to the negotiation, execution or delivery of this Agreement, the Merger Agreement (including the Per Share Company Stock Consideration) or the consummation of the transactions contemplated hereby and thereby.

(b) Acknowledgment. THE COMPANY STOCKHOLDER ACKNOWLEDGES AND AGREES THAT THE COMPANY STOCKHOLDER IS ENTERING INTO THIS AGREEMENT ON THE COMPANY STOCKHOLDER'S OWN FREE WILL AND NOT UNDER ANY DURESS OR UNDUE INFLUENCE. THE COMPANY STOCKHOLDER HAS ENTERED INTO THIS AGREEMENT FREELY AND WITHOUT COERCION, THE COMPANY STOCKHOLDER HAS BEEN ADVISED BY PARENT TO CONSULT WITH COUNSEL OF THE COMPANY STOCKHOLDER'S CHOICE WITH REGARD TO THE EXECUTION OF THIS AGREEMENT AND THE COMPANY STOCKHOLDER'S COVENANTS HEREUNDER, THE COMPANY STOCKHOLDER HAS HAD AN ADEQUATE OPPORTUNITY TO CONSULT WITH SUCH COUNSEL AND EITHER SO CONSULTED OR FREELY DETERMINED IN THE COMPANY STOCKHOLDER'S OWN DISCRETION NOT TO SO CONSULT WITH SUCH COUNSEL, THE COMPANY STOCKHOLDER UNDERSTANDS THAT PARENT HAS BEEN ADVISED BY COUNSEL, AND THE COMPANY STOCKHOLDER HAS READ THIS AGREEMENT AND THE MERGER AGREEMENT AND FULLY AND COMPLETELY UNDERSTANDS THIS AGREEMENT AND THE MERGER AGREEMENT AND EACH OF THE COMPANY STOCKHOLDER'S REPRESENTATIONS, WARRANTIES, COVENANTS AND OTHER AGREEMENTS HEREUNDER AND THEREUNDER. THIS AGREEMENT SHALL BE INTERPRETED AND CONSTRUED AS HAVING BEEN DRAFTED JOINTLY BY THE COMPANY STOCKHOLDER AND PARENT AND NO PRESUMPTION OR BURDEN OF PROOF SHALL ARISE FAVORING OR DISFAVORING ANY PARTY HERETO BY VIRTUE OF THE AUTHORSHIP OF ANY OR ALL OF THE PROVISIONS OF THIS AGREEMENT.

(c) <u>Consent to Terminate Certain Agreements</u>. The Company Stockholder hereby consents to the termination, contingent upon and automatically effective as of the Closing, of all Contracts set forth on Section 7.18 of the Company Disclosure Letter (other than any indemnification agreements between any D&O Indemnified Party and the Company).

(d) <u>Disclosure</u>. The Company Stockholder hereby authorizes the Company and Parent to publish and disclose in any announcement or disclosure required by the SEC the Company Stockholder's identity and ownership of the Equity Securities and the nature of the Company Stockholder's obligations under this Agreement; <u>provided</u>, that prior to any such publication or disclosure the Company and Parent have provided the Company Stockholder with an opportunity to review and comment upon such announcement or disclosure, which comments the Company and Parent will consider in good faith.

7. <u>General Provisions</u>.

(a) <u>Amendment</u>. This Agreement may not be amended except by an instrument signed by Parent and the Company Stockholder.

(b) <u>Notices</u>. All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) when delivered in person or, by e-mail (so long as such transmission does not generate an error message or notice of non-delivery), (b) on the next Business Day when sent by overnight courier, or (c) on the second succeeding Business Day when sent by registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the following addresses (or at such other address for a party hereto as shall be specified by like notice):

(i)     <u>if to Parent</u>:

Stable Road Acquisition Corp.
1345 Abbot Kinney Blvd
Venice, California 90291
Attention:    Brian Kabot
              Juan Quiroga
E-mail:       brian@stableroadcapital.com
              juan@nalainvestments.com

6

with a copy (which shall not constitute notice to Parent) to:
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attention:    Douglas C. Gessner, P.C.
              Bradley C. Reed, P.C.
              Kevin M. Frank
E-mail:       douglas.gessner@kirkland.com
              bradley.reed@kirkland.com
              kevin.frank@kirkland.com

(ii)    if to the Company Stockholder, to the address or addresses listed on Schedule 1 hereto.
with a copy (which shall not constitute notice to the Company Stockholder) to:
Orrick, Herrington & Sutcliffe LLP
631 Wilshire Blvd, Suite 2-C
Santa Monica, CA 90401
Attention:    Daniel S. Kim
              Hari Raman
              Albert W. Vanderlaan
E-mail:       dan.kim@orrick.com
              hraman@orrick.com
              avanderlaan@orrick.com

(c) Interpretation. Unless the context of this Agreement otherwise clearly requires, (i) references to the plural include the singular, and references to the singular include the plural, (ii) references to one gender include the other gender, (iii) the words "include", "includes," "including" and words of similar import do not limit the preceding terms or words and shall be deemed to be followed by the words "without limitation", (iv) the terms "hereof", "herein", "hereunder", "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement, (v) the term "or" will not be deemed to be exclusive, (vi) the word "will" shall be construed to have the same meaning and effect as the word "shall", (vii) the terms "day" and "days" mean and refer to calendar day(s), (viii) the terms "year" and "years" mean and refer to calendar year(s), (ix) references to any statute shall be deemed to refer to such statute and to any rules or regulations promulgated thereunder, (x) references to any person include the successors and permitted assigns of that person, and (xi) references from or through any date mean, unless otherwise specified, from and including such date or through and including such date, respectively. All Section and Schedule references herein are to Sections and Schedules of this Agreement, unless otherwise specified.

(d) Section Headings; Defined Terms. The Section headings contained in this Agreement are exclusively for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement. The defined terms contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(e) Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or e-mail shall be as effective as delivery of a manually executed counterpart of the Agreement. Minor variations in the form of the signature page, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining a party's intent or the effectiveness of such signature.

7

(f) <u>Entire Agreement; No Third Party Beneficiaries</u>. The agreement of the parties that is comprised of this Agreement, the Letter of Transmittal executed by the Company Stockholder and the provisions of the Merger Agreement referenced in <u>Section 4</u> herein to which the Company Stockholder has expressly agreed to be bound constitute the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and thereof and supersedes all other prior agreements, and understandings, whether oral or written, relating to the subject matter of this Agreement, and is not intended to confer upon any Person other than the parties hereto any rights or remedies hereunder; <u>provided</u>, <u>however</u>, that the Releasees are express third party beneficiaries of this Agreement and the Company shall be an express third party beneficiary with respect to <u>Section 4</u> and <u>Section 6(c)</u> hereof. For the avoidance of doubt, this Agreement does not and shall not affect any prior understandings, agreements or representations with respect to any similar subject matter entered into in connection with or as a result of the Company Stockholder's direct or indirect ownership of any Company Interests or any provision of services to the Company.

(g) <u>Severability</u>. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any party hereto. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the fullest extent possible.

(h) <u>Binding Effect; Assignment</u>. This Agreement and all of the provisions hereof shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Subject to <u>Section 4(a)</u>, neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned, directly or indirectly, including by operation of law, by any party hereto without the prior written consent of the other party hereto. Any purported assignment in violation of this <u>Section 7(h)</u> shall be null and void *ab initio*.

(i) <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof) as to all matters (including Legal Proceedings related hereto), including matters of validity, construction, effect, performance and remedies.

8

(j) <u>Consent to Jurisdiction, Etc.</u> Each party hereto hereby and any Person asserting rights as a third party beneficiary may do so only if he, she or it irrevocably agrees that any Legal Proceeding shall be brought only to the exclusive jurisdiction of the Court of Chancery of the State of Delaware or, if such court declines to exercise jurisdiction, the U.S. District Court for the District of Delaware, and each party hereto hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding that is brought in any such court has been brought in an inconvenient forum. During the period a Legal Proceeding that is filed in accordance with this <u>Section 7(j)</u> is pending before a court, all actions, suits or proceedings with respect to such Legal Proceeding or any other Legal Proceeding, including any counterclaim, cross-claim or interpleader, shall be subject to the exclusive jurisdiction of such court. Each party hereto and any Person asserting rights as a third party beneficiary may do so only if he, she or it hereby waives, and shall not assert as a defense in any Legal Proceeding, that (a) such party is not personally subject to the jurisdiction of the above named courts for any reason, (b) such action, suit or proceeding may not be brought or is not maintainable in such court, (c) such party's property is exempt or immune from execution, (d) such action, suit or proceeding is brought in an inconvenient forum, or (e) the venue of such action, suit or proceeding is improper. A final judgment in any action, suit or proceeding described in this <u>Section 7(j)</u> following the expiration of any period permitted for appeal and subject to any stay during appeal shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Laws. EACH OF THE PARTIES HERETO AND ANY PERSON ASSERTING RIGHTS AS A THIRD PARTY BENEFICIARY MAY DO SO ONLY IF HE, SHE OR IT IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY ON ANY CLAIMS OR COUNTERCLAIMS ASSERTED IN ANY LEGAL DISPUTE RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND FOR ANY COUNTERCLAIM RELATING THERETO. IF THE SUBJECT MATTER OF ANY SUCH LEGAL DISPUTE IS ONE IN WHICH THE WAIVER OF JURY TRIAL IS PROHIBITED, NO PARTY HERETO NOR ANY PERSON ASSERTING RIGHTS AS A THIRD PARTY BENEFICIARY SHALL ASSERT IN SUCH LEGAL DISPUTE A NONCOMPULSORY COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. FURTHERMORE, NO PARTY HERETO NOR ANY PERSON ASSERTING RIGHTS AS A THIRD PARTY BENEFICIARY SHALL SEEK TO CONSOLIDATE ANY SUCH LEGAL DISPUTE WITH A SEPARATE ACTION OR OTHER LEGAL PROCEEDING IN WHICH A JURY TRIAL CANNOT BE WAIVED.

(k) <u>Specific Performance.</u> The Company Stockholder agrees that irreparable damage would occur for which monetary damages, even if available, would not be an adequate remedy in the event that the Company Stockholder does not perform its obligations under the provisions of this Agreement in accordance with its specified terms or otherwise breach such provisions. The Company Stockholder acknowledges and agrees that Parent shall therefore be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any action instituted in any court in the United States or in any state or province having jurisdiction over the parties hereto and the matter in addition to any other remedy to which they may be entitled pursuant hereto, and that such explicit rights of specific enforcement are an integral part of the transactions contemplated by this Agreement and without such rights, Parent would not have entered into this Agreement. The Company Stockholder agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that Parent have an adequate monetary or other remedy at law. The Company Stockholder acknowledges and agrees that if Parent seeks an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the terms and provisions of this Agreement, Parent shall not be required to provide any bond or other security in connection with any such order or injunction.

(l) <u>No Ownership Interest.</u> Nothing contained in this Agreement shall be deemed to vest in Parent any direct or indirect ownership or incidence of ownership of or with respect to the Equity Securities of the Company Stockholder. All rights, ownership and economic benefits (but excluding, for the avoidance of doubt, any voting rights to the extent described herein) of and relating to the Equity Securities of the Company Stockholder shall remain fully vested in and belong to the Company Stockholder, and Parent shall have no authority to direct the Company Stockholder in the voting or disposition of any of the Stockholder's Equity Securities, except as otherwise provided herein.

(m) <u>Capacity as a Stockholder.</u> Notwithstanding anything herein to the contrary, the Company Stockholder signs this Agreement solely in the Company Stockholder's capacity as a stockholder of the Company, and not in any other capacity (including as an officer or director of the Company) and this Agreement shall not limit or otherwise affect the actions of the Company Stockholder (or any affiliate, employee or designee of the Company Stockholder) in his or her capacity, if applicable, as an officer or director of the Company or any other Person.

[Signature Pages Follow]

9

IN WITNESS WHEREOF, Parent and the Company Stockholder have caused this Transaction Support Agreement to be executed as of the date first written above.

PARENT:

STABLE ROAD ACQUISITION CORP.

By: _____

Name: Brian Kabot

Title: Chief Executive Officer

*Signature Page to Support Agreement*

10

COMPANY STOCKHOLDER:

I have read this Support Agreement, I have had the opportunity to consult legal counsel prior to my signing of this Support Agreement, I fully and completely understand this Support Agreement and I hereby agree to and accept this Support Agreement.

_____
[**NAME**]

*Signature Page to Support Agreement*

11

Schedule 1

**Equity Securities**

| Company Stockholder | Physical and Email Addresses for Notice | Class, Number and Type of Company Interests |
|---|---|---|
| [●] | [●] | [●] |

12

**Exhibit 10.3**
**EXECUTION**

October 7, 2020

Stable Road Acquisition Corp.
1345 Abbott Kinney Boulevard
Venice, California 90291

RE: Surrender and Potential Forfeiture of Parent Class B Common Stock

Reference is made to that certain Agreement and Plan of Merger (the "Merger Agreement"), to be dated as of the date hereof, by and among Momentus Inc., a Delaware corporation (the "Company"), Stable Road Acquisition Corp., a Delaware corporation ("Parent"), Project Marvel First Merger Sub, Inc., a Delaware corporation and a direct, wholly-owned subsidiary of Parent, and Project Marvel Second Merger Sub, LLC, a Delaware limited liability company and a direct, wholly-owned subsidiary of Parent. This letter agreement (this "Letter Agreement") is being entered into and delivered by Parent, SRC-NI Holdings, LLC, a Delaware limited liability company ("Sponsor"), and SRAC PIPE Partners LLC, a Delaware limited liability company ("SRAC Partners") in connection with the transactions contemplated by the Merger Agreement. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Merger Agreement.

In consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Parent and Sponsor hereby agree as follows:

1. Sponsor represents and warrants that (i) it holds 4,136,029 of the issued and outstanding shares of Class B common stock, par value $0.0001 per share, of Parent (the "Parent Class B Common Stock") and (ii) SRAC Partners holds 176,471 of the issued and outstanding shares of Parent Class B Common Stock, as of the date of this Letter Agreement. As of the date hereof, there are 4,312,500 shares of Parent Class B Common Stock issued and outstanding.

2. Subject to the satisfaction or waiver of each of the conditions to Closing set forth in Sections 8.1 and 8.3 of the Merger Agreement, immediately prior to and conditioned upon the consummation of the Closing, Sponsor shall surrender 1,437,500 shares of Parent Class B Common Stock (the "Sponsor Contingent Closing Shares") if, and only if, (i) the amount in the Trust Account (for the avoidance of doubt, prior to giving effect to the Parent Stockholder Redemptions and the payment of any Parent Transaction Costs), *minus* (ii) the aggregate amount of cash proceeds that will be required to satisfy the Parent Stockholder Redemptions (the result of clauses (i) *minus* (ii), the "Remaining Trust Amount"), is less than $100,000,000, in which event the Sponsor Contingent Closing Shares will be cancelled by Parent for no consideration. For the avoidance of doubt, if the Remaining Trust Amount is equal to or greater than $100,000,000, then the Sponsor Contingent Closing Shares shall not be subject to forfeiture, cancellation or vesting.

3. Subject to the satisfaction or waiver of each of the conditions to Closing set forth in Sections 8.1 and 8.3 of the Merger Agreement, effective immediately prior to and conditioned upon the consummation of the Closing, Sponsor and SRAC Partners each hereby waive any and all rights they have or will have under Section 4.3(b)(ii) of Parent's Amended and Restated Certificate of Incorporation to receive, with respect to each share of Parent Class B Common Stock held by Sponsor or SRAC Partners, more than one (1) share of Parent Class A Common Stock upon automatic conversion of such shares of Parent Class B Common Stock in accordance with Parent's Amended and Restated Certificate of Incorporation in connection with the consummation of the Transactions. Without limitation of the foregoing, upon the consummation of the Transactions, Sponsor and SRAC Partners each hereby acknowledge and agree that pursuant to Section 4.3(b)(i) of Parent's Amended and Restated Certificate of Incorporation, each share of Parent Class B Common Stock held by either Sponsor or SRAC Partners shall automatically convert into one (1) share of Parent Class A Common Stock.

4. Upon and subject to the Closing, 1,437,500 shares of Parent Class A Common Stock owned by Sponsor (the "Sponsor Earnout Shares") shall become subject to potential forfeiture upon the terms set forth in Article III of the Merger Agreement, such that such Sponsor Earnout Shares shall be forfeited if, and only if, the applicable vesting condition(s) set forth in Article III of the Merger Agreement are not satisfied prior to the expiration of the Earnout Period. If all or any portion of the Sponsor Earnout Shares vest in accordance with the terms of the Merger Agreement, any restrictive legends that have been placed on the Sponsor Earnout Shares, other than those, if any, required by applicable securities laws, shall be removed (and Parent hereby agrees to promptly cause the removal of such restrictive legends that have been placed on the applicable portion of the Sponsor Earnout Shares), and such vested Sponsor Earnout Shares shall not thereafter be subject to forfeiture, cancellation or additional vesting.

5. During the period commencing on the date hereof and ending on the earlier of the Closing and the termination of the Merger Agreement pursuant to Article IX thereof, if, and as often as, the outstanding shares of Parent Class A Common Stock or Parent Class B Common Stock shall have been changed into a different number of shares or a different class, by reason of any dividend, subdivision, reclassification, recapitalization, split, combination or exchange, or any similar event shall have occurred, then the number of Sponsor Contingent Closing Shares and Sponsor Earnout Shares to be surrendered or forfeited pursuant to Section 2 or Section 4 of this Letter Agreement (and, in the case of the Sponsor Earnout Shares, Article III of the Merger Agreement), will in each case be equitably adjusted to reflect such change.

6. Holders of the Sponsor Earnout Shares shall be entitled to vote such Sponsor Earnout Shares and receive dividends and other distributions in respect thereof prior to the vesting of such Sponsor Earnout Shares in accordance with the terms herein; provided, that any such dividends and other distributions in respect of the Sponsor Earnout Shares that are subject to vesting pursuant to the terms herein at the time of payment of such dividend or other distribution shall be set aside by Parent and shall be paid to the holder of such Sponsor Earnout Shares promptly following the vesting thereof (as applicable).

2

7.      Parent, Sponsor and to the extent applicable, SRAC Partners are subject to the terms and conditions of that certain letter agreement dated November 7, 2019 in connection with the initial public offering of Parent (the "Prior Letter Agreement"). The parties hereto acknowledge and agree that the Prior Letter Agreement shall survive the consummation of the Transactions in accordance with its terms, and Sponsor shall comply with, and fully perform all of its obligations, covenants and agreements set forth in, the Prior Letter Agreement; provided, that the parties agree that (and the Company, by its acceptance of this Letter Agreement, acknowledges that) (i) the phrase "one year" in clause (A) of Section 7(a) of the Prior Letter Agreement is hereby replaced with the phrase "six months", and (ii) the phrase "at least 150 days" in clause (B)(x) of Section (7)(a) of the Prior Letter Agreement is hereby deleted.

8.      During the period commencing on the date hereof and ending on the earlier of the Closing and the termination of the Merger Agreement pursuant to Article IX thereof, Sponsor shall not, without the prior written consent of the Company (which consent shall not be unreasonably withheld, conditioned or delayed), modify or amend any Contract between or among Sponsor or any Affiliate of Sponsor (other than Parent or any of its Subsidiaries), on the one hand, and Parent or any of Parent's Subsidiaries, on the other hand (including, for the avoidance of doubt, the Prior Letter Agreement).

9.      Sponsor and SRAC Partners each hereby acknowledge that they have read the Merger Agreement and this Letter Agreement and have had the opportunity to consult with their tax and legal advisors with respect thereto. Sponsor and SRAC Partners shall each be bound by and comply with Section 7.2 (Parent No Solicitation) and the final sentence of Section 7.8(c) (Confidentiality; Communications Plan; Access to Information) of the Merger Agreement (and any relevant definitions contained in any such Sections) as if Sponsor and SRAC Partners were original signatories to the Merger Agreement with respect to such provisions, *mutatis mutandis*.

10.     During the period commencing on the date hereof and ending on the earlier of the Closing and the termination of the Merger Agreement pursuant to Article IX thereof, at any meeting of the stockholders of Parent, or at any postponement or adjournment thereof, called to seek the affirmative vote of the holders of the outstanding Parent Shares entitled to vote thereon to adopt the Merger Agreement or in any other circumstances upon which a vote, consent or other approval of the stockholders of Parent with respect to the Merger Agreement, the Mergers or the other transactions contemplated by the Merger Agreement is sought, Sponsor and SRAC Partners shall each vote (or cause to be voted) all Parent Shares entitled to vote thereon currently or hereinafter owned by Sponsor and SRAC Partners in favor of the foregoing.

3

11. During the period commencing on the date hereof and ending on the earlier of the Closing and the termination of the Merger Agreement pursuant to Article IX thereof, at any meeting of the stockholders of Parent or at any postponement or adjournment thereof or in any other circumstances upon which Sponsor's and SRAC Partners' vote, consent or other approval (including by written consent) of the stockholders of Parent is sought, Sponsor and SRAC Partners shall each vote (or cause to be voted) all Parent Shares entitled to vote thereon, currently or hereinafter owned by Sponsor and SRAC Partners against and withhold consent with respect to any Parent Acquisition Transaction (other than the Merger Agreement and the transactions contemplated thereby, including the Mergers). Neither Sponsor nor SRAC Partners shall commit or agree to take any action in contravention of the foregoing that would be effective prior to the earlier of the Closing and the termination of the Merger Agreement pursuant to Article IX thereof.

12. During the period commencing on the date hereof and ending on the earlier of the Closing and the termination of the Merger Agreement pursuant to Article IX thereof, without the prior written consent of the Company, Sponsor and SRAC Partners each agree not to (a) transfer any Parent Shares or (b) deposit any Parent Shares into a voting trust or enter into a voting agreement or any similar agreement, arrangement or understanding with respect to Parent Shares or grant any proxy (except as otherwise provided herein), consent or power of attorney with respect thereto (other than pursuant to this Letter Agreement) that conflict with Sponsor's and SRAC Partners' obligations pursuant to Section 10 or Section 11; provided, that Sponsor and SRAC Partners each may, without the Company's prior written consent, transfer any such Parent Shares to any Affiliate of Sponsor or SRAC Partners, respectively, if, and only if, the transferee of such Parent Shares evidences in a writing reasonably satisfactory to Parent such transferee's agreement to be bound by and subject to the terms and provisions hereof to the same effect as Sponsor or SRAC Partners, respectively (to the extent applicable to such transferred Parent Shares).

13. During the period commencing on the date hereof and ending on the earlier of the Closing and the termination of the Merger Agreement pursuant to Article IX thereof, Sponsor and SRAC Partners each agree that any Parent Shares that either Sponsor or SRAC Partners purchases or otherwise hereinafter acquires or with respect to which either otherwise acquires voting power after the execution of this Letter Agreement and prior to the earlier of the Closing and the termination of the Merger Agreement pursuant to Article IX thereof shall be subject to the terms and conditions of this Letter Agreement to the same extent as if they were owned by Sponsor or SRAC Partner as of the date hereof.

14. Sponsor hereby represents and warrants to Parent as follows:

(a) Sponsor has the full power and authority to make, enter into and carry out the terms of this Letter Agreement. This Letter Agreement has been duly and validly executed and delivered by Sponsor and constitutes a valid and binding agreement of Sponsor enforceable against it in accordance with its terms, subject to the Remedies Exception.

4

(b) As of the date hereof, Sponsor is the owner of 495,000 shares of Parent Class A Common Stock, 4,136,029 shares of Parent Class B Common Stock, and 247,500 Private Placement Warrants, free and clear of any and all Liens, other than those (i) created by this Letter Agreement, the Prior Letter Agreement, the Charter Documents of Parent, the Merger Agreement, the Registration Rights Agreement dated November 7, 2019, by and among Parent, the Sponsor and Cantor Fitzgerald & Co. (the "RRA") or as otherwise disclosed pursuant to any Parent SEC Reports filed prior to the date hereof or (ii) arising under applicable securities Laws, and Sponsor does not own any other capital stock or other voting securities, or any rights to purchase or acquire any shares of capital stock or other equity securities of, Parent. Sponsor has and will have until the earlier of the Closing and the termination of the Merger Agreement pursuant to Article IX thereof sole voting power (including the right to control such vote as contemplated herein), power of disposition, power to issue instructions with respect to the matters set forth in this Letter Agreement and power to agree to all of the matters applicable to Sponsor set forth in this Letter Agreement.

(c) The execution and delivery of this Letter Agreement by Sponsor does not, and the performance by Sponsor of the obligations under this Letter Agreement and the compliance by Sponsor with any provisions hereof do not and will not: (i) conflict with or violate any Law applicable to Sponsor, (ii) contravene or conflict with, or result in any violation or breach of, any provision of any charter, articles of association, operating agreement or similar formation or governing documents and instruments of Sponsor, or (iii) result in any material breach of or constitute a material default (or an event that with notice or lapse of time or both would become a material default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, or result in the creation of a Lien on any of the Parent Shares owned by Sponsor pursuant to any Contract to which Sponsor is a party or by which Sponsor is bound, except, in the case of clause (i), (ii) or (iii), as would not reasonably be expected, either individually or in the aggregate, to materially impair the ability of Sponsor to perform its obligations hereunder or to consummate the transactions contemplated hereby.

(d) No consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity or any other Person is required by or with respect to Sponsor in connection with the execution and delivery of this Letter Agreement or the consummation by Sponsor of the transactions contemplated hereby, except as would not reasonably be expected, either individually or in the aggregate, to materially impair the ability of Sponsor to perform its obligations hereunder or to consummate the transactions contemplated hereby.

(e) As of the date hereof, there is no action pending against, or, to the knowledge of Sponsor, threatened against Sponsor that would reasonably be expected to materially impair the ability of Sponsor to perform its obligations hereunder or to consummate the transactions contemplated hereby.

5

(f) Except for this Letter Agreement and the Prior Letter Agreement, Sponsor has not: (i) entered into any voting agreement, voting trust or any similar agreement, arrangement or understanding, with respect to any Parent Shares or other equity securities of Parent owned by Sponsor, (ii) granted any proxy, consent or power of attorney with respect to any Parent Shares or other equity securities of Parent owned by Sponsor (other than as contemplated by this Letter Agreement) or (iii) entered into any agreement, arrangement or understanding that is otherwise inconsistent with, or would interfere with, or prohibit or prevent it from satisfying, its obligations pursuant to this Letter Agreement.

(g) Sponsor understands and acknowledges that the Company is entering into the Merger Agreement in reliance upon the Sponsor's execution and delivery of this Letter Agreement.

15.     SRAC Partners hereby represents and warrants to Parent as follows:

(a) SRAC Partners has the full power and authority to make, enter into and carry out the terms of this Letter Agreement. This Letter Agreement has been duly and validly executed and delivered by SRAC Partners and constitutes a valid and binding agreement of SRAC Partners enforceable against it in accordance with its terms, subject to the Remedies Exception.

(b) As of the date hereof, SRAC Partners is the owner of 0 shares of Parent Class A Common Stock, 176,471 shares of Parent Class B Common Stock, and 0 Private Placement Warrants, free and clear of any and all Liens, other than those (i) created by this Letter Agreement, the Prior Letter Agreement, the Charter Documents of Parent, the Merger Agreement, the RRA or as otherwise disclosed pursuant to any Parent SEC Reports filed prior to the date hereof or (ii) arising under applicable securities Laws, and SRAC Partners does not own any other capital stock or other voting securities, or any rights to purchase or acquire any shares of capital stock or other equity securities of, Parent. SRAC Partners has and will have until the earlier of the Closing and the termination of the Merger Agreement pursuant to Article IX thereof sole voting power (including the right to control such vote as contemplated herein), power of disposition, power to issue instructions with respect to the matters set forth in this Letter Agreement and power to agree to all of the matters applicable to SRAC Partners set forth in this Letter Agreement.

(c) The execution and delivery of this Letter Agreement by SRAC Partners does not, and the performance by SRAC Partners of the obligations under this Letter Agreement and the compliance by SRAC Partners with any provisions hereof do not and will not: (i) conflict with or violate any Law applicable to SRAC Partners, (ii) contravene or conflict with, or result in any violation or breach of, any provision of any charter, articles of association, operating agreement or similar formation or governing documents and instruments of SRAC Partners, or (iii) result in any material breach of or constitute a material default (or an event that with notice or lapse of time or both would become a material default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, or result in the creation of a Lien on any of the Parent Shares owned by SRAC Partners pursuant to any Contract to which SRAC Partners is a party or by which SRAC Partners is bound, except, in the case of clause (i), (ii) or (iii), as would not reasonably be expected, either individually or in the aggregate, to materially impair the ability of SRAC Partners to perform its obligations hereunder or to consummate the transactions contemplated hereby.

6

(d) No consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity or any other Person is required by or with respect to SRAC Partners in connection with the execution and delivery of this Letter Agreement or the consummation by SRAC Partners of the transactions contemplated hereby, except as would not reasonably be expected, either individually or in the aggregate, to materially impair the ability of SRAC Partners to perform its obligations hereunder or to consummate the transactions contemplated hereby.

(e) As of the date hereof, there is no action pending against, or, to the knowledge of SRAC Partners, threatened against SRAC Partners that would reasonably be expected to materially impair the ability of SRAC Partners to perform its obligations hereunder or to consummate the transactions contemplated hereby.

(f) Except for this Letter Agreement and the Prior Letter Agreement, SRAC Partners has not: (i) entered into any voting agreement, voting trust or any similar agreement, arrangement or understanding, with respect to any Parent Shares or other equity securities of Parent owned by SRAC Partners, (ii) granted any proxy, consent or power of attorney with respect to any Parent Shares or other equity securities of Parent owned by SRAC Partners (other than as contemplated by this Letter Agreement) or (iii) entered into any agreement, arrangement or understanding that is otherwise inconsistent with, or would interfere with, or prohibit or prevent it from satisfying, its obligations pursuant to this Letter Agreement.

(g) SRAC Partners understands and acknowledges that the Company is entering into the Merger Agreement in reliance upon SRAC Partners' execution and delivery of this Letter Agreement.

16. The Company is an express third party beneficiary of this Letter Agreement entitled to the rights and benefits hereunder and shall be entitled to enforce the provisions hereof as if it was a party hereto.

17. This Letter Agreement, together with the Merger Agreement to the extent referenced herein, the Prior Letter Agreement and the other agreements entered into by Sponsor and/or SRAC Partners in connection with the initial public offering of Parent constitute the entire agreement and understanding of the parties hereto in respect of the subject matter hereof and supersedes all prior understandings, agreements, or representations by or among the parties hereto, written or oral, relating to the subject matter hereof.

18. No party hereto may assign either this Letter Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other parties hereto, and any purported assignment in violation of the foregoing shall be null and void ab initio. This Letter Agreement shall be binding on the parties hereto and their respective successors and assigns.

7

19. This Letter Agreement shall be construed and interpreted in a manner consistent with the provisions of the Merger Agreement. In the event of any conflict between the terms of this Letter Agreement and the Merger Agreement, the terms of the Merger Agreement shall govern. The provisions set forth in Sections 11.3 (Counterparts; Electronic Delivery), 11.5 (Severability), 11.6 (Other Remedies; Specific Performance), 11.7 (Governing Law), 11.8 (Consent to Jurisdiction; Waiver of Jury Trial), 11.12 (Amendment) and 11.13 (Extension; Waiver) of the Merger Agreement, as in effect as of the date hereof, are hereby incorporated by reference into, and shall be deemed to apply to, this Letter Agreement *mutatis mutandis*.

20. Any notice, consent or request to be given in connection with any of the terms or provisions of this Letter Agreement shall be in writing and shall be sent in the same manner as provided in the Merger Agreement, with (a) notices to Parent being sent to the addresses set forth therein, in each case with all copies as required thereunder and (b) notices to Sponsor or SRAC Partners being sent to:

SRC-NI Holdings, LLC
1345 Abbot Kinney Blvd
Venice, California 90291
Attention:    Brian Kabot
Email:        brian@stableroadcapital.com
with a copy (which shall not constitute notice) to:
Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention:    Douglas C. Gessner, P.C.
              Bradley C. Reed, P.C.
              Kevin M. Frank
E-mail:       douglas.gessner@kirkland.com
              bradley.reed@kirkland.com
              kevin.frank@kirkland.com

21. This Letter Agreement shall immediately and automatically terminate, and have no further force and effect, upon the termination of the Merger Agreement in accordance with its terms prior to the Effective Time.

*[The remainder of this page left intentionally blank.]*

8

Please indicate your agreement to the terms of this Letter Agreement by signing where indicated below.

Very truly yours,

SRC-NI Holdings, LLC

By its Managing Members

/s/ Edward K. Freeman

Edward K. Freedman

/s/ Brian Kabot

Brian Kabot

/s/ Juan Manuel Quiroga

Juan Manuel Quiroga

SRAC PIPE Partners LLC

By:     /s/ Brian Kabot

Name:  Brian Kabot

Title:   Chief Executive Officer

Acknowledged and agreed
as of the date of this Letter Agreement:

Stable Road Acquisition Corp.

By:     /s/ Brian Kabot

Name:  Brian Kabot

Title:   Chief Executive Officer

*Signature Page to Sponsor Agreement*

**Exhibit 10.4**
**EXECUTION**

**REPURCHASE AGREEMENT**

This REPURCHASE AGREEMENT (this "Agreement") is made and entered into as of October 7, 2020, by and among Stable Road Acquisition Corp., a Delaware corporation ("Parent"), Prime Movers Lab Fund I LP (the "Holder") and Momentus Inc., a Delaware corporation (the "Company"). Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Merger Agreement (as defined below).

WHEREAS, as set forth in that certain Agreement and Plan of Merger, dated as of the date hereof (the "Merger Agreement"), by and among Parent, Project Marvel First Merger Sub, Inc., a Delaware corporation and a direct, wholly-owned subsidiary of Parent ("First Merger Sub"), Project Marvel Second Merger Sub, LLC a Delaware limited liability company and a direct, wholly-owned subsidiary of Parent ("Second Merger Sub") and the Company, amongst other things and in accordance with the terms and subject to the conditions set forth therein (i) First Merger Sub will merge with and into the Company, with the Company surviving as the Surviving Corporation (the "First Merger"), and (ii) immediately following the First Merger and as part of the same overall transaction, the Surviving Corporation will merge with and into Second Merger Sub, with Second Merger Sub surviving as the Surviving Entity (the "Second Merger", together with the First Merger, the "Mergers");

WHEREAS, the PIPE Investors have entered into Subscription Agreements with Parent, pursuant to which, among other things and on the terms and subject to the conditions set forth in such Subscription Agreements, such PIPE Investors have agreed to purchase from Parent shares of Parent's Class A common stock, par value $0.0001 per share (the "Class A Common Stock"), for cash in an aggregate purchase price equal to the PIPE Investment Amount, with such purchases to be consummated immediately prior to the closing under the Merger Agreement; and

WHEREAS, Parent has agreed to repurchase a number of shares of Class A Common Stock from the Holder at a price of $10.00 per share, effective as of immediately following the consummation of the Second Merger pursuant to the terms of the Merger Agreement (the "Second Effective Time"), as further described below.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

1. Repurchase.

(a) Repurchase Shares. In accordance with the terms and subject to the conditions of this Agreement, following the Second Effective Time, Parent hereby agrees to purchase from the Holder, and the Holder hereby agrees to sell to Parent (the "Repurchase"), the number of shares of Class A Common Stock (such shares, the "Repurchase Shares") equal to: (x) the Aggregate Repurchase Price (defined below) *divided by* (y) $10.00, and rounded down to the nearest whole number of shares, as applicable.

(b) <u>Certain Definitions</u>. For purposes of this Agreement:

(i) "<u>Net Proceeds</u>" shall equal the amount equal to (I) Parent Cash at the Closing, *minus* (II) the sum of (x) Parent Transaction Costs, (y) Company Transaction Costs and (z) amounts payable by Parent to Parent stockholders in connection with the Parent Stockholder Redemptions; and

(ii) "<u>Aggregate Repurchase Price</u>" shall equal:

(1) If the Net Proceeds are greater than or equal to $280,000,000, $30,000,000;

(2) If the Net Proceeds are less than $280,000,000 but greater than $265,000,000, (x) the Net Proceeds, *minus* (y) $250,000,000; and

(3) If the Net Proceeds are less than or equal to $265,000,000, $0. In such event, this Agreement shall automatically terminate and become null and void and neither party shall have any obligations hereunder.

(iii) "<u>Holder Expense Amount</u>" shall equal the amount equal to 3.3% of the Aggregate Repurchase Price.

2. <u>Qualifications</u>. Notwithstanding anything to the contrary in this Agreement:

(a) in no event will Parent be required to fund more than the Aggregate Repurchase Price, in each case, pursuant to <u>Section 1</u> (it being understood that the Aggregate Purchase Price may be zero);

(b) nothing in this Agreement shall limit or modify the rights or obligations of any party under the Merger Agreement; and

(c) this Agreement will become effective upon, and only upon, the Closing (as defined in the Merger Agreement), and if the Closing (as defined in the Merger Agreement) does not occur or the Merger Agreement is validly terminated for any reason, this Agreement shall automatically terminate and become null and void and neither party shall have any obligations hereunder.

3. <u>Closing</u>.

(a) In accordance with the terms and subject to the conditions of this Agreement, the closing of the transaction contemplated by <u>Section 1</u> (the "<u>Closing</u>") shall take place promptly following the Second Effective Time. At the Closing:

(i) Subject to the Aggregate Repurchase Price being greater than $0.00, Parent shall deliver (or cause to be delivered) to the Holder an amount in cash, by wire transfer of immediately available funds to an account designated by the Holder in writing no later than five (5) Business Days prior to the Closing, equal to (x) the Aggregate Repurchase Price, *minus* (y) the Holder Expense Amount; and

2

(ii) the Holder shall deliver (or cause to be delivered):

    (1)    the Repurchase Shares (along with any applicable instruments of transfer, including stock powers and letters of transmittal, as applicable) in book entry form to Parent or to a custodian designated by Parent prior to the Closing;

    (2)    a validly executed IRS Form W-9;

    (3)    a completed copy of the Tax Certification Form attached hereto as Exhibit A; and

    (4)    such documents or instruments required by the Company's transfer agent.

(b) The Closing shall be subject to the conditions that, on the Closing Date:

(i) all of the conditions set forth in Article VIII of the Merger Agreement (including the condition set forth in Section 8.2(g) of the Merger Agreement) shall have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver thereof in accordance with the terms of the Merger Agreement), the Mergers shall have been consummated and the Second Effective Time shall have occurred;

(ii) Parent shall have received the PIPE Investment Amount; and

(iii) (x) with respect to Parent, all representations and warranties of the Holder contained in this Agreement shall be true and correct in all material respects as of the Closing Date (except with respect to such representations and warranties which speak as to an earlier date, which representations and warranties shall be true and correct in all material respects at and as of such date, except for changes after the date of this Agreement which are contemplated or expressly permitted by this Agreement or the Merger Agreement), except for, in each case, inaccuracies in the representations and warranties of the Holder which would not preclude the ability of the Holder to consummate the transactions contemplated hereby, and consummation of the Closing shall constitute a reaffirmation by the Holder of each of the representations, warranties and agreements of the Holder contained in this Agreement as of the Closing Date; and (y) with respect to the Holder, all representations and warranties of Parent contained in this Agreement shall be true and correct in all material respects as of the Closing Date (except with respect to such representations and warranties which speak as to an earlier date, which representations and warranties shall be true and correct in all material respects at and as of such date, except for changes after the date of this Agreement which are contemplated or expressly permitted by this Agreement or the Merger Agreement), except for, in each case, inaccuracies in the representations and warranties of Parent which would not preclude the ability of Parent to consummate Repurchase, and consummation of the Closing shall constitute a reaffirmation by Parent of each of the representations, warranties and agreements of Parent contained in this Agreement as of the Closing Date.

(c) At the Closing, the parties hereto shall execute and deliver such additional documents and take such additional actions as the parties reasonably may deem to be practical and necessary in order to consummate the transactions contemplated by this Agreement, on the terms and conditions set forth herein.

3

4. <u>Withholding</u>. Parent, the Company and, following the Second Effective Time, the Surviving Entity, and each of their respective agents, Affiliates and representatives, shall be entitled to deduct and withhold from any amount payable pursuant to this Agreement any amounts as may be required to be deducted and withheld from such amounts under the Internal Revenue Code of 1986, as amended, or any other applicable Law (as reasonably determined by Parent, the Company and, following the Second Effective Time, the Surviving Entity, respectively). To the extent that any amounts are so deducted and withheld, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the person in respect of which such deduction and withholding was made. In the event that withholding was required, to the extent that such amounts are not so deducted and withheld from any Person, such Person shall indemnify Parent, the Company and, following the Second Effective Time, the Surviving Entity, and each of their respective agents, Affiliates and representatives that was required to perform such withholding, for such amounts, together with any related losses.

5. The Holder acknowledges and agrees that the Holder Expense Amount shall represent the Holder's obligation to pay the Company a portion of the Company Transaction Costs, and Parent, the Holder and the Company each hereby agree that Parent can withhold the Holder Expense Amount from the Aggregate Repurchase Price in full satisfaction and release of the Holder's obligation to pay the Company such portion of the Company Transaction Costs.

6. <u>Parent Representations and Warranties</u>. Parent represents and warrants to the Holder that:

(a) <u>Due Incorporation, Authorization and Enforceability</u>. Parent is duly incorporated and in good standing under the laws of the State of Delaware. Subject to obtaining the approvals in connection with Parent's performance of the Merger Agreement, this Agreement and the transactions contemplated thereby and hereby (the "<u>Required Approvals</u>"), (i) Parent has all requisite corporate power and authority to execute and deliver this Agreement and to consummate the Repurchase, (ii) this Agreement has been duly authorized, executed and delivered by Parent, and (iii) assuming due authorization, execution and delivery by, and enforceability against, the Holder, this Agreement constitutes the valid and binding obligation of Parent, enforceable against Parent in accordance with its terms, subject to the Remedies Exception.

(b) <u>No Conflict</u>. Subject to obtaining the Required Approvals, the execution and delivery by Parent of this Agreement and the consummation by Parent of the Repurchase will not (i) conflict with Parent's certificate of incorporation and bylaws, as in effect at the time of such execution and delivery and the Repurchase, respectively, (ii) violate or conflict with any provision of, or result in the breach of, or default under any applicable Law or governmental order applicable to Parent, or (iii) violate or conflict with any provision of, or result in the breach of, result in the loss of any right or benefit, or cause acceleration, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under any contract, agreement or instrument ("<u>Contract</u>") to which Parent is a party or by which Parent may be bound, or terminate or result in the termination of any such Contract, except, in the case of clauses (ii) and (iii), to the extent that the occurrence of the foregoing would not have, or would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of Parent to enter into and perform its obligations under this Agreement.

4

(c) <u>No Consents</u>. Subject to obtaining the Required Approvals, no consent, waiver, approval or authorization of, or designation, declaration or filing with, or notification to, any Governmental Entity or other person is required on the part of Parent with respect to Parent's execution or delivery of this Agreement or the consummation of the Repurchase.

(d) <u>No Other Representations or Warranties</u>. Parent acknowledges that there have been no representations, warranties, covenants and agreements made to Parent by the Holder, expressly or by implication, other than those representations, warranties, covenants and agreements included in this Agreement.

7. <u>Holder Representations and Warranties</u>. The Holder represents and warrants to Parent that:

(a) <u>Authorization and Enforceability</u>. The Holder is duly organized and in good standing as a limited partnership under the laws of the State of Delaware and is treated as a partnership for applicable income tax purposes. The execution and delivery by the Holder of this Agreement, the performance by the Holder of its obligations hereunder and the consummation by the Holder of the transactions contemplated hereby, have been duly authorized by all requisite action on the part of the Holder. This Agreement has been duly executed and delivered by the Holder, and (assuming due authorization, execution and delivery by, and enforceability of this Agreement against, Parent) this Agreement constitutes a legal, valid and binding obligation of the Holder, enforceable against the Holder in accordance with its terms, subject to the Remedies Exception.

(b) <u>No Conflict</u>. The execution and delivery by the Holder of this Agreement, the performance by the Holder of its obligations hereunder and the consummation by the Holder of the transactions contemplated hereby will not (i) conflict with the Holder's partnership agreement, certificate of limited partnership and other organizational documents, as in effect at the time of such execution and delivery and the Repurchase, respectively, (ii) violate or conflict with any provision of, or result in the breach of, or default under any applicable Law or governmental order applicable to the Holder, or (iii) violate or conflict with any provision of, or result in the breach of, result in the loss of any right or benefit, or cause acceleration, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under any Contract to which the Holder is a party or by which the Holder may be bound, or terminate or result in the termination of any such Contract, except, in the case of clauses (ii) and (iii), to the extent that the occurrence of the foregoing would not have, or would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of the Holder to enter into and perform its obligations under this Agreement.

(c) <u>No Consents</u>. No consent, waiver, approval or authorization of, or designation, declaration or filing with, or notification to, any Governmental Entity or other person is required on the part of the Holder with respect to the execution and delivery by the Holder of this Agreement, the performance by the Holder of its obligations hereunder and the consummation by the Holder of the transactions contemplated hereby.

5

(d) <u>Ownership of Repurchase Shares</u>. Immediately prior to the Closing, the Holder will own, beneficially and of record, and will have valid title to, and the right to transfer to Parent, all of the Repurchase Shares to be sold by the Holder to Parent pursuant to this Agreement, free and clear of any Lien of any kind or nature whatsoever. At the Closing, upon delivery from the Holder of the Repurchase Shares in book entry form to Parent, in accordance with the terms of this Agreement, or to a custodian designated by Parent prior to the Closing, and payment of the Repurchase Price for such Repurchase Shares, good and valid title to such Repurchase Shares, free and clear of all Liens, will pass to Parent. No person has any written or oral agreement, arrangement or understanding or option for, or any right or privilege (whether by Law, preemption or contract) that is or is capable of becoming an agreement, arrangement or understanding or option for, the purchase or acquisition from the Holder of any of the Repurchase Shares.

(e) <u>Information</u>. The Holder acknowledges that it knows that Parent may have material, non-public information regarding Parent and its condition (financial and otherwise), results of operations, businesses, properties, plans and prospects (collectively, "<u>Information</u>"). The Holder acknowledges that it has been offered and does not wish to receive any of this Information and that such Information might be material to the Holder's decision to sell the Repurchase Shares or otherwise materially adverse to the Holder's interests. Accordingly, the Holder acknowledges and agrees that Parent shall not have any obligation to disclose to the Holder any of such Information. The Holder, either alone or together with its representatives, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the transactions contemplated by this Agreement, including the Repurchase. The Holder hereby waives and releases, to the fullest extent permitted by applicable Law, any and all claims and causes of action it has or may have against Parent and its Affiliates, controlling persons, officers, directors, employees, representatives and agents, based upon, relating to or arising out of the Repurchase and the other transactions contemplated hereby, including (without limitation) any claim or cause of action based upon, relating to or arising out of nondisclosure of the Information.

(f) <u>No Other Representations or Warranties</u>. The Holder acknowledges that there have been no representations, warranties, covenants and agreements made to the Holder by Parent, or its officers or directors, expressly or by implication, other than those representations, warranties, covenants and agreements included in this Agreement.

8. <u>Miscellaneous</u>.

(a) <u>Notices</u>. All notices and other communications among the parties shall be in writing and shall be deemed to have been duly given (i) when delivered in person, (ii) when delivered after posting in the United States mail having been sent registered or certified mail return receipt requested, postage prepaid, (iii) when delivered by FedEx or other nationally recognized overnight delivery service, or (iv) when delivered by email (provided no "bounceback" or notice of non-delivery is received), addressed as follows:

> if to Parent, to:
> Stable Road Acquisition Corp.
> 1345 Abbott Kinney Boulevard
> Venice, CA 90291
>> Attention:    Brian Kabot
> Juan Quiroga
>> E-mail:    brian@stableroadcapital.com
>> juan@nalainvestments.com

6

with a copy to (which shall not constitute notice):

        Kirkland & Ellis LLP
        300 North LaSalle
        Chicago, IL 60654
        Attention:    Douglas C. Gessner, P.C.
                      Bradley C. Reed, P.C.
                      Kevin M. Frank
        E-mail:       douglas.gessner@kirkland.com
                      bradley.reed@kirkland.com
                      kevin.frank@kirkland.com

if to the Holder, to:

        Prime Movers Lab LLC
        P.O. Box 12829
        Jackson, WY 83002
        Attention:    Daniel Narea
        E-mail:       daniel@primemoverslab.com

with a copy to (which shall not constitute notice):

        Hogan Lovells US LLP
        3 Embarcadero Center
        Suite 1500
        San Francisco, CA 94111
        Attention:    Jon Layman
        E-mail:       jon.layman@hoganlovells.com

if to the Company, to:

        Momentus Inc.
        3050 Kenneth St.
        Santa Clara, CA 95054
        Attention:    Alexander Fishkin
        E-mail:       alex@momentus.space

with a copy to (which shall not constitute notice):

        Orrick, Herrington & Sutcliffe LLP
        631 Wilshire Blvd, Suite 2-C
        Santa Monica, CA 90401
        Attention:    Daniel S. Kim
                      Hari Raman
                      Albert W. Vanderlaan
        E-mail:       dan.kim@orrick.com
                      hraman@orrick.com
                      avanderlaan@orrick.com

or to such other address or addresses as the parties may from time to time designate in writing. Copies delivered solely to outside counsel shall not constitute notice.

(b) <u>Headings; Counterparts</u>. The headings in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(c) <u>Expenses</u>. Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

(d) <u>Entire Agreement; Third-Party Beneficiaries</u>. This Agreement constitutes the entire agreement among the parties relating to the transactions contemplated hereby and supersedes any other agreements, whether written or oral, that may have been made or entered into by or among any of the parties hereto relating to the transactions contemplated hereby. Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any Person, other than the parties hereto, any right or remedies under or by reason of this Agreement.

(e) <u>Severability</u>. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the parties.

(f) <u>Governing Law; Jurisdiction</u>. This Agreement, and all claims or causes of action based upon, arising out of, or related to this Agreement or the transactions contemplated hereby, shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to principles or rules of conflict of laws to the extent such principles or rules would require or permit the application of laws of another jurisdiction. Any proceeding or action based upon, arising out of or related to this Agreement or the transactions contemplated hereby must be brought in the Court of Chancery of the State of Delaware (or, to the extent such Court does not have subject matter jurisdiction, the Superior Court of the State of Delaware), or, if it has or can acquire jurisdiction, in the United States District Court for the District of Delaware, and each of the parties irrevocably submits to the exclusive jurisdiction of each such court in any such proceeding or action, waives any objection it may now or hereafter have to personal jurisdiction, venue or to convenience of forum, agrees that all claims in respect of the proceeding or action shall be heard and determined only in any such court, and agrees not to bring any proceeding or action arising out of or relating to this Agreement or the transactions contemplated hereby in any other court. Nothing herein contained shall be deemed to affect the right of any party to serve process in any manner permitted by Law or to commence legal proceedings or otherwise proceed against any other party in any other jurisdiction, in each case, to enforce judgments obtained in any action, suit or proceeding brought pursuant to this <u>Section 8(f)</u>.

(g) <u>Waiver of Jury Trial</u>. **EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY, UNCONDITIONALLY AND VOLUNTARILY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, SUIT OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.**

(h) <u>Assignment</u>. No party hereto shall assign this Agreement or any part hereof without the prior written consent of the other parties and any such transfer without prior written consent shall be void. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

(i) <u>Publicity</u>.

(i) All press releases or other public communications relating to the transactions contemplated hereby, and the method of the release for publication thereof, shall be subject to the prior mutual approval of Parent and the Holder, which approval shall not be unreasonably withheld, conditioned or delayed; provided, however that no consent shall be required for any communications to a director, manager, officer, stockholder, partner, limited partner, member, potential investor or affiliate of such entity or an investment fund or other entity controlled or managed by such entity or any of its affiliates.

(ii) The restriction in <u>Section 8(i)(i)</u> shall not apply to the extent the public announcement is required by applicable securities law, any Governmental Entity or stock exchange rule; <u>provided</u>, <u>however</u>, that in such an event, the party making the announcement shall use its commercially reasonable efforts to consult with the other parties in advance as to its form, content and timing.

(j) <u>Amendment and Modification; Waiver</u>. This Agreement may be amended or modified in whole or in part, only by a duly authorized agreement in writing executed in the same manner as this Agreement and which makes reference to this Agreement. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

9

(k) <u>Enforcement</u>. The parties hereto agree that irreparable damage could occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to seek specific enforcement of the terms and provisions of this Agreement, in addition to any other remedy to which any party is entitled at law or in equity. In the event that any action shall be brought in equity to enforce the provisions of this Agreement, no party shall allege, and each party hereby waives the defense, that there is an adequate remedy at law, and each party agrees to waive any requirement for the securing or posting of any bond in connection therewith.

(l) <u>Non-Recourse</u>. This Agreement may only be enforced against, and any claim or cause of action based upon, arising out of, or related to this Agreement or the transactions contemplated hereby may only be brought against, the entities that are expressly named as parties hereto and any express guarantor of any such party's obligations hereunder and then only with respect to the specific obligations set forth herein with respect to such party; <u>provided</u>, <u>however</u>, that the foregoing shall not relieve any party for liability with respect to fraud.

(m) <u>Termination</u>. This Agreement shall terminate and be void and of no further force and effect and all rights and obligations of the parties hereunder shall terminate without any further liability on the part of any party in respect thereof, upon the earliest to occur of (i) such date and time as the Merger Agreement is terminated in accordance with its terms, (ii) upon the mutual written agreement of each of the parties hereto to terminate this Agreement, or (iii) if any of the conditions to Closing set forth in <u>Section 3(b)</u> of this Agreement are not satisfied or waived, or are not capable of being satisfied, on or prior to the Closing and, as a result thereof, the transactions contemplated by this Agreement will not be and are not consummated at the Closing; <u>provided</u>, that nothing herein shall relieve any party from liability for any willful breach hereof prior to the time of termination.

[SIGNATURE PAGE FOLLOWS]

10

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement or caused their duly authorized officers to execute this Agreement as of the date first above written.

**STABLE ROAD ACQUISITION CORP.**

By:    /s/ Brian Kabot

Name:  Brian Kabot

Title:    Chief Executive Officer

[*Signature Page to Repurchase Agreement*]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement or caused their duly authorized officers to execute this Agreement as of the date first above written.

**PRIME MOVERS LAB FUND I LP**

By:   Prime Movers Lab GP I LLC

Its:   General Partner

By:   /s/ Dakin Sloss

Name: Dakin Sloss

Title:  Authorized Person

[*Signature Page to Repurchase Agreement*]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement or caused their duly authorized officers to execute this Agreement as of the date first above written.

**MOMENTUS INC.**

By:   /s/ Mikhail Kokorich

Name:  Mikhail Kokorich
Title:   Chief Executive Officer

[*Signature Page to Repurchase Agreement*]

**Exhibit 99.1**



**MOMENTUS TO BECOME PUBLIC THROUGH MERGER WITH STABLE ROAD ACQUISITION CORP.**

- Merger to create the first publicly traded space infrastructure company at the forefront of the new space economy
- Momentus partners and customers include SpaceX, Lockheed Martin, and NASA
- Momentus to become publicly listed through a business combination with Stable Road Acquisition Corp. (Nasdaq: SRAC, SRACU, SRACW) ("Stable Road")
- Combined company will have an estimated enterprise value of approximately $1.2 billion and will become listed on Nasdaq under the ticker symbol "MNTS" following expected transaction close in early 2021
- Pro forma for the transaction, Momentus will have approximately $310 million in cash on the balance sheet, to be funded by Stable Road's $172.5 million of cash held in trust (assuming no redemptions) and $175.0 million from a fully committed common stock PIPE at $10.00 per share, including investments from private equity growth investors, family offices and select top tier public institutional investors

SANTA CLARA, Calif.--(BUSINESS WIRE) -- **Momentus Inc.** ("Momentus" or the "Company"), a commercial space company offering in-space transportation and infrastructure services, today announced it has signed a definitive merger agreement with Stable Road Acquisition Corp. (Nasdaq: SRAC, SRACU, SRACW) ("Stable Road") that will result in the Company becoming publicly listed. Upon the closing of the transaction, the combined operating company will be named Momentus Inc. and its securities will be listed on Nasdaq and trade under the ticker symbol "MNTS."

Momentus graduated from the prestigious Y Combinator program and has raised venture and private funding from notable investors such as Prime Movers Lab, Y Combinator, Tribe Capital, University of Wyoming Foundation, Lerner Enterprise, Tony Robbins, Joe Montana's liquid2VC fund and others.

The current size of the global space economy is expected to grow from an estimated $415 billion to $1.4 trillion by 2030 driving demand for transportation and infrastructure services in space. With the significant market opportunity in the new space economy, Momentus is well-positioned to address the need for in-space transportation and infrastructure services. Utilizing a multi-pronged approach, Momentus is developing capabilities to provide critical infrastructure services: in-space transportation, satellite as a service, and in-orbit services. The Company has strong momentum from the rapidly expanding small satellite market, which is seeking low-cost and regular launch access to orbit. Momentus' customers include satellite operators, satellite manufacturers, launch providers, defense primes such as Lockheed Martin and government agencies such as NASA. As of September 30, 2020, the Company had customer contracts which represent approximately $90 million in potential revenue over the next several years.

Momentus is creating the first hub and spoke model in space by offering last-mile delivery in partnership with key launch operators, including SpaceX. Momentus offers its customers significantly more affordable access to space by combining the capabilities of low-cost launch vehicles and Momentus' transport and service vehicles, powered by water plasma propulsion technology. Momentus plans to expand its offerings by providing a satellite as a service model for hosted payloads and an in-orbit service model for satellite deorbiting, life extension, refueling, and repositioning. In 2019, the Company successfully tested its water plasma propulsion technology in space.

Momentus has developed its first transport and service vehicle, Vigoride, to serve the needs of customers in Low Earth Orbit by delivering small satellites up to 750kg to precise destinations, and expects to provide hosted payload services, and in-orbit services. The Company plans to launch its first Vigoride vehicle in December 2020 with commercial customers and four to five Vigorides in 2021. The Company is developing two larger, more capable vehicles in its development plans: Ardoride in 2022 and Fervoride in 2024 with the goal of serving all orbits up to Geosynchronous Orbit and even Lunar Orbit and handling payloads of up to 4,000 kg. To extend the capabilities of gigantic rockets like SpaceX's Starship and Blue Origin's New Glenn, the Company is building its largest vehicle to date – Fervoride, which the Company expects to be capable of delivering up to 20 tons of cargo anywhere from Low Earth Orbit to Geosynchronous Orbit and into deep space. Fervoride is expected to be a pathfinder for the prospecting and use of space resources such as water from the Moon and asteroids and a technology enabler for the largest moonshot opportunities like solar energy generation in space.

"Momentus is at the forefront of the new space economy and is poised to capitalize on the significant growth opportunity as a first mover; we believe in a future where humanity is equipped with all it needs to flourish throughout the solar system," said Mikhail Kokorich, Founder & Chief Executive Officer of Momentus. "Our mission is to provide the infrastructure services that support all industry beyond Earth. The technologies we've developed or built upon, including our groundbreaking water plasma propulsion, will support growing demand from the booming satellite industry with affordable, versatile and low risk transportation and infrastructure services across private companies, government agencies, and research organizations. We expect to deploy the proceeds of this transaction to support our rapid growth and operations, and to support our capital needs as we ramp up revenues. We are excited to partner with the Stable Road team and look forward to leveraging their capital markets expertise."

Brian Kabot, Chairman & Chief Executive Officer of Stable Road added, "We set out to identify a disruptive company and Momentus was the most unique and compelling opportunity to create value through our investment, as we believe the Company is primed to be a leader in the rapidly growing new space economy. As the only public, pure-play commercial space company capable of revolutionizing space infrastructure, Momentus is poised to capitalize on its market-defining position. We are excited to partner with Momentus as the Company develops its technology portfolio, continues to leverage deep customer relationships across diverse private and public sector applications, and expands its experienced leadership team."

2

**Transaction Overview**

Pursuant to the transaction, Stable Road, which currently holds approximately $172.5 million of cash in trust, will combine with Momentus, which is estimated to result in a pro forma enterprise value of approximately $1.2 billion. Momentus' existing equity security holders will hold approximately 75% of the issued and outstanding shares of Class A common stock immediately following the consummation of the merger, assuming no redemptions by Stable Road's existing public stockholders.

Cash proceeds in connection with the transaction will be funded through a combination of Stable Road's cash in trust and through a $175.0 million fully committed common stock PIPE at $10.00 per share, including investments from private equity growth investors, family offices and select top tier public institutional investors.

The boards of directors of both Momentus and Stable Road have unanimously approved the proposed transaction. Completion of the proposed transaction is subject to approval of Stable Road and Momentus stockholders and other closing conditions, including a registration statement being declared effective by the Securities and Exchange Commission, and is expected to be completed in early 2021.

Additional information about the proposed transaction, including a copy of the merger agreement and investor presentation, will be provided in a Current Report on Form 8-K to be filed by Stable Road with the Securities and Exchange Commission ("SEC") and available at http://www.sec.gov and on Momentus' website at http://www.momentus.space. Stable Road will file a registration statement (which will contain a proxy statement/prospectus) with the SEC in connection with the transaction.

**Advisors**

Evercore is serving as the exclusive financial advisor and capital markets advisor to Momentus. Cantor Fitzgerald & Co. is serving as capital markets advisor to Stable Road. Orrick, Herrington & Sutcliffe LLP is serving as legal advisor to Momentus, and Kirkland & Ellis LLP is serving as legal advisor to Stable Road. ICR is serving as investor relations and communications advisor to Momentus.

Evercore and Cantor Fitzgerald & Co. are the private placement agents.

**Investor Conference Call**

Momentus and Stable Road will host a joint investor conference call to discuss the business and the proposed transaction today, October 7, 2020, at 8:00 AM ET.

To listen to the conference call via telephone, dial 1-877-407-4018 or 1-201-689-8471 (international callers/U.S. toll) and enter the conference ID number 13711584. To listen to the webcast, please click here. A replay of the call will be accessible at the webcast link.

For Momentus investor relations, including a copy of the presentation as filed with the SEC, visit https://momentus.space/investors.

3

**About Momentus**

As a first mover in building in-space transportation and infrastructure technology, Momentus is at the forefront of the commercialization of space. With an experienced team of aerospace, propulsion, and robotics engineers, Momentus has developed a cost-effective and energy efficient in-space transport system based on water plasma propulsion technology. Momentus has in-place service agreements with private satellite companies, government agencies, and research organizations, and its first Vigoride™ transport and service vehicle launch is scheduled for December 2020.

**About Stable Road Acquisition Corp**

Stable Road Acquisition Corp. (Nasdaq: SRAC, SRACW, SRACU) is a special purpose acquisition company formed by SRC-NI Holdings, LLC, an affiliate of Stable Road Capital, for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination.

**Forward Looking Statements**

This press release may contain a number of "forward-looking statements" as defined in the Private Securities Litigation Reform Act of 1995. Forward-looking statements include statements about the expected timing of the completion of this transaction, information concerning Stable Road's or Momentus' possible or assumed future results of operations, business strategies, the expected development, capabilities and timing of the operation or offering of Momentus' transport vehicles and services, the expected timing of Momentus' first mission in December 2020, potential revenue from customer contracts, debt levels, competitive position, industry environment, potential growth opportunities and the effects of regulation, including whether this transaction will generate returns for stockholders. These forward-looking statements are based on Stable Road's or Momentus' management's current expectations, estimates, projections and beliefs, as well as a number of assumptions concerning future events. When used in this press release, the words "estimates," "projected," "expects," "anticipates," "forecasts," "plans," "intends," "believes," "seeks," "may," "will," "should," "future," "propose" and variations of these words or similar expressions (or the negative versions of such words or expressions) are intended to identify forward-looking statements.

These forward-looking statements are not guarantees of future performance, conditions or results, and involve a number of known and unknown risks, uncertainties, assumptions and other important factors, many of which are outside Stable Road's or Momentus' management's control, that could cause actual results to differ materially from the results discussed in the forward-looking statements. These risks, uncertainties, assumptions and other important factors include, but are not limited to: changes in domestic and foreign business, market, financial, political and legal conditions; the inability of the parties to successfully or timely consummate the proposed business combination, including the risk that any required regulatory approvals are not obtained, are delayed or are subject to unanticipated conditions that could adversely affect the combined company or the expected benefits of the proposed business combination or that the approval of the stockholders of Stable Road or Momentus is not obtained; failure to realize the anticipated benefits of the proposed business combination; risks relating to the uncertainty of the projected financial information with respect to Momentus; risks related to the ability of customers to cancel contracts for convenience; risks related to the rollout of Momentus' business and the timing of expected business milestones; the effects of competition on Momentus' future business; level of product service or product or launch failures that could lead customers to use competitors' services; developments and changes in laws and regulations, including increased regulation of the space transportation industry; the impact of significant investigative, regulatory or legal proceedings; the amount of redemption requests made by Stable Road's public stockholders; the ability of Stable Road or the combined company to issue equity or equity-linked securities in connection with the proposed business combination or in the future; and other risks and uncertainties indicated from time to time in the definitive proxy statement/consent solicitation statement/prospectus relating to the proposed business combination, including those under "Risk Factors" therein, and other documents filed or to be filed with the SEC by Stable Road. You are cautioned not to place undue reliance upon any forward-looking statements, which speak only as of the date made.

4

Forward-looking statements included in this press release speak only as of the date of this press release. Except as required by law, neither Stable Road nor Momentus undertakes any obligation to update or revise its forward-looking statements to reflect events or circumstances after the date of this release. Additional risks and uncertainties are identified and discussed in the Stable Road's reports filed with the SEC and available at the SEC's website at http://www.sec.gov.

**Additional Information and Where to Find It**

In connection with the proposed transaction contemplated by the merger agreement (the "Proposed Transaction"), Stable Road intends to file with the SEC a registration statement on Form S-4 (the "Registration Statement") that will include a proxy statement of Stable Road, a consent solicitation statement of Momentus and prospectus of Stable Road, and each party will file other documents with the SEC regarding the Proposed Transaction. A definitive proxy statement/consent solicitation statement/prospectus and other relevant documents will be sent to the stockholders of Stable Road and Momentus, seeking any required stockholder approval, and is not intended to provide the basis for any investment decision or any other decision in respect of such matters. STABLE ROAD'S STOCKHOLDERS AND OTHER INTERESTED PERSONS ARE ADVISED TO READ, WHEN AVAILABLE, THE REGISTRATION STATEMENT AND THE PROXY STATEMENT/CONSENT SOLICITATION STATEMENT/PROSPECTUS WHICH FORMS A PART OF THE REGISTRATION STATEMENT, AS WELL AS ANY AMENDMENTS THERETO, AND THE EFFECTIVE REGISTRATION STATEMENT AND DEFINITIVE PROXY STATEMENT/CONSENT SOLICITATION/PROSPECTUS IN CONNECTION WITH STABLE ROAD'S SOLICITATION OF PROXIES FOR STABLE ROAD'S SPECIAL MEETING OF STOCKHOLDERS TO APPROVE THE TRANSACTIONS CONTEMPLATED BY THE MERGER AGREEMENT (THE "SPECIAL MEETING"), BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED TRANSACTION. When available, the definitive proxy statement/consent solicitation statement/prospectus will be mailed to Stable Road's stockholders as of a record date to be established for voting on the Proposed Transaction and the other matters to be voted upon at the Special Meeting. Stable Road's stockholders will also be able to obtain copies of the proxy statement/consent solicitation statement/prospectus, and all other relevant documents filed or that will be filed with the SEC in connection with the Proposed Transaction, without charge, once available, at the SEC's website at http://www.sec.gov or by directing a request to: Stable Road Capital LLC, James Norris, CPA, Chief Financial Officer, 1345 Abbot Kinney Blvd., Venice, CA 90291; Tel: 310-956-4919; james@stableroadcapital.com.

5

**Participants in the Solicitation**

Stable Road, Momentus and certain of their respective directors, executive officers and other members of management and employees may be deemed participants in the solicitation of proxies of Stable Road's stockholders in connection with the Proposed Transaction. STABLE ROAD'S STOCKHOLDERS AND OTHER INTERESTED PERSONS MAY OBTAIN, WITHOUT CHARGE, MORE DETAILED INFORMATION REGARDING THE DIRECTORS AND OFFICERS OF STABLE ROAD IN ITS ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2019, WHICH WAS FILED WITH THE SEC ON MARCH 26, 2020. INFORMATION REGARDING THE PERSONS WHO MAY, UNDER SEC RULES, BE DEEMED PARTICIPANTS IN THE SOLICITATION OF PROXIES TO STABLE ROAD'S STOCKHOLDERS IN CONNECTION WITH THE PROPOSED TRANSACTION AND OTHER MATTERS TO BE VOTED AT THE SPECIAL MEETING WILL BE SET FORTH IN THE REGISTRATION STATEMENT FOR THE PROPOSED TRANSACTION WHEN AVAILABLE. Additional information regarding the interests of participants in the solicitation of proxies in connection with the Proposed Transaction will be included in the Registration Statement that Stable Road intends to file with the SEC.

**No Offer or Solicitation**

This press release is for informational purposes only and is neither an offer to purchase, nor a solicitation of an offer to sell, subscribe for or buy any securities or the solicitation of any vote in any jurisdiction pursuant to the Proposed Transaction or otherwise, nor shall there be any sale, issuance or transfer or securities in any jurisdiction in contravention of applicable law. No offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act of 1933, as amended.

**Contacts**

For investor inquiries please contact:

Tom Cook

investors@momentus.space

For media inquiries please contact:

Phil Denning

press@momentus.space

6

Exhibit 99.2



## DISCLAIMER AND CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This presentation (together with oral statements made in connection herewith, this "Presentation") contains selected confidential information about Momentus Inc. ("Momentus") and Stable Road Acquisition Corp. ("Stable Road" or "SRAC"). By participating in this Presentation, you expressly agree to keep confidential all otherwise non-public information disclosed by us, whether orally or in writing, during this Presentation or in these Presentation materials. You also agree not to distribute, disclose or use such information for any purpose, other than for the purpose of your firm's participation in the potential financing and to return to Momentus and Stable Road, delete or destroy this Presentation upon request. You are also being advised that the United States securities laws restrict persons with material non-public information about a company obtained directly or indirectly from that company from purchasing or selling securities of such company, or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities on the basis of such information.

This Presentation relates to the potential financing of a portion of the contemplated transaction through a private placement of Stable Road's Class A common stock. This Presentation shall not constitute a "solicitation" as defined in Section 14 of the Securities Exchange Act of 1934, as amended.

This Presentation is not an offer, or a solicitation of an offer, to buy or sell any investment or other specific product. Any offering of securities (the "Securities") will not be registered under the Securities Act of 1933, as amended (the "Act"), and will be offered as a private placement to a limited number of institutional "accredited investors" as defined in Rule 501(a)(1), (2), (3) or (7) under the Act and "Institutional Accounts" as defined in FINRA Rule 4512(c). Accordingly, the Securities must continue to be held unless a subsequent disposition is exempt from the registration requirements of the Act. Investors should consult with their legal counsel as to the applicable requirements for a purchaser to avail itself of any exemption under the Act. The transfer of the Securities may also be subject to conditions set forth in an agreement under which they are to be issued. Investors should be aware that they might be required to bear the final risk of their investment for an indefinite period of time. Neither Momentus nor Stable Road is making an offer of the Securities in any state where the offer is not permitted.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THE SECURITIES OR DETERMINED IF THIS PRESENTATION IS TRUTHFUL OR COMPLETE.

Information contained in this Presentation concerning Momentus' industry and the markets in which it operates, including Momentus' general expectations and market position, market opportunity and market size, is based on information from Momentus management's estimates and research, as well as from industry and general publications and research, surveys and studies conducted by third parties. In some cases, we may not expressly refer to the sources from which this information is derived. Management estimates are derived from industry and general publications and research, surveys and studies conducted by third parties and Momentus' knowledge of its industry and assumptions based on such information and knowledge, which we believe to be reasonable. In addition, assumptions and estimates of Momentus' and its industry's future performance are necessarily subject to a high degree of uncertainty and risk due to a variety of factors. These and other factors could cause Momentus' future performance and actual market growth, opportunity and size and the like to differ materially from our assumptions and estimates.

Stable Road and Momentus own or have rights to various trademarks, service marks and trade names that they use in connection with the operation of their respective businesses. This Presentation also contains trademarks, service marks and trade names of third parties, which are the property of their respective owners. The use or display of third parties' trademarks, service marks, trade names or products in this Presentation is not intended to, and does not imply, a relationship with Stable Road or Momentus, or an endorsement or sponsorship by or of Stable Road or Momentus. Solely for convenience, the trademarks, service marks and trade names referred to in this Presentation may appear without the ®, TM or SM symbols, but such references are not intended to indicate, in any way, that Stable Road or Momentus will not assert, to the fullest extent under applicable law, their rights or the right of the applicable licensor to these trademarks, service marks and trade names.

Copyright 2020. Momentus Inc. Proprietary & Confidential. Not Export Controlled. Any use, reproduction, or distribution without the express consent of Momentus is strictly prohibited. If you are not the intended recipient, please immediately delete this document and any associated communications.

2

## DISCLAIMER AND CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS (CONT'D)

This Presentation contains estimated or projected financial information with respect to Momentus, namely Momentus' projected revenue, customer demand, market share, EBITDA, EBITDA margin and free cash flow for 2020-2027. Such estimated or projected financial information constitutes forward-looking information, and is for illustrative purposes only and should not be relied upon as necessarily being indicative of future results. The assumptions and estimates underlying such estimated or projected financial information are inherently uncertain and are subject to a wide variety of significant business, economic, competitive and other risks and uncertainties that could cause actual results to differ materially from those contained in the prospective financial information. See "forward-looking statements" paragraph below. Actual results may differ materially from the results contemplated by the estimated or projected financial information contained in this presentation, and the inclusion of such information in this Presentation should not be regarded as a representation by any person that the results reflected in such estimates and projections will be achieved. Neither the independent auditors of Stable Road nor the independent registered public accounting firm of Momentus, audited, reviewed, compiled, or performed any procedures with respect to the estimates or projections for the purpose of their inclusion in this Presentation, and accordingly, neither of them expressed an opinion or provided any other form of assurance with respect thereto for the purpose of this Presentation.

The financial information and data contained in this Presentation is unaudited and does not conform to Regulation S-X promulgated under the Act. Accordingly, such information and data may not be included in, may be adjusted in or may be presented differently in, any proxy statement to be filed by Stable Road with the Securities and Exchange Commission (the "SEC"). Some of the financial information and data contained in this Presentation, such as EBITDA, EBITDA margin and free cash flow, have not been prepared in accordance with United States generally accepted accounting principles ("GAAP"). Stable Road and Momentus believe these non-GAAP measures of financial results provide useful information to management and investors regarding certain financial and business trends relating to Momentus' financial condition and results of operations. Stable Road and Momentus believe that the use of these non-GAAP financial measures provides an additional tool for investors to use in evaluating projected operating results and trends. Management does not consider these non-GAAP measures in isolation or as an alternative to financial measures determined in accordance with GAAP. The principal limitation of these non-GAAP financial measures is that they exclude significant expenses and income that are required by GAAP to be recorded in Momentus' financial statements. In addition, they are subject to inherent limitations as they reflect the exercise of judgment by management about which expense and income are excluded or included in determining these non-GAAP financial measures. In order to compensate for these limitations, management presents non-GAAP financial measures in connection with GAAP results.

Nothing herein should be construed as legal, financial, tax or other advice. You should consult your own advisers concerning any legal, financial, tax or other considerations concerning the opportunity described herein. The general explanations included in this Presentation cannot address, and are not intended to address, your specific investment objectives, financial situations or financial needs.

If the contemplated business combination is pursued, Stable Road will be required to file a proxy statement and other relevant documents with the SEC. Stockholders and other interested persons are urged to read the proxy statement and any other relevant documents filed with the SEC when they become available because they will contain important information about Stable Road, Momentus and the contemplated business combination. Stockholders will be able to obtain a free copy of the proxy statement (when filed), as well as other filings containing information about Stable Road, Momentus and the contemplated business combination, without charge, at the SEC's website located at www.sec.gov. Stable Road and its directors and executive officers and other persons may be deemed to be participants in the solicitations of proxies from Stable Road's stockholders in respect of the contemplated business combination and the other matters set forth in the definitive proxy statement. Information regarding Stable Road's directors and executive officers is available under the heading "Directors, Executive Officers and Corporate Governance" in its Annual Report on Form 10-K for the  year ended December 31, 2019 filed with the SEC on March 26, 2020. Additional information regarding the participants in the proxy solicitation and a description of their direct and indirect interests, by security holdings or otherwise, will be contained in the proxy statement relating to the contemplated business combination when it becomes available.

Copyright 2020. Momentus Inc. Proprietary & Confidential. Not Export Controlled. Any use, reproduction, or distribution without the express consent of Momentus is strictly prohibited. If you are not the intended recipient, please immediately delete this document and any associated communications.

3

## DISCLAIMER AND CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS (CONT'D)

**Forward Looking Statements**

This Presentation includes "forward-looking statements" within the meaning of the "safe harbor" provisions of the United States Private Securities Litigation Reform Act of 1995. Forward-looking statements may be identified by the use of words such as "estimate," "plan," "project," "forecast," "intend," "will," "expect," "anticipate," "believe," "seek," "target" or other similar expressions that predict or indicate future events or trends or that are not statements of historical matters. These forward-looking statements include, but are not limited to, statements regarding estimates and forecasts of other financial and performance metrics, projections of market opportunity and market share. These statements are based on various assumptions, whether or not identified in this Presentation, and on the current expectations of Momentus' and Stable Road's management and are not predictions of actual performance. These forward-looking statements are provided for illustrative purposes only and are not intended to serve as, and must not be relied on by any investor as, a guarantee, an assurance, a prediction or a definitive statement of fact or probability. Actual events and circumstances are difficult or impossible to predict and will differ from assumptions. Many actual events and circumstances are beyond the control of Momentus and Stable Road. These forward-looking statements are subject to a number of risks and uncertainties, including changes in domestic and foreign business, market, financial, political and legal conditions; the inability of the parties to successfully or timely consummate the proposed business combination, including the risk that any required regulatory approvals are not obtained, are delayed or are subject to unanticipated conditions that could adversely affect the combined company or the expected benefits of the proposed business combination or that the approval of the stockholders of Stable Road or Momentus is not obtained; failure to realize the anticipated benefits of the proposed business combination; risks relating to the uncertainty of the projected financial information with respect to Momentus; risks related to the rollout of Momentus' business and the timing of expected business milestones; the effects of competition on Momentus' future business; level of product service or product failures that could lead customers to use competitors' services; developments and changes in laws and regulations, including increased regulation of the space transportation industry; the impact of significant investigative, regulatory or legal proceedings; the amount of redemption requests made by Stable Road's public stockholders; the ability of Stable Road or the combined company to issue equity or equity-linked securities in connection with the proposed business combination or in the future, and those factors discussed in Stable Road's Annual Report on Form 10-K for the fiscal year ended December 31, 2019 and Quarterly Report on Form 10-Q for the quarter ended June 30, 2020, in each case, under the heading "Risk Factors," and other documents of Stable Road filed, or to be filed, with the Securities and Exchange Commission ("SEC"). If any of these risks materialize or our assumptions prove incorrect, actual results could differ materially from the results implied by these forward-looking statements. There may be additional risks that neither Stable Road nor Momentus presently know or that Stable Road and Momentus currently believe are immaterial that could also cause actual results to differ from those contained in the forward-looking statements. In addition, forward-looking statements reflect Stable Road's and Momentus' expectations, plans or forecasts of future events and views as of the date of this Presentation. Stable Road and Momentus anticipate that subsequent events and developments will cause Stable Road's and Momentus' assessments to change. However, while Stable Road and Momentus may elect to update these forward-looking statements at some point in the future, Stable Road and Momentus specifically disclaim any obligation to do so. These forward-looking statements should not be relied upon as representing Stable Road's and Momentus' assessments as of any date subsequent to the date of this Presentation. Accordingly, undue reliance should not be placed upon the forward-looking statements.

Neither Momentus, Stable Road, nor any of their respective affiliates have any obligation to update this Presentation. Although all information and opinions expressed in this Presentation were obtained from sources believed to be reliable and in good faith, no representation or warranty, express or implied, is made as to its accuracy or completeness. This Presentation contains preliminary information only, is subject to change at any time and is not, and should not be assumed to be, complete or to constitute all the information necessary to adequately make an informed decision regarding your engagement with Momentus and Stable Road.

Copyright 2020. Momentus Inc. Proprietary & Confidential. Not Export Controlled. Any use, reproduction, or distribution without the express consent of Momentus is strictly prohibited. If you are not the intended recipient, please immediately delete this document and any associated communications.

4

# TRANSACTION OVERVIEW

## MOMENTUS TEAM

**Mikhail Kokorich**
*Founder & CEO*

**Fred Kennedy**
*President*

**Dawn Harms**
*Chief Revenue Officer*

**Jikun Kim**
*Chief Financial Officer*

**Rob Schwarz**
*Chief Technology Officer*

**Alex Wicks**
*Chief Development Officer*

## STABLE ROAD CAPITAL TEAM

**Brian Kabot**
*Chairman & CEO*

**Juan M. Quiroga**
*Chief Investment Officer*

## TRANSACTION HIGHLIGHTS

**OFFERING SIZE**
- Stable Road (NASDAQ: SRAC) is a publicly listed special purpose acquisition company with ~$173M cash held in trust
- Raised $175M in PIPE commitments, including $10 million from Stable Road, before transaction announcement

**VALUATION[1]**
- PF enterprise value of $1.2B with well capitalized balance sheet
- Implies an attractive valuation versus peer averages (~80% discount to relative value)

**CAPITAL STRUCTURE**
- Post-transaction, Momentus will have ~$310M in cash to enhance operations, growth and path to profitability
- No additional capital needs expected prior to achieving profitability

**OWNERSHIP**
- ~75% existing Momentus shareholders, ~14% SPAC and founder shares, ~12% PIPE investors

**STABLE ROAD VIEWS MOMENTUS AS A UNIQUE AND COMPELLING OPPORTUNITY TO INVEST IN THE ONLY PUBLICLY-TRADED , PURE-PLAY COMMERCIAL SPACE COMPANY CAPABLE OF REVOLUTIONIZING SPACE INFRASTRUCTURE AND THE BROADER SPACE ECONOMY**

Copyright 2020. Momentus Inc. Proprietary & Confidential. Not Export Controlled. Any use, reproduction, or distribution without the express consent of Momentus is strictly prohibited. If you are not the intended recipient, please immediately delete this document and any associated communications.

Note: Assumes no redemptions from SPAC investors.
1. For additional details on transaction valuation, please refer to slide 33

5

# MOMENTUS AT A GLANCE

## COMPANY OVERVIEW

- **FIRST MOVER IN PROVIDING IN-SPACE TRANSPORTATION AND INFRASTRUCTURE SERVICES**

  - **SPACE TRANSPORTATION SERVICES** – first hub and spoke model of space, providing last mile delivery in partnership with key launchers, such as SpaceX

  - **SATELLITE AS A SERVICE** – hosted payload services that significantly decrease the cost of developing, launching and maintaining satellites

  - **IN-ORBIT SERVICES** – maintaining, repairing and refueling satellites in orbit

- **GROUNDBREAKING WATER PROPULSION TECHNOLOGY**[1] that significantly reduces costs and is reusable

- Successfully tested water based propulsion technology on a demo flight launched mid-2019 – is still operational today

- Founded in 2017 in Santa Clara, California

## PARTNERSHIPS, CUSTOMERS AND STRONG BACKLOG DEVELOPMENT



Copyright 2020. Momentus Inc. Proprietary & Confidential. Not Export Controlled. Any use, reproduction, or distribution without the express consent of Momentus is strictly prohibited. If you are not the intended recipient, please immediately delete this document and any associated communications.

1.  14 US and PCT patent applications that describe 70 distinct ideas
2.  Including non-binding options with deposits pre-paid

6

# EXCEPTIONAL TEAM LED BY VISIONARY FOUNDER



**MIKHAIL KOKORICH**
**CEO**
**FOUNDER**
**INNOVATOR**

Visionary space entrepreneur and innovator. Mikhail founded Momentus in 2017 with an idea to enable industrialization in space

He has more than 20 years of experience in industries ranging from manufacturing and retail to space technologies. Mikhail started his first company at 19 years old as a physics student in Siberia in 1996

Before entering the aerospace business, Mikhail founded and ran a chain of domestic merchandise retail stores, second in size only to Bed Bath & Beyond, successfully scaled and sold one of the largest consumer electronic retail chains as well as one of the biggest timber companies in the world

Copyright 2020. Momentus Inc. Proprietary & Confidential. Not Export Controlled. Any use, reproduction, or distribution without the express consent of Momentus is strictly prohibited. If you are not the intended recipient, please immediately delete this document and any associated communications.

## SIGNIFICANT AEROSPACE EXPERIENCE

**FRED KENNEDY** *PRESIDENT*

**JIKUN KIM** *CHIEF FINANCIAL OFFICER*

**DAWN HARMS** *CHIEF REVENUE OFFICER*

**ROB SCHWARZ** *CHIEF TECHNOLOGY OFFICER*

**ALEX WICKS** *CHIEF DEVELOPMENT OFFICER*

**AARON MITCHELL** *HEAD OF FUTURE ARCHITECTURES*

**JASON HUMMELT** *VP OF INNOVATION*

**NATHAN ORR** *CHIEF ENGINEER*

**TEMI ODUOZOR** *VP CONTROL*

**ALEX FISHKIN** *CHIEF BUSINESS AFFAIRS & LEGAL OFFICER*

**ALIKI LOPER-LEDDY** *VP OF PROGRAM OPERATIONS*

**NEGAR FEHER** *VP OF BUSINESS DEVELOPMENT*

7

















# FIRST MOVER WITH RAPID PROGRESS TO DATE

Vigoride launch on Falcon 9
Vigoride launch on Falcon 9
Vigoride launch on Falcon-9
Vigoride launch on Falcon-9

**WE ARE HERE**

>$90M[1] signed contracts
Signed deal with Space-X
$40M[1] signed contracts
First Air Force contracts
50 people
Venture round
El Camino test flight
First contract: Ardoride Demo
First 10 people
Seed round
First patents filed
YCombinator Demo Day
First thruster fire
Founder's investment
First hire

2018     2019     2020     2021

Copyright 2020. Momentus Inc. Proprietary & Confidential. Not Export Controlled. Any use, reproduction, or distribution without the express consent of Momentus is strictly prohibited. If you are not the intended recipient, please immediately delete this document and any associated communications.

1. Including non-binding options with deposits pre-paid

15











# PRODUCT ROADMAP ADDRESSES ALL MARKETS

| | 2020<br>**VIGORIDE** | 2022<br>**ARDORIDE** | 2024<br>**FERVORIDE** |
|---|---|---|---|
| **Capabilities[1]** | Up to 750 kg. | Up to 4,000 kg. | Up to 20,000 kg. |
| **Orbits** | LEO | MEO/GEO/HEO/Lunar | LEO/MEO/GEO/HEO Lunar, Deep Space |
| **Host Power Available** | Up to 1 kW | Up to 10 kW | Up to 100 kW |
| **Delta-V** | Up to 2 km/sec | Up to 5 km/sec | Up to 7 km/sec |
| **Space Transportation TAM Forecast[2]** | $1.5B | $10B | $37B |

Copyright 2020. Momentus Inc. Proprietary & Confidential. Not Export Controlled. Any use, reproduction, or distribution without the express consent of Momentus is strictly prohibited. If you are not the intended recipient, please immediately delete this document and any associated communications.

1. Lower payload capacity for higher delta-V missions
2. NSR Small Satellite Markets, 6th Edition NSR Satellite Manufacturing and Launch Services, 9th Edition, and Stratistics. Does not include Satellite as a Service and In-Orbit Servicing

20





## MOMENTUM AND COMPATIBILITY WITH LEADING LAUNCHERS ENABLE SUCCESS

| | SPACEX | BLUE ORIGIN | GK LAUNCH SERVICES | Relativity |
|---|---|---|---|---|
| Vigoride | ✔ | ✔ | ✔ | ✔ |
| Ardoride | ✔ | ✔ | ✔ | |
| Fervoride | ✔ | ✔ | | |
| | Launch deal signed RIDESHARE PARTNERSHIP AGREEMENT WITH SPACEX | | Launch deal signed | Launch deal signed |

Copyright 2020. Momentus Inc. Proprietary & Confidential. Not Export Controlled. Any use, reproduction, or distribution without the express consent of Momentus is strictly prohibited. If you are not the intended recipient, please immediately delete this document and any associated communications.

22








# STRONG BACKLOG AND DISRUPTIVE TAILWINDS DRIVING GROWTH

(# OF MISSIONS)

## SPACE TRANSPORTATION

|  | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E |
|---|---|---|---|---|---|---|---|---|
| Vigoride | 1 | 5 | 8 | 16 | 24 | 30 | 38 | 47 |
| Ardoride | - | - | 1 | 2 | 6 | 11 | 17 | 22 |
| Fervoride | - | - | - | - | 1 | 4 | 8 | 12 |
| Total | 1 | 5 | 9 | 18 | 31 | 45 | 63 | 81 |

## SATELLITE AS A SERVICE (SATAAS)

|  | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E |
|---|---|---|---|---|---|---|---|---|
| Vigoride | - | - | 2 | 8 | 16 | 24 | 36 | 54 |
| Ardoride | - | - | - | 1 | 2 | 8 | 16 | 24 |
| Fervoride | - | - | - | - | - | 2 | 4 | 8 |
| Total | - | - | 2 | 9 | 18 | 34 | 56 | 86 |

## IN-ORBIT SERVICING

|  | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E |
|---|---|---|---|---|---|---|---|---|
| Vigoride | - | - | - | 2 | 6 | 26 | 52 | 88 |
| Ardoride | - | - | - | - | - | 2 | 8 | 22 |
| Fervoride | - | - | - | - | - | - | - | - |
| Total | - | - | - | 2 | 6 | 28 | 60 | 110 |

Copyright 2020. Momentus Inc. Proprietary & Confidential. Not Export Controlled. Any use, reproduction, or distribution without the express consent of Momentus is strictly prohibited. If you are not the intended recipient, please immediately delete this document and any associated communications.

24

# CLEAR PATH TO PROFITABILITY AND >$1B IN EBITDA

| ($ in millions) | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E |
|---|---|---|---|---|---|---|---|---|
| Satellite Transportation Services | $2 | $19 | $122 | $435 | $852 | $1,089 | $1,453 | $1,717 |
| Satellite as a Service | - | - | 30 | 153 | 319 | 721 | 1,192 | 1,650 |
| In-Orbit Services | - | - | - | 10 | 29 | 150 | 343 | 669 |
| **Revenue** | **$2** | **$19** | **$152** | **$598** | **$1,200** | **$1,960** | **$2,987** | **$4,035** |
| *% Growth* | *NM* | *809%* | *718%* | *293%* | *101%* | *63%* | *52%* | *35%* |
| | | | | | | | | |
| Satellite Transportation Services | ($2) | $2 | $42 | $156 | $399 | $785 | $1,030 | $1,194 |
| Satellite as a Service | - | - | 21 | 70 | 158 | 505 | 796 | 1,031 |
| In-Orbit Services | - | - | - | 5 | 16 | 108 | 254 | 471 |
| **Gross Profit** | **($2)** | **$2** | **$63** | **$230** | **$573** | **$1,398** | **$2,080** | **$2,696** |
| *% Margin* | *NM* | *NM* | *42%* | *39%* | *48%* | *71%* | *70%* | *67%* |
| | | | | | | | | |
| (–) SG&A | (8) | (15) | (21) | (27) | (36) | (46) | (59) | (76) |
| (–) R&D | (17) | (32) | (60) | (96) | (129) | (151) | (160) | (164) |
| **EBITDA** | **($27)** | **($45)** | **($18)** | **$107** | **$409** | **$1,201** | **$1,861** | **$2,455** |
| *% Margin* | *NM* | *NM* | *NM* | *18%* | *34%* | *61%* | *62%* | *61%* |
| | | | | | | | | |
| (–) CapEx | ($6) | ($20) | ($6) | ($7) | ($51) | ($10) | ($10) | ($12) |
| (–) Change in NWC | 5 | 26 | (11) | 32 | 327 | 286 | 307 | (27) |
| (–) Income tax paid (unlevered) | - | - | - | (4) | (84) | (250) | (389) | (513) |
| **Unlevered Free Cash Flow** | **($28)** | **($39)** | **($35)** | **$128** | **$601** | **$1,227** | **$1,769** | **$1,903** |

Copyright 2020. Momentus Inc. Proprietary & Confidential. Not Export Controlled. Any use, reproduction, or distribution without the express consent of Momentus is strictly prohibited. If you are not the intended recipient, please immediately delete this document and any associated communications.

25







# MOMENTUS OPPORTUNITY

- **First mover** in providing in-space transportation & infrastructure **services to the space economy**

- Rapid near-term expected growth driven by **disruptive tailwinds in commercial space**

- **Breakthrough water-based propulsion technology**

- **Significant customer traction** and deep integration with industry leaders

- **Clear path to profitability and >$1B in EBITDA**

- **Massive long-term growth opportunities** beyond current business plan

- **Well-seasoned team** *with experience* in aerospace, propulsion and robotics piloted by **visionary leader and innovator**

Copyright 2020. Momentus Inc. Proprietary & Confidential. Not Export Controlled. Any use, reproduction, or distribution without the express consent of Momentus is strictly prohibited. If you are not the intended recipient, please immediately delete this document and any associated communications.

28





# DETAILED TRANSACTION OVERVIEW

($ IN MILLIONS)

## SOURCES & USES

| Sources | Amount | % |
|---|---|---|
| Existing Momentus Shareholders | $1,130 | 76% |
| SPAC Cash in Trust | 173 | 12% |
| PIPE Equity[1] | 175 | 12% |
| **Total Sources** | **$1,478** | **100%** |

| Uses | Amount | % |
|---|---|---|
| Existing Momentus Shareholders | $1,130 | 76% |
| Cash to Balance Sheet | 283 | 19% |
| Cash to Existing Shareholders | 30 | 2% |
| Estimated Fees & Expenses | 35 | 2% |
| **Total Uses** | **$1,478** | **100%** |

## PRO FORMA VALUATION

| | Amount |
|---|---|
| PF Shares Outstanding[2] | 151.2 |
| Share Price | $10.00 |
| **PF Equity Value** | **$1,512** |
| (+) Assumed PF Net Cash[3] | (312) |
| **PF Enterprise Value to Market** | **$1,200** |

## PF OWNERSHIP SPLIT



- SPAC Investors 11%
- SPAC Sponsors 2%
- Existing Shareholders 75%
- PIPE (incl. Sponsor Co-investment) 12%

Note: Assumes no redemptions from SPAC investors.
1. Includes $10M sponsor co-investment
2. Includes 113.0m Momentus rollover shares, 16.5m PIPE shares, 1.0m sponsor co-investment shares, 3.4m SPAC sponsor shares (2.9m founder shares and 0.5m private placement units) and 17.3m SPAC investors shares.
3. Estimated net cash on Momentus balance sheet at close of ~$29M, inclusive of options exercise

Copyright 2020. Momentus Inc. Proprietary & Confidential. Not Export Controlled. Any use, reproduction, or distribution without the express consent of Momentus is strictly prohibited. If you are not the intended recipient, please immediately delete this document and any associated communications.

30







Copyright 2020. Momentus Inc. Proprietary & Confidential. Not Export Controlled. Any use, reproduction, or distribution without the express consent of Momentus is strictly prohibited. If you are not the intended recipient, please immediately delete this document and any associated communications.

**Exhibit 99.3**

**MOMENTUS**

3050 Kenneth St.
Santa Clara, CA 95054
(650) 564-7820
momentus.

## Momentus Announcement Script

**Operator**

Welcome to the Momentus and Stable Road Acquisition Corp. business combination conference call. On the conference call is Brian Kabot, Chairman and CEO of Stable Road Acquisition Corp. and Mikhail Kokorich, Founder and CEO of Momentus Inc.

I would like to first remind everyone that this call may contain forward-looking statements including, but not limited to, Momentus and Stable Road's expectations or predictions of financial and business performance and conditions, competitive and industry outlook and the timing and completion of the transaction. Forward-looking statements are inherently subject to risks, uncertainties, and assumptions and they are not guarantees of performance. I encourage you to read the press release issued today, the accompanying presentation and Stable Road's filings with the SEC for a discussion of the risks that can affect the business combination, Stable Road's business and the business of the combined company after completion of the proposed business combination.

Momentus and Stable Road are under no obligation and expressly disclaim any obligation to update, alter or otherwise revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

I'd now like to introduce Brian Kabot.

**Brian Kabot, Stable Road**

Good morning everyone. Thank you all for joining us. My name is Brian Kabot. I am the Chairman and Chief Executive Officer of Stable Road Acquisition Corp. We are truly excited to share with you the potential business combination between Stable Road and Momentus.

We at Stable Road set out to find a high quality, value-add business, run by an accomplished management team, serving customers in an industry with incredible growth potential. Momentus fits that criteria perfectly. Momentus represents a rare opportunity to invest in the first, publicly traded space infrastructure company. With its visionary founder, highly experienced management team, progress to date and significant commercial traction, Momentus is set to revolutionize and enable the future of the space economy with a diverse offering of in-space, transportation, and infrastructure services. With these business opportunities, we believe that Momentus will be key to enabling the industrialization and commercialization of space. Momentus has signed contracts worth nearly $100 million in potential revenue and has developed key partnerships, including a marquee rideshare partnership with SpaceX.

1

**MOMENTUS**

3050 Kenneth St.
Santa Clara, CA 95054
(650) 564-7820
momentus.

This transaction will enable Momentus to accelerate its growth and speed to market, as it is set to catalyze the space industry. Pro forma for the transaction, the company will have approximately $310 million of cash, consisting of $173 million of cash from trust and $175 million from a committed PIPE, including an additional $10 million from Stable Road Capital. The combined company will have an estimated pro forma enterprise value of $1.2 billion and a pro forma equity value of approximately $1.5 billion at close.

Momentus and Mikhail have attracted a diverse and highly skilled team with a shared passion for space and the Company's mission. We at Stable Road are deeply impressed by the Company's remarkable vision, growth profile, and exceptional progress, and are excited to partner together in leading the commercialization of the space industry. With that, I will kick it over to Mikhail to talk about Momentus.

**Mikhail Kokorich, Momentus**

Thank you, Brian, and thank you all for your time. My name is Mikhail Kokorich. I am the Founder and CEO of Momentus. I started Momentus in 2017 in Santa Clara, CA. We are a first mover in offering space transportation and infrastructure services, powered by our groundbreaking water plasma propulsion technology.

We believe that the recent disruption of the space launch industry will enable the next industrial revolution, and we can capitalize on this opportunity by building the premier space infrastructure company. The market is massive with the space economy worth approximately $400 billion today and projected to increase to $1.4 trillion over the next decade.

The new space economy is rapidly changing, driven by the recent disruption in launch costs. This disruption has led to a wave of new companies reinventing parts of the traditional space industry, including human spaceflight, satellites, payload delivery, and methods of launch, in addition to unlocking entirely new market segments.

With the development of larger, cheaper and reusable rockets, the number of satellites launched has increased almost tenfold in the last decade, and is expected to reach many tens of thousands in the next. Additionally, the advent of nano and micro satellites has significantly decreased the size and cost of satellites. This is driving exponential growth in the number of single satellites and constellations being launched into Earth's orbit.

We are partnering with launch providers, like SpaceX, to offer "last-mile" delivery of satellites to their destination orbits. We will also soon offer payload hosting, or satellite as a service, and we plan on offering in-orbit servicing, all leveraging our groundbreaking water based propulsion technology.

With our first anticipated service, in-space transportation, Momentus plans to dramatically reduce launch costs while greatly expanding deployment options for a given satellite. When paired with a large reusable rocket like the Falcon 9, Momentus offers last mile delivery to a wide range of orbits, bringing the affordable and flexible hub and spoke logistics model to transportation in space.

2



3050 Kenneth St.
Santa Clara, CA 95054
(650) 564-7820
momentus.

This hub and spoke model offers our clients the ability to deploy their satellites to their target orbits at dramatically lower prices. For nano or micro satellites, spacecraft weighing between one and 100 kilograms, our model can reduce a customer's launch costs by up to a factor of 10 over traditional approaches. Momentus' transfer vehicles can thus offer a tremendous advantage over small dedicated rockets, or embedded oversized propulsion systems are oversized and constrain the amount of payload that a client can deliver to orbit.

Our next anticipated service will be satellite as a service. The best way for customers to save money is to apply modularity and standardization to a satellite's design. Momentus will enable the ultimate modularity by delivering a customer's payload to its destination orbit and remaining connected to that payload after deployment. Momentus' spacecraft will provide a hosted payload with multiple kilowatts of electrical power, orbit maintenance, orientation, and communications to support telemetry, commanding, and downlinking of payload data. This can replace the need to design, manufacture, and operate satellites.

Our third anticipated service will be in-orbit servicing, which is a growing business opportunity especially because of the shortening life cycle of small satellites. Momentus' reusable vehicles will be capable of performing proximity maneuvers, docking, and fueling. When equipped with special purpose robotic arms, they will be ideally suited to provide the entire range of in-orbit services. We will eventually be able to transfer propellant, extend the lifetimes of larger spacecraft, relocate satellites, de-orbit them, and conduct both salvage missions and robotic operations such as repair, unit replacement, and upgrade or assembly.

Our first vehicle, Vigoride, will eventually be capable of deploying up to 750 kilograms of small satellites anywhere in low earth orbit. We are building upon last year's successful in-space test of our water plasma propulsion and will be conducting our first flight with customers in December 2020.

We are planning to launch our second vehicle, Ardoride, in 2022. Ardoride will eventually be able to move up to 4,000 kilograms of larger satellites to higher orbits such as geosynchronous or even lunar orbit.

Our future larger vehicle, Fervoride, planned to launch in 2024, will expand both the range and payload capabilities of customers, satellites and cargo. It will eventually be capable of moving up to 20,000 kilograms throughout cislunar space and further into deep space. Fervoride will extend the reach of the giant future rockets like Starship or New Glenn.



3050 Kenneth St.
Santa Clara, CA 95054
(650) 564-7820
momentus.

We are starting with single use, expendable vehicles, but we are developing reusable ones that can be refueled in space. This will allow a single vehicle to operate multiple transportation and servicing missions.

At the heart of our vehicles is our groundbreaking water plasma propulsion technology, which uses simple water as a propellant. Our system was designed to be safe, inexpensive and offer an excellent mix of thrust and efficiency. Our thruster is more efficient than conventional chemical propulsion and has higher thrust than electric propulsion, such as Hall-effect thrusters.

The choice of water as a propellant drives the simplicity, reliability and extremely low-cost design of our entire vehicle. Additionally, water is safe and significantly reduces the risk and hazards in building and operating our vehicles.

A future benefit of using water is an abundance of water in the solar system. In the future, Momentus vehicles will be able to be refueled from extraterrestrial water sources such as the moon or asteroids and thus achieve in-space sustainability.

Commercially, we have seen strong market traction. Our customers include defense primes such as Lockheed Martin, government agencies such as NASA, and dozens of small satellite manufacturers and operators. Our backlog encompasses the initial and early deployment of our customers' constellations, and we expect our backlog with existing customers will grow by many multiples as we plan to serve the rollout of our customers' constellations. We have several substantial opportunities currently in negotiation or in discussions, worth more than $1 billion of additional potential revenue.

We expect good margin expansion over the next few years and we are projecting that we will be profitable by 2023 and operating at or near run-rate margins by 2025. On a run rate basis, we expect gross margins of around 70%, and EBITDA margins of 60%. Additionally, we expect strong free cash flow conversion. Our CapEx will be spent mostly on facility upgrades in 2021 and 2024 to be ready for production of next generation vehicles.

Overall, with the space transportation market growing to become a $40 billion business, and the satellite as a service and in-orbit services market growing to more than $100 billion over the next decade, we believe that our financial projections assume a conservative market capture.

Beyond the financial plan, Momentus has several significant long-term growth opportunities. The technologies Momentus is using and developing are key to accessing enormous moonshot opportunities in space.



3050 Kenneth St.
Santa Clara, CA 95054
(650) 564-7820
momentus.

Building solar power and data centers in space is potentially a trillion-dollar opportunity. Another long-term growth opportunity is mining of resources in space. The ultimate potential of asteroid mining is enormous.

We plan to deploy the proceeds of this transaction to accelerate our growth and operations to meet the demands of our customers, and to fully support our capital needs as we continue to ramp. We are excited to take the next step and become a publicly traded company. And we are excited to partner with the Stable Road team and look forward to leveraging their capital markets expertise.

**Brian Kabot, Stable Road**

Thank you for your time today. In summary, we believe Momentus is one of the most exciting companies in the new space industry and offers a rare opportunity to invest in the commercialization of space.

Momentus is well-poised for the significant long-term growth opportunities afforded by a new space age. Momentus has built the right team, technology, and business model to execute on their vision. Again, thank you very much for your time and your interest in wanting to learn more about us.

5