Robert V. Prongay (SBN 270796)
  *rprongay@glancylaw.com*
Casey E. Sadler (SBN 274241)
  *csadler@glancylaw.com*
Charles Linehan (SBN 307439)
  *clinehan@glancylaw.com*
Garth A. Spencer (SBN 335424)
  *gspencer@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Lead Plaintiff Hartmut Haenisch*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE STABLE ROAD ACQUISITION CORP. SECURITIES LITIGATION | Case No. 2:21-CV-5744-JFW(SHKx) |
| | Honorable John F. Walter |
| | **PLAINTIFF'S OPPOSITION TO THE MOTION TO DISMISS FILED BY DEFENDANT FRED KENNEDY** |
| | Hearing Date: July 11, 2022<br>Time:           1:30 p.m.<br>Courtroom:    7A |

PLAINTIFF'S OPPOSITION TO DEFENDANT KENNEDY'S MOTION TO DISMISS

# **TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................1

II.     FACTUAL BACKGROUND.................................................................2

    A.    Kennedy's Background In The Federal Government..........................2

    B.    Kennedy Joined Momentus As It Sought To Raise Millions From A Merger With SRAC ......................................................................3

    C.    The Government Identified Momentus's CEO As A National Security Risk, And Was Removing Him From The Country..............3

    D.    The Government Halted Momentus's January 2021 Space Mission Due To National Security Concerns About Kokorich............4

    E.    Kennedy Misleadingly Reassured Investors While Failing To Disclose The Government's National Security Concerns ...................5

    F.    Shortly After Momentus Settled The SEC's Fraud Claims, Kennedy Resigned From The Company ...............................................6

III.    ARGUMENT .........................................................................................7

    A.    Applicable Legal Standards Disfavor Kennedy's Motion...................7

    B.    Kennedy Concealed Material Facts That Made His Statements Misleading To Reasonable Investors....................................................7

    C.    The PSLRA Safe Harbor Does Not Shield Kennedy's Materially Misleading Omissions ........................................................................9

        1.    The PSLRA Safe Harbor Does Not Apply To Kennedy............9

        2.    Kennedy Made Non-Forward Looking Statements ..................10

        3.    Kennedy Failed To Provide Meaningful Cautionary Language, And Acted With Actual Knowledge.......................11

    D.    Defendant Kennedy Acted With Scienter ........................................11

        1.    It Is Absurd To Suggest That Kennedy Did Not Know Of The Government's Actions Against Kokorich.......................12

2.    At A Minimum, Kennedy Acted With Deliberate Recklessness .......................................................................... 13

IV.    CONCLUSION ................................................................................. 16

# TABLE OF AUTHORITIES

## CASES

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ................................................................................................. 7

*Berson v. Applied Signal Tech., Inc.*,
 527 F.3d 982 (9th Cir. 2008) ............................................................................. 7, 13

*Bond v. Clover Health Invs., Corp.*,
 2022 WL 602432 (M.D. Tenn. Feb. 28, 2022) ..................................................... 8

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
 856 F.3d 605 (9th Cir. 2017) ............................................................................... 15

*Eminence Cap., LLC v. Aspeon, Inc.*,
 316 F.3d 1048 (9th Cir. 2003) ............................................................................. 16

*In re Alphabet, Inc. Sec. Litig.*,
 1 F.4th 687 (9th Cir. 2021) ............................................................... 12, 13, 14, 16

*In re Quality Sys., Inc. Sec. Litig.*,
 865 F.3d 1130 (9th Cir. 2017) ............................................................................. 10

*In re QuantumScape Sec. Class Action Litig.*,
 2022 WL 137729 (N.D. Cal. Jan. 14, 2022) ....................................................... 11

*In re VeriFone Holdings, Inc. Sec. Litig.*,
 704 F.3d 694 (9th Cir. 2012) ................................................................... 13, 14, 16

*Khoja v. Orexigen Therapeutics, Inc.*,
 899 F.3d 988 (9th Cir. 2018) ................................................................................. 7

*Matrixx Initiatives, Inc. v. Siracusano*,
 563 U.S. 27 (2011) ........................................................................................... 7, 12

*Reese v. Malone*,
 747 F.3d 557 (9th Cir. 2014) ............................................................................... 14

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008)..................................................................................13

*S.E.C. v. Mozilo*,
2009 WL 3807124 (C.D. Cal. Nov. 3, 2009) ...........................................................8

*S.E.C. v. Todd*,
642 F.3d 1207 (9th Cir. 2011)..................................................................................8

*Siracusano v. Matrixx Initiatives, Inc.*,
585 F.3d 1167 (9th Cir. 2009).........................................................................12, 13

*Strasburger v. Blackburne & Sons Realty Cap. Corp.*,
2020 WL 6128223 (C.D. Cal. June 25, 2020) .......................................................14

*Yanek v. Staar Surgical Co.*,
388 F. Supp. 2d 1110 (C.D. Cal. 2005)..............................................................9, 11

## STATUTES

15 U.S.C. § 78*l*.............................................................................................................9

15 U.S.C. § 78m(a) .......................................................................................................9

15 U.S.C. § 78o(d) ........................................................................................................9

15 U.S.C. § 78u–5(a)....................................................................................................9

15 U.S.C. § 78u–5(a)(1)..........................................................................................9, 10

15 U.S.C. § 78u–5(a)(2)................................................................................................9

15 U.S.C. § 78u–5(b) ..................................................................................................10

15 U.S.C. § 78u–5(i)(4).................................................................................................9

## RULES

Fed. R. Civ. P. 15(a)(2).................................................................................................16

Plaintiff respectfully submits this memorandum of law in opposition to the motion to dismiss filed by Defendant Fred Kennedy.[1]

## I.     INTRODUCTION

Defendant Kennedy joined Momentus as its President in September 2020, after extensive experience in high-ranking, space and national security focused roles with the U.S. Air Force, the White House, and the Defense Department. While Kennedy was employed at Momentus, the government rejected the company's application to provide its technology to its Russian CEO, Defendant Kokorich, due to its "military potential" and the "detriment[] to the national security of the United States" if it were provided to him. Also, during Kennedy's tenure, Kokorich was actively contesting the government's efforts to remove him from the country (following the 2019 rejection of his asylum application due to "inconsistencies" regarding his political activities in Russia, and after a surprise visit by the FBI to Momentus headquarters in which it questioned employees, detained Kokorich, and removed him from the premises).

In January 2021, the government halted Momentus's planned space mission, due to an ongoing multi-agency investigation relating to Kokorich. Immediately thereafter, Kennedy, working together with Kokorich, reassured investors that this was merely a "standard" review that would not materially affect Momentus's business, and that Kokorich would be granted U.S. citizenship. Shortly following these misleading reassurances, Kokorich was forced to resign, he fled to Switzerland, Momentus had to enter a National Security Agreement with the government, and Momentus settled fraud claims from the SEC. Defendant Kennedy has also resigned from Momentus. In response to these revelations, the price of SRAC's stock

---

[1] Dkt Nos. 124 and 124-1 ("Kennedy MTD"). All emphasis in this brief has been added, all internal citations, quotation marks, and alterations have been removed, and citations to "¶__" refer to the amended complaint (Dkt No. 94) ("Complaint"). Capitalized terms have the same meanings as in the Complaint.

plummeted, and investors have suffered massive damages as a result.

Remarkably, Kennedy's motion to dismiss does not even contest the materiality of the information about Kokorich that Kennedy withheld from investors or the misleading nature of his January 2021 statements. Rather, he offers two excuses. First, that he is purportedly shielded by the PSLRA safe harbor. But this statutory provision, by its express terms, does not apply to Defendant Kennedy. Second, that he somehow was unaware that the government repeatedly told Momentus that Kokorich was a threat to national security, or that the government was in the process of removing Kokorich from the country. This claim is utterly implausible, and even if true, would simply prove Kennedy's deliberate recklessness when reassuring investors that there was no cause for concern. Kennedy's excuses fail to absolve him of responsibility for withholding from investors the truth about Kokorich.

## II.    FACTUAL BACKGROUND

### A.    Kennedy's Background In The Federal Government

Prior to joining Momentus, Defendant Kennedy had extensive experience in national security-related federal government roles. From July 2014 to June 2016, he served as Senior Material Leader, Space Production Division of the U.S. Air Force Space and Missile Systems Center's Remote Sensing Directorate. *See* Dkt No. 132-1 at 264. From July 2016 to January 2017, Kennedy was Senior Advisor for National Security Space and Aviation in the White House Office of Science and Technology. *Id.* From January 2017 to March 2019, he was the Deputy Director and later Director of the Tactical Technology Office at the Defense Advanced Research Projects Agency. *Id.* From March 2019 to June 2019, Kennedy served as the Director of the U.S. Department of Defense Space Development Agency. *Id.* After leaving government service, he had various consulting and executive roles at private aerospace industry companies. *Id.*

---

PLAINTIFF'S OPPOSITION TO DEFENDANT KENNEDY'S MOTION TO DISMISS

2

**B.**   **Kennedy Joined Momentus As It Sought To Raise Millions From A Merger With SRAC**

Defendant Kennedy joined Momentus as its President in September 2020. *Id.* At that time, Momentus was in the late stages of negotiations with Stable Road about a potential merger between Momentus and a special purpose acquisition company ("SPAC") called Stable Road Acquisition Corp. ("SRAC"). *See* ¶¶58, 60, 310. At that time, Momentus was in a precarious and deteriorating financial position, and stood to receive desperately needed funding (*i.e.*, hundreds of millions of dollars from SRAC's investors) if a merger with SRAC was successfully completed. *See* ¶¶66-71, 114. Shortly after Kennedy joined Momentus, on October 7, 2020, Momentus and SRAC jointly announced their planned merger. ¶114-15. From that time on, Defendants touted Momentus's prospects, the central role of its Russian CEO Mikhail Kokorich, and aggressive near-term revenue projections (purportedly ballooning to billions of dollars within a few years). *See* ¶¶122-30.

**C.**   **The Government Identified Momentus's CEO As A National Security Risk, And Was Removing Him From The Country**

On March 22, 2018, the Department of Commerce rejected Momentus's application to provide its technology to Kokorich because he "is not an acceptable recipient . . . for national security reasons." ¶77; Dkt No. 94-3. In June 2018, U.S. Customs and Immigration Services ("USCIS") revoked Kokorich's work visa and denied his application for permanent residency. ¶84. On June 24, 2018, Kokorich's lawyer wrote to the Department of Treasury's Committee on Foreign Investment in the United States ("CFIUS") regarding its conclusion that "the Kokoriches present a threat to the national security of the United States." ¶78; Dkt No. 94-4.

On August 28, 2019, USCIS rejected Kokorich's asylum application and initiated proceedings to remove him from the U.S., based on "inconsistencies" in his testimony "with regard to [his] political affiliations and activities in Russia." ¶84. Shortly thereafter, the FBI, Department of Homeland Security, and Department of Commerce arrived unannounced at Momentus headquarters, questioned employees,

detained Kokorich, and transported him to an immigration detention center. *Id.*

On April 15, 2020, Momentus learned that the Department of Commerce placed its renewed application to give Kokorich its technology on indefinite hold. ¶85. Over October 7-23, 2020, Momentus learned that the Departments of Defense, State, Energy, and Commerce had decided to reject that application. *Id.* On November 12, 2020, the Department of Commerece rejected the application citing the technology's "military potential" and the "detriment[] to the national security of the United States" if it were provided to Kokorich. ¶79; Dkt No. 94-6. As of January 2021 Kokorich was still contesting the removal proceedings against him. ¶84.

### D.     The Government Halted Momentus's January 2021 Space Mission Due To National Security Concerns About Kokorich

As part of the public announcement of the proposed merger on October 7, 2020, and repeatedly over the following months, Defendants touted their plans to launch several missions in space during 2020-2021, beginning with one planned for December 2020 (later rescheduled to January 2021). *E.g.*, ¶¶188, 190, 223, 253. Then, on January 4, 2021, Defendants abruptly announced that their much-hyped January 2021 mission would be indefinitely postponed to an unspecified time later in 2021, explaining that "[t]his move will allow for the additional time necessary to secure FAA approval of Momentus' payloads, including completion of a standard interagency review." ¶¶133-34.

In reality, the investigation that forced Momentus to delay the January 2021 mission was anything but "standard." Rather, it focused on the government's determination that Defendant Kokorich was a threat to national security, and this so-called "standard interagency review" ultimately led to Kokorich's resignation from Momentus, his fleeing the United States to Switzerland, his forced divestment from Momentus, Momentus's entry into a National Security Agreement with multiple federal government agencies, and the delaying of Momentus's first commercial launch by a year and a half. *See* ¶¶138, 161, 163, 165, 326.

**E.    Kennedy Misleadingly Reassured Investors While Failing To Disclose The Government's National Security Concerns**

In conjunction with Momentus's January 4, 2021 announcement of the investigation and delayed launch, Defendant Kennedy worked together with Kokorich and Momentus to allay investors' concerns. *See* ¶¶258-73. In a coordinated and pre-meditated effort to reassure investors: (i) Momentus issued a January 4, 2021 press release, (ii) Kennedy gave an interview to *IPO Edge* published by Defendants on January 4, 2021, and (iii) Kokorich gave an interview to *Forbes* published on January 5, 2021. ¶258.

In the press release and *IPO Edge* interview, Kennedy omitted material facts and made numerous misleading statements, including that:

- "We will continue to work with the FAA, as we have done successfully with other regulatory agencies, to obtain approval in a timely manner," ¶260;
- "The FAA did not express any specific concerns of its own, but rather indicated that more time was needed to complete its interagency review of Momentus' payload," ¶261;
- "We are quite familiar with interagency review processes, and we have cleared similar reviews for our other licenses," ¶262;
- "While we discuss interagency reviews in our S-4, these reviews are a standard part of various license application processes," *id.*;
- "NOAA and its partner agencies have already reviewed Momentus' foreign ownership – this review was completed to the satisfaction of these agencies, as evidenced by NOAA's issuance of a license," ¶263;
- "Mikhail Kokorich, the CEO of Momentus and one of the company's larger shareholders, is an asylum seeker from the Russian Federation, currently pursuing several paths to U.S. Person status. We believe that Mr. Kokorich meets all legal requirements to be granted such status in the United States, and that he will be offered U.S. citizenship," *id.*;

PLAINTIFF'S OPPOSITION TO DEFENDANT KENNEDY'S MOTION TO DISMISS

5

- "No, Momentus currently holds all necessary licenses for its Vigoride vehicle," ¶264;[2]

- "We anticipate that by launching our first Vigoride vehicle on a subsequent mission, we will still achieve our revenue expectations for 2021 while delivering our customers' payloads to orbit," ¶269; and

- "The number of launches did not change. Rather than launching in January, we will launch this particular vehicle at our first opportunity, later this year. Hence, we do not expect changes to our total revenue for 2021," ¶270.

In none of these statements did Kennedy disclose the government's actions against Kokorich, its national security concerns regarding Kokorich, or its ongoing efforts to remove him from the country.

### F.    Shortly After Momentus Settled The SEC's Fraud Claims, Kennedy Resigned From The Company

On January 23, 2021, Momentus received a subpoena form the SEC Division of Enforcement "investigating certain disclosures made in filings with the SEC" in connection with the proposed merger between SRAC and Momentus. ¶83. Over the following months, the SEC continued its investigation and entered into settlement discussions with Momentus. *See* ¶171. On July 13, 2021, the SEC announced a multi-million-dollar settlement with Momentus, published a consent order accusing Momentus of securities fraud, and filed a complaint accusing Kokorich of securities fraud. *See* ¶¶174-78; Dkt No. 94-1 (consent order); Dkt No. 94-2 (complaint). On August 12, 2021, SRAC and Momentus completed their merger. ¶61. Since that time, Momentus's business has continued to languish, and its stock price continues to trade far below its artificially inflated Class Period levels. *See* Spencer Decl. Ex. 1 (stock price chart). On January 3, 2022, Kennedy resigned from Momentus, effective

---

[2] This statement of Kennedy's was in response to the question "In addition to the FAA approval, are there any other approvals/licenses Momentus still needs in order to launch Vigoride?" ¶264.

January 21, 2022. *See* Spencer Decl. Ex. 2 (Momentus Form 8-K).

## III.    ARGUMENT

### A.    Applicable Legal Standards Disfavor Kennedy's Motion

To avoid dismissal, a complaint must "contain sufficient factual matter . . . to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs need only plead facts "that allow[] the court to draw the reasonable inference that the defendant is liable." *Id.* at 678. "Dismissal is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). It is a "fundamental rule" that "courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage." *Id.* at 1014.

To state a claim under Exchange Act §10(b) and SEC Rule 10b-5(b), a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). The Complaint more than sufficiently alleges each element.

### B.    Kennedy Concealed Material Facts That Made His Statements Misleading To Reasonable Investors

"[O]nce defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Khoja*, 899 F.3d at 1009 (cleaned up); *e.g.*, *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) ("once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of"). Even a statement that is literally true "may be misleading if it omits material information." *Khoja*, 899 F.3d at 1009.

"[T]he materiality and misleading nature of a misstatement or omission is usually a question for the trier of fact, and such an argument is rarely successful on a

motion for summary judgment, and even more rarely successful on a motion to dismiss." *S.E.C. v. Mozilo*, 2009 WL 3807124, at *9 (C.D. Cal. Nov. 3, 2009) (Walter, J.). "Accordingly, resolving an issue as a matter of law is only appropriate when the adequacy of the disclosure is so obvious that reasonable minds could not differ." *S.E.C. v. Todd*, 642 F.3d 1207, 1220 (9th Cir. 2011).

Defendant Kennedy concealed from investors that the federal government deemed Kokorich a threat to national security, and that it was currently in the process of removing him from the country. These highly material facts rendered Kennedy's public statements highly misleading to reasonable investors. For example, in his January 4, 2021 interview Kennedy stated, Kennedy stated "[w]e are quite familiar with interagency review processes, and we have cleared similar reviews for our other licenses . . . these reviews are a standard part of various license application processes." ¶262. This statement was materially misleading due to Kennedy's omission of the government's highly *non*-"standard" history with Kokorich (*e.g.*, the repeated national security risk determinations, and his questioning and detention by multiple agencies including the FBI), which was the reason for the investigation. And Kennedy's claim that "[w]e believe that Mr. Kokorich meets all legal requirements to be granted [U.S. Person] status," was highly misleading for its failure to disclose that his asylum application had already been rejected, and that he was the subject of ongoing removal proceedings. ¶263.

Kennedy's decision to conceal material information while downplaying the ongoing governmental investigation of Momentus, especially in the context of the government's decision to halt Momentus's January 2021 mission, was highly misleading to reasonable investors. *See Bond v. Clover Health Invs., Corp.*, 2022 WL 602432, at *21 (M.D. Tenn. Feb. 28, 2022) (withholding material details about and downplaying significance of governmental investigation into company was materially misleading); *Khoja*, 899 at 1012 (materially misleading to disclose only that the government took an action with respect to the company without disclosing *why* it did

so); *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1131 (C.D. Cal. 2005) (defendants' statements downplaying regulatory risks and omitting negative feedback from the government were materially misleading).

### C.     The PSLRA Safe Harbor Does Not Shield Kennedy's Materially Misleading Omissions

#### 1.     The PSLRA Safe Harbor Does Not Apply To Kennedy

The PSLRA safe harbor by its clear terms does not apply to the statements made by Defendant Kennedy. The safe harbor only applies to statements made by four narrow categories of specified persons: (1) "an issuer that, at the time that the statement is made, is subject to" certain SEC reporting requirements, (2) "a person acting on behalf of such issuer," (3) "an outside reviewer retained by such issuer making a statement on behalf of such issuer," or (4) certain "underwriter[s]." *See* 15 U.S.C. § 78u–5(a). Kennedy is not in any of these categories.

Kennedy asserts in a footnote that he falls within 15 U.S.C. § 78u–5(a)(2), as "a person acting on behalf of such issuer." Kennedy MTD at 19 n.10.  However, the term "person acting on behalf of an issuer" is defined to mean only "any officer, director, or employee of such issuer." 15 U.S.C. § 78u–5(i)(4). When Kennedy made his misleading statements, and throughout the entire Class Period, he was an officer of Momentus, which was a private company not subject to the relevant SEC reporting requirements listed in 15 U.S.C. § 78u–5(a)(1),[3] and so not falling within the meaning of "such issuer" in 15 U.S.C. § 78u–5(a)(2). While SRAC was an issuer subject to relevant reporting requirements at the time, Kennedy was not "acting on behalf of"

---

[3] Specifically, 15 U.S.C. § 78u–5(a)(1) references the reporting requirements set forth in 15 U.S.C. § 78m(a) and 15 U.S.C. § 78o(d). Section 78m(a) provides reporting requirements for securities registered pursuant to 15 U.S.C. § 78l, *i.e.* securities that are registered for trading on a national securities exchange. Section 78o(d) provides reporting requirements for issuers that have filed a registration statement that has become effective pursuant to the Securities Act of 1933. Momentus was not subject to either of these sets of reporting requirements during the Class Period.

SRAC under the statute's clear definition. Therefore, Kennedy was not "a person acting on behalf of an issuer" within the meaning of the statute, and the safe harbor simply does not apply to him.

That the safe harbor does not apply to Momentus or to Kennedy makes perfect sense. Congress created a narrowly limited safe harbor. It had no intention to encourage private companies inexperienced in SEC reporting to make unreliable projections to investors. *See* 141 Cong. Rec. S19062, 1995 WL 755363, (Dec. 21, 1995) (statement of Sen. Feinstein) ("I understand the safe harbor does not apply to a new company, but only applies to seasoned issuers."); *id.* ("The provisions are only available to companies with an established track record."). Indeed, the safe harbor expressly excludes statements made in connection with IPOs, penny stocks, blank check companies, or repeat securities law violators. 15 U.S.C. § 78u–5(b). This further shows Congress's intent to limit the safe harbor's protections to companies with a reliable track record of experience with relevant SEC reporting requirements (unlike Momentus during the Class Period).

### 2. Kennedy Made Non-Forward Looking Statements

Even if the safe harbor potentially could apply to Defendant Kennedy (it cannot), his statements still would not be protected. The safe harbor applies only to purely "forward-looking" statements, and most of Kennedy's statements here relate in whole or in part to past or current facts. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017) ("where defendants make mixed statements containing non-forward-looking statements as well as forward-looking statements, the non-forward-looking statements are not protected.").

For example, the statement that "We believe that Mr. Kokorich meets all legal requirements to be granted [U.S. Person] status in the United States," relates to whether Kokorich *presently* "meets" the legal requirements to become a U.S. Person. And Kennedy's statement that "[t]he FAA did not express any specific concerns of its own, but rather indicated that more time was needed to complete its interagency

review of Momentus' payload," relates to the particular concerns government agencies had *previously* expressed to Momentus. Moreover, Kennedy's material omissions regarding Kokorich's *past* run-ins with the federal government and *ongoing* removal proceedings are simply not "forward-looking."

### 3. Kennedy Failed To Provide Meaningful Cautionary Language, And Acted With Actual Knowledge

The safe harbor is further inapplicable because Kennedy made his statements with actual knowledge of their misleading nature (*see infra* Part III.D.1), and these statements lacked "meaningful" cautionary language. *See In re QuantumScape Sec. Class Action Litig.*, 2022 WL 137729, at *14 (N.D. Cal. Jan. 14, 2022) ("the caution must discredit the allegedly misleading statements so obviously that the risk of real deception drops to nil.") (cleaned up); *Yanek*, 388 F. Supp. 2d at 1123 (rejecting boilerplate cautionary language).

Here, the purported "cautionary" language that Kennedy points to is pure boilerplate and could apply equally to any business in the world. *See* Kennedy MTD at 22 (citing "the risk that any required regulatory approvals (including licenses) are not obtained [or] are delayed" and "risks relating to the uncertainty of the projected financial information with respect to Momentus, including estimated revenues"). These statements made no mention of the government's determination that Kokorich posed a national security risk or its ongoing efforts to remove him from the country. If statements such as these sufficed to be considered "meaningful" cautionary language under the PSLRA safe harbor, then no issuer would ever have to disclose the actual, specific regulatory or financial risks facing its business. Kennedy's misleading statements are not protected under the safe harbor.

### D. Defendant Kennedy Acted With Scienter

The Complaint raises a strong inference of Defendant Kennedy's scienter. Scienter is pled "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts

---

alleged." *Matrixx Initiatives*, 563 U.S. at 48. "[T]he court must review all the allegations holistically." *Id.*

### 1.    It Is Absurd To Suggest That Kennedy Did Not Know Of The Government's Actions Against Kokorich

Courts "may consider a senior executive's role in a company to determine whether there is a cogent and compelling inference that the senior executive knew of the information at issue." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 1227 (2022). "This includes consideration of the executive's access to the information, and, whether, given the importance of the information, it would be 'absurd' to suggest that management was without knowledge of the matter." *Id.*

Here, it would be utterly absurd to suggest that nobody at Momentus informed Kennedy of the Commerce Department's November 12, 2020 rejection of Momentus's renewed application to provide its technology to Kokorich (which occurred during Kennedy's tenure as Momentus's President). That rejection cited the technology's "military potential" and the "detriment[] to the national security of the United States" if it were provided to Kokorich. ¶79; Dkt No. 94-6. It is simply not plausible that such facts were never communicated to Momentus's President, who Momentus touted as having recent experience in high-ranking national security roles at the Defense Department, White House, and Air Force. *See* Dkt No. 132-1 at 264. The far stronger inference is that when the federal government told Momentus that providing its technology to Kokorich would be "detrimental to the national security of the United States" due to its "military potential," this was promptly communicated to Kennedy as it was squarely within area of expertise, and his responsibilities as a senior executive. *Cf. Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) ("the inference that high-level executives . . . would know that the company was being sued in a product liability action is sufficiently strong to survive a motion to dismiss"), *aff'd*, 563 U.S. 27 (2011).

It is similarly absurd to suggest that nobody at Momentus had ever informed Kennedy that in 2019 the FBI, the Department of Homeland Security, and the Commerce Department had arrived unannounced at Momentus's headquarters, questioned multiple employees, detained Kokorich and removed him from the premises. ¶84. Indeed, it is simply not believable that such dramatic events, concerning Momentus's CEO no less, were somehow concealed from its President arriving at the company only one year later. *See Berson*, 527 F.3d at 989 ("These facts were prominent enough that it would be absurd to suggest that top management was unaware of them").

Therefore, due to Kennedy's national security experience, his role as Momentus's President, and the primary importance of the information relating to Kokorich's government interactions and national security risks, a strong inference arises that Kennedy had actual knowledge of these highly material facts. *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008).

**2.     At A Minimum, Kennedy Acted With Deliberate Recklessness**

While scienter is clearly satisfied by the strong inference of Kennedy's actual knowledge regarding Kokorich's national security problems, such actual knowledge is not necessary to plead scienter. "Recklessly turning a 'blind eye' to impropriety is equally culpable." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012). As such, "a reckless omission of material facts satisfies the element of scienter," if it constitutes "deliberate recklessness." *Alphabet*, 1 F.4th at 701. Deliberate recklessness is defined as "an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.*; *see also Matrixx*, 585 F.3d at 1183.

Defendant Kennedy was, at the very least, deliberately reckless when making his January 4, 2021 statements. It is beyond dispute that when he made those statements Kennedy knew that the FAA was withholding approval for Momentus's

---

planned space mission due to an ongoing "interagency review," for which "more time was needed." ¶¶133-34, 260-62. Kennedy likewise knew that Momentus's CEO was not a U.S. citizen or permanent resident, but rather, "an asylum seeker from the Russian Federation." ¶263. And Kennedy had first-hand knowledge of the government's extreme sensitivity to national security issues relating to the space industry, having recently served as Senior Advisor for National Security Space and Aviation in the White House Office of Science and Technology, and as the Director of the U.S. Department of Defense Space Development Agency. *See* Dkt No. 132-1 at 264. Against this factual backdrop, even if Kennedy did not have actual knowledge of the government's actions against Kokorich (which is extremely doubtful), then his statements dismissing any concerns about Kokorich or the ongoing federal investigation were deliberately reckless. *See VeriFone*, 704 F.3d at 710 (executive was deliberately reckless who was "on notice" of potential problems yet "reassured investors" with "baseless" explanations).

As a senior executive officer of Momentus, speaking to public investors on its behalf, standards of ordinary care demanded that Kennedy have some factual basis for the statements that he made. *See Strasburger v. Blackburne & Sons Realty Cap. Corp.*, 2020 WL 6128223, at *5 (C.D. Cal. June 25, 2020) ("by failing to conduct any meaningful due diligence regarding the borrowers—[defendant]'s actions departed extremely from the standard of ordinary care that a reasonably diligent broker in its position should have observed."). A total failure on Kennedy's part to investigate the truth or falsity of his own public statements would clearly constitute "an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Alphabet*, 1 F.4th at 701; *see Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014) ("[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so

without extraordinary effort.") *overruled by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017).

Any minimal inquiry from Kennedy to his Momentus colleagues regarding the government's abrupt decision to halt Momentus's January 2021 mission, or regarding Kokorich's immigration status, would have revealed, among other glaring red flags, that (i) in 2019 the FBI had arrived unannounced at Momentus's headquarters, questioned multiple employees, detained Kokorich and removed him from the premises, and (ii) the Commerce Department recently told Momentus that providing its technology to Kokorich would be "detrimental to the national security of the United States" due to its "military potential." *See* ¶¶79, 84.

Similarly, any minimal inquiry from Kennedy to *Kokorich* would have revealed, among other things, that the government deemed Kokorich a national security risk, that the FBI had arrived unannounced at Momentus's headquarters and detained him, that his asylum application had been rejected, and that the government was currently in the process of removing him from the country. ¶¶78, 84, While Kokorich purposefully misled *Stable Road* regarding these matters, Plaintiff does not allege, and Defendant Kennedy does not argue, that Kokorich ever deceived *Kennedy* or other Momentus executives. Moreover, the facts show that Kennedy and Kokorich were working hand in hand as part of a coordinated public relations effort when providing their false reassurances to investors over January 4-5, 2021, in response to the FAA's halt of Momentus's planned space mission. *See* ¶258. On those dates, Defendants caused interviews with Kennedy and Kokorich to be published and distributed to investors in tandem, and Kennedy and Kokorich delivered complementary messages in their interview statements. *See* ¶¶258-71.

If Kennedy in fact did not bother to conduct such a minimal inquiry of Kokorich or his other Momentus colleagues, *after* he learned that the FAA was delaying Momentus's mission for completion of an "interagency review," and *before* making public statements to investors such as "[w]e believe that Mr. Kokorich meets all legal

requirements to be granted such status in the United States, and that he will be offered U.S. citizenship" (*see* ¶263), then this is a textbook example of "deliberate recklessness." *See VeriFone*, 704 F.3d at 704 (deliberate recklessness pled where executives knew of "unusual[]" accounting adjustments but "failed to question or demand supporting documentation" for them).

Such willful blindness is clearly "an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Alphabet*, 1 F.4th at 701. Burying one's head in the sand to avoid seeing the truth is not a defense to securities fraud.

## IV. CONCLUSION

For the foregoing reasons, Defendant Kennedy's motion should be denied. If the Court grants any part of the motion, Plaintiff requests leave to amend. *See* Fed. R. Civ. P. 15(a)(2); *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("Dismissal with prejudice and without leave to amend is not appropriate unless it is clear . . . that the complaint could not be saved by amendment").

Dated: May 26, 2022

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Garth A. Spencer*
Robert V. Prongay (SBN 270796)
 *rprongay@glancylaw.com*
Casey E. Sadler (SBN 274241)
 *csadler@glancylaw.com*
Charles Linehan (SBN 307439)
 *clinehan@glancylaw.com*
Garth A. Spencer (SBN 335424)
 *gspencer@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Lead Plaintiff Hartmut Haenisch*

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007
Email: fcruz@frankcruzlaw.com

*Additional Counsel*

PLAINTIFF'S OPPOSITION TO DEFENDANT KENNEDY'S MOTION TO DISMISS

17

## PROOF OF SERVICE BY ELECTRONIC POSTING

I, the undersigned say:

I am not a party to the above case and am over eighteen years old. On May 26, 2022, I served true and correct copies of the foregoing document by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 26, 2022, at Jacksonville, Florida.

*s/ Garth A. Spencer*
Garth A. Spencer