# EXHIBIT 5

**EFiled:  Mar 21 2023 04:47PM EDT**
**Transaction ID 69598214**
**Case No. 2023-0322-PAF**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ALEXANDER LORA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2023-0322- PAF |
| | ) | |
| BRIAN KABOT, JAMES | ) | **PUBLIC VERSION** |
| HOFMOCKEL, ANN KONO, MARC | ) | **FILED MARCH 21, 2023** |
| LEHMANN, JAMES NORRIS, JUAN | ) | |
| MANUEL QUIROGA, SRC-NI | ) | |
| HOLDINGS, LLC, EDWARD K. | ) | |
| FREEDMAN, DAWN HARMS, FRED | ) | |
| KENNEDY, and JOHN C. ROOD, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## VERIFIED CLASS ACTION COMPLAINT

Plaintiff Alexander Lora ("Plaintiff"), on behalf of himself and similarly situated stockholders of Stable Road Acquisition Corp. ("SRAC" or the "Company"), now Momentus, Inc. ("New Momentus"), brings this Verified Class Action Complaint (the "Complaint") asserting: (a) breach of fiduciary duty arising from SRAC's merger (the "Merger") with Momentus, Inc. ("Momentus" or "Legacy Momentus") against (i) Brian Kabot, James Hofmockel, Ann Kono, Marc Lehmann, James Norris, and Juan Manuel Quiroga, as members of SRAC's board of directors (the "Board") and/or as Company officers; and (ii) SRC-NI Holdings, LLC (the "Sponsor"), Kabot, Quiroga, and Edward K. Freedman (together, the "Controller Defendants"); (b) aiding and abetting breach of duty against Momentus officers Fred

Kennedy and John C. Rood; and (c) unjust enrichment against the Board and the Controller Defendants.

Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation, review and analysis of: (a) documents produced by New Momentus pursuant to a demand for books and records under Delaware General Corporation Law Section 220 ("Section 220"); (b) regulatory filings made by SRAC, Legacy Momentus, and/or New Momentus with the United States Securities and Exchange Commission (the "SEC"); (c) press releases and media reports relating to SRAC, Legacy Momentus, and/or New Momentus; (d) a cease-and-desist order issued by the SEC pertaining to the proposed Merger; (e) the files in *SEC v. Mikhail Kokorich*, Case No. 1:21-cv-1869 (D.D.C.); (f) the files in *In Re Stable Road Acquisition Corp. Securities Litigation*, No. 2:21-cv-5744 (C.D. Cal.); and (g) review of other publicly available information concerning SRAC and Momentus.

**NATURE OF THE ACTION**

1.    Too many of the public companies created by the 2019-2021 vintage of the Special Purpose Acquisition Company ("SPAC") structure have objectively destroyed massive amounts of investor value.  What was previously a reasonable way for startup companies with real business prospects to become publicly traded outside of the traditional IPO process devolved into a frenzy of hucksters, celebrities

2

and professional athletes chasing windfall returns by becoming SPAC sponsors and paying no heed to their fiduciary obligations.[1]

2.      Unfortunately, the grab for fast money at the core of the 2019-2021 frenzy in the SPAC market all too often left public investors stuck with dead investments in companies that should never be public, but achieved that status based on financial engineering and false projections about hypothetical business models.[2]

3.      Although poor to non-existent governance prevailed at so many SPACs, this case may well represent the single most extreme instance of fiduciaries recommending a patently unfair de-SPAC merger to their common stockholders when any hint of diligence and loyalty would compel the board to affirmatively recommend redemption (or simply allow the orderly and imminent liquidation of the SPAC trust account).  The facts known to the fiduciary-defendants in this case make their recommendation that stockholders approve the merger rather than take back their money so absurd that it could be the plot for a Saturday Night Live skit mocking the 2019-2021 SPAC industry.

---

[1] *See* Amrith Ramkumar, *The Celebrities from Serena Williams to A-Rod Fueling the SPAC Boom*, WALL ST. J. (Mar. 17, 2021), https://www.wsj.com/articles/the-celebrities-from-serena-williams-to-a-rod-fueling-the-spac-boom-11615973578.

[2] *See* Complaint, *Newbold v. McCaw* (Del. Ch. 2022) (No. 2022-0439) (challenging a SPAC merger with an "untested and unproven" space rocket company); Complaint, *Hebert v. Hamamoto* (Del. Ch. 2021) (No. 2021-1066) (challenging a SPAC merger with a company purportedly developing a fleet of electric pick-up trucks).

-*-*-*-*-*-*-

4.    The SPAC at issue here is Stable Road Acquisition Corp. ("SRAC"). It was founded (and sponsored) by self-described experts in the cannabis field, Brian Kabot ("Kabot") and Juan Manuel Quiroga ("Quiroga").  SRAC was controlled by a sponsor, SRC-NI Holdings, LLC (the "Sponsor"), which, in turn, was controlled by its three managing members: Kabot, Quiroga, and Edward K. Freedman ("Freedman") (collectively, the "Controller Defendants").  In addition to controlling SRAC's Sponsor, Kabot and Quiroga also installed themselves as officers of SRAC, with Kabot serving as CEO and Chairman of the Board, and Quiroga serving as CIO and Secretary.    Freedman also founded and leads Stable Road Capital, the investment vehicle that created and appears to operate SRAC's Sponsor, SRC-NI Holdings, which, in turn, controls SRAC.

5.    On November 13, 2019, SRAC completed its initial public offering ("IPO"), selling 17.25 million units to public investors at $10 per unit (consisting of one share of Class A common stock and one half of one warrant, exercisable at $11.50 per share), raising gross proceeds of $172.5 million.

6.    Prior to the IPO, SRAC issued "Founder Shares" to the Sponsor convertible into 20% of SRAC's post-IPO equity in exchange for nominal consideration of $25,000 or approximately $0.006 per share.  The Sponsor also bought 495,000 Private Placement Units, which enjoyed no redemption rights.  Like

4

the Founder Shares, the Private Placement Units were worthless if SRAC was forced to liquidate.

7. In turn, ensuring alignment of the interests of the Controller Defendants and the non-Controller Defendant directors, the Sponsor provided each member of the Board with interests in the Sponsor, and, thus, effectively, in the Founder Shares, rendering each fiduciary's interests in conflict with those of the public stockholders when it came to prioritizing a merger in order to reap the value of their Founder Shares.

8. SRAC's charter provided that SRAC would have 18 months within which to consummate a "de-SPAC" merger (unless its shareholders voted to approve an extension). If SRAC failed to merge within its permitted lifespan, the charter provided that it would liquidate and return all IPO proceeds to is public stockholders. Hence, the Sponsor and the directors would have preferred any merger – even an objectively value-destroying deal for public stockholders – over liquidation.

9. Despite the SRAC founders' expertise in the cannabis space, they struggled to identify an attractive de-SPAC target. With liquidation on the horizon, the Controller Defendants shifted their focus to a new industry.

10. After a cursory effort that would not meet anybody's definition of due diligence (including, as it turns out, the SEC's), SRAC's Board proposed to acquire Legacy Momentus, a private business supposedly owning a technology permitting

water-propulsion-based space transportation. Legacy Momentus's technology sounded more like science fiction than a means to move satellites through space. Indeed, even basic questioning by the Board about what Momentus claimed to be able to provide in a deal would leave it clear that the scientific community has long expressed serious doubts about the foundational concept underlying Momentus's supposed business model, and neither Momentus nor any other company had ever shown the technology to be commercially viable.

11. Anybody respecting their fiduciary obligations would conduct proper due diligence to ensure proof of viability before recommending the acquisition of such a novel and unproven technology. The SRAC Board's complete lack of any process, much less a fair or diligent one, is just the start of their failures.

12. Mikhail Kokorich ("Kokorich"), Legacy Momentus's founder, controlling stockholder, and then-CEO, is a Russian national with opaque ties to Russian military and intelligence agencies. These ties were serious enough that, following the Merger announcement, the U.S. Department of Defense threatened to block the deal unless Momentus severed its ties to Kokorich. Any fiduciary paying the slightest bit of attention (and putting loyalty ahead of greed) would have thought thrice before merging with Kokorich's company.

13.     Kokorich was eventually forced out of Momentus's leadership when the government's investigation became public (but well after SRAC and the Board knew about it).

14.     Nevertheless, SRAC's founders (who controlled SRAC's Sponsor and who also served as SRAC's executive officers) continued to unequivocally (and fraudulently) tout the revolutionary promise of Momentus's space-borne water propulsion technology.  The Board was, again, nowhere to be found.

15.     SRAC's public statements about Momentus were so patently fraudulent that the U.S. Securities and Exchange Commission ("SEC") – despite passively permitting a wide range of flawed disclosures in almost all other de-SPAC transactions – found itself compelled to investigate the deal itself.

16.     In April 2021, amidst the delays caused by the Pentagon's concerns that Kokorich might be a Russian asset, the SEC's investigation of SRAC's fraudulent public disclosures, and the reality that Momentus was not a viable space transport business, SRAC's Board had to decide whether to seek an extension of SRAC's imminent deal-completion deadline (thus salvaging their own potential windfall via their holdings of Founder Shares) or to do what their fiduciary duties required and give SRAC's public stockholders back their money via liquidation.

17.     Any fiduciary acting in good faith while facing such obvious indicia that an intended acquisition target is a fraud (or worse) will rely on their

7

sophisticated and independent legal counsel to advise about their contractual commitments, their fiduciary duties and the imperative of putting the common stockholders' interests ahead of personal greed. Even the worst of SPAC boards have at least nominally obtained independent legal advice. Not this one.

18.    SRAC's Board retained Kirkland & Ellis ("K&E") as the Company's legal advisor in connection with the merger. Despite specific requests during the Section 220 process, the Company could not provide any evidence that K&E (or any of the Sponsor-affiliated Defendants) disclosed to the Board at any time before the Proxy that K&E partners, likely through a standalone captive investment vehicle named Randolph Street Ventures LLC ("Randolph Street"),[3] held millions of dollars of investments in the Sponsor. Besides fees received in connection with the Merger, K&E partners owned at least 430,985 Founder Shares and 198,020 warrants to purchase SRAC Class A common stock through Randolph Street.

19.    SRAC's disclosure of this conflict in the Proxy was obscure – a single sentence at the end of the document in the inconspicuously-titled "Certain Legal Matters" section. The materiality of such an unusual and serious conflict should not be minimized.

---

[3] Will Louch, Silas Brown, & Jan-Henrik Foerster, *Private Equity's Top Lawyers Enjoy Prized Access to Buyout Funds*, BLOOMBERG (July 29, 2022), https://www.bloomberg.com/news/articles/2022-07-29/private-equity-s-top-lawyers-enjoy-prized-access-to-buyout-funds?leadSource=uverify%20wall.

20.    Put simply, the gatekeepers advising the Board about their fiduciary obligations when looking to buy an unproven business run by questionable management were themselves financially interested in the Board failing to perform their basic fiduciary duty.

21.    And so, instead of ending SRAC's misguided existence and giving the common stockholders their money back, the SRAC Board sought an extension. On April 9, 2021, SRAC issued a definitive proxy (the "First Proxy") soliciting stockholders to vote to extend SRAC's liquidation deadline from May 13, 2021 to August 13, 2021 (the "Extension Amendment"). On May 13, 2021, after being forced to delay the vote and then barely reaching the required voting threshold, Defendants bought themselves a few more months to complete a deal.

22.    Defendants used their additional time to again serve their own self-interest rather than respect their duties. The First Proxy was so filled with false and misleading statements that it triggered the imposition of SEC sanctions against SRAC, Kabot, and the Sponsor, along with Momentus.

23.    On July 13, 2021, the SEC publicly detailed Defendants' misrepresentations in a cease-and-desist order (the "SEC Order") entered against Momentus, SRAC, the Sponsor, and SRAC CEO Kabot, and a civil complaint (the "SEC Complaint") filed against Kokorich. According to the SEC Order and Complaint, among the Proxy's many misrepresentations and omissions were that:

9

(a) multiple federal agencies had determined that Momentus's then-CEO Kokorich, a citizen of Russia with ties to the Russian government, posed an unacceptable national security risk; (b) Momentus had never successfully tested its technology in space; (c) Momentus's financial projections of immediate, explosive revenue growth were highly misleading; and (d) SRAC's superficial due diligence of Momentus failed to provide any reasonable basis for its public statements about Momentus's technology and prospects.

24.    In a July 13, 2021 press release, SEC Chair Gary Gensler ("Gensler") confirmed that Defendants "misled the investing public" and that SRAC had "fail[ed] to undertake adequate due diligence to protect shareholders." As Gensler explained: "This case illustrates risks inherent to SPAC transactions, as those who stand to earn significant profits from a SPAC merger may conduct inadequate due diligence and mislead investors ... [SRAC], a SPAC, and its merger target, Momentus, both misled the investing public." According to the SEC, "[t]he fact that Momentus lied to [SRAC] does not absolve [SRAC] of its failure to undertake adequate due diligence to protect shareholders."

25.    What once seemed like satire turned into tragedy. No independent board advised by independent counsel could conceivably recommend that SRAC stockholders pursue a Momentus buyout in lieu of redeeming their shares or simply permitting SRAC's orderly liquidation. These Defendants, however, continued to

10

pursue Legacy Momentus as an acquisition target, notwithstanding the SEC's revelations.

26.    Defendants amended the Momentus merger agreement (the "Merger Agreement") to lower the target's nominal value (perhaps reflecting that they could not induce any "new money" to finance the deal). They cut the forecasts to reflect what they framed as regulatory delays without confronting the core problem: the lack of a viable technology. The outcome for SRAC's stockholders would be their $10 in trust going into an unproven space transport startup without much-needed cash.

27.    On July 23, 2021, SRAC issued its definitive proxy (the "Proxy"), jointly filed with Momentus and signed by Momentus's then-CEO, Dawn Harms ("Harms"), which contained the Board's inexplicable recommendation that stockholders approve the Merger at a special meeting to be held on August 11, 2021. Stockholders were also informed of the August 9, 2021 deadline for exercising their right to redeem all or a portion of their shares for the return of their $10 plus interest (the "Redemption Deadline").

28.    The Proxy contained multiple false and misleading statements and/or material omissions in Defendants' effort to ensure the Merger was consummated, including, *inter alia*, the following:

(a)    Overstating Legacy Momentus's value through still-inflated projections.

11

(b)    Misrepresenting the due diligence conducted by the SRAC Board.

(c)    Omitting material information regarding the nature and consequence of disabling conflicts suffered by SRAC's legal counsel, K&E.

(d)    Omitting the value of Founder Shares and Private Placement Units interests held by Defendants Norris, Lehmann, and Hofmockel.

(e)    Misrepresenting the value of SRAC shares by asserting that SRAC shares issued in the Merger would have a "deemed value of $10.00 per share." In reality and undisclosed in the Proxy, there was less than $6.00 in net cash underlying those shares due to dilution.

29.    Ultimately, in breach of their fiduciary duties, the Board recommended the deal despite it being a far worse alternative for public stockholders than a liquidation. Reflecting the illusory nature of the SRAC vote and the misleading Proxy, the Merger was approved by a majority vote of the stockholders on August 11, 2021, and the Merger closed on August 12, 2021.

30.    Today, Momentus stock trades at $0.63 per share. Former SRAC Class A investors' investments are destroyed. Defendants (as well as lawyers at the firm advising the Board about fiduciary duties) turned almost no out-of-pocket investment into millions of dollars. Defendants should face accountability.

12

## PARTIES

### I.    PLAINTIFF

31.    **Plaintiff Alexander Lora** owned Class A shares of SRAC from March 2021 until the closing of the de-SPAC acquisition through which SRAC acquired and was renamed Momentus, and has continued to hold shares through the filing of this Complaint.

### II.    DEFENDANTS

32.    **Defendant SRC-NI Holdings LLC** (as previously defined, the "Sponsor") served as the sponsor of SRAC and was at all relevant times a Delaware Limited Liability Company with its principal place of business in Venice, California. The Sponsor's board of managers consisted of Defendants Freedman, Kabot, and Quiroga, all of whom were listed as beneficial owners of Sponsor stock in SEC filings. At the time of the Merger, the Sponsor held 4,136,029 shares of SRAC Class B common stock (*i.e.*, the Founder Shares) and, following the IPO, 495,000 Private Placement Units.

33.    **Defendant Edward K. Freedman** (as defined above, "Freedman") was the sole member of Stable Road Capital, LLC, and the managing member of SRAC Partners, which are affiliated with the Sponsor. He was also a member of the Sponsor's board of managers along with Kabot and Quiroga, and was deemed a beneficial owner of the 4,312,500 Founder Shares held by the Sponsor.

13

34.     **Defendant Brian Kabot** (as defined above, "Kabot") was the CEO of SRAC, Chairman of the SRAC Board, and a manager of the Sponsor. Since July 2017, he has served as the Chief Investment Officer ("CIO") of Stable Road Capital, LLC, a Sponsor-affiliated investment vehicle based in Los Angeles, California. According to SRAC's IPO Prospectus filed on November 8, 2019 (the "Prospectus"), a substantial portion of Kabot's business activities in the past several years have involved the cannabis industry, including service on the boards of Old Pal, LLC, a private cannabis brand company, since June 2018 and Grenco Science LLC, a private developer of vape pens and portable vaporizers, since July 2019. Kabot was a deemed a beneficial owner of the 4,312,500 Founder Shares held by the Sponsor and, according to the Proxy, held direct or indirect economic interests in its Private Placement Units as well.

35.     **Defendant Juan Manuel Quiroga** (as defined above, "Quiroga") was the CIO and Secretary of SRAC and a manager of the Sponsor. Quiroga was deemed a beneficial owner of the 4,312,500 Founder Shares held by the Sponsor and, according to the Proxy, held direct or indirect economic interests in its Private Placement Units as well.

36.     Freedman, Kabot, Quiroga and the Sponsor, as defined above, are collectively referred to herein as the "Controller Defendants."

14

37.    **Defendant James Norris** ("Norris") was the Chief Financial Officer ("CFO") and a director of SRAC. Since November 2018, Norris served as CFO of Stable Road Capital, LLC. According to the Proxy, Norris held a "direct or indirect economic interest" in the Founder Shares and Private Placement Units held by the Sponsor. Based on SRAC's February 22, 2022 Prospectus Supplement, Norris held at least 49,155 Founder Shares.

38.    **Defendant James Hofmockel** ("Hofmockel") was a director of SRAC. According to the Proxy, Hofmockel held a "direct or indirect economic interest" in the Founder Shares and Private Placement Units held by the Sponsor. Based on SRAC's February 22, 2022 Prospectus Supplement, Hofmockel held at least 109,447 Founder Shares and 19,960 Class A Stock warrants.

39.    **Defendant Ann Kono** ("Kono") was a director of SRAC who joined the Board on or around March 2021. According to the Proxy, Kono held a "direct or indirect economic interest" in the Founder Shares and Private Placement Units held by the Sponsor. Based on SRAC's February 22, 2022 Prospectus Supplement, Kono held at least 15,752 Founder Shares.

40.    **Defendant Marc Lehmann** ("Lehmann") was a director of SRAC since 2019. Since November 2018, Lehmann has also served as a director of Green Growth Brands Inc., a producer and seller of cannabis and CBD products. The Prospectus premises Lehmann's qualifications as a SRAC director on his experience

15

in the cannabis industry, stating that "Mr. Lehmann is well qualified to serve as a director due to his extensive investing and advisory experience in the cannabis industry." According to the Proxy, Lehmann held a "direct or indirect economic interest" in the Founder Shares and Private Placement Units held by the Sponsor. Based on SRAC's February 22, 2022 Prospectus Supplement, Lehmann held at least 15,752 Founder Shares.

41. Kabot, Norris, Lehmann, Kono, and Hofmockel are collectively referred to herein as the "Director Defendants."

42. Kabot, Norris, and Quiroga are collectively referred to herein as the "Officer Defendants."

43. The Director Defendants, Quiroga, Freedman, and the Sponsor are collectively referred to herein as the "SRAC Defendants."

44. **Defendant John C. Rood** ("Rood") was and is Momentus's CEO and is now Chairman of its board of directors.

45. **Defendant Fred Kennedy** ("Kennedy") was President of Momentus from September 2020 through January 21, 2022.

46. **Defendant Dawn Harms** (as defined above, "Harms") was Momentus's Chief Revenue Officer, and replaced Kokorich on the Momentus board of directors and as interim CEO prior to the Merger.

16

47.    Defendants Kennedy, Rood, and Harms are collectively referred to herein as the "Momentus Defendants," and are named herein as aiders and abettors of the SRAC Defendants' breaches.

## III.    RELEVANT NON-PARTIES

48.    **Legacy Momentus** was, prior to the Merger, a private company that provided in-space infrastructure services, purportedly "by building transfer and service vehicles that will carry satellites and hosted payloads between orbits in space using an innovative water-based propulsion system." The Proxy identified Legacy Momentus's "water plasma propulsion technology" as the cornerstone of its business and stated that the company's "[f]irst launch with customers is anticipated to occur in June 2022." The Momentus Defendants were acting in their roles as officers of Momentus when they repeatedly provided the SRAC Defendants with utterly false representations and unreliable projections for inclusion in the Proxy.

49.    **Momentus, Inc., formerly known as Stable Road Acquisition Corp.** (as defined above, "SRAC" or the "Company") is a Delaware corporation and is the surviving entity of the Merger.

50.    **Kirkland & Ellis LLP** (as defined above, "K&E") is a multinational law firm and served as SRAC's legal advisor in connection with the Merger. In addition to fees received in connection with the Merger, K&E owned at least 430,985 Founder Shares and 198,020 warrants to purchase SRAC Class A common stock

17

through its investment vehicle Randolph Street. There is no evidence that K&E's indirect and multi-million-dollar investment in SRAC Founder Shares was adequately disclosed to the SRAC Board, much less that the Board adequately assessed this serious conflict.

**SUBSTANTIVE ALLEGATIONS**

## I. SRAC: A CANNABIS SPAC THAT SHIFTED ITS FOCUS TO WATER-PROPELLED SPACE TRAVEL

### A. SRAC's Capital Structure and Controlled Status

51. On May 28, 2019, the Controller Defendants incorporated SRAC under the laws of Delaware for the purpose of acquiring or merging with another company in order to take that company public.

52. SRAC was typical of the 2019-2021 vintage of SPAC structures. SPACs, also known as "blank-check companies," are publicly traded shell corporations created to merge with privately held businesses, permitting the target to bypass the traditional IPO process and allowing its equity to become publicly traded in an expedited manner without the traditional regulatory scrutiny.

53. From its inception, SRAC was controlled by its Sponsor, SRC-NI Holdings, whose managing members were Freedman, Kabot, and Quiroga. Kabot installed himself as SRAC's CEO and Chairman of the Board. As the Sponsor's controllers, Freedman, Kabot, and Quiroga appointed all other Board members.

18

SRAC's Board initially consisted of five members – Kabot, Hofmockel, Lehmann, Norris, and O'Keefe.  Defendant Kono joined the Board on December 23, 2019.

54.    Consistent with common practice among SPAC sponsors, before SRAC went public, the Controller Defendants granted the Sponsor a "promote," which allowed the Sponsor to purchase 4,312,500 Class B common shares[4] (*i.e.,* "Founder Shares"), convertible into 20% of SRAC's post-IPO equity, for a nominal cost of $25,000 (a price of approximately $0.006 per share).

55.    If SRAC consummated a business transaction, this nominal investment would result in exponential returns, even if the target company was nearly worthless and the terms of the merger agreement (including the dilution resulting from financing the transaction and paying a wide range of fee obligations to various advisors or other deal participants) were unfavorable for SRAC and its public stockholders.

56.    For sponsors and other holders of Founder Shares, the catch that comes with founder shares is one of the defining attributes of this era's SPACs:  that the potential for a windfall is time-limited.  A typical SPAC has a fixed deadline to complete a de-SPAC transaction, typically 18 to 24 months from the closing date of the IPO.  If a SPAC fails to complete a merger by the deadline, it must permit its

---

[4] Because the Sponsor later forfeited Founder Shares as part of the SEC settlement, and transferred an additional 176,471 to SRAC Partners, a sponsor affiliate, the Sponsor held 3,886,029 Founder Shares at the time of the Merger.

19

public stockholders to redeem their shares for $10 per share. SRAC had just 18 months – until May 13, 2021 – to either complete a business combination or liquidate.

57.     In addition to appointing all of SRAC's directors before the IPO, the Controller Defendants cemented their control of SRAC in various ways, including through:

(a)     the compensation of all of the directors with direct or indirect economic interests in the Sponsor, and therefore in the Founder Shares and Private Placement Units, aligning their interests with those of the Controller Defendants;

(b)     SRAC's statement at the time of its IPO that it may not hold an annual meeting of stockholders to elect new directors prior to completion of an initial business combination, which it admitted "may not be in compliance with Section 211(b) of the DGCL";

(c)     SRAC's implementation of a "staggered" board of three classes of directors, which resulted in the Controller Defendants having the ability to maintain control over SRAC throughout the entire 18-month lifespan of the SPAC;

(d)     their concurrent service as officers of SRAC; and

(e)     the implementation of a bylaw provision that effectively insulated the Board from any challenges to its control by restricting individual or group holders of more than 15% from redeeming their shares without board approval.

58.     SRAC completed its IPO on November 13, 2019, selling 17.25 million units to public investors for $10.00 per unit and raising proceeds totaling $172.5 million. Each $10.00 unit consisted of the right to receive: (a) one share of SRAC

20

Class A common stock; and (b) one half of a public warrant for the purchase of one share of SRAC Class A common stock at an exercise price of $11.50 per share.

59.  In connection with any proposed merger, public stockholders had a contractual right to redeem their shares for $10.00 per share plus interest.

60.  From the proceeds of the IPO, SRAC put $172.5 million in a trust account to be held until the earlier of the closing of a business combination or the expiration (or extension) of the 18-month deadline to complete a business combination.

61.  In the event that the Board approved a merger, the funds in the trust were to be used, first, to cover valid redemption demands.  Funds remaining in the trust would then be paid out to the SPAC to fund the merger.  If no business combination took place, the funds in the trust were required to be paid to the public stockholders in a liquidation.

62.  Concurrent with the IPO, the Sponsor purchased 495,000 Private Placement Units for $10.00 per unit, totaling over $4.95 million.  These units consisted of one share of common stock (the "Private Placement Shares"), and one-half of one private placement share, and private placement warrants exercisable following a business combination (the "Private Placement Warrants").  The Private Placement Units were identical to SRAC's publicly offered units, except for certain

21

features, including that the Private Placement Shares had no redemption rights and would not participate in a liquidating distribution.

63. Taken together, the interests of the Controlling Stockholders in SRAC securities had substantial value. This position cost them, in the aggregate, $4,525,000. SRAC reported that as of December 11, 2020, the Sponsor and its affiliate owned SRAC stock and warrants with an aggregate market value of approximately $80.9 million, but which would be worthless absent a business combination.

64. Although the exact distribution of Founder Shares amongst the Defendants is unclear, at minimum, Defendants Kabot, Quiroga, and Freedman were deemed beneficial owners of the 4,312,500 Founder Shares held by the Sponsor, and the February 22, 2022 Prospectus Supplement reveals that Defendant Hofmockel held at least 109,447 shares and 19,960 warrants for Class A Common Stock, and Defendants Lehmann, Norris, and Kono held at least 15,752 shares each.

65. As soon as the six-month lock-up period preventing them from selling their shares ended on approximately February 12, 2022, the SRAC Defendants rushed to register these shares for sale, seeking to offload their Founder Shares and line their pockets. In a fairly valued deal, these holdings would provide the SRAC Defendants an approximately $7.7 million windfall.

66.     The SRAC Defendants had an additional personal interest in both closing a deal and minimizing redemptions.  As is common, the eventual Merger Agreement contained a minimum cash condition.  If too many stockholders redeemed, SRAC would be unable to meet that condition, the Merger may not close, and Founder Shares and Private Placement Units would be worthless.

67.     The responsibility of SPAC boards for vetting prospective mergers is heightened because, unlike in a traditional stockholder vote, a SPAC stockholder vote is an "empty vote."

68.     In the past, sophisticated holders of IPO units in SPACs would sometimes decline to vote for a deal that was unattractive for the common stockholders unless the sponsors gave up some of their "promote" in order to improve the economics for the common stockholders.  Since investors had to hold onto the shares (and, necessarily, forego the option to redeem the shares) in order to vote, they would not support a deal unless they accepted its economic value.

69.     In recent years, SPAC sponsors and their advisors found a cynical way to employ their control over corporate capital structures to eliminate the "holdup" value to investors of demanding quality deal terms:  SPACs permitted common stockholders to redeem their shares but still vote for the merger.  True to the 2019-2021 SPAC model, SRAC stockholders were permitted simultaneously to redeem

23

and thereby divest themselves of any direct equity interest in Momentus, while still voting in favor of the deal to preserve the residual value of a free warrant.

70.     Thus, the decision whether to vote for a SPAC deal does not depend on actually supporting the deal itself.  Stockholders that hold both shares and warrants have an interest in redeeming their shares to get their original investment back (plus interest) while also voting their shares for a merger in order to preserve value in their warrants (regardless of their support for the deal's economic value).

**B.     SRAC Fails to Find Cannabis Targets, Shifts to Space Transport**

71.     During SRAC's IPO and afterwards, the directors and officers of SRAC held themselves out to investors as highly experienced businesspeople, with particular experience in the cannabis industry, which they repeatedly stated would be SRAC's focus for finding an acquisition candidate.

72.     In its Prospectus, for example, SRAC stated: "[o]ur strategy is to pursue one or more business combinations with companies servicing and operating adjacent or ancillary to, the cannabis sector but which are not directly involved in the production, distribution and sale of cannabis (*i.e.*, businesses that 'touch the plant')." While it preserves the legal option to do a deal in any industry, SRAC reported that "we intend to focus our search on companies in the cannabis industry."

73.     SRAC assured investors that its management team "is well positioned to identify and evaluate businesses within the cannabis sector that would benefit

24

from their skills and access to the public markets," and offered "a deep network of contacts[] in the cannabis sector."  SRAC's Prospectus highlighted that "Mr. Kabot and Mr. Quiroga have, in the aggregate, executed over 20 transactions within or ancillary to the cannabis sector and have been responsible for investing over $150 million within or ancillary to the cannabis sector since July 2017."

74.     SRAC similarly touted the cannabis industry experience of directors Kellen O'Keefe ("O'Keefe") and Lehmann.  Its Prospectus states that "Mr. Lehmann is well qualified to serve as a director due to his extensive investing and advisory experience in the cannabis industry," and emphasized O'Keefe's service as Chief Strategy Officer for "a cannabis cultivation, production, processing and custom packaging company."

### C.    The SRAC Defendants Exacerbate Their Own Conflicts by Employing a Law Firm Invested in Founder Shares

75.     The SRAC Board's choice of legal counsel compounded, rather than mitigated, their own personal financial conflicts.

76.     The 220 production suggests that the Board retained Kirkland & Ellis ("K&E") to serve as SRAC's legal counsel at the suggestion of the Controller Defendants.  Regardless of why the Board retained K&E, it either did not initially know about K&E's plainly material (and potentially irreconcilable) conflicts, or, worse, it knew and did not care about those conflicts.

77.    Specifically, certain K&E partners held Founder Shares in SRAC's Sponsor. They likely held the shares through an unusual private investment vehicle, Randolph Street, owned and controlled by the firm for the benefit of partners who wish to make private investments, often in the firm's private equity clients.

78.    As long as there is proper disclosure and waivers, one can presumably justify lawyers investing alongside their private equity clients as not posing a direct conflict between counsel and client. But when K&E partners invested in the sponsor of a SPAC while the firm was advising the board of that SPAC, including about their fiduciary duties to outside investors, the conflict is manifest and perhaps not even waivable.

79.    While the Section 220 production failed to provide any documentation of K&E's position (which further supports an inference that it was not properly disclosed to SRAC or its Board), subsequent public filings make clear that K&E partners owned *at least* 430,985 Founder Shares and 198,020 warrants to purchase SRAC Class A common stock.[5]

---

[5] These amounts reflect shares sold by certain K&E partners in a secondary offering dated February 18, 2022. Momentus, Inc. Prospectus Supplement No. 6 (filed pursuant to Rule 424(b)). Just as the Section 220 documents from the Company itself do not reflect the specific amounts of Sponsor interests held (directly or indirectly) by Board members, the documents do not disclose the original size of K&E's indirect interests in the Sponsor. Plaintiff does not know whether K&E or Randolph Street held additional shares during the deal process that it redeemed or otherwise sold directly into the market before the secondary offering.

26

80. K&E thus had the same misaligned financial interests through its ownership of Founder Shares as the Controller Defendants and SRAC Defendants: the incentive to prioritize getting a deal done regardless of its effect on the interests of SRAC's public stockholders.

81. Based on the 220 production, K&E does not appear to have disclosed its holdings in the Sponsor to the Board, other than an oblique reference in the Proxy. Based on the Board's passivity throughout the deal, it is unlikely the Board read this (or any) part of the Proxy.

82. If the SRAC Board was never made aware of K&E's holdings prior to the Proxy, the entire deal process is tainted by the Board's being uninformed that their most important legal advisor was actively invested on the opposite side of the transaction.

83. If the SRAC Board was aware of K&E's holdings in Sponsor, there is reason to question whether that conflict could properly be waived. Even assuming both that K&E did disclose these conflicts to the Board and that K&E could receive a waiver to represent SRAC despite its directly adverse financial interests, it is inexplicable how any faithful fiduciary could waive such a conflict in good faith.

II. **MOMENTUS: AN UNPROVEN SPACE TECHNOLOGY STARTUP**

84. With all of these conflicts in play, SRAC initially set out to find a suitable de-SPAC target in its industry of focus. Between its IPO and June 2020,

SRAC purportedly met with more than 50 potential business targets, many of them in the cannabis industry, without any resulting in a merger agreement. SRAC then pivoted to a very different industry: space propulsion technology.

85. The directors (who, of course, were financially aligned with the Sponsor and not the common stockholders) largely took a back seat, allowing Kabot and Quiroga to lead all efforts with potential targets, without any "independent" oversight.

86. On June 26, 2020, SRAC CEO Kabot was introduced to Momentus's then-CEO, Mikhail Kokorich (as defined above, "Kokorich") by Pickwick Capital Partners, LLC and JDA Funds Management, Inc. (who were later awarded 50,000 Class A "Finder Shares" for making the introduction).

87. Once SRAC identified Momentus as a potential target, SRAC's prior focus on the cannabis industry fell to the wayside, and SRAC solely focused its attention on the unproven space transport startup.

88. Momentus was founded in 2017 in Santa Clara, California, by co-founders Kokorich and Lev Khasis ("Khasis"). As of 2020, Kokorich, Khasis, and Khasis's wife were among Momentus's largest beneficial owners.

89. The company represented that it was developing a satellite delivery system vehicle dubbed "Vigoride" and planned to provide "payload services" and

28

"in orbit services" using its "innovative water-plasma based propulsion system[,]" the purported hallmark of Momentus's business.

90.    Although water propulsion technology had been posited as a theoretical means of altering the position of a satellite while in orbit, the scientific community has long since dismissed it as inefficient and impracticable, with no commercial viability.

91.    As of the time when SRAC slipped into Momentus's orbit, no company, Momentus included, had ever successfully tested the technology, much less proven its commercial viability.

92.    After years of worsening losses since Momentus's founding in 2017 – and no closer to vindicating the hypothetical technology on which he founded his business – Kokorich began seeking a SPAC willing to acquire his company.

93.    Kokorich started discussions with two other SPACs, but both had too much sense to move forward with a merger with Momentus.  However, with Kabot and his cannabis-focused SPAC, Kokorich found a ready and willing partner.

94.    As of June 30, 2020, when its discussions with SRAC began, Momentus had only $10.7 million in cash on hand.  Momentus had already burned through greater than that amount in the first six months of 2020.

95.    Particularly because of the obscure nature of Momentus's technology, investors were putting special trust in the Board to understand and articulate the value of the proposed deal.  The Board did not live up to that trust.

## III.    THE BOARD IGNORES SERIOUS RED FLAGS SURROUNDING THE INITIAL MERGER ANNOUNCEMENT

96.    SRAC and Momentus signed a merger agreement on October 6, 2020 – without the Board creating any meaningful record of involvement or assessment of the deal.

97.    The October 7 announcement of the Merger valued Momentus at approximately $1.2 billion.  It appears that at no time during the merger process did the Board obtain a fairness opinion or an independent valuation conducted by a financial advisor.  Indeed, the document production following Plaintiff's 220 Demand contains *no* valuation materials prepared for or reviewed by the Board prior to the October 7, 2020 execution of the Merger Agreement, and no evidence that they meaningfully assessed valuation at any time afterwards.  The Board was fundamentally absent in every way one would want fiduciaries to be engaged.

98.    As of the October 7, 2020 merger announcement, key members of the Momentus management team included, *inter alia*, Kokorich, Harms, then serving as Momentus's Chief Revenue Officer, and Kennedy, Momentus's President.

30

99.     The announcement stated that completion of the proposed transaction was subject to approval by Momentus and SRAC stockholders, and was expected to be completed in early 2021.

100.    Had the Board done any diligence, it would have known that Momentus was a sham, with a highly suspect individual at the helm, and would have never entered into – or at least justifiably abandoned – the patently destructive deal.

101.    Instead, SRAC and the Momentus leadership issued a slew of public statements and SEC filings promoting the Merger in advance of the stockholder vote. In doing so, they made a wide array of very specific – and, it would soon come to light, entirely false – affirmative representations about Momentus, its technology and commercial prospects, and the value of the deal they were asking SRAC's stockholders to endorse.

102.    These public statements about Momentus and its CEO reveal how deficient the Board's diligence had been, and how insupportable it was for the Board to counsel its stockholders in favor of the deal.  Indeed, the strong praise and emphasis on Kokorich's central role at Momentus highlights that the Board ignored all of the red flags raised by his involvement in the business.

103.    The Momentus Defendants, in turn, bolstered the SRAC Defendants' misrepresentations in advance of the Merger.  Relying on information they knew to be false, particularly about the viability of Momentus's underlying technology,

31

Momentus continued to publicly share false claims rather than correct the record, actively supporting SRAC's efforts to close the deal based on those misrepresentations.

104.   Among the objectively verifiable (and ultimately untrue) statements issued following the merger announcement were:

- A joint press release stating that "[i]n 2019, the Company successfully tested its water plasma propulsion technology in space." An October 2020 investor presentation elaborated that the 2019 test flight dubbed "El Camino Real" had been successful, and that the vehicle it launched was "still operational today."

- Momentus's "plans to launch its first Vigoride vehicle in December 2020 with commercial customers," with four to five launches to follow in 2021 with paying customers "includ[ing] satellite operators, satellite manufacturers, launch providers, defense primes such as Lockheed Martin and government agencies such as NASA."

- Revenue projections stating that Momentus had $90 million in projected revenue based on purported current contracts, and approximately $1 billion in projected revenue in the pipeline.

105.   SRAC's November 2, 2020, SEC registration statement repeated many of these aggressive (but false) promotions of the deal, including the projected $90M in revenue, the assertion that Momentus's "revolutionary" water propulsion technology had been "successfully tested in space in 2019," and that the company's "pioneer transport vehicle" had six launches planned within the next calendar year "with paying customers on board," starting the following month.

32

106.    The registration statement also included a glowing portrait of Kokorich, who was slated to be CEO and a director of the combined company.  It asserted that he "w[ould] play a vital role in helping us achieve our goals and advance the interests of our stockholders."  The registration statement did not disclose Kokorich's potential ties to the Russian defense or intelligence establishments.

107.    These statements made clear that the water plasma propulsion system – which SRAC and Momentus representatives frequently praised as "groundbreaking" – was the basis for Momentus's supposed competitive advantage.

108.    Kabot gave a televised interview on CNBC, reiterating Momentus's "phenomenal launch cadence for 2021" and also stating: "[W]e had a very successful test launch, the vehicle is still flying around in space, which is great."

109.    When asked about the risks involved in Momentus's forecasted contracts and projected revenue, Kabot responded: "That *$90 million is fully contracted* and then a portion are options that are written into the agreements." (emphasis added).  Kabot's statements were inaccurate, and he had no good faith basis for making them.

110.    When asked about the "blank check bonanza" and the massive proliferation of SPACs, Kabot said:  "I think SPACs are very healthy for the market ... [W]hat I think is great for the investor is we did four months of due diligence."  Kabot specifically praised K&E for its involvement in the purported due diligence

and for its standing as a "top service provider." Either due to ignorance or faithlessness, Kabot failed to disclose that K&E had interests directly conflicting with those of SRAC's public stockholders.

111. In a conference call that same day, Kokorich, as spokesperson for Momentus, echoed the same misrepresentations about Momentus's underlying technology and commercial potential. He not only painted the company's revenue projections as "a conservative market capture," but emphasized Momentus's "strong market traction" with customers, "includ[ing] defense primes such as Lockheed Martin, [and] government agencies such as NASA[,]" claiming that Momentus had "several substantial opportunities currently in negotiation ... worth more than $1 billion of additional potential revenue."

## IV. THE SRAC DEFENDANTS LEARN THAT THE U.S. GOVERNMENT IDENTIFIED KOKORICH AS A NATIONAL SECURITY RISK, YET DECLINE TO CHANGE COURSE

### A. The SRAC Board Does Nothing to Respond to Governmental Concerns That Momentus May be Involved in Espionage

112. While the SRAC Defendants had evidently failed to inquire into Kokorich's questionable foreign connections, the United States government had not. On November 12, 2020, Momentus received a notification from the Office of National Security and Technology Transfer Controls within the Bureau of Industry and Security ("BIS"), informing Momentus that the United States Department of Commerce intended to deny Momentus's application for the deemed export of its

34

"Vigoride" software and technology, *i.e.*, approval for its use in space, due to Kokorich's involvement.

113. The notification stated that the Department of Commerce believed the denial "furthers the United States policy ... to restrict the export of goods and technology which would make a significant contribution to the military potential of any other country or combination of countries which would prove detrimental to the national security of the United States." The Department of Commerce made this determination in consultation with the Department of Defense, the Department of State, and the Department of Energy.

114. On December 14, 2020, SRAC filed an amended registration statement on Form S-4/A with the SEC. The amended registration statement was substantially similar to the version previously filed by SRAC on November 2, 2020, but, in addition to repeating previous business and financial misrepresentations, the December 14, 2020 filing added new misleading statements regarding Momentus's application to the BIS to provide its technology to Kokorich.

115. The amended registration statement explained that "notwithstanding the restrictions on Mr. Kokorich's access to export-controlled materials, Momentus has been able to secure contracts with customers ranging from private space companies to established U.S. space industry entities such as NASA and Lockheed Martin … representing approximately $90 million in potential revenue."

116.  The Section 220 production does not reflect any effort by the Board to understand the nature of or facts underlying any of the above-described disclosures.

117.  Momentus's difficulties with U.S. regulators persisted.  On January 4, 2021 Momentus issued a press release, which SRAC filed with the SEC as an exhibit to a current report on Form 8-K, signed by Kabot.  The press release stated that Momentus would be "remanifesting its January 2021 mission[,]" further delaying its would-be inaugural flight, to "allow for the additional time necessary to secure [Federal Aviation Administration ("FAA")] approval of Momentus's payloads, including completion of a standard interagency review."  The release quoted Kennedy as saying that "[w]e will continue to work with the FAA, as we have done successfully with other regulatory agencies, to obtain approval in a timely manner."

118.  Also on January 4, 2021, IPO Edge published an interview with Kennedy.  When asked about the delays, Kennedy said that the FAA had "not express[ed] any specific concerns" but merely "indicated that more time was needed to complete its interagency review of Momentus' payload."  Kennedy described the interagency review as familiar and routine, "a standard part of various license application processes," no different than the National Oceanic and Atmospheric Administration's review to approve operation of a spacecraft's camera.

119.  When the IPO Edge interviewer specifically asked whether foreign ownership (including by Kokorich) was a concern for Momentus, Kennedy

36

represented (falsely) that Momentus's foreign ownership had already been vetted and approved "to the satisfaction of [U.S. government] agencies" and that Kokorich himself was well on his way to U.S. citizenship, an "asylum seeker ... meet[ing] all legal requirements to be granted such status" and stated that SRAC anticipated that he would be "offered U.S. citizenship."

120. As the Board knew or soon learned, Kennedy's statements were objectively false. Putting aside what it may say about patriotism, the Board's continued support for the deal reflects disloyalty to SRAC's common stockholders.

121. Although Defendants failed to conduct sufficient due diligence before signing the Merger Agreement, the red flags they later ignored or only half-heartedly pursued were so severe that it brought about something rarely seen in the SPAC arena: the SEC did the Board's diligence for them.

122. On January 13, 2021, the United States Department of Defense's Office of Foreign Investment Review sent a letter to the SEC regarding the proposed merger between SRAC and Momentus. As SRAC later admitted, the Department of Defense letter stated that "Momentus posed a risk to national security as a result of the foreign ownership and control of Momentus by Mikhail Kokorich and Lev Khasis and their associated entities, as well as concerns regarding disclosures relating to such matters made by Stable Road in its SEC filings in connection with the Business Combination."

123.  In the letter, the Department of Defense stated that it "has concluded that Momentus presently poses a risk to national security and accordingly has requested appropriate governmental agencies conduct national security reviews." The Office of Foreign Investment Review itself "recommend[ed] that DoD places an indefinite hold on all Momentus's relationships with DoD."

124.  The letter explained that Kokorich's previous company, Dauria Aerospace, had partnered with the Skolkovo Foundation, which the FBI assessed "may be a means for the Russian government to access our nation's sensitive or classified research." Put another way, Kokorich's prior business may have been engaged in espionage against the United States.

125.  The letter also noted national security concerns relating to Momentus's "complex and opaque foreign ownership structure [that] may not accurately reflect the ultimate beneficial owner of Momentus nor the true identity of financiers of Momentus." In particular, the letter noted that Khasis, who, along with his wife Olga, was reportedly a major Momentus stockholder, was also the "First Deputy Chairman of Russia's state-owned bank, Sberbank," which is on the Treasury Department Office of Foreign Assets Control's "Sanctions List."

126.  The Department of Defense went on to state that it believed SRAC's November 2, 2020 S-4 filed with the SEC to be misleading regarding these and related national security issues, and that the "DoD is currently reviewing a 2019

38

federal investigation to determine if Mikhail Kokorich violated export control laws while serving as both an investor and executive in several satellite companies."

127. The letter ended with the Department of Defense's "conclu[sion] that Momentus's current proposal poses *a risk to investors*," (emphasis added) and a request that the SEC "delay the IPO of Momentus in order to provide DoD and other government agencies the appropriate time to conduct further due diligence."

## B. Despite Governmental Warnings, Only One Director Resigns, The Others Rush Deeper Into Space

128. This Department of Defense letter appears to have prompted the SEC to investigate Momentus, SRAC, and the proposed merger.

129. The SRAC Board learned of the SEC's investigation promptly in January 2021. As SRAC admitted in later SEC filings, "[i]n January 2021, the SEC's Division of Enforcement informed SRAC and Momentus that it was investigating certain disclosures made in filings with the SEC, including in connection with the Business Combination." Nevertheless, in the months that followed, the Board continued headlong in their mission to close the deal.

130. On January 25, 2021, Momentus issued a press release, announcing that Kokorich had resigned from Momentus's board and as CEO. The press release stated that "Momentus, in consultation with ... [SRAC] ... has determined that accepting Mr. Kokorich's resignation is in the best interest of the Company, in an effort to expedite the resolution of U.S. government national security and foreign

39

ownership concerns surrounding the Company, the existence of which the Company recently has confirmed."

131. Thus, despite previously asserting that one of the main value propositions of the deal was Kokorich's management and leadership of Momentus, SRAC backtracked in order for Momentus to obtain the necessary licensing to have any operations whatsoever.

132. That same press release made clear that SRAC's Board had no intention of meaningfully reevaluating Momentus in light of the investigation. It expressed "full confidence" in Harms, Momentus's incoming CEO, and quoted her as saying "[w]e have an extremely talented team, groundbreaking water plasma propulsion technology, and a unique value proposition, all of which we believe have established Momentus as a leader in the in-space infrastructure industry."

133. Rather than reassess the best interests of SRAC stockholders in light of the SEC investigation and consider abandoning Momentus and liquidating the SPAC, the Board eschewed any semblance of a process or thoughtful fiduciary deliberation in connection with these developments, and simply forged ahead with the Merger Agreement, reacting to Kokorich's resignation with only a minor amendment to Momentus's employee stock purchase plan, adopted March 5, 2021 by unanimous written consent in lieu of a special meeting.[6]

---

[6] BURK-00004685.

40

134. The only sign of any form of Board-level process was the abrupt resignation of one of SRAC's Board members, O'Keefe, on March 24, 2021. The Company's Form 8-K announcing his departure opaquely stated that "Mr. O'Keefe and the Board concluded that his services and expertise were no longer necessary in light of the Company's proposed business combination with Momentus." The SRAC Board did not take steps to nominate a new director to fill his seat, leaving the Board with only five directors, Kabot, Hofmockel, Lehmann, Norris, and Kono.

135. The remaining SRAC Board members did not take this opportunity to renegotiate or cancel the Momentus deal, despite having every reason to know that SRAC's disclosures about Momentus's technology and promised business operations were false, that Momentus's CEO had been barred by the U.S. government as a potential foreign asset, and that Momentus offered no possible future business operations in the near term.

### C. The SEC Takes Action to Stop a De-SPAC That Could Turn a Russian Intelligence Asset Into a Public Company

136. On July 13, 2021, before the Merger was submitted to SRAC stockholders for approval, the SEC filed an administrative enforcement action, and released the SEC Complaint and SEC Order. The action, against Momentus, SRAC, the Sponsor, and Kabot, made it publicly known that the very public statements on which Defendants were relying to try to sell the merger with Momentus to their

41

stockholders – including that its "groundbreaking" technology had been successfully tested and was operational in space, and that it represented a breakthrough business in the space industry– were all lies.

137. In addition to highlighting falsehoods in the foundational representations about Momentus's technology and business, the SEC Order found that SRAC's Forms S-4 registration statements and proxy statements up to a third amendment filed on June 29, 2021 were materially false and misleading. Among the omissions and misrepresentations brought to light by the SEC Complaint was that, in reality, Momentus's 2019 "El Camino Real" test flight failed to meet Momentus's own public and internal pre-launch criteria for success. The test was conducted on a prototype not designed to generate commercially significant amounts of thrust, and the mission did not provide any measurable or detectible change in the satellite's orbital velocity. Consequently, Momentus's claim that the El Camino Real mission demonstrated its ability to provide commercial launch services was false.

138. The SEC Complaint also emphasized the extreme deficiency of SRAC's due diligence process. It noted that SRAC did not retain any firm or begin its substantive due diligence on Momentus's technology until late August or early September 2020, a little more than a month before the merger announcement on October 7, 2020. Nevertheless, SRAC's November 2020 registration statement gave

42

investors the misleading impression that the Company had independently verified Momentus's claim that its technology had been "successfully tested" in space.

139.  Investors had no way to know that SRAC was merely repeating what it had been told by Kokorich and Momentus, since the "due diligence" concerning Momentus's "technology solutions" and "testing progress" did not include *any* specific due diligence to evaluate and verify that assertion.

140.  The SEC Complaint found that SRAC's due diligence was conducted in a compressed timeframe, and failed to probe both Momentus's claim that its technology had been successfully tested in space and to follow up on red flags concerning the national security and foreign ownership risks associated with Momentus.  As such, the SEC found that SRAC had acted unreasonably in adopting and repeating Momentus's claims about its technology.  SRAC's public filings, including registration statements signed by Kabot, incorporated Momentus's and Kokorich's false and misleading claims and caused investors to be misled about material aspects of Momentus's business.

141.  In addition, the SEC found that SRAC conducted inadequate due diligence related to Kokorich's forced divestiture in 2018 from a prior space technology company and his status as a national security risk generally.  SRAC generally, and Kabot in particular, knew that the Committee on Foreign Investment in the U.S. ("CFIUS"), which exists for the express purpose of assessing national

security risks posed by foreign investment in U.S. businesses, had required Kokorich to divest from another space technology company in 2018.

142. During due diligence, SRAC received a copy of CFIUS's final order and repeatedly asked Momentus for correspondence and other documents that would describe the basis of the order. When Momentus incredibly responded that it did not possess those documents, SRAC nonetheless executed the Merger Agreement with Momentus without assessing the basis for the CFIUS's order or its impact on Momentus's business.

143. Lastly, the SEC Complaint laid out the consequences of SRAC's failure to disclose the fact that Kokorich was considered a national security risk. Although Momentus and SRAC became aware in January 2021 that the Department of Defense believed Momentus posed a risk to national security as a result of its association with Kokorich, SRAC did not reveal the extent to which Kokorich's affiliation with Momentus could jeopardize, among other things, the company's launch schedule, and, as a result, its projected revenue.

144. Crucially, SRAC's representations about Momentus's forecasted revenue – including the sanguine projection included in its November and December 2020 registration statements that the company would grow from zero revenue in 2019 to over $4 billion by 2027 – did not take into account the effect of the possible

adverse decisions by the U.S. government that could arise based on those national security concerns.

145.    These concerns were borne out when, as disclosed by SRAC in its June 2021 Form S-4 amendment, Momentus was forced to considerably reduce its financial projections for the same period due to the year-long delay to its inaugural payload launch caused by the adverse licensing decisions stemming from Kokorich's national security risks, which contributed to a reduction in the enterprise valuation of Momentus by almost 50%, from more than $1.2 billion to less than $600 million.

146.    As the SEC Complaint noted, SRAC's filings misrepresented the fact that on two occasions, December 2020 and March 2021, the FAA withheld approval for launches by third-party providers with Momentus's payload on board, explicitly basing its denial on a finding that the launch of Momentus's payload would jeopardize national security, and referencing Kokorich's continued ownership interest in the company at the time.

147.    With SRAC's liquidation date rapidly approaching, Momentus rushed to settle the SEC enforcement action – admitting no fault or guilt – and agreeing to pay approximately $8 million in fines, including $7 million from Momentus and $1 million from SRAC.  SRAC, the Sponsor, and Kabot also consented to the SEC Order, which required, *inter alia*, that: (a) SRAC would pay a $1 million penalty; (b) Kabot would pay a $40,000 penalty; (c) Momentus would pay a $7 million

45

penalty; (d) Momentus agreed to retain and pay for an independent compliance consultant approved by the SEC to conduct comprehensive ethics and compliance reviews; (e) Momentus and SRAC would allow certain private placement investors to terminate their investment agreements; and (f) the Sponsor would forego 250,000 of the Founder Shares to which it was otherwise entitled.

148. Furthermore, when PIPE investors started to disengage from the Company following the SEC release, the Company was forced to sweeten the deal for them by increasing the warrants for PIPE investments in order to ensure that SRAC would meet the minimum cash requirement to complete the deal – another step that disadvantaged common stockholders in the interest of finalizing the deal regardless of the consequences.

## V. INSTEAD OF LIQUIDATING OR FINDING AN APPROPRIATE TARGET, SRAC'S BOARD DOUBLES DOWN ON MOMENTUS

### A. Unwilling to Admit Their Disastrous Error, SRAC Seeks an Extension to Complete the Merger with Momentus

149. Defendants' next action was to buy more time and use it to rewrite the Momentus deal to push it through to closing.

150. With the SEC's investigation ongoing, SRAC's May 13, 2021 deadline to complete an acquisition was approaching. SRAC attributed SRAC's failure to complete an acquisition by the deadline to delays in getting a Notice of Effectiveness from the SEC for its registration statement and proxy prospectus.

46

151. On April 6, 2021, the SRAC Board approved, by written consent, Amendment No. 2 to the Merger Agreement, which extended the Merger termination date until August 12, 2021.[7] Again, the Board apparently approved this amendment without a meeting and without any deliberation.

152. On April 9, 2021, SRAC sent the First Proxy to SRAC stockholders, to solicit votes in favor of the Extension Agreement, in order to give SRAC time to complete the deal and avoid liquidation. The First Proxy informed public stockholders of their right to redeem their SRAC shares in connection with the extension request.

153. However, like Defendants' prior disclosures, the First Proxy did not give the stockholders all material information needed to make an informed choice about whether to redeem their shares or allow additional time to proceed with the Merger.

154. At this moment, any fiduciary acting in good faith and advised by independent counsel would simply allow liquidation, rather than extending the deadline to salvage the deal with Momentus. However, SRAC's stockholders were left to rely on Defendants to provide good faith guidance based on adequate and loyal diligence.

---

[7] BURK-00004731.

47

155.  To be sure, many SPAC boards have permitted an orderly liquidation in the absence of a deal, at least in part because recommending a facially absurd deal is wrongful.  Instead of doing the right thing, the SRAC Board recommended an extension so it could see its deal with Momentus through.

156.  The Board had the same advantage of an empty vote on the deadline extension as in a typical stockholder vote on a SPAC transaction:  stockholders could vote in line with the Board's recommendation, preserving the value of their warrants even if they chose to redeem their shares.

157.  Initially forced to postpone the vote, and then barely securing the required 65% of outstanding shares voting in favor, Defendants managed to get approval for the Extension Agreement at the eleventh hour, on May 13, 2021, what should have been the last day for SRAC to complete a deal or liquidate.

158.  Even with the extended deadline, Defendants faced extreme time pressure and financial incentives to complete a deal, and SRAC had no viable options to complete a deal apart from Momentus.

159.  Only 19,662 shares validly requested redemption in connection with the extension request.  Plaintiffs believes the reason for the low redemption rate despite the significant problems about Momentus that were already made public is that the generally sophisticated hedge fund investors who bought the IPO shares had

48

already sold their SRAC shares into the market amidst Defendants' fraudulent statements that drove the price well above the $10 redemption threshold.

**B.    SRAC Reprices the Deal with Momentus, Once All the "Smart New Money" Had Run for the Hills**

160. As the SEC and other government entities cracked down and sophisticated investors and PIPE investors ran for the proverbial hills, SRAC and Momentus were forced to slash the deal valuation to preserve the ruse. On June 27, 2021, the SRAC Board met to discuss Amendment No. 3 to the Merger Agreement, which cut the "base value" of Momentus by half, to $566,600,000, among other things.[8] Representatives of K&E, SRAC's conflicted legal counsel, were present at this meeting and actively participated in discussions.

161. In response to Plaintiff's 220 Demand, the Company was unable to produce any documents *at all* evidencing the Board conducting *any* due diligence or independent valuation of Momentus's business. It is reasonable to infer that no valuation effort was made. Rather, the SRAC Board and other Defendants simply backed into a valuation based on the amount of funding they were still able to retain. As noted, since SRAC shares had traded above $10 for a significant time (thanks to Defendants' public falsehoods), many sophisticated investors likely sold their shares. Defendants likely recognized that retail investors comprised the remaining

---

[8] BURK-00001732.

49

stockholder base, and were most likely to follow their fiduciaries' recommendation and least likely to seek to redeem absent an affirmative recommendation to do so.

162.   On June 29, 2021 – SRAC's Board, again by unanimous written consent, consented to Amendment No. 3 to the Merger Agreement.[9] The amendment did not lower SRAC's cash contribution commitment (that is, the money left in the Trust was still needed to support the deal) in connection with the Merger.  SRAC's extended deadline to complete the Merger was less than 45 days away.

## VI.   FACING SEC ACTION, SRAC ADMITS SOME OF THE UGLY TRUTH ABOUT MOMENTUS

163.   Even the release of the SEC Complaint and SEC Order on July 13, 2021 (discussed above), failed to jar the SRAC Board into performing their duties.

164.   On July 20, 2021, the SRAC Board held a brief special meeting, and appears to have discussed Momentus's settlement with the SEC and its "National Security Agreement" with the U.S. government, under which Kokorich was completely divested from Momentus.  The meeting convened at 8:30 a.m. and adjourned at 9:00 a.m.

165.   Whatever the Board may or may not have known before the release of the SEC Complaint, following it, no loyal fiduciary could persist in pursuing the merger with Momentus.

---

[9] BURK-00004743.

166.    Instead, the SEC Complaint and SEC Order only forced Defendants to finally admit (to some extent) the severe shortcomings of the one and only in-space test of the water propulsion technology that Momentus ever attempted.

167.    In a June 29, 2021 amendment to SRAC's registration statement, the SRAC Defendants admitted that the technology needed for the "key component of Momentus' business model … is still in the development stage and has ***not been fully validated through actual deployment and testing in space*.**" (emphasis added). Therefore, "the technology underlying Momentus's anticipated service offerings (including its water plasma propulsion technology) is ***still in the process*** of ***being developed*** … and may never have the capabilities or functionality in space that Momentus currently expects." (emphasis added).

168.    That is, not only had the product touted as a success been a failure, but the technology that Defendants had fervently promoted in connection with the Merger ***had yet to be developed***, facts that SRAC and its advisors surely would have discovered through adequate diligence.

169.    In an amendment to SRAC's Form S-4 on July 16, 2021, Defendants further revealed that:

> Our first-generation X-band thruster, which operates at 30 Watts, was flown aboard a demonstration mission called El Camino Real in mid-2019.  During this mission, Momentus launched its first MET [microwave electrothermal thruster] into space as a hosted payload on a nanosatellite.  The mission's

51

objective was to demonstrate the MET's ability to produce water plasma in space by performing 100 one-minute firings ... Failure of the host satellite in November 2019 prematurely terminated the demonstration after only 23 of the planned 100 firings of the thruster had been performed ...

170. Defendants thus obliquely admitted that only three of the test firings in this one and only in-space test met the intended conditions of the test, and none could be shown to work as anticipated. Preserving the confusion their prior false disclosures had fomented, Defendants nevertheless represented to SRAC investors: "Momentus believes that the reflected power data collected during the three hot firings with water present to be sufficient to conclude that plasma was produced."

171. Momentus itself finally publicly admitted the failure of its testing mission in a July 29, 2021, press release, stating that the 2019 El Camino Real mission "did not meet its pre-launch success criteria." Even then, SRAC did not amend the Proxy.

172. While Momentus and SRAC did not fully disclose this failure until July 29, 2021, any SRAC Board diligence would have focused on the viability of the technology, and the test of that technology. No such diligence took place.

173. In fact, Momentus leadership was aware of the mission's failure from the beginning. Kokorich and Harms were both included on a November 26-27, 2019 email chain discussing the failed test, with the subject line "Need El Camino Real Failure Review Board."

52

174. In that email chain, Momentus's Chief Technology Officer wrote, "[e]ven if we recover the spacecraft, at this point it is my judgement that we need to convene a failure review board."

175. Had the SRAC Board conducted basic due diligence into the technology, it would have learned of this failure long before exposing SRAC to SEC scrutiny and SEC fines.

176. Even in July 2021, Defendants could certainly have distanced themselves from Momentus and allowed the SPAC to liquidate – now an increasingly common practice among SPAC vehicles[10]– thus returning the public investors' funds. Even if they could have found a good faith basis to choose not to allow liquidation, Defendants could at least have revised the disclosures in their Proxy consistent with their settlement with the SEC, fully disclosed their self-interests, and presented a realistic description of their due diligence and the self-evident basis for all investors to redeem rather than stay invested in the transaction.

177. Defendants did none of these things. The record reflects no discussion about either altering their recommendation or simply permitting liquidation of

---

[10] Michelle Celarier, *SPACs Are Giving Up on Finding Deals*, INSTITUTIONAL INVESTOR (Dec. 12, 2022), https://www.institutionalinvestor.com/article/b1h6wsu5jlb20w/SPACs-Are-Giving-Up-on-Finding-Deals (observing that almost $45 billion worth of SPACs were liquidated in 2022, approximately 130 total liquidations, with "[r]edemption levels also extraordinarily high" at an average of 84% in the fourth quarter).

SRAC. The Board had a single-minded focus: reaping the windfall from their Founder Shares and Private Placement Unit interests upon the Merger's closure. They even left numerous of the false statements from the prior registration statements in the final Proxy. SRAC's stockholders would be left owning a company whose science fiction premise was rapidly fizzling.

178. Specifically, on July 20, 2021, the "Board determined to continue seeking approval of the Registration Statement from the SEC as quickly as possible to enable sufficient time prior to the special meeting of stockholders to solicit stockholder votes in favor of the proposed business combination with Momentus."[11]

## VII.   THE PROXY

179. The final Proxy in connection with the Merger was filed jointly by SRAC and Momentus on July 26, 2021, signed by Harms, Momentus's interim CEO.

180. The Proxy contained a number of materially false and/or misleading disclosures and omissions, including:   (a) repeating the false description of Momentus's business that the SEC had already flagged as misleading; (b) misrepresenting the scope and nature of the Board's due diligence; (c) failing to quantify certain SRAC's officers' and directors' ownership interests in the Sponsor; (d) failing to quantify the financial interests that certain partners at SRAC's legal counsel, K&E, held in the Sponsor, including identifying which K&E partners

---

[11] BURK-00001731.

suffered those disabling interests; and (e) misrepresenting the value of SRAC shares by not taking into account the significant dilution of value inherent in the Merger.

181. As detailed below, Defendants breached their fiduciary duties by agreeing to, and recommending to SRAC's public stockholders, the patently unfair Merger. In addition to the deal's unfair price, the process also was unfair, including because Defendants deceived stockholders into not exercising their redemption rights to walk away from a deal that no fiduciary could recommend in good faith.

### A. Misrepresentations About Momentus's Technology and Financial Projections

182. Surprisingly, the Proxy failed to correct omissions and contained several false and misleading statements repeated from SRAC's June 29, 2021 Registration Statements that the SEC had already determined were false and misleading. In other words, even after the SEC imposed millions of dollars in fines and penalties on Momentus, SRAC, and Kokorich, they still proceeded with disseminating a Proxy repeating false statements.

183. Defendants must have assumed that as long as they concurrently published the SEC Order, they had the right, consistent with their fiduciary duties, to put it on stockholders to sort out which disclosures about the Merger were false and which were reliable.

55

184. Defendants were wrong. In light of the widespread and broad nature of the SEC Order, Defendants' fiduciary duties required them to withdraw the prior disclosures entirely, and only repeat those statements that were, in fact, truthful.

185. The SEC Order made several findings of fact that the Proxy never corrected.

186. First, the SEC found that Momentus's and SRAC's claims in prior registration statements that Momentus's technology was successfully tested in space were false and misleading. In reality, as discussed above, the El Camino Real mission failed to meet Momentus's own public and internal pre-launch criteria for success, and was conducted on a prototype not designed to generate the level of power needed to be commercially viable.

187. Instead of providing complete and full information with regard to this failure, the Proxy doubled down on the claims of success, supplied with additional (yet still misleading) information from the Momentus Defendants. Specifically, the Proxy gave SRAC stockholders the impression that Momentus was forced to abandon its 2019 mission for reasons unrelated to the inherent success or failure of its technology, and the mission did demonstrate successful results as to plasma generation. Specifically, the Proxy stated:

> While a pump issue significantly restricted flow of water into the thruster during nine of the 12 hot firings, preventing plasma-generation, the three hot firings that did have water present were found to have produced plasma. Although pressure and temperature data did not

56

provide sufficient information to either confirm or contradict plasma presence, Momentus believes that the reflected power data collected during the three hot firings with water present to be sufficient to conclude that plasma was produced. Reflected power data collected during these three in-space firings closely matched ground test data collected by similar or identical sensors and associated with observed successful firings of the MET where water plasma was generated.

188. Thus, while the Proxy no longer expressly represented that the El Camino Real mission "was successful," it still implied that the mission achieved its objectives of producing plasma necessary for commercialization, comparing the results of the in-space testing with "successful firings" of that technology on the ground.

189. Under the circumstances, faithful fiduciaries attempting to provide material disclosures and a good-faith recommendation would, at the least, have to say that while the mission was unsuccessful in meeting its stated objectives, it is possible plasma was created, and that investors willing to speculate with their funds may have some hope of Momentus's technology eventually enjoying a successful test.

190. Second, the SEC found that SRAC's technology consulting firm, Stellar Solutions, Inc. ("Stellar Solutions"), did not actually evaluate the results of the El Camino Real mission or review any related data or other information, and, in fact, that the purported due diligence findings Stellar Solutions provided to the SRAC Board contained no mention of the mission at all. Nevertheless, the Proxy

57

restated Defendants' prior misrepresentation that Stellar Solutions assisted SRAC with "technical due diligence, including with respect to Momentus' R&D strategy, vehicle development to date, testing progress and competitive market positioning." This gave the false and misleading impression that such due diligence was actually conducted, despite the SEC findings to the contrary, and despite the Company's complete inability to provide Plaintiff with copies of any Stellar Solutions diligence materials.

191.   The Momentus Defendants aided the SRAC Defendants' breach of duty by putting out a proxy to their own shareholders that persisted in its false depiction of Momentus's business – and future business potential – and by continuing to prop up and promote the statements about Momentus in the SRAC Defendants' Proxy which the Momentus Defendants had long known to be materially misleading.

192.   Ultimately, in concert with the Momentus Defendants, the SRAC Defendants failed to correct multiple material misstatements with regard to the state of Legacy Momentus's technology and future business prospects and its due diligence regarding the same, painting a misleading picture of the company in which SRAC stockholders were asked to invest.

### B.   Misrepresentations About the Board's Diligence of Momentus

193.   While stockholders always rely on the basis for fiduciaries' recommendations when deciding whether to approve a board-supported transaction,

the diligence conducted by such fiduciaries takes on special importance to stockholders when the transaction at issue is a merger with a counterparty providing theoretical services based on an unproven technology.

194.    Here, as the Proxy disclosed, Momentus "plan[ned] to offer in-space infrastructure services by building transfer and service vehicles that will carry satellites and hosted payloads between orbits in space using an innovative water-based propulsion system …." Thus, SRAC stockholders were especially dependent on their fiduciaries conducting the necessary diligence to confirm that the fantastical technology the Board was recommending be acquired actually worked and that Momentus offered a viable business model.

195.    Recognizing the reliance that SRAC stockholders were placing on their Board's recommendation, the Proxy *repeatedly* represented that the SRAC Defendants thoroughly diligenced Momentus before agreeing to the Merger and recommending that the public stockholders vote in its favor rather than pursuing the proverbial safety valve that redemption offered:

- "SRAC and its advisors conducted *extensive due diligence* with respect to Momentus's financial model, customer base and customer contracts, total addressable market, industry in which Momentus operates, companies comparable to Momentus and aero-defense companies with similar characteristics, technology solutions, intellectual property and relationship with SpaceX."

- "Representatives of each of SRAC and Momentus, as well as each of their advisors, met telephonically several times throughout July,

59

August, and September 2020 *to discuss disclosure requests and responses in connection with SRAC's diligence review*."

- "On September 2, 2020, the SRAC board of directors had a call to discuss the potential business combination. During this call, Mr. Kabot and Mr. Quiroga *provided the other directors an update on progress with respect to diligence, definitive documentation and the potential PIPE investment*."

- "On September 14, 2020, the SRAC board of directors had a teleconference *to discuss updates to the proposed business combination process*."

- "On September 21, 2020, the SRAC board of directors had a call to discuss progress in the initial business combination. Mr. Kabot and Mr. Quiroga *provided a detailed update to the board regarding* progress on the PIPE investment, the negotiation of the merger agreement and other transaction documents and *SRAC's due diligence findings to date*."

- "From September 25, 2020 until signing on October 7, 2020, SRAC had multiple teleconferences and email exchanges with representatives of K&E, Stellar Solutions, … and certain of its other advisors *regarding the results of their due diligence review of Momentus and any outstanding areas of their due diligence review*."

- "On October 5, 2020, the SRAC board of directors had a telephonic meeting *to discuss the business combination*. At the meeting, Mr. Kabot and Mr. Quiroga *provided an overview of the proposed business combination and Momentus (including the rationale for the combined business)* and updated the board of directors regarding the final negotiations of the terms of the proposed business combination, including the key terms of the Merger Agreement and the PIPE investment. *SRAC's board of directors discussed and reviewed the proposed business combination, including Momentus*, the terms and conditions of the Merger Agreement and the key ancillary agreements (copies of all of which were provided to the board in advance of the meeting), *the potential benefits of, and risks relating to the proposed business combination and the reasons for entering into the Merger Agreement* …."

60

- In deciding to approve the Merger Agreement, SRAC's board of directors "*considered the scope of the due diligence investigation* conducted by SRAC's management and outside advisors and evaluated the results thereof," including purported "*extensive meetings and calls with the Momentus management team*," "review of materials related to Momentus made available by Momentus, including … export control and security matters," "*review of financial due diligence materials prepared by professional advisors*," "*technical diligence by a third party systems engineering service provider with significant experience in system and subsystem design and propulsion technology*," and "*discussions with industry experts*."

196. These disclosures were materially false and misleading. In response to Plaintiff's demand under Section 220, Momentus provided *zero* meeting minutes or other diligence materials predating the Merger Agreement's October 7, 2020 signing date. The *only* documents provided regarding any activity by the SRAC Board consisted of: (a) a single calendar invitation for a meeting on September 2, 2020, entitled "SPAC Pipeline Call – rescheduled time" and (b) a presentation entitled "Project Marvel: Organization Call," dated August 27, 2020, which merely included (i) "Team Contacts," (ii) an "Illustrative Process Timeline," and (iii) a "Key Deliverables Checklist." The presentation did not contain *any* discussion of Momentus or its business or technology.

197. Simply put, the Proxy gave stockholders a false sense of comfort that the Board actually diligenced Momentus, in accordance with their fiduciary duties, and thereafter recommended the business combination on the basis of that information. Such disclosures were materially misleading, because there is no

61

evidence that the SRAC Board *ever* met to substantively discuss the benefits or detriments to the SRAC stockholders of pursuing Merger, nor is there *any* evidence that the SRAC Board received written diligence materials concerning Momentus and the proposed business combination.

198. Although SRAC purportedly retained Stellar Solutions in connection with evaluating the deal, there is no evidence that the Board received or reviewed a technical report purportedly provided by Stellar Solutions. Even though such a report should have been easy to produce, Momentus could not even produce it in the Section 220 process.

199. And, to the extent that the Board did actually meet to discuss Momentus and those meetings were not documented, disclosure of that fact also would have been material. The absence of basic documentation of the Board's activities is especially glaring, given that SRAC retained experienced counsel, K&E, to represent it and its stockholders.

200. Particularly given the financial conflicts of the SRAC Defendants and K&E, discussed in ¶¶54-66 and 76-80, *supra*, it would have been material to stockholders to know that SRAC entirely abandoned basic corporate recordkeeping.

**C.      The Proxy Fails to Quantify the Ownership of Founder Shares and Private Placement Warrants by Certain SRAC Officers and Directors**

201.     Although the Proxy disclosed that all of SRAC's officers and directors have a "direct or indirect economic interest" in the Founder Shares and Private Placement Units held by the Sponsor, the Proxy does not quantify the ownership stakes of Defendants Norris, Lehmann, and Hofmockel.   A later Prospectus Supplement reveals that Norris and Hofmockel held at least 15,752 Founder Shares each, and Lehmann held at least 109,447.   The total number of shares could have been much larger, since the Prospectus Supplement merely reflects shares sold in that offering.   As discussed at ¶¶54-56, *supra*, ownership of Founder Shares and Private Placement Units creates financial interests that conflict with those of holders of SRAC's Class A common stock.

202.     Accordingly, SRAC's public stockholders were left guessing as to the materiality of those fiduciaries' ownership of Founder Shares and Private Placement Units.   Quantification of such ownership would have been material to stockholders' evaluation of the Merger, and whether to vote in its favor and/or exercise their redemption rights, since that information would have shown the extent to which Norris, Lehmann, and Hofmockel had financial incentives conflicting with those of the holders of SRAC's Class A common stock.

63

### D.    The Proxy Failed to Adequately Disclose K&E's Disabling Conflicts

203.   While K&E is discussed extensively in its "Background of the Merger" section, the Proxy slipped into the "Certain Legal Matters" section at the very end of the documents that "certain partners of Kirkland & Ellis LLP are investors in the Sponsor and SRAC Partners."

204.   For the same reasons described at ¶¶54-56, *supra*, concerning how the SRAC Defendants' financial interests conflicted with those of SRAC's public stockholders, K&E also had interests conflicting with the very stockholders they were retained to represent.

205.   Through its Randolph Street investment vehicle, K&E "[p]artners have invested in a range of internal pooled investment funds."[12] *Bloomberg* observed that, via Randolph Street, K&E partners enjoy a "significant perk, particularly at a time when getting allocations to top managers is hard."[13]

206.   Events post-dating the Merger make it clear that, through the Randolph Street vehicle, K&E partners held significant ownership interests in the Sponsor, as well as warrants (though K&E partners also may have separately invested "in the

---

[12] Will Louch, Silas Brown, & Jan-Henrik Foerster, *Private Equity's Top Lawyers Enjoy Prized Access to Buyout Funds*, BLOOMBERG (July 29, 2022), https://www.bloomberg.com/news/articles/2022-07-29/private-equity-s-top-lawyers-enjoy-prized-access-to-buyout-funds?leadSource=uverify%20wall.

[13] *Id.*

Sponsor and SRAC Partners"). In particular, in Prospectus Supplement No. 6 filed pursuant to Rule 424(b)(3) on February 22, 2022, Momentus disclosed that Randolph Street was one of the "Holders of Founders Shares," and held at least 430,985 shares and 198,020 warrants to purchase Class A stock. The K&E partners' ownership of the Sponsor may well have exceeded the amounts.

207. In all events, the Proxy did not disclose, and SRAC's public stockholder had no way to know prior to the Merger, (a) the size of the financial interests that the K&E partners held in the Sponsor and (b) whether the K&E partners who advised SRAC in connection with the Merger held such interests.

208. Both of those data points were material to SRAC's public stockholders and implicate the extent to which K&E's advice was compromised. K&E was retained to advise *SRAC*, meaning that K&E was supposed to protect the interests of *all* SRAC stockholders. Yet, due to their (unquantified) ownership of interests in the Sponsor, K&E had the same financial incentives as Defendants, *i.e.*, get a deal done – nearly any deal – even if such transaction was value-destructive for SRAC's public Class A stockholders.

**E.     The Proxy Failed to Adequately Disclose the Net Cash Per Share that SRAC Would Contribute to the Merger**

209. Inherent to the SPAC structure and the Board's approval of the Merger was SRAC's public stockholders' option of pulling the proverbial rip cord and redeeming their shares for $10.00 per share (plus interest). Alternatively, they could

invest the net cash underlying their shares in the Merger and receive shares in the post-Merger Momentus in return. Such amounts were not equivalent, but the Proxy misleadingly created the impression that they were.

210. In particular, the Proxy represented that the value of a public stockholder's share (should it choose to invest in post-Merger Momentus) was $10.00 per share. For instance, the very first page of the Proxy states that "[t]he Combined Company Class A common stock issued (or reserved for issuance upon exercise of options or warrants) in connection with the Mergers *will be based on a deemed value of $10.00 per share*."

211. However, after accounting for, *inter alia*, the issuance of the Founder Shares at a nominal price, 50,000 "Finder Shares" issued to the entities that connected SRAC with Momentus, the Private Placement Warrants included in the units that the Sponsor purchased concurrently with the IPO, the public warrants issued for free to IPO investors, the additional warrants issued to PIPE investors, and transaction costs of approximately $50 million, the trust had less than $6.00 in net cash per share to invest in post-Merger Momentus.

212. In other words, the actual value of public stockholder's investment in New Momentus would be less than $6.00 per share, even if there were no redemptions. This impact of this financial dilution and dissipation of cash only would be increased by redemptions.

66

213.   The Proxy failed to disclose and/or affirmatively misrepresented these material facts.  Through the redemption right, SRAC's public stockholders had the ability to walk away from the value-destructive Merger with over $10 per share in hand.  Yet, upon the consummation of the business combination – and even putting aside Momentus's dire technological and operational issues, as evidenced by its current trading price of $0.63 per share – SRAC's public stockholders would be contributing less than $6 per share in New Momentus undergirding their investment.

214.   With a $6 contribution to the Merger, SRAC's public stockholders had every reason to expect that they would receive about $6 of value in return, which would mean that the value of their post-merger shares would be about $6.

215.   Thus, upon the closing of the Merger, SRAC's public stockholders would immediately suffer the loss of approximately 40% of their $10 per share investments,[14] i.e., more than $4 per share would instantly evaporate.  In order for those stockholders to break even on their cash investment, Momentus's value, post-Merger, would have to appreciate by nearly 67%.[15]

216.   A loyal and diligent board would have disclosed to its stockholders information sufficient to determine whether, based on the contribution of SRAC to

---

[14] ($10 per share, pre-Merger - $6 per share, post-Merger) ÷ $10 per share, pre-Merger = 40%.

[15] $6 per share, post-Merger × $1 \, 2/3 = \$10$ per share.

67

the Merger, they should redeem their shares or allow their funds held in trust to be invested in the post-Merger company and whether they could reasonably expect to receive post-Merger value greater than the cash they would receive by redeeming their shares. Defendants, conflicted by their own personal interests in Founder Shares and Private Placement Units, did not do so.

217. However, by ensuring the closure of the deal, the Board Defendants knew they were positioning themselves to cash in on a windfall through their Founder Shares as soon as the post-closing lock-up period had cleared.

## VIII. THE MERGER CANNOT POSSIBLY MEET THE APPLICABLE ENTIRE FAIRNESS TEST

218. In light of the conflicts affecting each of the fiduciary defendants, any merger recommendation would be subject to the entire fairness test *ab initio*.

219. When a controller or a majority conflicted board considers a transaction subject to the entire fairness test *ab initio*, they typically can pursue certain procedural safeguards that ensure the rights of non-controlling investors are protected, and which can be subject to the deferential protections of the business judgment rule. None of those protections were employed here.

220. The process employed here was patently unfair. The conflicted board did not employ any financial advisors, independent or not. The Board employed a very sophisticated law firm, but one whose own partners held millions of dollars' worth of shares in the Sponsor. Thus, the only gatekeeper advisor who would

normally bring some sense of sanity to the deeply conflicted SRAC Board process was, in fact, financially aligned against the common stockholders' interests.

221.   The Board did not meet, much less keep minutes, for the overwhelming majority of pertinent events.  It can point to no record of a deliberative process, much less one that acknowledged and tried to mitigate conflicts.

222.   Even after the initial Merger was derailed for reasons that would self-evidently make any faithful fiduciary at least meet to discuss simply liquidating SRAC rather than trying to sneak in the absurd Momentus Merger, the SRAC Board simply stayed their course, as set by the Sponsor and their counsel.

223.   Even if the Board were not entirely conflicted, the decision to slash the value of Momentus in half and still complete the deal on terms that left no protections for SRAC common stockholders would be inexplicable and evidence of bad faith disregard for their duties.

224.   The result of this patently unfair process, as is so often the case, was a patently unfair price.  Put simply, Defendants turned $10 per share of outside investor capital into less than $1 per share of remaining equity in a business that was never more than a pipe dream.

225.   In the normal SPAC situation, those investors who have a right to seek redemption of their shares have an escape hatch to take their money back.  That redemption option can, assuming full and complete material disclosures, mitigate or

69

eliminate the harm from an otherwise unfair deal. Not so here, since any SRAC investors who did not redeem in connection with the extension vote that was itself conducted in bad faith were injured by the Board's failure to recommend redemption or simply permit an orderly liquidation.

## CLASS ACTION ALLEGATIONS

226. Plaintiff, a stockholder in the Company, brings this action individually and as a class action pursuant to Rule 23 of the Rules of the Court of Chancery of the State of Delaware on behalf of himself and all record and beneficial holders of SRAC Class A common stock who held such as of the closing of the Merger (except the Defendants herein, and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants) and who were injured by the Defendants' breaches of fiduciary duties and other violations of law (the "Class").

227. This action is properly maintainable as a class action.

228. A class action is superior to other available methods of fair and efficient adjudication of this controversy.

229. The Class is so numerous that joinder of all members is impracticable. The number of members of the Class is believed to be in the thousands, and they are likely scattered across the United States. Moreover, damages suffered by individual members of the Class may be small, making it overly expensive and burdensome for individual members of the Class to pursue redress on their own.

230. There are questions of law and fact which are common to all members of the Class and which predominate over any questions affecting only individuals, including, without limitation:

    (a)    whether Defendants owed fiduciary duties to Plaintiff and the Class;

    (b)    whether the Controller Defendants controlled SRAC;

    (c)    whether "entire fairness" is the applicable standard of review;

    (d)    whether Defendants breached their fiduciary duties to Plaintiff and the Class;

    (e)    whether the Momentus Defendants aided and abetted any breaches of fiduciary duties by Defendants owed to Plaintiff and the Class;

    (f)    the existence and extent of any injury to the Class or Plaintiff caused by any breach; and

    (g)    the proper measure of the Class's damages.

231. Plaintiff's claims and defenses are typical of the claims and defenses of other members of the Class, and Plaintiff has no interests antagonistic or adverse to the interests of other members of the Class. Plaintiff will fairly and adequately protect the interests of the Class.

232. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

233. Defendants have acted in a manner that affects Plaintiff and all members of the Class alike, thereby making appropriate relief with respect to the Class as a whole.

71

234. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interests.

## COUNT I
### (Direct Claim for Breach of Fiduciary Duty Against the Controller Defendants)

235. Plaintiff repeats and reallege each and every allegation above as if set forth in full herein.

236. The Controller Defendants were the Sponsor, Kabot, Freedman, and Quiroga; SRAC's controlling stockholders. Specifically, the Controller Defendants controlled all of the Class B Founder Shares, elected (and could remove at any time) the members of the Board, had deep personal and financial ties to the members of the Board they selected, and served as officers of SRAC.

237. As such, the Controller Defendants owed Plaintiff and the Class fiduciary duties of care and loyalty, which include an obligation to act in good faith, with candor, and to provide accurate material disclosures to stockholders.

72

238. At all relevant times, the Controller Defendants had the power to control, influence, and cause – and actually did control, influence, and cause – the Company to enter into the Merger.

239. The Merger was unfair, reflecting an unfair price and unfair process.

240. Through the events and actions described herein, the Controller Defendants breached their fiduciary duties to Plaintiff and the Class by agreeing to and entering into the Merger without ensuring that it was entirely fair to Plaintiff and the Class, and thereafter by soliciting and obtaining the extension in lieu of permitting liquidation of SRAC in May 2021.

241. As a result, Plaintiff and the Class were harmed by the SRAC Board's bad faith and conflicted recommendations in favor of the extension and subsequently in favor of the Merger.

242. Plaintiff and the Class suffered damages in an amount to be determined at trial.

243. Plaintiff does not have an adequate remedy at law.

<u>**COUNT II**</u>
**(Direct Claim for Breach of Fiduciary Duty**
**Against the Director Defendants)**

244. Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

73

245. As directors of SRAC, the Director Defendants owed Plaintiff and the Class the utmost fiduciary duties of care and loyalty, which subsume an obligation to act in good faith, with candor, and to make accurate material disclosures to SRAC's stockholders.

246. These duties required them to place the interests of SRAC's stockholders above their personal interests and the interests of the Controller Defendants.

247. Through the events and actions described herein, the Director Defendants breached their fiduciary duties to Plaintiff and the Class by prioritizing their own personal, financial, and/or reputational interests and approving the Merger, which was unfair to SRAC's public stockholders, and thereafter by soliciting and obtaining an extension in lieu of permitting liquidation of SRAC in May 2021.

248. The Director Defendants also breached their duty of candor by issuing the false and misleading Proxy.

249. As a result, Plaintiff and the Class were harmed by the SRAC Board's bad faith and conflicted recommendations in favor of the extension and subsequently in favor of the Merger.

250. In addition, by virtue of misstatements and omissions in the Proxy, members of the Class could not exercise their vote in an informed manner and approved the acquisition of Momentus based on false and misleading information.

251. Plaintiff and the Class suffered damages in an amount to be determined at trial.

252. Plaintiff does not have an adequate remedy at law.

## COUNT III
### (Direct Claim for Breach of Fiduciary Duty Against the Officer Defendants)

253. Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

254. As the most senior officers of SRAC, the Officer Defendants owed Plaintiff and the Class the utmost fiduciary duties of care and loyalty, which include an obligation to act in good faith, with candor, and to provide accurate material disclosures to SRAC's stockholders.

255. These duties required the Officer Defendants to place the interests of SRAC's stockholders above their personal interests and the interests of the Controller Defendants. The Officer Directors are not exculpated for breaches of their duty of care for actions taken in their capacity as officers (which include all actions set forth herein except their formal vote to approve the Merger).

256. Through the events and actions described herein, the Officer Defendants breached their fiduciary duties to Plaintiff and the Class by prioritizing their own personal, financial, and/or reputational interests and approving the Merger, which was unfair to SRAC's public stockholders.

75

257. The Officer Defendants also breached their duty of candor by issuing the false and misleading Proxy, as well as making false and misleading statements through the period leading to the vote.

258. As a result, Plaintiff and the Class were harmed by the SRAC Board's bad faith and conflicted recommendations in favor of the extension and subsequently in favor of the Merger.

259. In addition, members of the Class approved the acquisition of Momentus based on false and misleading information.

260. Plaintiff and the Class suffered damages in an amount to be determined at trial.

261. Plaintiff does not have an adequate remedy at law.

## COUNT IV
### (Direct Claim for Aiding and Abetting Breach of Fiduciary Duty Against the Momentus Defendants)

262. Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

263. The Momentus Defendants were aware of the SRAC Defendants' fiduciary duties which, as set forth above, required that the SRAC Defendants ensure that the Merger was entirely fair to Plaintiff and other public Class A stockholders.

264. The Momentus Defendants knowingly participated in the SRAC Defendants' breaches of their duties (and any exculpated care breaches by the

76

Director Defendants), including the fiduciary duties of care and loyalty, which included an obligation to act in good faith, with candor, and to provide accurate material disclosures to stockholders.

265. The Momentus Defendants exploited the competing financial interests between SRAC Defendants and SRAC's public stockholders by providing false and misleading information, which was incorporated in public statements and filings, and omitting material information concerning Momentus, the practical and commercial viability of its technology, and its projected revenue based on that technology. The Momentus Defendants did so because they too stood to gain a substantial financial windfall if the Merger were to overstate the value of Momentus.

266. As a result of the Momentus Defendants' aiding and abetting of the SRAC Defendants' breaches of fiduciary duty, Plaintiff and the Class were harmed by the SRAC Board's bad faith and conflicted recommendations in favor of the extension and subsequently in favor of the Merger.

267. In addition, Plaintiff and members of the Class approved the acquisition of Momentus based on false and misleading information.

268. Plaintiff and the Class suffered damages in an amount to be determined at trial.

269. Plaintiff does not have an adequate remedy at law.

## COUNT V
### (Direct Claim for Unjust Enrichment
### Against the SRAC Defendants)

270. Plaintiff repeats and realleges each and every allegation as if set forth in full herein.

271. As a result of the conduct described herein, the SRAC Defendants breached their fiduciary duties to SRAC's public stockholders and were disloyal by putting their own financial interests above those of SRAC's public stockholders.

272. The SRAC Defendants were unjustly enriched by their disloyalty.

273. All unjust profits realized by the SRAC Defendants should be disgorged and recouped by the affected stockholders.

274. Plaintiff does not have an adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and relief in their favor and in favor of the Class, and against Defendants, as follows:

A. Declaring that this Action is properly maintainable as a class action;

B. Finding the Director Defendants liable for breaching their fiduciary duties owed to Plaintiff and the Class;

C. Finding the Officer Defendants liable for breaching their fiduciary duties, in their capacity as officers, owed to Plaintiff and the Class;

D.      Finding the Controller Defendants liable for breaching their fiduciary duties, in their capacity as SRAC's controlling stockholders, owed to Plaintiff and the Class;

E.      Finding the Momentus Defendants liable for aiding and abetting the breaches of fiduciary duties owed to Plaintiff and the Class by the Director Defendants, the Officer Defendants, and the Controller Defendants;

F.      Awarding rescission or rescissory damages to Plaintiff and the Class;

G.      Certifying the proposed Class;

H.      Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

I.      Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and expert witness fees and other costs; and

J.      Awarding Plaintiff and the Class such other relief as this Court deems just and equitable.

79

Dated:  March 16, 2023

OF COUNSEL:

Mark Lebovitch
Sara Swartzwelder
**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY  10020
(212) 554-1400

D. Seamus Kaskela
Adrienne Bell
**KASKELA LAW LLC**
18 Campus Boulevard, Suite 100
Newtown Square, PA  19073
(484) 258-1585

**BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**

*/s/ Daniel E. Meyer*
Gregory V. Varallo (Bar No. 2242)
Daniel E. Meyer (Bar No. 6876)
500 Delaware Avenue, Suite 901
Wilmington, DE  19801
(302) 364-3601

*Attorneys for Plaintiff*

80