# EXHIBIT 11

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE MOMENTUS, INC.          : CONSOLIDATED
STOCKHOLDERS LITIGATION       : C.A. No. 2022-1023-PAF

- - -

Chancery Courtroom No. 12B
Leonard L. Williams Justice Center
500 North King Street
Wilmington, Delaware
Thursday, February 1, 2024
1:30 p.m.

- - -

BEFORE: HON. PAUL A. FIORAVANTI, JR., Vice Chancellor

- - -

ORAL ARGUMENT ON DEFENDANTS' MOTION TO DISMISS THE
VERIFIED AMENDED CLASS ACTION COMPLAINT

------------------------------------------------------------
CHANCERY COURT REPORTERS
Leonard L. Williams Justice Center
500 North King Street - Suite 11400
Wilmington, Delaware 19801
(302) 255-0524

2

APPEARANCES:

    KELLY L. TUCKER, ESQ.
    REBECCA A. MUSARRA, ESQ.
    JONATHAN C. MILLIS, ESQ.
    JASON M. AVELLINO, ESQ.
    Grant & Eisenhofer P.A.
        -and-
    GLENN R. McGILLIVRAY, ESQ.
    Bernstein, Litowitz, Berger & Grossmann LLP
        -and-
    MARIA NUDELMAN, ESQ.
    of the New York Bar
    Bernstein, Litowitz, Berger & Grossmann LLP
        -and-
    DONALD J. ENRIGHT, ESQ.
    of the District of Columbia Bar
    Levi & Korsinsky, LLP
      for Plaintiffs

    ERIC A. VERES, ESQ.
    Abrams & Bayliss LLP
        -and-
    JEFFREY L. STEINFELD, ESQ.
    of the California Bar
    Winston & Strawn LLP
      for Defendants Dawn Harms and
      Fred Kennedy

    RUDOLF KOCH, ESQ.
    Richards, Layton & Finger, P.A.
        -and-
    STEFAN ATKINSON, ESQ.
    AMANDA LAMOTHE-CADET, ESQ.
    of the New York Bar
    Kirkland & Ellis LLP
      for Defendants Brian Kabot, James Hofmockel,
      Ann Kono, Marc Lehmann, James Norris,
      Juan Manuel Quiroga, Edward K. Freedman,
      and SRCNI Holdings, LLC

                - - -

3

THE COURT:  Good afternoon, everyone.

VARIOUS COUNSEL:  Good afternoon, Your Honor.

ATTORNEY TUCKER:  Your Honor, we thought we'd start with plaintiffs' introductions.  My name is Kelly Tucker, on behalf of Grant & Eisenhofer and the plaintiffs, Patricia Shirley, Christopher Dylan Spears, Alexander Lora, and James Burk.  And I'm joined by my co-counsel, Rebecca Musarra; Michael Barry, who is in the back; Jonathan Millis; and our law clerk, Michalis Polygiannis; and Jason Avellino.

I'm also joined by my colleagues at Bernstein Litowitz, Glenn McGillivray and Maria Nudelman, who's been admitted *pro hac vice*; and by my colleague Donald Enright of Levi & Korsinsky, who's also been admitted *pro hac vice*.

ATTORNEY VERES:  Good afternoon, Your Honor.  Eric Veres of Abrams & Bayliss on behalf of defendants Dawn Harms and Fred Kennedy.  I'm joined by Jeffrey Steinfeld of Winston & Strawn.

THE COURT:  Welcome.

ATTORNEY KOCH:  Good afternoon, Your Honor.  Rudy Koch from Richards, Layton & Finger on behalf of all defendants other than Dawn Harms and

4

Fred Kennedy.

And with me today are my co-counsel, Stefan Atkinson and Amanda Lamothe-Cadet, from Kirkland & Ellis. And Mr. Atkinson will be presenting on behalf of my clients today.

THE COURT: Very well. Welcome.

ATTORNEY ATKINSON: Thank you, Your Honor.

May I proceed, Your Honor?

THE COURT: You may.

ATTORNEY ATKINSON: Thank you.

I'll be speaking briefly on behalf of the Stable Road defendants, and then my friend Mr. Steinfeld, I believe, will be addressing argument on behalf of the other two defendants.

My name is Stefan Atkinson from Kirkland & Ellis. I represent the Stable Road defendants in this case. I have a short set of slides that, with Your Honor's permission, I'd like to hand up to the bench.

THE COURT: Sure. Were they disclosed to the other side?

ATTORNEY ATKINSON: They were, Your Honor. They were. We shared them by email

5

earlier today.

So Ms. Lamothe-Cadet will hand those up. I don't expect to go through every page, but I may refer to them from time to time, and hopefully they're a useful guide for the Court.

THE COURT: Very well.

ATTORNEY ATKINSON: Obviously, there have been a number of motion to dismiss decisions entered in SPAC cases in this court over the last couple of years, but this case, we submit, is different than the others.

In the others, the bad news on which the plaintiffs relied to bring their disclosure claims came to light after the redemption deadline. The news wasn't in the proxy, in other words.

So the plaintiffs reasonably claimed in all these other cases that they didn't know the information when they were called on to decide whether to redeem their shares.

Here, the news came to light before the redemption deadline. Problems with Momentus's technology, issues with the SPAC's diligence, downward revisions in the disclosed projections, and the fact that certain players had financial interests were all

6

in the proxy before shareholders made their redemption decision.

Specifically, prior to the redemption deadline, the SEC issued an order detailing disclosure violations that it had found in the preliminary proxy. The SEC's findings track many of the same claims that the plaintiffs assert here.

And, critically, the SPAC included the entire SEC order, in full, in the proxy statement, for all the shareholders to see.

THE COURT:  Which neither the SPAC nor any of the defendants admitted.

ATTORNEY ATKINSON:  That is correct, but they did not deny the allegations in the SEC order either.

The SEC order did not pull any punches.  It specifically found that "Momentus's Technology Is Currently Unproven."  That "Momentus's claim that the El Camino Real mission would demonstrate its ability to provide commercial launch services was false."  That "The El Camino Real mission did not meet any of the public or internal success criteria."  And that "[The] [SPAC] Did Not Perform Reasonable Due Diligence on Momentus[] ...."

7

The SEC order, in fact, was so revelatory and so significant that it was the corrective disclosure pled in a securities suit that Stable Road faced before the close of this deal.  That case is now in the settlement phase, as we've explained in our brief.

The plaintiffs cannot and do not dispute that the SEC order was appended to and was summarized and addressed in detail in the proxy, or that the proxy, with the SEC order attached, was filed weeks before the redemption deadline.

In fact, plaintiffs acknowledge repeatedly in their complaint that the SEC order came out in advance, and, of course, the plaintiffs rely on a number of the statements in the SEC order for their claims.

So, unlike in *MultiPlan*, and unlike in the *Malork* and *FinServ* cases, over which Your Honor is presiding, there was no bombshell revelation that came after the redemption deadline.  Shareholders here had the, quote/unquote, "bad news" before they were asked to redeem.

This case presents, we believe, a unique factual background that I don't believe the

CHANCERY COURT REPORTERS

8

Court has addressed before, and that I believe distinguishes the case from the others.

First -- so I'd like to make just three brief points this afternoon, and we'll rest on our papers.  Of course, if Your Honor has questions, I'm happy to answer them.

First, *MultiPlan* and the cases that have followed explicitly contemplate the possibility that disclosure theories in a SPAC case can be dismissed at the pleading stage, even under the entire fairness standard.

In fact, both the Court in *Gig2* and Your Honor in *FinServ* rejected certain disclosure theories at the motion to dismiss phase, while permitting the broader claim to proceed.

Second, the proxy, which, again, included the SEC order, disclosed all the material information concerning the four business topics that we've discussed in our briefing.  That's Momentus's technology, Momentus's projections, the SPAC's due diligence, and the relevant financial interests.

And then, third, even though this is a disclosure case, the plaintiffs have not made a single allegation anywhere in their complaint that Defendants

9

Freedman, Kono, Lehmann, Norris, or Quiroga, or the sponsor, had any involvement in any of the disclosures.

So those six defendants, we submit, should be dismissed from the case, regardless of how Your Honor resolves the various disclosure theories.

So I'd like to begin by highlighting that the case law, we think, is clear that disclosure claims and theories can be dismissed at the pleading stage, even with -- even under the entire fairness standard.

The plaintiffs appear to take the view that because entire fairness applies, all disclosure theories, even meritless ones, must survive. That does not make sense.

We have not moved to dismiss on the net cash issue, as you know, Your Honor, because the Court has repeatedly resolved that issue against defendants at the pleading stage. We don't want to waste Your Honor's time. So that claim will proceed. That theory will proceed.

But that doesn't mean that the parties and the Court have to spend time in this case doing discovery, then litigating over it, then adjudicating

10

meritless theories of disclosure.  If a theory is meritless, we submit that it should be dismissed and can be dismissed from the case.  And as I said before, in *Gig2*, in *FinServ*, that's exactly what the Court did.

Okay.  So let me move now to the business topics, the four topics that we say were -- the material facts of which were material -- were fully disclosed to the shareholders, again, in advance of the redemption deadline.

So the first point -- and I think it goes to something Your Honor asked me about a minute ago -- is with regards to the SEC order.  So the plaintiffs say that we cannot evade liability merely by "publishing the SEC Order concurrently with the Proxy ...."

As I said before, the defendants in this case did not deny the findings in the SEC order. They, in fact, made the SEC order available to all the shareholders to see.

And the fact, under Delaware law, that the SEC order was appended as an annex and then described in detail in the proxy is sufficient to put shareholders on notice as to the facts disclosed in

11

that.  We cite the *Teamsters* case from earlier in this year in our briefs, but the concept, of course -- and it's well-understood -- is that a document referenced or appended in a proxy statement is explicitly incorp -- and is explicitly incorporated, which ours was, is considered to be a part of the total mix of information available to stockholders.

So let's talk first about the first business topic.  This is Momentus's technology.  And you'll see, Your Honor, we've included, at Slide 10, a list of some of the fairly stark disclosures about limitations with respect to Momentus's technology in the proxy statement.

The plaintiffs claim that defendants failed to disclose that the El Camino Real mission did not meet Momentus's prelaunch criteria for success. That's simply not true.

In addition to appending the SEC order, which included findings on how the El Camino Real mission had been deficient, the proxy explicitly stated -- this is at page 31 -- that the "2019 test failed to meet Momentus's own public and internal pre-launch criteria for success ...."

Shortly after the proxy was issued,

12

but, again, before the redemption deadline, I want to say about two weeks before the redemption deadline, Momentus issued a press release.

And, as plaintiffs concede, Momentus, in that press release, publicly admitted and fully disclosed "the failure" of its testing mission, stating that the 2019 El Camino Real mission did not meet its prelaunch success criteria. And, of course, the language in our proxy was consistent with the SEC order.

The plaintiffs may prefer different framing, but we would submit that if you take a look at the five or six examples on this Slide 10 and read them in the context in which they're provided in the actual proxy, the plaintiffs' claim that shareholders were not fairly and fully informed of material problems with Momentus's technology should fail.

Let's talk about projections. That's the second category in the plaintiffs' complaint.

So, first of all, I don't believe the plaintiffs have actually pled specific facts with respect to projections. I spent some time last night flipping through the complaint, and I tried to find specific allegations about the projections. They

CHANCERY COURT REPORTERS

13

simply are not there.

Although plaintiffs identify Momentus's financial projections as a category of misrepresentations -- this is paragraph 28A of their complaint -- that's just a list of sort of topics, and there's no substantive allegation concerning projections anywhere else.

So they say in their brief, now, all the reasons why they think the projections -- the disclosures around the projections were misleading, but they don't cite to their complaint in that section of their brief, because these arguments and allegations are not in their complaint.

So we would submit, on the face of the complaint, the allegation concerning projections are not sufficiently pled. But even if they were properly pled, Your Honor, the plaintiffs' projection claim would still fail.

Unlike in *Astra Space* or *Gig3*, the projections here were counterbalanced by impartial information, and I'll explain.

So, first, the SEC order, and the proxy describing it, repeatedly characterized Momentus's technology as not ready and not

14

successfully tested.

The projections, in fact, were revised downward between the preliminary proxy and the final proxy.  Again, a signal that the projections, at least the initial ones, were not something the company was prepared to stand behind.

And in addition, there were a number of not just boilerplate, general cautionary statements, but specific extensive cautionary statements on the issue of projections and the way in which some of the findings in the SEC order might reflect on those projections.

So for an example, if you turn to page 11 of our deck, we've included a bunch of these examples.

But if you just look at the second one, for example, under a header that was "Basis for our financial projections," the SPAC disclosed, "it should be noted that our technology is still unproven as we have not yet experimentally confirmed the ability of our MET thruster to generate thrust in space, or to do so in a manner that is sufficiently reliable and efficient to permit commercialization of [] technology."

15

I won't go through all of these, but, again, I think we've cataloged a number of the robust and detailed specific disclosures warning shareholders about the problems, potentially, with the projections.

Third -- and now I'm on Slide 12 -- "Disclosures About Due Diligence."  This is the third of the four categories.

Your Honor, here, again, we would submit that all material information concerning Stable Road's due diligence was disclosed.

So, for example, the proxy disclosed that the SEC had found that SRAC repeated Momentus's misleading statements in public filings, and that it had failed its due diligence obligations to investors.

The proxy also disclosed that while SRAC claimed to have conducted extensive due diligence of Momentus, it never reviewed the results of Momentus's in-space test or received sufficient documents relevant to assessing the national security risks posed by Mr. Kokorich, the former CEO of Momentus.

The plaintiffs themselves acknowledge in their complaint -- and this is a quote from the plaintiffs -- that the SEC "emphasized the 'extreme

16

deficiency' of SRAC's due diligence process."  The plaintiffs knew that weeks before the redemption deadline.

And, additionally, unlike *Astra Space*, where there was a general disclaimer and vague generalities about diligence, here, the proxy and the appended SEC order went into specific, stark detail about the due diligence shortcomings of the SPAC.

And then, finally, this is the final slide in our deck, Slide 13, "Disclosures About Ownership Interests."

So, as the plaintiffs concede, the proxy disclosed that every officer and director of the SPAC, in fact, had an ownership -- an interest in the SPAC that might, or that would, create some kind of misalignment right between the directors and officers and the regular public shareholders.  They all had an interest, a financial interest, in the SPAC.  That is not disputed; the plaintiffs concede.

Instead, what they say is we needed to quantify that interest for each and every one of the directors and officers.  The plaintiffs do not cite a case for that proposition.  We're not aware of a case for that proposition.

17

In the *FinServ* case, Your Honor might remember, the disclosure was that certain officers and directors may have financial interests.  There was no such disclosure here.  There was no conditionality.  And, of course, it's well-established, there's lots of law that says, when something "is," it's mislead to say that it "may."

Here, the defendants disclosed that, in fact, there were financial interests on the part of every single officer and director of this SPAC.  The specific numbers for certain of -- and, by the way, there were also specific numbers disclosed as to certain of the defendants, particularly the ones who held their interests directly, but for the others who held their interests indirectly, the numbers were not disclosed.

The plaintiffs claim that somehow the specific financial interests for some fraction of the officers and directors was material information that would have moved the needle.  I don't think there's case law to support that, and I think, as a matter of common sense, that information as to two or three other people would not have significantly altered the total mix, which is, of course, the standard of

18

materiality.

Additionally, the proxy disclosed the financial interests of Kirkland & Ellis.  It said starkly and plainly -- with no caveats, no limiters, no qualifiers -- that certain partners of Kirkland & Ellis LLP are investors in the sponsor and SRAC partners.  Again --

THE COURT:  On page 293.

ATTORNEY ATKINSON:  Excuse me.  I'm sorry, Your Honor?

THE COURT:  On page 293 of the proxy statement.

ATTORNEY ATKINSON:  I see that in my notes as well.  I agree that is where that was.

THE COURT:  There was no disclosure as to which partners at Kirkland & Ellis owned interests, the nature of those interests, whether any of those partners at Kirkland & Ellis were the lawyers that were advising the board or assisting with due diligence or drafting the proxy statement; correct?

ATTORNEY ATKINSON:  That is correct, Your Honor.  But we would submit -- first of all, in terms of the page placement, the proxy is read as a whole, and we disclosed this information.  That's

19

conceded; that's how they know about it.  That's why they're alleging claims with respect to that disclosure.

I don't -- I do not see how the specific partners who were involved or the amount by which they invested moves the needle for a reasonable investor.

They understand the law firm representing the SPAC was invested in the SPAC sponsor and SRAC.  We would submit that's sufficient information to put shareholders on notice as to the issue.

THE COURT:  The lawyers advising the board and drafting the proxy statement had essentially a contingent interest in this transaction going through; right?

ATTORNEY ATKINSON:  I don't know that I can agree with that, Your Honor, because I don't know that it was multiple lawyers.  So I don't know precisely who it was.

THE COURT:  It was more than one.

ATTORNEY ATKINSON:  It was -- my understanding, Your Honor, is it was one partner and then a vehicle through which certain partners

20

sometimes may invest.

THE COURT:  That's not what the proxy statement says.

ATTORNEY ATKINSON:  So I -- but I think the partners who invested in the vehicle are doing so indirectly.  In other words, there are certain partners invested in the sponsor SPAC.

THE COURT:  That's not what the proxy statement says.

ATTORNEY ATKINSON:  I think it does. It says, "Certain partners of Kirkland & Ellis [] are investors in the Sponsor and SRAC Partners."  So some of them were indirectly invested, and some -- one of them, I believe, was directly invested.  So I do think it's an accurate disclosure.

My only point is, I'm not prepared to say this or that person, in fact, prepared the disclosures and was invested.  That's the point that I'm trying to highlight.

THE COURT:  Is there a reasonable inference that I can draw in that direction?

ATTORNEY ATKINSON:  I don't know.  I actually don't think so, because I don't know that they -- the plaintiffs have pled any facts supporting

21

who might have been invested.

THE COURT:  How would they know?

ATTORNEY ATKINSON:  Well, they did serve a 220 demand.

THE COURT:  How would they be able to discern from the 220 production by the company which partners at Kirkland & Ellis indirectly owned shares in the sponsor for the investment vehicle?

ATTORNEY ATKINSON:  I don't know what documents were available, Your Honor.  I don't know the answer to that.

And let me finish by saying, the claims against these six other defendants, there's not much to say.

THE COURT:  Before you do that, can we talk a little bit about due diligence and the claims that there are no recorded board minutes or board materials other than a couple of presentations.

ATTORNEY ATKINSON:  So I think what the plaintiffs have alleged is that there are missing minutes for certain either informal calls or meetings. There certainly were minutes produced on section -- on 220 for board meetings of the SPAC.  I think so -- I think what the plaintiffs are --

22

THE COURT:  Were there minutes provided for meetings prior to the board's approval of the transaction?  Because that's not how I read the complaint.

ATTORNEY ATKINSON:  So my understanding is yes.  I think what the complaint is saying is that those minutes didn't reflect sufficient due diligence, on the part of the board, in advance of the board's decision.

THE COURT:  Well, I'm reading from paragraph 196 of the complaint.  "[I]n response to Plaintiffs' [demand] [under] Section 220 [], Momentus produced [] zero meeting minutes or other diligence materials predating the Merger Agreement's October 7, 2020 signing date."

ATTORNEY ATKINSON:  So it was my understanding, Your Honor, that we -- that it wasn't us.  It was the counsel for the -- counsel for the company -- did produce minutes of the board from before the approval, but I'll confirm that.  I should confirm that.  I don't want to misstate that, of course.

THE COURT:  The complaint alleges otherwise.  And the complaint specifically cites the

23

October 5, 2020, board meeting, which is referred to as a meeting, which happens to be the meeting at which the board approved the transaction.

Can I draw a reasonable inference that that meeting never happened and that the proxy statement is false?

ATTORNEY ATKINSON:  No, I don't believe so, Your Honor.

THE COURT:  Why not?

ATTORNEY ATKINSON:  You can draw a reasonable inference that minutes weren't prepared for that meeting.

THE COURT:  Aren't minutes required?

ATTORNEY ATKINSON:  Under -- yes, I believe minutes are required, yes.

THE COURT:  Under the statute and under your company's bylaws.

ATTORNEY ATKINSON:  Correct.

THE COURT:  They shall be kept.

ATTORNEY ATKINSON:  Correct.  I will --

THE COURT:  And there are no minutes that were produced.

ATTORNEY ATKINSON:  I don't dispute

24

that, Your Honor.  I will say we did produce calendar
invites, which reflect that a meeting occurred, but,
Your Honor, I don't dispute there were not minutes.

THE COURT:  There's nothing in this
record that indicates that there was a calendar invite
for an October 5, 2020, board meeting, which the proxy
statement says was the meeting at which the board
approved the transaction.

ATTORNEY ATKINSON:  So I under -- I
believe we -- yeah, sorry.

Yeah, I believe we produced a calendar
invite for the October 5th meeting, the September 21st
meeting, the September 14th meeting, and the
September 10th meeting.  I'm using the term "meeting"
colloquially, because it is our position that a number
of these were not formal board meetings.

THE COURT:  So if they're not formal
board meetings, you don't need to record minutes; is
that your position?

ATTORNEY ATKINSON:  I would say -- no,
I would say -- I would say that the SPAC here did not
record formal minutes for informal board meetings.
I'm not stating that --

THE COURT:  And appears not to have,

25

for a formal meeting, on October 5th.

ATTORNEY ATKINSON:  Correct.

THE COURT:  Thank you.

ATTORNEY ATKINSON:  All right.  Thank you, Your Honor.

THE COURT:  Counsel, I think there is one more person to speak on the defense side.

ATTORNEY TUCKER:  Okay.

ATTORNEY STEINFELD:  Good afternoon, Your Honor.  Jeff Steinfeld on behalf of defendants Dawn Harms and Fred Kennedy.

Before I begin, Your Honor, I have a very, very brief demonstrative that I'd like to pass up to Your Honor.  We provided it to counsel ahead of time.

THE COURT:  You may.

ATTORNEY STEINFELD:  And I won't be referencing what's in that presentation until a little bit later on in my presentation.

Mr. Harms and Ms. Kennedy were the fiduciaries of Legacy Momentus, the arm's length merger counterparty to the SPAC, Stable Road, or SRAC, S-R-A-C.  And the sole claim against them is that they purportedly aided and abetted a single disclosure

26

violation by the arm's length merger counterparty's fiduciaries, the SRAC defendants.

I will detail this in a little more detail later, but at the outset, I want to note that Delaware courts have repeatedly held that such claims are one of the most, if not the most, difficult to plead, as this court adheres to the "long-standing rule that arm's-length bargaining is privileged and does not, absent actual collusion and facilitation of fiduciary wrongdoing, constitute aiding and abetting." And that's *Jacobs*, at page 7.

We also cite *Del Monte* under a similar proposition in our briefs.

Out of the five disclosure claims in the complaint, the one disclosure claim that Harms and Kennedy allegedly aided and abetted, is the claim regarding Momentus's technology and the El Camino Real mission, and that's found in paragraph 191 of the complaint.

Now, this court need not even reach the aiding and abetting issue, because, in addition to what Mr. Atkinson said, the disclosure claim regarding Momentus's technology was fully and accurately disclosed.

27

I won't belabor or go back through the points that Mr. Atkinson made, but I do want to emphasize two points because it would be dispositive for my clients.

First, I want to make clear that the SEC order and the related SEC complaint against Mikhail Kokorich, the founder and former CEO of Momentus, did not find or insinuate any wrongdoing whatsoever on behalf of Ms. Harms and Mr. Kennedy. In fact, they're not mentioned by name, title, or otherwise in the SEC order or the SEC complaint.

Second, to Your Honor's question regarding the SEC order and it being appended to the complaint, and also -- appended to the proxy, excuse me, and also being summarized in detail multiple times. Even putting aside the SEC order or the proxy's summary of the SEC order, the proxy itself repeatedly disclosed that Momentus had not successfully tested its technology in space, and that it was not commercially viable.

And that's the crux of plaintiffs' claim, that stockholders were purportedly misled into thinking that Momentus had a proven technology that was commercially viable. And that's 256 of the

28

complaint.

Defendants provided false and misleading information concerning the practical commercial viability of Momentus's technology, and that's confirmed in the answering brief, at 31 and 36.

And at 56, for example, plaintiffs' pleaded disclosure claim related to the commercial viability of Legacy Momentus's technology.

But this is simply false. And I'll direct Your Honor to pages 26, 47, 207 to 209, and 218 to 219 of the proxy. And just to provide a few quick examples. Again, this is not the SEC order or the summary of the SEC order. This is the proxy's own language.

In the company's overview section, the proxy discloses that Momentus's technology is "unproven ... has not yet been used to generate a measured orbit change in space," or even "completed life testing." And "there can be no assurance that Momentus will be able to successfully develop its technologies and implement them in [a] commercially viable vehicles."

Then under the heading "Water Propulsion Technology []," which is the technology at

29

issue here, the proxy disclosed that Momentus has "yet to experimentally confirm the unit's ability to generate thrust in space ...."  That's exactly what plaintiffs say was misleading, that there was some impression given that they had done so, but the proxy says they had not.

And on that same page, 219 of the proxy, "there can be no assurance that Momentus will be [successfully able to] develop its technologies and implement them in commercially viable vehicles."

And then, as Mr. Atkinson pointed out, Momentus itself released a press release two weeks before the redemption deadline that plaintiffs admit fully disclosed that the El Camino Real test was a failure.

So even before getting to the aiding and abetting deficiencies in the complaint, because the disclosure claim related to Momentus's technology was fully and accurately disclosed, the claims against Harms and Kennedy should be dismissed.

Now, as to the aiding and abetting claims themselves, as I noted at the outset, pleading aiding and abetting against an arm's length merger counterparty, let alone the fiduciaries of an

30

arm's length merger counterparty, is one of the hardest, if not the hardest, claims to plead.  And the rationale behind this rule was that counterparty fiduciaries have opposing fiduciary duties.

Harms and Kennedy, on the one hand, had a duty to Momentus and its stockholders to get the highest price in the sale of a company.

SRAC and its fiduciaries, on the other hand, had a duty to get the best deal for SRAC's shareholders.

Simply put, as stated in *Jacobs*, Harms and Kennedy were under no obligation to negotiate terms that benefited SRAC or otherwise to facilitate a superior transaction for SRAC.

The aiding and abetting claims fail for a few reasons.

First, there are no well-pled, specific facts supporting the notion that Harms or Kennedy provided any substantial assistance or otherwise aided and abetted the SRAC fiduciary duties -- the SRAC fiduciaries with respect to this claim.

The complaint is pled entirely in general terms.  It refers only generically to the

31

"Momentus Defendants," which include a third defendant, John Rood, and the complaint does not say who provided the alleged misleading information, who omitted information, or what information that was. And a couple examples.

Complaint paragraph 191, the Momentus defendants aided the SRAC defendants' breach by continuing to prop up and promote statements about Momentus in the SRAC defendants' proxy.

And then 187, instead of providing complete and full information with respect to El Camino Real's failure, the proxy doubled down on the claims of success supplied with additional, yet still misleading information, from the Momentus defendants.

So it doesn't say, was it Harms, was it Kennedy, was it Rood, was it someone else at Momentus? And what was this additional, yet still misleading, information that was provided? And, in fact, that allegation is demonstrably false because the proxy, which was issued in July of 2021, the complaint contains no allegations whatsoever of any statement by Harms or Kennedy thereafter, other than the Momentus press release, which plaintiffs admit

32

fully disclosed the El Camino Real failure. Therefore, they could not have supplied any additional, yet misleading, information.

And the law is clear, as in *Jacobs*, that the Court can infer knowing participation only if the plaintiff alleges "specific facts from which [the] court could reasonably infer knowledge of the breach." This alone renders the complaint deficient.

There's also *Cornerstone* and *Genworth*, which stands for the propositions that plaintiff is required to identify specific acts of each individual defendant, and that group pleading will not suffice.

Second, the aiding and abetting claim fails under well-settled precedent. And in this respect, *Oracle*, 2020 WL 3410745, is instructive. *Oracle* dismissed aiding and abetting claims against a counterparty's fiduciaries, despite sustaining claims against the primary defendants.

In *Oracle*, it was a merger between Oracle and NetSuite. Oracle had a controlling shareholder who also owned a substantial amount of shares in the target, NetSuite. Oracle set up a special committee to negotiate the deal, but before the special committee was set up, Oracle's controller

33

had a meeting with the target NetSuite's fiduciaries, and at that initial meeting, they discussed a price collar for that deal.

When the deal was eventually announced and the proxy was put out, this initial meeting was omitted from the proxy materials. Oracle shareholders brought a claim against Oracle's fiduciaries for breach of fiduciary duty, and also an aiding and abetting claim against NetSuite's fiduciaries, because they allegedly knew about this initial meeting, knew that Oracle had not disclosed it, and failed to correct it. That's essentially exactly what the claim is here.

But the Court rejected this claim against the target-side fiduciary duty -- against the target-side fiduciaries for a few independent reasons.

First, the Court noted that knowing participation must "constitute[] substantial assistance in causing the breach."

The Court found that silence from the counterparty's fiduciaries, the target's fiduciaries, was insufficient to constitute substantial assistance. That's true here. Specifically, the Court found that "[a]bsent a fiduciary or contractual relationship,

CHANCERY COURT REPORTERS

34

'Delaware law generally does not impose a duty to speak.' ...  Thus ... even if the NetSuite Defendants believed that the Oracle Defendants intended to breach [their] fiduciary duties ...  Delaware law recognizes no affirmative duty of the NetSuite Defendants to so inform Oracle, its fiduciaries, or its stockholders."  That's exactly the same thing here.

Second, sometime after the proxy was issued, the target, NetSuite, put out an 8-K they filed with the SEC that revealed this initial meeting, the alleged missing information.  Albeit not in the detail or the terms plaintiffs would have liked.

The Court found that this disclosure by the target, which is similar to Momentus's press release two weeks before the redemption decision, meant that the initially omitted information was subsequently disclosed, and, therefore, plaintiffs' complaint on aiding and abetting was merely as to the form of the disclosure and not that the information wasn't actually disclosed, and rejected the aiding and abetting claim.  It held it is not reasonably conceivable that the disclosure of the omitted information by the target, in two separate SEC filings, did not, at a minimum, disclose to the public

35

and to the acquirer the allegedly omitted information.

The same exact thing is true here with the Momentus press release.

*Oracle* is consistent with a long line of Delaware cases dismissing aiding and abetting claims against a merger counterparty's fiduciaries, including *Baker Hughes*, *Xura*, and *Repairman's Service Corp.*, and there are many others that we cite in our papers.

So at this point, this brings me to the packet that I passed up to Your Honor.

And there are two recent decisions by Chancellor McCormick regarding aiding and abetting claims against a target-side's fiduciaries in de-SPAC transactions. They're both within the last year.

The first case is *XL Fleet*, which we briefed extensively. The second case is *Electric Last Mile*.

As provided in our briefing, *XL Fleet* contained much more detailed and severe allegations than those here, yet the Court dismissed the aiding and abetting claim against the target fiduciaries.

*Electric Mile* contained even more detail and more severe allegations, and, therefore,

36

the Court found that it withstood a motion to dismiss.

So these cases provide a paradigm to evaluate aiding and abetting claims in this de-SPAC situation.  And the allegations must, at a minimum, rise above the level in *XL Fleet*.  The allegations do not do so here.

And as shown in the packet, I will briefly just go through the allegations in the three cases, *XL Fleet*, *Electric Mile*, and our case.

In the first slide in your packet, after the introduction is the *XL Fleet* allegations, and I won't read these *verbatim*, but, essentially, in *XL Fleet*, the target founder, who was one of the two defendants, had a decades-long relationship with the SPAC's controller.  He reached out to the SPAC regarding a merger.

Three days later, an LOI came in.  The target-side fiduciaries provided the valuation to the SPAC of $1 billion, despite knowing that the company had previously been valued at only 73 million.  The target fiduciary and his father had personally invested in the earlier round, at just 73 million, and while they disclosed their investment, they never disclosed the valuation that they invested at.

37

The two target defendants were the chief points of contact during the merger negotiations. Importantly, the target fiduciaries knew that the company had recently lost its California CARB certification, which meant that it could no longer sell its electric vehicle products in California, which meant that its sales figures were inflated. They knew that, but yet still provided the sales figures to the SPAC's board.

The two target fiduciaries knew that the $1 billion valuation was too high, because the company had lost its certification, it had an inflated pipeline, and that its recent valuations were as low as 55 and 73 million.

The SEC subsequently investigated these exact allegations. Nevertheless, the Court found that these allegations were "scant," and dismissed the aiding and abetting claim against both target-side fiduciaries.

In *Electric Mile*, and this is on the next slide, the two co-founders of the company were the target-side defendants. They were involved "from start to finish" in negotiating and promoting the merger, including negotiating the LOI and the merger

38

agreement, and then promoting it through closing. Negotiations began the day of the IPO.

The two target-side fiduciaries, Luo and Taylor, prepared extraordinary projections that they provided to the SPAC. And the crux of the case is, just prior to the merger announcement, Luo and Taylor secretly purchased equity in the company at a substantial discount that they never disclosed, and then after doing that secret discounted purchase, post-signing, Luo and Taylor, the target fiduciaries, were instrumental and heightened the transaction to ensuring that it closed.

Luo and Taylor also knew that the company had outsourced its end-to-end responsibility for designs in another electric vehicle company, had outsourced its production of its electric vehicles to a Chinese company, despite touting that it had an in-house process to assemble its own vehicles.

Eventually, the company formed a special committee, investigated the target fiduciaries, and removed them for cause for these exact misrepresentations, and then the SEC investigated these two defendants as well.

These cases, and especially

39

*Electric Mile*, are in stark contrast to the allegations against Harms and Kennedy, and this is the second-to-last slide.  The only allegations against Harms and Kennedy are that they were part of the "management team" at the time of the merger announcement.

Harms and Kennedy did not lead the negotiations, which were handled by the founder of Momentus and then-CEO, Mikhail Kokorich.  If anything, Mr. Kokorich is the analogous defendant to Luo and Taylor in the *Electric Mile* case.  And that's paragraphs 86 to 97 of the complaint.

The only allegation against Mr. Kennedy is that he discussed regulatory issues in interagency review in an IPO Edge interview.  And then as to Ms. Harms, there is the allegation that she was copied on an email in November 2019, the same month she joined the company.

And when the company replaced Mr. Kokorich and made Ms. Harms interim CEO, the company issued a press release announcing that switch, and Ms. Harms is quoted in that press release, with general puffery-type statements, like, "We have an extremely talented team, groundbreaking water plasma

40

[] technology, and a unique value proposition ...."

And all of these actions were prior to the revised deal, which slashed the valuation in half, and the revised proxy, which is at issue in this case.

So then the final slide in the presentation, we've put together a quick chart synthesizing these allegations on this paradigm.

And, again, *XL Fleet*, which sits in the middle of this chart, dismissed the aiding and abetting claims against the target's fiduciaries. *Electric Mile*, or ELMS, sustained the claims.

But the core of either one of those cases are not present in this case, and, therefore, because the allegations don't rise even to the *XL Fleet* level, we respectfully ask that the Court dismiss the single claim against Harms and Kennedy with prejudice.

If Your Honor has any questions, I'm happy to answer them.

THE COURT:  I do not.

ATTORNEY STEINFELD:  Thank you, Your Honor.

ATTORNEY TUCKER:  Good afternoon, Your Honor.  And may it please the Court.

41

I think it's important to start here with what defendants -- none of them challenge in this motion to dismiss, which distinguishes it from *FinServ*, it distinguishes it from *Gig2*, because in both of those cases, the defendants actually moved to dismiss the complaint.  They haven't done so here.

Defendants don't challenge plaintiffs' assertions that the controller defendants, the sponsor, Kabot, Quiroga, and Freedman, were controllers of SRAC generally or in connection with the merger.  They don't challenge that the merger was a conflicted controller transaction.  They don't challenge the allegations that each of the SRAC defendants received nonratable benefits as a result of the merger.  They concede entire fairness applies.

Ultimately, they don't actually challenge plaintiffs' allegations of unfair process or unfair price, because they don't challenge plaintiffs' allegations that net cash per share wasn't disclosed and that it was material.  Therefore, for pleading purposes, defendants have conceded that plaintiffs adequately pleaded a claim for breach of fiduciary duty.

Why are we here?  Defendants have

42

brought everyone here to waste the Court's time, to waste plaintiffs' time, and to waste their own time and money.  Defendants' motion has no basis in fact or law.  Even if it were successful, the case would continue.

The motion wouldn't dispose of any counts in this action, and it wouldn't shift the review from entire fairness or even change the scope of discovery, because we're still entitled to discovery on fair process and fair price.

THE COURT:  Counsel, I hear you on that one, but what about the aiding and abetting claims?

ATTORNEY TUCKER:  Yes.  So the aiding and abetting claims, Your Honor, obviously, we disagree with how the Momentus defendants have described them.

As with the SRAC defendants, the Momentus defendants don't challenge a breach of fiduciary duty.  They don't challenge damages.  They don't challenge that net cash per share was a disclosure issue.

Now, they have said that plaintiffs only allege that they participated in the breach of

43

the duty of disclosure with regard to the El Camino Real launch, but that's not true.  Paragraph 28 of the complaint lists five disclosure issues attributable to all defendants in the proxy, and paragraph 265 of the complaint, which is a count as to aiding and abetting, says, as a result of the Momentus defendants -- oh, wait, sorry, "The Momentus Defendants exploited the competing financial interests between SRAC Defendants and SRAC's public stockholders by ... providing false and misleading information, which was incorporated in public statements and filings, and omitting material information concerning Momentus, the practical and commercial viability of its technology, and its projected revenue based on that technology."

So the disclosure claims against the aiding and abetting defendants are broader than they characterize them.  There's no requirement to plead knowing participation with particularity that we've done so here.

All that's required is sufficient well-pleaded facts from which it can be reasonably inferred that the fact was knowable and that the defendant knew it.

Here, Defendant Harms signed the proxy

44

that had, concededly, misleading disclosures about net cash per share.  Defendant Harms also signed the merger agreement.  Kokorich, true, was involved in the negotiation of the initial agreement, but that agreement was amended after he departed.  Harms was the CEO at that time, Kennedy was the president, and Harms was also the chief revenue officer at the time both sets of projections were created that plaintiffs challenge.

Plaintiffs have well-pleaded that the SRAC defendants were conflicted to do any deal, and Legacy Momentus defendants were also motivated to do a deal.

At the time the negotiations began, Legacy Momentus had only $11 million in cash on hand, the company was at the brink of bankruptcy, the jobs of Harms and Kennedy were on the line.  They had a motivation to get a deal done as well.

And while the Momentus defendants, you heard them earlier, rely heavily on cases that address aiding and abetting in arm's length transactions, that's not what we had here.  As *MFW* recognized, when you have a conflicted controller transaction, negotiation is not at arm's length, unless it is

45

evaluated and negotiated by an independent special committee and approved by a majority of the minority stockholders, and that's not what happened here.  The case *Carr v. New Enterprise Associates* recognized that distinction as well.

There, the Court recognized that as a primary negotiator with a conflicted controller, negotiations were more than simple arm's-length negotiations.

On the motion to dismiss, plaintiffs only need to prove that it's reasonably conceivable that Harms and Kennedy had knowledge of the facts alleged to be omitted or misleading.  That's *Electric Last Mile*, at 6.

Both Kennedy and Harms, as the securities case found, were high-level executives at the time of the merger, at the time of the negotiation, and at the time the proxy was issued. Harms was the chief revenue officer and then interim CEO.  Kennedy was Legacy Momentus's president.

And as we've alleged in the complaint, Harms signed the proxy.  That is different than *XL Fleet*.  That is different even than *Electric Last Mile*, where it was just conferred, based on the

46

contractual obligations, that the defendants -- the aiding and abetting defendants participated in review of the proxy.

THE COURT:  What allegations are there that Kennedy was engaged or was involved in reviewing the proxy?

ATTORNEY TUCKER:  Sure, Your Honor. There are several allegations that -- not related to review of the proxy, but related to his participation in putting out false and misleading disclosures to the public in an effort to push this deal along.  That's at paragraphs 118, 119, 120.

Essentially, Kennedy was part of the PR team that was telling the public and telling the press, when they were selling this deal, that the El Camino Real mission was a success, that the revenue projections were reasonable, and, thus, he was actively participating.

Obviously, he knew.  And the securities court in *Stable Road Stockholders Litigation* agreed that he didn't just know what he said; he knew the information underlying it.  And it was reasonable to infer that.

And it's reasonable to infer, we

47

respectfully submit, that he also had an opportunity to review the proxy as the president of the company, and he was involved in negotiations, along with Harms, after Kokorich left.

So I want to address a few of the disclosures specifically, even though the Court doesn't have to, to find that the case shouldn't be dismissed.

So there are a few categories of disclosures. One is the misrepresentations about the El Camino Real, success of that mission, and the resulting inflated projections. And despite admitting, after being forced -- well, they don't admit.

As Your Honor noted, they don't admit or deny the allegations in the SEC complaints, but even giving them the benefit of the doubt that that was somehow an omission, the proxy, nevertheless, gave SRAC stockholders the impression that the mission successfully created plasma and was a demonstration of the near-term commercial viability of Momentus's rockets.

So even though they say in the SEC consent order, and in this later press release on

48

July 29, that it was a failure, the proxy still gives the impression that there was some success in that mission, it matched up with successful on-ground testing, and, therefore, there were -- it was a good sign for things to come.

And why was this material?  Because the initial proxy projections were created in October 2020, prior to the November 2020 failed mission, under the assumption that the mission would be a success and Momentus was close to commercialization.

In particular, as defendants admit, and they put it in their demonstrative, the proxy disclosed the projections are based on assumptions about Momentus's ability to fully develop, test, and validate its technology in space and the timing thereof.  That assumption also was contained in the proxy, as to the revised projections.

But while the subsequent SEC -- after the subsequent SEC order, Momentus revised the projections.  It only did so based on so-called regulatory issues.  It didn't adjust the projections based on the failure of the El Camino Real test.  It still assumed commercialization by the end of 2020,

49

which is less than 18 months after the merger closed, and it's reasonable to infer that Momentus's inability to actually successfully launch or test its space TUG, what I'll call it, because they call it a TUG, using its technology would have a material impact of the timing of revenue.

And defendants knew, or should have known, that their assumption that the mission failure would not impact revenue or timing was entirely unreasonable and painted an unrealistically rosy picture of Legacy Momentus's financial future.  That is defendants' published projections that relied on the successive omission that they knew at the time the projections were published was a failure.

As we noted in our opposition, Momentus has predictably fallen short of its projections.  Even in the very short term, its projections for 2022, they missed by 94 percent.

This is not a case, as the Court held in *Astra Space*, where the results fall short of expectations.  The problem here, as in *Gig3* and other decisions by this court, is that the very ambitious projections were not counterbalanced by impartial information.

50

Under our law, it cannot be that fiduciaries who owe a duty of loyalty to stockholders can simply disclose pie-in-the-sky projections of an early-stage company and say that they've fulfilled their duties by simply reproducing these disclosures without information about what stockholders could realistically expect.  That's exactly what happened here.

And that problem is exacerbated by the net cash per share issue, as courts have recognized, because the target knows -- here, the Momentus defendants -- that SRAC only had less than $6 per share underlying each share of SRAC prior to the merger and prior to any redemptions.  They had incentive to, and did, inflate their projections as a result so they wouldn't be charged with the shortfall.

The Court recognized that issue in *Gig3*, *Gig2*, *XL Fleet*, and other cases addressing this net cash per share issue.

As Your Honor noted, SRAC's lack of due diligence, despite the attachment of the SEC consent order to the proxy, was not adequately disclosed.  Defendants argue that they sufficiently disclosed their failure to properly conduct due

51

diligence in connection with the merger because they attached a consent order, but this isn't sufficient where the proxy itself paints a contradictory picture.

Plaintiff's 220 demand revealed no materials reflecting due diligence, materials being shared with the board, or board minutes predating the board's approval of the initial merger agreement.

And as the Supreme Court held in *Apple*, stockholders' ambiguous disclosures aren't sufficient to meet fiduciaries' disclosure obligations.  Notwithstanding the SEC order, which found that the proxy's representations as to due diligence were false, defendants don't challenge -- defendants' defense appears to be that these meetings were all informal.

Certainly, it would have been material to stockholders that the board never held more than a few informal phone calls to discuss this incredibly problematic and highly conflicted deal being negotiated and due diligence by conflicted controller defendants prior to actually signing the merger agreement, that they didn't review any due diligence materials and they didn't bother to keep board minutes.  That's material information to stockholders.

52

As to the Kirkland & Ellis conflicts, defendants standing up here today couldn't answer questions as to who invested, how much they invested, what those investments were, and what their participation was in connection with the merger due diligence process and negotiation.

That is a problem. As this court has recognized in the context of financial advisors, when an advisor faces a conflict, the Court requires disclosure of the relationship itself and the amount of fees received.

As the Court held in *Vento*, an advisor's own proprietary financial interest in a proposed transaction -- here, contingent consideration that Kirkland & Ellis would only receive if the merger closed -- must be carefully considered in considering -- in assessing how much credence to give to its analysis. And defendants robbed stockholders of that opportunity.

The interests of Kirkland & Ellis were not small. They held almost 500,000 founder shares, based on disclosures post-merger. They were also defendants' only advisor, other than Stellar Solutions, which, defendants were forced to admit in

53

the consent order, didn't actually do any due diligence.

As to the three directors, defendants say it's only three, two of them were the independent directors.  As Your Honor recognized in *FinServ*, the financial interests of so-called independent directors is especially important.

I have a demonstrative, which I provided to defendants, that I'd like to pass up.

THE COURT:  You may.

ATTORNEY TUCKER:  You'll see from this chart, Your Honor, the top is the Stable Road acquisition at 290.  This is the chart that purports to reflect the interests of the directors and officers of SRAC prior to the merger.

At the bottom is the FinServ Acquisition Corp. proxy, at 121, which purports to do the same thing.

So while defendants disclosed in the proxy that these directors had an indirect or direct interest in the founder shares, or the private placement units, they didn't quantify those interests, and then they put in this contradictory disclosure that says they held none.

54

One of those disclosures is false.  A later prospectus issued by Momentus revealed that Norris and Hofmockel found at least 15,000 founder shares, and Lehmann, a purportedly indirect -- excuse me, independent director, held 109,000.

The Court held that almost similar -- excuse me, substantively identical disclosures in *FinServ* were insufficient.

Defendants' remaining arguments, to the extent they aren't entirely frivolous, as to the SRAC defendants, are entirely without merit.  The idea that independent directors who were in place at the time of the merger, the only two independent directors, are not liable for false and misleading proxy or for disloyal conduct in connection with stockholders' redemption decisions is outrageous.  The proxy was signed by Kabot by order of the board. That's at page 7 of the proxy.

As to the officers, and officer duties are the same as directors, and as officers, Quiroga -- excuse me, Quiroga and Norris had independent duties to ensure stockholders were provided with full information when asking for stockholder action.

Quiroga and Norris also had the duty

55

to act when negotiating the terms of the merger and participating in due diligence, which they both did, to put the interests of stockholders ahead of their own personal financial interests.

Plaintiffs' complaint is also replete with allegations about Quiroga's participation.  Even though he's also the director, as the Court held in *MultiPlan*, the capacity in which he's acting is not required to be specified on a motion to dismiss.

Quiroga, Kabot, and Norris were the only members of SRAC's management team, and the proxy repeatedly discloses, and the complaint alleges, the involvement of the management team in negotiation and due diligence of the merger.

So it can be reasonably inferred that he was part of that management team to which the proxy referred, and, thus, was intimately involved in the negotiation and approval of this value-destructive conflicted controller transaction.

Freedman, Quiroga, and the sponsor are in the controller group that plaintiffs have alleged. Defendants don't actually challenge that they are controllers.  They are in that group with Kabot, who signed the proxy.  Quiroga and Kabot negotiated the

56

deal.  And as the Court held in *Columbia Pipeline*, the actions of an affiliate can be imputed on to the controller.

Finally, defendants argue -- although they said that they have it in their motion, they haven't done so today -- that plaintiffs haven't pleaded unjust enrichment.  Unjust enrichment doesn't depend on individual disclosures; it depends on, overall, was there a breach of fiduciary duty, and defendants haven't alleged that there wasn't.  The motion doesn't ask to dismiss the claims as to the net cash per share disclosure.

I think that, just to highlight again what Harms and Kennedy knew about those disclosure issues, Harms was the chief revenue officer at the time the projections were created; she was the CEO at the time the subsequent proxy was issued.  She signed the merger agreement; she signed the proxy.

Like in *Electric Last Mile*, Momentus had an obligation to review the proxy and point out false or misleading disclosures or omissions.  Kennedy was the president, who also was making public statements about revenue projections, so he also knew what those projections were and what they were

57

comprised of.

As to due diligence, they were participants in the due diligence process, so they certainly knew that the statements in the proxy as to due diligence were false.

And like in *Columbia Pipeline*, *Mindbody*, *Electric Last Mile*, participation is easy here.  Harms signed the proxy; Kennedy had an obligation to review it.

And, in sum, in connection with the merger, due diligence, and negotiations, the SRAC defendants and Momentus defendants acted as allies. They didn't act as adversaries.  Both sets of defendants were highly motivated to get any deal done, and even after huge SEC fines, they still persisted in publishing a false and misleading proxy and pushing through the deal, which was accomplished, in part, by discouraging redemptions and impairing stockholders' public redemption rights.

So we respectfully submit, Your Honor, that both motions should be denied in their entirety.

THE COURT:  Reply.

ATTORNEY ATKINSON:  Thank you, Your Honor.

58

May I hand up a page from the proxy? I wanted Your Honor to have an opportunity to take a look at it.  It's the --

THE COURT:  Why don't you just point me to the page.  I have the proxy.

ATTORNEY ATKINSON:  Sure.  Great. It's page 290.

So you see, Your Honor, this is the page from which the plaintiffs' demonstrative was just taken.

And I just wanted to point Your Honor to one line that the plaintiffs have excluded from their demonstrative.  It's about, let's call it, a third of the way down the page, under "James Hofmockel."  You see, in italics, it says, "All executive officers and directors of SRAC as a group (7 individuals)."

And then there's a disclosure with respect to their interests.  I just wanted the record to be clear that this -- the table presented here by the plaintiffs is not actually the table in the proxy. The table in the proxy references interests held by the entire executive officer and director group.

And as my friend acknowledged, the

59

proxy itself says, "All of SRAC's officers and directors have a direct or indirect economic interest in such shares and private placement units."  That's the proxy, at 74.

Counsel talked about the "independent directors," quote/unquote.  But, of course, the allegation in this claim is that none of the directors were disinterested and independent, or officers, to that point.  I think the plaintiffs can't quite have it both ways, right?

The disclosure, I think, is clear, and there's no dispute, no reasonable shareholder would have thought that any of the directors or officers here lacked some interest.

The question is, was the -- was it necessary to quantify it with respect to each and every single person?  We would say that it was not necessary to make that additional disclosure.

I'll also just state for the record, Your Honor, we did produce a calendar invite, or Momentus produced a calendar invite for the October 5th meeting to the plaintiffs, so I can confirm that.

THE COURT:  Is that in the record?

60

ATTORNEY ATKINSON:  I don't believe it is in the record.  It is -- but it had the Bates stamp Burk5538.

THE COURT:  I look forward to seeing it in a later phase of the case.

ATTORNEY ATKINSON:  Understood, Your Honor.  Thank you.

And then, finally, and I will turn over the floor in case Mr. Steinfeld has anything further, the projections arguments.  I mentioned it earlier, but the arguments that our friend presented here in court today are not in this complaint, and the complaint pleads allegations around technology, as Your Honor knows, but not around projections.

Thank you very much.

ATTORNEY STEINFELD:  I have just a few brief points, Your Honor.

The first is, and as I noted in my initial presentation, Harms and Kennedy do challenge the underlying breach on the disclosure claim they are alleged to have aided and abetted, which is the Momentus technology claim.

Second, regarding this new argument that plaintiffs put forward that Harms and Kennedy

61

somehow aided and abetted the net cash claim, my friend cites *XL Fleet* as an example of a case sustaining a net cash claim.

But what they ignore is that *XL Fleet* did have a net cash claim, but *XL Fleet* dismissed the target's fiduciary duties to -- the target's fiduciaries in full in that complaint, despite the net cash claim. There's no difference here.

And I ask, where in the complaint is an allegation that Harms and Kennedy provided substantial assistance on the net cash claim? There is none. Each paragraph cited by plaintiff is either generic or involves Momentus's technology.

Let's take paragraph 265 that was cited. "The Momentus Defendants exploited the competing financial interest between SRAC Defendants and SRAC's public stockholders by ... providing false and misleading information, which was incorporated in[to] public statements and filings, and omitt[ed] material information" -- and here's the key -- "concerning Momentus, the practical and commercial viability of its technology, and its projected revenue based on that technology."

There's no mention whatsoever of the

62

net cash claim there, nor could there be.  The net cash claim is solely within the purview of the SPAC or the SRAC defendants.

The net cash claim is a calculation, as Your Honor knows, involving dilution because of founder shares, because of warrants, because of transaction costs.  That's not something that the target's fiduciaries have a purview over.

Second, plaintiffs rely on the high-level positions, so to speak, of Harms and Kennedy; Harms being interim CEO or chief revenue officer before then, and Kennedy being president.

But, of course, *XL Fleet* dealt with the founder, CEO, and president of the target's side as well.  Still dismissed.  And that's consistent with longstanding law.

*Baker Hughes*, at 16, that the CFO would have reviewed and authorized dissemination of the proxy simply because she was CFO is insufficient to plead that she acted with *scienter* for an aiding and abetting claim.

Same thing in *Oracle*, where you had high-level positions on the aiding and abetting claim of the target, but still resulted in dismissal.

63

As to Mr. Kennedy, Your Honor asked, where's the allegation as to Mr. Kennedy?  You were pointed to paragraphs 118 to 120 of the complaint. Paragraphs 118 to 120 of the complaint, first of all, don't speak to projections at all, and they involve a January 4, 2021, interview.

January 4, 2021, was over six months before the operative deal was signed.  That was only after the initial deal, which is not at issue here. And there's over six months before the operative proxy was released.

There are no allegations whatsoever regarding Mr. Kennedy, nor Ms. Harms, on the alleged misleading statements in the operative deal, which, again, the valuation was slashed in half and the projections were substantially lowered.

On the projection point, I just wanted to note that the projections that are complained about in the complaint are the old projections, which are not operative.  There's no mention whatsoever of the new projections in the complaint, other than they were materially lower than the old projections.

And my friend mentioned year 2022 projections, the new ones.  Page 140 of the proxy

64

shows only 5 million in projected revenue.  So they were substantial -- and not only that, but a negative gross profit and a negative EBITDA.

So they were substantially revised downward because of the El Camino Real failure, because of the national security concerns when Kokorich was involved, and, of course, he was removed.

In addition to the lack of allegations regarding the projections, unlike in the other cases cited, where there was allegations regarding the projections, they were in the complaint, but where Vice Chancellor Will found there was not counterbalancing language, the proxy here, under the heading "Basis for our financial projections," spoke exactly to the situation and the risk that plaintiff complains about.

The proxy provided that Momentus's "technology is still unproven as we have [] yet [to] experimentally confirm[] the ability of our MET thruster to generate thrust in space, or to do so in a manner that is sufficiently reliable and efficient to permit full commercialization of the technology.  Our revenue forecasts are contingent upon our ability to fully develop, test and validate our technology in

65

space, commercialize our technology and ramp up our manufacturing effort."

So there is that counterbalancing language right in the projection section.  It says, we haven't done this yet, and if we're not able to, we won't hit these projections.

Regarding the statements on on-the-ground testing, what was -- and that's on -- or what the El Camino Real test and how it was similar to on-the-ground testing, that's at proxy 222 to 223, and we address this in our reply brief at page 23 to 24.  Everything that was in the proxy at that point was accurate.

The proxy disclosed that the mission "prematurely terminated ... after only 23 of [] 100 planned [] firings ... had been performed [of which] 12 [were] hot ... and 11 [were] cold .... a pump issue significantly restricted flow of water into the thruster during nine of the 12 hot firings, preventing plasma-generation ....  pressure and temperature data did not provide sufficient information to [] confirm or contradict plasma presence ...."

That's a very detailed disclosure on exactly what occurred during that mission.  And for

66

some reason, that's what plaintiff complains about.

Finally, Harms and Kennedy had no personal obligation to review the proxy.  The merger agreement was between Momentus, the entity, and SRAC, the entity, just like in *XL Fleet*, there was a nearly analogous provision, where the -- where *XL Fleet* had an obligation to review the proxy.

Therefore, that -- and this is not pled in the complaint at all, and this is at our reply, at 16 -- that does not provide a basis without specific factual allegations for aiding and abetting. The fact that Harms and Kennedy were high-level executives is not sufficient for an aiding and abetting claim.

If Your Honor has any questions, I'm happy to address them.

THE COURT:  Do you want to address Chancellor McCormick's analysis in that issue, in the *Electric Last Mile* case.

ATTORNEY STEINFELD:  Yes, Your Honor. May I have just one second to grab the case?  I have it right here.

THE COURT:  Sure.  I'm looking, in particular, at paragraphs 23 through 25 of the order.

67

ATTORNEY STEINFELD:  Yes, Your Honor.

So what Chancellor McCormick says is that the fact -- so she draws a contrast between cases like -- and it's in footnote 22 -- *Columbia* and *Mindbody*, where the defendant, which was the company in those cases, had an obligation to review the proxy. And in those two cases, there was -- the aiding and abetting claim was sustained.

What she says is the mere fact that -- it's in paragraph 24 -- the mere fact that Luo and Taylor, in that case, were not personally obligated does not preclude a finding of participation, but in no way does she say that it supports a finding, in and of itself.

What she does is she says that, coupled with all those other allegations I went through earlier, made it, in that case, that it was reasonably conceivable.

But here, there's a complete absence of those other allegations that are alleged against Luo and Taylor, such as the secret equity purchase, the touting of the deal so that they could make millions of dollars on the secret equity purchase, them being the core people involved in the

68

negotiations.  None of those allegations are present.

So while the fact that they are not personally obligated to review the proxy doesn't preclude a finding, it also doesn't support a finding.

And, again, footnote 22, she says, "As compared to [] situations in *Colombia* and *Mindbody* ...," where the defendant was actually obligated, and, therefore, supported such a finding on its own.

THE COURT:  Thank you.

ATTORNEY STEINFELD:  Thank you, Your Honor.

ATTORNEY TUCKER:  Your Honor, if I could just quickly have a moment?  No.  Okay.

THE COURT:  I don't need any further argument.

ATTORNEY TUCKER:  Okay.

THE COURT:  I'm not going to give you a ruling today, but I will give you a bench ruling in due course.

But let me kind of set the stage for where we're going to go.  This is an entire fairness case.  The defendants have not moved to dismiss with respect to the entire fairness claim, because they

CHANCERY COURT REPORTERS

69

have not challenged the disclosure with respect to net cash per share.

So this case is going to go forward as an entire fairness case. Some of the defendants might get out at this stage, but the case is going to go forward, so you should start preparing your discovery and get on with it.

With that, court stands in recess. Have a good day.

(Proceedings concluded at 2:51 p.m.)

- - -

70

CERTIFICATE

I, DOUGLAS J. ZWEIZIG, Official Court Reporter for the Court of Chancery of the State of Delaware, Registered Diplomate Reporter, Certified Realtime Reporter, do hereby certify the foregoing pages numbered 3 through 69, contain a true and correct transcription of the proceedings as stenographically reported by me at the hearing before the Vice Chancellor of the State of Delaware, on the date therein indicated.

IN WITNESS WHEREOF, I have hereunto set my hand at Wilmington this 5th day of February, 2024.


/s/ Douglas J. Zweizig
------------------------------
Douglas J. Zweizig
Official Court Reporter
Registered Diplomate Reporter
Certified Realtime Reporter

CHANCERY COURT REPORTERS