Robert V. Prongay (SBN 270796)
 *rprongay@glancylaw.com*
Casey E. Sadler (SBN 274241)
 *csadler@glancylaw.com*
Garth Spencer (SBN 335424)
 *gspencer@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Lead Plaintiff Hartmut Haenisch*
[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE STABLE ROAD ACQUISITION CORP. SECURITIES LITIGATION | Case No. 2:21-CV-5744-JFW(SHKx) |
| | Honorable John F. Walter |
| | **DECLARATION OF CASEY E. SADLER IN SUPPORT OF: (I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES** |
| | Hearing Date:  April 22, 2024 Hearing Time: 1:30 p.m. Location:  W. 1st Street, Courtroom 7A |

DECLARATION OF CASEY E. SADLER

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................3

II.     PROSECUTION OF THE ACTION .............................................................8

        A.      Commencement of the Instant Action and Appointment of Lead Plaintiff and Lead Counsel ...................................................................8

        B.      The Comprehensive Pre-Filing Investigation and Preparation of the Complaint ...................................................................8

        C.      Defendants' Motions to Dismiss the Complaint and Lead Plaintiff's Responses ...................................................................9

        D.      The Court Lets the Action Through to Discovery ..............................10

        E.      Mediation Efforts and Settlement Negotiations.................................10

        F.      The Court Grants Preliminary Approval of Settlement But Lead Plaintiff Is Forced to Move to Enforce the Settlement Due to a Lack of Payment ...................................................................11

III.    THE RISKS OF CONTINUED LITIGATION .............................................13

        A.      Ability to Pay Risk...........................................................................14

        B.      Risks to Proving Liability .................................................................15

        C.      Risk of Proving Loss Causation and Damages..................................17

        D.      Risks Faced in Obtaining and Maintaining Class Action Status ........19

        E.      Other Risks.......................................................................................19

        F.      The Settlement is Reasonable in Light of the Maximum Potential Recovery in the Action ...................................................................20

IV.     LEAD    PLAINTIFF'S    COMPLIANCE    WITH    THE    COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE ...................................................................20

V.      ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT ......23

VI.     LEAD    COUNSEL'S    REQUEST    FOR    ATTORNEYS'    FEES    AND REIMBURSEMENT OF LITIGATION EXPENSES.................................26

i
DECLARATION OF CASEY E. SADLER

A.    The Outcome Achieved Is the Result of the Significant Time and Labor that Lead Counsel Devoted to the Action ............................................. 26

B.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases ......... 29

C.    The Experience and Expertise of Lead Counsel, and the Standing and Caliber of Defendants' Counsel .......................................................... 30

D.    The Reaction of the Settlement Class Supports Lead Plaintiff's Counsel's Fee Request ................................................................................ 31

E.    Lead Plaintiff Supports Lead Counsel's Fee Request ........................ 32

F.    Reimbursement of the Requested Litigation Expenses Is Fair and Reasonable .......................................................................................... 32

VII.   CONCLUSION ............................................................................................. 34

## TABLE OF EXHIBITS TO DECLARATION

| EX. | TITLE |
| --- | --- |
| 1 | Declaration of Margery Craig Concerning: (A) Mailing of the Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections |
| 2 | Excerpts from Edward Flores and Svetlana Starykh, Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review (NERA Jan. 23, 2024) |
| 3 | Glancy Prongay & Murray LLP Lodestar Chart |
| 4 | Table of Peer Law Firm Billing Rates |
| 5 | Declaration of Lead Plaintiff Hartmut Haenisch |
| 6 | Glancy Prongay & Murray LLP Firm Résumé |
| 7 | Chart of Select Ninth Circuit Cases Awarding Attorneys' Fee of 33% or Above |

I, Casey E. Sadler, hereby declare and state as follows:

1. I am an attorney admitted to practice before this Court. I am a partner at the law firm Glancy Prongay & Murray LLP ("GPM"), the Court-appointed Lead Counsel in this Action.[1] GPM represents the Court-appointed Lead Plaintiff Hartmut Haenisch ("Lead Plaintiff") and the proposed Settlement Class. I have personal knowledge of the matters set forth herein based on my participation in the prosecution and settlement of the claims asserted in the Action.

2. I respectfully submit this declaration, together with the attached exhibits, in support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation. As set forth in the Final Approval Memorandum, Lead Plaintiff seeks final approval of the $8.5 million Settlement for the benefit of the Settlement Class, as well as final approval of the proposed Plan of Allocation of the Net Settlement Fund to eligible Settlement Class Members.

3. I also respectfully submit this Declaration in support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (referred to herein as the "Fee and Expense Application"). The Fee and Expense Application seeks an award of attorneys' fees in the amount of 25% of the Settlement Fund (*i.e.*, $2,125,000, plus interest earned at the same rate as the Settlement Fund), and reimbursement of Litigation Expenses in the total amount of $111,115.83, which consists of out-of-pocket litigation expenses in the amount of $101,115.83, plus $10,000 to Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for his costs, including lost wages, incurred in connection with his representation of the Settlement Class. As discussed in detail in the Fee and Expense Application, the requested 25% fee is consistent with the Ninth Circuit "benchmark,"

---

[1] All capitalized terms, unless otherwise defined herein, have the same meaning as set forth in the Stipulation and Agreement of Settlement dated August 18, 2023 (the "Stipulation"). ECF No. 178-1

is well within the range of percentage awards granted by courts in this Circuit in comparable securities class actions, and is a fair and reasonable amount in light of the work performed and the result obtained.  Moreover, the expenses were necessarily incurred by Lead Counsel in litigating this Action and are of the type that Court's routinely reimburse to counsel.

4.    The Court granted preliminary approval of the proposed Settlement by its Order dated September 20, 2023 (the "Preliminary Approval Order").  *See* ECF No. 181.[2] Pursuant to the Preliminary Approval Order, Strategic Claims Services ("SCS"), the Court-approved Claims Administrator, implemented a comprehensive notice program whereby notice was given to potential Settlement Class Members by mail or email and by publication.  *See* ¶¶55-64, *infra* (detailing notice program); *see also* Ex. 1 (Declaration of Margery Craig Concerning: (A) Mailing of the Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections (the "Craig Decl."), ¶¶3-13).

5.    In total, as of March 12, 2024, either a copy of the Notice Packet, (consisting of the Notice and Claim Form) was timely mailed, or a link to the Notice and Claim Form was emailed, to approximately 80,815 potential Settlement Class Members.  To date, only four requests for exclusion have been received by Lead Counsel or the Claims Administrator. *See* Ex. 1 (Craig Decl., ¶¶9, 14, 15).  Moreover, only one objection, which essentially seeks an advisory opinion regarding the scope of the release, has been filed with Court to date.[3]

---

[2] The deadlines set forth in Preliminary Approval Order were modified by Court order on November 22, 2023 (the "Revised Preliminary Approval Order").  ECF No. 195.

[3] Lead Plaintiff and Lead Counsel will address this objection and any subsequent objections in the reply memorandum that will be filed after the objection and exclusion deadline.

## I.    INTRODUCTION

6.    Lead Plaintiff in this action alleges claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, arising from Defendants' alleged misrepresentations and omissions made between October 7, 2020 and July 13, 2021, inclusive (the "Settlement Class Period").

7.    The proposed Settlement presented to the Court for final approval provides for the resolution of all claims in the Action in exchange for a cash payment of $8,500,000 (the "Settlement Amount") for the benefit of the Settlement Class.  As detailed herein, Lead Plaintiff and Lead Counsel submit that the proposed Settlement represents an extremely favorable result for the Settlement Class in light of the significant risks to overcome and remaining in the Action, as well as serious ability to pay issues.

8.    The maximum damages potentially recoverable for the Settlement Class *if* Lead Plaintiff fully prevailed in each of his claims at both summary judgment and after a jury trial, and *if* the Court and the jury fully accepted Lead Plaintiff's loss causation and damages arguments—*i.e.*, Lead Plaintiff's ***best-case scenario***—is approximately $80.5 million.  Under this best-case scenario, the $8.5 million Settlement Amount represents approximately 10.5% of total maximum damages potentially recoverable in this Action.  This recovery thus compares favorably to the median recovery of 1.8% for securities class actions settled in 2023, and a median recovery of 3.8% for similar securities class actions (with estimated damages of $50-$99 million) from 2014-2023.  *See* Exhibit 2 attached hereto (Edward Flores and Svetlana Starykh, Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review (NERA Jan. 23, 2024) at p. 25, Fig. 21 and p. 26, Fig. 22).  When viewed in this context, the percentage recovery achieved here is fair and reasonable, even putting aside the substantial risks of establishing liability and damages and Defendants' ability to pay.

9.     Thus, the Settlement provides a substantial, certain, and immediate recovery, while avoiding the significant risks and expense of continued litigation, including the risk that the Settlement Class could recover less than the Settlement Amount (or nothing at all) after years of additional litigation and delay.

10.     The Settlement was only achieved after a hard-fought litigation, during which Lead Counsel became well informed of the relative strengths and weaknesses of Lead Plaintiff's claims in the Action.  In prosecuting the Action, Lead Counsel expended great efforts and resources on behalf of the Settlement Class, including, *inter alia*:

a.     conducting a detailed and substantive investigation into the allegedly wrongful acts, which included, among other things: (i) review and analysis of Stable Road Acquisition Corp. ("SRAC") and Momentus Inc. ("Momentus") filings with the SEC, press releases, and other public statements made by Defendants prior to, during, and after the Settlement Class Period, as well as research reports prepared by securities and financial analysts regarding Stable Road and Momentus, and publicly available documents, reports, announcements, and news articles concerning Stable Road, Momentus, and the other Defendants; (ii) retaining and working with a private investigator who conducted an investigation that involved, *inter alia*, numerous interviews of former Company employees and other sources of relevant information; (iii) consultation with an expert in loss causation and damages; and (iv) reviewing and analyzing filings in the related action, *Securities and Exchange Commission v. Mikhail Kokorich*, Case No. 1:21-cv-1869 (D.D.C. July 13, 2021);[4]

---

[4] Lead Plaintiff also engaged in a Freedom of Information Act request process with the SEC for the production of documents.

b. drafting the comprehensive and factually detailed 103-page[5] Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint," ECF No. 94) incorporating the foregoing research and investigation efforts;

c. researching and drafting responses to Defendants' *three* motions to dismiss with corresponding voluminous exhibits (ECF Nos. 124, 127, 131-32, 134-36), which were filed by Lead Plaintiff on May 26, 2022 (ECF Nos. 138-141);

d. substantially overcoming Defendants' three motion to dismiss (ECF No. 154);

e. conducting discovery, including holding a Rule 26(f) conference, serving Lead Plaintiff's initial disclosures and reviewing the remaining Defendants' initial disclosures, propounding comprehensive requests for production on Defendants and analyzing Defendants' responses and objections thereto, proposing search terms, date ranges, and document custodians for Defendants to search their electronically stored information, and drafting and sending to Defendants a proposed confidentiality order and discovery protocol;

f. preparing for and participating in an adversarial mediation process and extensive settlement negotiations, which involved, (i) preparing a detailed mediation statement addressing liability, loss causation, and damages along with exhibits, (ii) reviewing and analyzing Defendants' mediation statement with exhibits, and (iii) participating in a full-day mediation session with an experienced and highly respected mediator, Jed D. Melnick, Esq. of JAMS, where the Parties and counsel engaged

---

[5] This page length does not include the numerous exhibits that were attached to the Complaint.

in full and frank discussions concerning the merits of the Action.  The session ended without any agreement being reached;

g.  continuing to engage in settlement discussions facilitated by the mediator over the next several month, which culminated in Mr. Melnick making a mediator's recommendation to resolve the Action for $8,500,000 for the benefit of the Settlement Class, that the Parties accepted;

h.  preparing and negotiating a term sheet that set out the preliminary terms of the Settlement;

i.  preparing the initial draft, and negotiating the terms, of the Stipulation (including the exhibits thereto) and the Supplemental Agreement, which included the involvement of the mediator;

j.  reviewing certain documents relating to the planned merger SRAC and Momentus that Lead Counsel had requested to evaluate the merits of the Action and the reasonableness of the proposed Settlement;

k.  working with a consulting damages expert to craft a plan of allocation that treats Lead Plaintiff and all other members of the proposed Settlement Class fairly;

l.  drafting the preliminary approval briefing;

m.  negotiating with counsel for Defendants when they indicated that Momentus wanted an extension of time to pay part of the Settlement Amount, which resulted in a joint stipulation that was filed with the Court and granted (ECF No. 183) that set out various terms that needed to be met for there to be any extensions;

n.  successfully moving the Court to enforce the Settlement (ECF Nos. 185-187, 190-191), resulting in an Order compelling payment (ECF Nos. 192-93);

o.  overseeing the implementation of the notice program; and

p.  drafting the final approval briefing.

DECLARATION OF CASEY E. SADLER

11. Based on the foregoing efforts, Lead Plaintiff and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action and believe the Settlement represents a favorable outcome for the Settlement Class and is in the best interests of the Settlement Class Members. For all the reasons set forth herein and in the accompanying memoranda and declarations, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and that the Court should grant final approval pursuant to Federal Rule of Civil Procedure 23(e).

12. In addition, Lead Plaintiff seeks approval of the proposed Plan of Allocation as fair and reasonable. As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of a consulting damages expert. ¶¶65-72, *infra* (discussing Plan of Allocation). The Plan of Allocation provides for the distribution of the Net Settlement Fund to each Authorized Claimant on a *pro rata* basis based on their Recognized Loss amounts. No Settlement Class Member, including Lead Plaintiff, or segment of the Settlement Class receives preferential treatment under the plan.

13. Finally, Lead Counsel seeks approval of the request for attorneys' fees, and reimbursement of Litigation Expenses, as set forth in the Fee Memorandum. As discussed in detail in the accompanying Fee Memorandum, the requested 25% fee is the "benchmark" in the Ninth Circuit and is within and even below the range of percentage awards granted by courts in this Circuit, and nationwide, in comparable securities class actions. Additionally, the fairness and reasonableness of the request is confirmed by a lodestar cross-check, and is warranted in light of the extent and quality of the work performed and the substantial result achieved. Likewise, the requested litigation expenses of $101,115.83 to Lead Counsel and the aggregate requested PSLRA award of $10,000 to Lead Plaintiff is fair and reasonable. Accordingly, as set forth in the Fee Memorandum and for the additional reasons set forth below, I respectfully submit that Lead Counsel's request for attorneys' fees and

DECLARATION OF CASEY E. SADLER

reimbursement of Litigation Expenses of $111,115.83 is fair and reasonable and should be approved.

## II.    PROSECUTION OF THE ACTION

### A.    Commencement of the Instant Action and Appointment of Lead Plaintiff and Lead Counsel

14.    Beginning on July 15, 2021, three class action complaints were filed in the United States District Court for the Central District of California (the "Court"), styled *Jensen v. Stable Road Acquisition Corp.*, No. 2:21-cv-05744- JFW(SHKx); *Hall v. Stable Road Acquisition Corp.*, No. 2:21-cv-05943-JFW(SHKx); and *DePoy v. Stable Road Acquisition Corp.*, No. 2:21-cv-06287- JFW(SHKx).

15.    By Order dated October 20, 2021, the Court ordered that the cases be consolidated and recaptioned as *In re Stable Road Acquisition Corp. Securities Litigation*, No. 2:21-CV-5744-JFW(SHKx); appointed Hartmut Haenisch to serve as lead plaintiff for the consolidated action; and approved Lead Plaintiff's selection of Glancy Prongay & Murray LLP ("GPM" or "Lead Counsel") as lead counsel for the putative class.  ECF No. 75.

### B.    The Comprehensive Pre-Filing Investigation and Preparation of the Complaint

16.    As discussed above, Lead Counsel conducted an extensive and detailed pre-filing investigation of Defendants, which included, among other things: (i) review and analysis of the SEC filings, press releases, and other public statements made by Defendants prior to, during, and after the Settlement Class Period, as well as research reports prepared by securities and financial analysts, and publicly available documents, reports, announcements, and news articles concerning Stable Road and Momentus and the Defendants, and reviewing filings in an related SEC action; (ii) retaining and working with a private investigator who conducted an investigation that involved, *inter alia*, numerous interviews of former Company employees and other

sources of relevant information; and (iii) consultation with an expert in market efficiency, loss causation, and damages.

17.    On November 12, 2021, Lead Plaintiff filed and served his 103-page Complaint asserting claims against: (i) defendants Momentus, SRAC, Kokorich, Kennedy, Kabot, Norris, and Hofmockel under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; (ii) defendants Momentus, Kokorich, Harms, And Kennedy under Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder; and (iii) the Individual Defendants and Sponsor under Section 20(a) of the Exchange Act.  ECF No. 94.  Among other things, the Complaint alleged that Defendants materially misled investors regarding Momentus's business and future prospects in an attempt to gain investor support for a proposed merger between SRAC, a special purpose acquisition company (or "SPAC") focused on the cannabis industry, and Momentus, a privately owned space industry startup with no revenue.  The Complaint further alleged that the prices of SRAC's publicly traded securities were artificially inflated during the class period as a result of Defendants' allegedly false and misleading statements, and declined when the truth was revealed.

**C.    Defendants' Motions to Dismiss the Complaint and Lead Plaintiff's Responses**

18.    On February 14, 2022, defendants Momentus and Harms filed a motion to dismiss the Complaint.  ECF No. 122.  On that same day, defendant Kennedy filed a motion to dismiss the Complaint.  ECF No. 124.  On February 25, 2022, defendants SRAC, Sponsor, Kabot, Hofmockel, Norris and Quiroga filed a motion to dismiss the Complaint.  ECF No. 131.

19.    On May 26, 2022, Lead Plaintiff filed and served his papers in opposition to the three motions to dismiss.  ECF Nos. 138-141.

20.    On June 20, 2022, Defendants served their reply papers.  ECF Nos. 142-45.

9

DECLARATION OF CASEY E. SADLER

### D.      The Court Lets the Action Through to Discovery

21.      On July 13, 2022, the Court granted in part, and denied in part, defendants' motions.  ECF No. 154.   Pursuant to the Court's July 13, 2022 Order, defendants Hofmockel, Norris, and Quiroga were dismissed from the litigation.  *Id.*

22.      On July 28, 2022, the Parties held their Rule 26(f) conference.  On August 2, 2022, defendants: (1) Momentus, Harms, and Kennedy; and (2) SRAC, Sponsor, and Kabot, filed and served their Answers to the Complaint.  ECF Nos. 160-161.  Thereafter, Lead Plaintiff initiated discovery.  Lead Plaintiff served his initial disclosures on Defendants, and reviewed Defendants' initial disclosures.  Lead Plaintiff propounded comprehensive requests for production on Defendants, and analyzed Defendants' responses and objections thereto.  Lead Plaintiff proposed search terms, date ranges, and document custodians for Defendants to search their electronically stored information.  Lead Plaintiff drafted and sent to Defendants a proposed confidentiality order and discovery protocol.  While the Parties had agreed to explore a potential resolution of the Action, Lead Plaintiff remained prepared to vigorously press discovery if the Parties' efforts toward resolution were not successful.

### E.      Mediation Efforts and Settlement Negotiations

23.      On October 17, 2022, Lead Counsel and Defendants' Counsel participated in a full-day mediation session before Jed Melnick, Esq. of JAMS, a well-respected mediator of complex actions.  In advance of that session, the Parties exchanged, and provided to Mr. Melnick, detailed mediation statements and exhibits, which addressed the issues of both liability and damages.  The session ended without any agreement being reached.  Over the course of the next several months, Mr. Melnick conducted further discussions with the Parties, which culminated in Mr. Melnick making a mediator's recommendation to resolve the Action for $8,500,000 for the benefit of the Settlement Class, that the Parties accepted.  The agreement in principle to settle the Action was memorialized in a term sheet (the "Term Sheet"),

which was fully executed as of April 13, 2023, following several months of negotiations, which included the involvement of the mediator. The Term Sheet sets forth, among other things, the Parties' agreement to settle and release all claims asserted against Defendants in the Action in return for $8,500,000 to be paid on behalf of the Defendants by Momentus and/or the Corporate Defendants' insurers for the benefit of the Settlement Class, subject to certain terms and conditions and the execution of a customary "long form" stipulation and agreement of settlement and related papers.

24. In connection with the Parties' agreement in principle to settle the Action set forth in the Term Sheet, and in order to better enable Lead Counsel to evaluate the merits of the Action and the reasonableness of the proposed Settlement, Lead Counsel requested, and Momentus has provided, certain documents relating to the planned merger between SRAC and Momentus. Lead Counsel reviewed the documents produced by Momentus, which consisted of Momentus' Board of Directors materials, internal emails, and other documents relating to the planned merger between SRAC and Momentus, to confirm Lead Plaintiff and Lead Counsel's belief that the Settlement is fair, reasonable, and adequate.

25. On August 18, 2023, after a lengthy mediation and negotiation process, which required additional help from the mediator, the Parties executed the Stipulation.

**F.    The Court Grants Preliminary Approval of Settlement But Lead Plaintiff Is Forced to Move to Enforce the Settlement Due to a Lack of Payment**

26. On August 30, 2023, Lead Plaintiff filed his Unopposed Motion For Preliminary Approval Of Class Action Settlement. ECF No. 177.

27. On September 21, 2023, the Court entered the Order Preliminarily Approving Settlement And Providing For Notice. ECF No. 181.

28. After the Court entered the Preliminary Approval Order and Lead Counsel provided to Defendants' Counsel the information necessary to effectuate a

transfer of funds to the Escrow Account, which both occurred on September 21, 2023, the deadline to pay the Settlement Amount under the Settlement Agreement was October 5, 2023.

29.     On September 20, 2023, counsel for Momentus contacted counsel for Lead Plaintiff, to ask for an extension of time to pay part of the Settlement Amount.

30.     From September 20, 2023, through October 6, 2023, Lead Counsel had various communications with counsel for Defendants concerning Momentus's extension request. These communications culminated in the filing of the Joint Stipulation Regarding Revising Settlement Agreement and Continuing Deadlines Set in the Preliminary Approval Order. ECF No. 182 (the "Extension Stipulation").[6] Among other things, the Extension Stipulation stated that "as of the filing of this Joint Stipulation, $5 million of the Settlement Amount has been deposited into the Escrow Account, and $3.5 million remains outstanding." Extension Stipulation at 1. The Extension Stipulation further stated that "Momentus has informed counsel for Lead Plaintiff that it needs an extension of the funding deadline to avoid an adverse impact on its ability to continue as a going concern." *Id.* at 2.

31.     The Extension Stipulation provided that "[t]he deadline for Momentus and/or the Corporate Defendants' insurers to fund the remaining unpaid portion of the Settlement Amount shall be extended by one week (until October 12, 2023)." *Id.* The Extension Stipulation provided that the Parties would request an additional ninety-day extension if certain conditions were met, in Lead Plaintiff's sole discretion. *Id.* at 2-3, n.3.

---

[6] On October 10, 2023, the Court entered the Order Regarding Revising Settlement Agreement and Continuing Deadlines Set in the Preliminary Approval Order (ECF No. 183), as had been proposed by the Parties in connection with Lead Plaintiff's filing of the Extension Stipulation, and which effectively so-ordered the terms of the Extension Stipulation.

32.    Momentus did not meet those conditions.[7]    As such, Lead Plaintiff moved the Court for an order compelling payment from Momentus of the outstanding $3.5 million.  ECF Nos. 185-87.  Following Momentus' opposition filing, which requested an extension of time, but did not oppose Lead Plaintiff's motion on the merits  (ECF No. 188), and Lead Plaintiff's reply filing (ECF No. 190), the Court granted the motion to enforce the Settlement and ordered Momentus to fund the Settlement within two business days.  *See* ECF Nos. 192-93.

33.    Following the funding of the remaining Settlement Amount, the Parties submitted a Joint Stipulation to Reinstate and Continue Deadlines Set in the Preliminary Approval Order (ECF No. 194), which was granted on November 22, 2023.  ECF No. 195.

## III.    THE RISKS OF CONTINUED LITIGATION

34.    The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a cash payment of $8,500,000.  As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case proceeded through additional years of litigation to a potentially litigated verdict, followed by the inevitable appeals.  Indeed, Momentus's precarious financial condition and Defendants' limited insurance, which would be significantly reduced by defense costs, created the very real risk that Lead Plaintiff would not be able to recover on a judgment as large as the Settlement after trial and appeal.  Defendants also had or potentially had substantial arguments with respect to liability, loss causation, and damages in this case.  These risks, among many others, were carefully considered in evaluating whether the Settlement was in the Settlement Class's best

---

[7] Additionally, Lead Counsel negotiated and entered into a non-disclosure agreement with Momentus to receive confidential financial information about Momentus.

interests. There was simply no guarantee that Lead Plaintiff and the Settlement Class would achieve any recovery, let alone one greater than $8.5 million.

## A. Ability to Pay Risk

35. The most immediate risks facing Lead Plaintiff and Lead Counsel was the Defendants' ability to pay a judgment. Momentus issued a going concern warning in its 10-Q for the quarter ended March 31, 2023, and has done so every quarter since, received a notice of delisting from NASDAQ on March 20, 2023 (and another one on November 21, 2023) because its stock had been trading for under $1.00 for 30 consecutive days, and as of close of trading on March 14, 2024, has a current market capitalization of only approximately $5.9 million, which is much less than the amount of the Settlement. The Company also disclosed on October 30, 2023, that it was "explor[ing] strategic alternatives" to "raise additional capital." *see* ECF No. 188. In fact, the Company represented to Lead Counsel and the Court that Momentus "needs an extension of the funding deadline to avoid an adverse impact on its ability to continue as a going concern." *See* Extension Stipulation at 2. Since then, the Company further disclosed on January 12, 2024, that:

**<u>Liquidity</u>**

The Company has not generated sufficient revenues to provide cash flows that enable the Company to finance its operations internally and the Company's financial position and operating results raise substantial doubt about the Company's ability to continue as a going concern. The Company has taken and continues to take proactive steps with respect to managing its cash burn rate and extending its cash runway while the Company continues exploring new business opportunities and working to raise additional capital. ***At the end of the fourth quarter of 2023, the Company reduced its headcount of full-time employees and contractors by approximately 20% to reduce its cash burn rate while retaining the talent it needs to execute on its key near-term initiatives. Nevertheless, the Company's ability to continue to fund operations for the next few weeks and months will be dependent on its ability to raise equity capital or engage in a strategic transaction.***

**Strategic Process**

As part of the evaluation of strategic alternatives, Momentus has conducted discussions with multiple potential strategic partners over the past few months. Those discussions have not resulted in any definitive agreements. The Company continues to engage in discussions and attempts to position itself to be able to quickly capitalize on any potential opportunities with interested parties should they arise and to evaluate all viable strategic options. ***However, if the Company is unable to raise sufficient capital to provide a bridge to full commercial production at a profit, the Company's operations could be further curtailed or ceased***[8]

36.   In sum, Momentus is in dire financial shape.  It may soon file for bankruptcy and the $8.5 million Settlement Amount is greater than the available insurance.  As such, continued litigation would have likely led to the Company not even having the funds that they ultimately were forced by Court order to pay.

37.   Moreover, this is one of the rare cases in which Lead Plaintiff was able to recover more than all of the available insurance policies.  If the case had to continue to be litigated, there was a very real risk that Momentus could declare bankruptcy.  If this was the case, then the recovery would likely be significantly less than the Settlement Amount.  Moreover, this insurance was likely quickly wasting and would only be further drained by continued defense costs surrounding this Action and the other claims.

38.   Accordingly, it is highly unlikely that Lead Plaintiff could have recovered more than the Settlement Amount by continuing to litigate the Action and not settling.

**B.     Risks to Proving Liability**

39.   While Lead Counsel believe that the claims of Lead Plaintiff and the Settlement Class are meritorious, Lead Counsel also recognized from the outset that

---

[8] All emphasis added unless otherwise indicated.

there were a number of substantial risks in the litigation and that Lead Plaintiff's ability to succeed at trial and obtain a large judgment was far from certain. For evidence of this risk, the Court needs to look no further than its own Order dismissing certain Individual Defendants and portions of the case with prejudice pursuant to Defendants' motions to dismiss. *See* ECF No. 154. Moreover, Defendants had challenged, or would challenge, virtually every element of Lead Plaintiff's Exchange Act claims. For example, Defendants forcefully argued, and would continue to maintain at summary judgment and trial, that the statements at issue were neither actionable nor material. Among other things, Defendants maintained that many of the statements at issue were: (i) protected by the PSLRA safe harbor provision (15 U.S.C. § 78u-5(c)(1)(A)) because they were forward-looking in nature and accompanied by meaningful cautionary language; (ii) vague, generalized statements of corporate optimism or opinion that no reasonable investor could rely; or (iii) true. While Lead Plaintiff prevailed on the motion to dismiss because the Court could not "conclude as a matter of law that the alleged omissions or misstatements were not material or misleading" (ECF No. 154, pp.11-12), it also made clear that "[b]oth the materiality and misleading nature of a statement or omission are usually questions for the trier of fact." *Id*. at p.11; *see also id*. (noting that "such an argument is rarely successful on a motion for summary judgment"). Falsity and materiality were, therefore, an open question, and the trier of fact could have determined that the evidence supported Defendants' version of the events.

40.   Defendants, including Defendants SRAC, Sponsor and Kabot (the "Stable Road Defendants"), would have also continued to contest scienter. Among other things, the SRAC Defendants would assert that the following cut against a finding of scienter: (i) after investigating the transaction and disclosures the SEC determined that the Stable Road Defendants acted negligently, not with fraudulent intent, and declined to bring the very same claims asserted by Lead Plaintiff; (ii) that affiliates of SRAC committed $15 million towards the transaction alongside other

investors, which they would never have done if they believed they were investing in a fraudulent enterprise; and (iii) neither SRAC affiliates nor its directors and officers (including defendant Kabot) sold any SRAC Securities during the class period.  While Lead Plaintiff strongly disagreed with Defendants and believed he would be able to prove scienter, there is no doubt that the issue would have been contested on summary judgment, at trial and on appeal.

41.    In their motions to dismiss, Defendants further argued that the element of reliance cannot be presumed on the facts of this Action.  *See, e.g.*, ECF No. 122-2, pp. 22-23.  This argument would have been presented at the class certification phase, as well as at summary judgment and trial, and a loss would have been catastrophic for Lead Plaintiff.

42.    Although Lead Plaintiff believes he has strong arguments in response to each of these arguments, Defendants' contentions nevertheless pose significant risks to establishing liability had the litigation continued.  Indeed, despite believing that this Action is meritorious, Lead Plaintiff and Lead Counsel are well aware of the high hurdles they would have to surmount in order to **prove** that Defendants violated the Exchange Act.

## C.    Risk of Proving Loss Causation and Damages

43.    Even assuming Lead Plaintiff overcame the above risks and successfully established Defendants' liability, Lead Plaintiff would have confronted considerable challenges in establishing loss causation and classwide damages.

44.    Defendants argued, and would continue to contest, loss causation and damages.  For instance, the Momentus defendants argued in their motion to dismiss that (i) "[a]ny attempt to plead loss causation here is undercut by the fact that Stable Road's stock price actually *increased* significantly after one of Plaintiff's alleged corrective disclosures"; and (ii) that "announcement and commencement of a regulatory investigation does not constitute a 'corrective disclosure' for purposes of loss causation."  ECF No. 122, at p.23 (emphasis in the original).  While Defendant's

were unsuccessful at the motion to dismiss on this argument, there is no assurance that they would not be successful at summary judgment or trial.

45.     In order to prove loss causation and damages, Lead Plaintiff would have to proffer expert testimony demonstrating: (i) what the "true value" of SRAC Securities would have been had there been no alleged material misstatements and omissions; (ii) the amount by which SRAC Securities were inflated by the alleged material misstatements and omissions; and (iii) the amount of artificial inflation removed by the corrective disclosures.  Defendants would almost certainly present their own damages expert(s) to present conflicting conclusions and theories regarding the reasons for SRAC Securities price decline on the alleged disclosure dates, requiring a jury to decide the "battle of the experts" – an expensive and intrinsically unpredictable process.

46.     Moreover, expert testimony can often rest on many assumptions, any of which risks being rejected by a jury.  A jury's reaction to such expert testimony is highly unpredictable, and Lead Counsel recognized that, in such a battle, there is the possibility that a jury could be swayed by Defendants' expert(s) and could find only a fraction of the amount of damages Lead Plaintiff contended were suffered by the Settlement Class, or none at all.  Thus, the amount of damages that the Settlement Class would recover at trial, even if successful on liability issues, was uncertain.  Similarly, there was no assurance that any evidentiary documents and testimony relating to liability and damages could be obtained or would be admitted as evidence by the Court at trial.  These issues could have seriously affected Lead Plaintiff's ability to successfully prosecute the allegations in this case.

47.     In sum, had any of Defendants' loss causation and damages arguments been accepted at summary judgment or trial, they could have dramatically limited—if not eliminated—any potential recovery.

DECLARATION OF CASEY E. SADLER

**D.      Risks Faced in Obtaining and Maintaining Class Action Status**

48.      Defendants would have argued against class certification.  The Parties reached the Settlement before Lead Plaintiff filed a motion for class certification. While Lead Counsel is confident that all of the Rule 23 requirements would have been met, and that the Court would have certified the proposed class, Defendants would have undoubtedly raised arguments challenging the propriety of class certification on, among other grounds, the issue of reliance.  *See, e.g.*, ECF No. 122-1, pp. 22-23.  If the Court accepted any of Defendants' anticipated arguments in opposition to class certification, that would have created significant hurdles for the proposed class to overcome.

**E.      Other Risks**

49.      It is also noteworthy that Lead Plaintiff's hard work led to a relatively early settlement.  Had the case not settled, Lead Plaintiff would have needed to complete substantial discovery, including reviewing and analyzing documents produced by Defendants, and other relevant third parties, taking fact depositions and conducting all expert discovery, the costs of which are assuredly high and the fruits of which are highly uncertain.

50.      Lead Counsel know from painful experience that despite the most vigorous and competent of efforts, attorneys' success in contingent litigation such as this case is never assured.  For instance, Lead Counsel lost a six-week antitrust jury trial in the Northern District of California after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs.  *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115 (N.D. Cal.).

51.      And, even if Lead Plaintiff had prevailed at trial, he would have had to succeed on the post-trial appeals that would have surely followed.  This process could have extended for years and might have ultimately led to a smaller recovery—or no recovery at all.  Indeed, considering the ability to pay issues, even prevailing at trial

would not have guaranteed a recovery larger than the $8.5 million Settlement. In fact, with Momentus's current financial condition it is virtually guaranteed that the recovery would be less.

52. Given these significant litigation risks, I believe that the Settlement represents an excellent result for the Settlement Class.

### F. The Settlement is Reasonable in Light of the Maximum Potential Recovery in the Action

53. In addition to the attendant risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages. If Lead Plaintiff had fully prevailed on all of his claims at the motion to dismiss stage, summary judgment and after a jury trial, if the Court certified the same class period as the Settlement Class Period, and if the Court and jury accepted Lead Plaintiff's damages theory, including proof of loss causation as to each of the eleven price drop dates alleged in this case—*i.e.*, Lead Plaintiff's ***best-case scenario***—estimated total maximum damages under the Plan of Allocation is approximately $80.5 million. Thus, the $8.5 million Settlement Amount represents approximately 10.5% of the total ***maximum*** damages ***potentially*** available in this Action.

54. Having evaluated the relative strengths and weaknesses of the Action in light of Defendants' arguments, the stage of the litigation, and Defendants' ability to pay, it is the informed judgment of Lead Counsel, that the proposed Settlement is fair, reasonable, and adequate and in the best interests of the Settlement Class.

## IV. LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE

55. The Court granted the Preliminary Approval Order on September 20, 2023 and its deadlines were extended on November 22, 2023. *See* ECF Nos. 181 &

20
DECLARATION OF CASEY E. SADLER

195.[9]  The Court set the deadline of April 1, 2024, for the receipt of objections to the Settlement, Plan of Allocation and/or the application for attorneys' fees and expenses or to request exclusion from the Settlement Class, and set a final fairness hearing date of April 22, 2024 (the "Settlement Hearing").

56.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed SCS, the Court-approved Claims Administrator, to begin mailing and emailing notice of the Settlement and to publish the Summary Notice.  Contemporaneously with the mailing and emailing of the Notice and Claim Form, Lead Counsel instructed SCS to post downloadable copies of the Notice and Claim Form online at www.StableRoadSecuritiesSettlement.com (the "Settlement Website").

57.    The Notice contains, among other things, a description of the Action; the definition of the Settlement Class; a summary of the terms of the Settlement and the proposed Plan of Allocation; and a description of Settlement Class Members' right to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the application for attorneys' fees and expenses, or to exclude themselves from the Settlement Class.  The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed $33\frac{1}{3}\%$ of the Settlement Fund, and for reimbursement of Litigation Expenses in an amount not to exceed $165,000, which may include an application for reimbursement of the reasonable costs and expenses incurred by Lead Plaintiff directly related to his representation of the Settlement Class.  *See* Craig Decl., Ex. A (Notice) at ¶¶5, 66.

58.    To disseminate the Notice, SCS mailed, by first class mail, postage prepaid, the Notice Packet to five organizations identified in the security lists that were provided to SCS by Defendants' Counsel. These records reflect persons and

---

[9] The deadlines set forth in Preliminary Approval Order were modified by the Revised Preliminary Approval Order.

entities that purchased SRAC Securities for their own account, or for the account(s) of their clients, during the Settlement Class Period. *See* Craig Decl., ¶5.

59. In addition, SCS maintains a proprietary database with the names and addresses of the largest and most common banks, brokers, and other nominees. *See id.* at ¶4. At the time of the initial mailing, SCS's proprietary master mailing list consisted of 827 banks and brokerage companies, as well as 1,317 mutual funds, insurance companies, pension funds, and money managers. *Id.* On December 7, 2023, SCS caused a letter to be sent by First-Class Mail or e-mailed to the 2,144 nominees contained in the SCS master mailing list. *Id.* The letter notified the nominees of the Settlement and requested that, within 7 calendar days from the date of the letter, they either: (a) request from SCS sufficient copies of the Notice Packet to forward to all such beneficial purchasers/owners and, within seven (7) calendar days of receipt of those Notice Packets, forward them to all such beneficial purchasers/owners; (b) request from SCS a link to the Notice Packet and email the link to all such beneficial purchasers/owners for whom valid email addresses are available within seven (7) calendar days of receipt of the link; or (c) send a list of the names, mailing addresses and email addresses (to the extent available) of all such beneficial purchasers/owners to SCS, in which case SCS would send a Notice Packet to them. *Id.* at ¶4 & Ex. B (nominee letter).

60. As of March 12, 2024, 80,815 potential Settlement Class Members were notified either by mailed Notice Packet or by emailed link to the Notice Packet. *Id.* at ¶8.

61. On December 18, 2023, SCS caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted once over the *PR Newswire*. *See id.* at ¶11 & Ex. C.

62. Lead Counsel also caused SCS to establish the dedicated Settlement Website, which became operational on December 7, 2023, to provide potential Settlement Class Members with information concerning the Settlement, submit a

22

DECLARATION OF CASEY E. SADLER

claim online, download copies of the Notice and Claim Form, as well as copies of the relevant pleadings. *Id.* at ¶13.

63.     The deadline for Settlement Class Members to object to the Settlement, Plan of Allocation, and/or to the application for attorneys' fees and expenses, or to request exclusion from the Settlement Class is April 1, 2024. As of March 12, 2024, four requests for exclusion have been received. *Id.* at ¶14 & Ex. D. SCS will file a supplemental affidavit after the deadline addressing whether any additional requests for exclusion have been received.

64.     To date, only one objection has been entered on this Court's docket. No other objections have been received by Lead Counsel. Lead Counsel will address this objection (and any other objections) in its reply papers that are due after the objection deadline has run.

## V.     ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

65.     Pursuant to the Preliminary Approval Order and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $8.5 million Settlement Amount plus any and all interest earned thereon less: (a) all federal, state and/or local taxes on any income earned by the Settlement Fund and the reasonable costs incurred in connection with determining the amount of and paying taxes owed by the Settlement Fund (including reasonable expenses of tax attorneys and accountants); (b) the costs and expenses incurred in connection with providing notice to Settlement Class Members and administering the Settlement on behalf of Settlement Class Members; and (c) any attorneys' fees and Litigation Expenses awarded by the Court) must submit a valid Claim Form with all required information submitted online or postmarked no later than April 5, 2024. *See* Ex. 1-A (Notice at pp. 3, 6-7 & ¶¶35, 37, 41); ECF No. 195 at ¶1. The Net Settlement Fund will be distributed among Authorized Claimants according to the proposed Plan of Allocation, as subject to approval by the Court.

66.     The Plan of Allocation is detailed in the Notice.  *See* Ex. 1-A (Notice, pp. 7-12). The Notice is posted on, and downloadable from, the Settlement Website, and it has been mailed or emailed along with the Claim Form to potential Settlement Class Members identified by SCS.  The Plan of Allocation's objective is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered losses as a proximate result of the alleged violations of the Exchange Act as opposed to losses caused by market, industry, or Company-specific factors or factors unrelated to the alleged violations of law.  Under the Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund based on his, her, or its total Recognized Loss Amount as compared to the total Recognized Loss Amounts of all Authorized Claimants.  *See* Ex. 1-A (Notice at ¶¶46-48). Calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement.  Instead, the calculations under the Plan of Allocation are a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund. *Id.* at ¶47.

67.     The Plan of Allocation, developed by one of Lead Plaintiff's consulting damages consultant, working in conjunction with Lead Counsel, is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act, and reflects an assessment of the damages that Lead Plaintiff contends could have been recovered under the theories of liability and damages asserted in the Action.  More specifically, the Plan of Allocation reflects, and is based on, Lead Plaintiff's allegation that the prices of SRAC Securities were artificially inflated due to Defendants' materially false and misleading statements and omissions.

68.     The Plan of Allocation is based on the premise that the decreases in the prices of SRAC Securities that followed the alleged corrective disclosures that

24
DECLARATION OF CASEY E. SADLER

occurred on January 5, 2021, January 6, 2021, January 25, 2021, January 26, 2021, January 27, 2021, March 8, 2021, May 4, 2021, May 24, 2021, May 25, 2021, July 14, 2021 and July 15, 2021 (the "Corrective Disclosure Dates") may be used to measure the alleged artificial inflation in the price of SRAC Securities prior to these disclosures.

69. An individual Claimant's recovery under the Plan of Allocation will depend on a number of factors, including when the Claimant purchased, acquired, or sold SRAC Securities during the Settlement Class Period, in what amounts, and if any securities were sold, when they were sold and in what amounts, as well as the number of valid claims filed by other Claimants.

70. If a Claimant has an overall market gain with respect to his, her, or its overall transactions in SRAC Securities during the Settlement Class Period, the Claimant's recovery under the Plan of Allocation will be zero.

71. If the prorated payment to be distributed to any Authorized Claimant is less than $10.00, no distribution will be made to that Authorized Claimant. Any prorated amounts of less than $10.00 will be included in the pool distributed to those Authorized Claimants whose prorated payments are $10.00 or greater. In Lead Counsel's experience, processing and sending a check for less than $10.00 is cost prohibitive.

72. In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund fairly among Settlement Class Members based on the losses they suffered on transactions in SRAC Securities that were attributable to the conduct alleged in the Complaint. Lead Counsel believes that the proposed Plan of Allocation will result in a fair and equitable distribution of the Net Settlement Fund among Settlement Class Members similar to the result if Lead Plaintiff prevailed at trial.

## VI.    LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

73.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying for a fee award of 25% of the Settlement Fund (*i.e.*, $2,125,000 plus interest accrued thereon), which is significantly below the 33⅓% maximum potential attorney fee request contained in the Notice.  Lead Counsel also requests reimbursement in the amount of $101,115.83 for out-of-pocket expenses incurred by Lead Counsel in connection with the prosecution and resolution of the Action and an award of $10,000 for Lead Plaintiff for his costs, including for time spent, in connection to his role as a representative plaintiff in the Action.  The requested Litigation Expenses of $111,115.83 are below the maximum amount of $165,000 set forth in the Notice.

74.    As set forth in the accompanying Fee Memorandum, the requested 25% award is the "benchmark" in the Ninth Circuit and well within the range of fee awards in other comparable class action settlements, and the resulting multiplier on Lead Counsel's lodestar of approximately 1.76 strongly supports the reasonableness of the requested attorneys' fee.  The legal authorities supporting the requested fees and expenses are set forth in the concurrently filed Fee Memorandum.  The primary factual bases for the requested fees and expenses are set forth below.

### A.    The Outcome Achieved Is the Result of the Significant Time and Labor that Lead Counsel Devoted to the Action

75.    The work undertaken by Lead Counsel in investigating and prosecuting the Action and arriving at the present Settlement in the face of substantial risks has been time-consuming and challenging.  At all times throughout the pendency of the Action, for a period of over two years, Lead Counsel's efforts were driven and focused on advancing the Action to bring about the most successful outcome for the Settlement Class, whether through settlement or trial.  That work is summarized in ¶10 above.

76.     Attached as Exhibit 3 hereto is a summary indicating the amount of time spent by attorneys and professional support staff of my firm who, from inception of the Action through and including March 14, 2024, billed ten or more hours to the Action, and the lodestar calculation for those individuals based on Lead Counsel's current billing rates.  For personnel who are no longer employed by Lead Counsel, the lodestar calculation is based upon the billing rates for such personnel in his or her final year of employment. The schedule was prepared from contemporaneous daily time records regularly prepared and maintained by Lead Counsel.

77.     Attorneys involved in this Action reviewed these daily time records in connection with the preparation of this declaration.  The purpose of this review was to confirm both the accuracy of the records, as well as the necessity for, and reasonableness of, the time committed to the litigation.  As a result of this review, Lead Counsel made reductions to certain of the firm's time entries such that the time included in Exhibit 3 reflects that exercise of billing judgment.  Based on this review and the adjustments made, I believe that the time of Lead Counsel attorneys and staff reflected in Exhibit 3 was reasonable and necessary for the effective and efficient prosecution and resolution of the Action.  No time expended on the application for fees and reimbursement of expenses has been included.

78.     The hourly rates for the attorneys and professional support staff are similar to the rates that have been accepted in other securities or shareholder litigation in this District.  Additionally, the rates billed by Lead Counsel's attorneys (ranging from $450 to $750 per hour for non-partners and $895 to $1,195 per hour for partners) are comparable to peer plaintiff and defense firms litigating matters of similar magnitude.  *See* Ex. 4 attached hereto (table of peer law firm billing rates).

79.     The total number of hours reflected in Exhibit 3 is 1,433.95 hours.  The total lodestar reflected in Exhibit 3 is $1,208,155.00, consisting of $1,156,415.00 for

attorneys' time and $51,740.00 for professional support staff time.[10]  The requested fee amount of 25% of the Settlement Fund equals $2,125,000 (plus interest earned at the same rate as the Settlement Fund), and therefore represents a multiplier of 1.76 on Lead Counsel's lodestar.

80.     Moreover, Lead Counsel will continue to work towards effectuating the Settlement in the event the Court grants final approval.  Among other things, Lead Counsel will continue working with the Claims Administrator to resolve issues with Settlement Class Member claims, will respond to shareholder inquiries, will draft and file a motion for distribution, and will oversee the distribution process.  No additional compensation will be sought for this work.  Thus, the multiplier will be smaller by the time the case concludes.

81.     As detailed above, throughout this case, Lead Counsel devoted substantial time to the prosecution of the Action.  I personally devoted substantial time to this case and was involved in drafting and reviewing and editing pleadings and other court filings, and communicating with other lawyers about the case on a regular basis.  Other experienced attorneys were involved with drafting, reviewing and/or editing pleadings, court filings, various informal discovery-related materials, and the mediation submissions, participating in the mediation process, negotiating the terms of the Stipulation, and other matters. Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

82.     Based on the work performed and the quality of the results achieved, Lead Counsel respectfully submits that a 25% fee is fully merited under the "percentage of the fund" methodology.  Furthermore, as shown in Lead Counsel's

---

[10] Lead Counsel intends to share a portion of any attorneys' fees awarded by the Court with The Law Offices of Frank R. Cruz in accordance with its level of contribution to the initiation, prosecution, and resolution of the Action.

accompanying Fee Memorandum, I also respectfully submit that the requested fee is fully supported by a "lodestar multiplier cross-check" because the requested multiplier is below the range of multipliers that courts often award in comparably complex securities class actions, which is a strong indication that the percentage request is fair and reasonable.

**B.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases**

83.    This prosecution was undertaken by Lead Counsel on a pure contingency fee basis.  From the outset, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and to cover the considerable litigation costs required by a case like this one.

84.    With an average lag time of many years for complex cases like this case to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Lead Counsel received no compensation during more than two years of litigation and incurred $101,115.83 in litigation-related expenses in prosecuting the Action.

85.    Lead Counsel also bore the risk that no recovery would be achieved.  As discussed above, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever.  Despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured. As set forth above, Lead Counsel knows from experience that the commencement of a class action does not guarantee a settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious

settlement negotiations at meaningful levels.  And, even when that effort is put forth, sometimes you lose.

86.     Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 n.4 (2007) ("private securities litigation is an indispensable tool with which defrauded investors can recover their losses – a matter crucial to the integrity of domestic capital markets.") (internal quotation marks omitted).  As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

**C.     The Experience and Expertise of Lead Counsel, and the Standing and Caliber of Defendants' Counsel**

87.     As demonstrated by Lead Counsel's firm résumé, Lead Counsel have extensive and significant experience in the specialized area of securities litigation. *See* Ex. 6 (GPM firm résumé).  The attorneys who were principally responsible for leading the prosecution of this case have prosecuted securities claims throughout their careers and have recovered tens of millions of dollars on behalf of investors.  This experience allowed Lead Counsel to develop and implement litigation strategies to address the complex obstacles that are inherent in securities class actions and those specific to this case that were raised by Defendants.  I believe that the recovery achieved here for the Settlement Class reflects the high quality of Lead Counsel's representation.

88.     Additionally, the quality of the work performed by Lead Counsel in obtaining the Settlement should also be evaluated in light of the quality of the

DECLARATION OF CASEY E. SADLER

opposition. Here, the Defendants were represented by Kirkland & Ellis LLP, Baker & Mckenzie LLP, Wilson Elser Moskowitz Edelman & Dicker LLP, Winston & Strawn LLP, Stoner Carlson LLP—well-respected law firms that vigorously represented the interests of their clients throughout this Action. In the face of this experienced and formidable opposition, Lead Counsel were nonetheless able to persuade Defendants to settle the case on terms that I believe are favorable to the Settlement Class.

**D.     The Reaction of the Settlement Class Supports Lead Plaintiff's Counsel's Fee Request**

89.     As noted above, as of March 12, 2024, 80,815 potential Settlement Class Members were either mailed a Notice Packet or emailed a link to the Notice Packet that advised Settlement Class Members that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund. *See* Craig Decl. ¶8 & Ex. A (Notice at ¶5). In addition, the Court-approved Summary Notice has been published in *Investor's Business Daily* and transmitted once over the *PR Newswire*. *See* Craig Decl. ¶11 & Ex. C (confirmations of Summary Notice publications). To date, only one objection has been received by Lead Counsel or entered on this Court's docket. *See* ECF No. 196. Lead Plaintiff will address this objection and other received after the date of this filing in Lead Counsel's reply papers.

90.     In sum, Lead Counsel accepted this case on a fully contingent basis, committed significant resources to it, and prosecuted the case for more than two years without any compensation or guarantee of success. Based on the result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submits that a fee award of 25%, resulting in a multiplier of 1.76, is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases.

## E.    Lead Plaintiff Supports Lead Counsel's Fee Request

91.    As set forth in the declaration submitted by Lead Plaintiff Hartmut Haenisch, Lead Plaintiff has concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action.  *See* Ex. 5 (Haenisch Decl.) at ¶¶9-11.  Lead Plaintiff has been intimately involved in this case since its early stages, and his endorsement of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

## F.    Reimbursement of the Requested Litigation Expenses Is Fair and Reasonable

92.    Lead Counsel seeks a total of $111,115.83 in Litigation Expenses to be paid from the Settlement Fund.  This amount includes $101,115.83 in out-of-pocket expenses reasonably and necessarily incurred by Lead Counsel in connection with commencing, litigating, and settling the claims asserted in the Action; as well as a total of $10,000 for Lead Plaintiff directly related to his representation of the Settlement Class.  I respectfully submit that the request for reimbursement of Litigation Expenses is appropriate, fair, and reasonable and should be approved in the amounts submitted herein.

93.    From the inception of this Action, Lead Counsel were aware that they might not recover any of the expenses incurred in prosecuting the claims against Defendants, and, at a minimum, would not recover any expenses until the Action was successfully resolved.  Lead Counsel also understood that, even assuming the Action was ultimately successful, an award of expenses would not compensate Lead Counsel for the lost use or opportunity costs of funds advanced to prosecute the claims against Defendants.  Thus, Lead Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

DECLARATION OF CASEY E. SADLER

94. In my opinion, the expenses paid were necessary and appropriate for the prosecution and resolution of this Action. A list of the payments by category is set forth below:

| ITEM | AMOUNT |
|---|---|
| COURIER AND SPECIAL POSTAGE | $65.31 |
| COURT FILING FEES | $448.75 |
| DELIVERY OF COURTESY COPIES TO THE COURT | $945.12 |
| EXPERTS - ECONOMETRIC (LOSS CAUSATION, DAMAGES, PLAN OF ALLOCATION) | $41,261.00 |
| MEDIATORS | $33,618.75 |
| ONLINE RESEARCH | $12,892.40 |
| PHOTOIMAGING | $25.48 |
| PRIVATE INVESTIGATORS | $10,564.20 |
| PSLRA-MANDATED PRESS RELEASE | $110.00 |
| TRAVEL AIRFARE | $894.20 |
| TRAVEL HOTEL | $290.62 |
| **Total** | **$101,115.83** |

95. As set forth in the chart above, the largest expense was for the retention of experts, amounting to $41,261.00 or 40.81% of the total expenses—two in the field of damages, loss causation and market efficiency. These experts were consulted at different points throughout the litigation, including on matters related to the preparation of the Complaint, on matters relating to the negotiation of the Settlement, and on preparation of the proposed Plan of Allocation.

96. Another large component of expenses include $33,618.75, or approximately 33.25% of the total expenses, expended on Lead Plaintiff's share of mediation fees paid for the services of Mr. Melnick. The retention of investigators were another $10,564.20, or approximately 10.45% of the total expenses. The investigators conducted numerous interviews with former employees and other relevant third parties and assisted Lead Counsel in conducting the factual investigation required to develop claims in the Action. And, $12,892.40, or 12.75% of the total expenses, was expended on the use of online research vehicles to research and support Lead Plaintiff's various factual allegations in the Complaint and legal arguments while engaged in motion practice.

DECLARATION OF CASEY E. SADLER

97.     Finally, Lead Plaintiff seeks reimbursement of his reasonable costs and expenses incurred directly in connection with representing the Settlement Class in the amount of $10,000.  The substantial effort devoted to this Action by Lead Plaintiff is detailed in his accompanying declarations.  *See* Ex. 5.  Based on the time and effort expended by Lead Plaintiff for the benefit of the Settlement Class, I would respectfully request that the Court grant Lead Plaintiff's request in full.

## VII.   CONCLUSION

98.     In view of the significant recovery for the Settlement Class and the substantial risks of this Action, as described herein and in the accompanying Final Approval Memorandum, I respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and that the proposed Plan of Allocation should be approved as fair and reasonable.  I further submit that the requested fee in the amount of 25% of the Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of total Litigation Expenses in the amount of $111,115.83 (which includes $10,000 for Lead Plaintiff) should also be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this, the 18th day of March, 2024, at Los Angeles, California.

 *s/ Casey E. Sadler*
 Casey E. Sadler

## <u>PROOF OF SERVICE</u>

I hereby certify that on this 18th day of March, 2024, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*s/ Casey E. Sadler*

Casey E. Sadler

DECLARATION OF CASEY E. SADLER