# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE STABLE ROAD ACQUISITION CORP. SECURITIES LITIGATION | Case No. 2:21-CV-5744-JFW(SHKx) |
| | Honorable John F. Walter |
| | **STATEMENT OF DECISION RE: (I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES** |

DECISION
RE FINAL APPROVAL MOTION AND FEE AND EXPENSE REQUEST

**ORDER GRANTING LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION [filed 03/18/2024; Docket No. 198] AND LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES [filed 03/18/2024; Docket No. 200]**

On March 18, 2024, Lead Plaintiff Hartmut Haenisch ("Lead Plaintiff") filed a motion seeking: (1) final approval of the proposed Settlement; and (2) approval of the proposed plan of allocation of the proceeds of the Settlement.[1] Dkt. Nos. 198-99. On March 18, 2024, Lead Counsel filed a motion for an award of attorneys' fees and reimbursement of Litigation Expenses. Dkt. Nos. 200-201. On April 15, 2024, Lead Plaintiff filed a reply in further support of both motions. Dkt. Nos. 201-02. Plaintiffs' reply also addressed an objection to the Settlement that was filed on March 8, 2024. Dkt No. 196. On April 15, 2024, Defendants also submitted a response to the objection. Dkt. Nos. 205-06.

This matter came on for hearing on April 22, 2024. After considering the moving and reply papers as well as the objection, and the arguments made at the hearing, the Court grants both motions in full.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Lead Plaintiff asserts securities fraud claims on behalf of a class of investors against SRAC, the Sponsor, Momentus and the Individual Defendants (collectively, "Defendants"). Lead Plaintiff alleges Defendants misled investors between October 7, 2020, and July 13, 2021, inclusive (the "Settlement Class Period"), by failing to disclose material information concerning Momentus' business, and concerning

---

[1] All capitalized terms, unless otherwise defined herein, have the same meaning as set forth in the Stipulation and Agreement of Settlement dated August 18, 2023 (the "Stipulation"). Dkt. No. 178-1.

SRAC's due diligence for its merger with Momentus.

On August 18, 2023, the Parties executed the Settlement Agreement. On August 30, 2023, Lead Plaintiff filed his Unopposed Motion for Preliminary Approval of Class Action Settlement. Dkt. No. 177. On September 21, 2023, the Court entered the Order Preliminarily Approving Settlement And Providing For Notice. Dkt. No. 181.

Following non-payment of certain of the amounts owed under the Stipulation, Lead Plaintiff moved the Court for an order compelling payment from Momentus of the outstanding $3.5 million. Dkt. Nos. 185-87. On November 14, 2023, the Court granted the motion to enforce the Settlement and ordered Momentus to fund the Settlement within two business days. *See* Dkt. Nos. 192-93.

Following the funding of the remaining Settlement Amount, the Parties submitted a Joint Stipulation to Reinstate and Continue Deadlines Set in the Preliminary Approval Order (Dkt. No. 194), which was granted on November 22, 2023. Dkt. No. 195. The November 22, 2023 Order modified the deadlines set out in the Preliminary Approval Order, including setting the Settlement Hearing date for April 22, 2024 at 1:30 p.m. *Id.*

On March 8, 2024, James Burk, Alexander Lora, Patricia Shirley, and Christopher Dylan Spears (collectively, the "Objectors") filed an Objection to Stipulation of Settlement and Notice of Intent to Appear (the "Objection"). Dkt. No. 196. On March 18, 2024 Lead Plaintiff filed a motion seeking final approval of the proposed Settlement and approval of the proposed plan of allocation of the proceeds of the Settlement. Dkt. Nos. 198-99. On March 18, 2024, Lead Counsel filed a motion for an award of attorneys' fees and reimbursement of Litigation Expenses. Dkt. Nos. 200-201. On April 15, 2024, Lead Plaintiff filed a reply in further support of both motions, which also addressed the Objection. Dkt. Nos. 201-02. On April 15, 2024, Defendants also submitted a response to the Objection. Dkt. Nos. 205-06.

## II.    THE OBJECTION IS OVERRULED

Only one objection has been filed with the Court on behalf of four individuals that have brought a variety of state law claims in Delaware state court. Dkt. No. 196. The Objection claims that the release is overbroad. But instead of excluding themselves from the Settlement Class and litigating their case in Delaware, the Objectors seek to either carve out these claims from the release or have the entire Settlement denied. Since the release is not overbroad, the Objection is overruled.

An objector to a proposed settlement agreement bears the burden of proving any assertions they raise challenging the reasonableness of a class action settlement. *United States v. Oregon*, 913 F.2d 576, 581 (9th Cir. 1990). Where the Court is satisfied that the negotiated settlement is the product of "good faith, arms-length negotiation," it is "presumptively valid" and the objector must meet "a heavy burden" of showing it is "unreasonable." *Id.* The Objectors fail to meet this burden.

First, the language of the terms of the release is standard. As set out in the Stipulation, the terms of the release (the "Release") are:

> "Released Plaintiff's Claims" means all claims and causes of action of every nature and description, whether known claims or Unknown Claims (as defined below), whether arising under federal, state, common or foreign law, that Lead Plaintiff or any other member of the Settlement Class: (i) asserted in the operative Complaint, or (ii) could have asserted in any forum that arise out of, or relate to, or are based upon the allegations, transactions, facts, matters or occurrences, representations or omissions involved, set forth, or referred to in the operative Complaint, and that in any way arise out of, relate to, or are based upon, directly or indirectly, the purchase, acquisition, ownership, disposition, holding, transfer, or sale of SRAC Securities during the Settlement Class Period. Dkt. No. 178-1 at ¶1(nn)

The Settlement's release language is commonplace in court-approved securities class action settlements, and appropriately restricts the scope of the release to the facts underlying this Action. "[T]he Ninth Circuit allows federal courts to release not only those claims alleged in the complaint, but also claims based on the identical factual predicate as that underlying the claims in the settled class action." *Zhou v. Faraday Future Intelligent Elec. Inc.*, 2024 WL 1245341 at *8 (C.D. Cal.

Mar. 18, 2024). Put differently, "the released claims must arise from the same common nucleus of operative fact as those alleged in the complaint." *Belew v. Brink's, Inc.*, 721 F. App'x 734, 735 (9th Cir. 2018); *see also Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) ("we have held that federal district courts properly released claims not alleged in the underlying complaint where those claims depended on the same set of facts as the claims that gave rise to the settlement").

Here, the "Released Plaintiff's Claims" are appropriately limited to claims that: (i) were asserted in the Complaint; or (ii) "arise out of, or relate to, or are based upon" matters alleged in the Complaint *and* relate to transactions in or ownership of SRAC Securities during the Settlement Class Period. *See* Dkt. No. 178-1 at ¶1(nn). The Objection does not argue that the first prong—claims asserted in the Complaint—should not be released. As to the second prong, it is properly tailored to the same common nucleus of operative facts as those alleged in the Complaint, and so satisfies the identical factual predicate rule. *First,* the release is limited to claims relating to matters alleged in the Complaint. *Second*, the release is further limited to claims relating to transactions in or ownership of SRAC Securities. *Third*, the release is still further limited to claims relating to the October 7, 2020 through July 13, 2021 Settlement Class Period. Thus, the Settlement releases only claims relating to the conduct at issue in the Complaint that affected SRAC Securities during the Settlement Class Period. Any claims that do not relate to this "common nucleus of fact" are not released.

This scope of the proposed release is similar to many other releases in securities class action settlements that have been approved by this Court, other courts in the Ninth Circuit, and even the law firms now representing the Objectors (in cases where they served as lead counsel for federal securities class action plaintiffs). *See* Dkt. No. 204-2. Judge Snyder just faced a similar objection to a class action settlement from similarly situated Delaware state court plaintiffs in *Faraday*. There, the Court analyzed similar release language, finding that it "is commensurate with the legal

standard," and that "[c]ourts in this circuit have approved releases with similar language." 2024 WL 1245341, at *8 (collecting cases); *see also Davis v. Yelp, Inc.,* 2022 WL 21748777, at *2 (N.D. Cal. Aug. 1, 2022) (analyzing similar release and holding that "[i]n limiting the scope of the of released claims as such, the agreement focuses on the factual predicates relevant to the securities claims"); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.,* 2018 WL 6198311, at *5 (N.D. Cal. Nov. 28, 2018) ("The proposed release of claims is sufficiently tailored. The release's scope is limited to claims that relate to both the complaint's factual allegations and to the purchase or ownership of VWAG's ADRs.").

The Objection fails to address the weight of such precedent, and does not even mention the applicable "identical factual predicate" rule. Instead, the Objectors argue that the Settlement might release claims in their Delaware state court action and claim to be confused by the meaning of the Release. But this is irrelevant to the analysis of whether the Release is overbroad. Likewise, the Objectors' speculation regarding the Parties' subjective intent when negotiating the release language is also irrelevant. After extensive negotiations, overseen by a respected mediator, the Parties agreed to the release language that is plainly set forth in the Stipulation. It is the objective language of the Stipulation, and not the subjective intent of the Parties, that determines the release's scope. *See In re W. States Wholesale Nat. Gas Antitrust Litig.,* 725 F. App'x 560, 564 (9th Cir. 2018) (whether "claims share an 'identical factual predicate' is a purely legal question; we need not look beyond the complaints in each action").

Second, the Objection claims that the release is overbroad because it extends not only to Defendants, but also to directors, officers and other affiliates. Objection at 10; Stipulation at ¶1(n) (definition of "Defendants' Releasees"). Defendants cite no authority holding that such a release is impermissible. On the contrary, it is well-established that "[a] class settlement may also release factually related claims against parties not named as defendants," provided that the released claims "arise from an identical factual predicate as the claims asserted" in the action. *Reyn's Pasta Bella,*

5

*LLC v. Visa USA, Inc.*, 442 F.3d 741, 748 (9th Cir. 2006); 6 Newberg and Rubenstein on Class Actions § 18:20 (6th ed.) ("courts approve the release of non-parties, even those beyond their jurisdiction, so long as there exists some factual relationship between the release and the class's claims.").

Here, extending the release to Defendants' related parties is appropriate because the proposed release language is narrowly tied both in subject matter and temporally to the conduct alleged in the Complaint. Therefore, the released claims as to Defendants' affiliates "arise from the same common nucleus of operative fact as those alleged in the complaint" against the Defendants. *Belew*, 721 F. App'x at 735. Such non-party releases are customary in securities class action settlements, and have been repeatedly approved by this Court, other courts in the Ninth Circuit, and even the law firms representing the objectors. *See* Dkt. No. 204-2.

Again, *Faraday* is instructive. There, the Delaware objectors made essentially the same arguments as here about the scope of the release, including objecting to the inclusion of certain non-parties. *See* Case No. 2:21-cv-09914 at Dkt. No. 125, p. 7. Judge Snyder overruled the objection, finding "that the proposed release language is appropriate. The Ninth Circuit allows federal courts to release not only those claims alleged in the complaint, but also claims based on the identical factual predicate as that underlying the claims in the settled class action." *Faraday*, 2024 WL 1245341 at *8; *see also Negrete v. ConAgra Foods, Inc.*, 2021 WL 4202519, at *8 (C.D. Cal. June 21, 2021) ("The inclusion of the Third-Part[ies] . . . in the definition of Released Parties . . . does not undermine the fairness of the settlement"); *Sabol v. Hydroxatone LLC*, 2013 WL 6154432, at *14 (D.N.J. Nov. 22, 2013) ("There is nothing wrong, in general, with releasing non-parties in connection with the settlement of a class action. That is frequently done when the claims against the non-parties are closely related factually to the claims asserted against the named parties").

Third, the Objection argues that the Settlement Amount is too small because the Delaware claims are "many times (*i.e.*, at least an order of magnitude) greater than

the $8.5 million for which the Federal Plaintiffs have agreed to settle." Objection at 6-8. The Objection fails to provide *any* factual basis for this claim, including, for instance, a damages analysis. Nor does it cite a single case with similar claims where a better result was obtained. In stark contrast, Lead Plaintiff has already articulated why the Settlement is an excellent result and provided actual evidence in support. Dkt. No. 199 at 13-15. Indeed, the recovery here is more than two and a half times the typical recovery. *Id.* at. 14.

Fourth, the Objectors essentially ask this Court to issue a hypothetical, advisory opinion on whether the proposed Release would bar claims in the Delaware action, and if so, to require the Parties to carve them out. The Court declines this improper request. The determination of whether the proposed release covers any claims in the objectors' Delaware action should be made, if at all, by the Delaware court on consideration of an appropriate motion. *See Faraday*, 2024 WL 1245341, at *8 n.5 ("The Court does not address whether the proposed release language would cover the claims that Cleveland is asserting in the Delaware Action. That determination is properly left for the Delaware Court of Chancery.").

Fifth, the Objectors reserved the right to conduct discovery of Lead Counsel and Defendants' counsel at the Settlement Hearing. Objection at 8-9. ("Objectors reserve the right to . . . call counsel for the Federal Plaintiffs and/or Federal Defendants as witnesses at the settlement hearing, and/or [] otherwise seek discovery with respect to the settlement and negotiation thereof, including with respect to negotiations occurring between the parties."). This request, which was not supported by any argument or legal authorities, was withdrawn at the Settlement Hearing.

In any event, such information would have been irrelevant to determine the scope or effect of the release. *Zhou v. Faraday Future Intelligent Elec. Inc.*, 2024 WL

1458406, at *2 (C.D. Cal. Mar. 6, 2024)[2] ("the effect of the release on the Delaware Action is not appropriately determined by discovery, as the language of the release controls that determination").  And the Objectors "failed to show that this is one of the 'rare circumstances' where discovery pertaining to settlement negotiations is appropriate," because the objectors have made no showing whatsoever that the Settlement is collusive. *Id.* Additionally, the requested discovery would have invaded the attorney-client and mediator privileges, as they sought to discover settlement negotiations and attorney-client communications. *Id.*

In sum, the Objection is deemed meritless and is overruled.

## III. THE SETTLEMENT IS FINALLY APPROVED BECAUSE IT IS FAIR, REASONABLE AND ADEQUATE

### A. Legal Standards

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise or settlement of class action claims and states that a class action settlement should be approved if the court finds it "fair, reasonable, and adequate." FED. R. CIV. P. 23(e)(2).  In the Ninth Circuit, "there is a strong judicial policy that favors settlements particularly where complex class action litigation is concerned." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008).[3]

Rule 23(e)(2)—which governs final approval—requires courts to consider the following questions in determining whether a proposed settlement is fair, reasonable, and adequate:

(A)  have the class representatives and class counsel adequately represented the class;
(B)  was the proposal negotiated at arm's length;
(C)  is the relief provided for the class adequate, taking into account:

---

[2] Unlike in *Faraday*, the objectors here did not actually file a request for leave to take discovery in aid of their objection, and the Objectors withdrew their request . *Id.* at 1.

[3] Unless otherwise indicated, all emphasis is added and citations and quotations omitted.

(i)    the costs, risks, and delay of trial and appeal;

(ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii)    the terms of any proposed award of attorneys' fees, including timing of payment; and

(iv)    any agreement required to be identified under Rule 23(e)(3); and

(D)    does the proposal treat class members equitably relative to each other.

Factors (A) and (B) "identify matters . . . described as procedural concerns, looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement," while factors (C) and (D) "focus on . . . a substantive review of the terms of the proposed settlement" (*i.e.*, "[t]he relief that the settlement is expected to provide to class members"). FED. R. CIV. P. 23(e) Advisory Committee Notes to 2018 Amendments, 324 F.R.D. 904, at 919.

These factors do not "displace" any previously adopted factors, but "focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." *Id.*, 324 F.R.D. at 918. "Accordingly, the Court [should] appl[y] the framework set forth in Rule 23, while continuing to draw guidance from the Ninth Circuit's factors and relevant precedent." *Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *4 (N.D. Cal. Dec. 18, 2018).

Prior to the Rule 23(e)(2) amendment, courts in the Ninth Circuit considered the following "*Hanlon* factors" (certain of which overlap with Rule 23(e)(2)):

(1) strength of the plaintiff's case; (2) risk, expense, complexity, and likely duration of further litigation; (3) risk of maintaining class action status throughout the trial; (4) amount offered in settlement; (5) extent of discovery completed and stage of the proceeding; (6) experience and views of counsel; (7) presence of a government participant; and (8) reaction of class members to the proposed settlement.[4]

---

[4] "Because no government entities are participants in this case, this factor is neutral." *In re Amgen Inc. Sec. Litig.*, 2016 WL 10571773, at *4 (C.D. Cal. Oct. 25, 2016).

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998); *see also Wong v. Arlo Techs., Inc.*, 2021 WL 1146042, at *6 (N.D. Cal. Mar. 25, 2021) (recognizing Rule 23(e)'s considerations "overlap with certain *Hanlon* factors.").

Application of each of the four factors specified in Rule 23(e)(2), and the relevant, non-duplicative Hanlon factors, demonstrate that the Settlement merits final approval.

**B.      Lead Plaintiff And Lead Counsel Have Adequately Represented The Settlement Class**

FED. R. CIV. P. 23(e)(2)(A) requires the Court to consider whether the "class representatives and class counsel have adequately represented the class." "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020.

Here, Lead Plaintiff and Lead Counsel adequately represented the Settlement Class both during the litigation of this Action and its settlement.  Lead Plaintiff's claims are typical of and coextensive with the claims of the Settlement Class, and they have no antagonistic interests; rather, Lead Plaintiff's interest in obtaining the largest possible recovery in this Action is aligned with the other Settlement Class Members. *Mild v. PPG Indus., Inc.*, 2019 WL 3345714, at *3 (C.D. Cal. July 25, 2019) ("Because Plaintiff's claims are typical of and coextensive with the claims of the Settlement Class, his interest in obtaining the largest possible recovery is aligned with the interests of the rest of the Settlement Class members.").  And Lead Counsel vigorously prosecuted the Settlement Class's claims throughout the litigation by, *inter alia*, conducting an extensive investigation of the claims through a detailed review of publicly available documents about the Company, as well as contacting former Momentus employees, drafting the detailed 103-page Complaint, fully briefing and defeating in part three motions to dismiss, initiating discovery of Defendants,

obtaining an $8.5 million Settlement for the benefit of the Settlement Class, and moving to enforce the Stipulation and funding requirements. *PPG*, 2019 WL 3345714, at *3 (finding adequacy and noting that Lead Counsel GPM "are highly experienced in securities litigation and have vigorously prosecuted the Settlement Class's claims[.]").

**C.    The Settlement Is The Result Of Arms'-Length Negotiations**

The Court must also consider whether the settlement "was negotiated at arm's length." FED. R. CIV. P. 23(e)(2)(B).[5]  The Ninth Circuit, as well as courts in this District, "put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution" in approving a class action settlement. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009).  Here, the Parties participated in a full-day mediation session with Mr. Melnick in October 2022.  The mediation negotiations continued for several months and culminated in a mediator's proposal.  The arm's-length nature of the extensive settlement negotiations and the involvement of a mediator with substantial experience support the conclusion that the Settlement is fair and was achieved free of collusion. *See In re China Medicine Corp. Sec. Litig.*, 2014 WL 12581781, at *5 (C.D. Cal. Jan. 7, 2014) ("Mr. Melnick's involvement in the settlement supports the argument that it is non-collusive.").

---

[5] Rule 23(e)(2)(A)-(B)'s considerations overlap with certain *Hanlon* factors, "such as the non-collusive nature of negotiations, the extent of discovery completed, and the stage of proceedings." *Arlo*, 2021 WL 1146042, at *6 (citing *Hanlon*, 150 F.3d at 1026).

**D.**     **The Settlement Is An Excellent Result For The Settlement Class In Light Of The Benefits Of The Settlement And The Risks Of Continued Litigation**

Under Rule 23(e)(2)(C), the Court must also consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal" along with other relevant factors. FED. R. CIV. P. 23(e)(2)(C).[6]

In assessing whether the proposed Settlement is fair, reasonable, and adequate, the Court "must balance the risks of continued litigation, including the strengths and weaknesses of plaintiff's case, against the benefits afforded to class members, including the immediacy and certainty of a recovery." *Knapp v. Art.com, Inc.*, 283 F. Supp. 3d 823, 831 (N.D. Cal. 2017).

As the Court recognized in its motion to dismiss order, while Lead Plaintiff sufficiently pled certain of his fraud claims, the Court dismissed the claims against certain of the Individual Defendants. *See In re Xcel Energy, Inc., Sec., Deriv. & "ERISA" Litig.*, 364 F. Supp. 2d 980, 1003 (D. Minn. 2005) ("The court needs to look no further than its own order dismissing the shareholder…litigation to assess the risks involved."). Additionally, as set forth in Lead Plaintiff's memorandum of law in support of final approval (*see* Dkt. No. 199 at 8-11), there were numerous and substantial risks that Lead Plaintiff faced in order to be successful if the litigation continued, including the ability to have a class certified, demonstrating loss causation and the appropriate amount of damages and proving that the Defendants acted with scienter.

---

[6] Rule 23(e)(2)(C)(i) essentially incorporates three of the traditional *Hanlon* factors: the strength of plaintiff's case (first factor); the risk, expense, complexity, and likely duration of further litigation (second factor); and the risks of maintaining class action status through the trial (third factor). *Arlo*, 2021 WL 1146042, at *8 (citing *Hanlon*, 150 F.3d at 1026).

**E.**       **The Settlement Satisfies Rule 23(e)(2)(C)(ii)-(iv)**

Under Rule 23(e)(2)(C), courts also must consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims," "the terms of any proposed award of attorneys' fees, including timing of payment," and "any agreement required to be identified under Rule 23(e)(2)." FED. R. CIV. P. 23(e)(2)(C)(ii)-(iv). Each of these factors support the Settlement's approval or are neutral and thus do not suggest any basis for concluding the Settlement is inadequate.

**Rule 23 (e)(2)(C)(ii):**  The method for processing Settlement Class Members' claims and distributing relief to eligible claimants is well-established and effective. Here, Strategic Claims Services ("SCS"), the Claims Administrator selected by Lead Counsel (and approved by the Court (Dkt. No. 181, ¶7)), will process claims under the guidance of Lead Counsel, allow Claimants an opportunity to cure any Claim deficiencies or request the Court to review a denial of their claims, and, lastly, mail or wire Authorized Claimants their *pro rata* share of the Net Settlement Fund (per the Plan of Allocation), after Court approval.  Claims processing, like the method proposed here, is standard in securities class action settlements.  It has been long found to be effective, as well as necessary, insofar as neither Lead Plaintiff nor Defendants possess the individual investor trading data required for a claims-free process to distribute the Net Settlement Fund.[7]  *See New York State Teachers' Ret. Sys. v. Gen. Motors Co.*, 315 F.R.D. 226, 233-34, 245 (E.D. Mich. 2016) (approving settlement with a nearly identical distribution process).

**Rule 23(e)(2)(C)(iii):**  The Notice disclosed that Lead Counsel would be applying for a percentage of the common fund fee award in an amount not to exceed

---

[7] This is not a claims-made settlement.  If the Settlement is approved, Defendants will not have any right to the return of a portion of the Settlement based on the number or value of the claims submitted.  *See* Stipulation ¶13.

33⅓% to compensate them for the services rendered on behalf of the Settlement Class. Lead Counsel ultimately decided to request a fee of only 25% of the Settlement Fund (which, by definition, includes interest earned on the Settlement Amount). As discussed further below, this request is reasonable in light of the work performed and the results obtained, is the Ninth Circuit "benchmark," and is below awards in many similar complex class action cases. *See In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (approving fee equal to 33% percent of a $12 million settlement fund). Additionally, approval of the requested attorneys' fees is separate from approval of the Settlement, and the Settlement may not be terminated based on any ruling with respect to attorneys' fees. *See* Stipulation ¶16.

**Rule 23(e)(2)(C)(iv):** The Parties have entered into a confidential agreement that establishes certain conditions under which Defendants may terminate the Settlement if Settlement Class Members owning a certain percentage of SRAC Securities purchased during the Settlement Class Period request exclusion (or "opt out") from the Settlement. "This type of agreement is standard in securities class action settlements and has no negative impact on the fairness of the Settlement." *Christine Asia Co., Ltd. v. Ma*, 2019 WL 5257534, at *1 (S.D.N.Y. Oct. 16, 2019); *see also In re Carrier IQ, Inc., Consumer Privacy Litig.*, 2016 WL 4474366, at *5 (N.D. Cal. Aug. 25, 2016) ("opt-out deals are not uncommon as they are designed to ensure that an objector cannot try to hijack a settlement in his or her own self-interest.").

### F.   The Settlement Treats All Class Members Equitably Relative To Each Other

Rule 23(e)(2)(D) requires courts to evaluate whether the settlement treats class members equitably relative to one another. The Settlement easily satisfies this standard. Under the proposed Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized

Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.  Lead Plaintiff will receive the same level of *pro rata* recovery, based on his Recognized Claim as calculated by the Plan of Allocation, as all other similarly situated Settlement Class Members. "Moreover, the service award Lead Plaintiff seeks is reasonable and does not constitute inequitable treatment of class members." *In re Regulus Therapeutics Inc. Sec. Litig.*, 2020 WL 6381898, at *5 (S.D. Cal. Oct. 30, 2020).  Accordingly, this factor favors final approval of the Settlement.  *See Yang v. Focus Media Holding Ltd.*, 2014 WL 4401280, at *10 (S.D.N.Y. Sept. 4, 2014) ("the Plan of Allocation ensures an equitable *pro rata* distribution of the Net Settlement Fund among all Authorized Claimants based solely on when they purchased and sold shares, taking into account the relative amounts of artificial inflation prevailing during the Class Period.").

### G.    The Remaining *Hanlon* Factors Are Neutral Or Weigh In Favor Of Final Approval

*Hanlon* also outlined several factors that are not coextensive with Rule 23(e)(2)'s new factors.[8]  These factors, viewed in light of the Rule 23(e)(2) factors identified above, support final approval.

**The Amount Offered in Settlement:** "To evaluate the adequacy of the settlement amount, courts primarily consider plaintiffs' expected recovery against the value of the settlement offer." *Hefler v. Wells Fargo & Co.*, 2018 WL 4207245, at *9 (N.D. Cal. Sept. 4, 2018).  "This determination requires evaluating the relative strengths and weaknesses of the plaintiffs' case; it may be reasonable to settle a weak claim for relatively little, while it is not reasonable to settle a strong claim for the same amount." *Vikram v. First Student Management, LLC*, 2019 WL 1084169, at *3 (N.D. Cal. March 7, 2019); *see also Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666,

---

[8] Although courts within the Ninth Circuit have recognized that Rule 23(e)(2)(A)-(B)'s considerations overlap with certain *Hanlon* factors, such as the extent of discovery completed and the experience and view of counsel, these factors are addressed below for thoroughness.

at *11 (S.D.N.Y. Mar. 24, 2014) (settlement amount must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case").  Courts must also consider the "serious risk[] that even if Plaintiffs were successful in all aspects of their claims they may be unable to collect a judgment." *Gudimetla v. Ambow Education Holding*, 2015 WL 12752443, at *5 (C.D. Cal. Mar. 16, 2015).

The $8.5 million recovery represents approximately 10.5% of estimated maximum damages of approximately $80.5 million under the proposed Plan of Allocation in this Action—i.e., Lead Plaintiff's best-case scenario—assuming that: (i) the Court certified the same class period as the Settlement Class Period; (ii) Lead Plaintiff survived summary judgment on all elements and also convinced a jury that liability was proven; and (iii) the trier of fact accepted Lead Plaintiff's damages theory.  This recovery is **more than two and a half times** the typical recovery for cases of a similar magnitude.  *See, e.g.,* Dkt. No. 202., Ex. 2 (excerpt from Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* (NERA Jan. 23, 2024), at p. 25 (Fig. 21) (median recovery was 3.8% for securities class actions with estimated damages between $50-$100 million that settled between January 2014-December 2023)).

"Considering the risks inherent in this litigation and [Defendant's] financial situation, this factor weighs in favor of Final Approval." *See Gudimetla v. Ambow Educ. Holding*, 2015 WL 12752443, at *5 (C.D. Cal. Mar. 16, 2015) (approving securities fraud class action settlement where recovery of $1.5 million was 5.6% of $26.7 million in estimated damages where there were very serious ability to pay and collectability issues); *In re LJ Int'l, Inc. Sec. Litig.*, 2009 WL 10669955, at *4 (C.D. Cal. Oct. 19, 2009) (approving securities fraud class action settlement where $2 million recovery was 4.5% of $44 million maximum possible recovery).

**The Stage of the Proceedings and Extent of Discovery Completed:** The fact that formal discovery was in its early stages does not weigh against final approval.

16

*See, e.g., In re: Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2016 WL 6248426, at \*13-\*14 (N.D. Cal. Oct. 25, 2016) (formal discovery is "not a necessary ticket to the bargaining table where the parties have sufficient information to make an informed decision about settlement"). Here, Lead Plaintiff conducted an extensive investigation of SRAC and Momentus, including contacting former employees and analyzing numerous publicly available documents. Moreover, (i) Lead Plaintiff engaged in substantial briefing on three motions to dismiss, (ii) the Parties exchanged detailed mediation briefs and participated in a months-long adversarial mediation process in conjunction with an experienced mediator, and (iii) Momentus produced, and Lead Counsel reviewed, certain documents during confirmatory discovery. *Vaccaro v. New Source Energy Partners L.P.*, 2017 WL 6398636, at \*5 (S.D.N.Y. Dec. 14, 2017) ("Although the action did not proceed to formal discovery, Lead Plaintiffs (i) reviewed vast amounts of publicly available information, (ii) conducted interviews of numerous individuals, and (iii) consulted experts on the ... industry. The Court finds that Lead Plaintiffs were well-informed to gauge the strengths and weaknesses of their claims and the adequacy of the settlement.").

**The Experience and Views of Counsel:** "The recommendation of experienced counsel carries significant weight in the court's determination of the reasonableness of the settlement." *In re Heritage Bond Litig.*, 2005 WL 1594403, at \*9 (C.D. Cal. June 10, 2005). This makes sense, as counsel is "most closely acquainted with the facts of the underlying litigation." *Id.* Through litigating this Action, Lead Counsel has a thorough understanding of the merits and weakness of the claims, as well as extensive prior experience litigating securities class action cases. Under such circumstances, Lead Counsel's conclusion that the Settlement is fair and reasonable and in the best interests of the Settlement Class likewise supports the Settlement's approval. *See In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2007) (finding class counsel's recommendation in favor of settlement presumptively

17

reasonable because counsel demonstrated knowledge about the case and securities litigation in general).

Additionally, Lead Plaintiff supports the Settlement, which is to be afforded "special weight" because a plaintiff "ha[s] a better understanding of the case than most members of the class." *Nat'l Rural Telecomm. Coop. v. DirecTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004); *see also In re Portal Software, Inc. Sec. Litig.*, at *5 (N.D. Cal. Nov. 26, 2007) (noting Congress' intent to foster involvement of Lead Plaintiff when passing PSLRA and stating that "the role taken by the lead plaintiff in the settlement process supports settlement because lead plaintiff was intimately involved in the settlement negotiations.").

**The Reaction of the Settlement Class:** The eighth *Hanlon* factor—the reaction of the Settlement Class—overlaps with Rules 23(e)(4), on the opportunity for exclusion, and 23(e)(5), on the opportunity to object. *Hanlon*, 150 F.3d at 1026. "[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class action settlement are favorable to class members." *Omnivision*, 559 F. Supp. 2d at 1043; *see also Hanlon*, 150 F.3d at 1027 (that the "overwhelming majority" stayed in the class is "objective positive commentary as to its fairness").

Here, in accordance with the Court's Preliminary Approval Order, 81,066 potential Settlement Class Members were notified of the Settlement either by mailed Notice and Claim Form or by emailed link to the Notice and Claim Form, and the Summary Notice was published in the national edition of *Investor's Business Daily* and transmitted over the *PR Newswire* on December 18, 2023. Dkt No. 204-1 at ¶¶8, 11. The Claims Administrator also established a dedicated website, www.StableRoadSecuritiesSetttlement.com, to provide potential Settlement Class Members with information concerning the Settlement and access to downloadable copies of relevant documents. *Id.* at ¶13. Only four requests for exclusion have been

received by the Claims Administrator, and only one objection was filed with the Court.

That only one objection and only four requests for exclusion have been received demonstrates the Settlement Class's positive reaction to the Settlement and supports final approval. *Faraday*, 2024 WL 1245341, at *7-10 (approving settlement where there was one objection and four exclusion requests, noting "[t]he absence of objections to the Settlement by almost all class members strongly supports approval.); *Maine State Ret. Sys. v. Countrywide Fin. Corp*., 2013 WL 6577020, at *16 (C.D. Cal. Dec. 5, 2013) (69 exclusion requests in response to mailing of over 50,000 notices supports settlement); *Omnivision*, 559 F. Supp. 2d at 1043 (approving settlement where there were three objections out of approximately 57,000 class members). Moreover, the fact that no institutional investors or other large shareholders have objected to the proposed Settlement further underscores the reasonableness of the Settlement. *See, e.g.*, *In re Extreme Networks, Inc. Sec. Litig.*, 2019 WL 3290770, at *9 (N.D. Cal. July 22, 2019) ("Many potential class members are sophisticated institutional investors; the lack of objections from such institutions indicates that the settlement is fair and reasonable.").

In sum, the relevant factors and the Settlement Class's reaction to the Settlement also support its final approval.

## IV.   THE PLAN OF ALLOCATION IS FAIR, REASONABLE AND ADEQUATE

A plan of allocation in a class action "is governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable, and adequate." *Omnivision*, 559 F. Supp. 2d at 1045. To meet this standard, a plan of allocation recommended by experienced and competent class counsel "need only have a reasonable and rational basis." *In re Par Pharm. Sec. Litig.*, 2013 WL 3930091, at *8 (D.N.J. July 29, 2013); *Heritage Bond*, 2005 WL 1594403, at *11; *see also In re Marsh & McLennan Companies, Inc. Sec. Litig.*, 2009

WL 5178546, at *13 (S.D.N.Y. Dec. 23, 2009) ("In determining whether a plan of allocation is fair, courts look largely to the opinion of counsel.").

Here, the proposed Plan of Allocation is set forth in the Notice that was mailed to Settlement Class Members and posted on the Settlement Website.   Lead Counsel developed the Plan of Allocation in consultation with Lead Plaintiff's damages consultant with the objective of equitably distributing the Net Settlement Fund to Settlement Class Members who suffered economic losses as a proximate result of the alleged wrongdoing.   Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase or other acquisition of SRAC Securities during the Settlement Class Period that is listed in the Claim Form and for which adequate documentation is provided.  The calculation of each Settlement Class Member's Recognized Loss under the Plan of Allocation will be based on several factors, including when the SRAC Securities were purchased and sold, the type of SRAC Securities purchased or sold, the purchase and sale price of the SRAC Securities, and the estimated artificial inflation in the price of the SRAC Securities at the time of the purchase or sale of the SRAC Securities.  In general, the Recognized Loss Amount will be the difference between the estimated artificial inflation on the date of purchase and the estimated artificial inflation on the date of sale, or the difference between the actual purchase price and sale price, whichever is less.

This is a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as a proximate result of the conduct alleged in the Action. *See Schueneman v. Arena Pharm., Inc.*, 2020 WL 3129566, at *7 (S.D. Cal. June 12, 2020) (approving substantially similar plan of allocation); *City of Omaha Police & Fire Ret Sys. v. LHC Grp.*, 2015 WL 965693, at *15 (W.D. La. March 2, 2015) (approving plan of allocation where "[u]nder the Plan, each Class Member will receive his or her *pro rata* share of the funds based on the calculation of recognized losses."). Moreover, to date, no Settlement Class Members have objected to the Plan of Allocation. *See Heritage Bond*, 2005 WL 1594403, at

*12 ("In light of the lack of objectors to the plan of allocation at issue, and the competence, expertise, and zeal of counsel in bringing and defending this action, the Court finds the plan of allocation as fair and adequate."); *Mauss v. NuVasive, Inc.,* 2018 WL 6421623, at *4 (S.D. Cal. Dec. 6, 2018) (concluding the plan of allocation was fair and reasonable after it was in the notice and no class member objected).

The Court thus approves the Plan of Allocation.

## V.    THE SETTLEMENT CLASS IS FINALLY CERTIFIED

The Court's September 20, 2023 Preliminary Approval Order certified the Settlement Class for settlement purposes only under Fed. R. Civ. P. 23(a) and (b)(3). *See* Dkt. No. 181 at ¶¶1-3.  Since there have been no changes to alter the propriety of class certification for settlement purposes, the Court affirms its determinations in the Preliminary Approval Order certifying the Settlement Class under Rules 23(a) and (b)(3).

## VI.    NOTICE TO THE SETTLEMENT CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

For any class certified under Rule 23(b)(3), due process and Rule 23 require that class members be given "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).    The Notice provides all the necessary information required by Rule 23(c)(2)(B) and satisfies the requirements of the PSLRA, 15 U.S.C. § 78u-4(a)(7).  This Court has already found that the proposed notice program is adequate and sufficient (*see* Dkt. No. 181, ¶¶7-9) and Lead Counsel and the Claims Administrator carried out the notice program as proposed.  As such, the notice program has fairly apprised Settlement Class Members of their rights with respect to the Settlement, and is the best notice practicable under the circumstances. *See Mauss*, 2018 WL 6421623, at *2-3 (combination of mailed notice, publication of summary notice in *Investor's Business Daily* and over *Globe Newswire*, and posting

21

of notice on settlement website satisfied requirements of "Rule 23, the Private Securities Litigation Reform Act ("PSLRA"), and due process.").

## VII.   THE COURT APPROVES LEAD COUNSEL'S FEE REQUEST

Lead Counsel are requesting an attorney fee award of 25% in this action.  For the reasons set out below, this request is granted in full.

### A.   Lead Counsel Is Entitled To A Common Fund Fee Award

It is well settled that attorneys who represent a class and are successful in recovering a common fund for the benefit of class members are entitled to a reasonable fee from the common fund as compensation for their services. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole"); *see also Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 769 (9th Cir. 1977).

"Under Ninth Circuit law, the district court has discretion in common fund cases to choose either the percentage-of-the-fund or the lodestar method" when awarding attorneys' fees. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002).  Notwithstanding that discretion, where there is an easily quantifiable benefit to the class—such as a cash common fund—the percentage-of-the-fund approach is the prevailing method.  *See Ellison v. Steven Madden, Ltd.*, 2013 WL 12124432, at *8 (C.D. Cal. May 7, 2013) (finding "use of the percentage method" to be the "dominant approach in common fund cases").  Moreover, application of the percentage-of-the-fund method is consistent with the PSLRA, which provides that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a ***reasonable percentage*** of the amount" recovered for the class. 15 U.S.C. § 78u-4(a)(6); *see also Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 643 (5th Cir. 2012) ("Part of the reason behind the near-universal adoption of the percentage method in securities cases is that the PSLRA contemplates such a

calculation."). For these reasons, among others, the Court awards attorneys' fees in this case on a percentage-of-the-fund basis.

### B.     The Requested Attorneys' Fee Is Reasonable

"The Ninth Circuit has established twenty-five percent of the fund as the 'benchmark' award that should be granted in common fund cases." *Heritage Bond,* 2005 WL 1594403, at *5. The benchmark is "presumptively reasonable," *In re Anthem, Inc. Data Breach Litig.,* 2018 WL 3960068, at *4 (N.D. Cal. Aug. 17, 2018), and it should only be adjusted upward or downward for "unusual circumstances." *Paul, Johnson, Alston & Hunt v. Graulty,* 886 F.2d 268, 272 (9th Cir. 1989). In making this determination, "[t]he guiding principle is that attorneys' fees be reasonable under the circumstances." *Rodriguez v. Disner,* 688 F.3d 645, 653 (9th Cir. 2012). Factors that courts have used to determine whether the requested percentage is fair and reasonable include: (1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs; (5) the reaction of the Settlement Class; and (6) awards made in similar cases. *See Vizcaino,* 290 F.3d at 1048-51. The Ninth Circuit has explained that these factors should not be used as a rigid checklist or weighed individually, but, rather, should be evaluated in light of the totality of the circumstances. *Id.* Here, each of these factors, along with the lodestar cross-check, support Lead Counsel's requested fee.

First, "[c]ourts have consistently recognized that the result achieved is a major factor to be considered in making a fee award." *Heritage Bond,* 2005 WL 1594389, at *8; *Hensley v. Eckerhart,* 461 U.S. 424, 436 (1983) ("most critical factor is the degree of success obtained"); *In re Bluetooth Headsets Prods. Liab. Litig.,* 654 F.3d 935, 942 (9th Cir. 2011) ("Foremost among these considerations, however, is the benefit obtained for the class."). Here, Lead Counsel have achieved a significant and certain cash payment of $8.5 million, plus interest, for the benefit of the Settlement Class without the substantial risk, delay, expense, and uncertainty of continued

litigation, trial and the inevitable appeals.  The estimated total maximum class wide damages are approximately $80.5 million, making the recovery approximately 10.5% of class-wide damages.  Since this is more than two and a half times the typical recovery for cases of a similar magnitude (*see* Dkt. No. 202., Ex. 2), this result supports the requested attorneys' fees. See *LJ Int'l*, 2009 WL 10669955, at *4-5, *7-8 (awarding 25% of gross settlement fund in securities fraud class action settlement where $2 million recovery was 4.5% of $44 million maximum possible recovery and significantly below the median recovery in similar sized cases); *Int'l Bhd. of Elec. Workers Local 697 Pension Fund v. Int'l Game Tech., Inc.*, 2012 WL 5199742, at *3 (D. Nev. Oct. 19, 2012) (awarding 25% of $12.5 million gross settlement fund in securities fraud class action settlement where recovery was 3.5% of maximum damages).

Second, courts in this Circuit consider when awarding attorneys' fees "the risk of litigation." *Omnivision*, 559 F. Supp. 2d at 1046-47; *see also Vizcaino*, 290 F.3d at 1048.  While courts have always recognized that securities class actions are complex and carry significant risks, post-PSLRA rulings and empirical studies make it clear that the risk of no recovery has increased significantly.  See *Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *13 (N.D. Cal. Dec. 18, 2018) ("Plaintiffs' Counsel faced substantial risks in pursuing this litigation, given the inherent uncertainties of trying securities fraud cases and the demanding pleading standards of the PLSRA."); *Schwartz v. TXU Corp.*, 2005 WL 3148350, at *32 (N.D. Tex. Nov. 8, 2005) ("the risk of no recovery in complex [securities] cases of this type is very real.").  This Action was no exception.[9]

---

[9] That the Court dismissed certain Individual Defendants and portions of the case with prejudice pursuant to Defendants' motions to dismiss supports a finding that there were substantial risks to the litigation.  *See* Dkt. No. 154; *see also In re Xcel Energy*, 364 F. Supp. 2d at 1003.

24

Third, courts have recognized that the "prosecution and management of a complex national class action requires unique legal skills and abilities," *Omnivision, 559 F. Supp. 2d at 1047*, and that "[t]he experience of counsel is also a factor in determining the appropriate fee award." *Heritage Bond, 2005 WL 1594403, at \*12*. "This is particularly true in securities cases because the [PSLRA] makes it much more difficult for securities plaintiffs to get past a motion to dismiss." *Omnivision, 559 F. Supp. 2d at 1047*. As demonstrated by its firm résumé, GPM's attorneys have many years of experience litigating complex federal civil cases, and, in particular, shareholder and securities class actions. *See* Dkt. No. 202 at Ex. 6; *PPG, 2019 WL 3345714, at \*3* (GPM lawyers "are highly experienced in securities litigation and have vigorously prosecuted the Settlement Class's claims[.]"). Lead Counsel's skill and experience were a major factor in obtaining the excellent result achieved by this Settlement.[10]

Fourth, the fact that Lead Counsel took this case on a contingent basis supports the fee request. *In re Wash. Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1299 (9th Cir. 1994) ("WPPSS")*; *see also Destefano v. Zynga, 2016 WL 537946, at \*18 (N.D. Cal. Feb. 11, 2016)* ("[W]hen counsel takes on a contingency fee case and the litigation is protracted, the risk of non-payment after years of litigation justifies a significant fee award."). Here, Lead Counsel has received no compensation to date, invested 1,433.95 hours of work equating to a total lodestar of $1,208,155.00, and advanced expenses of $101,115.83. Since the inception of this case, Lead Counsel has borne the risk that any compensation and expense reimbursement would be

---

[10] And Defendants in this Action were represented by Kirkland & Ellis LLP, Baker & McKenzie LLP, Wilson Elser Moskowitz Edelman & Dicker LLP, Stoner Carlson LLP, and Winston & Strawn LLP, all of which are experienced, aggressive, and highly skilled counsel. *Schwartz v. TXU Corp., 2005 WL 3148350, at \*30 (N.D. Tex. Jan. 13, 2006)* ("The ability of plaintiffs' counsel to obtain such a favorable settlement for the Class in the face of such formidable legal opposition confirms the superior quality of their representation.").

25

contingent on the result achieved, as well as on this Court's discretion in awarding fees and expenses. Nevertheless, Lead Counsel committed significant amounts of both time and money to vigorously and successfully prosecute this Action for the benefit of the Settlement Class. Under such circumstances, "[t]he contingent nature of counsel's representation strongly favors approval of the requested fee." *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 488 (S.D.N.Y. 1998).

Fifth, the 25% fee award is consistent with fee awards in similar, complex, contingent litigation. "[T]he Ninth Circuit has established 25 percent of the common fund as the benchmark for attorney fee awards." *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Prods. Liab. Litig.*, 2013 WL 12327929, at *32 (C.D. Cal. July 24, 2013). However, "a reasonable fee award is the hallmark of common fund cases" and the guiding principle in this Circuit is that a fee award be "reasonable under the circumstances." *WPPSS*, 19 F.3d at 1295 n.2. As applied, this means that "in most common fund cases, the award exceeds that benchmark." *Omnivision*, 559 F. Supp. 2d at 1047; *see also Marshall v. Northrop Grumman Corp.*, 2020 WL 5668935, at *8 (C.D. Cal. Sept. 18, 2020) (awarding one-third of $12.375 million settlement fund, collecting cases, and stating: "[a]n attorney fee of one third of the settlement fund is routinely found to be reasonable in class actions."); *Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*, 2009 WL 9100391, at *4 (C.D. Cal. June 24, 2009) (reviewing empirical research and stating: "[n]ationally, the average percentage of the fund award in class actions is approximately one-third.").

"This is particularly true in securities class actions such as this." *In re Am. Apparel Inc. S'holder Litig.*, 2014 WL 10212865, at *23 (C.D. Cal. Jul. 28, 2014); *see also Pac. Enters.*, 47 F.3d at 373 (affirming 33% award from $12 million common fund "because of the complexity of the issues and the risks"); *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1373 (N.D. Cal. 1989) (surveying securities cases nationwide, awarding 32.8% fee from $3.5 million fund, and noting, "[t]his court's

26

review of recent reported cases discloses that nearly all common fund awards range around 30%"); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000) (affirming award of one-third of $1.725 million settlement).

The requested fee is, therefore, in line with the Ninth Circuit benchmark and is well within the range of percentages courts in this Circuit and elsewhere have awarded in similarly complex cases. *See Vizcaino*, 290 F.3d at 1051 (affirming award of 28% of $97 million settlement fund); *Morris v. Lifescan, Inc.*, 54 F. App'x 663, 664 (9th Cir. 2003) (affirming attorneys' fee award of 33% of a $14.8 million cash class action settlement); *Heritage Bond*, 2005 WL 1594403, at *23 (awarding fee of 33.33% of $27,783,000 settlement fund because "courts in this circuit, as well as other circuits have awarded attorneys' fees of 30% or more in complex class actions"); *In re Banc of California Sec. Litig.*, 2020 WL 1283486, at *1 (C.D. Cal. Mar. 16, 2020) (awarding one-third of a $19.75 million settlement fund); *In re Nuvelo, Inc. Sec. Litig.*, 2011 WL 2650592, at *2 (N.D. Cal. July 6, 2011) (30% of $8.9 million); *OmniVision*, 559 F. Supp. 2d at 1049 (28% of $13.75 million); *Kendall v. Odonate Therapeutics, Inc.*, 2022 WL 1997530, at *6 (S.D. Cal. June 6, 2022) (awarding 33⅓% of $12.75 million settlement fund in securities class action).

Sixth, "[t]he existence or absence of objectors to the requested attorneys' fee is a factor is determining the appropriate fee award." *Heritage Bond*, 2005 WL 1594403, at *21. Here, there is not a serious objection to the requested fee. While the Objection states in passing that the objectors "object to the proposed settlement *and request for attorneys' fees*," that is the *full* extent of the argument concerning fees. Regardless, "[t]hat only one objection to the fee request was received is powerful evidence that the requested fee is fair and reasonable." *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 594 (S.D.N.Y. 2008); *see also Fernandez v. Victoria Secret Stores, LLC*, 2008 WL 8150856, at *13 (C.D. Cal. 2008) (3 members objected and 29 opted out, indicating favorable result and award of "generous fee"); *Waldbuesser v. Northrop Grumman Corp.*, 2017 WL 9614818, at *5 (C.D. Cal. Oct.

27

24, 2017) (finding only two objections after mailing 210,000 notices was "remarkably small," and "conclud[ing] that the lack of significant objections to the requested fees justifies an award of one-third of the [$16.5 million] settlement fund.").

### C.   A Lodestar Cross-Check Supports The Requested Fee

Although Lead Counsel seek approval of a fee based on a percentage of the fund, as "[a] final check on the reasonableness of the requested fees, courts often compare the fee counsel seeks as a percentage with what their hourly bills would amount to under the lodestar analysis." *Omnivision*, 559 F. Supp. 2d at 1048; *see also Amgen*, 2016 WL 10571773, at *9 ("Although an analysis of the lodestar is not required for an award of attorneys' fees in the Ninth Circuit, a cross-check of the fee request with a lodestar amount can demonstrate the fee request's reasonableness").

"A lodestar cross-check first computes the plaintiffs' attorneys' reasonable hourly rate for the litigation and multiplies that rate by the number of hours dedicated to the case." *In re Genworth Fin. Sec. Litig.*, 2016 WL 5400360, at *7 (E.D. Va. Sep. 26, 2016).  In the second step of the analysis, a court adjusts the lodestar to take into account, among other things, the time and labor required, the result achieved, the quality of representation, whether the fee is fixed or contingent, the novelty and difficulty of the questions involved, and awards in similar cases.  *See Gonzalez v. City of Maywood*, 729 F.3d 1196, 1209, n.11 (9th Cir. 2013); *Vizcaino*, 290 F.3d at 1051-52 ("courts have routinely enhanced the lodestar to reflect the risk of non-payment in common fund cases."); *Heritage Bond*, 2005 WL 1594403, at *22 ("In securities class actions, it is common for a counsel's lodestar figure to be adjusted upward by some multiplier reflecting a variety of factors such as the effort expended by counsel, the complexity of the case, and the risks assumed by counsel.").

When the lodestar is used as a cross-check, "the focus is not on the necessity and reasonableness of every hour of the lodestar, but on the broader question of whether the fee award appropriately reflects the degree of time and effort expended by the attorneys." *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 270

28

(D.N.H. 2007); *Glass v. UBS Fin. Servs.*, 331 F. App'x. 452, 456 (9th Cir. 2009).[11] In this case, the lodestar method – whether used directly or as a "cross-check" on the percentage method – strongly demonstrates the reasonableness of the requested fee.

Here, Lead Counsel (including attorneys, paralegals, and professional support staff) collectively devoted a total of 1,433.95 hours to the prosecution of the Action. Based on current hourly rates, Lead Counsel's lodestar is $1,208,155.00. Thus, the 25% fee request (equal to $2,125,000), yields a multiplier of 1.76. A multiplier of 1.76 is well within the range of multipliers commonly awarded in securities class actions and other complex litigation. *See* *Vizcaino*, 290 F.3d at 1051-52 (approving a 3.65 multiplier and finding that when the lodestar is used as a cross-check, "most" multipliers were in the range of 1 to 4, but citing numerous examples of even higher multipliers); *Steiner v. Am. Broad Co.*, 248 F. App'x 780, 783 (9th Cir. 2007) (approving a percentage fee award that corresponded to a multiplier of 6.85); *Craft v. Cty. of San Bernardino*, 624 F. Supp. 2d 1113, 1125 (C.D. Cal. 2008) (approving percentage fee award equal to multiplier of approximately 5.2, collecting cases and stating that "[w]hile this is a high end multiplier, there is ample authority for such awards resulting in multipliers in this range or higher."). As such, Lead Counsel's lodestar supports the Court's finding that the awarded fee is reasonable.

**VIII. THE COURT REIMBURSES LEAD COUNSEL ITS EXPENSES**

In addition to an award of attorneys' fees, attorneys who create a common fund for the benefit of a class are also entitled to payment of reasonable litigation expenses and costs from the fund. *Omnivision*, 559 F. Supp. 2d at 1048. The appropriate analysis to apply in deciding which expenses are compensable in a common fund case of this type is whether the particular costs are of the type typically billed by attorneys

---

[11] *See also* *In re Apollo Grp. Inc. Sec. Litig.*, 2012 WL 1378677, at *7 (D. Ariz. 2012) ("an itemized statement of legal services is not necessary for an appropriate lodestar cross-check"); *In re Am. Apparel*, 2014 WL 10212865, at *23 ("the lodestar cross-check can be performed with a less exhaustive cataloging and review of counsel's hours.").

to paying clients in the marketplace.  *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) ("Harris may recover as part of the award of attorney's fees those out-of-pocket expenses that would normally be charged to a fee paying client.").

In the aggregate, Lead Counsel have incurred out-of-pocket expenses in the amount of $101,115.83 while prosecuting the Action.  The vast majority of expenses ($98,336.35, or approximately 97.25%) were for the retention of a experts ($41,261.00), the mediator ($33,618.75), and a private investigation firm ($10,564.20), as well as online research ($12,892.40).  These expenses, like the other categories of expenses for which counsel seek reimbursement, are the types of expenses routinely charged to clients who pay hourly.  *See In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1177-78 (S.D. Cal. 2007) (approving counsel's request for reimbursement "for 1) meals, hotels, and transportation; 2) photocopies; 3) postage, telephone, and fax; 4) filing fees; 5) messenger and overnight delivery; 6) online legal research; 7) class action notices; 8) experts, consultants, and investigators; and 9) mediation fees.").  As such, Lead Counsel's request for expenses from the common fund is approved.

## IX.  THE COURT GRANTS LEAD PLAINTIFF'S PSLRA AWARD REQUEST

"Court[s] have found that the PSLRA permits courts to award lead plaintiffs in federal securities actions reimbursement for their time devoted to participating in and directing the litigation on behalf of the class." *Guevoura Fund Ltd. v. Sillerman*, 2019 WL 6889901, at *22 (S.D.N.Y. Dec. 18, 2019).  Reimbursement of such costs are allowed because it "encourages participation of plaintiffs in the active supervision of their counsel." *Varljen v. H.J. Meyers & Co., Inc.*, 2000 WL 1683656, at *5 n.2 (S.D.N.Y. Nov. 8, 2000).  Here, Lead Plaintiff Haenisch has requested a PSLRA award in the amount of $10,000 to reimburse Mr. Haenisch for time spent prosecuting the Action.  15 U.S.C. § 78u-4(a)(4).

Mr. Haenisch took an active role in the litigation by, among other things: (i) moving to serve as Lead Plaintiff in the Action; (ii) producing his trading records to my attorneys; (iii) regularly communicating with his attorneys regarding the posture and progress of the case; (iv) reviewing significant pleadings and briefs filed in this Action; (v) reviewing the Court's orders and discussing them with his attorneys; (vi) consulting with his attorneys regarding the settlement negotiations; and (vii) evaluating and approving the proposed Settlement. Dkt. No. 202-5. These are "precisely the types of activities that support awarding reimbursement of expenses to class representatives." *Marsh & McLennan*, 2009 WL 5178546, at *21. As such, the Court grants his request for reimbursement of his "reasonable costs and expenses incurred in managing this litigation and representing the Class." *Id.* at *21; *Todd v. STAAR Surgical Co.*, 2017 WL 4877417, at *6 (C.D. Cal. Oct. 24, 2017) ($10,000 award to lead plaintiff).

## X.   CONCLUSION

The Court grants the motion for: (1) final approval of the proposed Settlement; and (2) approval of the proposed plan of allocation of the proceeds of the Settlement.

The Court also grants Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses.

The Court overrules the Objection.

SO ORDERED this 23rd day of April, 2024.

_____
The Honorable John F. Walter
United States District Judge

31