UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE SHERILYN PEACE GARNETT, U.S. DISTRICT JUDGE

CALIFORNIA RIFLE & PISTOL )
ASSOCIATION, INCORPORATED, et al., )
)
            PLAINTIFFS, )CASE NO.
)
        vs. )CV 23-10169-SPG
)
LOS ANGELES COUNTY SHERIFF'S )
DEPARTMENT, et al., )
)PAGES 1 TO 73
            DEFENDANTS. )
_____)

REPORTER'S TRANSCRIPT OF
MOTION FOR PRELIMINARY INJUNCTION
WEDNESDAY, APRIL 10, 2024
1:32 P.M.
LOS ANGELES, CALIFORNIA

_____

MIRANDA ALGORRI, CSR 12743, RPR, CRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4455
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFFS:**

> MICHEL & ASSOCIATES, P.C.
> BY:  KONSTADINOS T. MOROS
> BY:  JOSHUA R. DALE
> 180 East Ocean Boulevard
> Suite 200
> Los Angeles, California 90802

**FOR DEFENDANTS LOS ANGELES SHERIFF'S DEPARTMENT AND SHERIFF LUNA:**

> WILMER CUTLER PICKERING HALE & DORR, LLP
> BY:  RYAN M. CHABOT
> 7 World Trade Center
> 250 Greenwich Street
> New York, New York 10007

> WILMER CUTLER PICKERING HALE & DORR, LLP
> BY:  MARK D. SELWYN
> 2600 El Camino Real
> Suite 400
> Palo Alto, California 94306

**FOR DEFENDANT ROBERT BONTA:**

> CALIFORNIA DEPARTMENT OF JUSTICE
> OFFICE OF THE CALIFORNIA ATTORNEY GENERAL
> BY:  CHRISTINA RAE BURGART LOPEZ
> 300 South Spring Street
> Los Angeles, California 90213

> CALIFORNIA DEPARTMENT OF JUSTICE
> OFFICE OF THE CALIFORNIA ATTORNEY GENERAL
> BY:  JANE ELIZABETH REILLEY
> 455 Golden Gate Avenue
> Suite 11000
> San Francisco, California 94102

**FOR DEFENDANTS LA VERNE POLICE DEPARTMENT AND CHIEF FLORES:**

> JONES & MAYER
> BY:  BRUCE A. LINDSAY
> 3777 North Harbor Boulevard
> Fullerton, California 92835

**LOS ANGELES, CALIFORNIA; WEDNESDAY, APRIL 10, 2024**

**1:32 P.M.**

**---**

THE CLERK:  Calling item No. 4, civil case 23-10169, California Rifle and Pistol Association, et al., versus Los Angeles County Sheriff's Department.

Counsel, please make your appearances beginning with the plaintiff counsel.

MR. MOROS:  Good morning, Your Honor. Konstadinos Moros on behalf of the plaintiffs.  Sorry.  Good afternoon I meant to say.

THE COURT:  Good afternoon.

MR. DALE:  Good afternoon, Your Honor. Joshua Dale appearing on behalf of plaintiffs and specially appearing on behalf of plaintiff Second Amendment Foundation.

MS. LOPEZ:  Good afternoon, Your Honor. Deputy Attorney General Christina Lopez on behalf of defendant Rob Bonta.

MS. REILLEY:  Good afternoon, Your Honor. Deputy Attorney General Jane Reilley on behalf of defendant Rob Bonta.

MR. CHABOT:  Good afternoon, Your Honor. Ryan Chabot for L.A. County Sheriff's Department and Sheriff Luna.

MR. SELWYN:  Mark Selwyn for the same defendants, L.A. County Sheriff's Department and Sheriff Luna.

MR. LINDSAY:  Good afternoon, Your Honor. Bruce Lindsay on behalf of the La Verne Police Department and chief -- Police Chief Flores.

THE COURT:  Okay.  Good afternoon to you all.

So we're here to address the plaintiffs' preliminary injunction application against all of the defendants.  Since it's the plaintiffs' application, you can go first.  I will suggest ten minutes.  I don't have a tentative, and so that means I may be interrupting you with questions.

MR. MOROS:  Good afternoon, Your Honor.  Thank you for this opportunity to be heard today.  I had written in my notes good afternoon, but I still messed it up.

So I have prepared a few -- just a couple very general opening remarks, and then I'm happy to either run through my argument or just take your questions, whatever Your Honor would be better served with today.

The first major point I want to cover, because it came up in the briefing a bit with defendants, is that CCW permitting in general is not at issue in this case.  We're not challenging that a permit can be required.  We just want that permit to be achievable with a reasonable fee, within a reasonable time frame, and we want people who are not residents of California to be able to exercise their right to carry as

well.

THE COURT:  First question.

MR. MOROS:  Yes.

THE COURT:  So your Complaint challenges the 120-day permitting requirement, but it seems like your application doesn't touch it, and I think in a footnote you said that you're no longer pursuing that avenue.

MR. MOROS:  Your Honor, I think my clients may want to keep the option open of challenging that requirement in the future, but for the purposes of the preliminary injunction, because we have plaintiffs as well as the members of the associational plaintiffs that have been waiting years to get immediate relief, we would be -- we would be satisfied with just having that 120-day time limit actually be enforced.  A decision might be made later in whether we're still going to pursue it if we get that relief.  But at this time for the purposes of preliminary injunction we are sticking with that.

THE COURT:  Let me ask you this.  For the purposes of the preliminary injunction, do you agree that all the relief that you are requesting is effectively mandatory relief and so the higher scrutiny applies?

MR. MOROS:  Yes.  But I think given how egregious the violations are here, that it still -- it still has -- it's still something we should get because, you know, when people are waiting years or paying a thousand dollars to exercise a

constitutional right, mandatory relief is necessary.  Now, it could be construed as not mandatory, I suppose, if the city has to take no action.

Like, I think one of the suggestions we make for the waiting time issue is after 120 days, if someone has applied, done their training, and submitted their background check and they still haven't gotten a permit, then they should be able to carry tentatively until the permanent decision is reached.  By the way, I found out after the briefing that is actually not unprecedented.  Michigan does that by state law after 45 days.  Your receipt is vowed as a permit if no decision is reached within 45 days.

THE COURT:  Wouldn't that still be mandatory because, in effect, you are asking the city not to apply the statute itself that has the specific requirements?

MR. MOROS:  I suppose it would be, Your Honor.  I will concede that point.  I do think that mandatory relief is required here just because of the egregiousness of the violations.

THE COURT:  Okay.

MR. MOROS:  What I -- my point earlier was that plaintiffs do want to carry legally.  They do want to get CCW permits within the system.  You know, we tried on the wait times and high fees issue.  In particular, we wrote --

THE REPORTER:  Counsel, please slow down.

MR. MOROS:  I'm sorry.  Bad habit of mine.

On the wait times and high fees issue, in particular, we tried to reach out to the Attorney General last summer to get these issues corrected, and we didn't even receive a response to our letter.  Unfortunately, that's why we had to come bother you today with this, at least as to those issues.

Again, I think the general theme here is that it is important to recognize that there are criminals out there every day that pay no mind to things like permitting.  They're carrying illegally.  They're carrying weapons.  They are harming people in these crimes.  And plaintiffs are not that.  They have come to the government in good faith over a constitutional right, and they're just saying, please, just let us be able to exercise this right within four months of time or within -- or with fees that are not a thousand dollars or, for the purposes of Plaintiff Hoover and some members of the situational plaintiffs, they don't even have the option of engaging in those long waits and high fees.  They just cannot carry in California, period.  They have no right to exercise a constitutional right in this state, and that is an absurd situation, frankly, and that's why we think preliminary relief is called for here, at least as to those issues.

So with those general points in mind, I do have a long discussion prepared if you'd like me to go through all our

points, but I'd be happy to just answer your questions as well, Your Honor, if you prefer.

THE COURT:  Let me ask you.  Is your discussion that you prepared organized in terms of the relief for the various challenges you are bringing?

MR. MOROS:  Yes.

THE COURT:  Because I do have questions in terms of, you know, how or what sorts of challenges you are bringing. For example, as to the 120-day requirement, you're not mounting a facial challenge to that particular statute.  But what you're complaining of as to that is the amount of time, the delay beyond the 120 days that the sheriff's department is taking.

And it sounds like -- and I don't speak for the sheriff's department, but they're saying we're trying.  But after *Bruen*, we have this huge change of applicants.  The applicants went way up, and we have, you know, come up with certain -- or we have changed the way that we have approached this.  We have made it electronic, et cetera, and we are trying to deal with a backlog of cases.

So, I guess, my question is is this an as-applied challenge to the delay if it's not a facial challenge to the actual statute?

MR. MOROS:  I think you could describe it as either/or.  I think it's a facial challenge to long waits in general because it's not just over 120 days.  By the -- we were

actually a little surprised to find in the defendants' briefing that the pace they are going at just to clear the backlog with no additional applicants would take four years.

THE COURT:  Let me go back to something you just said.  A facial challenge to the delay, I'm not sure if that's a thing.

MR. MOROS:  That's fair, Your Honor.  So, yes, we think, whether it's as-applied or facial, we think it applies here.  I do want to clarify one point about the 120-day limit.  It's not that we are, you know, saying that we can enforce that.  That's a Penal Code.  It's up to the Attorney General to enforce.  That's why we sent them a letter.  What we are treating that as is the -- when *Bruen* talks about lengthy wait times, we understand that puts Your Honor in a difficult position because it could be a subjective term.  What is lengthy, what is not lengthy.  But the state has defined it.  The state has said 120 days, and by the way, that's longer than most other states.  So they put a 120-day maximum, and we think that's a standard for this Court to use just as a marking point of what is and isn't too long.

THE COURT:  Okay.  So let me follow up, though, because I think you cited -- I read a lot of briefs.  I think you cited there was a case dealing with five months, there was a case dealing with one year, and that you generally have focused on 18 months as being the wait times.  But following up

to my previous question in terms of what sort of challenge this is, if it is an as-applied challenge, then in terms of a remedy -- let's assume I agree with you that the delay is too long.  In terms of a remedy, aren't I just looking at as applied to particular individuals who are part of this lawsuit as opposed to any application that's pending beyond 120 days?  Because it seems to me that the relief that you are requesting is, you know, for the LASD to just grant all these applications or not enforce as to all of these applicants the statute requiring that they meet the criteria.  And I will keep going.

So doesn't that mean that you have about four people who fall into that category of they're part of this suit and their application has been pending, and they seem to meet the criteria but they haven't received a license?

MR. MOROS:  Your Honor, that would be the case if we didn't have associational plaintiffs.  So we have the California Rifle and Pistol Association and others, and we have declarations submitted from their members that are facing these same issues.

I suppose, if Your Honor limited relief to these plaintiffs, we would probably have to gather up some sort of mass action and bring it for everyone that's waiting because we have dozens or hundreds of members who are facing these same issues, and that's why we tried to -- that's why we brought in the associations as plaintiffs because we think the

associational standing here is well-established.  And that's where the -- I suppose you could limit relief to just the members of the associational plaintiffs.  But that would be -- I won't speak for the County, but that would be sort of confusing because I guess the application would have to say are you a member of CRPA or something like that.

So I think a general injunction is called for here because of that, because we have four different large membership organizations.

THE COURT:  A general injunction.

MR. MOROS:  I'm sorry.  A preliminary injunction.

THE COURT:  In terms of how broad it is, as the association, aren't you -- like you're here on behalf of your particular members who are plaintiffs; correct?

MR. MOROS:  Right, Your Honor.  But now the case escapes me.  I believe there is precedent that if an association establishes standing on behalf of one of their members, they can challenge the statute generally.  They aren't limited to those facts.

THE COURT:  But you're not challenging the statute.  You're challenging the delay.

MR. MOROS:  The delay.  I'm sorry.  Yes, the delay.

THE COURT:  So does your answer change?

MR. MOROS:  I don't think it does because, like I

said, there's hundreds of people facing these issues who are members of these plaintiffs -- of these associational plaintiffs.  And if relief is limited to just the people that applied, then we would unfortunately have to come back with, like I said, I suppose some kind of mass action against L.A. for the same issues.

THE COURT:  You don't scare me, but I'm limited -- I'm limited to the Complaint and, for purposes of this preliminary injunction, I'm limited to what you have raised in the injunction.

MR. MOROS:  That's fair.

THE COURT:  You may continue briefly.

MR. MOROS:  Sure.  I will skip past the -- I will jump to the fees issue.  That's the La Verne.

You know, when *Bruen* talked about what is an exorbitant fee, just like a lengthy wait time, it was in the context of a footnote talking about the 43 states that were already shell issue before *Bruen*.  California was not one of these states.  Most of these cities including La Verne didn't even offer permits before *Bruen*.  So with *Bruen* they now have these fee requirements, and they're comparing in their briefing to other local cities.  They're saying, well, this city in L.A. or that city in L.A. is similarly expensive, so that makes our fee okay.

What is exorbitant, the standard by which they

should be judged, is the states that the Supreme Court said are not exorbitant because they essentially blessed the 43 shell issue regimes that were already in existence.

THE COURT:  Did they?

MR. MOROS:  Yes.

THE COURT:  Okay.

MR. MOROS:  They said -- in fact, I think they used the language that nothing, in our opinion, questions the validity of the 43 state regimes that do not have these discretionary good cause permit policies.

THE COURT:  But is it fair to say that that wasn't the issue?  So, you know --

MR. MOROS:  Sure.

THE COURT:  -- that statement is kind of dicta, kind of like the footnote you are relying on.

MR. MOROS:  So it is dicta.  Absolutely.  And I believe the exact term that the Supreme Court used was they were not ruling out future challenges based on high fees or lengthy wait times.  So we're not saying that this is something the Supreme Court has definitively said isn't okay.  However, it is notable that when they were imagining a hypothetical of a future constitutional challenge to a permitting regime --

THE REPORTER:  Counsel, please slow down.

MR. MOROS:  Sorry.  The example they came up with was high fees and long wait times.

THE COURT:  Right.  But they said exorbitant without a definition.

MR. MOROS:  Right.  We think the definition should be compared to other states -- the 43 other states that had those regimes, and those states generally range from $50 up to $150 plus, of course, the cost of the training course that the applicant bears themselves.  That's the sort of relief we are seeking here.

THE COURT:  Okay.  So here is my question.  Why should it be based on the 43 other states if, for example, the cost of living is different, the regime is different?  According to La Verne, they outsource a part of this inquiry, and that results in, you know, private fees that are -- I think it was like 300 and something.

Why -- why, then, should the Court look to these 43 other jurisdictions as opposed to looking to jurisdictions in California with California's high cost of living?  What sort of case law do you have to point to to tell me where I should go to determine what is exorbitant, air quotes?

MR. MOROS:  What the Supreme Court said, it's not a subjective standard.  It is an objective standard.  It is that when the fees deny people the right to carry.  $1,000 in fees, Your Honor, do deny people the right to carry.  I don't think this would be a close call if this were a voter registration case with a $1,000 fee.  This is a constitutional

right.  The problem with what you are suggesting -- and, by the way, if it came that California was slightly more expensive than other places, maybe that's cost-of-living sort of differences.  But what we are talking about here is, you know, you can live in La Verne and pay over a thousand dollars in fees but next door in Glendora, two miles over, the fees are $243 plus the cost of a training course.

So even within California they're on the higher end of these -- of this price tag.  The L.A. Sheriff, for example, their fees are a lot lower.  It's just that unfortunately La Verne city residents cannot apply with the L.A. Sheriff, so they have to go through -- they have no choice but to go through La Verne's expensive process.

THE COURT:  I guess what I'm saying -- and this goes to all of the parties.  I have sometimes -- in reading the briefs, I'm trying to put it in a category that I can address.  In terms of the exorbitant fees allegation or challenge, in the context of *Bruen*, *Bruen* doesn't talk about whether I should be looking at the 43 that the Court has blessed, quote/unquote.  *Bruen* just says, go back and look at history.  Neither party really gave me that history.

In terms of looking at the 43, as you are arguing I should, that's more than just looking at a number.  That's looking at what makes up those fees and how -- you know, the clearest example is La Verne.  They outsource, and maybe LASD

does not.  So there's going to be a different price.

California DOJ requires a portion of that fee in terms of -- I forgot what particular category that was whereas in Michigan it might be something different.  So I'm not necessarily agreeing with the plaintiffs that looking at the 43 states is the way to go, but, you know, guidance would be helpful.

MR. MOROS:  Sure.  So, Your Honor, what the Supreme Court talked about was objective criteria, not discretionary criteria.  And when La Verne imposes costs on itself like requiring a psych exam, which even most California authorities do not, like choosing to outsource instead of simply accepting applications, setting up one interview and accepting live scan results.  Because the DOJ does the background check, not La Verne.  So if they decide to do extra investigation on top of these objective criteria that *Bruen* said is what is required or what is allowed -- excuse me -- for permitting, then plaintiffs shouldn't have to bear that cost.

And, also, when we are talking about history, I understand the focus has been on comparisons to other localities because that's the best way we can define what exorbitant is, but if there is a dearth of history supporting the fee and the defendants haven't presented it, then we prevail because *Bruen* says that it is the Government's burden to establish this history and to have their law upheld.

The presumption is actually on our side here. What they have presented is some historical laws as to concealed carry specifically -- concealed carry permitting specifically. But all of those laws, with a few exceptions, generally allowed open carry without a permit. So the California regime is already more restrictive than that.

THE COURT: Let me ask you this question. Do you really prevail in the preliminary hearing context where we are applying a higher scrutiny and the plaintiffs have to show a likelihood of success on the merits plus the high scrutiny?

MR. MOROS: Yes, Your Honor. I think we have a clear likelihood of success on the merits. There is no other place in the country outside of California where you can find fees, not just at $1,000 for two years but not even close to that. We are talking about fees that are $50 or $100 in other states and the permit is good for five years, not just two years.

So this isn't a case where the fees are just slightly more expensive and reasonable minds may differ. This is just exorbitant. Again, I have to keep coming back to, if this were placed on any other constitutional right, this would not be a close call. It feels like it's only -- when it's the 2nd Amendment, what Justice Thomas referred to as this disfavored right where cities feel at liberty to impose all these burdens on people who, again, are just coming to the

government in good faith to exercise a constitutional right.

Frankly, if La Verne prices out people and they can't afford these fees and we ultimately lose and don't get the relief we need, that's going to push people to break the law because they will have no other choice. There is Supreme Court precedent talking about this. There are courts talking about, you know, when a permit becomes a complete obstacle to a right, you can exercise that right with impunity --

THE REPORTER: Counsel --

MR. MOROS: Sorry. I get a little passionate. I'm sorry.

Anyway, Your Honor, I feel I'm starting to ramble. So I can move on or answer another question.

THE COURT: Before we move on, I have one last question. What would the relief be with respect to the fees charged by La Verne? Do I go through each fee and figure out whether it's exorbitant? How do I approach this fee issue beyond the historical *Bruen* analysis that I discussed?

MR. MOROS: Well, Your Honor, I think what *Bruen* allowed for was, like I said, these objective criteria. And what that is is a background check, a training course, maybe a police interview. So those sorts of costs are okay.

When it comes to the background check, the city refers out applicants, I believe, to take a live scan, and the

DOJ does the background check.  With the training course, the city also refers them out.  They pay a couple hundred dollars to a training provider, and they do that.

So, really, all we think the applicant should be paying is the DOJ fee -- I believe it's $93 -- plus maybe, if Your Honor is so inclined, perhaps some I guess to cover the time of the police doing the interview or any administrative work.  But none of that comes close to the thousand dollars we are talking about.

THE COURT:  But on what basis, though?  You're saying that the Court should make decisions as to what the client should be paying based on not much because there's nothing in *Bruen* that says that the city can't pass the cost of these checks on to the applicant.  My understanding from La Verne is that they do cover some of the cost of the 390 outsourcing.  But as to the DOJ check, et cetera, they collect the fee, and it ultimately goes to DOJ.

So what should the Court rely on to make these sorts of decisions as to which of the various categories that La Verne charges should not be passed on to the applicant because, you know -- I could lower the fee down to 500 or 300, and there would still be people who couldn't pay that amount.

MR. MOROS:  I understand, Your Honor.  I understand, also, that we are here on a preliminary injunction. We haven't gone into discovery yet.  But if Your Honor is

looking for models, there are plenty of models in L.A. which, perhaps, they wouldn't fully satisfy us but would provide dramatic relief right now for plaintiffs while we litigate this case.  Those would be, for example, L.A. Sheriff fee schedule, the Glendora fee schedule, all these fees that do fall into that 4- or $500 range.  I want to be clear, I'm not suggesting we think that is constitutional, but it would provide dramatic relief to the plaintiffs.  One other brief point --

THE COURT:  Let me make a point before you make that point.

Forgive me if I'm getting this wrong, L.A. County Sheriff.

But I don't think they outsource which is part of the problem that you have challenged in that they don't have enough people to go through these, you know, number of applications that they have received.  And one of the ways that La Verne has reduced that problem is by outsourcing which costs more.

So now you're having the Court try to figure out -- let me put it this way.  I don't want to be in the business of trying to figure out which way is better and more cost effective.  There has got to be under *Bruen* a better way to figure out what exorbitant is, and I don't think you have touched on it yet.

MR. MOROS:  Well, Your Honor -- and earlier I

think you mentioned how *Bruen* -- you said it just now -- doesn't define what exorbitant is.  We believe it does.  It says that it's exorbitant when it denies people the ability to exercise the right.

And I take your point that for some people even $100 might deny them the right, but at minimum here on a preliminary injunction it's clear, it's beyond dispute that a thousand dollars is, you know -- like, I keep coming back to this.  If that's what you put on the right to vote, then clearly we would have a lot less votes in this next election than we did in the last one.

I don't know that it's our burden here to say -- to solve their problems for them on what policy they have to follow because at the end of the day there's 28 other states that don't even require a permit to exercise a constitutional right.  We're not challenging that.  But if the Government is going to impose on plaintiffs a burden on the right that they have to get a permit first, it's not -- I don't mean to be rude, but it's not, frankly, our problem here to figure out what the fee should be.  It's their problem.  And you determine, I suppose, whether that fee is constitutional or not.  I'm sorry if I'm not satisfying you with that answer, but that's the best I can do.

THE COURT:  All right.  Let me move you on to something else in terms of the Velasquez and -- hold on.

Forgive me.  Paro --

MR. MOROS:  Parowashraf.

THE COURT:  Thank you.  You bring a challenge as to their ability to obtain an application.  As to Mr. Velasquez, I believe he was denied within six months or so; correct?

MR. MOROS:  Yes.  His was a renewal permit, though, and we acknowledge that the sheriff does a much better job with renewal applications than they do with initial applications.

THE COURT:  Okay.  So in the briefing the remedy would require the Court to make certain credibility determinations as to whether the TRO was appropriately granted, et cetera.  Under *Bruen* -- let me formulate a question.  Do you want to address that issue?

MR. MOROS:  Sure.  We don't believe it does because *Bruen*, again, only allows for objective criteria in permit issuance.  That is a background check, that sort of thing.

THE COURT:  Isn't this objective criteria?  I mean, you do not challenge the actual statutes that require or preclude somebody who has a TRO within the last five years from obtaining the license, and you do not challenge the statutes that talk about whether somebody, in effect, is law-abiding, responsible, et cetera.

So as to these two individuals, I guess my question or comment is it seems like your challenge is replacing a discretionary -- sorry -- nondiscretionary decision whether they fall within the statute and, oh, yes, they do so they don't get to get a gun with a Court making a determination based on the merits of the TRO and whether or not somebody was lying, et cetera.  So do you want to address that issue?

MR. MOROS:  Sure.  So part of the issue here, we acknowledge we didn't challenge that statute.  And part of the reason for that is it was a little confusing because SB2 took effect on January 1st after we had filed our complaint.  So we acknowledge we may need to ultimately amend our complaint on that issue.  So if that is the conclusion today, it is what it is, and we will have to resolve that question on a different day.  We do believe ultimately that a dissolved temporary retraining order, which means he turned in his guns once he got the temporary restraining order, he went to the hearing, it was dissolved, and he got his guns back.  That should not be grounds to deny somebody.

We think there was a recent case in the Northern District as to former convicts who had convictions dissolved who the Court ruled in the Northern District -- granted, I'm sure it will be appealed -- that they still have their 2nd Amendment rights because those felonies were dissolved.  That was, I believe, *Linton v. Bonta.*

As to Mr. Velasquez, there is no such issue. That might be an issue for Mr. Parowashraf. But for Plaintiff Velasquez, he was denied a renewal permit. First of all, he didn't get a reason. On the form they just marked "other." They didn't tell him he had to call. When he called, they first told him it was because he had firearms stolen from his car which is a little, we felt, ridiculous because he was the victim of a crime. He promptly called the police and filed a report. And then -- only then, when he pointed that out, did the officer on the phone tell him, well, actually, you had an unintentional discharge in April, I think, 2021. But, again, he called the police immediately. He reported it to the CCW unit, and they granted him a permit after that. So it's a little absurd for them to now go back and say, well, we granted you the permit but now on renewal we're going to use that as a reason to deny the permit.

THE COURT: Let's assume it was because he had firearms stolen from his vehicle. Is there an argument that that would suggest lack of responsibility?

MR. MOROS: It could. And California has laws on the books that if you are, you know -- if you haven't stored your firearms properly -- I forget if it's a misdemeanor or felony or an infraction, but there are laws against that, and no charges like that were filed against him. The state has never suggested -- I believe now in the briefing maybe the

defendants did.  But there was never a suggestion before this case that he was criminally negligent in how he stored his firearms.  He stored them in the trunk of his car which is a proper way to store firearms under the California law.  It's an example of a locked storage container.

THE COURT:  According to him.

MR. MOROS:  No.  According -- I believe there's a California Penal Code.

THE COURT:  I'm saying you're getting into the facts and the merits of the underlying issue which I don't.

MR. MOROS:  I understand.

THE COURT:  Let me move you forward.

You want to deal with the psych issue, the psychological testing?

MR. MOROS:  Sure.  I'm a little more eager to get into reciprocity, but let's cover the psych.

THE COURT:  Okay.

MR. MOROS:  So the psych exam, we believe -- and to be clear, this is another example of something kind of like the fees were.  It is totally unprecedented in any other state. If there is another state out there, it must be one other outlier.  I don't believe any other state even allows the option of psychological exams.  And, further, even within California, most issuing authorities do not require it.  But -- because we think it is inherently discretionary and it doesn't

even provide a path for someone to get a second opinion.  You know, maybe this one psychologist felt you weren't appropriate but maybe another psychologist might.  And there is no path for that.  There is an appeal to superior court that is available, but that is quite a burdensome process.

Your Honor, even if you were inclined to accept the psychological exam --

THE REPORTER:  Counsel --

MR. MOROS:  Sorry.

Even if you were inclined to accept the psychological exam, that doesn't mean La Verne's particular implementation is okay because what the city requires for applicants, only on weekdays when they might be working, to drive to San Bernardino and take a four- to five-hour exam, from what we understand, and then deal with all the traffic and possibly miss work and subject themselves to this invasive exam that isn't required anywhere else in the country.

So even if a psychological exam in a vacuum might be okay, we believe La Verne's is particularly abusive.  They should at least have a vendor somewhere close by in the city that offers appointments around the week that can work around these people's schedules as they seek to exercise a constitutional right.

THE COURT:  Long awaited reciprocity.

MR. MOROS:  So reciprocity, there is no other

constitutional right that ends at state borders.  If you are a California resident -- I'm sorry.  California residents are fine.  If you are a resident of any other state, right now you have no right to carry in California.  That is historically unprecedented.  I know the defendants have pointed to certain historical laws that have allowed permitting, but that only applied to concealed carry.  Generally, there was no prohibition on anyone carrying openly.

We're not challenging the open carry restrictions here, but we're just pointing out that isn't an avenue for someone like Plaintiff Hoover.  He can't carry openly.  That's illegal.  And if he can't get a concealed carry permit and if California won't honor his Florida permit in which he already went through a background check and a training course, then he just can't exercise a constitutional right here.  It's gone for him whenever he's here, and it's gone for the members of the associational plaintiffs any time they visit California.  We don't think there is any historical precedent for that.

Now, there's two forms of relief here, and I know there's arguments in the brief about that.  Frankly, allowing people to apply for a California permit would improve the situation for sure because right now there is no avenue.  But it would be very incomplete relief because the way to get a California permit, you have to attend an in-person interview.  You have to do a training course from a California approved

trainer.

So it would require someone -- let's say you live in Michigan and you are planning on taking your family on vacation in California so you are checking will I be able to exercise my constitutional right to carry while I'm there in the summer?  Well, I will have to plan two more trips.  I would have to plan two more trips to California at great expense to do this.  And that's assuming, by the way, that you wouldn't face these high fees and wait times.  I suppose, depending on how this went, you could select a county that has a lighter wait time and lighter expenses.  But besides that, it would be an incredible burden.  And these are people who have already gotten permits in other states.

By the way, Your Honor, a lot of states have reciprocity agreements.  So what these states do is they look at all the other states and say we approve of this state, this state, this state, and this state and those permits are honored here.  California doesn't honor any other state's permits.  Although maybe the Attorney General can say we don't like how this state does this, clearly there's going to be some other states that they do approve of.  At minimum, they should at least do that.

I know, for example, Arizona and Utah both require a training course and they both require a thorough background check.  You send in your fingerprints, you send in

proof of your training before they will issue a non-resident permit.

By the way, that's another issue.  The La Verne plaintiffs, a couple of them have Arizona and Utah permits. And if those permits were recognized, they would have all the relief they need.  You wouldn't even need to deal with the fee issue because they would have the relief of being able to exercise their right on -- to exercise their right to carry based on their existing permits.  This is just like James Obergefell.  These were people --

THE COURT:  Not quite.

MR. MOROS:  Well, they went to Maryland, got married, and then Ohio wouldn't honor their marriage license. And the Court pointed -- Justice Kennedy pointed out how -- what a problem that is if you're in another state and your marriage isn't honored.  It could cause all sorts of issues.

I believe in the briefing we pointed out a gentleman in Maryland who had a Virginia carry permit and stopped a crime in Maryland, but then Maryland wouldn't honor the permit, so he was arrested.  One of our heros, a veteran.

This is an absurd situation that needs to end. We think this Court has its model.  Unfortunately, there's only one example to look at so far.  But the state court -- I think it was in Massachusetts -- looked at this issue and concluded there is no historical tradition of barring people from a

constitutional right just because they aren't residents of that state.

I'd be happy to answer any questions you have on that.

THE COURT:  I don't at the moment.  Thank you.

MR. MOROS:  Thank you so much for your time.

Madam court reporter, I apologize for my sprint.

MR. CHABOT:  Good afternoon, Your Honor. Ryan Chabot from WilmerHale for the Los Angeles Sheriff's Department and Sheriff Luna.

I want to start with one quick comment on the mandatory preliminary injunction standard.  I heard Mr. Moros agree that the mandatory standard applies here which I think is certainly correct, but I wanted to point to just one case on that that makes clear that the right barometer for whether something is a mandatory or prohibitive injunction is whether or not it preserves the status quo or changes the status quo and whether it's actually sort of ordering someone to take an act or not is a secondary consideration.  And that is the 9th Circuit's en banc decision in *Fellowship of Christian Athletes versus San Jose* which is 82 F.4th 664 from last year, 2023.  It makes clear that's the right standard here.

And since, in any event, the status quo was currently that these folks do not have concealed carry licenses and what they are seeking is to change that status quo, the

mandatory preliminary injunction standard applies.

I wanted to start there even though Mr. Moros agrees with it because I think that is a deciding factor here. We are in a novel post-*Bruen* landscape, and plaintiffs are asserting new untested *Bruen* rights.  Based on a fully developed record, this case might advance the post-*Bruen* jurisprudence in a way that plaintiffs like or in a way that plaintiffs dislike, but the complex and novel questions here shouldn't be decided under a preliminary injunction standard that requires clear law in their favor and clear facts in their favor.

On the backlog claim, plaintiffs are not entitled to a mandatory preliminary injunction because they have offered no authority that demonstrates, either directly or by analogy, that the 2nd Amendment entitles them to a firearm license on a particular timeline.  Plaintiffs admit in their reply brief that courts have tolerated some amount of permit processing time, and they have no authority holding that a delay for getting a license of any length by itself is a constitutional violation.  On the contrary, we cited cases in the context of other constitutional rights that expressly recognize that even indeterminant delays in issuing licenses do not by themselves give rise to a constitutional violation.  Instead, what is required by all of the authority that either side has cited is that the delay results from a constitutional licensing regime

being put to abusive ends.

THE COURT:  Isn't that what they are saying?

MR. CHABOT:  It is what they are saying, but it is not what they have evidence of or any allegations supporting.

THE COURT:  Let me be devil's advocate for a second.  So the regime is the statute that says that licenses are supposed to be issued, if the person qualifies, within 120 days.  Plaintiffs, if I understand their arguments correctly, they're not challenging the regime.  They are challenging LASD's abuse of the regime by taking, according to the plaintiffs, up to 18 months to issue the license in contravention of the statute that says 120 days.  Doesn't that fall within what you just said?

MR. CHABOT:  I don't think it does, Your Honor.  I think what's lacking there is any fact that is suggestive of abuse except for the mere fact of the delay itself, the waiting time.

THE COURT:  Okay.  So abuse means they have to be -- it's almost like you're saying there has to be some sort of willful conduct like they're purposefully trying to abuse by doing something to thwart the 120-day requirement as opposed to what LASD seems to be saying is that we are overwhelmed.  We don't have enough people.  *Bruen* changed everything, and now we have all these applicants.

MR. CHABOT:  That's right, Your Honor.  That is consistent with all of the cases that both sides have cited on this issue.

THE COURT:  How long can LASD, for argument's sake, use that if *Bruen* was decided in 2022 and we are now in 2024?  At what point does the Court say now it is abuse because you haven't really done anything to change the situation?  You haven't hired more personnel, et cetera.

MR. CHABOT:  So I don't know if there is an exact time period.  I think, the longer the wait, the more suggestive it is of abuse.  So if it's 50 years, I don't think you can get to 50 years without saying somebody is abusing their rights here, somebody is doing this on purpose.

THE COURT:  Can you get to two years?

MR. CHABOT:  You can get to two years, Your Honor, because I think the evidence that we have put in the record shows that L.A. County is trying to make a good faith effort to implement the post-*Bruen* backlog.  If we were here on a Motion to Dismiss and we had said, listen, they don't even state a claim under the 2nd Amendment here, they cite *Bruen* Footnote 9, Footnote 9 says, you need abusive ends and they have no plausible allegation of abusive ends, I think it would be a much harder case because I think you could look at the time of the delay by itself and say, this is a fact that when you are taking all plausible inferences in favor of the

plaintiffs, you could use to conclude that this is really put to abusive ends because it has taken a long time.

THE COURT:  What about the plaintiffs' arguments based on their calculations that based on how many applications are being reviewed at the pace that they are being reviewed, it's going to take four years to deal with the applications that are currently pending?

MR. CHABOT:  First, plaintiffs have it wrong. Second, the fact that there is a factual dispute over this, if that's a question, just shows that the facts don't clearly favor them here and they fail to meet the mandatory preliminary injunction standard.

So I can provide the Court with some updates on the progress in L.A. County since the filing in February.  In the six weeks since then, the County has processed 1,100 applications.  If that pace were to continue, then it will be complete with the remaining applications that were outstanding as of our February 21st filing in under a year.  The numbers in our declaration about how many they are processing per week, at least for this time period, prove to be conservative.  And plaintiffs' math in their reply brief about four years was wrong in any event because it assumed incorrectly that the 9,400 we cited were all initial applications that were only processed by the four investigators that were assigned to initial applications and not the additional investigator who

handles just renewals.  The 9,400 is both initial and renewals.

So they were sort of wrong in the facts as we presented them.  The facts in the last six weeks have improved. I don't have a definite answer to you, Your Honor, about when the number will be done because a lot of this turns on the applications and the applicants.  Anecdotally, something like 80 percent of applications are incomplete in some way and require follow-up, require additional documentation.

L.A. County has taken steps from the get-go to make progress on this issue, has recognized the issue.  We're not saying that two years is the goal here.  We are trying to impose two years.  On the contrary, we are trying to reduce the processing time.  Plaintiffs do not cite any case that says, with those good faith efforts, you have an abusive ends that would be manifest under *Bruen* or the long history of cases that *Bruen* is drawing on when it gives that example.

THE COURT:  Tell me again where you get the abusive ends analogy or language.

MR. CHABOT:  So abusive ends is a quote from *Bruen* Footnote 9.  It says, because valid licensing regimes can be put toward abusive ends, we don't rule out a facial challenge -- we don't rule out constitutional challenges to shell issue regimes.

In all the cases the parties have cited support of the same principle.  The plaintiffs cited -- rely heavily on

*Cooper versus Aaron.*  And that case says, "It was made plain that delay in any guise in order to deny constitutional rights could not be countenance and that only a prompt start diligently and earnestly pursued to eliminate racial segregation from the public schools could constitute good faith compliance."  We have put on the evidence that shows that is exactly what L.A. County is doing.  A prompt start diligently and earnestly pursued.  At a bare minimum, the facts don't clearly state a claim -- don't clearly support liability under that standard.

Plaintiffs' other cases are consistent with the same principle.  *Rogers versus Hacker,* which is a 2nd Amendment case post-*Bruen* that they cite from Illinois, says that -- has an allegation that the licensing official took no articulable steps to actually redress the problem of delay.  We have put in evidence that is uncontroverted at this stage that we have taken steps to prevent -- to redress the problem.

THE COURT:  Let's say I disagree with everything that you have said -- and I'm not saying that I do -- in terms of the remedy here, the Court had posed a question to the plaintiffs regarding the as-applied challenge and the remedy being as to the applicants who were part of this suit and their applications pending being addressed.  Can you speak to that?

MR. CHABOT:  Yeah.  Absolutely, Your Honor.

So we made this point in our opening brief that

the relief they are asking for where they want everybody's licenses to either be issued or they want across the board every pending license of the 9,400 to be able to conceal carry until we adjudicate them.  It is far beyond the scope of the standing that they have.

They certainly don't have standing to assert an injunction under an as-applied challenge of their licensing regime for anyone who is not the forenamed plaintiffs who have pending applications with L.A. County or members of the association.  I don't think I heard any argument that would give them -- I didn't hear Mr. Moros even argue that they had a basis for asserting an injunction for everyone.

As far as the associations go, I don't think there are facts in the record from which Your Honor could issue a mandatory preliminary injunction that would say that every member of the association has been subject to an as-applied constitutional challenge and so should have their -- should be able to carry without a license until we resolve their applications.

We don't dispute that the four individuals have standing to bring an as-applied challenge, and I can provide the Court an update with where those four folks stand. Mr. Messel is approved, and his license will be ready to pick up shortly.  He's at the end of the process, so he should have his license pretty soon.  Mr. Skadsem is -- submitted his

firearms training certificate to the County on April 4th which --

THE COURT:  Of this year?

MR. CHABOT:  Of this year.  Which is the last step in the process.  So one of the last steps in the process after your application is approved is then you basically get an e-mail saying we have cleared your application for the statutory criteria, go do your firearms training, when you're done, let us know that you have your certificate and firearms training and come back and we will give you the license.

THE COURT:  So he has to wait until the LASD does a preliminary step of approving certain steps of it.

MR. CHABOT:  Right.

THE COURT:  Okay.

MR. CHABOT:  He submits a paper application, and then an investigator reviews the paper application.  Once the paper application is approved for the statutory criteria, then they get a notification that says now you have to go do your mandatory firearms training.

THE COURT:  This is not really a question for you, but get ready.  When the plaintiff says 18 months for something to be approved, in that process, is it 18 months for -- until LASD says, hey, now you can go to the firearms training, or is it something else?

MR. CHABOT:  So I think they're calculating their

18 months from the day *Bruen* was decided in June 2022 which is when some of the named plaintiffs submitted their application to December 2023 when they filed their lawsuit and they still hadn't received the application. I think that's their calculation of 18 months.

THE COURT: What is LASD's calculation?

MR. CHABOT: So the statute says -- prior to SB2 the statute said 90 days, and now it says 120 days. But it's measured from the date of the receipt of a complete application or 30 days -- it's either 120 days after receiving a complete application or 30 days after receiving the results of the DOJ background check, whichever is the later.

So the statute doesn't require, as I think plaintiffs have suggested, from the day you mail it in, there's 120 days until you get your application. It's measured from either a complete application or the application of a DOJ background check.

THE COURT: So using those parameters, what would you say the wait time is?

MR. CHABOT: Your Honor, I don't have an answer to that specifically under those parameters how long from when you have a complete application and the reason is because when you have a complete application varies so much that I -- I won't say specifically that the County doesn't have those statistics, but I haven't asked for them and I don't have them,

to know from on average, once there's a complete application or a DOJ background check, from that point on what's the time period.

THE COURT:  Okay.  You have two more individuals that you were talking about.

MR. CHABOT:  So Mr. Stalter, his file was reviewed earlier this month on April 2nd.  So he will soon get an e-mail to let him know to schedule of firearms training.  So those three individuals are either at the end of the process or one step before the end of the process which is scheduling the firearms training.

And then for Mr. Weimer, he's the gentleman who submitted his application in January of 2023.  The other individuals submitted them in mid 2022.  So his application hasn't been reviewed yet.  So we don't have substantive update on him.

THE COURT:  Can you speak to the suitability determination as to Mr. Velasquez?

MR. CHABOT:  Yes, Your Honor.  On Mr. Velasquez, first, the objective criteria are have you lost three firearms in a manner that is contrary to California law?  The evidence that was in his application was that he had lost these firearms, and the County gets a police report, and the police report says he reported three firearms were stolen from the trunk of his car.  There's no evidence of damage to the vehicle

or breaking and entering.  I think it is a reasonable conclusion for an investigator to say this is evidence that the firearms were kept -- the police report says they were kept in a range bag, which is not a locked container, in the trunk and that they were accessed and stolen without any damage to the vehicle.

It's reasonable for the investigator to conclude that that shows they were taken contrary to California law which requires, if you are transporting firearms in a vehicle, they are either in a locked container or locked in the trunk. Now, I understand Mr. Velasquez says, I did lock the car, but he didn't say, I did lock the car to the L.A. investigator.  In fact, he didn't bring up the fact that firearms were stolen at all during his interview and only brought it up a few days later even though it happened a month before his interview.  So I think it was a reasonable conclusion for the investigator to say the circumstances of this theft meet the objective statutory criteria.

THE COURT:  Okay.

MR. CHABOT:  Your Honor, I think those were the points I wanted to make in response to Mr. Moros's argument. I'm happy to answer any other questions that you have about it. But I think I hit the highlights.

THE COURT:  Thank you.

MR. CHABOT:  Thanks very much, Your Honor.

MS. LOPEZ:  Good afternoon, again, Your Honor. Deputy Attorney General Christina Lopez on behalf of Defendant Bonta.

I think there's a theme here today where we're all starting with the relief that is being sought.  I'd like to do the same unless you have a question.

THE COURT:  I do.  I have a question specifically to Bonta.  Throughout the briefing, it seemed like the Attorney General's Office assumed that the first -- let's call it the first burden of *Bruen* was met because throughout the briefing the Attorney General's Office kept saying, even if the Court gets to the second part of the test.  And my question to you is are you basically arguing that the plaintiffs have not shown that they fall under the 2nd Amendment which would be the first part of the test?

MS. LOPEZ:  The answer is yes, Your Honor.  We do not believe that they have shown that they fall within the plain text of the 2nd Amendment as to either of the two potential challenges as to the state.  And I do think that appears in our briefing, and I can point Your Honor to those sections if you'd like.

So in the opposition, in part -- under the argument, in part 1(b)(1), so that's as to reciprocity, we state that the proposed conduct in which the plaintiffs wish to engage here which is to carry a concealed weapon in California

without the State being able to verify that these plaintiffs or these nonresident individuals are permitted to do so does not fall within the plain text of the 2nd Amendment.  So that's in Section 1(b)(1) of the briefing as to the reciprocity claim. In Section 1(c)(2) of the briefing, the same argument is made as to the psychological testing.

THE COURT:  Let me ask you this.  So under *Bruen*, if I understand it correctly, the Court is to see if the plaintiffs themselves fall under the 2nd Amendment, i.e., are they people, and then does their conduct fall under the 2nd Amendment.  So as to whether they're people, have they satisfied that with respect to the Attorney General's challenge or challenge to the Attorney General or the statutes?

MS. LOPEZ:  Again, I think the short answer is no.  And it's not that we don't -- it's not that I know whether or not these particular plaintiffs are law-abiding responsible citizens --

THE COURT:  Then here's my next question.  And sorry to cut you off, because I am left with *United States versus Perez Garcia*.  Familiar?

MS. LOPEZ:  Yes, Your Honor.

THE COURT:  Okay.  Notwithstanding *Heller* and *Bruen* and all the Supreme Court said about law-abiding citizens, ordinary law-abiding responsible citizens, the 9th Circuit has broadened people -- not broadened.  Let me back

up.  I don't want to get in trouble.  The 9th Circuit says "people" means American people.

And so as to some of the arguments in the brief, I was grappling with *Perez*.  And so if I assume that these challenges are -- or fall within that portion of the 2nd Amendment, what I'm left with is the conduct.

MS. LOPEZ:  I take your point, Your Honor.  I do think that *Perez Garcia* came at the step one inquiry of whether or not the defendants were people in a different context.  So in the context of licensing, really what we are looking to do is verify who the people are, right, who are these people who are applying.  But *Perez Garcia* -- what *Perez Garcia* did not speak to, especially for this case, is the proposed conduct portion.

THE COURT:  I guess what I'm saying then -- sorry to keep cutting you off.  I guess what I'm saying is I'm grappling with where we are in the *Bruen* test and who has the burden because that may or may not be dispositive.  And the Attorney General's Office seems to be saying, well, we haven't gotten to where the Attorney General's Office or the Government has to show the historical analogues, et cetera, because the plaintiffs have not satisfied their burden of showing they fall within the 2nd Amendment.  As to the challenges being brought by the statutes by the non-residents don't they fall within the 2nd Amendment?  Doesn't their conduct in carrying anything but

an AK-47 fall within the 2nd Amendment?  And now do we -- are we at the burden shifting to the Government to show that the prohibited or the non-residency portion of the statute or the statute that says that non-residents can't even apply falls within some sort of historical analogue?

MS. LOPEZ:  Right, Your Honor.  I don't want to concede that --

THE COURT:  I'm not going to make you.

MS. LOPEZ:  -- that the proposed conduct of being able to carry a concealed weapon without a permit falls within the plain text of the 2nd Amendment.  I don't think it does.  I think California is permitted to verify various background information about the people to whom it is going to issue permits to concealed carry.  And it just logistically -- and this is addressed in various of the cases -- is not able to do that with regard to non-residents.  But I do think that the proposed conduct is the relevant part of the step one inquiry, at least for this case.

Does that answer your question?

THE COURT:  It does.  It's just that's -- in full candor, that's kind of where I'm struggling in terms of the Attorney General's portion of this issue.  Anyway, go ahead.

MS. LOPEZ:  Sure, Your Honor.  And as our briefing indicates, even if we get to step two, there is a long-standing history and tradition that we can rely on here.

So if Your Honor has concerns about the step one process or wants to assume that it's met and we get to step two, the plaintiffs still cannot prevail, especially in this preliminary phase.

Stepping back for a minute, as to the relief that is being sought here, I just did want to point out that, specifically as regards to the facial challenges to the extent there are any as to the state, the requirements at issue have been on the books for a dozen years.  So this is not a case that needs to be litigated in the preliminary injunction context.  These are long-standing requirements.  Both the residency requirement and the action for psychological testing have been California law for more than a decade.

Plaintiffs have sort of portrayed it in their briefing as new based on SB2 or new based on *Bruen*.  Well, at this point we are pretty far past *Bruen*.  In addition to that, *Heller* was long before *Bruen* itself.  So any claim that now is the time to litigate and it has to be done on a truncated schedule as to these facial challenges, as my friend for the County said, do raise novel issues, some of them, and certainly important constitutional issues, the preliminary injunction context is not the place to do that.

Plaintiffs even go a step further.  They suggest in their briefing that the Court can enter permanent relief on this record.  That is just not appropriate under these

circumstances, especially in the context of the mandatory injunction standard.

THE COURT: Then how do I deal with -- forgive me if I'm citing the wrong case. I think it was *Baird* who says, you know, once you have a constitutional violation, the irreparable harm part of it and the second part of the *Winter* test gets sort of conflated because, you know, it's a constitutional violation, and what the plaintiffs are challenging is, you know, this whole, under a variety of constitutional provisions, non-residents being able to even apply for a permit.

So does the Court really spend a lot of time thinking about how long this has been on the books if the challenge it's being presented with is now?

MS. LOPEZ: Yes, Your Honor. *Baird*, I think, reiterated the standard that has long applied in the 9th Circuit under *Winter* that there is a sliding scale and the likelihood of success is the more important of the factors. But that doesn't mean that the rest of the factors are unimportant. So especially under this mandatory injunction standard where there does need to be clear facts, clear law, where the likelihood of success, I would submit, is very low. But even if Your Honor thought it was a little higher than I did, those other factors are still going to come into play. I don't think *Baird* says otherwise. It says you have to decide

the likelihood first, sure, but it doesn't say you don't get to then look at the other factors.  Here I don't think plaintiffs would disagree with me.  They don't cite any other irreparable harm.  A constitutional violation, that's its own harm.  But they don't cite any other irreparable harm.  And the notion there is some urgency I think is just belied by the timing of this, especially as to the state.

THE COURT:  Okay.

MS. LOPEZ:  I will start just briefly with the psychological testing requirement.  Again, as to the state -- and this appears in our briefing -- we really think the main point here is that there just cannot be a facial challenge to this requirement.  The statute itself does not say how the requirement should be implemented.  And that's really what the plaintiffs appear to be complaining about in the primary section of their briefing on this issue.

If we set all of those facts aside, all we have here is the option for a licensing authority to verify someone's mental health status.

THE COURT:  Just for clarification, what you are talking about is having to drive to San Bernardino, et cetera?

MS. LOPEZ:  As to those particular facts.

THE COURT:  All right.

MS. LOPEZ:  The statute doesn't speak at all as to how the psychological testing option would be implemented.

So to the extent that there is some sort of facial challenge here, the plaintiffs cannot meet the *Salerno* standard to say there is no version of the option that could pass constitutional muster.

THE COURT: What about the argument in light of Footnote 9 in *Bruen* that this is entirely discretionary because some psychologist has to evaluate the results of the psychological testing and then make a recommendation to the Government?

MS. LOPEZ: Yes, Your Honor. And I think Footnote 9 itself speaks to that a little bit. So Footnote 9 was focused entirely on these -- the suitability determination of some special need for self-defense. And everything it said was couched in those terms.

My friend on the other side has agreed with me that *Bruen* blessed 43 other versions of licensing that didn't have that requirement. A number of those other 43 licensing schemes have requirements that arguably contain some discretion.

Now, this was presented squarely in the 2nd Circuit's *Antonyuk* opinion that is cited in our briefing. There it was a good moral character requirement as also the previous California scheme had and no longer does under SB2. But in *Antonyuk*, the 2nd Circuit upheld the good moral character requirement because -- in part because it

specifically found that some of those 43 licensing schemes blessed by *Bruen* had good moral character requirements.

So the notion that *Bruen* took away all discretion is -- is just an overread of Footnote 9.  It was speaking specifically of an extra requirement on the right that you have some special need for self-defense and having a licensing authority make that subjective determination about an added element to the 2nd Amendment, if you will.  But there are any number of other types of requirements that were included in those schemes that were considered to be just fine.

Now, I will note that the psychological testing here is not discretionary even if that's what Footnote 9 meant which, as I said, *Antonyuk* does a good job of discussing why it does not mean that.  But the psychological testing requirement here is not a licensing authority sitting down -- the Government sitting down and speaking with the candidate about the mental health.  It's a licensed psychologist.  The statute says it has to be.  And they operate under their own professional standards, their own professional guidelines, and they make a determination about somebody's mental health status.  And that is tied specifically in the statute to dangerousness, to the preventing harm to self and others.

THE COURT:  Isn't that a discretionary determination?

MS. LOPEZ:  As I said, the 2nd Amendment in

*Antonyuk* specifically found that in the context of deciding dangerousness, that a modicum of discretion is permitted, and *Bruen* itself certainly didn't speak to that.

To Your Honor's point about *Perez Garcia*, the Court in that case specifically found a tradition of disarming folks who are considered to be a danger. So, again, the dangerousness aspect of licensing, I think, is -- to the extent anything is well-settled since *Bruen*, I think that is as close as we get.

So, like I said, the point, at least as to this date, on the psychological testing is there really can't be a facial challenge here. They haven't made an effort to meet *Salerno*. And both at the threshold and at the second step of *Bruen,* there's -- there's no argument that -- there's no version of psychological testing that could pass constitutional muster.

Turning to the reciprocity claim, plaintiffs today recognize themselves that, you know, different states approach reciprocity differently. I believe Mr. Moros said that some states have only a handful of states that they recognize. There is not a challenge in every state saying that every other state has to recognize a CCW permit. It is a novel issue that, at least from what I can tell, beyond the state court opinion that Mr. Moros has cited is a new one here and, again, we don't think should be decided in a preliminary

fashion.

With regard to that claim, it's not just a 2nd Amendment claim that the plaintiffs have raised. There's privileges and immunities which -- and they also mentioned equal protection. Those are one and the same in this context, I would submit.

I also wanted to address the privileges and immunities claim briefly first. I think it's a little bit more straightforward in terms of there actually being on point circuit level precedent. So we have pointed to three circuit cases in our briefing that addressed this very issue. Now, of course, the plaintiffs say those are all pre-*Bruen*. That's true. But the privileges and immunities analysis is not impacted by *Bruen*.

So I think the 10th Circuit in *Peterson*, the 2nd Circuit in *Bach,* and the 7th Circuit in *Culp* -- those are at pages 12 to 14 of our brief -- they have the right analysis here as to privileges and immunities. And the reasoning makes sense. What the plaintiffs are asking to do here is carry a concealed weapon without the State of California being able to have any sort of monitoring of the relevant behavioral information that is listed in the criteria in the statutory scheme.

THE COURT: What about the argument that at the minimum California should at least allow out-of-state residents

to apply?

MS. LOPEZ:  Well, the concern that's raised in those cases is presented equally by that circumstance.  So if a non-resident applied for a California license and proved at the outset that they met the relevant criteria, passed the background check, the various other things that are listed in the statute, that would all be fine and good, and then they'd go back to their home state, and they may do something in their home state that would render them disqualified for a California CCW.  Now, if they were in California or a California resident when that happened, the state would learn about that, and it would be an automatic disqualification.  That's just not the same circumstance as when those things happen out of state.

THE COURT:  So talk to me about what you just argued in terms of *Bruen* and the analysis that the Court is supposed to apply.

MS. LOPEZ:  Sure.  We talked a little bit about *Bruen* step one.  Again, I think *Bruen* itself -- and I think this falls into the step one inquiry of the proposed conduct -- *Bruen* itself gave license to states to have their own CCW criteria by blessing those 43 different schemes.  So *Bruen* itself says, okay, every state can have its own criteria.  And if that's the case, then states also need to be able to monitor for that criteria.  That's a necessary assumption within the notion that states can have their own criteria.  If you can't

enforce them, then that's an empty promise.  That's sort of as to step one.

As to step two, we outline an extensive historical tradition in our briefing.  Of course, we have pointed to specific analogous historical laws.  Those appear on page 10 of the brief that both expressly and impliedly contained residency provisions.  And, again, those laws would apply in both the circumstance of recognizing an out-of-state permit and allowing a non-resident to apply.  Those laws had residency requirements just like California's.

But if we take a step back, those laws are the culmination of a broader historical tradition that goes back to the founding.  I think it's helpful in this context to look at what *Bruen* tells us about where we look to find the history and tradition to the extent it speaks to that issue at all.  There's a couple principles that it lays out.  One of them is, of course, the time frame that you look to.  *Bruen* noted both the founding and the reconstruction eras as relevant time frames.  The 9th Circuit in its post-*Bruen* opinions has declined to decide which of those two is more important as of yet, and I don't think it matters in this case anyway.  But the law, as it stands, is that you can look to both as primary founding time periods.

The other thing *Bruen* did was it focused on consistency.  So it said that historical evidence predating the

founding or reconstruction may not be illuminating if things have changed, but if there's a consistent tradition, then the fact that something comes later doesn't matter. And that's important here because the plaintiffs like to say that all of our analogues are just too late and totally irrelevant. I submit that that's not the case where the evidence is a long-standing tradition that is consistent over time.

What is the tradition we have here? Our experts have outlined that, and, of course, we included that in the briefing as well. With regard to concealed carry, the form the regulation of concealed carry has taken over time has varied, and it has sort of culminated in the sort of licensing schemes that we see today. But initially regulation of concealed carry was actually much stricter. There were outright bans on concealed carry instead of having this sort of, well, if you are a law-abiding, responsible citizen, you can have a permit to do it.

I think equally important here is those laws were local. Your experts talk about that too, about the localism of this type of regulation. So if I entered a state that had a different law than my home state on concealed carry, I had to abide by the new state's law, and that might have been a ban in the founding eras before licensing came into play. That sort of localism really was the norm.

Then as Government became more robust, more

police forces, just a bit of a more sophisticated society, the regulation of concealed carry transitioned into what we see today of more licensing type scheme.  But that doesn't mean that just because licensing of concealed carry became more prevalent around reconstruction, that it didn't grow out of some other relevant history and tradition that predated those specific licensing laws.

So if we look to concealed carry as a whole, there is that sort of long-standing tradition.  I know Mr. Moros mentioned in his view a ban on concealed carry didn't mean that someone couldn't carry openly.  Our expert Professor Rivas speaks to that.  She talks about that there were open carry restrictions in some locations as well and, also, just the sort of context of the laws that there was not a -- an extensive practice of everyday open carry like Mr. Moros would contend.

So I don't think the fact that -- again, here we're looking at concealed carry in particular.  To the extent open carry is relevant at all, the tradition there is in line with the concealed carry tradition as well.

THE COURT:  Do you have a law that you can cite to or point to that outright banned open carry or concealed carry?

MS. LOPEZ:  As to concealed carry --

THE COURT:  At the founding era.

MS. LOPEZ:  As to --

THE COURT:  Actually, just outright banned a non-resident from carrying in a state -- from one state to the other.

MS. LOPEZ:  I will submit, Your Honor, that the laws did not speak in terms of residency at that time because they were bans.  So to the extent there was a law in the books, when I entered the state, I had to abide by it.  I do not have a law to point you to today that said something like only non-residents can't carry.  There were some of those that existed in the hunting context that said non-residents cannot carry a firearm to hunt in this location.  But in terms of the bans themselves, they spoke categorically.

THE COURT:  Okay.  Anything else?

MS. LOPEZ:  I don't believe so, Your Honor, unless you have any further questions.

THE COURT:  Not at this time.

MS. LOPEZ:  Okay.

MR. LINDSAY:  Good afternoon.

THE COURT:  Good afternoon.

MR. LINDSAY:  Bruce Lindsay on behalf of La Verne Police Department and Police Chief Flores, Your Honor.

THE COURT:  Thank you.  One moment.

We have been on the record for quite some time, so I'm just checking to see.  Go ahead.

MR. LINDSAY:  Does the reporter want a break?

THE COURT:  If you go for more than, say, 15 minutes, which you shouldn't --

MR. LINDSAY:  Probably not.  I will mind my Ps and Qs, Your Honor.

THE COURT:  Okay.

MR. LINDSAY:  La Verne takes seriously its duty to ensure that when it issues a concealed carry permit or license, that the person is a law-abiding citizen or resident that is not a danger to themselves or others.

The attack, I think, as far as La Verne is concerned in this lawsuit, is as applied as opposed to any other basis.  So we need to look at two things, I believe, the source of the fees that the applicants must pay and the reason for using the facility that they do for the psychological examination.

The City did a study, and city labor, in addition to using MyCCW, the third party vendor, is a little over $135. And the City actually only charges $100, 20 percent of which is due with the application and the rest is due upon the license being granted.  That's for administration, taking prints, getting them to the DOJ for the Live Scan.

Without MyCCW, the City's calculation that it would take about 15 hours of one of their sergeants to do the processing that MyCCW does which would cost about $920 rather

59

than $398 for MyCCW and another hundred for the city.  So it did make a studied analysis of that, Your Honor.  The other fees don't go to the city.  They go to the DOJ, $93.  They go to the firearms training -- approved firearms training facility which I originally thought was 250 but apparently, looking at the website of the police department yesterday, found that was actually $175.  Then the psych course is $150 on the applicant with the City paying the other $150 of the $300 that's charged for the psychological examination.

This is not a city moneymaking endeavor.  In fact, the city didn't do this until the sheriff's department and the sheriff determined that this needed to be done by local departments, local municipalities unless they were under the sheriff's authority.  The renewal is -- that all adds up to $936, not 1,081.  The renewal is about $575.  You don't need the psych examination at that point.  The city gets $25.  MyCCW gets $348 for their work.  The DOJ gets $52 for running the Live Scan again.  And the course is $150 at that point.  So that's $575.

Looking at the cases that were cited, *Murphy versus Guerrero* was one.  It came out of the Northern Mariana Islands, I believe, district judge deciding there, that was a $1,000 excise tax.  That wasn't, hey, here are our costs and this is what we need to do to try to recoup that to some degree.  It was an excise tax to help support governmental

functions that had nothing to do with issuing permits to anybody for concealed carry or otherwise.

The *Kwong versus Bloomberg* case that was cited by plaintiffs also allowed the City to try to recoup some of its expenses in the sum of about $340 when it was only about a third of what it cost them when the rest of the state could charge no more than $10 for such permits.  So charging based on what your expenses are and nothing more is not a constitutional violation of the 2nd Amendment.  In fact, it is permitted by the Penal Code of the State of California.

The other case that was cited and relied upon is *Bullock versus Carter* in which rather high, even exorbitant, fees were charged of candidates for the primaries in Texas. Apparently for one of them it would be $8,900 in 1969, 1970 which today would be pushing $30,000 to get on the ballot. That was held to be a violation of equal protection because there was no alternative to coming up with that kind of money.

I don't know that the City would not be amenable to waiving its fee in the event of somebody claiming that they -- and proving that they had a financial difficulty that they couldn't pay the $100 to the -- it's actually 120.  Excuse me.  The other $20 is for the prints.  So it's $120.  I can't speak for the City Council or the police department, but I don't think that that would be an outrageous thing to ask of them in certain circumstances when there is some -- I can't

speak apparently -- indigency involved.

THE COURT:  Can you speak to the psych testing and La Verne's decision?

MR. LINDSAY:  Yes.  I was heading there right now.

The Penal Code Section 26190(f) allows the authority, the agency, to have a psychological examination conducted, but it specifies that it must be the facility that the agency uses for testing of its own employees, and that's what the City is doing.  It is complying with the law because that is the facility.  It's called The Counseling Team, and they're out in San Bernardino, and they have used them for quite some time.  That's for their employees and those applying to be their employees.  And they're complying with the state law and using that facility.

Actually, under the Federal Rules of Civil Procedure, you have up to 75 miles from your residence in which you may be deposed.  There are other lengthy territorial limitations like that in the code as well.  This is about 33 miles from city hall.  It is only Monday through Friday, I understand.  But this issue seems to be important enough for them to bring a federal lawsuit.  I assume they can miss one day from work to go if that was the problem.

As applied, the City is following the law.  It is doing what it is supposed to do for that, and it's even

underwriting a good portion.  There are no plans to raise the portion that comes from the applicants.  We have checked with the City.  There are no plans to do that.  In fact, my esteemed opponent brought that issue up to us, and we checked, and we're able to say there are no plans to do that.

So, Your Honor, as applied, the City is charging $120 per applicant for what it does on this.  The rest is all going to third-party providers.  And as far as the facility, it is mandated by the Penal Code that we use that facility.  There is actually talk of an RFP going out to try to find another closer, cheaper acceptable evaluation counseling facility.  I think that's going to go out this month, but that has not been done yet.

Does the Court have any questions for me?

THE COURT:  No.  Thank you.

MR. LINDSAY:  Okay.  Did I mind my Ps and Qs?

THE COURT:  Yes.

MR. LINDSAY:  Thank you so much.

MR. MOROS:  It's short, Your Honor.

THE COURT:  How short is short?

MR. MOROS:  Five to ten minutes, but not talking too fast, Your Honor.  I have the message.

THE COURT:  Yes.

MR. MOROS:  I will do my best.

So counsel for L.A. mentioned and emphasized that

*Bruen* talks about abuse and it's only purposeful abuse that would count, but that's actually not how *Bruen* defined it.  It says, when it's put towards abusive ends such as lengthy wait times and high fees that denied people the right to carry, and that's what's happened here.  These people have applied, by their own admission -- one gentleman who is one of our declarants or plaintiffs -- sorry, plaintiff -- he applied in January 2023.  That's 15 months ago.  And he hasn't even gotten his interview yet.  So it's going to be some amount of time beyond 15 months and probably approaching two years or more before he can exercise a constitutional right.

THE COURT:  What about counsel's argument -- well, the statute defines the timing of when the timing starts differently than what plaintiffs have been, you know, advancing in the brief.  When you say that so and so applied, can you speak in terms of what the real timing is based on what the statute -- how the statute defines the timing?

MR. MOROS:  Sure.  The statute defines the timing as when the application is submitted to the department.  I'm not sure why that's a point that seems to be disputed because I think we agree on that.  For example, that gentleman I just mentioned applied in January 2023, submitted his application to the department, and it's been 15 months since then, well beyond the 120-day time period.  I don't think there's actually a dispute as to that.  We think, when the application is

submitted, that's when the time period starts.

THE COURT:  Can you speak to -- I'm going to switch gears a little bit on you.  Your motion -- there's a non-residency portion of it, reciprocity versus the residency requirement.  There's a reciprocity portion of it, and there's a residency requirement.  As to this motion, what are you challenging?

MR. MOROS:  Your Honor, we believe that the full relief that is constitutionally required today is that people who have permits issued by other states should have those permits honored by California.  However, if the Court decides it is not willing to do that today, a lesser form of relief that would at least provide some relief would be at least letting them apply for a California permit.  We believe that's incomplete for the reasons I talked about earlier, all the trips to California that would require and the expense, but at least then there would be some avenue for these people to have some meaningful right to carry as part of the people that you were discussing earlier.

Now, to be clear, that doesn't mean we concede the first point which is that there is no historical tradition, none whatsoever, of completely denying non-residents of the right to carry.  Counsel on the other side spoke about concealed carry requirements, but like we have talked about, open carry was generally permitted, and not only permitted but

legally sanctioned -- we gave some examples in the briefing of what were called travelers' exceptions where someone could travel through the state of somewhere they weren't from and they would be exempt from these laws.

Granted, I realize there's argument in the briefing those were limited exceptions and once you arrived in a town, you couldn't carry, and I understand that. But California hasn't even extended that much leeway. If Plaintiff Hoover drives through California or is hiking in California and he has a firearm, he's breaking the law. He has no right to carry in this state effectively, and he can't apply for a permit either. We think that is completely historically without precedent, and that's why we should prevail on that issue.

One other point -- and I hate to jump around, Your Honor, but to bring it back to L.A. briefly, they talk about all these efforts they're going through to speed things up, and we're happy to hear that. But it seems oddly self-serving here because none of that is in the record. I believe counsel referred to a thousand permits a month now being processed. We would be overjoyed. If that's true, that would be terrific, and then they shouldn't object to this Court entering a preliminary injunction that will take effect, say, six months from now giving them one more window of time to come into compliance, one last opportunity. That would seem a fair

resolution here.

If they truly are processing that fast, then this Court should order one last opportunity for them to get their house in order and from then on they would have -- they would be ordered to comply with the 120-day limit.  And if it is true that they are processing 1,000 applications a month now, then that shouldn't be an issue.  Maybe it's not six months.  Maybe you can play with that number.  But something like that would provide some relief at least so we at least have a light at the end of the tunnel as when this situation will finally be over and people will be getting permits.  Our associational plaintiff members will be getting permits within a reasonable time frame.

Briefly just real quick on Plaintiff Velasquez, they make allegations that -- not allegations, insinuations that he didn't properly store his firearms.  Again, he did store them in the locked trunk of a car which the California Penal Code expressly defines as sufficient.  And they say maybe he didn't do that right, but he wasn't charged with any crime.  If he had stored his firearms inappropriately, that's a crime.  He could have been charged.  They chose not to.

So to now then have an investigator or CCW permit office employee say that it was reasonable to conclude it was irresponsible, I can't think of anything more subjective than that.  It is inherently subjective to say, well, even though we

didn't file charges, I think this behavior where you had firearms stolen from your car and called the police, I think that was irresponsible.  That's subjective.  That's not an objective measure.

THE COURT:  What about the measure of have you lost three firearms in a specified period of time?

MR. MOROS:  Well, he was storing those firearms appropriately, though, under California law.  I understand that SB2 created this whole new standard of losing firearms, and maybe we will challenge that one day.  But this denial was before SB2.  That law was not in effect about these three firearms.  That's new as of January 1st.

THE COURT:  What about the argument that this -- the entirety of this argument should be raised before the reviewing court, which is not me?

MR. MOROS:  The reviewing court?

THE COURT:  Isn't there an opportunity to challenge a finding by taking it to California Superior Court?

MR. MOROS:  Yes, Your Honor.  But that started on January 1st.  There was no appeals process when he was denied.

THE COURT:  Okay.

MR. MOROS:  We did cede part of our argument on the psychological exam because we acknowledged there is now an appeals process.  So for our plaintiffs going forward, if the fees are sorted out and they apply and they have to face a

psych exam, they would have that appeal, but that was not the case for Plaintiff Velasquez.

The state now on the psychological exam, they talked about what these 43 other states have done about good moral character.  What they didn't say, because they can't, is that none of these 43 other states have a psych exam.  California is the only one.  In the context of talking about what *Bruen* blessed or didn't bless, maybe there can be some reasonable disagreement.  They clearly didn't bless psych exams because those 43 states didn't have them.

THE COURT:  Didn't *Bruen* itself have a -- the particular statute at issue, didn't it have a moral character component that the Court didn't address?  It went straight to this need issue?

MR. MOROS:  Correct.  Because the good moral character wasn't squarely before the Court.  But how other circuits have defined good moral character is essentially are you a law-abiding citizen?  Would you pass a background check?  I think it was the *U.S. v. Daniels* -- I'm going to lie to you on which circuit it was.  But I believe the quote from that was "The 2nd Amendment is not just reserved to who the government deems are model citizens.  It's deemed to law-abiding citizens who objectively pass a background check."

Now, the state also says that there is no discretion here because it isn't a governmental official, but

the state can't get around the discretionary band by just outsourcing the discretion to a psychologist. That doesn't seem appropriate, and we wouldn't allow that, I don't think, in other contexts.

By the way, Your Honor, there is already, just to purchase a firearm, to possess one, there is already a mental health disqualifier. If you have been involuntarily committed, you can't buy a firearm, let alone have a carry permit. You will not pass the background check in the first place. So this is a secondary defense layered on top of something that is already prohibited.

Lastly, I will move real quick to La Verne. I believe the City's counsel said that they charge about 125 or $130 to take prints, to submit the background check, to do the interview, and then the rest is outsourced to the provider. Your Honor, that's all they have to do as objective measures. Do a background check, do an interview, accept the training course paperwork.

If the City is choosing to impose additional investigation, additional costs on itself, that shouldn't be the plaintiffs' issue. That shouldn't be up to the plaintiffs to pay for it. It would be like -- there's all sorts of precedent on parade permits in the 1st Amendment context. It would be like, if somebody wanted to do a one-person demonstration on the street corner and the City insisted that a

police detail, five people, even though it wasn't a controversial cause, had to be around him to ensure safety and then they charged him for the cost of those five police officers, yes, that is their true costs of those five police officers.  But it shouldn't have been necessary in the first place.

So when the City imposes this expensive process which other cities nearby it do not, like, again, Glendora, then that shouldn't be appropriate.  We believe they might have answered your question on what relief can be provided.  They can charge for that $135 plus the state fee, and then the applicant, of course, pays for their own cost of training and Live Scan.  And that should be the fee at least for purposes of a preliminary injunction.  We don't concede, I think, that will add up to 4- or $500.  We don't necessarily concede that's constitutional.  But it would provide relief on preliminary injunction from these fees.

I think they also questioned whether the fees are 936 or 1,081.  We came into this motion with 936.  We only got to that nearly $1,100 figure because that was in their supporting paperwork.  Their declaration said that the fee is now $1,081, not 936.  But I don't want to get hung up on that because we believe over $900 is still excessively expensive.

Finally, they talk about the reason *Murphy* was decided how it was being an excised tax.  No.  The reason the

Court in *Murphy* took issue with the $1,000 expense was because of the burden it imposed on 2nd Amendment rights.  It wasn't because it was an excised tax or because it was their reasonable costs.  It was about the fact that by charging $1,000, 2nd Amendment rights were essentially eradicated for anyone who wasn't wealthy.  That is, I think, what we are dealing with here today.  Wealthy residents of La Verne are fine.  People who want to exercise their right to self-defense but cannot afford a $1,000 fee don't have a right to carry in La Verne.

Your Honor, if you don't have any questions, we are happy to submit on that.

THE COURT:  Thank you all for your arguments.  Very helpful on a very interesting issue and case.

I'm not going to promise that I won't ask for further briefing on something.  I really have to delve in even more to the arguments that were made today as well as the case law because obviously it's an important issue and I want to get it as right as possible.  Somebody is going to be unhappy with the Court's decision, but I will do the best that I can.

I'm not going to take it under submission right away until I'm absolutely sure that I have everything that I need.  But you will hear from the Court hopefully relatively soon.

Anything further?

MR. MOROS:  Not from plaintiffs, Your Honor.
Thank you so much for your time today.

MR. CHABOT:  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

(Proceedings concluded at 3:12 p.m.)

CERTIFICATE OF OFFICIAL REPORTER


                I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

THE UNITED STATES.


                DATED THIS  29TH  DAY OF APRIL, 2024.



                /S/ MIRANDA ALGORRI

                _____
                MIRANDA ALGORRI, CSR NO. 12743, CRR
                FEDERAL OFFICIAL COURT REPORTER